# Exhibit A

Case: 1:03-cr-00978 Document #: 344-3 Filed: 12/12/05 Page 2 of 19 PageID #:1526

# COMMISSION OF INQUIRY INTO THE METHODS OF INVESTIGATION OF THE GENERAL SECURITY SERVICE REGARDING HOSTILE TERRORIST ACTIVITY*

## Chapter One: Introduction

1.1   On 31 May 1987, The Government of Israel resolved:

"That the matter of the GSS methods of interrogation regarding Hostile Terrorist Activity (HTA) is – in the wake of Criminal Appeal 124/87 (Nafsu)[1] – a subject of vital public importance at this time which requires elucidation."

Therefore the Government decided:

"To establish a Commission of Inquiry, in accordance with Sec. 1 of the Commissions of Inquiry Law, 1968,[2] regarding the investigation methods and procedures of the GSS on HTA, and the giving of testimony in court in connection with these investigations.

"The Commission will make recommendations and proposals, as it sees fit, also regarding the appropriate methods and procedures concerning these investigations in the future, while taking into account the unique needs of the struggle against Hostile Terrorist Activity."

* Following are excerpts from the English translation published by the Government Press Office in October, 1987 of Part 1 of the Commission Report. Technical alterations have been made in the translation, and footnotes have been rearranged completely, with additions and omissions. Page numbers from the authorized translation are indicated at the end of each original page in square brackets. Abbreviations used in the Report – GSS for the General Security Service, and HTA for Hostile Terrorist Activity – are used throughout the issue. The Report, when referred to in the issue, will be cited as R., followed by the page number of the authorized translation.

1   Nafsu v. Chief Military Prosecutor (1987) 41(ii) P.D. 631, 7 S.J. 263.

2   23 L.S.I. 32.

The Government also decided that:

"Because the subjects on the investigation obligate secrecy, to apply to the Commission Sec. 23 of the Commissions of Inquiry Law, with the exception of subsections (1) and (6) ... The Commission of Inquiry shall decide regarding publication of its report according to Sec. 20 of the Commissions of Inquiry Law."[3]

On 1 June 1987 the Knesset's Defence and Foreign Affairs Committee confirmed, in accordance with Sec. 23 of the law, "that the subject of the inquiry and the deliberations of the Commission of Inquiry require secrecy."

On 2 June 1987 the President of the Supreme Court, in accordance with Sec. 4(a) of the Law, appointed the undersigned, Justice (retired) Moshe Landau as Chairman of the Commission, and Judge (retired) Ya'akov Malz (currently the State Comptroller) and Major General (res.) Yitzhak Hofi as the members of the Commission. The Commission appointed Judge Alon Gillon as coordinator.[1]

. . .

1.6   Its Letter of Appointment required the Commission to deal with two subjects: the investigation methods and procedures of the GSS on Hostile Terrorist Activity, and the giving of testimony in Court regarding these

3   Sec. 23 of the Commissions of Inquiry Law, 1968 (ibid., at 36) provides:
   "Where the Government, with the approval of the Foreign Affairs and Security Committee of the Knesset, determines that the subject-matter of the inquiry, or the proceedings of the commission, requires or require secrecy, the following provisions shall apply, unless the Government, with approval as aforesaid, decides to deviate from all or part of them:
   1) A notice of the setting-up of the commission of inquiry shall not be published;
   2) the provisions of section 38 of the Penal Law (State Security, Foreign Relations and Official Secrets) Law, 5717–1957, shall apply mutatis mutandis;
   3) a person who attends before the commission under section 15 shall only be represented by an advocate authorised to act as defence counsel under section 18 of the Military Justice Law, 5715–1955;
   4) the proceedings of the commission shall be held in camera;
   5) the commission shall submit its report also to the Foreign Affairs and Security Committee of the Knesset;
   6) the commission shall not publish its report or the minutes of its proceedings".

investigations. As the ground for the appointment of the Commission, the Letter of Appointment cited the *Nafsu* case which was heard by the Supreme Court in Criminal Appeal 124/87. The exposure of the facts regarding the GSS methods of interrogation in the Supreme Court's judgment in the *Nafsu* case severely undermined the public's confidence in the GSS, and in parallel, caused immense confusion, to the point of a danger of a loss of direction, within the GSS itself. We shall note at once that those directly involved, namely GSS investigators and legal advisers and their superiors, constitute a small minority of the total GSS personnel. But because the Investigators Unit is an integral part of the GSS, the injury and the confusion spread throughout the GSS.

1.7 This was not the first shock sustained by the GSS; it was preceded by the shock of the affair known as the No. 300 Bus Affair, which was perhaps even more painful. According to our Letter of Appointment, we were not to deal with that affair, which ended on 25 June 1986 when the President pardoned eleven GSS personnel, among them members of the GSS senior personnel, followed by the resignation of most of them from the GSS, including the then head of the GSS, Mr. Avraham Bendor (Shalom). But we shall not be wrong in saying that it was the very grave failure of these persons, with respect to their criminal conspiracy to subvert the deliberations [3] of, and mislead the committees that investigated that affair, which prepared the ground for the revelations that attended the *Nafsu* affair: once confidence was so badly shaken as a result of the first affair, it was no longer possible to cover up the manifestations that were exposed in the *Nafsu* appeal.

1.8 The investigation staff of the GSS is characterized by professionalism, devotion to duty, readiness to undergo exhausting working conditions at all hours of the day and night and to confront physical danger, but above all by high inner motivation to serve the nation and the State in secret activity, with "duty being its own reward", without the public glory which comes with publicity. It is all the more painful and tragic that a group of persons like this failed severely in its behaviour as individuals and as a group. In saying this we are not referring to the methods of interrogation they employed – which are largely to be defended, both morally and legally, as will be explained below – but to the method of giving false testimony in court, a method which has now been exposed for all to see and which deserves utter condemnation. The revelation of this method increased the crisis of confidence in the GSS's moral fibre, which had begun earlier, and

it is undermining the sense of self-confidence and self-respect of every GSS officer. This evil must be eradicated, for it is a matter of life and death for us all, in the full sense of the term.

1.9 We are convinced that today, recognition of the necessity to turn a new leaf and to rehabilitate the standing of the GSS in the eyes of the public and in the eyes of its own personnel, extends to every person in the GSS, from its senior personnel, under the leadership of the current Head, to the most junior interrogator. We see a first step toward this essential catharsis of the GSS from its failings, in the disclosure of the whole truth which marked the testimony of the GSS personnel who appeared before us. They opened their hearts to us and admitted their errors without hiding anything, and we believe in the sincerity of their intentions to set straight what was twisted. The interim period in which the GSS has been awaiting the report of this Commission has lasted until today. We regard our principal function as being to guide the essential process of rehabilitation and healing with regard to the GSS activity on HTA, by integrating this vital activity into the framework of [4] the values of the rule of law which the state of Israel espouses. We hope that in this way the GSS personnel will have restored to them their inner conviction of the rightness of their way, which they require for their work, and the ability to distinguish between right and wrong, without needing the help of a legal expert at every step and turn.[5]

### Chapter Two: Description of Facts

### The Izzat Nafsu Case

2.1 Since the *Nafsu* case was posited as the point of departure for the appointment of this Commission, it is proper to open with a concise description of its main points. To this end, we must turn to the description of the facts in the Supreme Court's judgment in Criminal Appeal 124/87 of 24.5.87. This appeal was submitted by Izzat Nafsu, by leave of the President of the Supreme Court, in accordance with Sec. 440-9 of the Military Justice Law, 1955.[4] The findings of facts in the appeal were determined on the basis of the appellant's admission before the Supreme Court of facts which constitute an offence of exceeding authority to the point of impelling State security, under Sec. 73(a) of the Military Justice Law, 1955. The

---

4  9 L.S.I. 184, as amended *S.H.* (1986) no. 1183, p.172. This amendment granted appeal with leave of judgments of the Military Court to the Supreme Court.

Prosecution, for its part, agreed to have the Special Court Martial's judgment of 29.6.82 set aside, in which the appellant was also convicted of grave offences of treason, espionage, and aiding the enemy during wartime, for which he was sentenced to 18 years' imprisonment from the day of arrest, 4.1.80, and dismissed from the Army. It also agreed to have the Military Appeals Court's judgment given on 29.6.86 set aside. Instead, the Supreme Court sentenced the appellant to 24 months' imprisonment, and demoted him from lieutenant to sergeant-major. Before convicting the appellant of the offence, the Supreme Court convinced itself, on the basis of a thorough clarification that it conducted with the appellant in court, that his confession before the Court was a truthful one.

