Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 1 of 17 PageID #:1508

are entitled to humane treatment, and if put on trial they are entitled to a fair and regular trial. [71]

. . .

## Chapter Four: Conclusions and Recommendations

4.1   In this Chapter of the Report we have to draw our conclusions from all that has been stated above. We also consider it right to add recommendations on suitable procedures for investigations of HTA in the future, and further recommendations in which we shall point to a way out of the tangle in which the Service has become involved, so that its members, and in particular members of the Investigation Unit, may be able to overcome the feelings of distress and anxiety due to the burden of the past that weighs on them. In our Letter of Appointment we were, as it were, guided to have regard, in formulating our recommendations, "to the unique needs of the struggle against HTA." It is hardly necessary to state that we are well aware of these needs, but no less have we directed our attention to those values of law and morals without which no civilized State can exist.

4.2   Three ways exist for solving this grave dilemma between the vital need to preserve the very existence of the State and its citizens, and to maintain its character as a law-abiding State which believes in basic moral principles – for the methods of police interrogation which are employed in any given regime are a faithful mirror of the character of the entire regime.[59] And let us add here: all the more so with respect to the interrogation methods of a security service, which is always in danger of sliding towards methods practiced in regimes which we abhor.

4.3   The first way proposed is to recognize that because of crucial interests of State security, the activity of the Security Services in their war against terrorism occurs in a "twilight zone" which is outside the realm of the law, and therefore these services should be freed from the bonds of the law and must be permitted deviations from the law.

   This way must be utterly rejected. The law, which expresses the will of a free people, is the keystone for the existence of a State such as ours, which believes in values of liberty and equality. If the GSS, with its immense latent power, is not to be subject to the rule of law in its interrogations, who will [77] determine its ways in that regard? Will it be its own conductor

or will the political echelon lay down for it a legality of its own? It is easy to see that if this way is followed, control over the GSS is one day liable to fall into the hands of an unscrupulous person or group of persons, and from there to the despotism of a police state it is but a hair's breadth. If we do not preserve the rule of law zealously in this area as well, the danger is great that the work of those who assail the existence of the State from without will be done through acts of self-destruction from within, with "men devouring each other." If the GSS needs scope for its operations in addition to what the law of the land allows, the solution lies in convincing the legislator that the law should be amended, not in disregarding the existing law.

   A version slightly different from the above would have the GSS subordinate to its own quasi-legal system, parallel to but separate from the law of the land, with the GSS acting on its own by setting up internal law for itself and scrupulously preserving that internal law, through the imposition of discipline and, when the need arises, punitive sanctions, on its own personnel. We saw that this path led the GSS into an impasse from which it must extricate itself, in order to take the high road of full obedience to the laws of the State, as regards its methods of interrogation.

4.4   The second way is that of the hypocrites: they declare that they abide by the rule of law, but turn a blind eye to what goes on beneath the surface. We found an apposite description of this frame of mind in an article by Prof. Joseph W. Bishop, Jr., of Yale University on "Control of Terrorism and Insurrection: The British Laboratory Experience".[60] Referring to harsh methods of interrogation, the author says:

   "The inclination of the average, ordinarily humanitarian, Member of Parliament (or Congressman, or voter) is to tolerate the use of such methods, but only when they are 'unbeknownst' to him. Neither Parliament nor any responsible Minister was prepared explicitly to authorize the system of questioning described in the Compton Report ..."[78]

Or, in the figurative language of one of the GSS witnesses: It is convenient for the citizen to sit on the clean green grass in front of his house, while beneath him the refuse is washed away in the sewerage pipes." But the comparison is not apt. because it is impossible to isolate any one State authority

from the overall social structure, and rot in one place is liable to spread and engulf the entire structure.

4.5   There is no alternative but to opt for the third way – the truthful road of the rule of law – also where this difficult subject is concerned. The law itself must ensure a proper framework for the activity of the GSS regarding Hostile Terrorist Activity (HTA) investigations, with all their attendant problems and dilemmas. At the conclusion of our long deliberations, we are convinced that this is essential for the moral strength of Israeli society and of the GSS as a part of it, and that it is feasible, on the lines we shall describe below.

Acts of terrorism have as their aim to deprive citizens of the State of a basic right, namely the right to life and to physical integrity. Organizations which set this as their goal have no moral right to demand that the State for its part maintain towards them the usual civil rights. Nevertheless, it is incumbent upon the State and its authorities, including the GSS, to preserve humanitarian behaviour and human dignity in their treatment of terrorists, in order to uphold the credo of the State itself as a law-abiding State grounded in fundamental concepts of morality. Any infringement of these basic concepts, even as against those who would destroy the State, is liable to recoil on us by engendering internal moral corruption.

4.6   We are convinced that effective activity by the GSS to thwart terrorist acts is impossible without use of the tool of the interrogation of suspects, in order to extract from them vital information known only to them and unobtainable by other methods.

