*and Truth*, 27 <u>Mishpatim</u> (1997) 11 at 13). To the same extent however, a democratic society, desirous of liberty seeks to fight crime and to that end is prepared to accept that an interrogation may infringe upon the human dignity and liberty of a suspect provided it is done for a proper purpose and that the harm does not exceed that which is necessary. Concerning the collision of values, with respect to the use of evidence obtained in a violent police interrogation, Justice H. Cohen opined as follows:

> " On the one hand, it is our duty to ensure that human dignity be protected; that it not be harmed at the hands of those who abuse it, and to do all that we can to restrain police investigators from fulfilling the object of their interrogation through prohibited and criminal means; On the other hand, it is (also) our duty to fight the increasingly growing crime rate which destroys the positive aspects of our country, and to prevent the disruption of public peace to the caprices of violent criminals that were beaten by police investigators" (Cr. A. 183/78 *Abu Midjim v. The State of Israel*, 34(4) P.D. 533 at 546).

Our concern, therefore, lies in the clash of values and the balancing of conflicting values. The balancing process results in the rules for a 'reasonable interrogation' (See Bein, *The Police Investigation- Is There Room for Codification of the 'Laws of the Hunt'*, 12 <u>Iyunei Mishpat</u> (1987) 129). These rules are based, <u>on the one hand</u>, on preserving the "human image" of the suspect (See Cr. A. 115/82 *Mouadi v. The State of Israel* 35 (1) P.D. 197 at 222-4) and on preserving the "purity of arms" used during the interrogation ( Cr. A. 183/78, *supra*, *ibid*.). <u>On the other hand</u>, these rules take into consideration the need to fight the phenomenon of criminality in an effective manner generally, and terrorist attacks specifically. These rules reflect "a degree of reasonableness, straight thinking (right mindedness) and fairness" (Kedmi, *supra*, at 25). The rules pertaining to investigations are important to a democratic state. They reflect its character. An illegal investigation harms the suspect's human dignity. It equally harms society's fabric.

23. It is not necessary for us to engage in an in-depth inquiry into the "law of interrogation" for the purposes of the applications before us. These vary from one matter to the next. For instance, the law of interrogation, as it appears in the context of an investigator's potential criminal liability, as opposed to the

Case: 1:03-cr-00978 Document #: 34-5 Filed: 12/12/05 Page 2 of 16 PageID #:1613

purpose of admitting evidence obtained by questionable means. Here, by contrast, we deal with the "law of interrogation" as a power activated by an administrative authority ( See Bein *supra*.). The "law of interrogation" by its very nature, is intrinsically linked to the circumstances of each case. This having been said, a number of general principles are nonetheless worth noting:

First, a reasonable investigation is necessarily one free of torture, free of cruel, inhuman treatment of the subject and free of any degrading handling whatsoever. There is a prohibition on the use of "brutal or inhuman means" in the course of an investigation (F.H. 3081/91 *Kozli v. The State of Israel*, 35(4) P.D. 441 at 446). Human dignity also includes the dignity of the suspect being interrogated. (Compare H.C. 355/59 *Catlan v. Prison Security Services*, 34(3) P.D. 293 at 298 and C.A.4463/94 *Golan v. Prison Security Services*, 50(4) P.D. 136). This conclusion is in perfect accord with (various) International Law treaties -to which Israel is a signatory -which prohibit the use of torture, "cruel, inhuman treatment" and "degrading treatment" (See M. Evans and R. Morgan, Preventing Torture (1998) at 61; N.S. Rodley, The Treatment of Prisoners under International Law (1987) at 63). These prohibitions are "absolute". There are no exceptions to them and there is no room for balancing. Indeed, violence directed at a suspect's body or spirit does not constitute a reasonable investigation practice. The use of violence during investigations can potentially lead to the investigator being held criminally liable. (See, for example, article 277 of the Penal Law: Pressure on a Public Servant; *supra* at 130, 134; Cr. A. 64/86 *Ashash v. The State of Israel* (unpublished)). Second, a reasonable investigation is likely to cause discomfort; It may result in insufficient sleep; The conditions under which it is conducted risk being unpleasant. Indeed, it is possible to conduct an effective investigation without resorting to violence. Within the confines of the law, it is permitted to resort to various machinations and specific sophisticated activities which serve investigators today (both for Police and GSS); Similar investigations- accepted in the most progressive of societies- can be effective in achieve their goals. In the end result, the legality of an investigation is deduced from the propriety of its purpose and from its methods. Thus, for instance, sleep deprivation for a prolonged period, or sleep deprivation at night when this is not necessary to the investigation time wise may be deemed a use of an investigation method which surpasses the least restrictive means.

