IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED

MAY 17 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|   |   |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )    No. 03 CR 978 |
| v. | ) |
| | )    Judge Amy J. St. Eve |
| | ) |
| MOUSA MOHAMMED | ) |
| MARZOOK, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MUHAMMAD SALAH'S DISCOVERY REPLY MEMORANDUM

## I. THE INFORMATION AND DOCUMENTS THAT THE DEFENDANT SEEKS ARE CRITICAL TO A FAIR SUPPRESSION HEARING AND TO HIS DEFENSE AT TRIAL PURSUANT TO HIS DUE PROCESS AND FAIR TRIAL RIGHTS AND ARE ALSO DISCOVERABLE UNDER *BRADY* AND *GIGLIO*.

For the past 12 years Mr. Salah has repeatedly claimed that he was subjected to torture and cruel, inhumane and degrading treatment at the hands of his GSS Israeli interrogators following his arrest in the Israeli occupied territories in January of 1993 and that whatever statements he is alleged to have made were the product of such coercive policies and practices. It is also a matter of public record that in 1993 the Israeli GSS engaged in systematic acts of torture and extreme coercion during their interrogations of suspected Palestinian militants arrested in the occupied territories. These systematic methods of physical and psychological coercion were in fact sanctioned as official policy by the highest levels of the Israeli government to be used to interrogate security suspects. (See, *e.g.* Landau Commission Report, attached to Initial Memo in

1

interrogate security suspects. (See, *e.g.* Landau Commission Report, attached to Initial Memo in Support of Discovery Requests).

Despite these facts which were well known to the prosecution in this case, it nonetheless chose to return an indictment against Mr. Salah which substantially relies on statements and the fruits thereof, which were the direct product of this State sanctioned torture and coercion. The prosecution intends to offer these coerced statements of Mr. Salah at the trial of this cause and apparently will claim that they were freely given, not the subject of coercion and pressure, and should not be suppressed.

Now, when the defense seeks to obtain the essential information and documents to support its claim that these alleged statements should be suppressed and if necessary, to show to the jury that such statements are unreliable, the prosecution wants to limit what information and documents are provided to the defense. It does so by claiming that the information and documents are not in the Government's possession but in the possession of the State of Israel and that the documents sought are not admissible.

First, the prosecution has readily obtained the statements themselves in various forms and other supporting documents from the State of Israel, while at the same time declining and/or failing to obtain other information and documents including the names, whereabouts and reports of all those involved in (and/or witnesses to) the interrogation and coercion of Mr. Salah and documents which detail the specific methods used by the GSS to interrogate security suspects in 1993. Certainly the prosecution can not choose to obtain information and documents which enable them to present the alleged statements of Mr. Salah and at the same time, decline or fail to obtain information and documents which are directly relevant to challenging the admissibility and

2

reliability of such statements. Such a selective procedure deeply offends and clearly violates Mr. Salah's due process and fair trial rights.

Second, the documents which Mr. Salah seeks are highly relevant to establishing that Israel at the time of Mr. Salah's interrogations had an officially sanctioned policy and practice of torture and coercion and the specific methods used to implement these interrogation policies. These documents constitute *Brady* material as they support Mr. Salah's claims of torture and help to prove his right to suppress his statements and to establish their unreliability at trial. The documents are also impeaching of a witness' denial of coercion and admissible as evidence of a pattern, motive, intent to use torture and coercion under Fed. R. Evid. 404(b).

### A. The Names, Addresses and Reports of All Police, Prison Guards and Palestinian Collaborators Who Participated in the Interrogation of Mr. Salah.

In order for the defense to fully and fairly be heard on a motion to suppress and for this Court to make a reasoned determination on the issue, the defense must be provided with the identity, whereabouts and statements of all persons involved in or witnesses to the coercive interrogation of Mr. Salah, so that this Court may hear the testimony of those persons whether offered by the government or by the defense. The Government, however, argues that a hand-written Hebrew transcript which contains the code-name[1] and limited military court testimony of only one of the numerous interrogators and collaborators involved in breaking the spirit and will of Muhammad Salah is sufficient and constitutes "significant efforts" by the Israeli government to provide requested materials.

---

[1] The government refers to these code names - clearly designed to conceal the identity of those GSS interrogators involved in torture - as "official names of Israeli interviewers." (Gov't response at 7). These "official names" provide the defense with absolutely no ability to conduct any investigation into the background of these interrogators.

