## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 03 CR 978 |
| | ) |
| MOUSA MOHAMMED ABU MARZOOK, | ) |
| MUHAMMAD HAMID KHALIL | ) |
| SALAH, and ABDELHALEEM | ) |
| HASAN ABDELRAZIQ ASHQAR, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On August 19, 2004, a Grand Jury returned a multiple-count, second superseding indictment (the "Indictment") against Defendant Muhammad Hamid Khalil Salah ("Defendant" or "Salah"), also known as Abu Ahmad, and his co-defendants, Mousa Mohammed Abu Marzook and Abdelhaleem Hasan Abdelraziq Ashqar. Defendant Salah has filed a motion to suppress statements he allegedly made to Israeli authorities in 1993 on the basis that he did not voluntarily make any of the statements which the government seeks to admit at trial. Defendant Salah argues that Israeli authorities coerced and tortured him into making any such statements. The Court conducted an extensive hearing on the issue. Because the Court finds that the government has met its burden of proving by a preponderance of the evidence that Defendant voluntarily made the majority of the statements at issue, the Court denies Defendant's motion in

large part. The Court further finds that the government has not met its burden of proving

Defendant's purported statements to Officer Suleiman on January 27, 1993 and February 21,

1993 were voluntary, and therefore, the Court grants Defendant's motion as to these statements.

The Court's reasoning is set forth in detail below.

## BACKGROUND

**I.    Defendant's Arrest in Israel**

On approximately January 25, 1993, Defendant Salah was arrested by Israeli authorities at

a checkpoint between the Gaza Strip and Israel[1]. From Salah's arrest through March 1993, Salah

allegedly made various incriminating statements – both orally and in writing – to Israeli

authorities while he remained in their custody. Although he made statements through May 18,

1993, his questioning was essentially completed two months earlier on March 18, 1993. Salah

allegedly made such statements to agents of the Israel Security Agency ("ISA") – also known as

the General Security Service ("GSS") and "Shin Bet" – the Israeli National Police ("INP"), and

others working for these Israeli authorities. The government seeks to admit these statements

during trial.

---

[1] The testimony during the hearing reflected that the Israeli authorities arrested Salah at a Gaza checkpoint. According to the American Consulate General documents, both Salah and his brother had reported that the authorities arrested Salah at a YMCA, but "YMCA employees have indicated that Salah was not present at the 'Y' when Israeli National Police and Israel General Security Services Officers arrived there with a court order to conduct a search of his room." (Gov. Ex. Consulate Documents at 009; Def. Ex. Salah Con. Docs. at 13, 16, 44.) Even Defendant Salah avers in his affidavit that the Israeli soldiers arrested him at a Gaza checkpoint.

## II.    The Statements at Issue

The statements at issue are as follows:

1.    Oral statements that Salah allegedly made to agents of the ISA after his arrest and while in custody which are memorialized in the ISA's activity logs;

2.    Salah's alleged statements on January 27, 1993, and February 21, 1993 to INP Officer Meron Suleiman;

3.    Salah's alleged January 30, 1993 statement to INP Officer Hezi Eliyahu;

4.    A handwritten signed agreement allegedly entered into between Salah and his GSS interrogators;

5.    A handwritten map allegedly made by Salah;

6.    A handwritten statement allegedly authored by Salah between approximately March 1, 1993 and March 4, 1993; and

7.    Salah's oral statements allegedly made and tape recorded at a March 18, 1993 session with an ISA interrogator.

Defendant allegedly made the majority of these statements to two ISA interrogators –

Nadav and Haim.  Both Nadav and Haim testified in court at the suppression hearing.  In

addition, Officer Eliyahu testified, but Officer Suleiman did not.  Salah's interrogation primarily

took place at the Ramallah interrogation facility in the West Bank.

## III.   The Indictment

The Indictment charges Defendant Salah with conspiring to violate the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d) (Count

I); knowingly providing and attempting to provide material support and resources to a Foreign

Terrorist Organization, namely, Hamas, in violation of 18 U.S.C. § 2339B (Count II); and

obstructing justice, in violation of 18 U.S.C. § 1503 (Count III). (R. 59-1.) Each charge is premised upon and related to Salah's alleged support of the Hamas terrorist organization, both prior to and after the United States designated Hamas as a Specially Designated Terrorist Organization and a Foreign Terrorist Organization. The Indictment alleges that Hamas has called for violent terrorist attacks, and engaged in numerous terrorist attacks aimed at Israeli military personnel, police officers, and civilians. It alleges that Defendant Salah has provided material support to Hamas, including recruiting and training new Hamas members in the United States and disbursing money from the United States to support Hamas activities and members. It further alleges that Salah was a member of a United States-based Hamas security committee that identified Palestinian men in the United States to assess "their capacity to participate in terrorist activities against Israel."

In furtherance of the conspiracy, the Indictment alleges that Defendant Salah traveled to Israel in January 1993 to further the objectives of Hamas. During this trip, Israeli authorities arrested him as described above.

The government seeks to admit the statements set forth above as evidence at the trial of this matter. The government bears the burden of proving the voluntariness of these statements by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618 (1972). The trial is scheduled to commence in October, 2006.

**IV.    The Hearing[2]**

Commencing with opening statements on March 3, 2006, the Court heard extensive testimony over thirteen days[3]. During the hearing, two interrogators from the ISA testified, including Nadav, the interrogator who primarily questioned Defendant Salah during the time period in question. The Court heard over six days of testimony from these two witnesses, including approximately four days of cross examination. Defendant Salah called multiple witnesses at the hearing, but did not testify himself. Both sides admitted extensive documentation for the Court to consider. To the extent it is relevant, the Court will address it below[4].

---

[2] The Court repeatedly held during the hearing, over Defendant's strenuous objections, that the Federal Rules of Evidence do not apply during suppression hearings. *See United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *United States v. Matlock*, 415 U.S. 164, 172-73, 94 S.Ct. 988, 994, 39 L.Ed.2d 242 (1974) ("[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence"); *United States v. Ienco*, 92 F.3d 564, 568 (7th Cir. 1996) ("But when, as in a suppression hearing, a jury is not involved, there is no reason for the judge to become preoccupied with the niceties of the rules of evidence.") *See also* Fed.R.Evid. 104(a) (a court is "not bound by the rules of evidence except those with respect to privileges" in deciding "[p]reliminary questions concerning ... the admissibility of evidence").

[3] In order to accommodate witnesses' schedules, including Defendant's witness Mr. Jonathan Kuttab, the Court extended the hours of some of the suppression hearing days.

[4] Over Defendant's objection, the Court admitted the English translations of his alleged statements. *See United States v. Watson*, 87 F.3d 927, 930 (7th Cir. 1996) (the totality of the circumstances "[b]y definition . . . includes the confession itself."). The Court did not, however, consider the truthfulness of these statements in reaching its holding. *See Lego*, 404 U.S. at 485 n.12, 92 S.Ct. at 624 n.12; *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741, 5 L.Ed.2d 760 (1961).

Defendant Salah submitted an affidavit in connection with his motion to suppress in which he averred that he only made the statements at issue after months of "an on-going nightmare of unmitigated and unbearable terror, threats, physical and psychological abuse, and sensory and sleep deprivation carried out by numerous Israeli interrogators, soldiers, police officers, jail guards and others working with the Israeli authorities." (R. 310-2 at ¶ 5.) Salah's affidavit provided details of the conditions he claims he endured during his interrogations by Israeli authorities. (*Id.* at ¶¶ 7-29.) Because his affidavit made a preliminary showing that a significant, disputed factual issue exists, the Court held an evidentiary hearing. *See United States v. Wilson*, 169 F.3d 418, 426 (7th Cir. 1999).

Prior to the hearing, the Court granted the government's motion to conduct certain portions of the suppression hearing in a closed courtroom because the anticipated testimony was classified under the Classified Information Procedures Act ("CIPA"), 18. U.S.C. app. 3. *United States v. Salah*, 412 F.Supp.2d 913, 919 (N.D. Ill. 2006). Specifically, the Court ordered the testimony closed to the public for two ISA witnesses – Nadav and Haim. *Id.* The government agreed to waive the majority of the classification designation as to Defendant Salah and his attorneys thus they were present for the majority of the hearing. *Id.* at 917. Pursuant to the Court's order, significant portions of the transcripts from the suppression hearing containing either non-classified information or information to which the government agreed to waive its classification designation were subsequently filed in the public docket. *Id.* at 924. (R. 465-1, 485-1, 502-1, 509-1, 510-1, 512-1.)

Because the government refused to waive the classification designation regarding certain

6

limited areas of the ISA testimony, the Court conducted a limited portion of the hearing *ex parte, in camera.* The Court also reviewed various documents *ex parte, in camera* pursuant to Section 4 of CIPA, to determine whether disclosure is appropriate and, if so, in what form. The remainder of the proceeding was open to the public.

## V.    Testimony Elicited During the Hearing

The government called the following witnesses during the suppression hearing: ISA Interrogator Haim, ISA Interrogator Nadav, Israel National Police Officer Hezi Eliyahu, and Federal Bureau of Investigation ("FBI") Special Agent Priestap. The government also called FBI Special Agent David Bray in its rebuttal case. Defendant Salah called the following witnesses at the hearing: Jonathan Kuttab, Yuval Ginbar, Avigdor Feldman, Eyad El Sarraj, Ahmed Al-Batsh, and Ribhi Qatamesh.[5] Defendant Salah submitted an affidavit, but did not testify at the hearing. A summary of the pertinent portions of each witness's testimony is set forth below. Because a portion of the testimony was classified and thus covered by CIPA, limited portions of this opinion are filed under seal.

In addition, both sides introduced exhibits during the hearing. To the extent such exhibits are relevant and material to the Court's ruling, they are discussed below.

### A.    ISA Agent Haim

ISA Interrogator Haim testified for 3 full days of testimony – over 20 hours of testimony

---

[5] Both Al-Batsh and Qatamesh testified via video conference.

in total, including 11 hours[6] of extensive cross-examination by Defendant's counsel. Haim

testified regarding the ISA and its organizational objectives. Haim testified that the ISA – whose

motto is "defend but not be seen" (Transcript of Suppression Hearing ("Tr.") at 836) – has an

overall agency mission aimed at preventing the acts of terrorists and terrorist organizations, as

well as acts aimed at harming Israel's state security generally. (*Id.* at 218.) To this end, the ISA

collects and receives intelligence information for safeguarding and promoting state security

interests (*id.*), preserves Israel's state secrets (*id.* at 219), and insists that the true identities of ISA

agents remain secret[7] (*id.* at 836). Incidental to preventing terrorist activities, the ISA also

develops evidence for the prosecution of criminal cases. (*Id.* at 227.)

Haim also described the role of the Israeli police. (*Id.* at 227-29.) The Israeli police, not

the ISA, determine what criminal charges are brought against an individual. (*Id.* at 227.) The

Israeli police also have the principal authority for investigating criminal cases. (*Id.*) In addition,

Haim explained that Israeli police officers – not ISA interrogators – take testimony or written

statements from detainees. (*Id.* at 228.) Haim stated that he had no authority over the police,

other than requesting that they come to the ISA facility to take testimony from an individual in

custody. (*Id.* at 228.)

During the relevant time period, Haim worked as an interrogator at the Ramallah ISA

---

[6] The time periods refer to actual testimony time – breaks and attorney argument are excluded.

[7] Indeed, Haim and Nadav are pseudonyms. The Court did not require them to disclose their true identities at the suppression hearing because their names are classified under Executive Order 12958. *See Salah*, 412 F. Supp. 2d at 923.

8

facility. (*Id.* at 215.) In January 1993, Haim served as the head of the investigating "interrogation team" at that facility. (*Id.*) Interrogation teams had "the responsibility for investigating terrorist activities, to prevent terrorist activities in the geographical area where it is in charge." (*Id.* at 219-220.) Haim described his job as "protecting the State of Israel and its democratic regime from terror threats, sabotage, espionage and political sabotage ... and treason." (*Id.* at 833.) Haim's responsibilities in 1993 included "starting reviewing the files for interrogation, deciding whether to accept an interrogated – that is, an arrest; later, planning the interrogation; division of labor among the members of the team regarding the investigation; deciding some central decisions during the interrogations; and deciding to end an interrogation, of course." (*Id.* at 224.)

Ramallah is located in the area referred to as the West Bank. (*Id.* at 224.) Haim explained that the Ramallah facility was part of a military base. (*Id.* at 264.)

## REDACTED PURSUANT TO CIPA

Haim testified regarding the importance of obtaining accurate information from an interrogee in order to prevent future terrorist activities. (*Id.* at 220-23.) If the ISA interrogators did not obtain accurate information and focused on the wrong people, Haim said that it "makes [them] lose twice, so to speak. First, the true terrorists continue with their activities and kill innocent people. And the second thing, concentrating on the wrong people is, of course,

concentrating on the wrong people, but it also brings about more hatred towards us; and we don't wish to do that." (*Id.* at 223.) Significantly, "1993 was a turning point in the actions carried out by Hamas, and 1993 was the first time that it started carrying out suicide bombers." (*Id.* at 219.)

Haim further testified regarding the four "wait" designations employed during interrogations – "cell," "wait," "cell wait," and "rest." (*Id.* at 288-300.) Haim testified that "cell" referred to the ISA sending the detainee to a prison cell under jurisdiction of the Israeli Prison Authority, not the ISA interrogators. (*Id.* at 288.) "Wait," according to Haim, has two states. (*Id.* at 288-89.) The first wait state is in the interrogation room. The second state is in the hallways of the interrogation area. (*Id.* at 288-89, 733, 807.) The designation "cell wait" refers to the ISA placing a detainee inside a cell at the ISA interrogation facility, which has a bench where the detainee can sit down. (*Id.* at 297-98, 732.) It also contains a light and air conditioning. Salah was held in "cell wait" once, on February 21, 2006. He was there for 3 ½ hours, uncuffed and with no head cover. (*Id.* at 299.) The fourth category is "rest." (*Id.*) Haim explained rest:

> When we decide to let the interrogee rest during the interrogation, and for some reason or another, we cannot transfer him back to the cell that is under the supervision of the prison's authority, we are obligated to provide the detainee with a mattress and two blankets in the interrogation room when he can sleep. Of course, under those circumstances, he's uncuffed and without any **REDACTED PURSUANT TO CIPA**
> I want to conclude by saying that this gives the detainee the ability to sleep and rest not inside the cell, but within the interrogation facility.

(*Id.* at 299-300.)

## 1.    The Landau Commission

Haim testified regarding the Landau Commission. Haim testified that the Landau

Commission was "convened or appointed by the president of the supreme court ... in order to

look into the investigation methods of the ISA regarding terrorism and in order to establish the

rules for the ISA's methods of interrogations regarding terrorism." (*Id.* at 590.) After the

Commission investigated the ISA methods, it issued a written report in 1987. (*Id.* at 633.) A

portion of that report is public and a portion of it – the Annex 2 – is classified. (*Id.* at 545, 589.)

The report set forth certain types of methods that the ISA could use during the questioning of

detainees. (*Id.* at 633.) The Commission found that some ISA officials lied at mini-trials (the

procedural mechanism equivalent to a suppression hearing), and had done so for many years.

(*Id.* at 590.) It further found that supervisors at the ISA knew that such lying took place and

allowed it to continue. (*Id.* at 591.)

## 2.  Salah's Arrest

On January 25, 1993, Salah was arrested pursuant to a warrant at the Erez Crossing – the

main entry point between the Gaza Strip and Israel. (*Id.* at 257.) Pursuant to Haim's

instructions, Salah came to the Ramallah facility within hours of his arrest. (*Id.* at 245, 258.)

Haim did not participate in Salah's arrest. He did, however, consistent with Israeli law, request

an arrest warrant from a police officer in Ramallah for Defendant Salah's arrest based on his

suspected terrorist activities. (*Id.* at 245-46.) Such a warrant was not necessitated under Israeli

law, according to Haim, because the military had the authority to arrest individuals whom they

suspected of terrorist activities. (*Id.* at 246.)

After being processed and having a medical examination, Salah was transferred to the Ramallah interrogation facility around 10:00 p.m. in the evening. (*Id.* at 301.) Haim then had him detained "because of his terrorist activities, because of intelligence regarding his terrorist activities." (*Id.* at 850.)

### 3. Haim Met Salah on January 25, 1993

Haim first saw Salah around 10:30 p.m. the evening of January 25, 1993, the day the Israelis arrested Salah. He described Salah as "a mature person dressed with a suit, and I think he even had an overcoat." (*Id.* at 310, 778.) Haim described Salah as "a wise, sophisticated man; and I realized that he wanted to check out to see what we know about him, what we don't know about him, so that he could consider his steps ... in order to decide what to admit to and what to conceal." (*Id.* at 322.) Haim testified that Salah's clothing was not dirty, rumpled or torn in any way. He was "very respectably dressed." (*Id.* at 310.) Furthermore, Haim testified that he did not observe any bruises or cuts on Salah, although he acknowledged that he did not see the parts of his body that were covered by his clothes. (*Id.* at 311, 779.) Haim did not observe any signs of mistreatment, nor did Salah complain to him of any such mistreatment. (*Id.* at 311-12.) Moreover, Haim never heard from Israeli authorities that Salah had been mistreated during his arrest. (*Id.* at 312.) Haim also testified that, contrary to statements in Salah's affidavit, Salah was not placed in a cold, dark isolated cell at the interrogation facility after his arrest. (*Id.* at 312-13.) Haim also denied that Salah was cuffed to a small child's chair, hooded, or that any interrogator slapped him. (*Id.* at 316, 778.) During this first meeting, Haim introduced himself to Salah as Major Haim, the head of the interrogation team in Ramallah. According to Haim, he

explained to Defendant Salah that he was "under interrogation by the ISA." (*Id.* at 318, 769-70.)

Haim assigned Nadav as the case officer for Defendant Salah because he "was the best interrogator on the team," and "from the standpoint of his character, he was suitable for Muhammed Salah." (*Id.* at 342.) Specifically, "Nadav in his character is a very quiet person. He is very logical." (*Id.*) Based on the information provided by Salah at the first meetings, Haim understood Salah to have a significant rank within the Hamas organization and to be a "senior activist in the Hamas." (*Id.* at 347-48.)

### 4. Order from Head of ISA

Haim testified that he received a direct order regarding Salah from the head of the ISA – Ya'akov Perry – directing Haim to "treat Muhammad Salah differently than other detainees.... We were not allowed to use covering the head, a small chair, nor waiting. And the only thing we could do was frontal interrogation." (*Id.* at 265.) Frontal interrogation, according to Haim, is "a conversation between the interrogator and the interrogee that takes place in the interrogation room." (*Id.* at 307, 341.) Haim stated on cross examination that he did not speak directly to Perry, but received the Perry directive from Abu Hasan and possibly Abu Daoud, both of whom were Haim's supervisors. (*Id.* at 666-68.) Because of these instructions, Haim was present when Salah first arrived at the Ramallah interrogation facility on January 25, 1993 to ensure that the interrogation team followed these instructions. (*Id.* at 313.)

Furthermore, Haim testified that it was unusual to detain an American citizen and "even then, in '93, the U.S. was a power." (*Id.*) Because Salah was a United States citizen the ISA treated Salah differently. (*Id.* at 343-44.) Also, Haim said that the ISA treated Salah differently

because he was older (40 years old) than most of the alleged terrorists whom the ISA questioned. (*Id.* at 344.)

### 5. Salah's Treatment While At ISA Interrogation Facility

Haim testified about Salah's treatment during the time the ISA questioned him from January 25, 1993 through March 18, 1993. He testified that because of Salah's age and his American citizenship, the ISA treated him more favorably than other detainees. (*Id.* at 343-44.) He also testified that the ISA realized that Salah was high up in the Hamas organization and they wanted information from him to prevent future terrorist attacks. According to Haim's testimony, Salah ate food prepared for the prison staff rather than the food prepared for prisoners, (*id.* at 434), and was permitted to use the restroom whenever he wanted to do so. (*Id.* at 864.)

Haim denied that Defendant Salah was subjected to any of the allegations of abuse put forth in Salah's affidavit. Specifically, Haim denied that Salah was ever beaten, subjected to physical pressure, stripped naked, handcuffed in an interrogation room for long periods of time, threatened with taking pictures of him naked, forced to sit in a low child's chair, slapped, left for long periods of time in a tiny freezing cell, denied sleep for long periods of time, subjected to having a foul smelling sack placed on his head for long periods of time, subjected to deafening loud music, forced to sleep on a cold floor for long periods without a mattress or blanket, placed in dark cells, threatened with violence, threatened with murder, threatened with harm to his family through the FBI, threatened with long detention without being brought before a judge, threatened with long prison sentences, denied food, clothing, or worship, or subjected to extreme heat and cold. Haim denied that he ever personally did any of these things, directed anyone to do

14

them, observed anyone doing them, or heard of anyone doing them. (*Id.* at 236-244.) Although Haim testified that he never kept Salah in wait with a hood on his head, he noted that it was possible for security reasons during transfer that his head was covered. Haim testified that he never saw that happen, but he acknowledged that it could have happened. (*Id.* at 295-96, 306-08.)

Haim further testified that Salah was never forced to sit in a child-like chair. (*Id.* at 295-96.) The Interrogators were forbidden, pursuant to Haim's order, from placing Salah in small child-like chair. (*Id.* at 343.) Haim admitted, however, that, in general, ISA

**REDACTED PURSUANT TO CIPA**

Haim testified that Salah requested to remain at the ISA interrogation facility during the evenings to sleep, rather than return to the prison facility at Ramallah. (*Id.* at 434, 854, 869.) According to Haim, the ISA accommodated Salah's request and provided him with a mattress and two blankets in the ISA interrogation room so he could sleep at night. (*Id.* at 239, 434, 854,

869.) Haim testified that Salah "wanted to remain in the investigating room or in interrogation room." (*Id.* at 239.)

During his testimony, Haim admitted that at times, the ISA interrogated Defendant Salah into the night "according to the need of the investigation or the interrogation." (*Id.* at 238.) He added, however, that they proceeded in this manner with Salah's agreement. (*Id.* at 239.) Haim also stated that during Salah's interview sessions, they took breaks to enable Defendant Salah to rest, eat and drink. (*Id.* at 239.)

### 6. Right to An Attorney and Visits from the American Consulate

Haim testified that Israeli laws differ from those in the United States regarding a detainee's right to an attorney. Under Israeli law, Defendant Salah did not have the right to see a lawyer immediately, even if he requested one. (*Id.* at 243, 319.) Haim testified that the head of the ISA interrogation team could prevent a detainee from seeing a lawyer for 15 days, and could further extend that period for an additional 15 days. (*Id.* at 243, 431.) A military judge could then extend that period for an additional 30 days. (*Id.* at 431-32.) The president of the military court, according to Haim, could extend the time period by yet another 30 days, but Haim testified that such an extension rarely occurs. (*Id.* at 432.)

Haim denied laughing at Defendant Salah when he asked for an attorney, but he explained to him that he was not permitted one immediately under Israeli law. (*Id.* at 243.) On January 27, 1993, Haim issued an order – as permitted under Israeli law – that Salah could not meet with an attorney for 13 days. (*Id.* at 819-26.) He testified that he exercised this authority for the benefit of the ISA's investigation. (*Id.* at 820-24; Def. Ex. 6.) Haim testified that he

subsequently shortened that period and permitted an attorney to see Defendant Salah, although Haim could not specifically recall by how much he shortened it. (Tr. at 827-28.)

In addition, Haim testified regarding the access of American citizens to American Consulate General Officials. Haim explained that the head of the ISA determines whether a foreign citizen is permitted to have visits with a consulate official. (*Id.* at 363-64.) Haim further testified that he recommended to his supervisors that they permit Salah to meet with the American Consulate. (*Id.* at 365.) On January 29, 1993, according to Haim, the ISA agreed to a consular visit for Defendant Salah on January 31, 1993. (*Id.* at 362-65, 843, 845.) On January 31, 1993, Salah met with an official from the American Consulate at the Ramallah prison facility. (*Id.* at 365.) Haim testified that ISA officials were not present in the room during consular visits, including the January 31, 1993 visit. (*Id.* at 368.) He further testified that the consulate officials did not provide the ISA with any details of what the detainee informed them. (*Id.*)

### 7. Access to the Military Court

Under Israeli military law, the ISA could wait 18 days before taking a detainee before a military court. (*Id.* at 419.) Haim testified that Defendant Salah had his first court appearance on February 2, 1993 – the seventh full day of his interrogation. (*Id.*) Haim testified that he had Defendant Salah brought before a judge before the law required him to do so because he was an American citizen and "we wanted a judge to see him as early as possible and to show that he's not being detained for a prolonged period of time." (*Id.* at 420-21.) Haim testified that police officer Meron Suleiman walked Defendant Salah from the Ramallah facility to the courthouse for his February 2, 1993 appearance. (*Id.* at 423-27; Gov. Ex. Newspaper Photographs Group; Gov.

Exs. Salah Video Photo 1 & Salah Video Photo 2.) Haim further testified that on February 2, 1993, Defendant Salah did not complain to the judge regarding his treatment. (Tr. at 430.)

### 8. Sa'doan

Haim testified at length regarding his discussions with Defendant Salah about the burial site of Ilan Sa'doan. (*Id.* at 385-419.) Sa'doan was an Israeli soldier from the Israeli Defense Forces whom Haim testified was kidnaped and murdered. (*Id.* at 385.) Israeli officials did not know where his body was buried. Haim testified that Salah told Nadav that he had information that could lead the ISA to the burial place of Sa'doan. This information was very significant to the ISA, according to Haim, because "according to Judaism, you have to recover people that are taken as prisoners. It's a matter of life and death .... And for us, discovering the burial place of the soldier and bringing him – and giving him a Jewish ceremony burial, for us it's – it's a very fundamental principle. Supreme – supreme principle." (*Id.* at 386.)

