**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 03 CR 978** |
| | ) | **Judge Amy St. Eve** |
| **MUHAMMAD HAMID KHALIL SALAH et al,** | ) | |
| **Defendant** | ) | |

**MEMORANDUM OF CCR INTERVENORS IN OPPOSITION TO GOVERNMENT'S**
**MOTION TO RESTRICT ACCESS OF PUBLIC TO COURTROOM DURING**
**TESTIMONY OF ISRAELI INTERROGATORS**

**INTRODUCTION**

This is not just another criminal case; it is a case about the soul of America. In this post-September 11 period, the Executive Branch, in the name of fighting terrorism to preserve democracy, has all too often given short shrift to the bedrock principles in the Bill of Rights that make our democracy real. The Sixth Circuit has said that in this period the public and "particularly individuals who feel that they are being targeted by the Government" must believe that our government will continue to follow traditional, fair and proper judicial procedures. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 704 (6th Cir. 2002). Our federal appellate court has said that "[e]ven disputes about claims of national security are litigated in the open." *Union Oil v. Leavell Co.*, 220 F.3d 562, 567 (7th Cir. 2000).

Nevertheless, In prosecuting Defendant Salah for involvement with Hamas, now the elected government of the Palestinian people, the Executive

Branch has sought to bring home the concept of secret judicial proceedings to a criminal trial in Chicago, despite the rejection of that concept as it applied to foreign soil trials by the Supreme Court in *Hamdan v. Rumsfeld*, ___ U.S. ___, 126 S.Ct. 2749, 2798 (2006). In doing so in this case, the Executive Branch wants to curtail the public's ability to fulfill one of the cherished missions guaranteed to it by the First Amendment—scrutinizing the criminal trial of Mr. Salah and his co-defendant to help ensure fundamental fairness and due process. *See Globe Newspaper Co. v. Superior Court for County of Norfolk*, ("*Globe Newspaper*"), 457 U.S. 596, 603 (1982) citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 558-81 (1980).

The prosecution's reasons for seeking this extraordinary remedy–the closing of the courtroom to the public when four key witnesses (Haim, Nadav, Cohen and Benny) testify against Mr. Salah–are not rooted in the kind of specific need and limited restriction that courts have approved in the past. *See U.S. v. Lucas*, 932 F.2d 1210, 1216-17 (8th Cir. 1991). Rather the prosecution wants an extended curtailment of the public's First Amendment rights based only on suppositions and conclusory assertions made in a secret Israeli affidavit in which the Israeli government claims that these agents, who, for at least 13 years, have interrogated thousands of Palestinians without any disguise, would now be subject to being identified and placed in danger in Israel because of their testimony in an American courtroom. [Gov't Motion at 2-4; Testimony of Haim

2

and Nadav at suppression hearing].

The secret "evidence" on which the prosecution bases their claim is completely insufficient to show the compelling governmental interest required by the First Amendment to justify such an extensive restriction on the public's right of access to the criminal trial in this case. *Press-Enterprise Co. v. Superior Court of California*, (*Press-Enterprise*"), 464 U.S. 501, 510 (1984). *See Walton v. Briley*, 361 F.3d 431, 433-34 (7th Cir. 2004).

The contrast between the paucity and insufficiency of specific evidence to support restrictions on the public and the overriding need for public access to the criminal trial in this case because of what is at stake causes the organizational and individual intervenors (collectively "the CCR intervenors")[1] to request that this Court deny the prosecutor's motion to allow the Israeli agents to testify in light disguise behind either a screen or in a courtroom closed to the public.[2]

---

[1] Exhibit A contains an list and description of the intervenors. The list of 21 organizations and 11 individuals comprise a cross section of organizations and individuals dedicated to the preservation of fundamental fairness and due process. They include the American Friends Service Committee; American Arab Anti Discrimination Committee (AADC); the Council of American Islamic Relations (CAIR); the Heartland Alliance; Not in My Name, a Jewish peace organization; human rights scholars, M. Chariff Bassiouni and Susan Gzesh; religious leaders Rabbi Robert Marx and Reverend Christopher Pierson; columnist Don Rose; former Chicago Tribune public editor Don Wycliff and civil rights and criminal defense attorney Standish Willis.