2.2   As stated in the Supreme Court's judgment, Nafsu maintained in a "trial within the trial" held concerning the confessions he gave to his interrogators in 1980, that during his interrogation, GSS interrogators committed acts of violence against him, which included pulling his hair, shaking him, throwing him to the ground, kicks, slaps and insults. He was ordered to strip and was sent to take a shower with cold water. He was prevented from sleeping for hours at a stretch, during the day but chiefly at night, and was forced to stand in the yard of the prison premises for long hours also when he was not being interrogated. He was also threatened with [6] the arrest of his mother and wife, as well as with the publication of personal information about himself that the interrogators possessed.

These allegations were denied in the testimony under oath of the interrogators, headed by the person who at that time was Head of the GSS Interrogation team which investigated Nafsu's case. The Court Martial preferred their denial over Nafsu's testimony, and after weighing the evidence, in a very detailed judgment, it accepted Nafsu's confessions as truthful and lawfully obtained, and convicted him – principally on the basis of these confessions – on all the counts of the indictment, including the smuggling of combat material for a terrorist organization from Southern Lebanon into the country.

2.3   In its Judgment, the Special Court Martial rejected Nafsu's allegations concerning violence exerted on him and threats made against him. The Judges did not desist from this belief, even though they discovered false denials by the interrogators concerning the interrogation of others, as well as concerning certain details relating to the interrogation of Nafsu himself. Nor was the Military Appeals Court impressed by the Defence's arguments, and it added a reprimand in sharp terms of the defence for daring to attack the interrogators' testimony.

2.4   Some time before the Military Appeals Court gave its Judgment, the criminal conspiracy entered into by several senior GSS personnel to obstruct the proceedings of committees investigating the bus affair which occurred on 12.4.84, was revealed. In this conspiracy, a senior GSS official, Mr. Yossi Ginnosar, acted as a "Trojan horse" on the Zorea Committee, as a committee member sitting with Maj. Gen. (res.) Zorea. This Committee submitted its report in May 1984. Afterwards, a team headed by the State Attorney Mr. Y. Blattman, was also misled, through coordinated obstruction in the form of false testimony to that team, which submitted its report in July 1985. When this disgraceful conspiracy was revealed, the doubts among GSS personnel concerning the justness of Nafsu's conviction, which had existed here and there in the GSS already beforehand, increased, and in January 1987 the new GSS Head at his initiative ordered that an internal investigation be conducted to reexamine this case. In this investigation, the [7] interrogators admitted the validity of most of Nafsu's claims in the trial concerning means of pressure exerted on him, with the exception of his contentions regarding blows and slaps. As a result, prior to the hearing of the appeal by the Supreme Court, an agreement was reached between the Chief Military Advocate, who represented the Prosecution, in the appeal and who had also investigated the case himself, and the Defence. In the agreement the Prosecution, with the concurrence of the Attorney General, agreed to annul the judgments of the first two instances, after admitting that because of the means of pressure exerted on Nafsu, it could no longer be argued that the confessions obtained from him were admissible and credible. The appellant Nafsu for his part confessed, in accordance with the agreement, to the lighter offence of which he was convicted by the Supreme Court, as noted above. The Supreme Court's decision concerning his guilt and the degree of his guilt now conclusively constitutes *res judicata*.

2.5   In the above-mentioned internal investigation, which was conducted in February 1987, Nafsu's interrogators maintained that in using means of pressure they had not gone beyond what was allowed to them in the GSS directives that existed at the time, and – what was even graver – they claimed that even in giving false testimony at the trial within the trial, in which they denied having exerted such pressures, they also had not deviated from accepted practice in the GSS, and this with the knowledge of their superiors. These contentions on the part of the interrogators drew not one word of reservation by anyone taking part in the internal investigation. With regret and shame, we must find that these claims concerning permis-

Case: 1:03-cr-00978 Document #: 344-3 Filed: 12/12/05 Page 4 of 19 PageID #:1528

sion to employ pressure, together with the related "norm" of giving false testimony in Court, were proved to us to be correct (although permission to use physical means of pressure was greatly reduced in the years since 1980, as detailed in the second part of this report). We shall elaborate on this matter below.

2.6   From these points of view, then, the proceedings in the *Nafsu* trial – and particularly the false testimony given in the trial within the trial – were no different from what occurred in other such trials in which GSS interrogators testified. Yet this should not be considered the main factor underlying the perversion of justice due to which Nafsu was imprisoned for [8] years, beyond the 24 months to which he was finally sentenced by the Supreme Court.

As will be explained below, the GSS is very scrupulous about not accepting from persons under interrogation false confessions concerning untrue facts. The aim is to obtain a true confession, using psychological pressure if need be, and sometimes even physical pressure, such as was exerted against Nafsu. Any false confession, mistakenly believed to be true, disrupts – for obvious reasons – the GSS's methods of struggle to foil Hostile Terrorist Activity. It is for this reason that a thorough comparison is made between the information obtained in a confession with information obtained from other suspects and with information in the hands of the GSS from privileged sources, which cannot be revealed to the Court.

2.7   This was not the case in the *Nafsu* affair. Here credible secret evidence was almost totally lacking, since the main witness, an informer who had provided information against Nafsu, had been termed a "dyed-in-the-wool liar" by the interrogators. He was not brought to court to testify. The only additional testimony which supported the confession of Nafsu himself, was in fact the testimony of that same informer's wife, which was accepted as reliable. For this reason Nafsu's interrogators were prepared to release him at a certain stage of the investigation. But in the end, the results of Nafsu's polygraph test – which his investigators at the time believed indicated a sense of guilt – were decisive. The trouble is that this case can serve as an example of the risks involved in unreservedly relying on the interpretation of polygraph tests, since recently the results of Nafsu's test were re-examined and it was found that due to his character, he should be considered "unexaminable" – in other words, the polygraph test proved nothing.

At the time a great deal of effort was devoted to the *Nafsu* investigation taking into consideration his status as an IDF officer accused of such severe offences of (treason and spying. Basic disagreements emerged among the eight interrogators who took part in the various stages of the investigation two of them believed that Nafsu was entirely innocent, another found that he had committed all the offences of which he was accused, the head of the team himself had doubts as to Nafsu's guilt of the most serious of the counts [9] against him: smuggling combat material into Israel. These differences are well reflected in a final, comprehensive report drawn up at the conclusion of Nafsu's interrogation. The summation was unusual in comparison with the customary procedure in GSS interrogations, since it contained no clear conclusion as to Nafsu's guilt and its degree. (These differences among the interrogators, including also the matter of interpretation of the polygraph test, exist to this day, as we learned from their statements in their testimony before us.)

In view of the differences among the interrogators, the then GSS Head decided to submit the material gathered to the Chief Military Advocate's office for a decision on whether Nafsu should be brought to trial, and on which counts. However, not all the material was submitted to the Military Advocate's office, nor was it explained to that office that a minority opinion existed regarding Nafsu's guilt in the above-mentioned final report. Only later, at the defence's demand, did the GSS submit the final report to the Court. Incomplete disclosure of this nature to the Prosecution is also regular GSS practice, and the justification advanced for that was the need for absolute compartmentalization of information, as will be evident later. The Court was critical of this "filtering" of the material submitted to the Military Advocate's Office. But this too did not suffice to shake the Court's belief in Nafsu's confessions and the version according to which he was guilty on all counts. The Prosecutor at the trial did not know about the pressures brought to bear upon Nafsu, because the GSS interrogators and legal advisers concealed these as well from the Military Advocate, in accordance with accepted practice in the GSS.

If these pressures had been revealed to the Court, it might have influenced the stand taken by the Military Prosecution and, ultimately, the Court's conclusions regarding Nafsu's guilt. In this matter, at least, the Court was misled by the GSS, through the Military Prosecution, which acted in this respect as the unwitting agent of the GSS.

2.8   To sum up: this case serves as an alarm and a warning, not only [10] because of the miscarriage of justice to Nafsu himself, but no less because

of the corruption inherent in perjury, which was exposed to the light of day and which must now be wholly eradicated.

### The Terrorist Organizations and "The Armed Struggle"

2.9  We have heard testimony and read exhaustive reviews about the development of Hostile Terrorist Activity (HTA) in the territories and in Israel. It may be said, concisely, that the objective of the terrorist organizations is the destruction of the State of Israel, by means of terrorist acts and disruption of normal life.

*Arafat's Fatah*, which began to operate in 1965, remains the veteran and dominant of the Palestinian organizations, and it is also the chief component of the "Palestinian Liberation Organization" (PLO). Fatah is the progenitor of the idea of "the armed struggle," as a systematic and methodical conception in its "Palestinian Convenant" (1968). Article 8 of the Covenant states:

"The Palestinian people is at the stage of national struggle for the liberation of its homeland. For that reason, differences between Palestinian national forces must give way to the fundamental difference that exists between Zionism and imperialism on the one hand and the Palestinian Arab people on the other. On that basis, the Palestinian masses, both as organizations and as individuals, whether in the homeland or in such places as they now live as refugees, constitute A SINGLE NATIONAL FRONT WORKING FOR THE RECOVERY AND LIBERATION OF PALESTINE THROUGH ARMED STRUGGLE."