The effective interrogation of terrorist suspects is impossible without the use of means of pressure, in order to overcome an obdurate will not to disclose information and to overcome the fear of the person under interrogation that harm will befall him from his own organization, if he does reveal information.[79]

Interrogation of this kind is permissible under the law, as we interpreted it above, and we think that a confession thus obtained is admissible in a criminal trial, under the existing rulings of the Supreme Court.

4.7   The means of pressure should principally take the form of non-violent psychological pressure through a vigorous and extensive interrogation, with the use of stratagems, including acts of deception. However, when these do not attain their purpose, the exertion of a moderate measure of physical pressure cannot be avoided. GSS interrogators should be

guided by setting clear boundaries in this matter, in order to prevent the use of inordinate physical pressure arbitrarily administered by the interrogator. As is set out in detail in the Second Part of this Report, guidelines concerning such boundaries have existed in the Service ever since the scope of investigation of HTA was expanded, as required by the new situation following the Six Days War. These guidelines underwent occasional changes, generally in the direction of restrictions on the use of physical force, which were imposed from time to time at the initiative of the political echelon, until today the authorization of physical contact with the person under interrogation is extremely limited.

4.8   These instructions are at present scattered among various internal GSS instructions. They should be collected in one document. In a Chapter of this Report, which for understandable reasons will be included in the second, secret Part, we have therefore formulated a code of guidelines for GSS interrogators which define, on the basis of past experience, and with us much precision as possible, the boundaries of what is permitted to the interrogator and mainly what is prohibited to him. We are convinced that if these boundaries are maintained exactly in letter and in spirit, the effectiveness of the interrogation will be assured, while at the same time it will be far from the use of physical or mental torture, maltreatment of the person being interrogated, or the degradation of his human dignity.

We note once again that no investigation is to be opened against a person unless information exists giving reasonable grounds to suspect that he is involved in some manner in HTA, or in political subversion which is [80] prohibited by law in Israel or the territories. The GSS has always followed this rule, and it is not to be deviated from.

The code of detailed guidelines which we recommend in the Report's secret Part shall be brought annually for reappraisal before a small Ministerial Committee whose creation has already been recommended in another Report. This Committee can make whatever changes it deems fit, according to changing circumstances. Afterwards the guidelines will be made known to the Services Subcommittee of the Knesset's Defence and Foreign Affairs Committee.[81]

. . .

# Exhibit B

Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 4 of 17 PageID #:1511



## JEWISH VIRTUAL LIBRARY

# Text of Supreme Court Decision on GSS Practices

## (September 6, 1999)

## Judgment

### President A. Barak:

The General Security Service (hereinafter, the "GSS") investigates individuals suspected of committing crimes against Israel's security. Is the GSS authorized to conduct these interrogations? The interrogations are conducted on the basis of directives regulating interrogation methods. These directives equally authorize investigators to apply physical means against those undergoing interrogation (for instance, shaking the suspect and the "Shabach" position). The basis for permitting such methods is that they are deemed immediately necessary for saving human lives. Is the sanctioning of these interrogation practices legal? - These are the principal issues presented by the applicants before us.

## Background:

1. The State of Israel has been engaged in an unceasing struggle for both its very existence and security, from the day of its founding. Terrorist organizations have established as their goal Israel's annihilation. Terrorist acts and the general disruption of order are their means of choice. In employing such methods, these groups do not distinguish between civilian and military targets. They carry out terrorist attacks in which scores are murdered in public areas, public transportation, city squares and centers, theaters and coffee shops. They do not distinguish between men, women and children. They act out of cruelty and without mercy (For an in depth description of this phenomenon see the Report of the Commission of Inquiry Regarding the GSS' Interrogation Practices with Respect to Hostile Terrorist Activities headed by (ret. ) Justice M. Landau, 1987 - hereinafter, "Commission of Inquiry Report") published in the Landau Book 269, 276 (Volume 1 , 1995).

The facts presented before this Court reveal that one hundred and twenty one

Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 5 of 17 PageID #:1512

people died in terrorist attacks between 1.1.96 to 14.5.98. Seven hundred and seven people were injured. A large number of those killed and injured were victims of harrowing suicide bombings in the heart of Israel's cities. Many attacks-including suicide bombings, attempts to detonate car bombs, kidnappings of citizens and soldiers, attempts to highjack buses, murders, the placing of explosives, etc.- were prevented due to the measures taken by the authorities responsible for fighting the above described hostile terrorist activities on a daily basis. The main body responsible for fighting terrorism is the GSS.

In order to fulfill this function, the GSS also investigates those suspected of hostile terrorist activities. The purpose of these interrogations is, among others, to gather information regarding terrorists and their organizing methods for the purpose of thwarting and preventing them from carrying out these terrorist attacks. In the context of these interrogations, GSS investigators also make use of physical means. The legality of these practices is being examined before this Court in these applications.