## From the General to the Particular

24. We shall now turn from the general to the particular. Plainly put, shaking is a prohibited investigation method. It harms the suspect's body. It violates his dignity. It is a violent method which does not form part of a legal investigation. It surpasses that which is necessary. Even the State did not argue that shaking is an "ordinary" investigation method which every investigator (in the GSS or police) is permitted to employ. The submission before us was that the justification for shaking is found in the "necessity" defence. That argument shall be dealt with below. In any event, there is no doubt that shaking is not to be resorted to in cases outside the bounds of "necessity" or as part of an "ordinary" investigation.

25. It was argued before the Court that one of the investigation methods employed consists of the suspect crouching on the tips of his toes for five minute intervals. The State did not deny this practice. This is a prohibited investigation method. It does not serve any purpose inherent to an investigation. It is degrading and infringes upon an individual's human dignity.

26. The "Shabach" method is composed of a number of cumulative components: the cuffing of the suspect, seating him on a low chair, covering his head with an opaque sack (head covering) and playing powerfully loud music in the area. Are any of the above acts encompassed by the general power to investigate? Our point of departure is that there are actions which are inherent to the investigation power (Compare C.A. 4463/94, *supra.*, *ibid.*). Therefore, we accept that the suspect's cuffing, for the purpose of preserving the investigators' safety, is an action included in the general power to investigate ( Compare H.C. 8124/96 *Mubarak v. The GSS* (unpublished)). Provided the suspect is cuffed for this purpose, it is within the investigator's authority to cuff him. The State's position is that the suspects are indeed cuffed with the intention of ensuring the investigators' safety or to prevent fleeing from legal custody. Even the applicants agree that it is permissible to cuff a suspect in similar circumstances and that cuffing constitutes an integral part of an interrogation. Notwithstanding, the cuffing associated with the "Shabach" position is unlike routine cuffing. The suspect is cuffed with his hands tied behind his back. One hand is placed inside the gap between the chair's seat and back support, while the other is tied behind him, against the chair's back support. This is a distorted and unnatural position. The investigators' safety does not require it. Therefore, there is no relevant justification for handcuffing the suspect's hands with particularly small handcuffs, if this is in fact the practice. The use of these methods is prohibited. As was noted, "Cuffing causing pain is prohibited" (See the *Mubarak* affair *supra.*). Moreover, there are other ways of preventing the suspect from fleeing from legal custody which do not involve causing the suspect pain and suffering.

27. This is the law with respect to the method involving seating the suspect in question in the "Shabach" position. We accept that seating a man is inherent to the investigation. This is not the case when the chair upon which he is seated is a very low one, tilted forward facing the ground, and when he is sitting in this position for long hours. This sort of seating is not encompassed by the general power to interrogate. Even if we suppose that the seating of the suspect on a chair lower than that of his investigator can potentially serve a legitimate investigation objective (for instance, to establish the "rules of the game" in the contest of wills between the parties, or to emphasize the investigator's superiority over the suspect), there is no inherent investigative need for seating the suspect on a chair so low and tilted forward towards the ground, in a manner that causes him real pain and suffering. Clearly, the general power to conduct interrogations does not authorize seating a suspect on a forward tilting chair, in a manner that applies pressure and causes pain to his back, all the more so when his hands are tied behind the chair, in the manner described. All these methods do not fall within the sphere of a "fair" interrogation. They are

Case: 1:03-cr-00978 Document #: 34-5 Filed: 12/12/05 Page 4 of 16 PageID #:1615

not reasonable. They impinge upon the suspect's dignity, his bodily integrity and his basic rights in an excessive manner (or beyond what is necessary). They are not to be deemed as included within the general power to conduct interrogations.