Other than its statement that Israel will not provide the names of the Palestinian cooperators working with the GSS, (Gov't. Response at 7), the response leaves intentionally vague what other information the prosecution has asked the Israelis to provide and what Israel has refused to provide. The government's opposition to the discovery requests fails to set forth for example, whether or not the prosecution has requested that the Israelis provide the true names, whereabouts and reports of all the GSS interrogators involved with Mr. Salah, as well as the police[2] and prison guards involved in the interrogation.

As an initial matter, the prosecution must be required to disclose what specific requests for discovery were made to the Israeli government and the responses by Israel as to each request. Clearly, there is a material difference between the prosecution failing to request relevant discoverable information and the government making such requests and Israel refusing to produce such information. At the very least a formal denial of production by Israel as to each specific request will inform this Court and counsel whether Letters Rogatory have any likelihood of producing such information and what due process and fair trial rights of Mr. Salah are implicated.

**Names, Addresses and Reports of Palestinian Collaborators in the Interrogation of Mr. Salah.**

As set out in Mr. Salah's initial memorandum in support of his discovery requests, Palestinian collaborators, commonly referred to as "birds" working with the GSS, apparently played a critical role in extracting information from Mr. Salah, including threatening him with

---

[2] While the GSS conducts the primary interrogation, Israeli police were called in to take the official "confessions" of Mr. Salah. The identity and whereabouts of the police who took down Mr. Salah's statements are critical to a fair inquiry as to the admissibility of these statements.

4

serious harm and even death if he did not write down information to prove that he was not collaborating with the GSS. These Palestinians were working with the GSS, and once they obtained these written statements, they were given to the GSS for further interrogation of Mr. Salah. A determination by this Court as to whether or not Mr. Salah's statements to the Israelis should be suppressed or their reliability by a jury at trial, without the benefit of the identity and testimony of those who directly threatened and coerced Mr. Salah, would be to in violation of fundamental due process and the right to confrontation, right to counsel and right to a fair trial.

While this Court can not order the State of Israel to produce information or documents which it refuses to do, the Court can determine that such information is necessary and material to the due process and fair trial rights of Mr. Salah and thus put the prosecution on notice as to the consequences of a refusal by the State of Israel to provide relevant information and documents.

### B. Documents Detailing GSS Methods of Interrogation.

The defense has requested specific documents which detail the methods of interrogation that were authorized in 1993 at the time of Mr. Salah's interrogation. The prosecution opines, however, that these documents are inadmissible under Fed. R. Evid. 404(a) as evidence of an interrogators "propensity" to use "harsh interrogation tactics," and are therefore not discoverable. This argument is wrong for several reasons.

First, the fact that the State of Israel had an official policy to use harsh physical and psychological methods and the fact that those specific methods are enumerated in several official documents are highly relevant to support the claims and testimony of Mr. Salah that he was subjected to the very same methods that were authorized in these documents. These documents are admissible in support of Mr. Salah's claims of torture and coercion at his motion to suppress

and before a jury. According to the Federal Rules of Evidence, evidence is relevant if it has any "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable then it would be without the evidence." Fed. R. Evid. 401. These documents are clearly relevant, constitute *Brady* material, and the government, rather than making convoluted arguments regarding "propensity", should be directed to use all possible means to obtain such documents from the State of Israel.

Second, these documents are clearly impeaching of any GSS interrogator who denies using such specific methods against Mr. Salah. For example, at the hearing in Israel in which interrogator "Nadav" testified that the tiny low chair in which Mr. Salah was forced to sit was not to put pressure on Mr. Salah but to ensure that if he fell asleep and slipped from the chair he would only fall a short ways to the ground. Clearly, an official GSS document which authorizes the use of such a tiny chair for the purpose of pressuring a detainee in the course of interrogations would be impeaching of the credibility of a key government witness. See, *e.g. United States v. Bastanipour*, 41 F.3d 1178, 1182 (7th Cir. 1994) ("Moreover, due process requires the disclosure of evidence which impeaches the credibility of a key prosecution witness. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972)"). Similarly, any Israeli interrogator who denies the use of other methods specified in these official documents can be similarly impeached.