According to Haim, Salah told them that he had a map at home in the United States reflecting Sa'doan's burial location. Salah told Haim that he would attempt to obtain the map from the United States to assist them in locating Sa'doan's body. In return, Salah "demanded that we release a number of prisoners and that we give him his money back, the money that we took from him." (*Id.* at 387.) Haim described his negotiations with Salah and testified that they ultimately agreed to release female prisoners in exchange for the map of Sa'doan's burial site. (*Id.* at 388-392.) Haim testified that they only reached this agreement after Prime Minister Rabin approved it. (*Id.* at 390-91, 397.) Once they reached an agreement, Defendant Salah wrote out the terms of the agreement on January 31, 1993. (*Id.* at 391-92; Gov. Ex. Sa'doan Agreement.)

The agreement, written by Salah, was signed by Nadav, Haim and Defendant Salah. (Tr. at 392.) Under the terms of the written agreement, if Salah provided the ISA with information of the burial site and the ISA recovered the body and confirmed that it was the body of Sa'doan, Israel would release female prisoners who had not engaged in military operations or activity and return the approximate $96,000 in cash they had seized from Salah at the time of his arrest. (*Id.* at 396-99.) Haim further testified that he and Salah had a "gentleman's agreement" that the ISA would release Salah and send him home if they located the body of Sa'doan. (*Id.* at 397-98.) He added that "Muhammad Salah did not want to write it in the agreement. He said that he understood, he got the understanding that he didn't want it written. That when the Hamas people found out about it, they wouldn't think that he did it in order to release himself." (*Id.* at 398.)

Salah told Haim that he had initially obtained the map in London, memorized it, then sent it to his home in the United States. (*Id.* at 402-03.) For security purposes, Salah did not want to travel to Israel with the map. (*Id.* at 403.) Haim testified that the ISA permitted Salah to call his wife in the United States to attempt to obtain the map. (*Id.* at 402-03.) He further testified that according to Salah, his wife informed him that she had "destroyed a lot of things" after she learned that the Israeli authorities had arrested Salah. (*Id.* at 403.) Accordingly, Salah never obtained the map from his wife. (*Id.*) Instead, Haim testified that Salah drew a map from memory. (*Id.* at 404; Gov. Ex. Salah Handwritten Map 1.) Salah also accompanied Haim, Nadav, and others to the location drawn on the map to assist them in locating the body. (Tr. at 404-410, 413-415.) Although the Israeli authorities did not locate the body based on Salah's map, when they ultimately located the body in July 1996, Haim testified that he realized Salah

19

had made a mistake on the map regarding the location of one of the roads. (*Id.* at 415-18.) As Haim stated, "I am convinced that Muhammad Salah was seriously willing to help us find the body. He just made a mistake with regards to the junction, that's all." (*Id.* at 416-17.)

### 9. Judith Miller

Haim also testified about a visit from *New York Times* Reporter Judith Miller to the ISA interrogation facility at Ramallah during Salah's custodial interrogation in February 1993. (*Id.* at 440-48, 461-62.) She came with an interpreter, although Haim testified that he thought Ms. Miller understood Arabic. (*Id.* at 446-47, 539.) Haim further testified that he received an order from his superiors that Ms. Miller was coming to observe an interview of Defendant Salah. (*Id.* at 441-42.) Haim admitted that this procedure was unusual, and in fact, had not occurred before or after Ms. Miller's visit. (*Id.* at 530-34.) One of the reasons his supervisors permitted this visit was because the government of Isarel wanted to convince the FBI that terrorist activities were taking place in America of which they were unaware. (*Id.* at 441-42, 462.)

### REDACTED PURSUANT TO CIPA

According to Haim, Salah initially refused to allow Ms. Miller to observe an interview, but subsequently, Salah agreed to it. (*Id.* at 443.) Haim "received Ms. Judy Miller to the facility" and he "explained to her the rules of the game." (*Id.*) The ISA allowed Ms. Miller to observe and hear Nadav questioning Salah through a monitor – which provided for direct, live feed – without recording the conversation. (*Id.* at 444, 446, 554.) When Nadav finished his questioning, Ms. Miller met with Nadav to "ask him the question that she wanted to be asked."

20

(*Id.* at 444, 543.) Haim stated that Ms. Miller did, in fact, dictate some questions for Nadav to pose to Salah, and that Nadav thereafter asked Salah these questions. Haim testified that "[s]he again asked to ask a few more questions. She heard everything. She understands Arabic. And that is how we ended it." (*Id.* at 446.)

### 10. The "Birds"

Because the ISA did not believe that Defendant Salah was providing them with complete and truthful information, they decided to temporarily cease their questioning of him and instead planned a "bird drill." (*Id.* at 477-78.) Haim described a "bird drill:"

> It is a group of collaborators with the ISA who are located in prisons, not in the interrogation facilities; and they simulate terrorist command centers in prisons....

**REDACTED PURSUANT TO CIPA**

From approximately February 28, 1993 through approximately March 5, 1993, Salah's bird operation took place. (*Id.* at 488-94.)

**REDACTED PURSUANT TO CIPA**

21

REDACTED PURSUANT TO CIPA

During his time with the birds, Haim testified that Salah wrote a long statement regarding

his activities and knowledge of Hamas activities, including new information that he had not

previously provided to the ISA interrogators. (*Id.* at 494-95; Gov. Ex. Salah Handwritten

Statement.)

REDACTED PURSUANT TO CIPA

On March 4, 1993 – in the middle of the bird operation – Salah had a court appearance

before the military court. Haim testified that after that appearance, Haim received a protocol

from the judge lodging a complaint against him. Salah complained to the judge that Haim had stripped him naked and threatened him with a long detention. (Tr. at 499-500.) The allegations were subsequently investigated and, according to Haim, they were never substantiated. (*Id.* at 500.) In fact, Haim testified that Salah retracted the allegations during the investigation and told the birds that he had lied to the judge about Haim. (*Id.* at 501-02.)

### 11. Salah's March 18, 1993 Statements to Nadav

The ISA resumed questioning Salah after the bird operation. Haim testified that they eventually informed Salah that they had the handwritten statement that he had provided to the birds. (*Id.* at 509.) According to Haim, Salah agreed to let Nadav question him about that statement on March 18, 1993. (*Id.* at 510.) The ISA recorded that conversation. (*Id.*) Haim testified that he authorized the tape recording of that session because Salah indicated that he would talk to Nadav regarding the contents of his handwritten statement, but he would not give any testimony to the Israeli police officers on the subject. (*Id.*) March 18, 1993 was the last lengthy interview session of Salah by the ISA.

### B. ISA Agent Nadav

ISA Interrogator Nadav also testified during the hearing for a full 3 days. Specifically, he testified for approximately 8 ½ hours on direct and over 11 hours on cross examination.

### 1. Nadav Was the Primary Questioner of Defendant Salah

Nadav is a former interrogator for the ISA who served as the deputy head of the team of interrogators. (*Id.* at 958.) Nadav explained – and contemporaneous ISA interview logs confirm – that he had the primary responsibility at the ISA for questioning Defendant Salah. (*Id.* at

1571.) Indeed, Nadav spoke with Salah in over 30 separate sessions. Nadav interviewed Salah

during these sessions regarding Salah's Hamas activities and his role in and knowledge of such

activities. He also identified Salah in court. (*Id.* at 1010.) Nadav testified that on January 26,

1993, Haim selected him to question Salah. (*Id.* at 1259.) Prior to interviewing him, Nadav

testified that he was told that Salah "is a senior Hamas activist that was meeting with senior

Hamas activists; and, that already that night he started to admit to it in a connection with – in a

connection to the Hamas, any kind of connection to the Hamas." (*Id.* at 1252-53.) Haim directed

Nadav to question Salah about his Hamas activities and "about his encounters or meetings with

Hamas activists." (*Id.* at 1370.) According to Nadav, his objective in questioning Salah was to

have Salah tell him "as much as he could about his activities." (*Id.* at 974.) Nadav said that he

wanted the truth from Salah in order to prevent future attacks by Hamas on Israelis. (*Id.* at

1646.)

Nadav admitted that even though he questioned Salah in 1993 – over 13 years ago – he

had some independent recollection of the events due to their unique nature, but he also needed to

refresh his recollection with his Interview Logs that he completed contemporaneously with each

interview of Salah in 1993. (*Id.* at 979-80, 1398.) He contemporaneously completed interview

log sheets to "reflect what the interrogee said during his interview" and to "remind the

interrogator of what took place." (*Id.* at 1392-93.) Nadav described the ISA interview logs as

follows: "the memo reflects the exact hour of when the interview started and when it ended.

And, in those memos, I write bullets about what the interrogee said." (*Id.* at 1398.)

Nadav testified that he first met with Defendant Salah on January 26, 1993 at 11:30 a.m.,

24

and their interview session lasted approximately an hour and a half. (*Id.* at 959, 966, 969, 1238.)

Nadav described Salah as alert and not overly tired during this session. (*Id.* at 968.) He further

testified that Salah did not have a hood on his head and his clothes were not dirty or torn during

this meeting. (*Id.* at 967.) Nadav did not observe any bruises on Salah at this initial meeting,

although Nadav admitted that he could not observe those portions of his body that were covered

with Salah's clothing. (*Id.* at 1286-87.) Salah was handcuffed at the beginning of this meeting,

and Nadav uncuffed him immediately upon entering the room. (*Id.* at 966-67.)

Nadav testified that from this initial encounter with Salah, they had "good chemistry"

between them which "impacted the relationship we had and it was a very good relationship." (*Id.*

at 960.) He further testified that "the relationship between us is based on friendship." (*Id.* at

1114-15.) Nadav described Salah as highly intelligent and polite. (*Id.* at 967-68.) Salah's

interrogation sessions took place at the ISA facility in Ramallah and Nadav never had a gun or

weapon with him when he questioned Salah. (*Id.* at 968.)

### 2.     Treatment of Salah

Both sides extensively questioned Nadav about Defendant Salah's treatment while he was

in custody and while Nadav and others questioned him. In the course of this testimony, Nadav

directly denied the averments in Salah's affidavit.

Nadav described the interrogation rooms where he typically questioned Defendant Salah.

According to Nadav, Salah asked to remain in these interrogation rooms at the end of each

session, including the evenings, rather than being transferred to the prison facility at Ramallah,

"because of the good atmosphere during the interrogation." (*Id.* at 963, 1570.) Nadav explained

that the ISA, including himself, granted Salah's request and permitted him to remain in the interrogation rooms at the Ramallah facility at night during the week. (*Id.* at 962.) They also provided him with blankets and a mattress in the room so he could sleep. (*Id.*) When the interrogation facility at Ramallah closed on Friday and Saturday, the ISA transferred Salah to the prison facility for the weekend. (*Id.* at 1033.)

Nadav testified that Salah received special treatment such as spending the nights in the interrogation rooms at his request for three reasons: 1) Salah was an American citizen; 2) he had started cooperating from the beginning; and 3) "the click that we had since the outset of the interrogation." (*Id.* at 1370, 1502.) Nadav could not, however, recall if Haim gave him a specific instruction to treat Salah differently because he was an American citizen. (*Id.* at 1370.)

Nadav testified that they took breaks throughout their interrogation sessions. (*Id.* at 972-73, 1053.) He said that his conversation with Salah was "flowing," and he was able to communicate with him effectively. (*Id.* at 973, 994, 996.) According to Nadav, their relationship was a good one. (*Id.* at 1027.)

Nadav testified that Salah was alert every time Nadav spoke to him. (*Id.* at 992, 994, 996, 1009, 1027, 1033, 1045, 1067, 1069, 1396-97, 1658-60.) He further testified that Salah was rested every time he questioned him as well. (*Id.* at 1009, 1033, 1045, 1046, 1053-54, 1065, 1069, 1396.) According to Nadav, he never intended to deprive Salah of sleep, and in fact, never deprived Salah of sleep. (*Id.* at 1411, 1483, 1489, 1524, 1612.) Nadav explained that he sometimes questioned Salah in the middle of the night "because of severe terrorist activity, because of the nature of that activity, it was very important to receive information as soon as

possible in order to prevent another act of killing." (*Id.* at 1489.) Salah was alert when such questioning took place. (*Id.*)

Nadav testified that the ISA provided Salah with meals three times a day unless Salah was fasting for religious purposes. (*Id.* at 963-64.) When Salah wanted food, Nadav said that they gave it to him. (*Id.* at 1484.) In fact, Nadav often ate meals with him. Salah also received food from the kitchen of the interrogators, rather than from the prison kitchen, including fresh salads. (*Id.* at 964, 995.) In addition, Nadav testified that he gave Salah coffee and tea when he asked for such drinks, and even offered drinks to him when he did not ask for them. (*Id.* at 1484.) Nadav testified that he brought coffee for both himself and Defendant so frequently that he knew how Salah liked his coffee – with two spoons of sugar. (*Id.* at 1050, 1106 1178-79.) Further, Nadav said that he permitted Defendant Salah to go to the bathroom whenever he wanted to do so; Salah never had to beg to go to the bathroom. (*Id.* at 1198-99, 1483.) Nadav also gave Defendant Salah a copy of the Koran. (*Id.* at 964.) Nadav said that he treated Salah "quite nicely" while he was in custody. (*Id.* at 1485.)

According to Nadav, Salah did not complain to him about his treatment while he was in custody. Nadav further testified that he never observed any signs of physical or mental abuse during his questioning of Defendant Salah. (*Id.* at 992, 1009, 1027, 1033, 1067, 1069, 1222, 1484, 1486-87, 1534.) Salah never complained to Nadav that Haim had mistreated him. (*Id.* at 1486.) Nadav added that "I can say that judging on the relationship that we had, if something of this had happened to him or could have happened to him or something even close or similar to that, he would tell me about it." (*Id.* at 1225.) Also, Nadav testified that other ISA agents would

have told him if any such things happened because "we don't hide information one from the other." (*Id.* at 1225.) Salah did tell Nadav that other prisoners in custody cursed the ISA. (*Id.* at 1486.)

Nadav testified that he never left Salah handcuffed in the interrogation room, and he never left Salah outside of the interrogation room handcuffed or sitting in a small chair. (*Id.* at 1006, 1221.) Furthermore, Nadav never saw Salah sitting in a small chair. (*Id.* at 1006, 1221, 1428, 1483, 1693.) In addition, Nadav testified that the ISA did not use a small chair like Defendant's Exhibit 5. (*Id.* at 1427-28.)

Nadav further testified that he never exposed Salah to deafening music. (*Id.* at 1221, 1462.) He testified that he never threatened Salah. (*Id.* at 1223, 1483.) Nadav said that he never threatened Salah that he would spend the rest of his life in jail if he did not confess. (*Id.* at 1223.) In fact, Nadav said that he did not tell Salah that they would release him if he confessed. (*Id.* at 1224.) Instead, he told Salah that his sentence was up to the judge in the case. (*Id.*) Salah wanted to know what his sentence would be, but Nadav did not give him an answer regarding the extent of the sentence that he would get. (*Id.* at 1666.)

Nadav testified that he never threatened to have the FBI kill Salah's family. (*Id.* at 1221.) He said further that he never heard any such threats made to Salah. (*Id.* at 1222.) Moreover, Nadav never threatened Salah's family. (*Id.* at 1484.) He testified that he never threatened or heard anyone threaten to have Salah sexually assualted. (*Id.* at 1222.)

Similarly, Nadav said that he never physically abused Salah, nor did he personally observe others do so or hear of others physically abusing him. (*Id.* at 1222, 1483.) Salah never

told Nadav that he had been physically abused. (*Id.* at 1223.) Nadav testified that he never personally photographed or threatened to photograph Salah without his clothes on, and he was not aware of anyone else doing so or making such threats. (*Id.* at 1120.) Neither Nadav nor anyone else to his knowledge ever put Defendant into a cell or room with freezing temperatures. (*Id.* at 1220.) Nadav added that Defendant Salah could adjust the thermostat in the interrogation room himself if he wanted to. (*Id.* at 1533.)

Further, Nadav strongly denied ever putting a hood over Salah's head, (*id.* at 1483, 1448-52), or placing him in a cold or hot room. (*Id.* at 1483.) He testified that he never observed Salah's head covered with a hood, and never asked anyone to cover Salah's head with a hood. Similarly, Nadav testified that no other ISA interrogators told Nadav that they had covered Salah's head with a hood. (*Id.* at 1448-52.) Nadav also denied that he or anyone else threatened to blind or poison Defendant Salah if he did not confess or cooperate with the ISA. (*Id.* at 1223.)

Regarding Salah's access to an attorney, Nadav testified that Israeli law does not provide a detainee with immediate access to an attorney. (*Id.* at 1528-29.) In Defendant Salah's case, Haim had the authority to determine, within the time constraints provided by law, when Salah could see an attorney. (*Id.* at 1529.) Although Nadav could not remember the exact time frame, he testified that Salah was permitted access to an attorney before the ISA had to give him such access under the law. (*Id.*)

### 3. Sa'doan

Nadav also testified extensively on his discussions with Salah regarding the burial site of Sa'doan's body. (*See, e.g., id.* at 1016-1031, 1036-37, 1046, 1076.) On approximately January 31, 1993, Salah informed Nadav that he had "at his disposal the map that describes the location of the body of Sa'doan." (*Id.* at 1018.) Nadav testified that it was very important to find the body "because we have a custom that it is our obligation to bring soldiers – and, in general, people, to be buried according to the custom of our religion of Israel." (*Id.* at 1019.)

Nadav testified regarding Salah's negotiations with the ISA over the burial location. Nadav stated, "What he said is he told us he has the map in Chicago at his house and he was willing to negotiate with us about the finding of the body, and only afterwards he would ask his wife to send the map." (*Id.* at 1019.) Nadav explained that Salah and the ISA then negotiated and reached an agreement on this issue. (*Id.* at 1019; Government Exhibit Sa'doan Agreement.) According to Nadav, Salah handwrote their agreement, setting forth the terms of their agreement regarding the map and finding Sa'doan's body. (Government Exhibit Sa'doan Agreement.) Nadav testified that Prime Minister Rabin ultimately had to agree to the terms in the agreement before the ISA could commit to them. (Tr. at 1021-22.)

In an effort to obtain the map which Salah said he had at home, he called his wife in the United States. (*Id.* at 1017-18.) Salah reported that his wife said that she either destroyed or burned the map. (*Id.* at 1023.) Nadav testified that Salah attempted to re-create the map to reflect where the body was buried. (*Id.* at 1024; Gov. Ex. Salah Handwritten Map 1.) After drawing the map, the ISA took Defendant Salah out into the field with them to assist the ISA in

30

locating the body. (Tr. at 1024-25.) When Salah was out in the field, the ISA had him handcuffed. (*Id.* at 1031.)

Nadav testified that Salah again called his wife in an attempt to obtain the map from her. (*Id.* at 1037; Gov. Ex. 2-8-93 Log.) He explained that Salah indicated a hesitancy on his wife's part regarding the map, but Salah attempted to explain to her that he was trying to get the map on his own initiative. (*Id.* at 1038.) During the conversation, Nadav said that Salah informed his wife that his condition in the prison was fine and that he was getting his necessary medication. (*Id.*)

Nadav testified that Salah again called his wife on both March 17, 1993 and March 18, 1993, and that Nadav remained present in the room. (*Id.* at 1097-98; Gov. Ex. 3/17/93 Log Translation SH; Gov. Ex. 3/17/93 Log Translation SH.) During both conversations, Salah discussed locating the map reflecting the burial site of Sa'doan's body. (Tr. at 1097-98.) He also spoke with his children on March 17, 1993, and inquired about their studies. (*Id.* at 1097.)

### 4. Judith Miller

Nadav testified regarding his interactions in February 1993 with *New York Times* reporter Judith Miller. Haim asked Nadav to inquire of Salah if he would meet a journalist from the *New York Times*. (*Id.* at 1048.) Initially, Salah told Nadav that he was not interested in such an interview. (*Id.*) Subsequently, he agreed to the interview, and Ms. Miller thereafter observed Nadav interview Salah. (*Id.* at 1048-50.) She observed the interview through a monitor. (*Id.* at 1049.) After she saw the interview session, Ms. Miller asked Nadav to ask several questions for clarification, and Nadav went back into the interrogation area and asked Salah the questions. (*Id.*

at 1051.)

## 5. Birds

Nadav also testified about Salah's experience with the birds.

**REDACTED PURSUANT TO CIPA**        (*Id.* at 1084.)

During the time that Defendant was with the birds, Nadav was on personal leave for 10 days because his father had passed away. (*Id.* at 1084-85.) When Nadav returned from his leave, he learned that Salah had authored a lengthy hand written statement in Arabic while with the birds. (*Id.* at 1085, 1576.) Nadav testified that March 11, 1993 was the first date that he saw Defendant Salah since his return from personal leave. (*Id.* at 1088-89.) According to Nadav, Salah stood up when Nadav entered the room and shook his hand. (*Id.* at 1089.) Nadav described Salah as alert and well rested. (*Id.*) Nadav also said that Salah did not complain to him about his time with the birds or anything else. (*Id.* at 1089-90.) Nadav testified that Defendant Salah never told him that the birds had threatened him. (*Id.* at 1223.) Instead, Nadav said that Salah was "really taking interest in what I've been through." (*Id.* at 1090.) Nadav testified:

> In general, I would like to say that the type of relationship that I developed with him throughout the interrogation was very deep. We used to talk about personal matters. He used to tell me things, I would tell him things. I can say if it wasn't in the framework of an interrogation, we could have been good friends.

(*Id.* at 1089.)

## 6. March 18, 1993

Nadav testified that Salah did not know as of March 16, 1993 that Nadav had a copy of

32

the handwritten statement he gave to the birds. (*Id.* at 1094.) As of March 18, 1993, however, Salah knew that he had this statement. (*Id.* at 1098.) Nadav testified that Salah agreed to meet with him and discuss the contents of the written statement that he gave to the birds. (*Id.* at 1098-99.) Salah told Nadav that he would "sit with [him] and tell [him] everything, but [Salah's] condition is that [he] tell today everything and we will no longer sit and talk about this report." (*Id.* at 1099.)

Accordingly, on March 18, 1993, Salah began talking to Nadav about his written statement to the birds. (*Id.*) Nadav received Haim's permission to record the statement, and he recorded it in its entirety. (*Id.* at 1099, 1102-03; Gov. Exs. 3/18/93 Tapes 1-5; Gov. Exs. Tape English Translations SH 1-5.) Nadav did not disclose to Salah that he was recording the session. (Tr. at 1100.) Nadav also admitted that this is the only session between Salah and an ISA interrogator that the ISA recorded. (*Id.* at 1250-01.) The session lasted approximately 5 hours. (*Id.* at 1100.) Nadav testified that Defendant Salah "insisted on completing the report on that day." (*Id.*) At various times during the session, Salah told Nadav that he wanted to complete their discussion that day and thereafter not talk further about the matters. (*Id.* at 1179-80, 1193-94, 1202-03.) Nadav testified that Salah told him to "[f]orget about interrogation after this." (*Id.* at 1203.)

Nadav testified that Salah admitted that he had written the statement and further admitted to Nadav that "all that I have written here is true." (*Id.* at 1101, 1145-47.) Nadav said that Salah never complained that he had been forced to write the report or threatened with violence or acts of violence if he did not write it. (*Id.* at 1101.) Salah told Nadav that "I trust you personally."

(*Id.* at 1106.) Nadav described Salah as "very respectful when he spoke, and he made very good contact with people he came in touch with." (*Id.* at 1165.) With respect to Haim, Salah told Nadav, "if I wanted to be defiant with Haim, I would have done so." (*Id.* at 1106.)

During the March 18, 1993 session, Salah reviewed the contents of his handwritten statement in detail. They had a copy of the report with them during the session and went through it. (*Id.* at 1146-47.) According to Nadav, Salah discussed the topics and admitted areas where he previously had not been truthful with Nadav or had given him false information. (*Id.* at 1163, 1181, 1200-02, 1204-05.) Nadav testified that Salah told him about his Hamas activities both inside and outside the United States.

Nadav testified that Salah did not know how he had obtained a copy of his handwritten statement to the birds. (*Id.* at 1146-48, 1207-08.) Salah inquired about how he had obtained it, and asked if they had "spies" in the prison. (*Id.* at 1147.) Nadav testified that Salah "didn't understand if I went to the prison and had – and I just took it from the detainees or did I have spies that they brought me these reports." (*Id.* at 1148.) Nadav added, "from my experience, it indicates in the prison – that in the prison it was like regular detainees and his treatment was good. That in such a situation, from my previous experience, if there was any problem at that moment, he would have told me in which way he delivered the reports. From my standpoint, it's another indication that his treatment during the exercise was good." (*Id.*)

According to Nadav, Salah refused to provide Nadav with certain information during this session on March 18, 1993. (*Id.* at 1144-46, 1204-06.) Nadav did not push the issue. (*Id.* at 1093, 1108-09.) He also corrected statements in the handwritten document that were incorrectly

34

written. (*Id.* at 1177-78.) Salah told Nadav that he was talking, in part, to help himself – he hoped to get a reduced sentence. (*Id.* at 1210.)