[2] Intervenors do not object to the use of separate entrances for these witnesses or to restrictions on knowledge of their true identities because neither of these proposed actions affect the public's ability to scrutinize the trial although intervenors acknowledge that these restrictions raise Confrontation Clause issues for the

**ARGUMENT**

**I.    The First Amendment Rights at Stake in this Case**

The Supreme Court has repeatedly and unambiguously held "that the press and general public have a constitutional right of access to criminal trials." *Globe Newspaper Co.*, 457 U.S. at 603 citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 558-81 (1980); *Waller v. Georgia*, 467 U.S. 39, 44-6 (1984). The Court has emphasized that access to such trials ensures that the "constitutionally protected right of 'discussion of government affairs' is an informed one." *Globe Newspaper*, 457 U.S. at 605.

The Court's holding was premised on the fact that a "criminal trial historically has been open to the press and the general public" at the time when "'the organic laws' of this country were adopted." *Id; see In re Oliver*, 333 U.S. 257, 266 (1948)( presumption of public access to criminal trials was so solidly grounded that the Court "was unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of the country."). Specifically, the Court observed that "throughout its evolution, the trial has been open to all who cared to observe." *Globe Newspaper*, 457 U.S. at 564. In the days before the Norman Conquest, cases in England were brought before moots or local courts where attendance was compulsory and free men were called upon to publicly render judgment. *Id*. at 565. "From these

---

defendants and may also impact the ability of the press to report and investigate.

early times, although great changes in courts and procedures took place, one thing remained constant: the public character of the trial at which guilt or innocence was decided." *Id*. at 566.

In acknowledging the critical importance of the right to trial by a jury, the Court noted that "neither life, liberty nor property," can be taken except upon the judgment of jurors after a "fair trial, and full enquiry, *face to face*, in open Court, before as many of the people as [choose] to attend." *Id*. 568-569 (citations omitted, emphasis added). In addition to historical evidence of open court proceedings both here and in England, the Court considered "the importance of openness to the proper functioning of a trial." *Id*. at 569; *see also id*. at 589 (Brennan, J., concurring). In that case, 448 U.S. at 606, the Court emphasized the core principles at stake in open, public criminal trials:

> [T]he right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the fact-finding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process - an essential component in our structure of self-government.

The Seventh Circuit has reached the same conclusion, stating that "[t]he political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public

view makes the ensuing decision look more like fiat, which requires compelling justification." *Union Oil v. Leavell*, 220 F.3d at 568.

While the right of public access to a criminal trial is not absolute, the appropriate instances in which the public is not permitted at a trial or portion thereof in order to protect "the government's interest in inhibiting disclosure of sensitive information" are "rare." *See Waller v. Georgia*, 467 U.S. at 45. In order to assess when, if ever, the government's interests can overcome the rights of the public the Court has enunciated the following balancing test:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is *essential to preserve higher values and is narrowly tailored to serve that interest.* The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enterprise Co. v. Superior Court of California*, (*Press-Enterprise*"), 464 U.S. 501, 510 (1984) (emphasis added). The balancing test at issue is a case-specific one. *See Roviaro v. United States*, 353 U.S. 53 (1957).

"Where closure motions are at issue, the record must support an inference of a substantial probability of danger, *see Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994), *cert. denied,* 513 U.S. 1102 (1995), and the stringent "substantial probability" test must be met, *see Press-Enterprise II,* 478 U.S. at 14 (comparing test to a less rigorous "reasonable likelihood of substantial prejudice" standard applied under California state law). *U.S. v. Doe*, 63 F.3d 121, 129-30 (2nd Cir.

6

1995).