Article 9: "ARMED STRUGGLE IS THE ONLY WAY TO LIBERATE PALESTINE. Thus it is the overall strategy, not merely a tactical phase. The Palestinian Arab people assert their absolute determination and firm resolution to continue their armed struggle and to work for an armed popular revolution for the liberation of their country and their return to it. They also assert their right to normal life [11] in Palestine and to exercise their right to self-determination and sovereignty over it." [Emphases added by the Commission.]

We must therefore see straightforwardly that as long as Fatah retains this doctrine, the path of violence remains in its view the only path. And indeed, this was stated again in the concluding political Statement of the 18th session of the Palestine National Council, held last Spring (1987) in

Algeria:

"On the basis of the Palestinian National Covenant, and out of a commitment to the resolutions of the Palestine National Council, we stress the following elements as a basis for Palestinian national action within the framework of the PLO, the sole legitimate representative of the Palestinian people."

"On the Palestinian level: continuation of the struggle in all its forms: an armed, mass and political struggle, in order to realize the national goals and to liberate the Palestinian and Arab lands from the Israeli occupation ..."

On this issue, the other Arab terrorist organizations concur with Fatah: "The Popular Front for the Liberation of Palestine," headed by George Habash, with its dogmatically Marxist ideology, and Naif Hawatmeh's "Democratic Front for the Liberation of Palestine," which recently joined the PLO, also preach the "armed struggle" in all the territory of Eretz Israel; and the same holds good for other organizations of the "Rejection Front."

2.10  This doctrine of destruction of the State and the killing of its citizens is no mere proclamation. We are witness to the fact that the terrorist organizations spend their maximum efforts to perpetrate terrorist acts on a continuous basis, in order to realize their doctrine. They draw no distinction between military and civilian targets: the "armed struggle" is conducted against every possible target. Some of them declare publicly that there is no difference between a military and a civilian target, since both serve Israel's "aggressive policy." Others disguise attacks on civilian targets with the claim that all the targets they attack are military or intelligence targets. For the purpose of "the armed struggle," the terrorist organizations have [12] perpetrated terror attacks of mass murder in public places, such as public transportation, public squares and markets, movie theaters, and bathing places.

The overwhelming majority of the acts of terrorism are planned by terrorists across the "Green Line," to be perpetrated on the territory of the State. The attacks are perpetrated with extreme brutality, indiscriminately against men, women and children; every human target serves their aim. They also deal in terrorism on an individual basis: against Jews, soldiers, security personnel and civilians, as well as against Arabs suspected by ter-

rorist organizations of collaborating with the Israeli authorities. They pursue their schemes relentlessly.

According to the method of the terrorist organizations, terror, or what they call "the armed struggle", abets the coalescence of the natural identity of the Palestinians, wherever they are. It aids in expanding the ranks of the organizations themselves with new recruits, and it is designed to undermine the morale and security of the State's population. It also underscores the presence of the organizations in the regional and international arenas. Their tactical objective is to arouse the Arab population in the territories and in Israel to violent open revolt against the State.[13]

. . .

## Description of GSS Activity

2.16 A description of the tasks and structure of the GSS we include in the second, classified, part of this Report. . . .

2.17 The GSS has always attached the utmost importance to collecting information for preventing and thwarting [HTA]. Obtaining evidence for the trial of those interrogated did not have top priority in the work of the interrogators.

A ranking GSS official who testified before the Commission put it this way:

"The network that deals with all of this is mainly a collecting system. In the end, we thought, and we still think today, that the tool of [16] interrogation is a system for collecting intelligence information. This also explains, albeit very partially and perhaps not very convincingly, why we were less interested in, or why we cared less about putting them on trial, because after catching the person responsible and solving the crime, I go on to the next stage – I go after the next suspect."

This does not mean that prosecution was shunted aside. The GSS has always considered putting terrorists on trial an important means of thwarting HTA. One of the GSS personnel described it thus in his testimony:

"From our point of view, obviously, the fact that the accused is convicted and jailed is part of the foiling process. The foiling element takes the form of the offender being 'neutralized' for the X years of his imprisonment. That is definitely foiling ..."

2.18 Basic differences exist between the essence of a police interrogation of an ordinary criminal, on the one hand, and an interrogation carried out by the GSS of persons suspected of HTA or subversive political activity, on the other. The police investigation is aimed at collecting evidence against individuals within the society, suspected of criminal offences, and its purposes are to have the accused convicted so that he will change his ways, to deter him and others from committing future crimes, and to give him the punishment he deserves. Whereas the direct goal of the GSS interrogation is to protect the very existence of society and the State against terrorist acts directed against citizens, to collect information about terrorists and their modes of organization and to thwart and prevent the perpetration of terrorist acts whilst they are still at a state of incubation, by apprehending those who carried out such acts in the past – and they will surely continue to do so in the future – and those who are plotting such acts, as well as seeking out those who guide them.

Another difference between a police investigation and one by the GSS is that when the police are trying to uncover a criminal offence, they seek to collect evidence (testimonies from witnesses, real evidence, clues left at the scene of the crime, etc.) which will further the process of finding the culprit; whilst in a GSS interrogation, the investigator does not usually possess evidence of this [17] kind: eye-witnesses to acts of terrorism, such as the murder of a Jew in an Arab area, are unwilling to assist the investigators and generally even provide cover for the perpetrators because of the local population's sympathy for and fear of the terrorists. Only rarely is the perpetrator of a terrorist act caught red-handed.

GSS interrogations in terrorist cases are hampered by the determination of those interrogated not to reveal information known to them, as the result of ideological indoctrination which includes a thorough briefing on how to cope with an interrogation, with this coping as such being considered an act of bravery by the terrorist's organization. On the other hand, there is the fear of the person under interrogation that he will be attacked while still inside the prison if he reveals information known to him, and his unwillingness to cooperate with the interrogators which is fed by the hope that he will at all events be freed from prison early in a prisoner exchange, as has happened in the past.

Under these circumstances, the interrogation of an HTA suspect by the GSS turns into a difficult confrontation between the vital need to discover what he knows, based on a well-founded assumption, usually from classified sources, and the will of the person interrogated to keep silent and con-

Case: 03-cv-09918 Document #: 344-1 Filed: 02/21/05 Page 7 of 19 PageID #:1133

ceal what he knows or to mislead the interrogators by providing false information.

2.19   From the above it emerges that every time a truthful confession is obtained from a person under interrogation, then as distinct from the majority of criminal cases which are investigated by the Police, in HTA cases submitted by the GSS to the military or civil Prosecution, the accused's confession, as taken down from him and signed by him before a police interrogator, to whom the accused is handed over following the completion of his interrogation by the GSS interrogator – is almost always the main evidence against the accused. Even if GSS interrogation personnel possess additional incriminating information against the suspect, this information often cannot serve as evidence in court, either because it is inadmissible under the laws of evidence or because the harm liable to be caused by its disclosure outweighs the benefit of bringing it before the court. Hence the [18] major importance of obtaining a truthful confession from an accused on trial for terrorist acts.

2.20 . . . [I]n the past twenty years the GSS has scored considerable achievements in protecting the State and its citizens from HTA. As for terrorist attacks that were carried out, the perpetrators were captured sooner or latter in 80–90 percent of the cases. Of the tens of thousands of interrogations carried out by the GSS during the period in question, some 50 percent were brought to trial on an annual basis. Most of the other suspects were released after the interrogation, with administrative measures such as detention, restriction, expulsion etc. taken against a minority of them whom it was impossible to bring to Court due to the secrecy of the reliable information against them. The overwhelming majority of those tried were convicted on the basis of their confession in court; as for the rest – also quite a large number – trials were held in which they pleaded not guilty and evidence was heard . . .

. . . In the second and secret part of this Report [we have included a survey of] the interrogation methods applied by the GSS to HTA suspects from 1967 onwards, and of the permission given to interrogators from time to time to employ means of pressure, including physical pressure. Summing up the description of the development throughout the years of the grant of permission to use pressure, the Commission notes that among almost all those engaged in this subject the prevailing view is that recourse to some [19] measure of physical pressure in the interrogation of HTA suspects is unavoidable. The changes which occurred regarding this topic over

the years – in the direction of both expansion and of reduction and prohibition, to the point where today the use of such means is greatly restricted – indicate soul-searching within the GSS stemming from moral inhibitions and a constant examination of the effectiveness of such methods, as against their necessity. The issue was also affected by outside complaints, by deviations from permitted methods, and by specific restrictions imposed by the political echelon . . .