## The Applications:

2. These applications are entirely concerned with the GSS' interrogation methods. They outline several of these methods, in detail, before us. Two of the applications are of a public nature. One of these (H.C. 5100/94) is brought by the Public Committee Against Torture in Israel. It submits that GSS investigators are not authorized to investigate those suspected of hostile terrorist activities. Moreover, they claim that the GSS is not entitled to employ those pressure methods approved by the Commission of Inquiry's Report ("the application of non-violent psychological pressure" and the application of "a moderate degree of physical pressure"). The second application (hereafter 4054/95), is brought by the Association for Citizen's Rights in Israel (ACRI) . It argues that the GSS should be instructed to refrain from shaking suspects during interrogations.

Five of the remaining applications involve specific applicants who turned to the Court individually. They each petitioned the Court to hold that the methods used against them by the GSS are illegal. Who are these applicants?

3. The applicants in H.C. 5188/96 (Wa'al Al Kaaqua and Ibrahim Abd'alla Ganimat) were arrested at the beginning of June 1996. They were interrogated by GSS investigators. They appealed to this Court (on 21-7-96) via the Center for the Defence of the Individual, founded by Dr. Lota Saltzberger. Their attorney petitioned the Court for an order *nisi* prohibiting the use of physical force against the applicants during their interrogation. The Court granted the order. The two applicants were released from custody prior to the hearing. As per their attorney's request, we have elected to continue hearing their case, in light of the importance of the issues they raise in principle.

4. The applicant in H.C. 6536/96 (Hat'm Abu Zayda), was arrested (on 21-9-95) and interrogated by GSS investigators. He turned to this Court (on 22-10-95) via of the Center for the Defence of the Individual, founded by Dr. Lota

Saltzberger. His attorney complained about the interrogation methods allegedly used against his client (deprivation of sleep, shaking, beatings, and use of the "Shabach" position). We immediately instructed the application be heard. The Court was informed that the applicant's interrogation had ended (as of 19-10-95). The information provided to us indicates that the applicant in question was subsequently convicted of activities in the military branch of the Hamas terrorist organization. He was sentenced to seventy four months in prison. The convicting Court held that the applicant both recruited and constructed the Hamas' infrastructure, for the purpose of kidnapping Israeli soldiers and carrying out terrorist attacks against security forces. It has been argued before us that the information provided by the applicant during the course of his interrogation led to the thwarting of an actual plan to carry out serious terrorist attacks, including the kidnapping of soldiers.

5. The applicant in H.C. 7563/97 (Abd al Rahman Ismail Ganimat) was arrested (on 13-11-97) and interrogated by the GSS. He appealed to this Court (24-12-97) via the Public Committee Against Torture in Israel. He claimed to have been tortured by his investigators (through use of the "Shabach" position", excessive tightening of handcuffs and sleep deprivation). His interrogation revealed that he was involved in numerous terrorist activities in the course of which many Israeli citizens were killed. He was instrumental in the kidnapping and murder of IDF soldier (Sharon Edry, of blessed memory); Additionally, he was involved in the bombing of the Cafe "Appropo" in Tel Aviv, in which three women were murdered and thirty people were injured. He was charged with all these crimes and convicted at trial. He was sentenced to five consecutive life sentences plus an additional twenty years of prison.

A powerful explosive device, identical to the one detonated at Cafe "Appropo" in Tel Aviv, was found in the applicant's village (Tzurif) subsequent to the dismantling and interrogation of the terrorist cell to which he belonged. Uncovering this explosive device thwarted an attack similar to the one at Cafe "Appropo". According to GSS investigators, the applicant possessed additional crucial information which he only revealed as a result of their interrogation. Revealing this information immediately was essential to safeguarding state and regional security and preventing danger to human life.

6. The applicant in H.C. 7628/97 (Fouad Awad Quran) was arrested (on 10-12-97) and interrogated. He turned to this Court (on 25-12-97) via the Public Committee against Torture in Israel. Before the Court, he claimed that he was being deprived of sleep and was being seated in the "Shabach" position. The Court issued an order *nisi* and held an immediate hearing of the application. During the hearing, the State informed the Court that "at this stage of the interrogation the GSS is not employing the methods alleged by the applicant against him". For this reason, no interim order was granted.

7. The applicant in H.C.1043/99 (Issa Ali Batat) was arrested (on 22-2-99) and interrogated by GSS investigators. The application, brought via the Public Committee Against Torture in Israel, argued that physical force was used against the applicant during the course of the interrogation. The Court issued an order *nisi*. While hearing the application, it came to the Court's attention

that the applicant's interrogation had ended and that he was being detained pending trial; The indictment alleges his involvement in hostile activities, the purpose of which was to harm the "area's" (Judea, Samaria and the Gaza strip) security and public safety.

## The Physical Means

8. The physical means employed by the GSS investigators were presented before this Court by the GSS investigators. The State's attorneys were prepared to present them for us behind closed doors (in camera). The applicants' attorneys were opposed to this proposal. Thus, the information at the Court's disposal was provided by the applicants and was not tested in each individual application. This having been said, the State's position, which failed to deny the use of these interrogation methods, and even offered these and other explanations regarding the rationale justifying the use of an interrogation methods or another, provided the Court with a picture of the GSS' interrogation practices.