28. We accept that there are interrogation related considerations concerned with preventing contact between the suspect under interrogation and other suspects and his investigators, which require means capable of preventing the said contact. The need to prevent contact may, for instance, flow from the need to safeguard the investigators' security, or that of the suspects and witnesses. It can also be part of the "mind game" which pins the information possessed by the suspect, against that found in the hands of his investigators. For this purpose, the power to interrogate- in principle and according to the circumstances of each particular case- includes preventing eye contact with a given person or place. In the case at bar, this was the explanation provided by the State for covering the suspect's head with an opaque sack, while he is seated in the "Shabach" position. From what was stated in the declarations before us, the suspect's head is covered with an opaque sack throughout his "wait" in the "Shabach" position. It was argued that the sack (head covering) is entirely opaque, causing the suspect to suffocate. The edges of the sack are long, reaching the suspect's shoulders. All these methods are not inherent to an interrogation. They do not confirm the State's position, arguing that they are meant to prevent eye contact between the suspect being interrogated and other suspects. Indeed, even if such contact should be prevented, what is the purpose of causing the suspect to suffocate? Employing this method is not connected to the purpose of preventing the said contact and is consequently forbidden. Moreover, the statements clearly reveal that the suspect's head remains covered for several hours, throughout his wait. For these purposes, less harmful means must be employed, such as letting the suspect wait in a detention cell. Doing so will eliminate any need to cover the suspect's eyes. In the alternative, the suspect's eyes may be covered in a manner that does not cause him physical suffering. For it appears that at present, the suspect's head covering - which covers his entire head, rather than eyes alone,- for a prolonged period of time, with no essential link to the goal of preventing contact between the suspects under investigation, is not part of a fair interrogation. It harms the suspect and his (human) image. It degrades him. It causes him to lose sight of time and place. It suffocates him. All these things are not included in the general authority to investigate. In the cases before us, the State declared that it will make an effort to find an "ventilated" sack. This is not sufficient. The covering of the head in the circumstances described, as distinguished from the covering of the eyes, is outside the scope of authority and is prohibited.

29. Cutting off the suspect from his surroundings can also include preventing him from listening to what is going on around him. We are prepared to assume that the authority to investigate an individual equally encompasses precluding him from hearing other suspects under investigation or voices and sounds that, if heard by the suspect, risk impeding the interrogation's success. Whether the means employed fall within the scope of a fair and reasonable interrogation warrant examination at this time. In the case at bar, the detainee is found in the

Case: 1:03-cr-00978 Document #: 344-5 Filed: 12/12/05 Page 5 of 16 PageID #:1616

"Shabach" position while listening to the consecutive playing of powerfully loud music. Do these methods fall within the scope or the general authority to conduct interrogations? Here too, the answer is in the negative. Being exposed to powerfully loud music for a long period of time causes the suspect suffering. Furthermore, the suspect is tied (in place) in an uncomfortable position with his head covered (all the while). The use of the "Shabach" method is prohibited. It does not fall within the scope of the authority to conduct a fair and effective interrogation. Powerfully loud music is a prohibited means for use in the context described before us.

30. To the above, we must add that the "Shabach" position includes all the outlined methods employed simultaneously. Their combination, in and of itself gives rise to particular pain and suffering. This is a harmful method, particularly when it is employed for a prolonged period of time. For these reasons, this method does not form part of the powers of interrogation. It is an unacceptable method. "The duty to safeguard the detainee's dignity includes his right not to be degraded and not to be submitted to sub-human conditions in the course of his detention, of the sort likely to harm his health and potentially his dignity" (In Cr. A. 7223/95 *The State of Israel v. Rotenstein* (not yet published)).

A similar- though not identical- combination of interrogation methods were discussed in the case of *Ireland v. United Kingdom* (1978) 2 EHRR 25. In that case, the Court probed five interrogation methods used by England for the purpose of investigating detainees suspected of terrorist activities in Northern Ireland. The methods were as follows: protracted standing against the wall on the tip of one's toes; covering of the suspect's head throughout the detention (except during the actual interrogation); exposing the suspect to powerfully loud noise for a prolonged period and deprivation of sleep, food and drink. The Court held that these methods did not constitute "torture". However, since they treated the suspect in an "inhuman and degrading" manner, they were nonetheless prohibited.

31. The interrogation of a person is likely to be lengthy, due to the suspect's failure to cooperate or due to the information's complexity or in light of the imperative need to obtain information urgently and immediately (For instance, see The *Mubarak* affair, *supra*; H.C. 5318/95 *Hajazi v. GSS* (unpublished)). Indeed, a person undergoing interrogation cannot sleep as does one who is not being interrogated. The suspect, subject to the investigators' questions for a prolonged period of time, is at times exhausted. This is often the inevitable result of an interrogation, or one of its side effects. This is part of the "discomfort" inherent to an interrogation. This being the case, depriving the suspect of sleep is, in our opinion, included in the general authority of the investigator (Compare: H.C. 3429/94 *Shbana v. GSS* (unpublished)). So noted Justice Shamgar, in a similar instance:

> "The interrogation of crimes and in particular, murder or other serious crimes- cannot be accomplished within the confines of an ordinary public servant's work day...The investigation of crime is essentially

> mental resistance...For this reason, the interrogation is often carried out at consecutive intervals. This, as noted, causes the investigation to drag on ...and requires diligent insistence on its momentum and consecutiveness." (Cr. A. 485/76 *Ben Loulou v. The State of Israel* (unpublished)).