Further, the use of these documents can be used to show that GSS interrogation methods used against of Mr. Salah, who was a security detainee and a suspected terrorist, establishes motive, intent, plan and knowledge of the identical methods which were authorized and routinely used against such detainees in the occupied territories and is admissible under Rule 404(b). *See, e.g., United States v. Asher*, 178 F. 3d 486, 492-93 (7th Cir. 1999).

The government's offer to stipulate to the GSS methods in lieu of producing these highly relevant and incriminating documents is not a sufficient alternative. *See United States v. Williams*, 238 F.3d 871, 875-76 (7th Cir. 2001) ( defendant's offer to stipulate to element of offense does not render inadmissible the prosecution evidence of prior crimes to prove elements like knowledge and intent.). Similarly, here the defense should have the right to put in evidence the rules and methods authorized to be used by the GSS and routinely used in the interrogation of security detainees in the occupied territories.

For the same reasons the defense is entitled to the names and whereabouts of any security detainee in the occupied territories who confessed after interrogations by any of the GSS interrogators who interrogated Mr. Salah or were tortured pursuant to the same policy and practices as Mr. Salah. The testimony of similar methods of torture and coercion used against such detainees is also admissible under 404(b), and the government should at the very least request this evidence from Israel.

The government's claim that this request is impossible to meet is unavailing. The government has chosen to rely on evidence that it readily and easily obtained from a government that routinely engaged in the torture of Palestinian detainees. The prosecution can not have it both ways. It is disingenuous for the prosecution to now complain that they have not requested this information from Israel because there are too many victims of tortured confessions. It is obvious that the prosecution can limit this request to those who were interrogated in the Ramallah Detention Center between 1992-1993 by any of the same GSS agents who interrogated Mr. Salah. The Prosecution's reluctance to obtain these documents underscores the defendant's belief that the prosecution wants to prevent a full and fair inquiry into the circumstances surrounding the

7

statements obtained in Israel.

## III. CONTACTS BETWEEN THE U.S. AND ISRAELI SECURITY FORCES

The government objects to providing documents evidencing on-going contacts and a working relationship between the U.S. and Israeli law enforcement agents. While specific documents which provide information or reflect contacts concerning Mr. Salah between the two government's agents are obviously relevant, and the prosecution agrees to "attempt to locate those contacts, determine whether they are discoverable, and if so, provide them to the defendants," (Gov't. Response at 8), the prosecution claims other on-going contacts during the period in question are not discoverable. However, if there are documents which establish a pattern of conduct or show an on-going close working relationship between Israeli and U.S. law enforcement, such documents are material and relevant to proving a joint relationship in this particular case. Documents are material if they significantly help in "uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal." *United States v. Gaddis*, 877 F.2d 605, 612 (7th Cir. 1989) (quoting *United States v. Felt*, 491 F. Supp. 170, 186 (D.D.C. 1979)).

## IV. PRE-INDICTMENT DELAY

The defense does not quarrel with the government's position that before the burden shifts to the government to justify its pre-indictment delay, the defendant must show he has been prejudiced by such delay. However, the defendant is seeking the discovery of documents which show the improper motivation for such a prolonged pre-indictment delay, and has not yet filed his motion to dismiss for pre-indictment delay and has not yet specifically alleged the prejudice caused by such delay.

8

Suffice it to say, the delay involved here which dates back in substantial part to 1992 and 1993 and involves people, places and acts taking place in the Israeli occupied territories, on its face, raises a serious *prima facie* case of prejudice. How can the defendant find witnesses thousands of miles away in a region involved in social chaos and war after the passage of so many years? While the defense intends to spell out the specifics of the prejudice in its motion to dismiss, supplemented by a continuing investigation into the prejudice to the defense by the delay, the government should at least at this preliminary stage provide an explanation to the Court and the defense for this extraordinary delay and should be required to produce any relevant documents requested.

## V. SELECTIVE PROSECUTION CLAIM

The defense has sought in discovery documents that support its compelling claim of selective enforcement. For purposes of discovery, a defendant faces "a relatively low burden" since the "government holds most of the relevant evidence." *United States v. Utecht*, 238 F. 3d 882, 888-89 (7th Cir 2001). *Utech* was decided after *United States v. Armstrong*, 517 U.S. 456 (1996), and this Circuit was presumably aware of standards in *Armstrong* in fashioning its language in *Utecht*.