Nadav testified that he and Defendant Salah again discussed the map of the location of the body of Sa'doan during this session. He said that Salah "suggested that he would go out of the facility for five hours, reach a public phone and make a collect call to his wife in the United States. That way she would feel that he was free." (*Id.* at 1175.) Nadav further testified that Salah discussed a conversation that he had had with his attorney, Ahlam Haddad, after he provided her with a copy of the handwritten agreement he entered with the ISA regarding Sa'doan's burial location. (*Id.* at 1184-85.) The attorney told Salah that the ISA would not abide by the written agreement they had entered regarding the Sa'doan map, and that the ISA would "tear it apart." (*Id.* at 1185.) Salah told Nadav that he was afraid they would tear it up after he spoke with her, but he came to understand that he could trust Nadav and "therefore, I don't listen to the female attorney." (*Id.* at 1184-85.) Nadav added, "he was trying to tell me that he does not trust the lawyer regarding this subject. But I told him that this is none of my business." (*Id.* at 1185.)

Nadav testified that Defendant Salah told him that because no one knew most of the information that he was providing to Nadav but himself, that "his commanders in the Hamas will understand that he was the one who gave it up, who gave it away, and that will create problems for him in dealing with them." (*Id.* at 1114-15.)

During the March 18, 1993 session, Nadav testified that Salah joked with him, even suggesting that Nadav should pay him for the significant information he was providing. (*Id.* at

1130-31; *see also id.* at 1140-42, 1193-94, 1204-05.) Nadav said that he offered Salah drinks throughout the session, and never denied him the use of the bathroom. (*Id.* at 1124-25, 1163-65, 1198-99.)

Nadav also testified regarding several of Salah's statements to Nadav. Regarding his release, Salah told Nadav "it all depends on how you release me. It depends on how I get out. If I leave here with the state of mind that you have screwed me, I will leave here seeking vengeance and I will start all over again. Do you want better than this honesty." (*Id.* at 1112.) Nadav testified that Salah added that if the Israeli authorities gave him a severe penalty, he would "dedicate [himself] to Palestinian action ... and train a hundred" soldiers. (*Id.* at 1113.)

During the session, ISA Interrogator Benny briefly came into the room. (*Id.* at 1172-74.) Salah did not complain to Nadav about Benny once he left the room. Nadav testified that Salah joked with Benny. (*Id.* at 1173-74.)

### 7. ISA Guidelines

Nadav also testified that he followed the ISA's internal guidelines when questioning detainees. (*Id.* at 1341, 1658.) When he began working for the ISA, they provided him with these written guidelines. (*Id.* at 1343.)

### C. Israel National Police Officer Hezi Eliyahu

Officer Eliyahu, a senior investigator with the Israeli police, testified at the hearing regarding his interaction with Defendant on January 30, 1993. Officer Eliyahu explained that the "Israeli police [department] only works under its own orders, under its own rules. We do not work under the orders of the ISA. We are a totally independent unit." (*Id.* at 1801.)

36

Prior to January 30, 1993, Eliyahu did not have any involvement with Defendant Salah. He testified that he received a call the evening before and was told to come early in the morning to take testimony. (*Id.* at 1752.) When he arrived to take Salah's testimony, he spoke with either Nadav or Haim, and reviewed the ISA logs, although he could not remember which specific logs. Eliyahu was informed that the Prime Minister of Israel was waiting for the results of Salah's statement, thus he knew his assignment was important. (*Id.* at 1760.)

Eliyahu testified that he interrogated Defendant Salah in Arabic – a language they both spoke – for approximately two hours, although some evidence suggested it was longer. (*Id.* at 1761-62.) He testified that Salah was calm, relaxed and "spoke in a regular manner." (*Id.* at 1722.) He was polite, alert and did not appear sleepy or tired. (*Id.* at 1722-23.) After general conversation, including Salah's statement that he had translated the Koran into English, Eliyahu obtained background information from him and then took his statement. (*Id.* at 1723-1726.) During that time, Eliyahu wrote down "word for word" what Salah said to him in a six page statement. (*Id.* at 1731; Gov. Ex. 1/30/93 Salah Statement.) Officer Eliyahu conceded that portions of Salah's January 30 statement were identical to portions of the ISA activity memorandum from January 28, 1993. (Tr. at 1784-92.) He denied, however, copying the information and insisted that Salah independently gave him the information in the statement. (*Id.* at 1788, 1791-92.) Although their conversation took place in Arabic, Eliyahu wrote the statement in Hebrew, a language Salah does not read or write. (*Id.* at 1726-1727; Gov. Ex. 1/30/93 Salah Statement.) Eliyahu knew that Salah did not speak Hebrew. (Tr. at 1755-56.) Officer Eliyahu further admitted that he knew how to write in Arabic, but did not do so. (*Id.* at

37

1757.) Eliyahu testified that after he completed writing each page of the statement in Hebrew, he translated what he wrote to Salah for his confirmation that each sentence in the statement was accurate. (*Id.* at 1730, 1731-1732, 1733, 1734.) If Salah wanted him to change anything, he changed it. (*Id.* at 1732.) Once he completed this process, Eliyahu had Salah sign the bottom of each page. (*Id.* at 1731-39.) Salah signed all of the pages in English, except he signed page 4 in Arabic after Eliyahu asked him to do so. (*Id.* at 1736-37.) During the questioning, Salah expressed concern to Eliyahu about the people whose names he was providing to him. (*Id.* at 1739-40.)

Eliyahu further testified that he never saw anyone verbally or physically abuse Salah, and that Salah never complained about any such treatment to him. (*Id.* at 1747-49.) Eliyahu never heard about anyone doing such things to Defendant Salah. (*Id.* at 1749.) Eliyahu also testified that he never deprived Defendant of the use of a bathroom and never had him sit in a child's chair or saw him sitting in such a chair. (*Id.* at 1748.) Similarly, he did not subject him to deafening music, subject him to extreme temperatures, threaten to blind or maim him, threaten to have him sexually assaulted, kick him, slap him, force him to stay awake, strip him naked, threaten to photograph him naked, or threaten to harm his family. (*Id.* at 1746-49.)

### D.    FBI Special Agent E.W. Priestap

FBI Special Agent Priestap, who currently works at the FBI's Headquarters in Washington, D.C., testified regarding an interview he conducted of Majed Razek, a foreign service national at the American Consulate in Israel. (*Id.* at 1925-28.) Agent Priestap previously was assigned to the FBI counter-terrorism squad in Chicago. (*Id.* at 1926.) While on that squad,

Agent Preistap interviewed Majed Razek in September 2002 regarding his prior discussions with Defendant Salah. (*Id.*) Mr. Razek worked in the arrest department at the American Consulate where he set up consular visits with American citizens whom the Israelis had arrested. (*Id.* at 1929.)

Mr. Razek told Agent Priestap that he had several meetings with Defendant Salah after the Israeli authorities arrested him in 1993 and while he remained in their custody. Mr. Razek documented each of his visits with Defendant Salah. (*Id.* at 1929-30.) Specifically, he met with Salah on January 31, 1993, February 2, 1993, and February 12, 1993. Agent Priestap testified that Mr. Razek told him that "he did not observe any signs of mistreatment during his interaction with Mr. Salah." (*Id.* at 1931.) Mr. Razek described Salah as "very intelligent." (*Id.* at 1936.)

Mr. Razek first met with Salah at a holding facility where the Israelis had him in custody on January 31, 1993. (*Id.* at 1931-32.) Mr. Razek told Agent Priestap that Salah told him during that first meeting that he had not been mistreated and he had no complaints regarding his "holding." (*Id.* at 1932.) His only complaint was that the Israelis should not arrest American citizens such as himself. (*Id.*) On February 2, 1993, Mr. Razek and another consulate official met with Salah in an Israeli courtroom prior to Salah's hearing. (*Id.* at 1932-33.) Although Mr. Razek informed Agent Priestap that they did not have privacy in the courtroom, and thus Defendant may not have felt comfortable reporting any mistreatment to him, Salah did not complain of any mistreatment at this time. (*Id.* at 1934.) Furthermore, Mr. Razek told Agent Priestap that Salah was acting in a friendly manner and smiling during this court appearance. (*Id.* at 1933-34.)

39

On February 12, 1993, Mr. Razek again met with Defendant Salah. During this session, Salah complained to him for the first time that he had been handcuffed to a chair with the front legs shorter than the back legs. (*Id.* at 1935.) According to Agent Priestap, Mr. Razek did not, however, notice any marks from this alleged mistreatment, even though it was his policy to have detainees show him any marks or scars on their person and describe the origin of the marks or scars. (*Id.* at 1935-36.) Mr. Rajek also told Agent Priestap that if he personally noticed the marks or scars, he would inquire of them and include them in his reports.

Agent Priestap also testified that Salah told Mr. Razek that he was attempting to negotiate with the Israelis regarding the burial location of a slain Israeli soldier in exchange for the release of female Palestinian prisoners. (*Id.* at 1936-37.) During this conversation, Salah asked Razek to convey a message to his wife. (*Id.* at 1937.) Because Mr. Razek thought the message sounded suspicious, he did not convey it to Salah's wife. (*Id.*)

### E.    Jonathan Kuttab

Defendant called Jonathan Kuttab as an expert on ISA interrogation techniques. Mr. Kuttab is an attorney who practices in Israel and Palestine and sometimes in the United States. (*Id.* at 1820-21.) As part of his practice, Mr. Kuttab has represented "hundreds" of people before the miliary courts in the Occupied Territories. (*Id.* at 1822.) Some of these individuals were security detainees. (*Id.*) Mr. Kuttab has written about and spoken regarding the rule of law in the Occupied Territories. (*Id.* at 1822-23.) He has also appeared in the media as an expert regarding these subjects, and has taught courses on the issue of human rights in the Occupied Territories. (*Id.* at 1824.) Mr. Kuttab is active in multiple human rights organizations. (*Id.* at

1824-28.) Mr. Kuttab admitted, however, that he had never been in an ISA interrogation facility, he had never observed an actual ISA interrogation, he had never observed a videotape of an ISA interrogation, and he had never heard an audio-tape of any such interrogation. (*Id.* at 1881-82.) Further, Mr. Kuttab has not spoken with any of the ISA interrogators who questioned Salah. (*Id.* at 1886.) He also has never spoken with Defendant Salah or questioned him regarding his ISA interrogation. (*Id.*) Finally, Mr. Kuttab did not review any of the ISA documentation regarding Defendant's Salah's questioning, including the five hour audio-taped conversation. (*Id.* at 1888-89.) Mr. Kuttab did review Defendant Salah's affidavit submitted in connection with this case. (*Id.* at 1884.)

During this testimony, Mr. Kuttab testified that the ISA treats security detainees and criminal prisoners differently. (*Id.* at 1832.) He testified that the ISA does not allow an attorney access to a security detainee until "the interrogation is over." (*Id.* at 1832-33.) Further, if a security detainee requests a lawyer, the ISA does not have to cease its interrogation of the detainee. (*Id.* at 1837-38.)

Mr. Kuttab also testified regarding the military courts in the Occupied Territories. He testified that the judges in these courts are military officers, appointed to the court by the Israeli Army. (*Id.* at 1836.) He stated that "if it's a single judge, they are legally trained. If it's a three-judge panel, then the presiding judge has to be a legally-trained judge. The other two can be just regular officers with no legal training." (*Id.* at 1837.)

He opined on techniques employed by the ISA interrogators in connection with security detainees. He testified that isolation from outside parties was one of the most significant aspects

41

of interrogation. (*Id.* at 1841.) Mr. Kuttab further opined that another technique used by the ISA was wearing down a detainee's will "wearing down his – physically his – ability to withstand the questioning. This is done either physically – you know, beating up, making him sit in totally uncomfortable positions for hours and hours and hours on end, sleep deprivation, denial of going to the bathroom." (*Id.*) He further testified that the ISA used strategies, including threatening detainees and "good cop, bad cop." (*Id.* at 1842.)

Mr. Kuttab also opined that the ISA forces detainees to sit in small chairs with "crooked legs" and places hoods on their heads. (*Id.* at 1845.) He further opined that while in that position, the ISA guards would "slap you or hit you on the head or knock on your cell to make sure you don't fall asleep and use that period to rest." (*Id.*) He also opined that the ISA placed detainees in tiny cells where they cannot sit down or lie down. (*Id.* at 1846.)

Mr. Kuttab also opined regarding the confession rate by security detainees. He testified that his studies showed that eighty-five percent of detainees were interrogated, and ninety-four percent of those who were interrogated signed a confession. (*Id.* at 1844.)

During his testimony, Mr. Kuttab also asserted his opinions regarding the birds. Mr. Kuttab testified that the birds pretend to be Palestinian prisoners who welcome you and inquire why you are in prison, (*id.* at 1849), but then they subsequently turn against you and force you to prove that you are not a traitor. (*Id.* at 1849-50.) Mr. Kuttab opined that the birds intimidate detainees, and "hit[] on their contacts with the community." (*Id.* at 1850.) He testified that the birds sometimes force detainees to write down information in Arabic. (*Id.*)

According to Mr. Kattab, United States citizens are not given special treatment while

42

being interrogated. (*Id.* at 1851-52.) He further stated that older individuals are not given special treatment either. (*Id.* at 1853.)

When questioned regarding his opinion regarding terrorists acts, Mr. Kuttab said that an attack on a military target is typically not an act of terrorism. (*Id.* at 1905-06.) He confirmed his belief that an attack against a military target such as the U.S.S. Cole is not an act of terrorism because "under traditional laws of war and customary international law, such politically motivated actions – however, foolish, unwise or injurious – must not be confused with attacks on clearly civilian targets." (*Id.* at 1906.)

### F.    Yuval Ginbar

Yuval Ginbar is a legal advisor for Amnesty International who currently resides in London, England. Ginbar previously worked at B'Tselem, the Israeli Information Center for Human Rights in the Occupied Territories. During the mid 1990s, Mr. Ginbar researched and presented a dissertation "on the subject of Israel's treatment of its detainees and specifically its interrogation methods or the GSS, the General Security Service interrogation methods." (*Id.* at 2054.) As part of his research, Mr. Ginbar took testimony from former Palestinian detainees who had been interrogated by the ISA, and has written or co-authored various articles on the subject. (*See* Def. Exs. 13, 14, 15, 16.)

Mr. Ginbar testified that he has personally taken testimony from "dozens" of former Palestinian security detainees and reviewed testimonies taken of such detainees by his co-workers and others. (Tr. at 2060-62, 2064, 2066.) He also has reviewed petitions made to the Israeli Supreme Court by Palestinian security detainees.

Based on his work, Mr. Ginbar opined that in 1993, the ISA engaged in systematic and deliberate harsh interrogation methods against security detainees. (*Id.* at 2065-66.) He testified that the ISA used isolation techniques, and "waiting" techniques which deprived the detainees of sleep. (*Id.* at 2069.) Mr. Ginbar testified that "in order to make – to prevent a person from sleep, you have to make them extremely uncomfortable, especially if it's over a day and over two days." (*Id.* at 2071.) Mr. Ginbar further testified that "Waiting for the interrogation routinely involved being shackled to a small – very small – forward-slanting chair while being hooded and music playing in your ears." (*Id.*)

Mr. Ginbar further testified that he had never heard of a special dispensation from the Landau methods for people who were 40 years old or older. (*Id.* at 2076-77.) He had, however, heard of special dispensations for detainees with physical conditions. (*Id.* at 2077.)

Mr. Ginbar said that before April of 1993, an ISA interrogator could use the interrogation methods approved by the Landau Commission without obtaining prior permission. He opined that after April 1993, an interrogator only needed to obtain the permission of his supervisor to use them which was not "such a big deal." (*Id.* at 2080.)

Both prior to and after April of 1993, Mr. Ginbar testified that he had received complaints from former detainees and testimonies from detainees being denied the use of a bathroom. (*Id.* at 2082.) Mr. Ginbar opined regarding certain procedures that the ISA specifically precluded in at least 1993. He based his opinion on an affidavit that he reviewed that the ISA had submitted to the Supreme Court of Israel in April 1993. (*Id.* at 2081-88.) He testified that, pursuant to the affidavit, the ISA specifically prohibited the following techniques: the denial of bathroom

privileges; the use of extreme heat or cold in locations where the ISA housed detainees; and the deprivation of food or drink. (*Id.* at 2080-89.)

In Mr. Ginbar's opinion, the ISA interrogators gave excuses regarding their use of certain techniques: "They hood so that they don't look at each other and exchange whatever messages; the music so that they don't talk to each other; and, the tying up so that they don't attack the interrogator." (*Id.* at 2093.)

Mr. Ginbar admitted that he had never been inside one of the ISA facilities or watched an ISA interrogation. (*Id.* at 2100.) He was not present when the ISA interviewed Salah, nor has he spoken with any of the ISA interrogators who questioned Salah. (*Id.* at 2128.) Mr. Ginbar reviewed the testimony from the mini-trial in Salah's case and reviewed Defendant's affidavit in this case. (*Id.* at 2129.) He did not, however, review any of the other evidence, including the American Consulate files or the photographs. (*Id.* at 2129-30.) Similarly, Mr. Ginbar was not aware that the ISA had audio-taped the May 18, 1993 interview session with Defendant Salah, and he has not listened to any of the tape. (*Id.* at 2101.)

## G. Eyad El Sarraj

Defendant called Dr. Sarraj, a psychiatrist from Palestine, as an expert witness at the hearing to testify regarding the effect the ISA's interrogation techniques have on Palestinian men. He also opined on the voluntariness of Defendant's statements.

Dr. Sarraj describes himself as a "human rights and peace activist." (Def. Ex. 22.) He is the Director General of the Gaza Community Mental Health Program, and Secretary General of the Palestinian Independent Commission for Citizen's Rights. Although Sarraj previously

treated patients, he has not done so for the past 6 or 7 years. (Tr. at 2409.) Dr. Sarraj has treated victims of torture and spent time investigating the methods used against Palestinians by the ISA. (*Id.* at 2410; Def. Ex. 23.) He testified that the median age of these victims was 25.4 years of age. (Tr. at 2452-53.) As part of this investigation, he interviewed victims of alleged torture at the hands of the ISA. (*Id.* at 2411.) None of these victims were American citizens and Dr. Sarraj admitted that he had never talked to an American citizen who claimed to have been tortured at the hands of Israeli authorities. (*Id.* at 2464.) None of these alleged victims lived in America or had a family structure in America. (*Id.* at 2452-53.)

Dr. Sarraj stated that he has focused his work on children and individuals living in the Gaza Strip who have been traumatized by their living conditions. (*Id.* at 2442.) Dr. Sarraj was imprisoned by Palestinians and testified that he was tortured by them. He was never, however, arrested, questioned or imprisoned by the ISA or any other Israeli authority.

Dr. Sarraj opined that in 1993, the ISA used interrogation techniques designed to break the will of interrogees to enable the ISA to obtain information. (*Id.* at 2411-12.) In his opinion, the first 36 hours that a detainee is in custody are crucial to "breaking down" the individual's will. (*Id.* at 2434-35.)

Before testifying, Dr. Sarraj read Salah's affidavit and listened to random portions of the audio-tape from March 18, 1993. (*Id.* at 2456-57.) Dr. Sarraj opined that the allegations in Defendant Salah's affidavit were consistent with the methods used by the ISA against other security detainees at that time. (*Id.* at 2412.) He further opined that sleep deprivation was "one of the routine methods used by the interrogators in Israel and later on by the Palestinians

themselves. Sleep deprivation, I think that the basic idea behind it is that people lose their concentration. Their thoughts become disturbed. Their emotions becomes disturbed. So, they become at the end at the – at the – mercy of the torturer because they are exhausted physically and mentally by the deprivation of sleep." (*Id.* at 2418.)

Dr. Sarraj further opined that the "hooding" alleged by Salah in his affidavit "is a form of degradation ... because of the smell; but, mainly it is a form of isolating you from the rest of the world, trying to cut down your sensory input." (*Id.* at 2414.) He also gave his opinion regarding Salah's allegation that he had to strip naked:

> I think that this is one of the most undignified things for an Arab and a Muslim, to be naked and other people look at him and laugh at him. This is kind of very humiliating for us. I think it is humiliating for anybody; but, perhaps for the Muslim Arabs, it's much more painful.

(*Id.* at 2420.)

In addition, Dr. Sarraj opined that Salah was not acting of his own free will when he wrote the 53 page statement while imprisoned with the birds. (*Id.* at 2424.) Based on his partial review of the taped conversation between Nadav and Defendant on March 18, 1993 and his experience, Dr. Sarraj opined that Defendant Salah did not make any of the statements in this session of his own free will. Instead, he testified that he believed Salah's will had been overborne. (*Id.* at 2425-26.) He also opined that Salah's free will could not have been restored while in custody. (*Id.* at 2431.)

During cross examination, Dr. Sarraj admitted that he had never examined Defendant Salah, interviewed Defendant Salah, or conducted any psychological examination of him. (*Id.* at

2456, 2465.) In fact, he had never met Defendant. (*Id.* at 2427.) Dr. Sarraj admitted that if he had interviewed Defendant Salah, his opinion would have been better informed. (*Id.* at 2465.) He stated "I am not an expert on Mr. Salah's story." (*Id.* at 2464.)

He also conceded that he had never been in an ISA facility, or been present for an ISA interrogation. (*Id.* at 2455.) He also was not present for Mr. Salah's interrogation by the ISA. (*Id.*)

During cross examination, Dr. Sarraj further admitted that it is difficult to know with any certainty whether someone is over-reporting or under-reporting their torture, even as to those individuals whom he has personally interviewed. (*Id.* at 2495-96; Gov. Ex. Sarraj 2.)

### H. Avigdor Feldman

Avigdor Feldman is an attorney licensed to practice law in Israel. His practice is "mainly criminal law with a special stress on security cases." (Tr. at 2174.) Mr. Feldman is active in human rights organizations, and a founder of B'tselem. (*Id.* at 2171-72.) He also is a board member of the Committee Against Torture, an independent human rights organization which monitors the use of torture in interrogation in Israel and the Palestinian Authority. (*Id.* at 2172; Gov. Ex. Feldman 3.) In 1991, Mr. Feldman won the Robert F. Kennedy Human Rights Award from the Robert F. Kennedy Center for Human Rights. Mr. Feldman represented Defendant Salah commencing in April or May of 1993 in connection with his charges in Israel. (Tr. at 2222.) Mr. Feldman did not represent Salah during the core of his interrogation. Mr. Feldman

testified at the suppression hearing in both an expert and a fact[8] witness capacity.

### 1. Israeli Procedures

Mr. Feldman testified regarding the differences between a military court where Salah was prosecuted and a civil court in Israel. (*Id.* at 2194-97.) In a military court, all the judges are soldiers. (*Id.* at 2195.) Where three judges preside over a case in military court, only one of them has to have legal training. (*Id.*) In the case of Defendant Salah, two of the judges had legal training. (*Id.*) Mr. Feldman explained that the ISA has no legal power in a military court – they do not appear in court or address the court directly. Instead, a prosecutor appears to make the requests. (*Id.* at 2199.)

Mr. Feldman also testified regarding the "mini-trial" procedure in Israel. He testified that a defendant in a military court in Israel had the right to challenge the admissibility of the prosecutor's evidence, including the admissibility of any statements that the defendant purportedly made to Israeli authorities. (*Id.* at 2310.) In order to make a determination regarding such evidence, a military judge holds a mini-trial, which is similar to a suppression hearing in the United States. (*Id.* at 2310-11.) As Mr. Feldman testified, the military judge dictates to a soldier to record the proceedings. (*Id.* at 2322-23.) At the time of Defendant Salah's mini-trial in Israel, the soldiers hand wrote the proceedings. (*Id.*)

Mr. Feldman also testified regarding the Landau Committee's report from 1987. (*Id.* at 2182-89.) He testified that there is an open report and a confidential report. (*Id.* at 2182.) He

---

[8] Salah executed a written and oral waiver of his attorney client privilege regarding Mr. Feldman's representation of him while in Israel. (R. 532-1, Salah Waiver Aff.)

testified that the public report concluded that the ISA used "physical means, torture as a routine in their investigations," and that ISA Interrogators lied to courts about the "means of investigation (*Id.* at 2182-92.) In response, the Landau Committee gave the ISA specific directives on what techniques it could employ during the questioning of detainees. (*Id.* at 2185.) Mr. Feldman further testified that certain amendments were made to the report in the mid 1990s. (*Id.* at 2202-03.) Mr. Feldman added that he currently has a petition pending before the Supreme Court of Israel to publish the secret part of the report. (*Id.* at 2193.)

## 2. Representation of Salah

Mr. Feldman testified that Salah told him, during the course of his representation in 1993, about various interrogation methods used by the ISA. Specifically, he testified that Salah told him that the ISA interrogators threatened to photograph him naked, made him sit in a small child-like chair that was slanted, slapped him, placed a "stinking" hood over his head, threatened him with long imprisonment if he did not cooperate, placed him in a freezing cold cell, deprived him of sleep, played loud music, threatened Salah with violence, including harming his family, promised to release him immediately if he gave a confession, and refused his request to be given his "statement" in English. (*Id.* at 2233-35, 2239-42, 2245-47, 2335-36.) Mr. Feldman testified that Salah told him of this conduct sometime after he started representing him in April or May of 1993 and before the November 1993 mini-trial, although he could not remember specifically when. (*Id.* at 2206-08, 2226-27.) Mr. Feldman's testimony was consistent with his affidavit, dated July 25, 2004, submitted in the civil case *Boim v. Quranic Literacy Institute, Holy Land Foundation for Relief and Development, Islamic Association for Palestine (a/k/a American*

*Muslim Society), Mohammed Salah*, 00 C 2905 (Keys). (Gov. Ex. Feldman 3.)