Closure efforts restricting the public and press' access to the courtroom during criminal trials have not fared well in the Seventh Circuit because the Court has found an insufficient record to curtail the public and press' First Amendment access rights. *See U.S. v. Peters*, 754 F.2d 753, 759-61 (7th Cir. 1985); *Walton v. Briley*, 361 F.3d 431, 433-34 (7th Cir. 2004). The Seventh Circuit has said that "[a] party seeking to bar the court's doors to the public must satisfy a four-part test" that includes the showing of an "overriding interest which is likely to be prejudiced by a public trial", "the closure must be narrowly tailored to protect that interest", alternatives to closure must be considered by the court and there must be a record to support closure. *Id*. at 433.

## II. The Public's First Amendment Rights to Scrutinize the Testimony of Witnesses in This Criminal Trial Have Even Greater Significance in This Case

In Intervenors' memorandum in opposition to the closing of the suppression hearing when two Israeli secret agents were to testify, Intervenors recounted the state of current events in which the actions of the Executive Branch had placed the issue of the use of torture and the treatment of persons of Middle Eastern descent at the forefront of the public's concern. *See* Intervenors' First Memorandum at 5-10. Issues of secrecy in judicial proceedings and the Executive Branch's efforts to curtail basic American liberties related to criminal trials has made that an issue of great public concern as well. This crisis continues at an accelerated rate, notwithstanding the Supreme Court's decision

7

in *Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2798. *See e.g.* Congressman Conyer's report, "The Constitution in Crisis at http://www.house.gov/judiciary_democrats/iraqrept2.html.

Adding to that crisis is a local one, the continued revelations of police torture of persons suspected of crimes here in Chicago coupled with claims that systematic torture was covered up the Chicago Police Department and the Cook County State's Attorney. See e.g. Chicago Sun Times, July 23, 2006, Marin, Carol, "Burge Report Doesn't Tell Whole Story."

The impact of the continued stories regarding the Executive Branch's use of secrecy, mistreatment of persons of Middle Eastern descent and police torture in Chicago have created a mistrust in our government's ability to treat criminal defendants, particularly those of Middle Eastern descent fairly in criminal proceedings. As a result, the need for public scrutiny is at an exceedingly high level. Thus, here the prosecution must show specific facts that override the compelling First Amendment interests at stake in this current crisis.

### III. The Prosecution Has Not Provided Facts to Support the Restrictions It Seeks

As stated above, the prosecution has to produce facts that prove that "closure is essential to preserve higher values and is narrowly tailored to serve that interest." (*Press-Enterprise*"), 464 U.S. at 510. One apparently undisputed fact alone undercuts the need to restrict public access to trial testimony. Here, in circumstances quite different from the situations presented by the cases cited

by the prosecution, the interrogators choose to reveal their identity to the thousands of persons they interrogate, including Mr. Salah.  Unlike the undercover agents working on American streets in the cases cited by the prosecution, they do not have to; they could conceal their identities as they interrogated Palestinians if they had chosen to do so.  This reality substantially undercuts their claim for secrecy when that secrecy causes a detriment to such a cherished right as the public access to criminal trials, particularly here given the heightened public interest described above.[3]

In one of the principal cases the prosecution cited to support the use of a screen or removing the public when the four Israeli agents testify, *U.S. v. Lucas*, 932 F.2d 1210, 1216-17 (8th Cir. 1991), the facts that the Court found had been shown to justify allowing one witness to testify behind a screen were as follows:

---

[3]  Intervenors are compelled to note that the Executive Branch's claimed concern about the protection of the identity and safety of Israeli secret agents is paradoxical for several reasons.  First is its well- known efforts to publicly expose an undercover CIA agent, Valerie Plame.  In doing so, the Bush Administration apparently thought nothing of risks to her safety and the safety of her contacts but instead focused on achieving narrow, selfish and politically opportunist gains.   The prosecution's asserted safety concern is also paradoxical because of recent events, in which supposedly in  response to two small military incursions, the Israeli government has launched massive military attacks against the civilian populations in Gaza and Lebanon, resulting in perhaps a 1000 deaths and a million people being made refugees.  Given this recent history and historical events regarding attacks on Palestinians and torture of Palestinian detainees by Israeli agents, the Executive Branch's claim that these Israeli secret agents have something to fear from Mr. Salah and Palestinian-American attendees of the trial rather than the other way around is ironic and highly doubtful. [*See* Ashqar Memorandum at pp. 9-12 for a discussion of attacks on Palestinians by Israeli security forces and human rights abuses, including torture of detainees by those security forces].