### False Testimony in "Trials within a Trial"

2.22   When the accused's confession during interrogation is the main evidence against him, the accused's plea of not guilty in Court is tantamount to an allegation that his confession was obtained by improper methods, and is therefore invalid and inadmissible as evidence against him. Such an allegation necessitates the conducting of a "trial within a trial" on the admissibility of the confession. Needless to say that in such circumstances, the "trial within a trial" constitutes the essence of the trial itself, and the verdict in it is in effect a decision in the entire trial, against the accused or in his favour.

The accused's confession as submitted to the Court is set forth as an orderly document detailing the accused's name and particulars, the name and particulars of the person who took down the confession, the place and time the confession was taken down, a statement noting that the accused was informed of his right not to say anything if he so wishes, and then the accused's statement. At the bottom of the statement, the person who took it down notes that the accused said what appears in the statement voluntarily and of his own free will, that the statement was read out to the accused – and [20] translated for him, if necessary – and that the accused confirmed its accuracy with his signature.

GSS personnel have never engaged in taking down such confessions. They interrogate the accused in their interrogation premises, when the main effort is directed toward inducing the accused to show readiness to give information and in the process admit to the acts attributed to him. Once this stage has been completed successfully and the suspect is actually ready to confess, he is handed over to a police investigator who takes down his confession in accordance with the law. This confession is subsequently presented in court by the policeman who took it down, and who appears as witness for the Prosecution.

2.23   According to Sec. 12 of the Evidence Ordinance (New Version), 1971:

> "Testimony of the accused's confession to having committed an offence shall be admissible only if the Prosecutor presents testimony concerning the circumstances in which the confession was made, and the Court finds that the confession was made voluntarily and of free will."[5]

Up to the 1967 Six Days War the interrogation of Hostile Terrorist Activity (HTA) suspects, whose number was small, was conducted according to the law and the Supreme Court's decisions of that time – without recourse to any physical pressure. Likewise, in the first years following the Six Days War, the Prosecution encountered no difficulty on this matter. Concerning the circumstances of obtaining and taking down of the confession, only the policeman who engaged in this at the end of the interrogation process would be brought to court to testify. He could testify in all good faith and conscience that at the stage in which he was involved, i.e. taking down the confession, everything went smoothly and the accused indeed made his confession voluntarily and of his own free will, as required by the law. The entire interrogation procedure preceding this stage, i.e. the interrogation by GSS interrogators, would not be raised in court at all, and no GSS interrogator was called as a witness in trials within the trial.

2.24   Such was the situation until 1971, when a fundamental change [21] occurred in trials within a trial. More and more defence lawyers began resorting in Court to the argument that the confession – ostensibly made to a policeman voluntarily and of the accused's own free will – resulted from improper methods used by GSS interrogators on the accused at the previous stage. These arguments forced the Prosecution, as part of the duty incumbent on it under Sec. 12 of the said Ordinance, to call GSS interrogators as witnesses for the Prosecution in order to have them testify on the circumstances of the interrogation and the making of the confession, and thereby refute the Defence's allegation that the confession had to be rejected.

As a result, since 1971 the phenomenon of GSS interrogators appearing as witnesses for the Prosecution in trials within the trial has become common. This, in turn, led to the grave phenomenon under discussion here –

5   2 L.S.I. [N.V.] 198, at 200.

that of untruthful testimony by GSS interrogators in trials within the trial.[22]

. . .

### The Reasons for Giving False Testimony

2.37   The principal reason why GSS interrogators lied in court, during the trial within the trial, and denied applying any physical pressure whatsoever on [29] persons under interrogation, was the operative need not to expose the methods of interrogation. By its nature the GSS is a body which acts and must act, in secret and far from the public eye. To this end the GSS has imposed virtually total compartmentalization on itself and its staff. If this is so for the GSS in general, it is all the more so for the investigation unit. For a long time, varied and diverse methods of interrogation, the chief effectiveness of which lies in their secrecy, have been employed in this unit. The moment such a method is exposed and revealed, its efficacy is damaged or completely disappears. One method of interrogation is physical pressure, which interrogators regard as an interrogation tool of the utmost importance. It is the view of the unit that without this tool, effective interrogation is inconceivable. Thus, if its details are exposed, its effectiveness will disappear and serious damage will accrue to investigation work in general which has – it bears reiterating – scored many successes, both in thwarting and discovering attacks, and has saved many lives.

Hence, in order to preserve their investigative tool, i.e. absolute compartmentalization, the investigators felt that it must apply to everyone, including even the Courts. The logical continuation was to give false testimony in Court.

2.38   The second reason is directly related to the judicial process itself. We have already said that the GSS, justifiably, views the conviction of a terrorist and his imprisonment for a lengthy period as a most important preventive measure. Accordingly, the judicial process through which the terrorist is removed from the sphere of terrorist activity is one in which the GSS takes a great interest. The success of the GSS in a trial is, therefore, directly dependent on the acceptance of the accused's confession – in the majority of cases the only evidence against him – by the Courts. Revelation of the acts of physical pressure exerted in interrogations puts at risk the admissibility of the confession by the Court. Therefore the GSS concluded, and from its viewpoint this was the most logical conclusion, that the danger of having confessions rejected must be prevented by concealing the means of physical pressure from the Court, even if this entailed perjury.

Case: 1:03-cv-00978 Document #: 344-4 Filed 10/12/05 Page 10 of 19 PageID #:9133

2.39   The third reason for employing the method, and especially for its survival for such a lengthy period, has already been mentioned: it simply succeeded. For years the GSS interrogators who testified in Court received the full trust of the judges. Because of this trust, and the success of the method of false testimony, no one ever saw the need to reflect on it or search for other methods which would ensure the conviction of the guilty. [30]

### Rationalizations for Committing Perjury

2.40   Although the interrogators, in their view, had good reasons for lying in court, and although this became an accepted and continuous method, they felt very uneasy in this situation, and their conscience troubled them. This is true for at least some of them. In order to be able to continue employing this method while also being at peace with their conscience, over the years they had developed a series of rationalizations for this situation. We have extracted the following from their testimony before us:

Interrogation work for uncovering Hostile Terrorist Activity and its prevention is a sacred mission which justifies the means, any means. We the members of the GSS – as someone said – are the emissaries of the people of Israel to perform actions which the State cannot take upon itself. Here we are talking about "the cleaning of sewers" the existence of which endangers State security, and this unpleasant mission has been imposed upon us. One cannot clean sewers without dirtying oneself. We took risks just as soldiers on the front take risks.

Statements in this spirit we heard from numerous senior GSS personnel. By means of such self-justification, the criminality of perjury becomes an ideological criminality, whose central motto is that security is above the law.

2.41   The GSS personnel declared to us, with a hint of pride, that they had been extremely scrupulous in ensuring that any confession presented to the Court would be a truthful one, whatever the means used in obtaining it. Never, they explained to us, was such a confession brought before the court before it was examined and verified by other intelligence sources, including sources which could not be brought before the Court. Furthermore, there were cases where investigators had full confessions of persons under interrogation which were not presented in court, because the interrogators were uncertain about their veracity. Never, one of the investigators testified before us, did I feel that I was putting an innocent person into prison. [31]

We were convinced that this was indeed the aim of interrogations by GSS investigators. We will also emphasize here that in this respect their methods are as far as East is from West, from the notorious methods of the secret police in certain totalitarian states, where pressure is used to extract false confessions from a person under interrogation for something he did not do, in order to liquidate him later, after a staged show-trial or to send him into exile.

Because the investigators were convinced that what was said in confessions was the truth, its presentation [to the] Court was easier for them, even at the cost of perjury.

2.42   The investigators found an additional rationalization for doing what they did in the unqualified backing they received from their superiors. Within the framework of a clear and rigid hierarchy such as that of the GSS, backing "from above" is very meaningful. Naturally, it is much easier for an investigator on the witness stand to commit perjury when he knows that his action is performed not only with the knowledge, but also with the blessing of his superiors.

The investigators also found justification for their actions in the fact that, in many cases persons under interrogation exaggerated greatly in their descriptions of the physical pressure employed against them. A situation thus developed that when interrogators denied in their testimony the use of any physical pressure whatsoever, at least part of their testimony – that which related to physical pressure alleged by suspects, but not actually employed – was true. Under these conditions, it was easier – at least for the conscience – to deny also the physical pressure that had been employed.

Above all else, of course, was the principal rationalization of "no alternative." One of the GSS Chiefs told us frankly that he did not change the norm of committing perjury. and was incapable of changing it, because [32] "there is no alternative to this situation". Simply, he said, I had no other solution.[33]

. . .

### Conclusion

2.53   The picture which emerges from the above is a dismal and regrettable one: The GSS which has done and is doing work of the utmost importance in preserving Israel's security and has to its credit many outstanding achievements in this area, failed utterly, in permitting itself to violate the law systematically and for such a long period by assenting to, [39]

approving, and even encouraging the giving of false testimony in Court. The GSS top echelon failed by not comprehending that no activity in the field of security, however important and vital it may be, can place those acting above the law. It did not understand that it was entrusted with a vital task, which perhaps justifies means, but not all means, and certainly not the means of giving false testimony.