The decision to utilize physical means in a particular instance is based on internal regulations, which requires obtaining permission from various ranks of the GSS hierarchy. The regulations themselves were approved by a special Ministerial Committee on GSS interrogations. Among other guidelines, the Committee set forth directives pertaining to the rank authorized to allow these interrogation practices. These directives were not examined by this Court. Different interrogation methods are employed depending on the suspect, both in relation to what is required in that situation and to the likelihood of obtaining authorization. The GSS does not resort to every interrogation method at its disposal in each case.

## Shaking

9. A number of applicants (H.C. 5100/94; H.C. 4054/95; H.C. 6536/95) claimed that the shaking method was used against them. Among the investigation methods outlined in the GSS' interrogation regulations, shaking is considered the harshest. The method is defined as the forceful shaking of the suspect's upper torso, back and forth, repeatedly, in a manner which causes the neck and head to dangle and vacillate rapidly. According to an expert opinion submitted in one of the applications (H.C. (motion) 5584/95 and H.C. 5100/95), the shaking method is likely to cause serious brain damage, harm the spinal cord, cause the suspect to lose consciousness, vomit and urinate uncontrollably and suffer serious headaches.

The State entered several countering expert opinions into evidence. It admits the use of this method by the GSS. To its contention, there is no danger to the life of the suspect inherent to shaking; the risk to life as a result of shaking is rare; there is no evidence that shaking causes fatal damage; and medical literature has not to date listed a case in which a person died directly as a result of having been only shaken. In any event, they argue, doctors are present in all interrogation compounds, and instances where the danger of medical damage presents itself are investigated and researched.

All agree that in one particular case (H.C. 4054/95) the suspect in question expired after being shaken. According to the State, that case constituted a rare exception. Death was caused by an extremely rare complication resulting in the atrophy of the neurogenic lung. In addition, the State argues in its response that the shaking method is only resorted to in very particular cases, and only as a last resort. The interrogation directives define the appropriate circumstances for its application and the rank responsible for authorizing its use. The investigators were instructed that in every case where they consider resorting to shaking, they must probe the severity of the danger that the interrogation is intending to prevent; consider the urgency of uncovering the information presumably possessed by the suspect in question; and seek an alternative means of preventing the danger. Finally, the directives respecting interrogation state, that in cases where this method is to be used, the investigator must first provide an evaluation of the suspect's health and ensure that no harm comes to him. According to the respondent, shaking is indispensable to fighting and winning the war on terrorism. It is not possible to prohibit its use without seriously harming the GSS' ability to effectively thwart deadly terrorist attacks. Its use in the past has lead to the thwarting of murderous attacks.

## Waiting in the "Shabach" Position

10. This interrogation method arose in numerous applications (H.C. 6536/95, H.C. 5188/96, H.C. 7628/97). As per applicants' submission, a suspect investigated under the "Shabach" position has his hands tied behind his back. He is seated on a small and low chair, whose seat is tilted forward, towards the ground. One hand is tied behind the suspect, and placed inside the gap between the chair's seat and back support. His second hand is tied behind the chair, against its back support. The suspect's head is covered by an opaque sack, falling down to his shoulders. Powerfully loud music is played in the room. According to the affidavits submitted, suspects are detained in this position for a prolonged period of time, awaiting interrogation at consecutive intervals.

The aforementioned affidavits claim that prolonged sitting in this position causes serious muscle pain in the arms, the neck and headaches. The State did not deny the use of this method before this Court. They submit that both crucial security considerations and the investigators' safety require tying up the suspect's hands as he is being interrogated. The head covering is intended to prevent contact between the suspect in question and other suspects. The powerfully loud music is played for the same reason.

## The "Frog Crouch"

11. This interrogation method appeared in one of the applications (H.C. 5188/96). According to the application and the attached corresponding affidavit, the suspect being interrogated was found in a "frog crouch" position. This refers to consecutive, periodical crouches on the tips of one's toes, each lasting for five minute intervals. The State did not deny the use of this method, thereby prompting Court to issue an order *nisi* in the application where this method was alleged. Prior to hearing the application, however, this interrogation practice ceased.

Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 9 of 17 PageID #:1516

## Excessive Tightening of Handcuffs

12. In a number of applications before this Court (H.C. 5188/96; H.C. 7563/97), various applicants have complained of excessive tightening of hand or leg cuffs. To their contention, this practice results in serious injuries to the suspect's hands, arms and feet, due to the length of the interrogations. The applicants invoke the use of particularly small cuffs, ill fitted in relation to the suspect's arm or leg size. The State, for its part, denies any use of unusually small cuffs, arguing that those used were both of standard issue and properly applied. They are, nonetheless, prepared to admit that prolonged hand or foot cuffing is likely to cause injuries to the suspect's hands and feet. To the State's contention, however, injuries of this nature are inherent to any lengthy interrogation.