> The above described situation is different from those in which sleep deprivation shifts from being a "side effect" inherent to the interrogation, to an end in itself. If the suspect is intentionally deprived of sleep for a prolonged period of time, for the purpose of tiring him out or "breaking" him- it shall not fall within the scope of a fair and reasonable investigation. Such means harm the rights and dignity of the suspect in a manner surpassing that which is required.

32. All that was stated regarding the exceptions pertinent to an interrogation, flowing from the requirement that an interrogation be fair and reasonable, is the accepted law with respect to a regular police interrogation. The power to interrogate given to the investigator GSS investigator by law is the same interrogation powers the law bestows upon the ordinary police force investigator. It appears that the restrictions applicable to the police investigations are equally applicable to GSS investigations. There is no statutory instruction endowing a GSS investigator with special interrogating powers that are either different or more serious than those given the police investigator. From this we conclude that a GSS investigator, whose duty is to conduct the interrogation according to the law, is subject to the same restrictions applicable to a police interrogation.

## Physical Means and the "Necessity" Defence

33. We have arrived at the conclusion that the GSS personnel who have received permission to conduct interrogations (as per the Criminal Procedure Statute [Testimony]) are authorized to do so. This authority-like that of the police investigator- does not include most of the physical means of interrogation which are the subject of the application before us. Can the authority to employ these interrogation methods be anchored in a legal source beyond the authority to conduct an interrogation? This question was answered by the State's attorneys in the affirmative. As noted, an explicit authorization permitting GSS to employ physical means is not to be found in our law. An authorization of this nature can, in the State's opinion, be obtained in specific cases by virtue of the criminal law defense of "necessity", prescribed in the Penal Law. The language of the statute is as follows: (Article 34 (1)):

> "*A person will not bear criminal liability for committing any act immediately necessary for the purpose of saving the life,*

*liberty, body or property, of either himself or his fellow person, from substantial danger of serious harm, imminent from the particular state of things [circumstances], at the requisite timing, and absent alternative means for avoiding the harm."*

The State's position is that by virtue of this "defence" to criminal liability, GSS investigators are also authorized to apply physical means, such as shaking, in the appropriate circumstances, in order to prevent serious harm to human life or body, in the absence of other alternatives. The State maintains that an act committed under conditions of "necessity" does not constitute a crime. Instead, it is deemed an act worth committing in such circumstances in order to prevent serious harm to a human life or body. We are therefore speaking of a deed that society has an interest in encouraging, as it is deemed proper in the circumstances. It is choosing the lesser evil. Not only is it legitimately permitted to engage in the fighting of terrorism, it is our moral duty to employ the necessary means for this purpose. This duty is particularly incumbent on the state authorities- and for our purposes, on the GSS investigators- who carry the burden of safeguarding the public peace. As this is the case, there is no obstacle preventing the investigators' superiors from instructing and guiding them with regard to when the conditions of the "necessity" defence are fulfilled and the proper boundaries in those circumstances. From this flows the legality of the directives with respect to the use of physical means in GSS interrogations. In the course of their argument, the State's attorneys submitted the "ticking time bomb" argument. A given suspect is arrested by the GSS. He holds information respecting the location of a bomb that was set and will imminently explode. There is no way to diffuse the bomb without this information. If the information is obtained, however, the bomb my be diffused. If the bomb is not diffused, scores will be killed and maimed. Is a GSS investigator authorized to employ physical means in order to elicit information regarding the location of the bomb in such instances? The State's attorneys answers in the affirmative. The use of physical means shall not constitute a criminal offence, and their use is sanctioned, to the State's contention, by virtue of the "necessity" defence.

34. We are prepared to assume that- although this matter is open to debate - (See A. Dershowitz, *Is it Necessary to Apply 'Physical Pressure' to Terrorists- And to Lie About It?*, [1989] 23 Israel L. Rev. 193; Bernsmann, *Private Self-Defence and Necessity in German Penal Law and in the Penal Law Proposa- Some Remarks*, [1998] 30 Israel L. Rev. 171, 208-210) - the "necessity" defence is open to all, particularly an investigator, acting in an organizational capacity of the State in interrogations of that nature. Likewise, we are prepared to accept - although this matter is equally contentious- (See M. Kremnitzer, *The Landau Commission Report- Was the Security Service Subordinated to the Law or the Law to the Needs of the Security Service?*, [1989] 23 Israel L. Rev.