The defense has indeed raised a "colorable" selective enforcement claim. It has shown that there are designated pro-Israel terrorist groups, which according to the United States Department of State, receive money and other material support from persons and entities in the United States, and yet no person or organization that has provided material support for any of these terrorist groups has ever been indicted for such material support. Given those undisputed facts, the defense is entitled to the discovery it seeks in order to establish its claim of selective enforcement.

9

## VI. OTHER DOCUMENTS REQUESTED

The defense is seeking documents which show that certain United States and Israeli government agencies and employees provided support for Hamas and affiliated social-welfare groups during the period in which the defendant is accused of providing material support for a foreign terrorist organization and conspiring with a "racketeering enterprise" by providing material support for Hamas. The government claims that such documents are only relevant if they show support for Hamas and its affiliates of which the defendants were specifically aware.

The prosecution, however, chooses to miss the point. The materiality of such documents is not limited to support by the U.S. and Israel of which the defendants have specific knowledge.

Certainly, it is relevant to a trier of fact in determining whether the support provided Hamas or its affiliates by a defendant was with the specific intent to further the illegal goals of Hamas (See e.g. *Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir 2001)), that an agency or employee of the United States or Israel provided financial or other types of support for Hamas. Such documents are material as they may aid the defendants in corroborating their testimony or defense. *See United States v. Gaddis*, 877 F.2d at 612. For example, the attached document provided by the government in discovery shows that as late as 1999 the United States government sponsored an all expense three week tour for alleged Hamas leader Sheik Jamil Hamami. (*See* attached). Documents which memorialize U.S. or Israel's support for Hamas or its affiliates are clearly material to the defense and should be ordered produced.

## ADDITIONAL REQUESTS

A. If and when the defense is notified that there are FISA overhears that the government seeks to introduce, Mr. Salah will make the appropriate motions.

10

B. The defense reiterates its request made in its Initial Motion for Discovery and the Supporting Memorandum that the government be required to produce the administrative record of any proceedings which led to the designation of Hamas as a foreign terrorist organization and Mr. Salah as a specially designated terrorist.

Dated: May 17, 2005                          Respectfully submitted,


                                             Michael E. Deutsch
                                             People's Law Office
                                             1180 N. Milwaukee Avenue
                                             Chicago, Ill. 60622
                                             773-235-0070

                                             Robert Bloom
                                             3355 Richmond Boulevard
                                             Oakland, CA 94611

                                             Attorneys for Muhammad Salah

**FreeRepublic**.com *"A Conservative News Forum"*

[ Browse | Search | Topics ]

Click to scroll to commentary.

## Sheik key figure in government case against Holy Land

Dallas Morning News ^ | 31 July 2002 | MICHELLE MITTELSTADT

Posted on **07/31/2002 5:36:29 PM PDT** by Stultis

*Last modified: 03:26 AM CDT on Wednesday, July 31, 2002*

# Sheik key figure in government case against Holy Land

## FBI memo says local charity paid for his trips here, but U.S. did too

07/31/2002

By MICHELLE MITTELSTADT / The Dallas Morning News

WASHINGTON – Sheik Jamil Hamami figures prominently in the government's case against the Holy Land Foundation for Relief and Development, the Dallas-area Muslim charity raided and shut down last year after being designated a financial front for the Hamas terrorist organization.

Holy Land paid for the sheik, a senior Hamas leader in the West Bank, to travel to the United States at least six times in 1990 and 1991 to headline fund-raising events, U.S. officials disclosed in a once-confidential FBI memo and in other documents linking the charity to Hamas.

Holy Land wasn't alone in bankrolling his travel.

The U.S. government treated Sheik Hamami to a three-week, all-expenses-paid tour of Washington, Los Angeles and other cities in 1999 – four years after the United States declared Hamas a terrorist organization.

### 'Beyond hypocritical'

Attorneys for Holy Land, which has gone to court in a bid to reclaim the $4 million to $5 million frozen by the Treasury Department's Office of Foreign Assets Control last year, contend that the government is on shaky ground using the Hamami connection to prove ties to Hamas. Representatives of Holy

ATTACHMENT #A

Land, which raised $13.3 million in 2000, deny any ties to Hamas.

"It seems beyond hypocritical that the United States government would accuse the Holy Land Foundation of consorting with terrorists when, in this case, it's someone who the U.S. government has invited over as its guest," John Boyd, one of the organization's lawyers, said Tuesday.