Salah told Mr. Feldman that Haim had slapped him, but not beaten him. (Tr. at 2335-36.)
Mr. Feldman opined that sleep deprivation was the primary method used against Salah while he
was in custody. (*Id.* at 2241.) Mr. Feldman added that he had never heard other prisoners
complain that the ISA officials stripped them naked and threatened to photograph them, thus he
questioned this assertion by Salah. (*Id.* at 2329-30.)

Mr. Feldman opined that based on these conditions, Salah's self-determination was
impaired while he was in custody. (*Id.* at 2267-69.) Mr. Feldman admitted, however, that he
was not present when the ISA officials allegedly took any of these actions, nor did he represent
Salah at that time, and he admitted that he could not testify with any certainty as to what actually
happened to Salah during his questioning. (*Id.* at 2334, 2358-59.)

Mr. Feldman testified that Salah did not convey to him that a group of soldiers drove him
around for many hours after his arrest and repeatedly stomped on Defendant Salah with their
boots, including stomping on his body, head and groin area. (*Id.* at 2345.) Nor did Salah tell Mr.
Feldman that these soldiers hit him with their rifle butts in his head, groin and all over his body
while he lay on the floor of their vehicle. (*Id.*) Mr. Feldman recalled Salah telling him only that
the soldiers treated him "very roughly during the arrest and the trip to Ramallah." (*Id.* at 2345-
46.)

Mr. Feldman testified that he never saw any bruises or cuts or marks on Salah, indicating
that the ISA officials had beaten him. (*Id.* at 2335.) Mr. Feldman noted, however, that he never
looked for such marks because Salah did not "complain to me that he got such beatings that left

marks two or three months afterwards." (*Id.*) Mr. Feldman never observed Salah in any stage of discomfort that required the attention of a physician. (*Id.*) Mr. Feldman testified that Salah had some health problems, but he received treatment for them. (*Id.*)

According to Mr. Feldman, Salah never complained to him about his treatment by the birds when he was in custody with them in March 1993. Mr. Feldman also testified that Salah never told him about the birds because Salah did not know that he was part of a bird exercise. (*Id.* at 2255-56, 2340.) Mr. Feldman testified that both he and Salah first learned of the bird exercise during the cross examination of either Nadav or Haim in the min-trial. (*Id.* at 2256, 2340.) Mr. Feldman testified that Salah never told him that he was transported to a prison in Hebron and placed in a cell with 15 to 20 Palestinian prisoners who also claimed to be part of resistance movements. (*Id.* at 2342.) Salah never told him that any prisoners held a razor to his face. (*Id.* at 2341.) Further, Mr. Feldman testified that Salah never told him that these prisoners had asked him to write a statement of why he had come to Israel. (*Id.* at 2342.) Mr. Feldman's belief was that Salah did not convey any such information to him because Salah did not know that he had been subjected to a bird exercise. (*Id.* at 2341-43.)

Salah never informed Mr. Feldman that Judith Miller observed any interrogation session. In fact, Mr. Feldman testified that he first learned of Ms. Miller's involvement by Salah's counsel in this case. (*Id.* at 2350-55.)

I.    **Ahmed Husni Khalil Al-Batsh**

Ahmed Husni Khalil Al-Batsh testified via video conference from the City of Ramallah. Al-Batsh is a Palestinian male who was arrested at his home by Israeli soldiers in September

1992. (*Id.* at 2523.) Al-Batsh said that they placed him in a military jeep, blindfolded him, and transported him to the Ramallah facility. (*Id.* at 2525.) Upon his arrival at Ramallah, Al-Batsch testified that "they put a bag over my head – a very rotten-smelling bag. And they tied my arms behind my back and sat me down in a very tiny chair, one that is used in a preschool. And I stayed there until the next morning, when the interrogator came and introduced himself." (*Id.*) Approximately six days after arriving at the Ramallah facility, Al-Batsh testified that he met Major Haim. (*Id.* at 2526-27.) Al-Batsh described how Haim shook him and threatened to kill him. (*Id.* at 2527-28.) According to Al-Batsh, Major Haim also threatened him "not to open my mouth at all in the presence of the judge." (*Id.* at 2536.) While detained for 76 days, he testified that the Israeli authorities deprived him of sleep, subjected him to loud music, and kicked him awake if he fell asleep. (*Id.* at 2529-32.) He was "occasionally placed in a tiny and very cold cell" where he could not sleep. (*Id.* at 2532-33.) He said that he ate his meals in the bathroom, not in the interrogation room, and never received food when he was in an interrogation room. (*Id.* at 2544.)

Al-Batsh further testified that despite Haim's threat, he complained to the Israeli judges that they had not given him access to a shower and he consequently smelled "rotten." (*Id.* at 2534.) He also showed the judges the physical scars on his body from the alleged abuse. (*Id.* at 2545.) Based on his complaints, the judges ordered that he have access to a shower, and ordered his interrogators to take him to a doctor. (*Id.* at 2534, 2545-47.) After his release, Al-Batsh gave a statement regarding his treatment to a Palestinian human rights group. (*Id.* at 2539.)

Al-Batsh does not know Defendant Salah, did not see Defendant Salah while he was

detained and has no knowledge of how the ISA agents treated Defendant Salah in 1993. (*Id.* at 2540-41.) Further, he is not an American citizen and he is not a high ranking member of Hamas. (*Id.* at 2450.)

## J.    Ribhi Qatamesh

Ribhi Qatamesh also testified via video conference from the City of Ramallah. Qatamesh is a 51 year old Palestinian attorney. (*Id.* at 2551-52.) The Israeli military arrested Qatamesh in March of 1994 at his home. (*Id.* at 2552.) Qatamesh testified that he was suspected of being an activist with the Popular Front for the Liberation of Palestine, yet the Israelis never charged him with a crime. (*Id.* at 2581-82.) At the time of his arrest, the officers placed him face down in a vehicle and transported him to the Al Moscobya facility in Jerusalem. (*Id.* at 2552.) Subsequently, they transferred him to the Ramallah interrogation facility. (*Id.* at 2552-53.) While at Ramallah, Haim was in charge of Mr. Qatamesh's interrogation. (*Id.* at 2554.) Qatamesh was questioned at these facilities for two to three months. (*Id.* at 2573.) Since his release, Qatamesh has spoken publicly on numerous occasions about his treatment. (*Id.* at 2575.)

Qatamesh testified that while he was detained, he was forced to sit in a small, slanted chair and was tied to the chair. (*Id.* at 2554-55.) In addition, they tied his legs to the chair and his hand behind his back. (*Id.* at 2555.) He testified that they covered his head with a hood that "smelled rotten." (*Id.*) According to Mr. Qatamesh, they also played loud music in the facility and kept his cell cold. (*Id.* at 2555-56.) At times, Mr. Qatamesh was held in a small room with one door and no windows. (*Id.* at 2556.) Mr. Qatamesh testified that the Israelis threatened him with administrative detention and kept him in administrative detention for four years without

charging him. (*Id.* at 2562-63.)

Mr. Qatamesh is not an American citizen. (*Id.* at 2569.) He also is not a member of Hamas. (*Id.* at 2569.) Mr. Qatamesh knows Defendant Salah's brother, who was present at the beginning of the hearing before Mr. Qatamesh's testimony. (*Id.* at 2572.) Mr. Qatamesh denied that he had spoken with Defendant's brother about his case. (*Id.*)

Qatamesh testified that he thought he met Salah in 1994 in "the courtyard of the jail" where the detainees referred to him as "the American, Abu Ahmad." Qatamesh did not, however, talk to Defendant Salah. (*Id.* at 2571.)

### K.    Special Agent David Bray[9]

In rebuttal, the government called FBI Supervisory Special Agent David Bray. Agent Bray has been an FBI agent for nine years, and has been involved with the investigation of Salah's case since April 2002. (*Id.* at 2607.)

Agent Bray testified regarding a 1991 mortgage loan that Salah had obtained for his home from Standard Bank and Trust based on a fraudulent loan application. (Gov. Ex. 8/21/91 Salah Mortgage Loan Application.) The loan application, which contained Defendant's signature, represented that Defendant Salah's base employment monthly income from the Quranic Literacy Institute ("QLI") in Oak Lawn, Illinois was $4,000, plus $1,000 in commissions. (Tr. at 2610-11.) Salah provided the loan officer with a September 4, 1991 letter from Amer Haleem

---

[9] Defendant objected to the admission of this testimony at the suppression hearing. As described in more detail below, the Court admitted it consistent with Federal Rule of Evidence 806.

verifying that "Mr. Mohammad Salah has been employed with the QURAN PROJECT since January 1, 1991 as a Computer Analyst at a salary of $36,000 per year." (Gov. Ex. 9/4/91 Salah Employment Letter.)

Agent Bray testified, however, that Mr. Haleem testified before the Grand Jury that Defendant Salah was never employed with QLI. (Tr. at 2625.) He did, however, work on a volunteer basis at QLI, commencing in approximately 1990. (*Id.* at 2635.) According to Mr. Haleem, Defendant Salah approached him regarding the need for an employment letter for a prospective landlord because he was moving from one apartment to another and needed the letter to secure his lease. (*Id.* at 2625.) According to Agent Bray, Mr. Haleem testified that Salah never told him that he needed the letter to obtain a loan from a bank. (*Id.* at 2626.)

The loan application also included signed, purportedly filed, federal tax returns for the tax years 1988, 1989 and 1990. (*Id.* at 2611-12.) Agent Bray confirmed with the loan officer at Standard Bank and Trust that Salah had provided him with copies of these tax returns. (*Id.* at 2612; Gov. Exs. 1988 Salah Mortgage Loan Tax Return, 1989 Salah Mortgage Loan Tax Return and 1990 Salah Mortgage Loan Tax; Tr. 2612.) Agent Bray also testified that his investigation revealed that Salah never filed a federal or state tax return for the tax years 1988 or 1989. (Tr. at 2613.) Indeed, both the Internal Revenue Service ("IRS") and the Illinois Department of Revenue indicated they had no record of Mr. Salah filing any personal income tax returns for 1988 or 1989. (*Id.*) The returns that Defendant provided in connection with the loan application, however, reflect that he had income of $55,424 in 1988 and $51,830 in 1989. (*Id.* at 2614-15.) The IRS never received any checks covering taxes for the amounts from Defendant. Further,

56

both the 1988 and 1989 returns were dated in April of the same year they covered – in other words, one year too early. (*Id.* at 2614, 2616.)

Agent Bray also testified that the 1990 tax return submitted by Defendant with the loan application reflected that he had earned $51,741 in the tax year 1990. (*Id.* at 2616.) The IRS did not show any taxes being paid by Defendant for 1990. Although the IRS could not locate a tax return filed by Defendant for the tax year 1990, it did locate a tax refund check from the IRS to Defendant Salah for that year in the amount of $961, dated April 26, 1991. (*Id.* at 2618; Government Exhibit 4-26-91 Salah Refund Check.) Agent Bray testified that his investigation revealed that the refund is "almost like a government subsidy program for lower-income taxpayers. According to the 1990 tables for earned income credit, taxpayer who received a $953 credit would have had earned income of at least $6,800 for that year, not to exceed $10,750." (Tr. at 2621.)

According to Agent Bray, the bank did not lose any money on this loan because it was paid off in full. (*Id.* at 2633.) In April 1993 – when Defendant remained in custody in Israel – Defendant's wife paid off the loan. (*Id.* at 2639.) Prior to that time, Agent Bray testified that she withdrew approximately $536,000 from an account at LaSalle Bank and deposited the amount into an account at Standard Bank and Trust. (*Id.* at 2640.) The $536,000 included funds from co-defendant Marzook. (*Id.*) Defendant's wife used $97,000 of this money to pay off the loan. (*Id.*)

## VI.   Salah's Affidavit

Defendant Salah did not testify at the suppression hearing, but submitted an affidavit in connection with his motion to suppress. In his affidavit, Salah averred that he was arrested on January 25, 1993 "by a large group of heavily-armed Israeli soldiers at a Gaza checkpoint in the Palestinian occupied territories." (R. 310-2, ¶ 2.) Salah contends that the soldiers handcuffed him, blindfolded him and threw him into a jeep. (*Id.*) While driving him to a military interrogation facility in Ramallah, Salah claims the following:

> [The soldiers] repeatedly stomped on me with their boots and struck me with their rifle butts in my head, my groin, and all over my body while I lay on the floor of their vehicle. They insulted me in English and Arabic, and they were laughing as they stomped on my body, my head, and my groin area. They insulted my mother. They called me a terrorist and constantly threatened me. They used racial slurs toward me and my family. I feared for my life from the moment I was taken into custody.

(*Id.* at ¶ 3.)

Salah further claims that once at the military interrogation facility in Ramallah, he was hooded and handcuffed, and his legs were shackled. From his day of arrest through at least March 18, 1993, Salah contends that he was interrogated through physical and psychological abuse and threats, and sensory and sleep deprivation. On his first day of interrogation at the Ramallah interrogation facility, Salah claims he was stripped naked and confronted by interrogator "Haim." (*Id.* at ¶ 7.) According to Salah's affidavit, Haim told him that he planned to photograph him naked. He also allegedly told Salah that he and his family would be killed unless Salah cooperated with the ISA, and informed Salah that he did not have a right to an attorney in Israel. (*Id.* at ¶ 7.)

Salah's affidavit further avers that the ISA interrogators – including Haim, Nadav and Benny – forced him to stay awake for over a 48 hours. (*Id.* at ¶ 9.) During this time period, Salah claims they placed a "filthy, foul-smelling hood" over his head, handcuffed him behind his back, and forced him to sit in a "slanted child-sized chair in a position that caused excruciating pain between [his] shoulder blades and in [his] back" – a technique known in Israel as "waiting periods." (*Id.* at ¶¶ 9-10.) While in this position, he claims that he was subjected to "deafening music and the sounds of people screaming in pain," and that someone slapped him on his head and face. (*Id.* at ¶ 10.) In addition, Salah claims they handcuffed him to a metal bar behind his back in a "dark, freezing, closet-sized cell in which [he] could not stand upright, sit or lie down." (*Id.*)

In his affidavit, Salah asserts that the ISA interrogators deprived him of sleep. (*Id.* at ¶¶ 5, 9, 13, 15, 17.) They also allegedly placed him in conditions that were not conducive to sleeping and did not provide him with a blanket or mattress while he was in a freezing cell. (*Id.* at ¶¶ 9, 15.)

Salah further avers that the ISA interrogators – especially Haim – threatened him repeatedly. (*Id.* at ¶¶ 12, 15, 16, 17, 19, 21, 28.) He claims that they threatened him with violence, including rape, blinding, maiming, and the murder of his family. (*Id.* at ¶¶ 12, 16.)

According to the affidavit, Haim laughed at Defendant when he asked for an attorney, and Haim allegedly told Defendant Salah that "the only law is what we say" in the military occupation zone. (*Id.* at ¶ 8.) He avers that he had to beg to use the toilet. (*Id.* at ¶ 11.)

Salah further claims that he was forced to sign statements in Hebrew, a language that he

did not read or understand. (*Id.* at ¶¶ 13, 14, 18.) Salah avers that on two occasions, an Israeli agent came into his interrogation room and demanded that he sign a statement written in Hebrew. Salah did not know what the statement said. On both occasions, he signed the statement with the hope that it would "end the nightmare." (*Id.* at ¶ 18.) The third time an Israeli agent attempted to have him sign such a statement, however, Salah refused to sign it and was subsequently threatened by Haim. (*Id.* at ¶ 21.)

According to Salah's affidavit, his interrogators transferred him to a prison cell in Ramallah with other "prisoners" who "claimed to be high ranking members of various resistance groups," but were in fact "birds" – agents who work with the Israeli authorities. Salah claims he wrote a two to three page truthful statement while in the birds' cell explaining that he came to the Occupied Territories to deliver money for humanitarian purposes. (*Id.* at ¶ 23.) Subsequently, the Israeli authorities transferred Salah to a prison in Hebron. (*Id.* at ¶ 24.) While there, Salah was placed in a cell with 15 to 20 Palestinian prisoners or "birds" who allegedly threatened him, held a razor to his face, tied his hands and feet to the corner of two bed posts in a position known as "zawiya," covered his head, hit and kicked him, threatened to rape him, and forced him to sit on "a blue bowl with a rounded and pointed bottom." (*Id.* at ¶¶ 24-27.) While at Hebron, Salah claims that he was forced to write a statement. In his words:

> These men would take what I wrote and bring back to me written questions and information that they wanted me to include in additional written statements. I eventually included in a written statement all the information that they provided to me in writing. The written questions and information that they presented to me made it clear what it was they wanted me to say. I knew that the only way to save my life and protect myself from further harm was to do what they wanted me to do.

60

(*Id.* at ¶ 27.) As a result of these alleged actions, Salah wrote a 53 page handwritten statement. (Gov. Ex. Salah Handwritten Statement.)

After his experience with the birds, the Israeli agents returned Salah to the Ramallah facility for further interrogation. Salah claims that Interrogator Nadav inquired into his written statement, and he told Nadav that he had not supplied the information. (*Id.* at ¶ 29.) Salah avers that Nadav ordered him to "go along with it, and made it clear" that if he did not, "the abuse and deprivations would continue." (*Id.*) Accordingly, Salah asserts that he had no choice but to submit to the use of the statement for interrogation. (*Id.*)

At the hearing, the Court admitted Salah's affidavit into evidence. (Def. Ex. 25.)

## ANALYSIS

Defendant Salah has moved to suppress all statements – written and oral – he allegedly made to agents of the Israeli government, including the Israeli police, ISA interrogators, and others working with the ISA. Defendant argues that any statements he made to the Israeli authorities were not given voluntarily, but instead, were the result of torture, and cruel, inhuman and degrading treatment. Moreover, Defendant argues that the Israeli authorities failed to give him *Miranda* warnings, and failed to immediately provide him with an attorney when he requested one. He contends that because these statements were given in violation of the Fifth and Eighth Amendments to the United States Constitution, and international law, the Court should suppress them.

Defendant Salah further argues that Haim's and Nadav's assertion of a classification privilege in response to certain questions violated his Sixth Amendment right to effectively cross

examine these witnesses[10]. He further contends that the Court's review of such testimony *ex parte* and *in camera* violated both his Fifth and Sixth Amendment rights.

## I. Legal Standards

### A. Voluntariness

A confession is inadmissible under the Fifth Amendment's Due Process Clause unless the government can show by the preponderance of the evidence that the confession was voluntary. *Lego*, 404 U.S. at 489, 92 S.Ct. at 627 (holding that prosecutor must prove voluntary confession by preponderance of the evidence). *See also United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). Under the Fifth Amendment, there is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). Rather, a confession satisfies the requirements of the Fifth Amendment if, after examining the totality of the circumstances, the Court is satisfied that the confession was the "product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will." *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997). *See also Arizona v. Fulminante*, 499 U.S. 279, 285-86, 111 S.Ct. 1246, 1251-52, 113 L.Ed.2d 302 (1991); *Dillon*, 150 F.3d at 757. The Court must determine, under the totality of the

---

[10] Defendant also reargues that the partial closing of the courtroom to receive classified information violated his right to a public suppression hearing. The Court has already ruled regarding this issue in a detailed opinion and will not revisit the issue here. *Salah*, 412 F.Supp.2d at 924-26. Furthermore, the majority of the testimony from the closed hearing has since become available through the publicly filed transcripts.

circumstances, whether the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2047.

In examining the totality of the circumstances surrounding a confession, the Court considers the conduct of the interrogator, the conditions of the interrogation and the characteristics of the accused. First, and most importantly, coercive activity by an interrogator is a "necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Absent some showing of "overreaching" that is "causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* An interrogator can overreach through both "mental as well as physical" coercion. *Fulminante*, 499 U.S. at 287, 111 S.Ct. at 1253 (quotations omitted). An interrogation accompanied by physical violence is presumptively involuntary. *See Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992). *See also Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936) (stating that due process violated when violence used to coerce confession). In addition, psychological coercion resulting from offers of leniency, threats of punishment, the deprivation of sleep and food, or credible threats of violence by others may render a confession involuntary. *See, e.g.*, *Fulminante*, 499 U.S. at 287-88, 111 S.Ct. at 1252-53 (holding confession involuntary based on credible threat of violence exploited by confederate prisoner); *Haynes v. Washington*, 373 U.S. 503, 514-15, 83 S.Ct. 1336, 1343-44, 10 L.Ed.2d 513 (1963) (holding confession involuntary based on threats of "incommunicado detention"); *Andersen v. Thieret*, 903 F.2d 526, 530 (7th Cir. 1990) (stating that "[f]ood, sleep, and water deprivation and a mentally coercive interrogation"

would produce involuntary confession).

Law enforcement officials, however, are permitted to "play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible." *United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994) (citations omitted). Indeed, the "law permits the police to pressure and cajole, conceal material facts, and actively mislead." *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990). The Seventh Circuit has recognized that "[c]ustodial interrogation is permitted even though inherently coercive and doubtless responsible for many a confession, and in addition the courts allow interrogators in these already coercive custodial settings considerable latitude in playing on the guilt and fears of the person interrogated in order to extract a confession that he will shortly regret having given." *Johnson v. Trigg*, 28 F.3d 639, 641 (7th Cir. 1994). *See also United States v. Ceballos,* 302 F.3d 679, 695 (7th Cir. 2002).

It is appropriate for law enforcement to promise to bring a defendant's cooperation and statements to the attention of the prosecutor. *Dillon*, 150 F.3d at 758; *United States v. Westbrook*, 125 F.3d 996, 1005 (7th Cir. 1997). The Seventh Circuit has also held that an officer's statements during an interrogation regarding the threat of jail time were not coercive because the police "are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible." *Sablotny*, 21 F.3d at 752 -753 (citations omitted).

Second, the Court examines the conditions of the interrogation to determine whether the confession was voluntary. The Court considers such factors as the duration, location and

continuity of the interrogation, as well as other factors such as whether weapons were present and the number of interrogators. *Ashcraft v. Tennessee*, 322 U.S. 143, 153-54, 64 S.Ct. 921, 926, 88 L.Ed. 1192 (1944) (listing continuous interrogation by multiple interrogators as factor making confession involuntary); *Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993) (listing length, continuity, and location of interrogation as factors under totality of circumstances); *Ceballos*, 302 F.3d at 694 (stating that totality of circumstances includes "the duration and nature of questioning"); *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997) (listing nature of interrogations as relevant factor in examining confession).

Third, the Court takes into consideration the characteristics of the accused. In examining the totality of the circumstances surrounding the confession, the Court "analyze[s] coercion from the perspective of a reasonable person in the position of the suspect." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). The characteristics of the accused that the Court considers include "the defendant's age, education, intelligence level, and mental state." *United States v. Gillaum*, 372 F.3d 848, 856-57 (7th Cir. 2004) (quotations omitted). "Absent a showing of some type of official coercion, however, a defendant's personal characteristics alone are insufficient to render a confession involuntary." *Watson*, 122 F.3d at 453 (citing *Connelly*, 479 U.S. at 167, 107 S.Ct. at 521).

## B. Confessions to Foreign Authorities

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), affords certain warnings to individuals in custodial interrogations in the United States before they speak to law enforcement. As the Supreme Court has described, these warnings include: a suspect "has the

right to remain silent, that anything he says can be used against him in a court of law, that he has

the right to the presence of an attorney, and that if he cannot afford an attorney one will be

appointed for him prior to any questioning if he so desires." *Dickerson*, 530 U.S. at 435, 120

S.Ct. at 2331 (citations omitted). In the United States, if a law enforcement officer fails during a

custodial interrogation to give a defendant the appropriate *Miranda* warnings, any statements

made by that defendant are subject to suppression. *See generally*, *United States v. Stewart*, 388

F.3d 1079, 1086-88 (7th Cir. 2004).

Courts have found that foreign officials do not have to give *Miranda* warnings prior to

obtaining confessions on foreign soil in order for such confessions to be admissible in a court in

the United States. Courts have reasoned that the exclusionary rules have little if any deterrent

effect on foreign police:

> Miranda was intended as a deterrent to unlawful police interrogations. When the
> interrogation is by the authorities of a foreign jurisdiction, the exclusionary rule has
> little or no effect upon the conduct of foreign police. Therefore, so long as the
> trustworthiness of the confession satisfies legal standards, the fact that the defendant
> was not given Miranda warnings before questioning by foreign police will not, by
> itself, render his confession in admissible.

*United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971). *See also United States v.*

*Martindale*, 790 F.2d 1129, 1132 (4th Cir. 1986); *United States v. Welch*, 455 F.2d 211, 213 (2d

Cir. 1972). *Miranda* warnings by foreign officials in foreign territories prior to obtaining

confessions particularly do not seem warranted where the United States is not involved and the

foreign officials have no indication that the United States has any ongoing criminal investigation

regarding the subject.

Although the Seventh Circuit has not addressed the issue in the context of testimony,[11] other courts have held that a defendant's statements made to foreign police or officials in the absence of *Miranda* warnings are admissible in a United States court, if the defendant made them voluntarily. *See, e.g., United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980). *See also United States v. Bin Laden*, 132 F.Supp.2d 168, 187 (S.D.N.Y. 2001).

Two exceptions apply to the admissibility of voluntary statements made to foreign officials on foreign soil in the absence of *Miranda* warnings. *Yousef*, 327 F.3d at 145-46. First, if the United States engaged in a "joint venture" with the foreign officials, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed." *Id.* at 145; *Heller*, 625 F.2d at 599 ("if American officials participated in the foreign ... interrogation, or if the foreign authorities were acting as agents for their American counterparts, the exclusionary rule should be invoked"); *United States v. Hensel*, 509 F.Supp. 1364, 1375 (D. Me. 1981). A joint venture occurs where the United States actively participated – either directly or indirectly – in the questioning of the defendant. Even if United States law enforcement did not directly question a defendant, courts suggest that a joint venture nonetheless exists if the American law enforcement agents used the foreign officials to carry out such questioning in order to circumvent *Miranda's* mandates. *See Yousef*, 327 F.3d at 145-46; *United*

---

[11] As discussed *infra*, the Seventh Circuit has discussed the analysis in the context of the 4th Amendment and the application of the exclusionary rule to acts of foreign officials on foreign soil. *See United States v. Marzano*, 537 F.2d 257, 269-70 (7th Cir. 1976).