At trial, the government sought to protect Detective Brown's identity, arguing that use of a screen was necessary to protect her personal safety and to avoid jeopardizing the extensive drug investigations in which she was involved at the time of the trial. The government supported its request with testimony from Captain David Barton of the Drug Enforcement Unit of the Kansas City Police Department's Special Investigations Division. He testified that Detective Brown was one of only a small number of black female detectives in the Division, and that at the time of trial she was involved in "very extensive [drug] investigations ⋯ of major importance to the community," Transcript III at 186; that undercover officers' lives are jeopardized if their identities are revealed; and that within the month prior to trial a friend of Detective Brown's family and two other confidential informants had notified Captain Barton's office that attempts were being made to identify Detective Brown and to determine when she was going to testify. In addition, he testified that his department had received a number of offers from people volunteering to be informants, but only if they could work with black female undercover officers. He interpreted these to be attempts to identify the small number of black female undercover officers in his Division.

Based upon this testimony, and after hearing extensive arguments by the various counsel, the court found that Detective Brown was, at the time of trial, involved in unrelated narcotics investigations and that if her identity was revealed her life would be in danger. It also found that people "engaged in unlawful activity in the Kansas City area" might attempt to use the Shakur trial to identify Detective Brown, Transcript III at 196, who was one of a very small number of black female undercover officers in the Kansas City Police force. Consequently, it concluded that the Government had established t"overriding interest[s]" likely to be prejudiced if Detective Brown's identity was not concealed: the ability of the police to conduct effectively law enforcement operations, and the physical welfare of the officers involved. It then considered the use of a disguise, the use of a screen, and full closure of the courtroom as means of concealing her identity. It concluded that, in order most effectively to protect Detective Brown as well as the right to a public trial and the right to confrontation, a screen should be used during her testimony in such a way as to permit spectators to hear but not see her, while not interfering with the ability of the defendants, the court, or the jury to see her when she testified.

There are several fundamental differences between the situation in *U.S. v. Lucas*, 932 F.2d at 1216-17 and the facts presented by the Government here. First, of course, here the prosecution has made its factual claims in secret by means of an affidavit where in that case the factual basis for restricting public access was made through testimony with an ability to cross examine.

Second, in that case, facts were proven that 1) the officer who was to testify behind a screen, was one of a small number of female African American undercover officers; 2) she was involved in current investigations that would be compromised because her appearance would be disclosed; and 3) ongoing and very current efforts were being made by persons engaged in unlawful conduct to identify her. *See* also *Ayala v. Speckard*, 131 F.3d 63, 71 (2nd Cir. 1997) (highly specific evidence supported limited closure).

Here, the record is almost the opposite. These agents were engaged in interrogation of Mr. Salah over 13 year ago and it is unknown whether they are still engaging in such interrogations, except for Nadav, who testified at the suppression hearing that he is no longer involved in interrogations. *See U.S. v. Marzook*, 435 F.Supp.2d 708, 722 (N.D.Ill. 2006). The prosecution here has apparently (since it is secret, Intervenors do not know what was said) offered vague, general statements about the past actions not against these agents but Israeli secret agents in general.

In the *Lucas* case, there was an immediate and close proximity between

11

the courtroom and the undercover activity of the officer whose identify was being concealed whereas here the courtroom is thousands of miles away from where these agents conduct their business. In this case, the factual claims by the prosecution lack the specificity and immediacy of those presented in *Lucas* and the closure sought here is much more expansive than the one sought there. These differences are substantial and dictate a different result.

Simply put, the prosecution has failed to meet its burden here even with the secret Israeli affidavit. The Seventh Circuit has expressed concern that court room closures be allowed only when specific and extraordinary circumstances dictate. For example, in *Walton v. Briley*, 361 F.3d at 433, the Court found that a procedure that may have resulted in the public being unable to attend the trial (i.e. judge allowing trial to last late into night), even if it resulted in an inadvertent exclusion, was a constitutional violation.