The Commission notes with satisfaction that this harmful practice has now been totally abolished.[40]

. . .

## Chapter Three: Legal and Moral Aspects [48]

. . .

### Investigative Powers of GSS Investigators on HTA Matters

3.3  As is explained in the chapter on the structure of the GSS, the GSS contains a unit whose task it is to carry out interrogations relating to HTA. Only some of this unit's personnel have been designated investigators by the Minister of Justice, on the model of appointments of police investigators, according to Sec. 2(1) of the Criminal Procedure (Evidence) Ordinance.[6] We accept the GSS interpretation that the purpose of this arrangement is to determine the obligation of a person under interrogation to reply truthfully to the questions of such an authorized investigator, as stated in Sec. 2(2) of the Ordinance; however, from this it is not to be inferred that this is the only means available to authorize a policeman or other public official (such as GSS investigators) to carry out interrogations within the ambit of his duties.[49] This was decided by the Supreme Court as far back as the Mandate period.[7] The source of this power currently resides in Sec. 17 of the Interpretation Law, 1981,[8] which vests a holder of substantive authority with the power to determine also his own work procedure, and in general the auxiliary powers required for the fulfillment of his functions. The investigator must exercise these powers subject to the limitations prescribed by law.

6  Drayton, *Laws of Palestine*, vol. 1, p. 467.
7  *Attorney General v. Hamad Muhsin Mahmud* (1946) 1 A.L.R. 674, at 676, and see also *Mizrahi v. Attorney General* (1953) 7 P.D. 415, at 421.
8  35 L.S.I. 370.

### Limitations According to Law

3.4  Legal limitations on methods of investigation may derive from criminal, civil or administrative law (including internal administrative orders binding on the investigator).

### Limitations According to Criminal Law

Sec. 277 of the Penal Law, 1977,[9] states that a public servant commits a criminal offence when he uses or directs the use of force or violence against a person for the purpose of extorting from him a confession to an offence or information relating to an offence. Also relevant are sec. 428, on blackmail by means of threats, sec. 415, on obtaining anything by deceit, sec. 416, on obtaining anything by means of a stratagem, and the sections on assault (sec. 378 *et seq.*).

### Limitations According to Civil Law

Harm inflicted physically on a suspect, or on his well-being, can amount to the tort of assault, under secs. 23 and 25 of the Civil Wrongs Ordinance (New Version).[10]

### Limitations According to Administrative Law

A GSS investigator, like any other public servant, must maintain the obligations imposed by law on administrative acts, such as the obligation not [50] to exceed the authority vested in him under the law and to wield his authority in good faith, and not for goals which are foreign to the purposes for which he was vested with his authority. In addition, the investigator must fulfil special administrative directives which have been laid down by the law for the fulfilment of his tasks. In this context, we must make special reference to the "Judges' Rules."

3.5  The Judges' Rules were received into Israeli law from English law, by way of Supreme Court rulings. They are not today, and never were in the past, in the nature of binding law the violation of which leads to unequivocal legal sanctions. This bears emphasizing, because GSS investigators of

9  L.S.I. Special volume.
10  2 L.S.I. [N.V.] 5.

Case 1:03-cr-00984-DC Document #: 344-3 Filed: 12/12/05 Page 11 of 19 PageID #:1535

various ranks who testified before us were apparently briefed to the effect that anyone who violates the Judges' Rules by so much as one iota necessarily incriminates himself, and that a confession by a suspect obtained without strict observance of the Judges' Rules must necessarily be *ipso facto* rejected; and since it is impossible to conduct an effective interrogation while completely observing the Judges' Rules, no choice remains but to violate them; hence the conclusion that a GSS interrogation must necessarily be conducted outside the framework of the law. However, this is not so: the underlying assumption of this approach is wholly misconceived.

The Judges' Rules originated in England in 1912, following an appeal by a Chief Constable to the Judges of the High Court there, that police personnel be guided how to conduct an interrogation of suspects, since contradictions had emerged in judges' comments on the obligation of the police to caution a suspect.[11] The judges acceded to this request and formulated regulations to guide the police – an exceptional case of judicial legislation outside the framework of a formal judgment.

In 1964, a new and amended version of the Judges' Rules was issued. There is no point here in going into detail. Suffice it to say that they indeed ensure the suspect's right to remain silent, about which the interrogator must inform the suspect as part of the caution administered to him. However, they also [51] provide wide scope for the interrogation of a suspect, as long as the interrogator has not decided to charge him with committing an offence.

Judicial decisions in England are to the effect that a confession not obtained in accordance with the Judges' Rules is nevertheless admissible as evidence in a trial.[12]

Our Supreme Court adopted the Judges' Rules, according to their English format, and therefore ruled along the same lines.[13] The Supreme Court has occasionally observed that the Police would do well to act in accordance with the Judges' Rules, but things have never reached the stage where a confession was thrown out because of a violation of the Rules. Instead, emphasis has always been placed on the condition that the confession must be given "of free will".[14]

11    See the Report of the Royal Commission on Criminal Procedure, 1981 (London, H.M. S.O., 1981) 153.

12    *R. v. May* (1952) 36 Cr. App. R. 91, 93; *R. v. Best* (1909) 1 K.B. 692.

13    See the leading judgments in *Ali Abdul Hadi and Muflih Za'arur v. Attorney General* (1950) 3 P.D. 13, at 33; and *Hussein Yassin v. Attorney General* (1963) 17 P.D. 1541, at 1566.

14    See Para. 3.18 below.

Concerning the suspect's right to remain silent, it bears mentioning that in various laws Israeli legislation has sanctioned directives which oblige a suspect to reply to an interrogator's questions. Therefore, the right to remain silent is not to be viewed as an inviolable principle.[15][52] . .

### Pleas in the Investigator's Defence

3.7    We return now to the topic of the limitations placed on a GSS investigator by criminal and civil law, and will set out the pleas an investigator can put forward in his defence against a criminal charge for an act or omission that he committed during an interrogation, or in a tort suit resulting therefrom.

Sec. 24(1)(a) of the Penal Law exempts from responsibility an accused who acted in obedience to an order given by a competent authority, provided that the order was not manifestly illegal. This term was interpreted in the *Kfar Kassem* case,[16] in which, as will be recalled, the Military Appeals Court affirmed Judge Halevy's striking simile at first instance that "manifestly illegal" means that any person of conscience will see a black flag saying "prohibited" flying over such an order.

3.8    In our opinion, great importance attaches to the defence of "necessity" in sec. 22 of the Penal Law, where a GSS investigator's criminal responsibility is concerned. The significance of this defence in the special context of activities designed to foil terrorist acts has not yet been considered in an Israeli court ruling. In other judicial systems, in the common law world outside it, we found a discussion of it in legal literature, but there, too, the Courts have not yet expressed their opinion on it in this context, as far as we know. This statutory provision has to be filled with interpretative content, in order to offer a response to new problems that arise in novel situations, even though the legislator may not have envisaged these problems when formulating the statutory provision.[17] In Israel, two learned authors have devoted a full discussion to the defence of necessity in general: Prof. A. Enker, in his book on *Necessity and Compulsion in*

15    See Income Tax Ordinance (New Version) (1 L.S.I. [N.V.] 145), sec. 138; Customs Ordinance (New Version) (1 L.S.I. [N.V.] 51), sec. 2; Value Added Tax Law, 1975 (30 L.S.I. 46), sec. 108; Currency Control Law, 1978 (32 L.S.I. 134), sec. 14.

16    *Ofer v. Chief Military Prosecutor* (1960) 44 P.E. 362.

17    And see *Kaufmann v. Margines* (1952) 6 P.D. 1005, at 1034.

*Penal Law,*[18] and Prof. S.Z. Feller, first in his article on "Necessity *Stricto Sensu* as a Situation Negating the Criminality of an Act",[19] and more recently in his comprehensive book, *Elements of Criminal Law.*[20][53]

3.9 Sec. 22 of the Penal Law was copied from Sec. 18 of the Criminal Law Ordinance of 1936, without any substantive change. The Mandatory legislator imported it through the Cyprus Penal Code, from the Criminal Law Digest compiled by Justice Stephen. This historical development is reviewed by Prof. Enker in his book (p. 98). Stephen explains his approach to this subject in his book, *A History of the Criminal Law of England.*[21] It is noteworthy that English jurists are divided over the very existence of a general defence based on necessity.[22] The oscillations apparent in the conclusions of various Commissions that wrestled with this problem there, one after the other, testifies to this. In 1974, a team of jurists affiliated with the Law Commission wrote an opinion favouring the introduction of such a general defence into statutory law "provided that it can be formulated in a manner that will preclude its applicability in exceptional and inappropriate cases." This reservation reflects the apprehensions that such a general defence could easily become a "disguise for anarchy," as stated by Edmund Davis L.J. in his judgment in *Southwark London Borough Council v. Williams.*[23] However, in 1974 the plenum of the Commission rejected this recommendation, in its Report on "Defences of General Application".[24] To date the last word on this subject was said in a further report, submitted to the Commission in 1985.[25] In par. 13.26 of this report (p. 120) it was proposed to leave the entire question for decision within the framework of the common law, or in other words for the decision of the Courts. Nevertheless, included in the draft Criminal Code proposed there (p. 195) is the defence of necessity for "one who performs an act which he believes is immediately necessary, in order to prevent death or serious injury to himself or others, when the danger he believes exists is of such a nature that it would have been impossible to demand of him to act otherwise."