## Sleep Deprivation

13. In a number of applications (H.C. 6536/96; H.C. 7563/97; H.C. 7628/97) applicants have complained of being deprived of sleep as a result of being tied in the "Shabach" position, being subjected to the playing of powerfully loud music, or intense non-stop interrogations without sufficient rest breaks. They claim that the purpose of depriving them of sleep is to cause them to break from exhaustion. While the State agrees that suspects are at times deprived of regular sleep hours, it argues that this does not constitute an interrogation method aimed at causing exhaustion, but rather results from the prolonged amount of time necessary for conducting the interrogation.

## Applicants' Arguments

14. Before us lie a number of applications. Different applicants raise different arguments. In principle, all the applications raise two essential arguments: First, they submit that the GSS is never authorized to conduct interrogations. Second, they argue that the physical means employed by GSS investigators not only infringe upon the human dignity of the suspect undergoing interrogation, but in fact constitute criminal offences. These methods, argue the applicants, are in violation International Law as they constitute "Torture," which is expressly prohibited under International Law. Thus, the GSS investigators are not authorized to conduct these interrogations. Furthermore, the "necessity" defence which, according to the State, is available to the investigators, is not relevant to the circumstances in question. In any event, the doctrine of "necessity" at most constitutes an exceptional *post factum* defence, exclusively confined to criminal proceedings against investigators. It cannot, however, by any means, provide GSS investigators with the preemptory authorization to conduct interrogations *ab initio*. GSS investigators are not authorized to employ any physical means, absent unequivocal authorization from the Legislator pertaining to the use of such methods and conforming to the requirements of the Basic Law: Human Dignity and Liberty. There is no purpose in engaging in a bureaucratic set up of the regulations and authority, as suggested by the Commission of Inquiry's Report, since doing so would merely regulate the torture of human beings.

We asked the applicants' attorneys whether the "ticking time bomb" rationale was not sufficiently persuasive to justify the use of physical means, for instance, when a bomb is known to have been placed in a public area and will undoubtedly explode causing immeasurable human tragedy if its location is not revealed at once. This question elicited a variety of responses from the various applicants before the Court. There are those convinced that physical means are not to be used under any circumstances; the prohibition on such methods to their mind is absolute, whatever the consequences may be. On the other hand, there are others who argue that even if it is perhaps acceptable to employ physical means in most exceptional "ticking time bomb" circumstances, these methods are in practice used even in absence of the "ticking time bomb" conditions. The very fact that, in most cases, the use of such means is illegal provides sufficient justification for banning their use altogether, even if doing so would inevitably absorb those rare cases in which physical coercion may have been justified. Whatever their particular views, all applicants unanimously highlight the distinction between the ability to potentially escape criminal liability *post factum* and the granting of permission to use physical means for interrogation purposes *ab initio*.

## The State's Arguments

15. The position of the State is as follows: The GSS investigators are duly authorized to interrogate those suspected of committing crimes against Israel's security. This authority emanates from the government's general and residual (prerogative) powers (Article 40 of the Basic Law: the Government). Similarly, the authority to investigate is equally bestowed upon every individual investigator by virtue of article 2(1) of the Criminal Procedure Statute (Testimony) and the relevant accessory powers. With respect to the physical means employed by the GSS, the State argues that these do not violate International Law. Indeed, it is submitted that these methods cannot be qualified as "torture," "cruel and inhuman treatment" or "degrading treatment," that are strictly prohibited under International Law. Instead, the practices of the GSS do not cause pain and suffering, according to the State's position.

Moreover, the State argues that these means are equally legal under Israel's internal (domestic) law. This is due to the "necessity" defence outlined in article 34(11) of the Penal Law (1977). Hence, in the specific cases bearing the relevant conditions inherent to the "necessity" defence, GSS investigators are entitled to use "moderate physical pressure" as a last resort in order to prevent real injury to human life and well being. Such "moderate physical pressure" may include shaking, as the "necessity" defence provides in specific instances. Resorting to such means is legal, and does not constitute a criminal offence. In any case, if a specific method is not deemed to be a criminal offence, there is no reason not to employ it even for interrogation purposes. As per the State's submission, there is no reason for prohibiting a particular act, in specific circumstances, *ab initio* if it does not constitute a crime. This is particularly true with respect to the GSS investigators' case, who, according to the State, are after all responsible for the protection of lives and public safety. In support of their position, the State notes that the use of physical means by GSS investigators is most unusual and is only employed as a last resort in very

Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 11 of 17 PageID #:1518

extreme cases. Moreover, even in these rare cases, the application of such methods is subject to the strictest of scrutiny and supervision, as per the conditions and restrictions set forth in the Commission of Inquiry's Report. This having been said, when the exceptional conditions requiring the use of these means are in fact present, the above described interrogation methods are fundamental to saving human lives and safeguarding Israel's security.