Case: 1:03-cr-00978 Document #: 344-5 Filed: 12/12/05 Page 8 of 16 PageID #:1619

216, 244-247) - that the "necessity" exception is likely to arise in instances of "ticking time bombs", and that the immediate need ("necessary in an immediate manner" for the preservation of human life) refers to the imminent nature of the act rather than that of the danger. Hence, the imminence criteria is satisfied even if the bomb is set to explode in a few days, or perhaps even after a few weeks, provided the danger is certain to materialize and there is no alternative means of preventing its materialization. In other words, there exists a concrete level of imminent danger of the explosion's occurrence (See Kremnitzer and Segev, *The Application of Force in the Course of GSS Interrogations- A Lesser Evil?*, [1998] 4 Mishpat U' Mimshal 667 at 707; See also Feller, *Not Actual "Necessity" but Possible "Justification"; Not "Moderate Pressure", but Either "Unlimited" or "None at All"*, [1989] 23 Israel L. Rev. 201, 207).

Consequently we are prepared to presume, as was held by the Inquiry Commission's Report, that if a GSS investigator- who applied physical interrogation methods for the purpose of saving human life-is criminally indicted, the "necessity" defence is likely to be open to him in the appropriate circumstances (See Cr. A. 532/91 *Anonymous v. The State of Israel* (unpublished)). A long list of arguments, from both the fields of Ethics and Political Science, may be raised for and against the use of the "necessity" defence, (See Kremnitzer and Segev, *supra*, at p.696; M.S. Moor, *Torture and the Balance of Evils*, [1989] 23 Israel L. Rev. 280; L. Shelf, *The Lesser Evil and the Lesser Good- On the Landau Commission's Report, Terrorism and Torture*, [1990] 1 Plilim 185; W.L. & P.E. Twining, *Bentham on Torture*, [1973] 24 Nothern Ireland Legal Quarterly 305; D. Stetman, *The Question of Absolute Morality Regarding the Prohibition on Torture*, [1997] 4 Mishpat U' Mimshal 161 at 175; A. Zuckerman, *Coersion and the Judicial Ascertainment of Truth*, [1989] 23 Israel L. Rev. 357. This matter, however, has already been decided under Israeli law. Israel's Penal Law recognizes the "necessity" defence.

35. Indeed, we are prepared to accept that in the appropriate circumstances, GSS investigators may avail themselves of the "necessity" defence, if criminally indicted. This however, is not the issue before this Court. We are not dealing with the potential criminal liability of a GSS investigator who employed physical interrogation methods in circumstances of "necessity." Moreover, we are not addressing the issue of admissibility or probative value of evidence obtained as a result of a GSS investigator's application of physical means against a suspect. We are dealing with a different question. The question before us is whether it is possible to infer the authority to, in advance, establish permanent directives setting out the physical interrogation means that may be used under conditions of "necessity". Moreover, we are asking whether the "necessity" defence constitutes a basis for the GSS investigator's authority to investigate, in the performance of his duty. According to the State, it is possible to imply from the "necessity" defence, available (*post factum*) to an investigator indicted of a criminal offence, an advance legal authorization endowing the investigator with the capacity to use physical interrogation methods. Is this position correct?

36. In the Court's opinion, a general authority to establish directives respecting

the use of physical means during the course of a GSS interrogation cannot be implied from the "necessity" defence. The "necessity" defence does not constitute a source of authority, allowing GSS investigators to make use physical means during the course of interrogations. The reasoning underlying our position is anchored in the nature of the "necessity" defence. This defence deals with deciding those cases involving an individual reacting to a given set of facts; It is an ad hoc endeavour, in reaction to a event. It is the result of an improvisation given the unpredictable character of the events (See Feller, *ibid.* at 209). Thus, the very nature of the defence does not allow it to serve as the source of a general administrative power. The administrative power is based on establishing general, forward looking criteria, as noted by Professor Enker:

"Necessity is an after-the-fact judgment based on a narrow set of considerations in which we are concerned with the immediate consequences, not far-reaching and long-range consequences, on the basis of a clearly established order of priorities of both means and ultimate values...The defence of Necessity does not define a code of primary normative behaviour. Necessity is certainly not a basis for establishing a broad detailed code of behaviour such as how one should go about conducting intelligence interrogations in security matters, when one may or may not use force, how much force may be used and the like (Enker, "The Use of Physical Force in Interrogations and the Necessity Defense," in Israel and International Human Rights Law: The Issue of Torture 61,62 (1995)).