The Justice Department, which is representing the Treasury Department and other federal agencies in the Holy Land legal proceedings, declined to comment on the claim. "We will respond in court," said Justice Department spokesman Charles Miller.

Sheik Hamami, who has renounced the suicide bombings and other violent methods used by Hamas to achieve Palestinian statehood, was a guest of the U.S. Information Agency for a February 1999 international visitors program on religion.

Officials at the State Department, which absorbed the Information Agency later in 1999, declined to comment on the trip.

In letters to Sheik Hamami, Information Agency officials at the U.S. Consulate in Jerusalem discussed his selection for a program on "Religion in America."

"This program is designed for mid-level professionals to meet their American counterparts and to exchange views on the latest developments in their fields," a Feb. 5, 1999, letter to Sheik Hamami explained. "Our office will provide the ticket for travel to the U.S. and per diem to cover hotel and meal costs."

Correspondence from the consulate described Sheik Hamami and other participants as "distinguished gentlemen."

Yet in recent legal filings opposing Holy Land's effort to recover its assets, Justice Department lawyers refer to Sheik Hamami as a "known Hamas principal."

**School donations**

In court this month, government attorneys said Holy Land contributed funds, even after Hamas was designated a terrorist organization, to a school run by Sheik Hamami "when they clearly know who Hamami is."

"Hamami was so well known as a Hamas leader that a textbook on Islamic fundamentalism and Hamas (written by a Palestinian professor from Bir Zeit University) described Hamami as a founder of the Hamas movement ... ," Justice lawyers wrote last month.

The government's decision to freeze Holy Land's funds rests on more than just the Hamami link.

Citing intelligence from electronic intercepts, the Israeli government and other sources, the Justice and Treasury departments contend that Holy Land was established as a funding mechanism for Hamas and took its directions from Hamas leadership.

Some of the charity's contributions were funneled to Hamas-linked organizations and the families of militants killed in violent attacks on Israel, Justice Department lawyer Elizabeth Shapiro said this month.

The Holy Land lawyers filed a motion Tuesday asking U.S. District Judge Gladys Kessler to permit them to introduce information about the government-funded Hamami trip, which they said they had learned about only recently.

"Now it appears that one of the defendants' principal allegations – that Holy Land paid for Hamami's speaking tour to the United States and met and conversed with him – parallels what the United States itself did, even after it designated Hamas a terrorist organization," the charity's lawyers wrote.

"The government's use of the 'Hamami connection' to buttress its case, along with some of the other evidence that Holy Land has placed in the record, suggests once again that the defendants have concocted a false record against Holy Land."

The Justice Department is opposing Holy Land's effort to submit the Hamami information. Department lawyers argued this month that the court must examine the Treasury Department's decision to freeze Holy Land's funds solely on the basis of the evidence compiled by the government.

"The fact that the government is opposing the admission of this evidence into the record is another indication that the government's view continues to be that the truth doesn't matter," Mr. Boyd charged.

E-mail mmittelstadt@dallasnews.com

---

TOPICS: Foreign Affairs; Front Page News; Government; Israel; News/Current Events
KEYWORDS: HAMAMI; HAMAS; HOLYLAND; ISLAMICCHARITIES; TERRORCHARITIES; WAHHABILOBBY; WOT

1 posted on 07/31/2002 5:36:29 PM PDT by Stultis
[ Post Reply | Private Reply | View Replies ]

To: blam; Shermy; Sabertooth; Grampa Dave; Miss Marple

*The U.S. government treated Sheik Hamami to a three-week, all-expenses-paid tour of Washington, Los Angeles and other cities in 1999 – four years*

FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) No. 03 CR 978 |
| v. | ) |
| | ) Judge Amy J. St. Eve |
| | ) |
| MOUSA MOHAMMED | ) |
| MARZOOK., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF MOTION

TO: Joseph Ferguson
    AUSA
    219 S. Dearborn Room 5000
    Chicago, Ill.

PLEASE TAKE NOTICE that on August 4, 2005 at 1:30 p.m., or as soon thereafter as counsel may be heard, I shall appear before the Honorable Judge Amy St. Eve, in Room 1241 of the United States District Court for the Northern District of Illinois, Eastern Division, 219 S. Dearborn St., Chicago, Illinois, and shall then and there present defendant Muhammad Salah's **MOTION FOR SUPPLEMENTAL DISCOVERY,** a copy of which is attached hereto and is hereby served upon you.