*States. v. Abu Ali*, 395 F.Supp.2d 338, 381 (E.D. Va. 2005). "[T]he existence of the exception itself is based on the assumption that *Miranda* must apply to any portion of an overseas interrogation that is, in fact or form, conducted by U.S. law enforcement." *Bin Laden*, 132 F.Supp.2d at 187 (lack of Miranda warnings provided by foreign officials "will still lead to suppression if U.S. law enforcement themselves actively participated in the questioning").

Second, even where a defendant voluntarily makes a statement, due process is violated where "the foreign officers' conduct is so egregious that it 'shocks the conscience' of the American court." *United States v. Angulo-Hurtado*, 165 F.Supp.2d 1363, 1370 (N.D. Ga. 2001) (citing *United States v. Rosenthal*, 793 F.2d 1214, 1230-31 (11th Cir. 1986)). *See also Abu Ali*, 395 F.Supp.2d at 380. Any statements made as a result of such conduct are inadmissible in an American court. *United States v. Maturo*, 982 F.2d 57, 60-61 (2d Cir. 1992).

## II.     Voluntariness of Defendant's Statements

As noted above, if the government has proven by a preponderance of the evidence that Defendant Salah voluntarily made the statements at issue, the Court will admit them at trial unless: (1) they were the product of a joint venture and no *Miranda* warnings were given to Defendant; or (2) the interrogator's conduct "shocks the conscience." The Court sets forth below its findings of fact relevant to this determination.

### A.   Classified Portions of the Hearing

Before turning to the findings of fact, however, the Court will first address the impact of certain classified information that the government provided *in camera, ex parte* to the Court during the course of the hearing.

1.     **CIPA Overview**

The suppression hearing involved the disclosure of a substantial amount of classified information. CIPA sets forth specific procedures for the treatment of classified information. CIPA's "fundamental purpose is to 'protect [ ] and restrict[ ] the discovery of classified information in a way that does not impair the defendant's right to a fair trial.'" *United States v. Dumeisi*, 424 F.3d 566, 578 (7th Cir. 2005) (quoting *United States v. O'Hara*, 301 F.3d 563, 568 (7th Cir. 2002)). CIPA "is essentially a procedural tool" for a court to address "the relevance of classified information before it may be introduced." *Id.* (citing *United States v. Wilson*, 901 F.2d 378, 379 (4th Cir. 1990)). CIPA is designed "to protect classified information from unnecessary disclosure at any stage of a criminal trial." *O'Hara*, 301 F.3d at 568. *See also United States v. Apperson*, 441 F.3d 1162, 1193 n.8 (10th Cir. 2006). One court has also noted that "CIPA is a procedural statute, and the legislative history of it shows that Congress expected trial judges to fashion creative solutions in the interests of justice for classified information problems." *United States v. North*, 713 F.Supp. 1452, 1453 (D.D.C. 1989) (citations omitted). *See also United States v. Libby*, No. 05-394, __ F.Supp.2d __, 2006 WL 862345, at *3 (D.D.C. Apr. 5, 2006).

CIPA defines classified information as "any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security ...." 18 U.S.C. App. 3, § 1(a). "[I]nformation provided to the United States Government by a foreign government ... with the expectation that the information, the source of the information, or both, are to be held in confidence" or "information produced by the United States pursuant to or

as a result of a joint arrangement with a foreign government ... requiring that the information, the

arrangement, or both, are to be held in confidence" constitutes "foreign government

information." Exec. Order No. 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), § 1.1(d). *See Salah,*

412 F.Supp.2d at 919. "[T]he unauthorized disclosure of foreign government information is

presumed to cause damage to the national security." *Id.*, § 1.1(c). Because Israel provided the

substance of the testimony of the ISA agents to the United States with the expectation that it

would be held in confidence, (R. 367-1, Ex. A.), the United States certified it as classified. (*Id.*,

Exs. A, B ¶ 4.) *Salah,* 412 F. Supp. 2d at 919.

The government agreed to waive the classification designation regarding the majority of

the information at the suppression hearing as to Defendant Salah and his counsel. *Id.* at 917.

This evidence was admitted during the hearing in the presence of Defendant and his counsel.

The State of Israel and the United States did not waive the classified designation regarding a

discrete sub-set of information as to Defendant Salah or his counsel. The Court relied on CIPA's

directive in developing the appropriate procedures to handle those portions of the suppression

hearing involving classified information.

Section 4 of CIPA provides, in relevant part:

> The court, upon a sufficient showing, may authorize the United States to delete specified
> items of classified information from documents to be made available to the defendant
> through discovery under the Federal Rules of Criminal Procedure, to substitute a
> summary of the information for such classified documents, or to substitute a statement
> admitting relevant facts that the classified information would tend to prove. The court
> may permit the United States to make a request for such authorization in the form of a
> written statement to be inspected by the court alone.

18 U.S.C. App. 3, § 4. The plain text of Section 4 specifically permits a court to review

classified information *ex parte. See, e.g., United States v. Mejia,* No. 02-3067, __ F.3d __, 2006

WL 1506853 (D.C. Cir. June 2, 2006); *United States v. LaRouche Campaign,* 695 F.Supp. 1282,

1284 (D. Mass. 1988) (holding that government properly invoked the *ex parte* procedures in

Section 4 of CIPA where defendants did not possess the classified information at issue).

Courts have held that the CIPA procedures apply to testimony, as well as documents.

*See, e.g., United States v. Klimavicius-Viloria,* 144 F.3d 1249, 1261 (9th Cir. 1998); *United States*

*v. Lee,* 90 F.Supp.2d 1324, 1326 n.1 (D.N.M. 2000); *United States v. North,* 708 F. Supp. 399,

399-400 (D.D.C. 1988). Even if Section 4 does not specifically apply to testimony, Section 8(c)

of CIPA permits the Court to hear testimony consistent with Section 4's guidelines. Specifically,

Section 8(c) of CIPA addresses testimony in a criminal case that may disclose classified

information. Section 8(c) provides that "[d]uring the examination of a witness in any criminal

proceeding, the United States may object to any question or line of inquiry that may require the

witness to disclose classified information not previously found to be admissible." 18 U.S.C.

App. 3, § 8(c). Once the government makes such an objection, "the court shall take such suitable

action to determine whether the response is admissible as will safeguard against the compromise

of any classified information. Such action may include requiring the United States to provide the

court with a proffer of the witness' response to the question or line of inquiry and requiring the

defendant to provide the court with a proffer of the nature of the information he seeks to elicit."

*Id.*

Section 6 of CIPA also addresses specific procedures for disclosure of classified

information. Similar to Section 4, Section 6(c) provides that the "United States may move that,

in lieu of the disclosure of such specific classified information [ordered disclosed by the court], the court order — (A) the substitution for such classified information of a statement admitting relevant facts that the specific classified information would tend to prove; or (B) the substitution for such classified information of a summary of the specific classified information." 18 U.S.C. App. 3, § 6(c). If a court determines that "the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information," the court shall grant the United States' motion. *Id.*

### 2.    *Ex Parte* CIPA Portions of the Suppression Hearing

Consistent with the CIPA principles set forth above, the Court conducted limited portions of the suppression hearing *ex parte* and *in camera.* Here, the "suitable action" for ensuring Defendant's right to a fair suppression hearing and protecting the classified information at issue was to apply the Section 4 framework to both the testimony and documents at issue. *See LaRouche Campaign*, 695 F.Supp. at 1287-88 (stating that a "manifest objective of CIPA is that classified information should not be disclosed to anyone needlessly" and that "when classified information is not yet in the hands of defendants and their attorneys and they are making demands for disclosure, the court must consider whether defendants' rights can be fully protected by an alternative procedure that does not result in disclosure of classified information.").

Pursuant to CIPA, the government presented limited testimony to the Court and gave the Court access to certain documents outside the presence of Defendant Salah and his counsel. Specifically, during the *ex parte* CIPA portion of the hearing,

**REDACTED PURSUANT TO CIPA**

by defense counsel. Both Haim and

Nadav answered every question posed by the Court regarding these areas. These areas included

the following:

**REDACTED PURSUANT TO CIPA**

None of the classified testimony or documents received by the Court relate to the

question of Salah's guilt or innocence of the underlying crimes with which he is charged in this

case. None of the information was exculpatory. Further, none of this *ex parte* information

included any description of his condition or treatment while in the custody of the ISA. With the

exception of the bird logs, none of the documents or testimony contained statements made by

Defendant Salah. To the extent that the bird logs contained Defendant's statements, the Court

ordered the government to turn over appropriate summaries of such statements even though they

were not exculpatory or helpful to Defendant. Furthermore, under the standard in *Strickler v.*

*Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999), there is not a

"reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682,

105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). In sum, the classified testimony and documents

reviewed by the Court *ex parte* and *in camera* pertained, at best, to the credibility of Haim and

Nadav regarding interrogation procedures and monitoring methods employed by the ISA.

Prior to hearing this evidence, the Court gave defense counsel the opportunity to proffer to the Court, *ex parte*, the relevance and materiality of this classified information to their case. In other words, the Court gave Defendant the opportunity to explain the pertinence and relevance of the line of questioning pursued on cross examination that evoked classified responses from the witnesses, as well as the significance of the requested documents. In addition, the Court had access to and reviewed the majority of the documents that the government would not produce to Defendant on the basis of a classification designation.

## REDACTED PURSUANT TO CIPA

After such review, where required under the CIPA framework, the Court ordered the government to substitute a statement admitting relevant facts that the classified information would tend to prove. In response, the government, for purposes of the suppression hearing, admitted the following through stipulation[12]:

## REDACTED PURSUANT TO CIPA

---

[12] Although the government referred to these as "stipulations" during the hearings, they are more appropriately termed admissions or concessions for purposes of the hearing.

**REDACTED PURSUANT TO CIPA**

Defendant did not stipulate to any of this information.

### 3. Constitutional Challenges

Defendant argues that his Due Process rights and Sixth Amendment right to confrontation were violated because 1) the ISA witnesses refused to answer certain questions that called for classified information, and 2) Defendant did not have the opportunity to hear the classified evidence or cross examine the witnesses during the Court's limited *ex parte* testimonial hearings

wherein these witnesses answered such questions before the Court pertaining to the discrete areas set forth above. Neither constitutional challenge has merit.

The law is clear that "the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself." *Raddatz*, 477 U.S. at 679, 100 S.Ct. at 2414. For example, the Federal Rules of Evidence expressly recognize that at suppression hearings – which deal only with the admissibility of evidence – a court is not bound by the Federal Rules of Evidence. Fed. R. Evid. 104(a).[13] Indeed, the Supreme Court has held that hearsay evidence is appropriate and admissible at suppression hearings while it is only admissible at trial if it falls within one of the designated exceptions under the Rules. *Raddatz*, 477 U.S. at 679, 100 S.Ct. at 2414 ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial"). "Furthermore, although the Due Process Clause has been held to require the Government to disclose the identity of an informant at trial, provided the identity is shown to be relevant and helpful to the defense, *Roviaro v. United States*, 353 U.S. 53, 60-61, 77 S. Ct. 623, 627- 628, 1 L.Ed.2d 639 (1957), it has never been held to require the disclosure of an informant's identity at a suppression hearing." *Id.* (citing *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967)).

Likewise, "the right of confrontation[14] does not apply to the same extent at pretrial

---

[13] Even disclosures under *Brady v Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), may not be required prior to a suppression hearing. *See United States v. Stott*, 245 F.3d 890, 902 (7th Cir. 2001).

[14] The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against

suppression hearings as it does at trial." *United States v. Boyce*, 797 F.2d 691, 693 (8th Cir.

1986). *See also United States v. Young*, No. 00-6378, 238 F.3d 418, 2000 WL 1726585, at *1

(4th Cir. Nov. 21, 2000) ("the right of confrontation does not apply to the same extent at pretrial

suppression hearings as it does at trial"). Rather, the Supreme Court has stated that "the right to

confrontation is a *trial* right." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct. 989, 999, 94

L.Ed.2d 40 (1987) (emphasis in original). Further, even at trial, a district court "retains wide

latitude in limiting the extent and scope of cross-examination." *United States v. Robbins*, 197

F.3d 829, 845 (7th Cir. 1999).

The Supreme Court has also expressly addressed a witness's assertion of a privilege in

the context of the Sixth Amendment. *McCray*, 386 U.S. at 312-13, 87 S.Ct. at 1063. In *McCray*,

the Supreme Court held that an Illinois court did not deprive the defendant of his Sixth

Amendment right to confrontation at a pretrial hearing when it allowed the officers to testify as to

what a confidential informant told them without disclosing the informer's identity. The *McCray*

Court found that the prosecutor did not need to call the informant at the pretrial hearing in order

to satisfy the petitioner's confrontation rights. The officers' testimony regarding the information

provided to them from the informant satisfied the defendant's rights. The Supreme Court further

held:

> On the other hand, the [petitioner's] claim may be that the petitioner was deprived of his
> Sixth Amendment right to cross-examine the arresting officers themselves, because their
> refusal to reveal the informer's identity was upheld. But it would follow from this
> argument that no witness on cross-examination could ever constitutionally assert a

him." U.S. Const. amend. VI.

testimonial privilege, including the privilege against compulsory self-incrimination guaranteed by the Constitution itself. We have never given the Sixth Amendment such a construction, and we decline to do so now.

*Id.* at 314, 87 S.Ct. at 1064.

The D.C. Circuit recently rejected a similar claim of the denial of a Sixth Amendment violation in the context of a CIPA hearing. *Mejia*, __ F.3d __, 2006 WL 1506853. In *Mejia*, the defendant argued that his Sixth Amendment right to confront witnesses had been violated because he did not have access to materials governed by CIPA and did not have the opportunity to participate "in the decision as to whether ... the material could be disclosed." *Id.* at \*19 (quotations omitted). The court held that the Sixth Amendment right is a "trial right," and "does not create a right to pretrial discovery." *Id.* (quotations omitted).

Given the protections afforded to Defendant, the extremely limited nature of the *ex parte* testimony and the totality of the circumstances in this case, neither Defendant's due process rights nor his confrontation rights were violated here. Significantly, Defendant's counsel extensively cross examined the ISA witnesses during the suppression hearing. In fact, counsel rigorously cross examined each witness for more than eleven hours of pure testimony. The Court allowed Defendant to pursue extensive cross examination in every area except the limited areas that would elicit classified information and some irrelevant areas. Defendant had more than ample opportunity to test these witnesses' recollections, challenge their credibility, attempt to poke holes in their versions of the events, and confront them face to face. As in *McCray*, "[e]ach [witness] was subjected to searching cross-examination." 386 U.S. at 313, 87 S.Ct. at 1063. Moreover, as recognized by the Seventh Circuit, "[t]he confrontation clause, however, generally

only 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.'" *U.S. v. Zapata,* 871 F.2d 616, 623 (7th Cir. 1989) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original)). Defendant had more than sufficient opportunity to cross examine Haim and Nadav.

As noted at the outset, the *ex parte* testimony at issue was not related in any way to the question of Salah's guilt or innocence of the underlying crimes with which he is charged. To the extent that the *ex parte* testimony was relevant, it went, at best, to the credibility of the testifying ISA officials. The ISA witnesses answered all of the Court's questions and did not refuse to answer any of the Court's questions on the basis of classified information. Prior to hearing the ISA witnesses' testimony *ex parte*, the Court gave Defendant the opportunity to proffer the purported significance of the questions to which these witnesses limited their answers in order to protect classified information. The Court – the trier of fact on the issues at the suppression hearing – had the opportunity to evaluate the demeanor and credibility of these witnesses, heard all of the testimony, and had access to all of the documents. *See United States v. Bell*, 464 F.2d 667, 671 (2d Cir. 1972).

Moreover, the government provided stipulations to the defense as substitutes for the classified information. These substitutions enabled Defendant to make appropriate arguments based on the information reviewed by the Court. Because the Court received and evaluated the classified evidence, the Court put Defendant's arguments in context.

In reaching this conclusion, it is significant that the *ex parte* hearings were quite limited

in nature. The government provided a well-substantiated showing that the information at issue was classified and highly confidential. *See Salah*, 412 F.Supp.2d at 919, 925-26. The classified information goes directly to national security interests and foreign relations with the State of Israel. *Id.* at 926. These compelling reasons justify the limited withholding of classified information in the context of this suppression hearing given all of the other protections afforded to Defendant Salah.

### 4. Striking Testimony

Defendant also asks the Court to strike the testimony of the ISA officers in their entirety. A court has broad discretion in striking a witness's testimony. *Zapata*, 871 F.2d at 624. Although courts have not addressed the precise issue here where a witness does not answer a question while testifying on the basis that an answer calls for classified information, the Court finds instructive the Seventh Circuit's teachings in the context of a witness's refusal to answer on Fifth Amendment grounds. "[W]hen a witness refuses to answer questions based on fifth amendment privilege, striking the witness's *entire* testimony is an extreme sanction." *Id.* (citations and quotations omitted) (emphasis in original). "When a witness' refusal to answer prevents defendant from directly assailing the truth of the witness' testimony, the court should strike at least the relevant portion of the testimony." *Id.* at 623-24 (citations and quotations omitted.) However, "should the witness' refusal to answer 'relate only to collateral matters, such as credibility, the danger to the defendant is considerably less and the witness' testimony need not be stricken.'" *Id.* (quoting *Untied States v. Humphrey*, 696 F.2d 72, 75 (8th Cir. 1982)). "It is within the district court's discretion to strike a balance between the defendant's confrontation

right and the witness' privilege against self-incrimination, and shall be reversed only upon a finding that the district court abused its discretion." *United States v. Kaufmann*, 985 F.2d 884, 898 (7th Cir. 1993) (citations omitted).

Here, the questions to which Haim and Nadav asserted the classification privilege did not pertain to Defendant's guilt or innocence or directly to the treatment of Defendant Salah while the ISA interrogated him in 1993. Further, they did not pertain directly to the scope of the direct examination – the treatment of Salah while he was in the custody of the ISA. Instead, they related to

**REDACTED PURSUANT TO CIPA**

This testimony goes to the credibility of Haim and Nadav,

**REDACTED PURSUANT TO CIPA**

Furthermore, the trier of fact – the Court – heard this testimony outside of their presence. As discussed *infra*, to the extent that it benefits Defendant, the Court will consider it for that purpose. Additionally, defense counsel extensively cross examined both Nadav and Haim. This extensive cross examination provided Defendant with ample opportunity to probe and question each witness's credibility.

Given all of these factors, the Due Process and Sixth Amendment confrontation rights afforded to Defendant at a suppression hearing were not violated. Defendant received more than ample protections.

### 5. Adverse Inferences

Nevertheless, because Defendant did not have access to certain information, the Court will draw appropriate adverse inferences against the government. In weighing the evidence and determining if the government has met its burden, the Court has drawn adverse inferences against the government in appropriate areas where Defendant Salah did not have access to certain information. As one court explained such inferences, these inferences are similar to "a thumb on the scales" in Defendant's favor. *Securities & Exchange Comm'n v. Prater*, 289 F.Supp.2d 39, 50 (D. Conn. 2003).

Furthermore, the Court will not draw any inferences in favor of the government based on this undisclosed information.

### REDACTED PURSUANT TO CIPA

Because neither Defendant nor his counsel had access to these classified materials, however, the Court will not draw any inferences in favor of the government and will not permit the government to use this classified information to meet its burden. The Court will not use the classified, *ex parte* evidence to the government's benefit. In sum, the Court will not rely on any of the *ex parte* evidence or

the government's Stipulations to the benefit of the government.

Defendant Salah, however, asks the Court to draw far more adverse inferences than appropriate. Salah asks the Court, for example, to draw adverse inferences and suppress his statements because the government did not call all of the ISA interrogators who questioned him from January 25, 1993 through March 18, 1993. The Court declines to do so. The government bears the burden of proving the voluntariness of Defendant's statements, and it can decide how it intends to meet that burden.

Defendant also seeks an adverse inference against the government for failing to call any witnesses from the United States Consulate in Israel, including Majeed Razek. Because hearsay evidence is appropriate at suppression hearings, the government properly admitted the statements of Mr. Razek and the consulate documents through FBI Special Agent Priestap. *See Raddatz,* 447 U.S. at 679, 100 S.Ct. at 2414. Even Defendant admitted the hearsay documents. *See* Def. Ex. Salah Con. Docs.

Defendant asks the Court to draw an inference from the government's Stipulation No. 1 that the ISA could - and did -- use all the methods set forth in the Landau Commission's Annex. The Court declines to made this broad of an inference.

### REDACTED PURSUANT TO CIPA

Defendant also makes numerous arguments regarding discovery disputes, and asserts that the Court should draw adverse inferences from these disputes. The Court has spent hours addressing discovery issues in this case, and will not repeat its detailed holdings in this opinion.

Many of the documents sought by Defendant are not in the custody or control of the United States government. *See* Fed. R. Crim. Pro. 16(a)(1)(E) (requiring discovery items "within the government's possession, custody, or control"). *See also Mejia*, __ F.3d at __, 2006 WL 1506853 at *7. Nonetheless, Defendant's argument that the government has failed to produce the file jacket from Defendant's ISA file and any Israeli documents regarding Judith Miller's observation of Defendant while in ISA custody fails.[15] The government, after conferring with Israeli authorities during the suppression hearing, confirmed that no such documents exist. Defendant also argues that the government failed to produce documents concerning the treatment of other Israeli detainees who were American citizens. Again, the prosecutor represented to the Court that he reviewed the State Department files regarding any such detainees, and none of the documents were discoverable within the confines set by the Court. Accordingly, the Court will not draw any adverse inferences against the government based on these discovery arguments.

## B. Findings of Fact

The Court will make specific findings pertaining to the totality of the circumstances surrounding Defendant Salah's oral statements to the ISA interrogators during the period of time he was questioned in 1993, then address the six specific statements upon which the parties focused in their briefing and at the hearing. The Court has carefully and deliberately weighed all of the evidence in the case in assessing the totality of the circumstances and the voluntariness of Defendant's statements. In doing so, the Court has evaluated and considered the consistencies

---

[15] Defendant repeatedly raised the issues of files pertaining to Judith Miller, yet conceded that he has not subpoenaed Judith Miller for her files.

and inconsistencies in the testimony. The Court closely assessed the demeanor of each witness, including his body language, tone of voice, facial expressions, mannerisms and other indicative factors.

ISA Interrogators Haim and Nadav were both significant witnesses for the government given their respective roles in questioning Defendant Salah, especially Nadav. During the extensive testimony from these witnesses – including the rigorous and lengthy cross examination – the Court had the opportunity to evaluate their demeanor and credibility. Based on these observations, the corroborating documentation, and the quality of the evidence, the Court finds the testimony of Haim and Nadav extremely credible and credits their testimony. The Court found them both forthright and truthful. Their demeanor remained unchanged during direct and cross examination. Haim was direct and responsive. Nadav remained soft spoken and mild mannered throughout his testimony. Indeed, the Court noticed Nadav's genuineness and sincerity throughout his testimony. He was both candid and thoughtful in his responses. Haim and Nadav both held up well under extensive cross examination. Moreover, their testimony was consistent in material respects and corroborated by the contemporaneous documentation and other evidence.

### 1.    Salah's Affidavit

Defendant Salah submitted his version of the events through a sworn affidavit. He did not testify, and thus his assertions were not subjected to cross examination. Nor did he provide the Court with the opportunity to assess the demeanor of his assertions while testifying. Given the credibility of Nadav and Haim, and the evidence corroborating their testimony, the Court

affords Salah's affidavit substantially less weight than the testimony of Nadav and Haim. *See, e.g., Untied States v. Baker*, 78 F.3d 1241, 1243 (7th Cir. 1996) ("Baker's Fourth Amendment claims rest on his version of the facts. The district court, however, determined after a suppression hearing that Baker's version was not credible. Instead, the court chose to credit [Officer] Brophy's view of what happened. That determination – to credit Brophy's version rather than Baker's – cannot be clearly erroneous."); *United States v. Carlisle*, No. 04-CR-055-C, 2004 WL 1085194, at *7 (W.D. Wis. May 7, 2004) ("[Defendant] claims that things were even worse than this, but I have accorded slight weight to his affidavit. First, although the affidavit is admissible in a suppression hearing, [Defendant] declined to subject his assertions to cross-examination or a demeanor check by taking the stand."); *United States v. Frank*, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) ("[s]ince Frank did not testify at the hearing, and was not subject to cross-examination, the Court was unable to form an opinion as to his credibility or the truthfulness of his allegations").

Furthermore, Agent Bray's testimony regarding the fraudulent loan application attacked Salah's credibility. The Court admitted Agent Bray's testimony pursuant to Federal Rule of Evidence 806. That Rule provides, in relevant part:

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.

Fed. R. Evid. 806. *See generally, United States v. Noble*, 754 F.2d 1324, 1331 (7th Cir. 1985).

If Defendant Salah had testified regarding the averments in his affidavit, the government

could have attempted to attack his credibility on cross examination by inquiring into the events surrounding his mortgage application and tax returns. Fed. R. Evid. 608(b). Accordingly, the admission of Agent Bray's testimony was consistent with Rule 806.