Additionally, the prosecution's request to have the four witnesses testify behind a screen or clear the courtroom, allowing the public to hear only the voices of the witnesses is not narrowly tailored to serve the asserted interests because the public will be denied its only opportunity to really scrutinize these agents to determine if they are telling the truth and whether the process by which the defendants are being tried is indeed a fair one. *See Walton v. Briley*, 361 F.3d at 433-34; *U.S. v. Doe*, 63 F.3d at 129-30. Given the interests at stake, it is not sufficient to let the public see these agents in disguise or see them behind a

screen or hear them in an adjacent court room because eyeball scrutiny, often the most penetrating kind, cannot occur with these restrictions. Hence they are not narrowly tailored to fulfill the First Amendment rights at stake here.

**IV.      Intervenors Have No Interest in Knowing the Names of Prospective Jurors**

At the status hearing, the Court asked Intervenors to comment on a possible procedure in which the names and other identifying information of prospective jurors would not be revealed to the public. The Court had raised that procedure in its August 8, 2006 order denying the prosecution's motion for an anonymous jury. Intervenors have no interest in knowing the names and other identifying information of prospective jurors as long as the Court does not restrict access to voir dire and allows the public to hear the prospective jurors respond to questions from the court. Of course the press may have a different view. *See Press Enterprise I*, 464 U.S. at 505-08; *In re Baltimore Sun Co.*, 841 F.2d 84, 75 -6 (4th Cir. 1988); *US. V. Antar*, 38 F.3d 1348, 1351 (3rd Cir. 1994). *But see U.S. v. Brown*, 250 F.3d 907, 921-22 (5th Cir. 2001) However, Intervenors do have an interest in being able to attend the voir dire in this case and hear answers given by fellow citizens as to their qualifications to sit on the jury. *Press Enterprise I*, 464 U.S. at 505-08.[4]

---

[4]  However, Intervenors are concerned about possible efforts by the prosecution to use CIPA to prevent the public from hearing certain information that is embarrassing to Israel and the Israeli Security Agency. Therefore, Intervenors request that they be allowed to file a further memorandum opposing any such efforts by the prosecution.

13

**CONCLUSION**

The current constitutional crisis is rooted in government secrecy.  in *Detroit Free Press*, 303 F.3d at 710, Judge Damon Keith  stated that "[a] government operating in the shadow of secrecy stands in complete opposition to the society envisioned by the Framers of our Constitution."  By seeking to allow the Israeli agents to testify in "light" disguise and outside the view of the public, the prosecution is seeking to operate "in the shadow of secrecy."   Once again we must rely on an Article III judge to enforce the meaning and effect of the Bill of Rights, the bedrock of our freedom and democracy.

For the reasons stated herein, this Court cannot allow the conclusory allegations of the Israeli government to justify denying the public full access to witness testimony in the criminal trial in this case.   While this Court has expressed its belief that the prosecutors do not exercise control over the Israeli government regarding this prosecution, the Court must ensure that the Israeli government is not allowed to trample American constitutional protections so as to keep its interrogation and military court practices from facing scrutiny in a United States courtroom.

This Court must enforce the mandate of the Supreme Court *Globe Newspaper*, 448 U.S. at 606 that:

> public access to the criminal trial fosters an appearance of fairness,
> thereby heightening public respect for the judicial process. And in
> the broadest terms, public access to criminal trials permits the

public to participate in and serve as a check upon the judicial process - an essential component in our structure of self-government.

Here that mandate can only be enforced by denying the prosecution's motion to prevent the public from seeing the four Israeli secret agents testify and being able to judge for themselves whether their claims are credible.

Respectfully submitted,

s/Steven Saltzman
Attorney for Intervenors

Steven Saltzman

Cooperating Attorney for Center for Constitutional Rights

122 S. Michigan, Ste 1850

Chicago, Illinois 60603

(312) 427-4500

 Of Counsel:

William Goodman

Director of Litigation

Center for Constitutional Rights

666 Broadway, 7th Fl.

New York, New York 10012

(212) 614-6464