18    (Ramat Gan, Bar-Ilan University, 1973, in Hebrew).
19    (1972) 4 *Mishpatim* 5.
20    (Jerusalem, 1987, in Hebrew) vol. 2, p. 387ff.
21    (London, Macmillan, 1882) vol. 2, p. 108ff.
22    See the discussion of this in Glanville Williams, *Textbook of Criminal Law* (London, Stevens, 2nd ed., 1983) 597ff.
23    (1971) 2 All E.R. 175, at 186.
24    Law Com. No. 83, para. 4.33 (London, H.M.S.O., 1977).
25    Law Com. No. 143 (London, H.M.S.O., 1985).

3.10   In U.S. law, the dominant view is that a general defence of necessity should be allowed, because "such a reservation, like the requirements of criminal intention, is essential for the logic and justice of all criminal prohibitions," and that the defence of necessity is designed to prevent a greater evil than that which the law which defines the offence seeks to prevent.[26]

3.11   As far as we are concerned, the determining factor is, of course, the statutory provision in sec. 22 of the Penal Law (and its parallel in the territories, in Sec. 11 of the Order on the Rules of Responsibility for an Offence),[27] which reads:

"A person may be exempted from criminal responsiblility for an act or omission if he can show that it was done or made in order to avoid consequences which could not otherwise be avoided and which would have inflicted grievous harm or injury on his person, honour or property or on the person or honour of others whom he was bound to protect or on property placed in his charge: Provided that he did no more than was reasonably necessary for that purpose and that the harm caused by him was not disproportionate to the harm avoided."

Prof. Feller comments[28] that in this section two theoretically different legal defences were intermingled, i.e., protection of others (in Prof. Feller's terminology "necessity *stricto sensu*") and self-defence. Of interest to us here is the protection of others, which the section exempts from criminal responsibility, provided three cumulative conditions have been fulfilled:
1. That the accused acted in order to prevent grievous harm to his person or honour or to the person of others whom he was bound to protect or to property placed in his charge.

26    Model Penal Code, sec. 3.02, and see p.10: "The formulation makes the actor's belief in the necessity sufficient (assuming a valid choice between evils) ... Questions of immediacy ... have bearing, of course, on the genuineness of a belief in necessity." See also the discussion of this flexible test for choosing the lesser evil in R.M. Perkins and R.M. Boyce, *Criminal Law* (New York, Foundation Press, 3rd ed., 1982) 1071.
27    Z. Priesler, ed. *Legislation in Judea and Samaria* (Jerusalem, Ktuvim, 1987, in Hebrew) 144.
28    In his aforementioned article, *supra* n. 19, and in his book, *Elements of Criminal Law, supra* n. 20.

2. That this harm could not otherwise have been avoided.[55]

3. That he did no more than was reasonably necessary for that purpose and that the harm caused thereby was not disproportionate in the circumstances of the case.

The section accords the perpetrator of the act full exemption from criminal responsibility, and does not confine itself to formal conviction with mitigation of punishment. It reflects the clash of opposing values: on the one hand, values protected by means of the prohibitions of criminal law, and on the other hand, the duty, grounded in ethical precepts, to protect one's life or bodily integrity or that of others. Like the defence of obedience to orders, according to sec. 24(1)(a), the law confronts this dilemma of: "the impossibility of reaching an absolute reconciliation between these two values purely by means of formal law, and thus it foregoes the attempt to solve the problem only by these means, and breaches, as it were, the barrier of judicial categories, and appeals to the sense of legality innate in the conscience of every human being ...", as was stated in the appeal in the *Kfar Kassem* case.[29] In other words, the law itself deviates under these circumstances from the framework of the criminal prohibitions laid down by law, for the sake of preserving a human value which is of higher importance than implementing these prohibitions.

3.12   We shall now consider the above-mentioned three conditions for the defence of necessity, as they are reflected in the interrogation of a suspect by a GSS investigator, during which the investigator performs an act or makes an omission, such as an injury to the person or well-being of the suspect, or a threat to him, which contain elements of a criminal offence from among the offences cited above (in Par. 3.4). But before this, we should discuss a fourth condition, which is not stated in Sec. 22, but which learned authors, and among them Prof. Feller,[30] suggest in order to qualify the defence of necessity: that the harm which the defendant acted to prevent must be imminent harm. Similarly, it was also stated in an opinion which the Military Advocate General wrote in 1986 concerning the interpretation of Sec. 22, that the section will apply only if obtaining immediate information from the suspect is vital for preventing injury to human life, and as an illustration he [56] mentions the case of a bomb which has just been planted in a crowded supermarket, and which is about to explode at any moment.

29   *Supra* n. 16, at 410.

30   In his book, *supra* n. 20, at 389, 400.

It bears noting here that the requirement of imminence of the danger is sometimes intermixed by authors with the requirement of immediately obtaining information from the suspect.

According to this version, then, the defence of necessity is not applicable except when, because of the time factor, the danger is liable to be realized immediately, and THEREFORE it is essential to get the information immediately from the suspect. This is not our opinion. The section itself makes no mention of such a qualification; rather it is built entirely upon the idea of "the concept of the lesser evil." Indeed the typical case of SELF-DEFENCE is against an immediate danger to the person being attacked, but this too is not a *sine qua non*: "The use of force may be immediately necessary to prevent an attack in the future."[31]

As regards the question under discussion: the harm done by violating a provision of the law during an interrogation must be weighed against the harm to the life or person of others which could occur sooner or LATER. This is the idea underlying the three conditions of Sec. 22. Prof. Paul H. Robinson of Rutgers University illustrates this choice in his monograph on *Criminal Law Defences*,[32] which contains the most complete discussion known to us on this topic. Under the heading "Lesser Evil Defence (Choice of Evils, Necessity)" he gives the following example:

"Suppose a ship's crew discovers a slow leak soon after leaving port. The captain unreasonably refuses to return to shore. The crew must mutiny in order to save themselves and the passengers. If the leak would not pose an actual danger of capsizing the vessel for two days, should its crew be forced to wait until the danger is IMMINENT, even though the disabled ship will be too far out at sea to reach shore when it is? Or should they be able to act before it is too late, even [57] though it may be several days before the danger of capsizing is present?"[33]

And as an additional example, closer in its facts to our subject:

"Consider the case of the bombmaker, X, whose construction plans require a 10-day period for building the weapon. Suppose further that the actor, D, knows that X is going to set off the bomb in a school. He also knows that X's construction plans require 10 days to build the

31   G. Williams, *op.cit. supra* n. 22, at 502.

32   (West Publishing Co., 1984) vol. 2, p. 45.

33   *Ibid.*, at 56-57.

weapon, and that police and other authorities are unavailable to intervene. Under the simple requirement that the conduct be 'necessary', the actor could trespass on X's property and abort the plan by disabling the bomb at any time, including the first day, as long as such an action was the least drastic means of preventing the project's completion. Under the 'immediately necessary' restriction, the actor would be obliged to wait until the last day, presumably until the last moment that intervention would still be effective."[34]

Here, the learned author comments that the second alternative is justified only to enable A to abandon his scheme in the meantime; however, many legislators would prefer to protect society at the cost of earlier intervention against one plotting such a scheme.

We are in accord with these remarks. They are consistent with the wording of our statutory provision in Sec. 22, which, as stated, makes no mention of any particular requirement for the imminence of the danger, but posits instead the flexible test of "the concept of the lesser evil," as in the example of the aforementioned provision in the Model Penal Code.

3.13   Regarding the first condition, the information which an interrogator can obtain from the suspect, about caches of explosive materials in the possession or knowledge of the suspect, about acts of terrorism which are about to be perpetrated, about the members of a terrorist group to which he belongs, about the headquarters of terrorist organizations inside the country or abroad, and about terrorist training camps – any such information can prevent mass killing and individual terrorist acts which are about to be [58] carried out. GSS investigators are charged with the task of protecting the citizenry against this as part of their official tasks, as stated in Sec. 22. It should be noted here that Prof. Feller maintains [35] that "a security interest of the State is not among the social values worthy to be saved from the danger of grave and immediate attack, without assuming the risk of being held accountable under the law for a crime committed in the act of rescue ..." May we remark that it is a salient security interest of the State to protect the lives of its citizens, and the duty to defend them, imposed on the State, certainly falls within the category of the need to prevent bodily harm or grievous injury, as stated in Sec. 22.