## The Commission of Inquiry's Report

16. The GSS' authority to employ particular interrogation methods, and the relevant law respecting these matters were examined by the Commission of Inquiry (whose report was published, as mentioned, in the Landau Book (1995) Volume 1 at 269). The Commission, appointed by the government by virtue of the Commission of Inquiry Statute (1968), considered the GSS' legal status [among other issues]. Following a prolonged deliberation, the Commission concluded that the GSS is authorized to investigate those suspected of hostile terrorist acts, even in absence of express statutory regulation of its activities, in light of the powers granted to it by specific legislation and the government's residual (prerogative) powers, outlined in the Basic Law: the Government (article 29 of the old statute and article 40 of the new version). In addition, the power to investigate suspects, granted to investigators by the Minister of Justice as per article 2(1) of the Statute of Criminal Procedure [Testimony], equally endows the GSS with the authority to investigate (*supra*, p.301 and following). Another part of the Commission of Inquiry's Report deals with, "the investigator's potential defences" (defences available to the investigator). With regards to this matter, the Commission concluded that in cases where the saving of human lives necessarily requires obtaining certain information, the investigator is entitled to apply both psychological pressure and "a moderate degree of physical pressure" (*supra*, at 328). Thus, an investigator who, in the face of such danger, applies that specific degree of physical pressure, which does not constitute abuse or torture of the suspect, but is instead proportional to the danger to human life, can avail himself of the "necessity" defence, in the face of potential criminal liability. The Commission was convinced that its conclusions to this effect were not in conflict with International Law, but instead reflect an approach consistent with both the Rule of Law and the need to effectively safeguard the security of Israel and its citizens.

The Commission approved the use of, " a moderate degree of physical pressure" with various stringent conditions including directives that were set out in the second (and secret) part of the Report, and for the supervision of various elements both internal and external to the GSS. The Commission's recommendations were duly approved by the government.

## The Applications

17. A number of applications dealing with the application of physical force by the GSS for interrogation purposes have made their way to this Court throughout the years (See, for example, H.C. 7964/95 *Billbissi v. The GSS* (unpublished); H.C. 8049/96 *Hamdan v. The GSS* (unpublished); H.C. 3123/94

Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 12 of 17 PageID #:1519

*Atun v. The Head of the GSS* (unpublished); H.C. 3029/95 *Arquan v. The GSS* (unpublished); H.C. 5578/95 *Hajazi v. The GSS* (unpublished)). An immediate hearing was ordered in each of these cases. In most, the State declared that the GSS does not employ physical means. As a result, the applicants requested to withdraw their applications. The Court accepted these motions and informed the applicants of their right to set forth a complaint if physical means were or are in fact being used against them (See H.C. 3029/95 *supra.*). Only a in a minority of complaints did the State did not issue the above mentioned notice. In other instances, an interim order was issued. At times, the Court noted that, "we (the Court) did not receive any information regarding the interrogation methods which the respondent (generally the GSS) seeks to employ and we did not take any position with respect to these methods" ( See H.C. 8049/96 *Hamdan v. The GSS* (unpublished). In a different case, the Court noted that, "[T]he annulment of the interim order does not in any way constitute permission to employ methods that do not conform to the law and binding directives" (In H.C. 336/96; In H.C. 7954/95 *Billbissi v. The GSS* (unpublished)).

Until now, therefore, the Court did not actually decide the issue of whether the GSS is permitted to employ physical means for interrogation purposes in circumstances outlined by the defence of "necessity". Essentially, we did not do so due to the fact that it was not possible for the Court to hear the sort of arguments that would provide a complete normative picture, in all its complexity. At this time, by contrast, a number of applications before us have properly laid out (both orally and in writing) complete arguments from sides' respective attorneys. For this we thank them.

Although the various applications are somewhat distinct in that some are rather general or theoretical while others are quite specific, we have decided to deal with them, since above all we seek to clarify (uncover) the state of the law in this most complicated question. To this end, we shall begin by addressing the first issue- namely, are GSS investigators generally authorized to conduct interrogations. We shall then proceed to examine whether a general power to investigate would potentially sanction the use of physical means- including mental suffering-the likes of which the GSS employs. Finally, we shall probe the circumstances under which the above mentioned methods are immediately necessary to rescue human lives and whether these circumstances justify endowing GSS investigators with the authority to employ physical interrogation methods.

## The Authority to Interrogate

18. The term "interrogation" takes on various meanings in different contexts. For the purposes of the applications before the Court at present, we refer to the asking of questions which seek to elicit a truthful answer (subject to the limitations respecting the privilege against self-incrimination; See article 2 of the Criminal Procedure Statute [Testimony ]). Generally, the investigation of a suspect is conducted at the suspect's place of detention. An interrogation inevitably infringes upon the suspect's freedom, even if physical means are not used. Indeed, undergoing an interrogation infringes on both the suspect's

dignity and his individual privacy. In a state adhering to the Rule of Law, interrogations are therefore not permitted in absence of clear statutory authorization, be it through primary legislation or secondary legislation, the latter being explicitly rooted in the former. This essential principle is expressed by the Legislator in the Criminal Procedure Statute (Powers of Enforcement-Detention - 1996) which states as follows:

"Detentions and arrests shall be conducted only by law or by virtue of express statutory authorization for this purpose" (article 1(a)).