In a similar vein, Kremnitzer and Segev note:

"[t]he basic rationale underlying the necessity defence is the absence of the possibility to establish accurate rules of behaviour in advance, appropriate in concrete emergency situations, whose circumstances are varied and unexpected. From this it follows, that the necessity defence is not well suited for regulation a general situation, the circumstances of which are known and (often) repeat themselves. In similar cases, there is no reason for not setting the rules of behaviour in advance, in order that their content be determined in a thought out and well-planned manner, in advance, permitting them to apply in a uniform manner to all" (*supra,* at 705).

Moreover, the "necessity" defence has the effect of allowing one who acts

Case: 1:03-cr-00978 Document #: 344-5 Filed: 12/12/05 Page 10 of 16 PageID #:1621

under the circumstances of "necessity" to escape criminal liability. The "necessity" defence does not possess any additional normative value. In addition, it does not authorize the use of physical means for the purposes of allowing investigators to execute their duties in circumstances of necessity. The very fact that a particular act does not constitute a criminal act (due to the "necessity" defence) does not in itself authorize the administration to carry out this deed, and in doing so infringe upon human rights. The Rule of Law (both as a formal and substantive principle) requires that an infringement on a human right be prescribed by statute, authorizing the administration to this effect. The lifting of criminal responsibility does not imply authorization to infringe upon a human right. It shall be noted that the Commission of Inquiry did not hold that the "necessity" defence is the source of authority for employing physical means by GSS investigators during the course of their interrogations. All that the Commission of Inquiry determined is that if an investigator finds himself in a situation of "necessity", constraining him to choose the "lesser evil" - harming the suspect for the purpose of saving human lives - the "necessity" defence shall be available to him. Indeed, the Commission of Inquiry noted that, "the law itself must ensure a proper framework governing the [security] service's actions with respect to the interrogation of hostile terrorist activities and the related problems particular to it" (ibid. at 328).

37. In other words, general directives governing the use of physical means during interrogations must be rooted in an authorization prescribed by law and not from defences to criminal liability. The principle of "necessity" cannot serve as a basis of authority (See Kremnitzer, ibid. at 236). If the State wishes to enable GSS investigators to utilize physical means in interrogations, they must seek the enactment of legislation for this purpose. This authorization would also free the investigator applying the physical means from criminal liability. This release would flow not from the "necessity" defence but from the "justification" defense which states:

"A person shall not bear criminal liability for an act committed in one of the following cases:

(1) He was obliged or authorized by law to commit it.
"

(Article 34(13) of the Penal Law) The defence to criminal liability by virtue of the "justification" is rooted in a area outside of the criminal law. This "external" law serves as a defence to criminal liability. This defence does not rest upon the "necessity", which is "internal" to the Penal Law itself. Thus, for instance, where the question of when an officer is authorized to apply deadly force in the course of detention arises, the authority is found in a provision of

Case: 1:03-cr-00978 Document #: 344-5 Filed: 12/12/05 Page 11 of 16 PageID #:1622

the Law of Detention, external to the Penal Law. If a man is killed as a result of the application of force, the provision is likely to give rise to a defence, by virtue of the "Justification" (See Cr. A. 486/88, *Ankonina v. The Chief Army Prosecutor* 34(2) P.D. 353). The "necessity" defence cannot constitute the basis for the determination of rules respecting the needs of an interrogation. It cannot constitute a source of authority on which the individual investigator can rely on for the purpose of applying physical means in an investigation that he is conducting. The power to enact rules and to act according to them requires legislative authorization, by legislation whose object is the power to conduct interrogations. Within the boundaries of this legislation, the Legislator, if he so desires, may express his views on the social, ethical and political problems, connected to authorizing the use of physical means in an interrogation. These considerations did not, from the nature of things, arise before the Legislature at the time when the "necessity" defence was enacted (See Kremnitzer, *supra*, at 239-40). The "necessity" defence is not the appropriate place for laying out these considerations (See Enker, *supra*, at 72). Endowing GSS investigators with the authority to apply physical force during the interrogation of suspects suspected of involvement in hostile terrorist activities, thereby harming the latters' dignity and liberty, raise basic questions of law and society, of ethics and policy, and of the Rule of Law and security. These questions and the corresponding answers must be determined by the Legislative branch. This is required by the principle of the Separation of Powers and the Rule of Law, under our very understanding of democracy (See H.C. 3267/97 *Rubinstein v. Minister of Defence* (has yet to be published)).