## CERTIFICATE OF SERVICE

I, Michael E. Deutsch, attorney at law, hereby certifies that I have served the attached motion on the above named AUSA by hand delivery on July 19, 2005

_____
Michael E. Deutsch

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **No. 03 CR 978** |
| **v.** | ) | |
| | ) | **Judge Amy J. St. Eve** |
| | ) | |
| MOUSA MOHAMMED | ) | |
| MARZOOK, *et. al.* | ) | |
| | ) | |
| **Defendants** | ) | |

**MOTION FOR SUPPLEMENTAL DISCOVERY**

Now comes the defendant Muhammad Salah by his undersigned counsel and respectfully requests additional discovery necessary for the preparation of the his motion to suppress statements and for his defense at trial. Specifically, Mr. Salah requests that the government provide all documents in the possession of the United States Department of State, including but not limited to the Consular Affairs Offices in Israel, in the occupied territories and in Washington D.C., which memorialize complaints by United States citizens or residents of torture, coercion or other forms of physical or psychological abuse during their detention and interrogation by Israeli security personnel, including the GSS which are alleged to have taken place between 1990-1998. In support of this request Mr. Salah through counsel states the following:

1. Mr. Salah made the request by letter dated June 28, 2005 to Assistant United States Attorney Joseph Ferguson who declined to produce these documents.

2. The above requested documents are relevant and necessary to challenge the statements

that the government seeks to introduce against Mr. Salah at trial and thus will be important evidence in his motion to suppress and, if necessary, in his defense at trial.

3. Specifically, the government on several occasions, once before this Court, has stated that although there may be systematic use of physical and psychological coercion used by Israeli security personnel against Palestinian detainees, such coercion is not used against Palestinian U.S. citizens who are detained and questioned by the Israelis.

4. The defense seeks documents containing information which directly disproves the part of the government's purported defense to Mr. Salah's claims of torture and physical and psychological coercion.

5. The documents which are sought are in the possession of the United States government and not the government of Israel and, upon information and belief, are well maintained and easily retrievable.

6. Further, such documents in addition to rebutting a the prosecution claim that Mr. Salah was not coerced since he was a U.S. citizen, are also likely to contain information about specific interrogators and specific methods of interrogation which corroborate the claims of Mr. Salah about what happened to him at the hands of the Israeli security forces.

Wherefore, Mr. Salah requests that the above enumerated documents be produced by the government.

Dated July 19, 2005

Respectfully submitted,


Michael E, Deutsch
People's Law Office
1180 N. Milwaukee Ave



**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

*Joseph M. Ferguson*
*Assistant United States Attorney*

*Everett McKinley Dirksen Federal Building*
*219 South Dearborn Street*
*Room 5000*
*Chicago, Illinois 60604*

(312) 353-1414
FAX: (312) 353-4324

October 7, 2005

*VIA Fax (773) 235-6699*
Michael E. Deutsch
People's Law Office
1180 North Milwaukee Avenue
Chicago, Illinois 60622

    Re:    *U.S. v. Marzook et al.* 03 CR 978, N.D. Ill. (St. Eve)

Dear Michael:

This letter serves to memorialize or telephone conversation last week during which I updated you on the availability of certain materials thought possibly to be in the possession of the Israeli Government that you have requested as discovery. Since we made inquiry into the existence and availability of these materials at the request of the court, we are copying the court on this letter. To date, the Israeli authorities have informed us of the following:

1. **The identity of "The Birds"**

Israel has represented that this is classified information that cannot be made available for these proceedings.

2. **Unpublished Annex to the Landau Commission Report**

Israel has likewise represented that this document is classified and cannot be made available for these proceedings.

3. **The identity of the guards or personnel on duty who interacted with Muhammad Salah during his period of interrogation.**

The Israel Security Agency (ISA) (formerly the General Security Service or GSS) did not maintain records of guards or personnel on duty other than the ISA interrogators.