Even without Agent Bray's testimony, Salah's affidavit is questionable given its inconsistencies with Salah's prior statements and the other evidence presented at the suppression hearing. As described above, Defendant's affidavit avers a pattern of sleep deprivation, sensory deprivation, physical abuse, psychological abuse, and threats of physical violence by his ISA interrogators that broke his will and forced him to make involuntary statements to the ISA interrogators. As noted in this Opinion, Salah's version of the events has progressed since 1993.

Both Haim and Nadav consistently denied that Defendant was subjected to any of the extreme actions set forth in his affidavit. The Court credits their testimony regarding these areas. Mr. Feldman's testimony tends to corroborate certain averments in Defendant's affidavit regarding actions taken by the ISA interrogators because Salah complained regarding some of these alleged abuses in 1993 or 1994 to Mr. Feldman. Mr. Feldman admitted that he could not say what actually happened because he was not present when the ISA questioned Salah and he did not represent Mr. Salah at that time. Mr. Feldman even questioned the validity of Defendant's allegation regarding the threat of Haim photographing him naked. Mr. Feldman also admitted that he had never represented an American citizen detained by the ISA, thus he did not have any experience with how the Israeli authorities treated Americans. Weighing this against Haim's and Nadav's credible testimony and the totality of the circumstances based on the evidence before the Court, the government has met its burden.

### 2.    Salah

The uncontested evidence at the hearing supports that Salah is quite intelligent and articulate. Nadav described Salah as highly intelligent and polite. (Tr. at 967-68.) The American Consulate report described Salah as "a bright well-informed individual who articulates his points clearly." (Def. Ex. Salah Con. Docs. At 73.) Indeed, Mr. Razek, from the Consulate General's office, described Salah to FBI Agent Priestap as "very intelligent." (Tr. at 1936.)

### 3.    American Citizenship

The Court also finds Defendant's American citizenship significant to its findings. Haim and Nadav both testified that Salah's citizenship status resulted in more favorable treatment than other detainees. In fact, Haim received a direct order from the head of the ISA that they should treat Salah differently because of his status, including not placing a hood on his head or having him sit in a small chair. Nadav consistently testified that Salah received special treatment, in part, because he was an American citizen. (*Id.* at 1370.) Even Salah told the American Consulate in 1993 that "he was well and that he believed he was receiving better treatment than other prisoners." (Gov. Ex. CDG at 25.)

Nadav's and Haim's testimony that Salah was treated differently from other detainees is corroborated on the audio-taped conversation between Nadav and Salah on March 18, 1993. Specifically, Nadav tells Salah that he has treated him "throughout my whole interrogation with you ... not like I treat anyone else." Salah responded, "That is it. Then our relationship remains, eh, brotherly and I will not have any surprises." (Gov. Ex. Tape 5 English Translation SH at 50-51.)

Additionally, as Mr. Feldman testified at the suppression hearing, he "heard in the trial that the Secret Service interrogators – again, either Haim or Nadav – said that he was treated differently because he was a foreign citizen." (Tr. at 2210.) This testimony from 1993 remains consistent with the Nadav's and Haim's testimony. Although Mr. Feldman had not heard of this exception for American citizens, he admitted that he had not represented any American citizens detained in Israel. (*Id.* at 2208-09, 2210-11.)

Defendant contends that Haim's testimony was impeached on this issue because he "changed his testimony from having personally received a 'direct order by ISA head Ya'kov Perry' to admitting that he never actually spoke to Perry." (R. 550-1, Defendant's Post-Hearing Brief at 46.) The Court disagrees. Haim never testified that he spoke directly to Mr. Perry. Further, the order that was conveyed to him was the same – Haim should treat Salah differently because he is an American citizen and "not to use what was allowed to us by the Landau Commission." (Tr. at 667.) Similarly, although Nadav did not remember receiving "special instructions," he clearly testified that he treated Salah differently, in part, because he was an American citizen. This corroborates Haim's testimony.

### 4. Photographic Evidence

With respect to physical abuse, Haim and Nadav emphatically denied that any ISA interrogator or official beat or physically tortured Defendant Salah. The other evidence in the record supports this credible testimony. None of the contemporaneous ISA logs reflect any such abuse. Further independent sources corroborate this testimony. The Court has carefully reviewed the photographs of Defendant Salah from the time period in question. Specifically, the

Court carefully observed photographs of Defendant from January 31, 1993, February 3, 1993, and March 15, 1993 – all within the time period of his custodial questioning. (*See* Gov. Exs.1-31-93 Photograph; 2/28/93 Salah Photograph; Newspaper Photographs Group – from 2/3/93 from the Chicago Tribune, Chicago Sun Times; and 3/15/93 from Chicago Tribune, Sun Times and certain foreign newspapers, including the Hahdashok and the Al-Quds Daily; Salah Photo Video 1; Salah Photo Video 2; Salah Photo Video 3). (*See also* Tr. at 369-70, 423-29.) These photographs are from the *Chicago Tribune*, the *Chicago Sun Times* and certain foreign publications. None of these photographs evidence any signs of physical abuse on Defendant's face, head, neck and other exposed areas. Furthermore, Haim testified that the suit coat worn by Defendant in the February 3, 1993 photographs is the same one worn by Salah at the time of the arrest. That suit coat in the February 3, 1993 photographs is not torn or damaged. If the allegations in Salah's affidavit were true, it is likely that his coat would show some signs of abuse. Furthermore, Defendant Salah was smiling in the photographs from February 3, 1993 and March 15, 1993.

### 5.    Judith Miller

On February 11, 1993, *New York Times* journalist Judith Miller observed Nadav question Salah at the Ramallah facility. She observed the session through a monitor that permitted her to see and hear the session. (Tr. at 443, 555-56, 1049-50.) She characterized her impression of Salah when Nadav entered the room – "[h]e did not seem afraid as his interrogator entered the room, carrying a metal tray with two glasses of Nescafe, milk, and sugar." (Gov. Ex. Israel Chapter at 381.)

Ms. Miller did not report any signs of physical abuse or torture of Salah. This is consistent with the testimony of the ISA witnesses.

### 6. The Medical Records Corroborate Nadav's and Haim's Testimony

The medical records further corroborate the ISA interrogators' testimony, and counter Defendant's assertions of abuse. Salah has not alleged that the medical officers abused him or treated him improperly, nor did he introduce any such evidence.

Salah received a medical examination when he arrived at the Ramallah facility on January 25, 1993. The medical officer who examined him reported that Salah did not have any complaints, and they treated him for his ulcer. (Gov. Ex. Medical Records 2 Trans SH at 13896; Tr. at 437.)

On January 28, 1993, the medical records – stamped by Dr. Ben-Ari Victor – reflect "Normal general physical and mental condition." (Gov. Ex. Medical Records 2 Trans SH at 13685). They further reflect "No need for treatment." (*Id.*) These medical records demonstrate that Defendant Salah was again checked for his medical condition on February 4, 1993, February 26, 1993, March 1, 1993, March 7, 1993, and March 25, 1993. (*Id.*) The only complaints reflected in these medical records relate to Defendant's ulcer. (*Id.*) The records also reflect that he was being treated for this condition. (*Id.*) None of these records contain any indication that Salah had been physically or psychologically abused.

The American Consulate General documents also reflect that Salah reported that his health was "fine." On February 12, 1993, Salah told them that he was "examined twice daily by prison medical personnel." (Gov. Ex. CDG at 21.) On February 19, 1993, he told the Consulate

General's office the same thing. (*Id.* at 28.)

### 7. Small Chair and Hood

Defendant's affidavit claims that the ISA forced him to sit in a "slanted child-sized chair." The first time Defendant apparently claimed that he was forced to sit in a small chair was during his third visit with the consular's office on February 12, 1993 – 18 days into his custodial interrogation. At that time, he told the Consulate General's office that *"during his first two days of imprisonment, he was hooded, tied with his hands behind him and forced to sit on a low stool. Since that time he has been alone in a room, but otherwise relatively comfortable."* (Gov. Ex. CDG at 21) (emphasis added.) Salah did not complain that the ISA continued to force him to sit in the small chair beyond the first two days. The report from the Consulate General's fourth visit to Salah on February 19, 1993 did not contain any such complaints. Similarly, the Consulate General's records from visits on March 8, 1993, March 19, 1993, March 29, 1993, April 7, 1993, April 16, 1993, April 23, 1993, April 30, 1993, May 7, 1993, May 13, 1993, and May 24, 1993 do not reflect any complaints from Defendant Salah regarding the ISA forcing him to sit in a small chair. (Gov. Ex. CDG at 32-33, 36-37, 39-52.)

Defendant Salah did complain to Mr. Feldman at some point after April 1993 that the ISA had forced him to sit in a small chair. (Gov. Ex. Feldman 3.) Similarly, on approximately November 8, 1995 – while in Israeli custody – in connection with the extradition of Mousa Mohammed Abu Marzook, his co-defendant in this case, Defendant Salah executed an affidavit (the "1995 Salah Affidavit") (Gov. Ex. 11/8/95 Salah Affidavit.) He executed that affidavit "on behalf of Dr. Mousa Abu Marzook in response to Israel's request that he be extradited to that

country." (*Id.* at ¶ 2.) The affidavit, in essence, denied the truth of any of the information Salah had provided to the ISA regarding Marzook on the basis that "[a]ll of these statements are the product of a systematic employment of physical and mental torture, terror and coercion." (*Id.* at ¶ 7.) In the 1995 Salah Affidavit, Defendant Salah averred that he "was forced to sit on a chair only eight inches high (a children's chair) and bound to it for long periods." (*Id.* at ¶ 8(b).)

Against this, the Court weighs the testimony of both Haim and Nadav who adamantly denied that anyone at the ISA forced Salah to sit in a small child-like chair. They denied that they forced him to do so, that they heard of anyone forcing him to do so, that they observed anyone forcing him to do so, or that they ever saw him sitting in such a chair. In addition, Haim credibly testified that the head of the ISA ordered not to place Defendant in a small chair or to place a hood on his head. Given these factors and weighing the totality of the circumstances, Haim's and Nadav's credible testimony outweighs Salah's statements in his affidavit in this case.

Furthermore, during the course of the hearing, defense counsel made much of a small child-like chair, marked as Defendant's Exhibit 5. No witness, however, identified this exhibit as the type of chair Defendant allegedly had to sit in. Defendant – who claims in his affidavit that he spent significant time in the chair – did not identify it in his affidavit. Further, Mr. Feldman – who testified that he saw the small chair during a court proceeding in Salah's case – did not identify Defendant's Exhibit. 5 as the type of chair they used. (Tr. at 2230-31.) Neither Mr. Al-Batsch nor Mr. Qatamesh – both of whom claimed to have been placed in such a chair – identified Defendant's Exhibit 5 as the type of chair in which they sat.

### 8.   Sleep Deprivation

The issue of sleep deprivation is relevant to the Court's determination of the voluntariness of Defendant's statements. *See United States v. Gillaum*, 372 F.3d 848, 856-57 (7th Cir. 2004); *United States v. Danser*, 110 F.Supp.2d 792, 802 (S.D. Ind. 1999). Defendant asserts in his affidavit that the ISA interrogators deprived him of sleep, including forcing him to stay awake for a period of 48 hours. (R. 520-1, Salah Aff. at ¶¶ 5, 9, 13, 15, 17.) As part of the sleep deprivation, Salah avers that the ISA placed him in conditions that were not conducive to sleeping and did not provide him with a blanket or mattress while he was in a freezing cell. (*Id.* at ¶¶ 9, 15.) In his 1995 affidavit in connection with the extradition of co-defendant Marzook, Salah also averred that the ISA deprived him of sleep. (Gov. Ex. 11/8/95 Salah Aff. at ¶ 8(h).) Additionally, Mr. Feldman represented "Mr. Salah was denied sleep for long periods of 24 hours or more." (Gov. Ex. Feldman 3 at ¶ 16(e).)

In contrast to Salah's averments, the three individuals who observed Defendant at the time in question and who testified at the suppression hearing – Nadav, Haim, and Eliyahu – all credibly testified that the ISA did not deprive Defendant of sleep. Nadav testified that from his first meeting with Defendant on January 26, 1993 at 11:30 a.m. (the morning after his arrest), Salah was alert and not overly tired. (Tr. at 968.) Nadav, who was Defendant's primary ISA interrogator, credibly testified that Salah was alert and rested every time he met with him. (*Id.* at 992, 994, 996, 1009, 1027, 1033, 1045-46, 1053-54, 1065, 1067, 1069, 1396-97, 1658-60.) Nadav further said that he never intended to deprive Salah of sleep, and in fact, never deprived Salah of sleep. (*Id.* at 1411, 1483, 1489, 1524, 1612.) Similarly, Haim testified that they did not

deprive Salah of sleep. (*Id.* at 236-244.) Israeli Police Officer Eliyahu – who saw Defendant on January 30, 1993 – also testified that Salah was calm, alert, relaxed, and did not appear sleepy or tired. (*Id.* at 1722-23.)

The photographs from the time in question corroborate this testimony. (*See* Gov. Exs.1, 1-31-93 Photograph; 2/28/93 Salah Photograph; Newspaper Photographs Group; Salah Photo Video 1; Salah Photo Video 2; Salah Photo Video 3.) The photographs do not depict any signs of sleep deprivation.

Contrary to Defendant's suggestion, the ISA Interview Logs do not prove that he was sleep deprived. Although they show that Defendant was questioned in the middle of the night and for lengthy periods of time, they do not overcome the credible testimony of the witnesses regarding Salah's alert and rested state. Furthermore, the law does not require law enforcement to question a detainee between the hours of 9:00 a.m. and 5:00 p.m. The Logs reflect that after his initial questioning session when he arrived at the Ramallah facility on January 25, 1993, the ISA questioned Defendant Salah during the middle of the night on January 27 (between 1:50 a.m. and 4:00 a.m.), January 28 (between 2:05 a.m. and 5:50 a.m.), February 2 (between 2:50 a.m. and 8:15 a.m.), February 4 (between 12:30 a.m. and 1:30 a.m.), February 7/8 (between 11:05 p.m. and 1:00 a.m.), and February 9 (between 1:30 a.m. and 6:40 a.m.). (Gov. Exs. 1/27/93 1:50 a.m., 1/28/93 2:05 a.m., 2/2/93 2:50 a.m., 2/4/93 12:30 a.m., 2/7/93 11:05 p.m., 2/9/93 1:30 a.m.) Thus, the ISA questioned him in the middle of the night on 6 evenings out of 52 evenings in custody between the time of his arrest and his March 18, 1993 statements.

Moreover, the ISA Interview Logs reflect that immediately before and/or after his questioning during these early morning hours, Salah was sent to "rest" for substantial periods of time – over 7 hours between his January 27 and 28 questioning (Gov. Ex. 1/27/93 6:00 p.m.), over 20 hours between January 28 and 29 (Gov. Ex. 1/28/93 2:00 p.m.), over 31 hours between January 31 and February 2 (Gov. Ex. 1/31/93 3:00 p.m.), over 10 hours on February 7 (Gov. Ex. 2/7/93 11:30 a.m.), and for over 16 hours on February 8 (Gov. Ex. 2/8/93 7:30 a.m.). As both Haim and Nadav testified, they permitted Salah – as he requested – to rest in one of the interrogation rooms with a mattress and blankets. He also had periods of time in "wait" where he was unrestrained.

As Nadav asserted, the ISA had legitimate reasons to question Salah at times during the middle of the night – "because of severe terrorist activity, because of the nature of that activity, it was very important to receive information as soon as possible in order to prevent another act of killing." (*Id.* at 1489.) Nadav further added, "since the character of this investigation has to do with prevention of terrorist attacks, we were obliged to interrogate him at this hour. This is why these are not odd hours. We interrogate only when there is a need to interrogate." (*Id.* at 1524.) Nadav added, the "need was to receive all of the information regarding his terrorist activities as fast as possible in order to be able to arrest people and prevent terrorist attacks from happening." (*Id.*) Given that Salah had substantial rest periods either immediately before or after (or both) these sessions, the Court does not find that the questioning time periods amount to sleep deprivation. This is especially so given Nadav's credible testimony that Defendant Salah was rested and alert when he spoke with him. Therefore, based on the totality of the circumstances,

96

the Court does not find that Salah was sleep deprived to the point of rendering his statements involuntary.

### 9.    American Consulate Contemporaneous Documentation

The American Consulate contemporaneous documentation reflects that on January 25, 1993, the ISA notified the American Embassy in Tel Aviv of Salah's *pending* arrest. (Gov. Ex. CDG at 005.) The report notes that "this is the first time in Consular Section memory that the [ISA] has passed on such notification about an arrested [American Citizen.]" (*Id.*) The Consulate General did not, however, meet with Defendant until January 31, 1993, even though they attempted to do so on January 29, 1993.

The documentation specifies that Salah "reports no mistreatment." (Gov. Ex. CDG at 003.) The report further notes that Salah "appeared relaxed and in good physical condition." (*Id.*) He indicated that prison medical personnel had provided medication for an ulcer condition and that he requires no further treatment or medication from the family." (*Id.*) The Court finds this report that was made less than six days after Defendant's arrest important. It corroborates Agent Priestap's testimony regarding Mr. Razek's assessment of no abuse. It further corroborates Nadav's and Haim's testimony.

Similarly, the second visit to Salah does not reflect any complaints of abuse. During the American Consulate's third visit to Salah on February 12, 1993, Salah noted for the first time to Mr. Razek that "during his first two days of imprisonment, he was hooded, tied with his hands behind him and forced to sit on a low stool. Since that time he has been alone in a room, but otherwise relatively comfortable. He is given a Koran, paper and pencil. Prison authorities,

however, would not let him deliver a letter for his family to the Conoff. He said the food is alright; sometimes he receives prison staff food. On weekends he is placed in a cell with another prisoner." (Gov. Ex. CDG at 021-22.) Notably, at that time, Salah did not assert any current mistreatment.

The American Consulate's office again met with Salah on February 19, 1993, March 8, 1993, March 19, 1993, March 29, 1993, April 7, 1993, April 16, 1993, April 23, 1993, April 30, 1993, May 7, 1993, May 13, 1993, and May 24, 1993. (Gov. Ex. CDG at 32-33, 36-37, 39-52.) The reports from these meetings do not reflect any complaints from Defendant Salah regarding physical abuse, and corroborate the testimony of Haim and Nadav. The report from March 8, 1993, notes that Salah complained that Haim threatened to beat him if he did not sign a confession, but it does not contain any complaints of physical abuse.

### 10. Alleged Abuse by Haim

Most of Salah's specific allegations regarding threats were directed at Haim. The documents and the testimony, however, reveal that Haim did not spend a significant amount of time with Defendant Salah. Haim also credibly denied the allegations against him during his testimony.

Defendant also claims now that Haim physically abused and beat him. Yet, Mr. Feldman testified that Defendant Salah did not tell him in 1993 about such abuse. He testified that Salah had told him, at most, that Haim had slapped him.

Furthermore, on March 4, 1993, Salah complained to a military judge about Haim. The allegations were investigated, Haim was interviewed, and, as Haim testified, the allegations were

"totally negated." (Tr. at 501.) In addition, Salah told "**REDACTED PURSUANT TO CIPA –**

that he lied in court and complained" about Haim "as if [he] were – [he] committed

violence against him because [Salah's] attorney told him to do so; because, otherwise, his

testimony ... will damage him a lot or will hurt him a lot. And, in such a way, he tried to

disqualify the testimony that he had given." (*Id*. at 501-02.)


**REDACTED PURSUANT TO CIPA**


(Gov. Ex. 3/5/93 Log Translation SH at 15120.)

Even during his mini-trial[16] to suppress his statements in Israel in November 1994, Salah

testified "As for violence, they didn't use physical violence. Haim only waived his hand towards

my face, but he didn't hurt me." (Gov. Ex. Salah Zuta Testimony Translation SH, at 383.) This

testimony from Salah himself contradicts his affidavit in this case where he claims that Haim

abused him to the point of being able to recognize "the feel of [Haim's] hand when he hit me."

(Def. Ex. 25 at ¶ 10.)

Finally, the Court finds telling Salah's audio-taped statement to Nadav from their March

18, 1993 session. During that session, Salah told Nadav that "if I wanted to be defiant with

---

[16] Given that the Court does not have an official transcript from this proceeding and the Court recognizes Mr. Feldman's testimony that Defendant Salah was not able to complete his testimony during the hearing, the Court places substantially less weight on this piece of evidence than on the live testimony and other evidence before the Court.

Haim, I would have done so." (Gov. Ex. Tape 1 English Translation SH at 7.) Such a bold statement counters his assertions of his will being overborne by Haim's actions.

### 11. Access to a Lawyer

Defendant argues that his Sixth Amendment right to counsel was violated when he requested counsel after his arrest, and the Israeli authorities refused to provide him one. In the United States, it is clear that a defendant in a custodial interrogation has the right to an attorney when he unambiguously requests one. *United States v. Peters*, 435 F.3d 746, 751 (7th Cir. 2006) (citing *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *Davis v. United States*, 512 U.S. 452, 458-59, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994); *Miranda*, 384 U.S. 436, 86 S.Ct. 1602). The Second Circuit, however, has held that "a request for counsel in the context of an investigation conducted solely by foreign officials does not, in itself, amount to an invocation of the right to counsel with respect to United States proceedings." *Yousef*, 327 F.3d at 142 (citing *United States v. Coleman*, 25 M.J. 679, 686-87 (A.C.M.R. 1987); *United States v. Covington*, 783 F.2d 1052, 1055-56 (9th Cir. 1985)). In *Yousef*, the defendant had been indicted in the United States on charges relating to the 1993 bombing of the World Trade Center, and the United States initiated extradition hearings in Pakistan to have him extradited to the United States to face the charges. Yousef claimed that he had invoked his right to an attorney to Pakistani officials during his extradition hearing. The court noted that Defendant Yousef "has failed to establish that his request [for an attorney] had any cognizable legal effect under American law or the Sixth Amendment thereunder." *Yousef*, 327 F.3d at 142.

The Court agrees with the *Yousef* holding. Similar to the joint venture analysis described

in detail *supra*, unless the United States was acting in a joint venture with the Israeli authorities at the time Defendant Salah made his statements to them, Defendant's request for an attorney to the ISA "cannot be extended to require the United States officials to proceed as if that request was made of them." *Id.* (citations omitted). Such a requirement would impose the United States' laws on all foreign officials where the United States does not have any involvement in the foreign investigation or interrogation.

Here, there is no evidence that the United States was acting in a joint venture with Israel or was attempting to circumvent Defendant's rights in the United States through Israeli officials. Furthermore, here, unlike in *Yousef*, there were no charges pending against Salah in the United States in 1993 and there is no evidence that the United States had any pending investigation against him.

The record is unclear as to precisely when Defendant Salah saw an attorney while he was in Israeli custody. There is some evidence that he did not have access to an attorney for 14 days. The American Consulate documents report that Defendant Salah met with an attorney on January 31, 1993. (Def. Ex. Salah Con. Docs at 42.) Either way, Defendant received an attorney within the time limits provided under Israeli law, and in fact, before the law required such access. (Tr. at 431-32.)

### 12.   Salah's Experts[17]

Defendant places heavy reliance on his expert witnesses. Specifically, Defendant called Mr. Kuttab, Mr. Ginbar, and Dr. Sarraj as expert witnesses. Mr. Kuttab, Mr. Ginbar, and Dr. Sarraj were all involved in studies of Palestinian security detainees by the ISA, and authored various publications regarding their findings. Each one of these witnesses opined on the techniques utilized by the ISA when questioning detainees, and some opined that the ISA used such techniques with Defendant Salah.

Significantly, Mr. Kuttab, Mr. Ginbar and Dr. Sarraj did not examine or interview Defendant Salah at the time of his interrogation or before testifying in court. None of them have any personal knowledge of the interrogation.

Further, in this case, the experts did not employ the methodologies they typically undertook when interviewing Palestinian detainees and assessing the validity of such detainees' statements. Mr. Kuttab, for example, testified that his organization trains its investigators "not to prompt witnesses who were giving their affidavits; not to allow others to intervene; to take a generally skeptical attitude; to ask questions very carefully and not to ask leading questions." (Tr. at 1826.) Mr. Kuttab, however, did not even speak to Defendant regarding his allegations. Mr. Ginbar testified that he normally would attempt to verify a detainee's version of the events by reviewing medical records and speaking to the detainee's attorney, if possible. (*Id.* at 2119-

---

[17] Defendant also called Mr. Feldman as a witness. The Court found Mr. Feldman credible, but as discussed above, his testimony does not overcome the credible testimony of Nadav and Haim and corroborating evidence.

20.) Mr. Ginbar, however, did not review any medical records in this case or speak to Mr. Feldman about it. In fact, both Mr. Kuttab and Mr. Ginbar only reviewed Defendant's affidavit before giving their opinions.

Similarly, Dr. Sarraj testified that it was his practice to take very deliberate steps to ensure that the information he received from former detainees was credible. (*Id.* at 2482.) He admitted that he did not take any of those steps regarding Defendant Salah and he did not know if any such steps were taken regarding Defendant's affidavit. (*Id.* at 2482.)

Instead of evaluating Defendant's assertions using precautions typically taken by them in assessing credibility, these experts based their opinions regarding the voluntariness of Salah's statements on his untested affidavit. Accordingly, the Court gives their testimony little weight.

Further, while the Court gives weight to their testimony regarding techniques used against Palestinian detainees, that testimony does not overcome the credible testimony of Nadav and Haim, as well as the corroborating evidence, under the totality of the circumstances. None of their testimony pertains to the events that actually took place regarding Defendant Salah while in the custody of the ISA.