---

34    *Ibid.*, at 58.
35    *Supra* n. 20, at 399.

The proposal for the General Part of a new Penal Code which was drawn up by Prof. Feller and Dr. M. Kremnitzer following the work of a Committee headed by Justice Agranat and published in *Mishpatim*[36] maintains in Sec. 45 ("necessity of circumstances"), that a "security interest of the state" is also among the protected interests. We do not believe that this addition is required in regard to the security interest to protect the general public, for the public is composed of individuals needing protection of their lives and their bodily integrity. In addition, the State, as the framework for social existence, needs protection against the machinations of terrorist organizations aimed at undermining its foundations and destroying it.

3.14   The second condition embodied in Sec. 22 is that it was impossible to prevent the anticipated harm in any other way. It has already been explained above, in regard to GSS interrogations, that the information possessed by a member of a terrorist organization (or a member of a group of local persons which has organized at its own initiative to perpetrate acts of terrorism) cannot be uncovered except through the interrogation of persons concerning whom the GSS has previous information about their affiliation with such an organization or group; we also saw that without some such previous information the GSS does not commence the interrogation of a suspect. Without such an interrogation there is no way to get to the arms caches and explosive materials stores, the location of which is a secret known only to the [59] suspect and the members of his group – and only he can reveal information about fellow members of his group to his interrogators.

3.15   The third condition is that, for the purpose of obtaining this information, the interrogator did not do more than was reasonably necessary and did not thereby cause disproportionate harm under the circumstances. This condition should be discussed in light of "the concept of the lesser evil," with which we have dealt above. We will again begin with an extreme example, from an article by Adrian A.S. Zuckerman of Oxford University, entitled "The Right against Self-Incrimination: An Obstacle to the Supervision of Interrogation".[37] He discusses the inadmissibility of a confession obtained by beating a person interrogated, and adds:

"This is not to say that it is impossible to envisage situations where the

---

36    (1984) 14 *Mishpatim* 127ff.
37    (1986) 102 Law Quarterly Review 45.

Case 1:03-cv-09848 Document #: 244-3 Filed 12/05/05 Page 15 of 19 PageID #:1539

organs of the State may excusably resort to torture. Where it is known that a bomb has been planted in a crowded building, it is perhaps justifiable to torture the suspect so that lives may be saved by discovering its location."[38]

This is an extreme example of actual torture, the use of which would perhaps be justified in order to uncover a bomb about to explode in a building full of people. Under such circumstances, the danger is indeed imminent. However, we cited above additional examples from Prof. Robinson's monograph, in which vigorous action to prevent the danger of loss of life is also justified, even though the danger will only be realized in course of time. And indeed, when the clock wired to the explosive charge is already ticking, what difference does it make, in terms of the necessity to act, whether the charge is certain to be detonated in five minutes or in five days? The deciding factor is not the element of time, but the comparison between the gravity of the two evils – the evil of contravening the law as opposed to the evil which will occur sooner or later; and as was already stated above, weighing these two evils, one against the other, must be performed according to the concepts of morality implanted in the heart of every decent and honest person. To put it bluntly, the alternative is: are we to accept the offence of assault entailed in [60] slapping a suspect's face, or threatening him, in order to induce him to talk and reveal a cache of explosive materials meant for use in carrying out an act of mass terror against a civilian population, and thereby prevent the greater evil which is about to occur? The answer is self-evident.

3.16  Everything depends on weighing the two evils against each other. The correct test for this is what the doer of the deed reasonably believed, and not what the situation actually was.

"The determinant is in terms of belief and not actuality. It it not whether the harm avoided was in fact greater than the harm caused, but whether the defendant reasonably believed it to be so. If it were necessary to bring in extrinsic evidence to determine the actual degree of the unrelated harms, the result might be in some case, although human life was in no way involved, that defendant would be convicted for doing what any ordinary person would have done under the circumstances – and that is not acceptable."[39]

38   *Ibid.*, at n. 4.
39   Perkins and Boyce, *supra* n. 26, at 1071.

It is true that strict care must be taken, lest a breach of the structure of prohibitions of the criminal law bring about a loosening of the reins, with each interrogator taking matters into his own hands through the unbridled, arbitrary use of coercion against a suspect. In this way the image of the State as a law-abiding polity which preserves the rights of the citizen, is liable to be irreparably perverted, with it coming to resemble those regimes which grant their security organs unbridled power. In order to meet this danger, several measures must be taken: first, disproportionate exertion of pressure on the suspect is inadmissible; the pressure must never reach the level of physical torture or maltreatment of the suspect or grievous harm to his honour which deprives him of his human dignity. Second, the possible use of less serious measures must be weighed against the degree of anticipated danger, according to the information in the possession of the interrogator. Third, the physical and psychological means of pressure permitted for use by an interrogator must be defined and limited in advance, by issuing binding directives. Fourth, there must be strict supervision of the implementation in practice of the directives given to GSS interrogators. Fifth, the interrogator's superiors must react firmly and without hesitation to every deviation from the [61] permissible, imposing disciplinary punishment, and in serious cases by causing criminal proceedings to be instituted against the offending interrogator. (In the second, secret, part of this Report, these means are defined more precisely.)

3.17  Here we would like to add some words from an author, about the cruel dilemmas a State which believes in liberal principles must face in the war against terrorism which threatens its existence. Professor Paul Wilkinson of Aberdeen University, Scotland, writes in his book, *Terrorism and the Liberal State*:[40]

"... internal terrorism is after all a particularly barbaric form of unconventional war and political leaders and decision-makers may need to make tough and unpleasant decisions to safeguard the security of State and citizens ... In the final analysis terrorists are engaged in a test of will with the democratic community and its leaders." (p. 105)

"Ultimately the liberal State has no *deus ex machina* it can rely upon to rescue it from the agonizing political and moral dilemmas of waging

40   (New York, Wiley and Sons, 1977).

Case 1:03-cv-00778-mm Document 84-4 Filed: 12/17/05 Page 16 of 19 Page ID #:1540

war on terrorism. In the end each sovereign liberal state is left to shift as best it can in the constant struggle to uphold the rule of law and to protect the life and limb of its citizens."(p. 234)

## Admissibility of a Confession as Evidence in a Trial

3.18 We will now proceed to discuss the admissibility in a criminal trial of confessions obtained from persons interrogated in GSS investigations, which were conducted in accordance with the directives to which we have just referred. A clear distinction must be drawn between this subject and the subject of what is permissible and what is precluded in an interrogation: the confession obtained may fulfil the directives for conducting the interrogation, yet at the same time be rejected as evidence in criminal proceedings brought against the person who made the confession (and when the confession is the main evidence available to the Prosecution, the accused will [62] necessarily be acquitted, if the confession is rejected). On the other hand, the interrogation which brought about the confession may have been conducted in violation of directives given to the interrogator, but the Court will nevertheless accept it as valid evidence. This depends on the judicial rulings which it is for the Supreme Court to evolve, in interpreting Sec. 12 on the Evidence Ordinance, which states that the confession of an accused will be admitted only if it is proved that the confession was made "freely and voluntarily." Similarly, Sec. 477 of the Military Justice Law, 1955, states that: "A military court shall not admit the confession of an accused as evidence unless it is convinced that the accused made it of his own free will." As is well known, this provision was also imported from the rules of evidence of the English common law. The body of jurisprudence which developed in Israel around the term "freely and voluntarily," from the first days of the State until now, is wide-ranging and tortuous, and we do not intend to explore it fully here. Suffice it to say that the term "freely and voluntarily" was in the past interpreted in the spirit of English precedents, as disqualifying confessions obtained as a result of a promise made to the suspect or a threat made to harm him, if he would not talk. In addition, the concept of "freely" was imbued with a meaning which is far from its normal meaning in human discourse: that a confession be considered "free and voluntary", as long as the suspect had the freedom of choice between two possibilities: to observe his right to remain silent, or to make a confession in order to remove the pressure of the interrogation.[41] On the flexible

41   See the *Hussein Yassin* case, *supra* n. 13, at 155J.

English rule concerning the freeness of a confession, see the judgment of the House of Lords in *D.P.P v. Ping Lin.*[42]

By the way, we will mention here that whereas in Israel judicial decisions are still struggling with the legacy of English common law on the question of "free will," in England itself, the test of "free and voluntarily" has already become outmoded, due to the intervention of the legislature, in Sec. 76(2) of the Police and Criminal Evidence Act, 1984. This section disqualifies as evidence in court a confession obtained by oppression against the person confessing, or if it is made as a result of something said or done [63] which was liable to make the confession unreliable (even though the confession might be truthful). This provision was enacted following the 11th Report of the the Criminal Law Revision Committee. The term "oppression" is defined in Sec. 76(8) as including "torture, inhuman or degrading treatment and the use or threat of violence (whether or not amounting to torture)."