Hence, the statute and regulations must adhere to the requirements of the Basic Law: Human Dignity and Liberty (see article 8 of the Basic Law). The same principle applies to interrogations. Thus, an administrative body, seeking to interrogate an individual- an interrogation being defined as an exercise seeking to elicit truthful answers , as opposed to the mere asking of questions as in the context of an ordinary conversation- must point to the explicit statutory provision which legally empowers it. This is required by the Rule of Law (both formally and substantively). Moreover, this is required by the principle of administrative legality. "If an authority (government body) cannot point to a statute from which it derives its authority to engage in certain acts, that act is *ultra vires* (beyond its competence) and illegal.". (See I. Zamir, *Administrative Authority* (1996) at 50; See also B. Bracha, *Administrative Law* (Vol. 1, 1987) at 25).

19. Does a statute, authorizing GSS investigators to carry out interrogations (as we defined this term above) exist? A specific instruction, dealing with GSS agents, in their investigating capacity was not found. "The Service's status, its function and powers are not in fact outlined in any statute addressing this matter" (Commission of Inquiry's Report, *supra*, at 302). This having been said, the GSS constitutes an integral part of the executive branch. The fact that the GSS forms part of the executive branch is not in itself sufficient to invest it with the authority to interrogate. It is true that the government does possess residual or prerogative powers, defined as follows:

> "The Government is authorized to perform in the name of the State and subject to any law, all actions which are not legally incumbent on another authority." (Article 40, Basic Law: The Government).

However, we are not to conclude from this provision the authority to investigate, for our purposes. As mentioned, the power to investigate infringes on a person's individual liberty. The government's residual (prerogative) powers authorize it to act whenever there is an "administrative vacuum" (See H.C. 2918/93 *The City of Kiryat Gatt v. The State of Israel and others*, 37 (5) P.D. 832 at 843).

A so called "administrative vacuum" of this nature does not appear in the case at bar, as the relevant field is entirely occupied by the principle of individual freedom. Infringing upon this liberty therefore requires specific directives, as insisted upon by President Shamgar:

Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 14 of 17 PageID #:1521

"There are activities which do not fall within the government's powers or scope. Employing them, absent statutory authorization, runs contrary to our most basic normative understanding, an understanding which emanates from our system's very [democratic] character. Thus, it is respecting basic rights that forms part of our positive law, whether they have been spelled out in a Basic Law or whether this has yet to be done. Thus, the government is not endowed with the capacity to, for example, shut down a newspaper on the basis of an administrative decision, absent explicit statutory authorization to this effect, irrespective of whether a Basic Law expressly protects freedom of expression; An act of this sort would undoubtedly run contrary to our basic understanding regarding human liberty and the [democratic] nature of our regime, which provides that liberty may only be infringed upon by virtue of explicit statutory authorization...Hence, freedom of expression, a basic right, forms an integral part of our positive law, creates an exception binding the executive (branch) and does not allow it to stray from the prohibition respecting guaranteed human liberty, absent statutory authorization" (In H.C. 5128/94 *Federman v. The Minister of Police*, 48(5) P.D. 647 at 652.).

In a similar vein, Professor Zamir has noted:

"While allowing the government to act, article 40 of the Basic Law: The Government (article 29 to the old Basic Law) simultaneously subjects it to the law. Clearly, this exception precludes the government from acting in a manner contrary to statutory directives. Moreover, it prevents the government from infringing upon individuals' basic rights. This is of course all the more true respecting specific rights protected explicitly by the Basic Laws Human Dignity and Liberty and Freedom of Occupation. Notwithstanding, this is also the case for human rights not specifically enumerated in the Basic Laws. For instance, article 29 (now article 40) does not in any way authorize the government to limit freedom of expression... Indeed, article 29 "(now 40) merely endows the administrative authority with general executive powers that cannot serve to directly infringe upon human rights, unless there is explicit or implicit statutory authorization for doing so" (I. Zamir, *Administrative Authority* (vol. 1, 1996) at 337).

Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 15 of 17 PageID #:1522

This is the law relevant to the case at bar. An individual's liberty is not to be the object of an interrogation- this is a basic liberty under our constitutional regime. There are to be no infringements on this liberty absent statutory provisions which successfully pass constitutional muster. The government's general administrative powers fail to fulfill these requirements. Indeed, when the Legislator sought to endow the GSS with the power to infringe upon a person's individual liberty, he proceeded to legislate specific provisions accordingly. Thus, for instance, it is stipulated that the head of a security service, under special circumstances, is authorized to allow for the secret monitoring of telephone conversations (See article 5 of the Secret Interception of Communication Statute-1979; Compare article 19(3)(4) of the Protection of Privacy Statute-1981). This requires that the following question be asked: Does there exist a special statutory instruction endowing GSS investigators with interrogating powers?