38. Our conclusion is therefore the following: According to the existing state of the law, neither the government nor the heads of security services possess the authority to establish directives and bestow authorization regarding the use

of liberty infringing physical means during the interrogation of suspects suspected of hostile terrorist activities, beyond the general directives which can be inferred from the very concept of an interrogation. Similarly, the individual GSS investigator-like any police officer- does not possess the authority to employ physical means which infringe upon a suspect's liberty during the interrogation, unless these means are inherently accessory to the very essence of an interrogation and are both fair and reasonable.

An investigator who insists on employing these methods, or does so routinely, is exceeding his authority. His responsibility shall be fixed according to law. His potential criminal liability shall be examined in the context of the "necessity" defence, and according to our assumptions (See paragraph 35 *supra*.), the investigator may find refuge under the "necessity" defence's wings (so to speak), provided this defence's conditions are met by the circumstances of the case. Just as the existence of the "necessity" defence does not bestow authority, so too the lack of authority does not negate the applicability of the necessity defense or that of other defences from criminal liability. The Attorney General can instruct himself regarding the circumstances in which investigators shall not stand trial, if they claim to have acted from a feeling of "necessity". Clearly, a legal statutory provision is necessary for the purpose of authorizing the government to instruct in the use of physical means during the course of an interrogation, beyond what is permitted by the ordinary "law of investigation", and in order to provide the individual GSS investigator with the authority to employ these methods. The "necessity" defence cannot serve as a basis for this authority.

## A Final Word

39. This decision opens with a description of the difficult reality in which Israel finds herself security wise. We shall conclude this judgment by re-addressing that harsh reality. We are aware that this decision does not ease dealing with that reality. This is the destiny of democracy, as not all means are acceptable to it, and not all practices employed by its enemies are open before it. Although a democracy must often fight with one hand tied behind its back, it nonetheless has the upper hand. Preserving the Rule of Law and recognition of an individual's liberty constitutes an important component in its understanding of security. At the end of the day, they strengthen its spirit and its strength and allow it to overcome its difficulties. This having been said, there are those who argue that Israel's security problems are too numerous, thereby requiring the authorization to use physical means. If it will nonetheless be decided that it is appropriate for Israel, in light of its security difficulties to sanction physical means in interrogations (and the scope of these means which deviate from the ordinary investigation rules), this is an issue that must be decided by the legislative branch which represents the people. We do not take any stand on this matter at this time. It is there that various considerations must be weighed. The pointed debate must occur there. It is there that the required legislation may be passed, provided, of course, that a law infringing upon a suspect's liberty "befitting the values of the State of Israel," is enacted for a proper purpose, and to an extent no greater than is required. (Article 8 to the Basic Law: Human Dignity and Liberty).

40. Deciding these applications weighed heavy on this Court. True, from the legal perspective, the road before us is smooth. We are, however, part of Israeli society. Its problems are known to us and we live its history. We are not isolated in an ivory tower. We live the life of this country. We are aware of the harsh reality of terrorism in which we are, at times, immersed. Our apprehension is that this decision will hamper the ability to properly deal with terrorists and terrorism, disturbs us. We are, however, judges. Our bretheren require us to act according to the law. This is equally the standard that we set for ourselves. When we sit to judge, we are being judged. Therefore, we must act according to our purest conscience when we decide the law. The words of the Deputy President of the Supreme Court, Justice Landau, speak well to our purposes:

> "We possess proper sources upon which to construct our judgments and have no need, and while judging, are forbidden from, involving our personal views as citizens of this country in our decisions. Still, great is the fear that the Court shall be perceived as though it had abandoned its proper place and descended to the midst of public debate, and that its decision making will be obstructed by one side of the population's uproar and by the other side's absolute and emotional rejection. In that sense, I see myself here as someone whose duty is to decide according to the law in all cases legally brought before the Court. I am strictly bound by this duty. As I am well aware in advance that the public at large will not pay attention to the legal reasoning, but to the end result alone. And that the Court's proper status, as an institution above partisan debates, risks being harmed. What can we do, as this is our function and role as judges." (H.C. 390/79 *Dawikat v. The State of Israel*, 34(1) P.D. 1 at 4).