Michael Deutsch
October 7, 2005

### 4.    Joint Venture

We believe that there were crossing inquiries made by the FBI and Israeli authorities regarding Muhammad Salah during his period of interrogation in Israel. Based on our tracing of the inquiries, there appears to have been no response by either government to the inquiry of the other until long after Salah was out of interrogation and had moved on to regular Israeli military court proceedings. Thus, we believe there was no joint venture and, of equal significance to you, no materials suggestive of a joint venture that have any bearing suppression of statements by Salah obtained during the interrogation period. We have nonetheless prompted Israeli authorities to review their files for indications of cooperation and/or joint venture regarding Salah prior to or during his period of interrogation, with specific reference to the aforementioned crossing inquiries that we believe to have occurred. Israel has indicated preliminarily that the interrogation of Salah was handled without the benefit and independent of any American support, cooperation or coordination. It nevertheless is continuing to search its files for materials reflecting contacts regarding Salah before or during the interrogation period

### 5.    Complaints Against Interrogators

As discussed over the telephone, the Israeli authorities have preliminarily informed us that a complaint of mistreatment of prisoners or detainees by an interrogator is not maintained or referenced in the personnel file of an interrogator unless the complaint was determined to be founded an independent Special Investigator. Procedurally, any complaint of prisoner or detainee mistreatment by an interrogator must be and is referred to a Special Investigator operating under the direction and auspices of the Ministry of Justice, with no involvement of ISA. If the Special Investigator finds that the complained of conduct took place and, accordingly, enters findings against the interrogator, the matter is, only then, placed in the interrogator's personnel file. If the Special Investigator determines that the complaint is unfounded, the complaint is not placed or referenced in the interrogator's personnel file, but rather is maintained or recorded only in the file of the complaining prisoner or detainee. It is our understanding that Muhammad Salah made a complaint to a military court judge in Hebron about physical violence and/or threats posed to him by "Chaim" during Salah's interrogation in the Ramallah facility. Salah's complaint was referred to and examined by a Special Investigator who determined Salah was not mistreated as he complained and that the claim of physical abuse was false.

Per our discussion, we will ask the Israeli's to explore prisoner or detainee files for complaints against specific interrogators if you provide us with a list of names of prisoners or detainees. We will make such a request in keeping with the general request posed to us by the court to inquire of such matters with our Israeli counterparts. However, in doing so, we maintain our position that mere complaints, under any circumstance, are not discoverable. Nevertheless, we will make inquiry with respect to specific prisoners or detainees you may identify.

### 6.    Polygraph

At your request, we have inquired whether Muhammad Salah was polygraphed during the period of interrogation. We have been informed that he was, but that the results of the polygraph have not been found. Whether the results were ever recorded, documented, maintained or otherwise kept is unknown.

Finally, on a separate but related matter, and, again, per the request of the court, we have made more particularized inquiry to the State Department regarding records it may have of complaints by American citizens of mistreatment while in Israeli custody. We have provided the State Department with the names

2

Michael Deutsch
October 7, 2005

you forwarded to me by your letter of September 15, 2005. We have also asked for complaints covering the period 1992 through 1995. (A request extending to 1998 as you requested in your letter is, we believe, overbroad and, more significantly is of such a scope as to ensure a very long response period.) We have been informed that the State Department has initiated a search of its files for such materials and will provide them to us if and when found.

In the meantime, I do want to take this occasion to memorialize the fact that the State Department is not aware of you having made any such request whether by way of subpoena or Freedom of Information Act (FOIA) request. In the absence of such a request, the State Department has directed that our office justify the relevance to *you* of the requested materials and the purposes to which *you* may put them, as is required for production of State Department records under the so called *Touhy* regulations of Title 28 of the Federal Code of Regulations. We have done so in a fashion that we believe will elicit any such materials that are of interest to you in defending this case. You also should be aware that the State Department has preliminarily and informally indicated that it does not believe that it has received any complaints of mistreatment of Israeli detained or incarcerated American citizens since 1999 (thus suggesting that the final response regarding a number of people listed in your September 15th letter, including Hanna Abu Khdeir, Steve Adams, a/k/a Mohammed Blata, and Dalell Mohmed, likely will be negative.)

As always, please do not hesitate to contact me should you have any questions or require further elaboration on any of the foregoing.

Respectfully,

PATRICK J. FITZGERALD
United States Attorney

By:

Joseph M. Ferguson
Assistant United States Attorney

cc:     Thomas Anthony Durkin
        Hon. Amy St. Eve

3