### 13. Rule 404(b)

Mr. Al-Batsch and Mr. Qatamesh testified as fact witnesses for Defendant pursuant to Federal Rule of Evidence 404(b). Although the Federal Rules of Evidence do not apply to suppression hearings, the Court permitted Defendant to offer the testimony of Ahmed Al-Batsh and Ribhi Qatamesh under a Rule 404(b) theory. Specifically, Defendant Salah claims that their testimony is "relevant to establish a common plan or scheme of torturing and coercing

103

statements, the opportunity to torture and coerce statements, and the intent to torture and coerce statements." (R. 550-1, Post Hearing Brief at 54.)

Rule 404(b) provides that evidence of prior crimes, wrongs or acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," but not as propensity evidence to establish that a defendant acted in conformity with the prior acts. Fed.R.Evid. 404(b). *See United States v. Macedo*, 406 F.3d 778, 792 (7th Cir. 2005). In trials, the Seventh Circuit applies a four part test to determine the admissibility of such evidence. *Id.* at 793. In assessing the value of the evidence at the hearing, this test provides helpful guidance. Namely, prior acts must be sufficiently similar in type and time to be relevant. *Id.* Here, neither Mr. Al-Batsh nor Mr. Qatamesh was an American citizen at the time the ISA questioned him. As noted above, this factor was instrumental to the ISA's decision to treat Defendant Salah differently than others. In addition, neither of these individuals claimed to be a high ranking member of the Hamas organization.

Moreover, even if the testimony of these witnesses established the Rule 404(b) objectives sought by Defendant, the Court finds that the credible testimony of Nadav and Haim, as well as the corroborating evidence discussed in detail above, outweigh this testimony. The Israeli authorities arrested Defendant based on evidence of his involvement in terrorist activities. The ISA was trying to investigate and prevent terrorist activities on Israeli soil, and Defendant made statements to them during the course of his interrogation regarding his activities. Based on the evidence before the Court, the government has proven by a preponderance of the evidence that Defendant's statements were not made as a result of physical or psychological abuse.

104

### 14.     Other ISA Interrogators

Defendant asserts that the government's failure to call the other ISA interrogators at the

hearing dooms any statements made by Defendant Salah to such ISA interrogators. The Court

disagrees.

The evidence clearly establishes that Nadav was the primary interrogator of Salah. He

was present at the majority of the interview sessions with Salah. There were, however,

significantly fewer sessions where Nadav was not present and the Court admitted into evidence

the Interview Logs reflecting such sessions. Regarding these sessions, Nadav unequivocally and

credibly testified that although he was not present during some of these sessions, the other ISA

interrogators informed him of what happened. (Tr. at 1455-59.) Both Nadav and Haim testified

that they never directed other ISA interrogators to physically or psychological abuse Defendant

Salah in any of the ways he has averred, they never observed anyone doing any of these things,

and they never heard of anyone doing them. (*Id.* at 236-244, 1222, 1483.) Furthermore, Nadav

said that if any such things had happened, he would have known about them.

Nadav also explained that he was confident that Salah would have complained to him if

he had been mistreated. As described in detail below, both Nadav and Salah describe their

relationship as one of friendship. *See infra* at 122-25.

Furthermore, in an audio-taped conversation on March 18, 1993, Salah joked with Benny.

(Tr. 1171-74; Gov. Ex. Tape 3 English Translation SH at 30-33.) They joked about a possible

suicide operation and Salah teased Benny that "he's the smart one" who can determine where it

is. (Tr. at 1172-73; Gov. Ex. Tape 3 English Translation SH at 32.) Salah further teased him

that the operation would take place "as a retaliatory act for the sake of the big Mujahid, the Hamas commander," namely for Salah's arrest by the Israelis. (Tr. at 1174; Gov. Ex. Tape 3 English Translation SH at 33.) This taunting exchange corroborates Haim's and Nadav's testimony.

In essence, given these circumstances and the credible and corroborated testimony of Nadav and Haim, the Court concludes that the government has proven by a preponderance of the evidence that Defendant voluntarily made the statements at issue. Of course, in order to admit such statements at trial, the government will have to lay the appropriate foundation since hearsay evidence is not admissible at trial. The Court will now specifically address the specific six statements upon which the parties have focused.

### C. Specific Statements

The above findings of fact pertain to the totality of circumstances surrounding the statements Defendant made to the Israeli authorities during the period of January 25, 1993 through May 18, 1993, although the questioning was essentially over after March 18, 1993. Given the different circumstances surrounding some of the specific statements at issue and the parties' focus upon these statements, the Court will address separately the following statements allegedly made by Defendant Salah: 1) the January 30, 1993, statement to INP Officer Eliyahu; 2) the January 27, 1993 and February 21, 1993 statements to INP Officer Suleiman; 3) the signed agreement and maps regarding the burial site of the body of Sa'doan; 4) the handwritten statement made to the birds; and 5) the March 18, 1993 statements.

1.     **January 27, 1993 and February 21, 1993 Statements to Israeli National Police Officer Meron Suleiman**

The government seeks to admit both a January 27, 1993 written statement and a February 21, 1993 written statement, both allegedly given by Defendant. (Gov. Exs. 1-27-93 Salah Statement & 2-21-93 Salah Statement.) The government contends that Defendant Salah gave both of these written statements to INP Officer Suleiman. Both of these statements are written in Hebrew. The government did not call Officer Suleiman as a witness at the hearing to testify regarding the circumstances surrounding these statements. Further, the February 21, 1993 statement does not contain Salah's signature.

a.     **January 27, 1993 Statement**

INS Interrogator Haim testified regarding both of these statements. (Tr. at 359-362.) He testified that he recognized the signatures of Suleiman and Salah on the January 27, 1993 statement, and that Suleiman gave Haim the document after he obtained Salah's statement. (*Id.* at 360.) Haim did not, however, provide any testimony regarding the circumstances of how Suleiman obtained this statement. Significantly, the government did not present any evidence as to whether Suleiman translated the Hebrew version to Defendant Salah before Salah signed the document.

b.     **February 21, 1993 Statement**

Haim testified that on February 21, 1993, he contacted Israeli National Police to take a written statement from Salah. (*Id.* at 464-477.) Suleiman came to the interrogation facility to take the statement. (*Id.* at 465.) After Suleiman met with Salah, he reported to Haim that Salah

107

would not give any testimony. Haim said that he then spoke with Salah emphatically. (*Id.* at 469.) Haim testified that he told Salah that he had already made many statements to them that he could not "negate" or "run away from." (*Id.* at 466.) Haim also conceded that he was angry that Salah refused to give any testimony to Officer Suleiman. (*Id.* at 468, 849.) Significantly, for the first and only time during his custodial questioning at the ISA, Haim sent Salah to "cell wait" because Salah refused to give Officer Suleiman any testimony. (*Id.* at 473-44, 850-51; Gov. Ex. 2/21/93 9:30 a.m.) "Cell wait" refers to placing a detainee inside a cell at the ISA interrogation facility that has a bench where the detainee can sit down. (Tr. at 297-98, 732.) Haim admitted that he sent him there, in part, to send a message that Salah should seriously consider giving testimony to Officer Suleiman. (*Id.* at 473, 866-67.) Haim left Defendant Salah in cell wait for 3 ½ hours that day. (*Id.* at 474; Gov. Ex. 2/21/93 9:30 a.m.) Furthermore, Haim also told Salah that if he did not give the testimony to Officer Suleiman that Salah's interrogation could be prolonged. (Tr. at 849.)

After Salah came out of cell wait, he met with Suleiman again. (*Id.* at 475.) Haim testified that Suleiman subsequently gave the ISA a handwritten statement allegedly reflecting information provided by Salah. (*Id.* at 475-76; Gov. Ex. 2-21-93 Salah Statement.) Similar to the January 27, 1993 statement, Suleiman wrote the February 21, 1993 statement in Hebrew. Salah, however, refused to sign the February 21, 1993 statement.

**c.    Analysis**

The government has not met its burden of proving by a preponderance of the evidence

that Defendant Salah voluntarily made either of these statements to Officer Suleiman. The

government did not call Suleiman as a witness at the hearing, and Haim's general testimony

alone was insufficient to establish that Salah voluntarily made the statements because Haim did

not testify regarding how Suleiman obtained these statements. In essence, the government

effectively withdrew these statements by not putting in sufficient testimony.

In addition, these statements are both in Hebrew, a language that Salah did not speak or

read. Although the January 27, 1993 statement contains a purported signature of Defendant, no

witness with first hand knowledge testified regarding this signature or the circumstances

surrounding it, including whether the statement was read to Mr. Salah in a language he

understood before he signed it. The February 21, 1993 statement does not even contain his

purported signature, and Haim testified that Salah refused to sign the document. (Gov. Ex.

2/21/93 Salah Statement.) Further, Nadav testified that the next day – February 22, 1993 – Salah

told him that he was concerned because he signed a document without having read it. (Tr. at

1077-78.)

Moreover, Salah has consistently complained about having to sign documents that he did

not understand because they were prepared by Suleiman in Hebrew. During the mini-trial, Salah

told the military tribunal that "Policeman Maron" wrote many things in Hebrew "around 20[th], 21st

of February," that Salah did not understand. (Gov. Ex. Salah Zuta Testimony Translation SH at

379-80.) Because he did not understand them, Salah testified that he refused to sign the

109

document. (*Id.* at 380.) Similarly, the American Consulate General's office noted in its reports that Salah had complained that he did not understand a statement that had been written in Hebrew. (Gov. Ex. Consulate Documents at 14; Def. Ex. Salah Con. Docs. at 37.) A March 3, 1993 account from the Consulate's office reflects that Salah complained that he had been pressured to sign "an additional statement which would amount to a confession." (Gov. Ex. Consulate Documents at 32.)

Given all of these factors and looking at the totality of the circumstances surrounding these statements allegedly made by Defendant Salah to Policeman Suleiman, the government has failed to meet its burden and the Court hereby suppresses both of the handwritten statements allegedly made to Officer Suleiman.[18] As evidenced below, the Court does not hold that a statement written in a language the defendant does not understand can never be voluntary when signed by the defendant. Under the totality of the circumstances in this case, however, the government has failed to meet its burden regarding these two statements.

2.     **Salah's alleged January 30, 1993 statement to INP Officer Hezi Eliyahu**

The government also seeks to admit a statement allegedly made to INP Officer Hezi Eliyahu on January 30, 1993. (Gov. Ex. 1/30/93 Salah Statement.) That statement is also written in Hebrew, a language that Defendant Salah does not understand.

---

[18] Even though the Court has found that the government has not met its burden regarding the January 27, 1993 and February 21, 1993 statements, it can still find subsequent statements voluntary. *See, e.g., Watson v. Detella,* 122 F.3d 450, 454-55 (7th Cir. 1997); *Holland v. McGinnis,* 963 F.2d 1044, 1050-51 (7th Cir. 1992); *Holleman v. Duckworth,* 700 F.2d 391, 396-97 (7th Cir. 1983).

In contrast to the other statements written in Hebrew, Officer Eliyahu testified at the suppression hearing. Officer Eliyahu testified that he took the statement at issue from Defendant Salah on January 30, 1993. Specifically, Officer Eliyahu testified that he came to the Ramallah facility in response to a call the evening before. Officer Eliyahu questioned Salah in Arabic – a language they both speak, and wrote the January 30, 1993 statement based on the information Salah provided to him. Officer Eliyahu credibly testified that he wrote down "word for word" what Salah said to him in the six page statement at issue. Although he wrote the statement in Hebrew, Eliyahu credibly testified that after he completed writing each page of the statement, he translated what he had written for Salah's confirmation. He explained that he changed anything in the text that Salah told him to change. After completing this process, Eliyahu testified that Salah willingly signed the bottom of each page of the statement, and Salah's signature in fact appears on the bottom of each page.

Furthermore, Nadav met with Salah on January 30, 1993. During that session, Salah did not complain to Nadav regarding his session with Eliyahu or about signing the statement. None of the evidence in the case reflects Salah complaining specifically about Officer Eliyahu. His specific complaints regarding the statements signed in Hebrew are directed at Officer Suleiman only.

In looking at the totality of the circumstances, the government has met its burden of proving by a preponderance of the evidence that Defendant Salah voluntarily made this statement. *See United States v. Benitez*, 920 F.2d 1080, 1084 (2d Cir. 1990) (defendant gave oral statement to agents that was "translated and transcribed" by a Spanish-speaking agent); *United*

111

*States v. Orozco-Martinez*, No. 05-CR-279, 2006 WL 51151, at *5-7 (E.D. Wis. Jan. 9, 2006) (recommending denial of motion to suppress statement written in English and translated to defendant in Spanish).

### 3. A handwritten signed agreement allegedly entered into between Salah and his GSS interrogators

The government seeks to admit a handwritten agreement written by Salah in Arabic pertaining to the location of the body of Sa'doan. (Gov. Ex. Sa'doan Agreement.) The Court heard extensive testimony regarding this document and the circumstances surrounding its creation, and holds that the government has proven by a preponderance of the evidence that Defendant Salah voluntarily made this statement.

First, Haim's and Nadav's testimony substantiates that Defendant Salah voluntarily made this statement. Defendant signed this agreement while in their presence, and they both credibly testified regarding the circumstances surrounding this agreement. They both testified that Salah negotiated the terms of the agreement, wrote out those terms in their presence, and signed the agreement in front of them.

Second, their testimony regarding these circumstances is corroborated in the contemporaneous ISA logs, including the logs reflecting Salah's telephone calls to his wife regarding this subject. (Gov. Exs. 1/31/93 – 3:00 p.m. Interview Log; Salah Handwritten Map 1; Salah Handwritten Map 2; 2/23/93 – 10:18 a.m. Interview Log; 2/3/93 – 5:30 p.m. Interview Log; 2/3/93 – 9:30 p.m. Interview Log; 2/4/93 – 12:30 a.m. Interview Log; 2/7/93 – 11:30 a.m. Interview Log; 2/9/93 – 2:30 p.m. Interview Log.)

Third, Salah's statements to Mr. Razek and the corresponding American Consulate documents support that Salah voluntarily entered into this agreement and made this statement. As Agent Priestap testified, Salah told Mr. Razek in February 1993 that he was attempting to negotiate with the Israelis regarding the burial location of a slain Israeli soldier in exchange for the release of female Palestinian prisoners. The documents from the American Consulate corroborate this testimony and the voluntariness of this agreement. In a "confidential" document from the Department of State reflecting Salah's meeting with the American Consulate while he was in ISA custody, Salah told the Consulate General about his "secret deal with the Israeli authorities." (Gov. Ex. Consulate Docs. at 024.) Salah told the Consulate General that he had a copy of the map in the United States "showing the location of the body, and that he was working from his memory of that map. He said his wife had burned all his documents but that she could get a copy of the map from someone in the U.S." (*Id.*) The State Department report reflects the terms of the agreement with the Israeli officials. It further notes that "Salah told Conoff he had been allowed to call his wife and had asked her to fax a copy of the map to the prison. His wife believed he was being coerced and refused to send it. Salah asked Conoff to call his wife and assure her that he is acting of his own free will." (*Id.*)

In addition, the Report notes that Salah showed the official a handwritten document, "which he claimed was an original of the deal he had made with the authorities." (*Id.*) The report sets forth the language of the handwritten agreement at issue, which is virtually verbatim with the one the government seeks to admit. (*Id.* at 025.) It specifically provides that Defendant Salah will identify the burial place of the Soldier Sa'doan, and that in return, the ISA agreed to

the following: 1) the release of "all the women who neither performed a military operation, possessed weapons, nor were leaders in organizations," and 2) "the confiscated money will be transferred to Mohammad Salah's bank account in Chicago." (*Id.*) The Consulate Report further notes that Nadav (in Hebrew), Haim (in Hebrew), and Salah (in Arabic) signed the agreement. (*Id.*)

Fourth, Salah's discussion with Nadav during the March 18, 1993 recorded interview supports that Salah voluntarily provided the ISA with information regarding Sa'doan because he believed it was "humanitarian." (Gov. Ex. 3/18/93 Tape 3 Transcript, p. 56-57.) During this interview, Salah described how Haim thanked him for his humanitarian action and agreed that the ISA was "ready to sign on anything you want other than for the blood and the dangerous ones." (*Id.* at 59-60.) During this same conversation, Salah discussed the handwritten agreement and told Nadav that he previously had given the "agreement document" to his "female attorney" because he "was afraid" at that time. (Tr. at 1184-85; Gov. Ex. Tape 4 English Translation SH at 17-18.) Salah agreed with Nadav, however, that "what they say about [the ISA] is incorrect" and that he could trust them to abide by the agreement. (Tr. at 1184-85; Gov. Ex. Tape 4 English Translation SH at 17-18.)

Fifth, during his mini-trial in Israel in November 1994, Salah testified that he "initiated giving the information about Sa'doan," and "handwrote [his] conditions." (Gov. Ex. Salah Zuta Testimony Translation SH at 375.) He added: "The conditions were the release of the female Palestinian prisoners, returning the money they took from me, to release about 500 men from prison, as well as releasing all the people they arrested because of my address book. ... They

114

agreed to my conditions, and treated me very well. ... I said that I don't want my people to think that I produced the body in order to release myself." (*Id.* at 375.) He admitted to the military tribunal that he had entered this agreement with the hope of having his conditions met.

Finally, the testimony surrounding the finalization of this agreement, as well as the terms of the agreement itself (whether or not they are true), reflect that Salah was negotiating with the ISA over the information he had – namely, the purported location of the burial of Sa'doan's body. This negotiation and the ultimate agreement that the Israelis would release certain female prisoners and return the money they seized to Salah demonstrate that Salah's will was not overborne. He was negotiating with the ISA officials, evidencing his strong mental state. Mr. Salah was attempting to satisfy the conditions of the agreement, and he was gaining something to his benefit in exchange for information. Moreover, that a negotiation took place at all and that ISA officials entered into an agreement with Defendant Salah reflects that Salah's statement was not the produce of abuse, but of his own free will. Given all of these circumstances, the government has met its burden of establishing by a preponderance of the evidence that Salah voluntarily made this statement.

### 4. A handwritten statement generated by Salah between March 1, 1993 and March 4, 1993

The government seeks to admit a 53 page, handwritten statement written by Salah between approximately March 1, 1993 and March 4, 1993, while he was incarcerated with "the birds." (Gov. Ex. Salah Handwritten Statement.)

Both Haim and Nadav testified regarding Defendant Salah's interaction with the birds.

115

The bird drill involved a group of Palestinian collaborators who "simulate terrorist command centers in prisons." (Tr. at 478.) The birds created a mock command center in the prison, and Salah entered that "command center" when he was transferred to the facility. (*Id.*) Salah spent approximately four to five days with the birds. During this time, he wrote the 53 page handwritten statement. Salah does not challenge that he wrote the statement in Arabic; he claims that he did not voluntarily write it because of the threats and abuse from the birds.

Haim credibly testified regarding the structure and monitoring of the birds and their treatment of Salah while he was in custody with them. They used Palestinian prisoners who had been convicted of non-violent crimes.

**REDACTED PURSUANT TO CIPA**

Significantly, Salah confirmed to Nadav that he wrote this statement, and even corrected inaccurate information in the statement. At one point, he told Nadav, "Everything I wrote here is

correct." (Gov. Ex. Tape 4 English Translation SH, at 20.) During the majority of the March 18, 1993 interview, Nadav reviewed the handwritten statement with Defendant Salah in detail. Salah added details to his handwritten statement, expanded on his statements, and corrected misinformation in the handwritten statement. These actions – which were captured on audio-tape as described below – support that Salah wrote the 53 page statement and that his statements in that document were voluntarily made. If Defendant Salah had simply written down what the birds allegedly told him to write, it does not make sense that he would not only agree that the written statement was his statement, but add more details to what he had written. Salah's tone was one of surprise that the handwritten statement ended up in Nadav's hands, suggesting that he never thought the ISA would obtain a copy of it. Such statements support that Defendant wrote it on his own free will.

During the course of the March 18, 1993 session with Nadav where Salah discussed his handwritten statement, Salah wanted to know how Nadav obtained a copy of this statement. (Tr. at 1147-48.) He asked Nadav, "Did you break into the prison to take it or do you have spies to such an extent." (*Id.* at 1147; Gov. Ex. Tape 2 English Translation SH, p. 60.) Salah even refers to his handwritten statement as the "confiscated report." (Gov. Ex. Tape 1 English Translation SH at 43.) Salah again asks later in the session, "First of all, how did you seize these papers? I mean did you break in or are there spies?" (Tr. at 1207; Gov. Ex. Tape 5 English Translation SH at 50.) He added "I just want to know: spies or a break-in?" (Tr. at 1207.) In asking these questions, Salah gave no indication that the birds had abused him or that he wrote the statement involuntarily. Further, Salah never expressed doubt or concern over writing the statement.

Nadav responded to Salah's inquiries: "I will tell you how. I knew that you were going to produce the papers... I used a tactic on you." Nadav explained, "There are always spies. There are ... As you know, in each eh ... eh. I can put in any place, if I want ... eh. Why did I send you to Hebron? As an example." (Gov. Ex. Tape 5 English Translation SH at 50.) The voluntariness of Salah's statement is further supported by Nadav's credible testimony that Salah never complained to him about his treatment by the birds. As Nadav testified, Salah "did not understand that it's an exercise with collaborators. And from my experience, it indicates in the prison – that in the prison it was like regular detainees and his treatment was good. That in such a situation, from my previous experience, if there was any problem at that moment, he would have told me in which way he delivered the reports. From my standpoint, it's another indication that his treatment during the exercise was good." (Tr. at 1148.) During the entire over five hour audio-taped session on March 18, 1993 where Defendant reviewed the handwritten statement in detail, Salah never once indicated that he did not write the statement, that the birds had coerced it out of him, or that the birds had tortured him or treated him unfairly. Given their relationship, it is quite likely that Salah would have informed Nadav if the birds had abused Salah.

In addition, the medical records also reflect that Salah saw medical personnel on both March 1, 1993 and March 7, 1993. (Gov. Ex. Medical Records 2 Trans SH at 13806.) Both entries reflect that he was continuing treatment for his ulcer. (*Id.*) Significantly, on March 1, 1993, the entry reads "No complaints." (*Id.*) The March 7, 1993 entry similarly states: "Feels good, doesn't complain." (*Id.*) These medical visits during or shortly after the bird operation where Defendant did not complain about anything and the medical personnel did not note any

118

signs of abuse corroborate the testimony of Nadav and Haim.

Further, Salah appeared before a military court in Hebron during the bird operation on approximately March 4, 1993. (Tr. at 498-99; Gov. Ex. Court Records Translation SH at 15011-12.) Although Salah complained about Haim's alleged misconduct at this hearing, he did not complain about the birds or his treatment by the birds. (*Id.*) The lack of any such complaints regarding the birds corroborates the other evidence in this case that the birds did not abuse Defendant Salah.

On March 8, 1993 – immediately after the birds – Salah again met with the American Consulate's office. He did not complain about the birds or any treatment by the birds. (Def. Ex. Salah Con. Docs. at 73.) Notably, he did not hesitate to complain to the officer that Haim had pressured him to sign a statement written in Hebrew. (*Id.*) This suggests that, if the birds had threatened him as Salah now alleges, he would have complained about them too. According to the report, however, he did not lodge any complaints regarding the birds.

The Court also finds significant that Defendant Salah never complained to Mr. Feldman about his treatment with the birds prior to the mini-trial or suppression hearing in Israel. In fact, Salah never even told Mr. Feldman about this handwritten statement prior to that time. Mr. Feldman testified that Defendant Salah did not tell him in advance of his suppression hearing or mini-trial in Israel that he had given a handwritten statement to the birds. Mr. Feldman credibly testified that he first learned of Salah's handwritten statement and his bird experience during the cross examination of one of the ISA witnesses during the mini-trial in Israel. Although Mr. Feldman surmised that Salah did not know that he had been with the birds, the evidence refutes

119

that. Given that Salah knew of his handwritten statement, knew that the ISA had it, reviewed it in detail with Nadav on March 18, 1993, questioned Nadav multiple times regarding how the ISA obtained the statement, and learned from Nadav that the ISA used a "tactic" in obtaining the statement, it is suspect that he did not inform Mr. Feldman of either the statement or the alleged abuse he now claims took place by the birds to obtain the statement.

Furthermore, Defendant executed an affidavit on approximately November 8, 1995 – while in Israeli custody – in connection with the extradition of Mousa Mohammed Abu Marzook, his co-defendant in this case. (Gov. Ex. 11/8/95 Salah Aff.) He executed it "on behalf of Dr. Mousa Abu Marzook in response to Israel's request that he be extradited to that country." (*Id.* at ¶ 2.) The affidavit, in essence, denied the truth of any of the information Salah had provided to the ISA regarding Marzook – including the significant details regarding Marzook contained in the 53 page statement – on the basis that "[a]ll of these statements are the product of a systematic employment of physical and mental torture, terror and coercion." (*Id.* at ¶ 7.) Regarding the birds, Salah averred that they "threatened [him] with violence and death" and said that he "could exonerate [himself] in their eyes by detailing everything [he] knew about Hamas and its activities, and that [he] must put these details in writing." (*Id.* at ¶ 9.) At that time, Salah did not claim that the birds physically abused him as he currently contends. (*See* Salah Aff. at ¶¶ 24-26.) In fact, based on the evidence before the Court, his affidavit in this case is the **first** time that he claims the birds physically abused him.