This innovation in statutory English law opened a new era in relation to the admissibility of confessions, and the English courts need no longer follow previous judgments concerning the "freeness" of the confession.[43]

3.19   The rulings of our Supreme Court are still formally confined to the Procrustean bed of Sec. 12 of the Evidence Ordinance. Over the years, however, the Court has gone a long way toward admitting confessions taken from accused persons by means of pressure that are far from testifying to the free will of the person confessing. A survey of this development may be found in Professor Harnon's book on the *Law of Evidence.*[44] The Military Courts in the territories are also following these precedents, without applying the proviso of Sec. 9 of the Order on Security Directives,[45] that "a Military Court is authorized to deviate from the laws of evidence for special reasons, which shall be recorded, if it seems to it just to do so." Until now, this development has crystallized, from the legal point of view, in the judgment in the case of the Mu'adi brothers.[46] In the full opinions written by the three judges who sat in that case, previous judgments are reviewed. It is true that the Court rejected the view that a confession taken

42   (1975) 3 All E.R. 175, at 182, 188.
43   See *R. v. Fulling* (1987) 2 W.L.R. 923.
44   (Jerusalem, Academic Press, 1979, in Hebrew) 248ff.
45   *Supra* n. 27, at 6.
46   *Ha'il Mu'adi v. State of Israel* (1984) 38(i) P.D. 197.

by use of excessive pressure must be disqualified without even investigating whether it is truthful – a question over which the judges disagreed in the earlier *Abu Midjem* case.[47] The court reaffirms the test of the credibility of the confession, and also adopts the earlier interpretation which equates the freedom of choice of the person interrogated with his free will.[48] Nevertheless, the judges introduce a reservation by disqualifying confessions [64] obtained by violating basic accepted values.[49] Therefore a confession obtained by physical abuse, or in a way that arouses feelings of moral repugnance, will *ipso facto* be disqualified.[50] But, says the late Supreme Court President Y. Kahan, quoting an earlier ruling, "the gravity of the offence at issue can affect the court's willingness to admit the confession given, and judicial policy on this subject may change, as the need grows to combat an increase in crime."[51]

The judgment recently given in the appeal of *Avrushmi*,[52] is in the same spirit. According to this line of thought, the court is willing to admit a confession obtained in a protracted interrogation, including interrogation at night, if there was substantive justification for continuing the interrogation,[53] and a confession obtained by means of a ruse,[54] including the use of an agent provocateur vis-à-vis the accused, will not be rejected. It may be said that at present judicial precedent allows the admissibility of a confession, even if it was obtained from the accused by means of pressure or by misleading him, as long as the interrogator did not use extreme means which contradict accepted basic values or are degrading. Other evidence obtained by means of an inadmissible confession ("the poisonous tree") is not disqualified under the law obtaining in Israel, nor has the *Miranda* ruling[55] handed down by the U.S. Federal Supreme Court, which disqualifies confessions given without a warning, been accepted here. It should be noted that from then (1966) until now, these strict requirements have been eroded there, too, on grounds of public safety.[56]

47 *Abu Midjem v. State of Israel* (1980) 34(iv) P.D. 533.
48 *Supra* n. 46, at 246-247.
49 *Ibid.*, at 224.
50 *Ibid.*, at 249-250.
51 *Ibid.*, at 248.
52 *Avrushmi v. State of Israel* (1987) 41(i) P.D. 387.
53 *Abu Amra v. State of Israel* (1980) 34(ii) P.D. 272.
54 *Supra* n. 46, at 245.
55 *Miranda v. Arizona* 384 U.S. 436 (1966).
56 *New York v. Quarles* 104 S.Ct. 2626 (1984).

The time has come for our legislature, too, to have its say on the admissibility of confessions in criminal proceedings. Two possible versions for this were proposed in Sec. 37 of the new Bill of the Law of Evidence, 1985, published by the Ministry of Justice.[57][65]

. . .

### International Conventions

3.21 We shall now briefly survey the provisions of international conventions relating to the methods of interrogation of persons suspected of terrorist activity. We do so although the State of Israel is not formally bound by these conventions. However, in the chapter of this report in which we shall submit our conclusions and recommendations, we shall take note of what they contain, with the aim of abiding by the general prohibitions they posit:

(1) Art. 5 of the Universal Declaration of Human Rights: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

(2) The International Covenant on Civil and Political Rights, which was passed by the United Nations General Assembly on 16.12.1966, reiterates Art. 5 of the above-mentioned Universal Declaration in Art. 7, adding in Art. 10(1) that "all persons deprived of their liberty shall be treated with humanity, and with respect for the inherent dignity of the human person."

(3) Similarly, the European Convention of Human Rights, which was entered into by the member-states of the Council of Europe and took effect in 1950, states in Art. 3 that:

"No one shall be subjected to torture or to inhuman or degrading treatment or punishment."

3.22 Under Art. 19, complaints about Convention violations are brought before the European Commission of Human Rights, and its decisions may be appealed in the European Court of Human Rights. A matter of special interest for us is the Judgment of the European Court of 18.1.78 on Ireland's complaint against the United Kingdom.[58] Discussed there were

57 (1986) 16 *Mishpatim* 3 and Explanatory Notes, at 26-27.
58 *Yearbook of the European Convention on Human Rights, 1978* (The Hague, Nijhoff) 602.

certain methods used by the Northern Ireland police force in its "interrogation in depth" of persons suspected of terrorism. This is how the Court describes these five methods, which were termed "techniques" of "disorientation" or "sensory deprivation".[68]

(1) Being made to stand against a wall for several hours "in a stress position", with fingers above the head, legs spread apart and standing on the toes, so that body weight is chiefly on the fingers and toes. Persons under interrogation were made to stand in this position for periods of between 6 and 15 hours.

(2) Covering the head with a bag continually, except during interrogation.

(3) Keeping persons under interrogation in a room full of a constant, loud hissing noise.

(4) Deprivation of sleep between interrogation sessions.

(5) Reducing diet and drink during interrogations.

These methods were given "high level" approval. Northern Ireland Police were briefed on their use at the Centre for British Intelligence, in a seminar held in April 1971. The European Commission on Human Rights emphasized that ill-treatment must reach a certain severe level, in order to be included in the ban contained in Art. 3 of the Convention. The Commission found that the above-mentioned methods could be construed as torture, in the sense of Art. 3. However, the Court disagreed with the Commission. It ruled that the term "torture" meant deliberate inhuman treatment causing very serious and cruel suffering," which should be branded with "a special stigma." Although the aim of the above-mentioned "techniques" was to extract confessions from those interrogated – in order to discover the names of others and to obtain information – and although they were used systematically, they did not occasion suffering of the particular intensity and cruelty implied by the term "torture," as so understood. However, these same techniques, "as applied in combination," amounted to inhuman and degrading treatment. (The words "as applied in combination" almost seem to be echoed by the Supreme Court's remarks on the *Nafsu* case, since according to the statement made by the Government's representative, "the GSS investigators went beyond the permissible, in his

opinion, in terms of the combined weight of their actions...") In other words, it remains to be [69] considered whether each of these acts separately constituted a deviation form what is permissible.

3.23 In the opinion of the European Commission of Human Rights, on complaints by a number of States against Greece, pertaining to violations of Art. 3 of the European Convention In the interrogation of political prisoners (The Greek Case), published in the 1969 Yearbook of the European Convention on Human Rights, it is stated that the Greek security forces violated the Article's provisions by their methods of interrogation. In discussing these cases, the Commission notes:

"It appears from the testimony of a number of witnesses that a certain roughness of treatment of detainees by both police and military authorities is tolerated by most detainees and even taken for granted. Such roughness may take the form of slaps or blows of the hand on the head or face."

In this context the Commission remarks that the amount of physical violence which detainees are ready to accept, as being neither cruel nor inordinate, varies between different societies, and even between different sections of them. Such distinctions between individuals seem questionable to us. At all events, the implied conclusion is that the Commission itself held that a moderate measure of physical violence of this kind does not violate the prohibition in Art. 3, relating to torture and inhuman or degrading treatment.

3.24 Article 31 of the Fourth Geneva Convention of 1949 Relative to the Protection of Civilian Persons in Time of War, the humanitarian provisions of which Israel undertook to carry out, states:

"No physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties."

This provision should be read together with Art. 5 of the Convention, which deprives a person who is under definite suspicion of activities hostile to the security of the State, or who is engaged in such activities, of the rights and [70] privileges under the Convention, to the degree that the granting of such rights harms the security of the State. Nevertheless, such persons

Case 1:03-cv-00778 Document # 244-3 Filed: 12/19/05 Page 19 of 19 PageID #:1543