20. A specific statutory provision authorizing GSS investigators to conduct interrogations does not exist. While it is true that various interrogation directives, some with ministerial approval, followed the Commission of Inquiry's Report, these do not satisfy the requirement that the authority flow directly from statute or from explicit statutory authorization. The directives set out following the Inquiry Commission's Report merely constitute internal regulations. Addressing these directives, Justice Levin opined:

"Clearly, these directives are not to be understood as being tantamount to a "statute", as defined in article 8 of the Basic Law: Human Dignity. They are therefore be struck down if they are found not to conform to it" (H.C. 2581/91 *Salhat v. The State of Israel*, 47(4) P.D. 837, at 845).

From where then, do the GSS investigators derive their interrogation powers? The answer is found in article 2(1) of the Criminal Procedure Statute [Testimony] which provides (in its 1944 version, as amended):

"A police officer, of or above the rank of inspector, or any other officer or class of officers generally or specially authorized in writing by the Chief Secretary to the Government, to hold enquiries into the commission of offences, may examine orally any person supposed to be

acquainted with the facts and circumstances of any offence in respect whereof such officer or police or other authorized officer as aforesaid is enquiring, and may reduce into writing any statement by a person so examined."

It is by virtue of the above provision that the Minister of Justice particularly authorized the GSS investigators to conduct interrogations regarding the commission of hostile terrorist activities. It has been brought to the Court's attention that in the authorizing decree, the Minister of Justice took care to list the names of those GSS investigators who were authorized to conduct secret interrogations with respect to crimes committed under the Penal Law-1977, the Prevention of Terrorism Statute-1948, the (Emergency) Defence Regulations-1945, The Prevention of Infiltration Statute (Crimes and Judging)-1954, and crimes which are to be investigated as per the Emergency Defence Regulations (Judea, Samaria and the Gaza strip- Judging in Crimes and Judicial Assistance-1967). It appears to us - and we have heard no arguments to the contrary- that the question of the GSS' authority to conduct interrogations can thus be resolved. By virtue of this authorization, GSS investigators are tantamount to police officers in the eyes of the law. If this solution is appropriate, is there not place for regulating the GSS investigators' powers by statute? We shall express an opinion on the matter at this time.

## The Means Employed for Interrogation Purposes

21. As we have seen, the GSS investigators are endowed with the authority to conduct interrogations (See par. 20, *supra*). What is the scope of these powers and do they encompass the use of physical means in the course of the interrogation in order to advance it? Can use be made of the physical means presently employed by GSS investigators (such as shaking, the "Shabach" position, and sleep deprivation) by virtue of the investigating powers given the GSS investigators? Let us note that the State did not argue before us that all the means employed by GSS investigators are permissible by virtue of the

Case: 1:03-cr-00978 Document #: 344-4 Filed: 12/12/05 Page 17 of 17 PageID #:1524

"law of interrogation" per se. Thus, for instance, the State did not make the argument that shaking is permitted simply because it is an "ordinary" investigator's method in Israel. Notwithstanding, it was argued before this Court that some of the physical means employed by the GSS investigators are permitted by the "law of interrogation" itself. For instance, this is the case with respect to some of the physical means applied in the context of waiting in the "Shabach" position: the placing of the head covering (for preventing communication between the suspects); the playing of powerfully loud music (to prevent the passing of information between suspects); the tying of the suspect's hands to a chair (for the investigators' protection) and the deprivation of sleep, as deriving from the needs of the interrogation. Does the "law of interrogation" sanction the use of physical means, the like used in GSS interrogations?

22. An interrogation, by its very nature, places the suspect in a difficult position. "The criminal's interrogation," wrote Justice Vitkon over twenty years ago, "is not a negotiation process between two open and fair vendors, conducting their business on the basis of maximum mutual trust" (Cr. A 216/74 *Cohen v The State of Israel*) 29(1) P.D. 340 at 352). An interrogation is a "competition of minds", in which the investigator attempts to penetrate the suspect's thoughts and elicit from him the information the investigator seeks to obtain. Quite accurately, it was noted that:

> "Any interrogation, be it the fairest and most reasonable of all, inevitably places the suspect in embarrassing situations, burdens him, intrudes his conscience, penetrates the deepest crevices of his soul, while creating serious emotional pressure". (Y. Kedmi, *On Evidence*, Part A, 1991 at 25).

> Indeed, the authority to conduct interrogations, like any administrative power, is designed for a specific purpose, which constitutes its foundation, and must be in conformity with the basic principles of the [democratic] regime. In crystallizing the interrogation rules, two values or interests clash. On the one hand, lies the desire to uncover the truth, thereby fulfilling the public interest in exposing crime and preventing it. On the other hand, is the wish to protect the dignity and liberty of the individual being interrogated. This having been said, these interests and values are not absolute. A democratic, freedom-loving society does not accept that investigators use any means for the purpose of uncovering the truth. " The interrogation practices of the police in a given regime," noted Justice Landau, "are indicative of a regime's very character" (Cr. A. 264/65 *Artzi v. The Government's Legal Advisor,* 20(1) P.D. 225 at 232). At times, the price of truth is so high that a democratic society is not prepared to pay it (See Barak, *On Law, Judging*