The Commission of Inquiry pointed to the "difficult dilemma between the imperative need to safeguard the State of Israel's very existence and the lives of its citizens, and preserving its character- that of a country subject to the Rule of Law and holding basic moral values" (*supra*, p.326). The Commission rejected an approach suggesting that the actions of security services in the context of fighting terrorism, shall take place in the recesses of the law. The Commission equally rejected the "ways of the hypocrites, who remind us of their adherence to the Rule of Law, while ignoring (being willfully blind) to what is being done in practice" (*ibid.* at 327). The Commission elected to follow a third route, "the way of Truth and the Rule of Law" (*Ibid.*, at p.328). In so doing, the Commission of Inquiry outlined the dilemma faced by Israel in a manner both transparent and open to inspection by Israeli society.

Consequently, it is decided that the order *nisi* be made absolute, as we declare that the GSS does not have the authority to "shake" a man, hold him in the "Shabach" position (which includes the combination of various methods, as

Case: 1:03-cv-00973 Document #: 344-5 Filed: 12/12/05 Page 14 of 16 PageID #:1625

mentioned in paragraph 30), force him into a "frog crouch" position and deprive him of sleep in a manner other than that which is inherently required by the interrogation. Likewise, we declare that the "necessity" defence, found in the Penal Law, cannot serve as a basis of authority for the use of these interrogation practices, or for the existence of directives pertaining to GSS investigators, allowing them to employ interrogation practices of this kind. Our decision does not negate the possibility that the "necessity" defence be available to GSS investigators, be within the discretion of the Attorney General, if he decides to prosecute, or if criminal charges are brought against them, as per the Court's discretion.

**Deputy President** S. Levin:

I agree.

**Justice** T. Or

I agree.

**Justice** E. Mazza

I agree.

**Justice** M. Cheshin

I agree.

**Justice** I. Zamir

I agree.

**Justice** T. Strasberg-Cohen

I agree.

**Justice** D. Dorner

I agree.

**Justice J' Kedmi**

I accept the result conclusion which has been reached by my fellow, the President, by which the use of exceptional interrogation methods, according to the directives of the Ministerial Committee - that relies on a collection of legal provisions suggested by the attorneys for the State - "has no authority, and is therefore, illegal". Similarly, I am of the opinion that the time has arrived for this issue to be regulated by

primary and explicit legislation, that is clear and non-partial.

Notwithstanding, it is difficult for me to accept a state of things in which, due to the absence of explicit legislation as noted (above), the State should be helpless from a legal perspective, in those rare emergencies that merit being defined as, "ticking time bombs"; and that the State would not be authorized to order the use of exceptional interrogation methods in those circumstances. As far as I am concerned, such an authority exists in those circumstances, deriving from the basic obligation of being a State- like all countries of the world- to defend (protect) its existence, its well-being, and to safeguard (the lives of) its citizens. It is clear that in those circumstances, the State - as well as its agents - will have the natural right of "self-defence", in the larger meaning of the term, since terrorist organizations, that seek the soul and the souls of its inhabitants, and carry out shocking terrorist attacks to advance their cause (objectives).

On this background, and deriving from the intention will to prevent a situation where the "time bomb will tick" before our eyes and the State's hand will be shortened to help, I suggest that the judgment be suspended from coming into force for a period of one year. During that year, the GSS could employ exceptional interrogative methods in those rare cases of "ticking time bombs", on the condition that explicit authorization is given by the Attorney General .

The suspension under these conditions, does not infringe the ruling of the judgment, that the use of exceptional interrogation methods - that relies on directives of the Ministerial Committee as noted above - is illegal. This is because according to the suggested conditions, the suspension of the judgment does not constitute an authorization to continue acting according to those directives; and the authorization of the Attorney General does not legalize the performance of an illegal action according to the judgment, but rather deals with the non-indictment (of a violator) for the employment of exceptional interrogation methods in those emergency circumstances defined as, "ticking bombs".

During the suspension period, the Knesset will be given an opportunity to consider the issue (speak its

words) concerning the views of exceptional interrogation methods in security investigations, both in general and in times of emergency. The GSS will be given the opportunity to cope with emergency situations until the Knesset considers the issue. Meanwhile, the GSS will also have an opportunity to adapt itself, after a long period in which the directives of the Ministerial Committee have governed, to the new state of things, which expresses the development that has occurred in Israel concerning the status and weight of human rights.

I, therefore, join in the judgment of the President subject to my proposal regarding the suspension of the judgment from coming into force for a period of one year, as explained above.

**Decided According the President's Opinion**

**Given today, the 6th of September, 1999.**

Copyright 2005 The American-Israeli Cooperative Enterprise