Salah also claimed in his November 8, 1995 affidavit that the birds said that he could

120

prove that he was not a collaborator with the Israelis by putting the information he knew in writing and they "produced paper and pen for me to use all the while screaming their threats." In his 1995 affidavit, Salah did not contend that the birds provided him with the substance of the information he included in his 53 page handwritten statement. Salah now adds that he based the handwritten statement on questions that the birds gave to him and "eventually included in a written statement all the information that they provided to [him] in writing." (Salah Aff. ¶ 27.) These contradictions regarding his treatment, the methods used by the birds to obtain the information, and the origin of the information challenge Defendant's credibility, including any averments that the birds coerced him into writing the 53 page statement.

Contrary to Defendant's assertion, the failure to call any of the "birds" as witnesses at trial does not require the suppression of Salah's handwritten statement. The government presented evidence – including Salah's audio-taped statements – that he wrote the statement. Further, the evidence described in detail above corroborates the government's position that Salah voluntarily wrote this statement.

Viewing the totality of the circumstances, the government has proven by a preponderance of the evidence that Defendant voluntarily made the 53 page handwritten statement to the birds.

### 5.    March 18, 1993 Statements

The government also seeks to admit Salah's statements from a March 18, 1993 session with Nadav. That session lasted over five hours, and the ISA audio-taped it in its entirety. As Nadav testified, Salah had agreed to meet with him one last time and review the 53 page handwritten statement that Salah had made with the birds – Salah "is going to tell me about

everything that he gave in the reports of the birds, including activities that he did not mention in the reports with the birds." (Tr. at 1146.)

Salah claims in his affidavit that Nadav inquired into his written statement, and he told Nadav that he had not supplied the information. (Salah Aff. at ¶ 29.) Salah avers that Nadav ordered him to "go along with it, and made it clear" that if he did not, "the abuse and deprivations would continue." (*Id.*) Salah claims that he had no choice but to submit to this use of the statement for interrogation on March 18, 1993. This assertion by Salah is completely discredited by the evidence presented at the suppression hearing – in particular, the audio-taped session where Nadav and Salah reviewed the handwritten statement in detail. Indeed, the taped conversation[19] and Nadav's testimony support that Salah was responding on his own free will to Nadav, and, in fact, engaging in friendly banter with him.

### a. Salah Acknowledged The Handwritten Statement As His Own

During the session with Nadav, Salah openly and willingly confirmed a mistake in his handwritten statement. (Tr. at 1176-78.) Not only does this correction support that Salah was the source of the information in the handwritten statement, it also corroborates that he voluntarily provided the information. At various times, Salah also corrected Nadav's understanding of the statements. (*See e.g.* Gov. Ex. Tape 1 English Translation SH at 35.)

As he was talking to Nadav and providing him with information, Defendant Salah even told Nadav, "I mean, not everything is written here." (Tr. at 1131; Gov. Ex. Tape 2 English

---

[19] The Court is not considering the statements made on the tape for the truth of the matter. The fact that Defendant even made such statements reflects his state of mind.

Translation at 19.) Salah promised Nadav that "if there was any information that was not included in the handwritten statement, he will add it." (*Id.* at 1115.)

### b. The Transcript Reveals A Friendly, Co-operative Relationship Between Nadav and Salah

Salah characterized his relationship with Nadav on March 18, 1993. He told Nadav that he agreed to speak with him about his handwritten statement because "what is encouraging me is that I trust you personally." (Gov. Ex. Tape 1 English Translation SH at 3, 7-8; Tr. at 1106-07.) Salah later adds, "You are my enemy, but you are my friend." (Tr. at 1114; Gov. Ex. Tape 1 English Translation at 25.) When asked to explain his understanding of Salah's statement, Nadav testified that Salah "understood that, after all, I work for the ISA; nevertheless, the relationship between us is based on friendship." (Tr. at 1114-15.) Salah even told Nadav, "let's benefit from one another so we know each other for the future." (*Id.* at 1149.)

During the March 18, 1993 session, Salah refused to answer certain questions posed by Nadav. (*See, e.g.*, Tr. at 1204-06.) Salah told Nadav that he did not want to answer certain questions because he did not want to "lie" to him. (*Id.* at 1144-45; *see also* Gov. Ex. Tape 5 English Translation SH at 47-48.) In response, Nadav never threatened him or treated him violently after such refusals. Salah also admitted that he had previously given the ISA false information.

Furthermore, the nature of Nadav's and Salah's relationship is supported by the joking and bantering captured on the tapes. At one point during the session, Salah told Nadav: "You should be afraid of me." (Tr. at 1141; Gov. Ex. Tape 2 English Translation SH at 42.) When

Nadav asked why he should be afraid, Salah responded "[b]ecause I'm a Hamas commander." (Tr. at 1141; Gov. Ex. Tape 2 English Translation SH at 42-43.) Nadav responded: "But I'm your friend. On the contrary, I would say, 'do you know who's my friend.'" (Tr. at 114; Gov. Ex. Tape 2 English Translation SH at 43.) Nadav testified regarding this joking exchange: "Again, we made some jokes. It's a part of the atmosphere that we had." (Tr. at 1141.)

During the conversation, Salah informed Nadav that if he had not been detained, he would have accepted the position of the military commander of Hamas. Salah then jokingly added: "When I would come to visit you, I would bring guards ... I mean an official meeting. We would need to search you and everything." (Tr. at 1142; Gov. Ex. Tape 2 English Translation SH at 44.) When Nadav asked "Search me," Nadav responded, "Yes. You meet the Hamas commander just like that." (Tr. at 1142.) As Nadav testified regarding Salah's remarks, they show that "he has enough confidence to kid with me about it." (*Id.* at 1143.)

Similarly, Salah jokingly added, "I am now a HAMAS commander. ... You cannot say anything." Nadav responded: "Why? I will ask the secretary to ... To schedule me an appointment with you. ... Do you want me to get you a secretary?" Salah then responded "I have to charge you for it." (Tr. at 1193; Gov. Ex. Tape 5 English Translation SH at 57.) These joking exchanges further corroborate Nadav's testimony regarding the relationship he had with Salah.

As noted above, Salah also joked with ISA Interrogator Benny regarding a possible suicide operation, teasing Benny that "he's the smart one" who can determine where it is. (Tr. at 1172-73; Gov. Ex. Tape 3 English Translation SH at 32.) Salah further teased that the operation would take place in "as a retaliatory act for the sake of the big Mujahid, the Hamas commander,"

namely for Salah's arrest by the Israelis. (Tr. at 1174; Gov. Ex. Tape 3 English Translation SH at 33.)

Salah also gave Nadav information that he previously had not given them, and told Nadav that he "didn't discover it either." (Tr. at 1198; Gov. Ex. Tape 5 English Translation SH at 13.) At one point when Salah provided certain information to Nadav, Nadav said, "you tricked me." Salah agreed, "I tricked you." Nadav then responded, "Tsk, tsk, tsk, tsk, tsk." Salah replied to Nadav, "It was your fault that you believed me." (Gov. Ex. Tape 3 English Translation SH at 23.) This ease of exchange and boldness contradicts Salah's assertions of a broken will.

The voluntariness of Salah's statements on March 18, 1993 is also corroborated by his bold statements to Nadav. At one point early in the session, for example, Salah told Nadav "[i]t is not like I'm deceiving you." (Gov. Ex. Tape 1 English Translation SH at 23.) Salah added, "If I leave here with the state of mind that you have screwed me, I will leave here seeking vengeance and I will start all over again ... Do you want better than this honesty?" (Tr. at 1112-13; Gov. Ex. Tape 1 English Translation SH at 23.) Near the end of the March 18 session, Salah told Nadav "don't let me out in a way that I would have a grudge." (Gov. Ex. Tape 5 English Translation SH at 52.) When Nadav told Salah that he did not "want any grudges," Salah added "if a human being works with revenge and a grudge, by God he will do miracles." (*Id.*) Salah's bold words captured on tape refute that his will was overborne and counter Salah's averments that Nadav ordered him to claim that the statement was his or "the abuse and deprivations would continue."

At the end of the session, Nadav asked Salah if he needed anything. (Tr. at 1198-99; Gov. Ex. Tape 5 English Translation SH at 12.) Salah said no. This recorded statement

corroborates Nadav's testimony that he typically ended his sessions with Salah with this question.

These exchanges corroborate that Salah was acting on his own free will. They support that Salah was not intimidated or broken down as of March 18, 1993 – 53 days into his custody. They also counter his allegations of mistreatment.

        **c.     No Evidence of Coercion**

In reviewing the transcripts, Nadav never threatened Salah, forced him to continue talking, forced him to sit in a small chair, placed a hood on his head, or denied him the use of the restroom.

Salah's voluntariness is also corroborated by the evidence that *Salah* insisted on continuing the March 18, 1993 session despite several inquiries from Nadav about continuing it at a later session. Salah told Nadav that he would sit with him and tell him everything on the condition that they would do it once and Salah would not longer sit and talk about it. (Tr. at 1099.) Nadav clearly did not force him to continue. Nadav asked Salah at various times if he wanted to stop the interview and continue at a later date. Salah said "No, no we should proceed and be done with it." (Gov. Ex. Tape 4 English Translation SH at 57.) Nadav simply responded, "Alright. As you wish." (*Id.*) At another point, Salah boldly told Nadav, "You are not going to leave tonight until you finish." (Tr. at 1133; Gov. Ex. Tape 2 English Translation SH at 26.) As Nadav explained, he understood Salah's comments "to say that he wouldn't let me finish the interrogation unless we go through all the reports or before we go through all the reports. This is another example for the relationship and the atmosphere that we had. That it he

took the liberty to speak to me in such a style." (Tr. at 1133.) Further, Salah said "I am in charge tonight." (Tr. at 1133; Gov. Ex. Tape 2 English Translation SH at 27.) In response, Nadav responded: "I am here until you tell me 'you can go home.'" (Gov. Ex. Tape 2 English Translation SH at 27.) Again, when Nadav inquired whether Salah wanted to save a certain topic for Sunday, Salah said, "No, no, I want to finish; and believe me, I won't be talking after this." (Tr. at 1202; Gov. Ex. Tape 5 English Translation at 36-37.) Further, Salah said "forget about interrogation after this." (Tr. at 1203; Gov. Ex. Tape 5 English Translation at 36-37.) Salah later said "This is my last session I will talk to you." (Gov. Ex. Tape 3 English Translation at 57.) Nadav commented, "We're friends. How come you tell me such a thing?" (Tr. at 1180.) Salah's insistence on continuing the session and bold statements to Nadav are not those of someone whose will is overborne or who is being tortured into speaking.

Additionally, Salah's interactions with Nadav also evidence his state of mind on March 18, 1993. In discussing whether information that Salah provided had led to the arrest of anyone, Salah said to Nadav: "But please let our meeting ... let's benefit from one another. So we know each other for the future. So if I ask you questions, don't give an intelligence answer. Give me an answer on a personal level." (Tr. at 1148-50; Gov. Ex. Tape 2 English Translation SH at 63.) As Nadav testified, this exchange was another example of Salah attempting to obtain information from Nadav. (Tr. at 1149-50.)

The tapes also reveal that Nadav repeatedly offered Salah drinks. (*See, e.g.*, Tr. at 1178-79; Gov. Exs. Tape 1 English Translation SH at 45-46; Tape 2 English Translation SH at 56; Tape 3 English Translation SH at 13, 54; Gov. Ex. Tape 4 English Translation SH at 55; Tr. at

1125.) Further, he never denied Salah's request to use the restroom. This corroborates Nadav's credible testimony that Salah never had to beg to go to the bathroom.

On March 19, 1993 – the next day – Defendant Salah met with an official from the Consulate General. (Tr. at 1119; Gov. Ex. CDG at 36-37.) During that session, Salah informed the official that he had been interrogated the day before, but he did not complain about the conditions. (*Id.*) He also claimed to the Consulate General officer that his interrogation primarily concerned "the still unfound burial site of the Israeli soldier Ilan Sa'adoun killed a few years ago." (Def. Ex. Salah Con. Docs. at 76.) Based on the audio-tape, Salah lied to the Consulate General's officer about the content of the March 18, 1993 session.

Moreover, Salah never told Mr. Feldman, his attorney, about this session. He did not complain to him about it or claim that Nadav forced him to make statements during it, even though Salah knew that Mr. Feldman was attempting to suppress any statements Salah had made to the ISA.

### d. The Tone of the Audio-Tapes

The Court has listened to the audio recordings of this interview in their entirety. (Gov. Exs. 3/18/93 Tapes 1-5.) Although the conversation took place almost exclusively in Arabic and consequently the Court could not understand the words (the Court has read the transcripts in English), the Court closely listened to the tone of the interview. This review yielded no yelling, no threats, no loud music, and no sounds of violence. To the contrary, the tone of the interview was calm and quite humane. It revealed an ease of exchange between Defendant Salah and Nadav that did not suggest that Defendant's will had been overborne, and was consistent with

Salah's statement to Nadav that Nadav was his friend. The conversation between Nadav and Salah was open and friendly. As demonstrated by the recordings and the transcripts, Nadav did not have a coercive attitude. To the contrary, Nadav's tone on the tapes is consistent with his demeanor observed by the Court during the hearing – calm and sincere. The tapes also corroborate Nadav's testimony that Salah was alert, attentive, interactive, responsive, and confident. The audio-tapes were particularly instructive on Salah's will, his relationship with Nadav and Nadav's demeanor.

### e. Dr. Sarraj's "Opinion"

Although Dr. Sarraj opined that Salah was not acting of his own free will when he made these statements or wrote the 53 page handwritten statement, the Court gives little weight to this testimony. First, Dr. Sarraj never examined Defendant Salah at the time in question or in advance of the hearing. Second, his opinion that "[t]here is no Palestinian today in Gaza or the West Bank that is exercising his free will" calls Dr. Sarraj's objectivity into question. Third, Dr. Sarraj testified that he had only reviewed certain portions of the tapes from the March 18, 1993 session. His opinion was based on those portions and Defendant's affidavit. This testimony is not enough to overcome the substantial evidence corroborating that Defendant voluntarily made these statements and the Court's own complete review of the tapes and the transcript.

Furthermore, Nadav credibly testified that Salah was not a changed man from January 26 to March 18. "I can say that the man I met on the 26th was polite, a smiling person and intelligent, such as he was on March the 18th." (Tr. at 1633.)

### f.    The Statements Are Admissible

Given the totality of the circumstances, the government has proven by a preponderance of the evidence that Defendant Salah voluntarily made these statements on March 18, 1993. The tone of the conversation and the comments made by Defendant Salah do not demonstrate an individual whose will was overborne. To the contrary, they corroborate that his statements were the product of a rational intellect and free will, not the product of coercion.

## III.    Exceptions to the Admissibility of Statements Made to Foreign Officials

### A.  Joint Venture

It is undisputed that the ISA agents did not give Defendant Salah any *Miranda* warnings prior to his statements. In fact, Haim testified that he informed Defendant Salah at their first meeting that Salah did not have the right to consult with an attorney under Israeli law. (Tr. at 805.) Even though the government has proven by a preponderance of the evidence that Defendant Salah voluntarily made the above described statements, if the United States was acting in a joint venture with the Israeli authorities at the time of Salah's questioning, *Miranda* warnings were mandated. *See, e.g., Yousef*, 327 F.3d at 145.

The record is devoid of any evidence suggesting that the United States was acting in a joint venture with the Israeli authorities in the questioning of Salah from January 25, 1993 through March 18, 1993. There is no evidence of any investigative contacts, communications or inquiries during this time period. No United States agents were present during the questioning of Salah. Furthermore, Haim credibly testified that he never received any requests or instructions from the FBI regarding his investigation and questioning of Salah. (Tr. at 462.) Nor did he base

any of his questions for Salah on anything regarding what someone suggested the FBI might be interested in knowing from him or how they might have preferred the interrogation to be conducted. (*Id.*) In fact, there is testimony that the United States did not believe that United States citizens were involved in Hamas efforts against Israel. (*Id.* at 441-42.)

Furthermore, there is no suggestion that the United States had any plans to prosecute Defendant Salah in 1993. The lapse in time from his questioning in Israel to the prosecution in this case suggests the opposite. In sum, there is no evidence of a joint venture between the United States and Israel.

## B. Shocks the Conscience

The Court does not condone torture in any form and there is no place for statements made as a result of it in any American court. The Court strongly agrees with the recent statement by Judge Lee from the Eastern District of Virginia:

> [T]orture of any kind is legally and morally unacceptable, and ... the judicial system of the United States will not permit the taint of torture in its judiciary proceedings. This Court takes very seriously its solemn duty and unwavering responsibility to ensure that the human rights guarantees of the United States Constitution and of those international documents on human rights to which the United States is a signatory, including the U.N. Convention Against Torture, are upheld in word, deed, and spirit.

*Abu Ali,* 395 F.Supp.2d at 379.

If the Court credited the events as told by Defendant Salah in his untested affidavit, there is no doubt the Israeli officials' conduct would shock the conscience of the Court. But the credible, corroborated testimony of Nadav and Haim counter Salah's statements on paper. Based on the evidence before the Court, the ISA's actions do not shock the conscience.

**IV.    Items Seized from Defendant Salah**

Defendant also seeks to suppress the items the Israeli authorities seized from him, including his address book. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. The Fourth Amendment prevents the government from conducting unreasonable searches and seizures. The exclusionary rule "is a judicially created remedy" precluding the use of evidence obtained in violation of the Fourth Amendment against a defendant who was the victim of such a violation. *United States v. Calandra*, 414 U.S. 338, 347-348, 94 S.Ct. 613, 619-620, 38 L.Ed.2d 561 (1974) (citations omitted). As the Supreme Court instructs:

> [T]he rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures: The rule is calculated to prevent, not to repair. Its purpose is to deter-to compel respect for the constitutional guaranty in the only effectively available way-by removing the incentive to disregard it.

*Id.* (quotations omitted).

As the Seventh Circuit and other courts have held, the Fourth Amendment and the exclusionary rule generally do not apply to acts of foreign officials on foreign soil. *See United States v. Marzano*, 537 F.2d 257, 269-70 (7th Cir. 1976); *United States v. DeRewal*, 10 F.3d 100, 102 (3d Cir. 1993) (district court applied correct legal standard that "[n]either the Fourth Amendment nor the exclusionary rule applies to searches conducted in foreign countries by foreign officials"); *United States v. Barona*, 56 F.3d 1087, 1090 (9th Cir. 1995). Two recognized exceptions apply to this general rule: 1) where a joint venture with foreign officials exists; and 2)

where the foreign officials' conduct shocks the conscience of the court.

## A. Joint Venture

The Seventh Circuit addressed the "joint venture" doctrine in the context of a motion to suppress evidence seized by officials of the Grand Cayman Island Police when they took the defendants into custody in the Grand Cayman Islands for various infractions of Grand Cayman Island law. *Marzano*, 537 F.2d at 269-70. In *Marzano*, FBI agents accompanied the Grand Cayman Island police officer "at various times during his investigation and search, but there [was] no evidence that they took an active part in interrogating or searching the suspects or in selecting evidence to seize." *Id.* at 270. The defendants sought to suppress the evidence seized by the Grand Cayman authorities on the ground that the FBI did not have probable cause to arrest the defendants in the Grand Cayman Islands, and thus the court must suppress any evidence seized when the Grand Cayman Island authorities took them into custody. In addressing the defendants' argument regarding the FBI's participation, the Seventh Circuit explained:

> In *United States v. Issod*, 508 F.2d 990, 994 (7th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975), this court held that if information is obtained in a search by a private individual absent probable cause, the information is usable if Government agents did not participate in the search. The same standard applies when foreign law enforcement personnel obtain evidence through such a search. Whether the Government participated so as to render the search Government action must be determined by examining the facts surrounding the search. *United States v. Newton*, 510 F.2d 1149, 1153 (7th Cir. 1975).

*Marzano*, 537 F.2d at 269-70.

The *Marzano* court upheld the district court's denial of the motion to suppress the evidence seized by the Grand Cayman authorities. It noted that "the law is clear that providing

133

information to a foreign functionary is not sufficient involvement for the Government to be considered a participant in acts the foreign functionary takes based on that information." *Id.* at 270 (citing *Stonehill v. United States*, 405 F.2d 738, 746 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *Gold v. United States*, 378 F.2d 588 (9th Cir. 1967); *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir. 1965), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965); *Shurman v. United States*, 219 F.2d 282 (5th Cir. 1955), *cert. denied*, 349 U.S. 921, 75 S.Ct. 661, 99 L.Ed. 1253 (1955); *Sloane v. United States*, 47 F.2d 889 (10th Cir. 1931)). Because there was no evidence that the FBI agents took "an active part in interrogating or searching the suspects or in selecting evidence to seize," the Seventh Circuit rejected the joint venture argument. *Id.* Indeed, "[m]ere presence of federal officers is not sufficient to make the officers participants." *Id.*

As noted above, there is no evidence that the United States was involved in any way with the Israeli authorities in connection with their arrest and search of Defendant Salah on January 25, 1993. Accordingly, the joint venture exception does not apply.

### B. Shocks the Conscience

Although the issue was not before the Seventh Circuit in *Marzano*, many courts have recognized a second exception to the rule that the Fourth Amendment does not apply to searches and seizures conducted by foreign governments on foreign soil – where the foreign law enforcement officials' conduct shocks the conscience. *See, e.g., Rosenthal*, 793 F.2d at 1230-31 (exception where "the conduct of the foreign officers shocks the conscience of the American court); *United States v. Hensel*, 699 F.2d 18, 25 (1st Cir. 1983) (same); *Angulo-Hurtado*, 165

F.Supp.2d at 1370 (same). The Court agrees that courts should not admit evidence obtained by foreign officials outside of the United States if they obtained such evidence through conduct that shocks the court's conscience.

For the reasons discussed above, the Court finds the ISA interrogators' testimony and version of the events credible. The Court rejects Defendant Salah's version set forth in his uncrossed affidavit. The Israeli officials' conduct does not shock the conscience.

Regarding Salah's treatment at the time of his arrest, both Haim and Nadav testified that they saw no evidence that the arresting officers had abused Defendant. They did not observe any such signs of abuse and Salah never complained to either of them about abuse. As Nadav testified, "if there would have been a problem, [he] would have known." (Tr. at 1322.) Further, his clothes were not torn or dirty. (*Id.* at 967.) The photographs taken shortly after his arrest also show no signs of physical abuse. Further, United States Consulate General Officer Razek visited Salah shortly after his arrest. Salah did not complaint to him about any abuse and Officer Razek did not observe any signs of abuse. Although none of these individuals observed the parts of Salah's body that were covered by his clothes, Salah has alleged, among other things, that the arresting officers struck him in the head with their rifle butts. (R. 310-2 at ¶ 3.) It is likely that such strikings would have manifested themselves in signs of abuse on Defendant's head, which none of these individuals viewed either immediately after or within days of Salah's arrest.

The medical records also corroborate that Salah was not injured. (Tr. at 1290-91; Gov. Ex. Medical Records.) According to the records, his medical condition was "fine." (*Id.*) Similarly, the records from the American Consulate report that Defendant did not report any

135

mistreatment to them when they met with him on January 31, 1993. (Gov. Ex. CDG at 003-04.)

Although he reported his 2:00 a.m arrest on January 25 and complained that the Israeli authorities

had taken $97,400 from him, he did not complain that they had mistreated him at the time. (*Id.*)

## V. International Law

Finally, Defendant argues that the Court should suppress his statements because the ISA

obtained them in violation of international law. Specifically, he claims that the United Nations

Convention Against Torture, and Other Cruel, Inhuman or Degrading Treatment or Punishment

mandates suppression of his statements. Article 2, upon which Defendant relies, of that

Convention provides:

> 1. Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.
>
> 2. No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.

*United Nations: Draft Convention against Torture and Other Cruel, Inhuman or Degrading*

*Treatment or Punishment*, 23 I.L.M. 1027, 1028 (1984).

Even if Defendant has standing to raise enforcement of this Convention, his argument

fails. The Seventh Circuit has expressly stated that "there is no general exclusionary rule for

international law violations." *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000).

Accordingly, suppression of evidence based on a violation of the Convention is not appropriate

unless the Convention "provides for that remedy" or there is an independent basis for

suppression of the evidence under the laws of the United States. *Id.* (quoting *United States v.*

136

*Chaparro-Alcantara*, 226 F.3d 616, 621-22 (7th Cir. 2000)). *See also United States v. Williams*, 617 F.2d 1063, 1090 (5th Cir. 1980) ("a violation of international law that is not also a violation of the Constitution would not call for the exclusionary rule to be applied to suppress any evidence obtained as a result of the violation.") Because the Convention does not provide for suppression of evidence and neither do the laws of the United States for the reasons discussed above, Defendant's international law argument fails.

Even if the Convention provided for suppression, the Court would not suppress Defendant's statements in this case because the government has proven by a preponderance of the evidence that Defendant voluntarily made these statements, that they were the product of rational intellect and his own free will, and that they were not the result of torture.

## CONCLUSION

As stated above, the Court has analyzed and weighed the testimony and other evidence adduced during the suppression hearing, as well as the credibility and demeanor of testifying witnesses. Based on its evaluation of the totality of the circumstances, the Court finds that the Government has satisfied its burden of proving by a preponderance of the evidence that Defendant Salah voluntarily made all of the statements at issue here, with the exception of Defendant's purported statements to Officer Suleiman on January 27, 1993 and February 21, 1993. The Court further finds that no joint venture existed between the United States and Israel, and the law enforcement conduct on the record before the Court does not shock the conscience. Accordingly, the Court grants Defendant Salah's motion to suppress in part to the extent it relates to the January 27, 1993 and February 21, 1993 statements, and denies it in part to the extent it relates to other statements.

Dated: June 8, 2006

ENTERED

AMY J. ST. EVE
United States District Judge