**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 CR 978 |
| | ) | |
| MUHAMMAD HAMID KHALIL | ) | |
| SALAH, and ABDELHALEEM | ) | |
| HASAN ABDELRAZIQ ASHQAR, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On August 19, 2004, a Grand Jury returned a multiple-count, second superseding indictment (the "Indictment") against Defendant Muhammad Hamid Khalil Salah ("Defendant" or "Salah"), also known as Abu Ahmad, and his co-defendants, Mousa Mohammed Abu Marzook and Abdelhaleem Hasan Abdelraziq Ashqar. Jury selection in the case commenced on October 12, 2006. Prior to the commencement of trial, the Court held extensive hearings regarding the government's proposed substitutions for classified information, pursuant to the Classified Information Procedures Act. The Court's holding regarding these substitutions is set forth in detail below.

## I.     Classified Evidence and the Classified Information Procedures Act

The Classified Information Procedures Act, 18 U.S.C. app. 3, ("CIPA") sets forth certain procedures for the disclosure of classified evidence at criminal trials. Section 5(a) of CIPA

requires a defendant to provide written notice to the United States and the Court if he "reasonably expects to disclose or to cause the disclosure of classified information in any manner in connection with any trial or pretrial proceeding" during the criminal prosecution. 18 U.S.C. app. 3, § 5(a). Once a defendant provides such notice, the United States can request a hearing pursuant to Section 6 of CIPA for the Court to determine "the use, relevance or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding." *Id.* § 6(a).

In this case, Defendant Salah filed a notice pursuant to Section 5(a) of CIPA identifying certain classified information that he expected to disclose during trial. (R. 686-1.) The information consisted of classified testimony given during the suppression hearing in this case. Although the government disputed the sufficiency of Defendant's notice, the Court need not address this issue because it has held multiple hearings – including *ex parte, in camera* hearings with Defendant – providing Defendant with the opportunity to explain what classified information he seeks to disclose and how such information pertains to his case. These hearings also provided the Court with an analysis of the nature of Defendant's defense. After extensive hearings and an exhaustive review of the classified information from both the Section 4 and Section 6 portions of the suppression hearing, the Court approves five separate substitutions that will provide Defendant Salah with substantially the same ability to make his defense as would disclosure of the specific underlying classified information. The Court orally gave its reasons for these rulings during the extensive hearings on the issue. The Court now provides a written explanation of these rulings, and hereby incorporates by reference its prior oral rulings.

## II.    Standard Governing CIPA Substitutions

Before addressing the substance of the substitutions, the parties dispute the appropriate standard governing CIPA substitutions at trial.  The government argues that the substitutions for classified information should be based on classified testimony and documents that are "helpful to the defense."  On the other hand, Defendant Salah argues that if the classified information is relevant and admissible under the Federal Rules of Evidence, it should be provided to him for use at trial.  Defendant further argues that if the classified evidence is relevant, "the defense is entitled to use it, and if the government refused to provide the information to the defense, the indictment must be dismissed."

Neither side has articulated the correct standard.  Instead, the substitution standard is set forth in the plain text of the CIPA.  Namely, Section 6(c) provides that the:

> United States may move that, in lieu of the disclosure of such specific classified information [ordered disclosed by the court], the court order — (A) the substitution for such classified information of a statement admitting relevant facts that the specific classified information would tend to prove; or (B) the substitution for such classified information of a summary of the specific classified information.

18 U.S.C. app. 3, § 6(c).  If a court determines that "the statement or summary will provide the defendant **with substantially the same ability to make his defense** as would disclosure of the specific classified information," the court shall grant the United States' motion.  *Id.*  (emphasis added).  *See also United States v. Dumeisi*, 424 F.3d 566, 578 (7th Cir. 2005) (upholding district court's approval of the substitution where the substitution provided defendant with "substantially the same ability to make his defense as would disclosure of the specific classified information"); *United States v. Moussaoui*, 365 F.3d 292, 313 -314 (4th Cir. 2004) ("We believe that the

standard set forth in CIPA adequately conveys the fundamental purpose of a substitution: to place the defendant, as nearly as possible, in the position he would be in if the classified information (here, the depositions of the witnesses) were available to him."). This standard complies with CIPA's "fundamental purpose" of protecting and restricting "the discovery of classified information in a way that does not impair the defendant's right to a fair trial." *Dumesi,* 424 F.3d at 578.

## III.    Substitutions At Issue

The approved substitutions are set forth below.[1] These substitutions are in lieu of classified information that is relevant to the testimony of the Israel Security Agency witnesses.

### A.    Substitution #1

The United States admits solely for the purposes of this trial that the following interrogation methods were authorized to be used by the Israel Security Agency ("ISA"), formerly known as the General Security Service ("GSS"), during detainee interrogations, without regard to an adult detainee's age or citizenship, during the time period of defendant Salah's detention from January 1993 through May 1993:

(a)    The use of hoods, handcuffs, and shackles;

(b)    The ability between interrogation sessions to handcuff a detainee behind the back either to a regular-sized chair in an interrogation room or to a regular-sized or small chair in the hallway where the detainee might also be hooded to avoid the

---

[1] The Court also approved a sixth substitution, but Defendant Salah opted not to use it. That substitution provided: **REDACTED PURSUANT TO CIPA**.

4

detainee observing other detainees in the hallway;

(c)     Threatening to harm a detainee or threatening to arrest family members of the

detainee;

(d)     Depriving the detainee of sleeping conditions by withholding access to a mattress

and blankets for up to 48 hours;

(e)     When the interrogator determines that the detainee is withholding information

that relates to an imminent threat to human life, and with supervisory approval,

slapping a detainee.

**B.      Substitution #2**[2]

As part of defendant Salah's interrogation and for the purpose of obtaining information,

including a written statement, from him between approximately February 28, 1993, and March 9,

1993, he was placed in two different prison facilities, both comprised of between ten to twenty

participants with whom defendant Salah was housed (referred to as "the Birds exercise").  The

United States admits solely for the purposes of this trial the following with respect to the Birds

exercise:

Individuals who participated in the Salah Birds exercise were instructed by the Israel

Security Agency ("ISA"), formerly known as the General Security Service ("GSS"), on how to

carry out the Birds exercise.  The ISA/GSS did not monitor Salah through either audio or video

while he was in the Birds exercise and, thus, there was no audiotaping or videotaping of any

---

[2] The Court recommended additional language in this Substitution, but Defendant
requested that it be removed from Substitution No. 2.

portion of Salah's time in the Birds exercise. The participants in the Birds exercise with defendant Salah were prisoners in jail for non-violent crimes who received reduced sentences, better prison conditions, and/or money based on their participation in the Birds exercise.

### C.    Substitution #3

The United States admits solely for the purposes of this trial that the Israel Security Agency ("ISA"), formerly known as the General Security Service ("GSS"), interrogators receive several years of training in order to become ISA/GSS interrogators. Among the topics in the interrogation training are language skills (including Arabic); Arabic culture and religion; human psychology, including the development of personal relationships with individuals; methods to maneuver a person into providing information to an interrogator; and interrogation methods. The ISA/GSS interrogators use the information they obtain from their training – including the information they learn about the Arabic culture – when interrogating individuals in order to obtain information.

### D.    Substitution #4

The United States admits solely for the purposes of this trial that in January 1993, it was the customary practice of the Israeli Defense Forces to blindfold detainees during transport to a prison facility.

### E.    Substitution # 5

On February 21, 1993, at the direction of the Israel Security Agency ("ISA"), formerly known as the General Security Service ("GSS"), defendant Salah was placed in a waiting cell in the interrogation facility for several hours. The United States admits solely for the purposes of

this trial that the waiting cell was tall enough for defendant Salah to stand but not large enough to lie down, and had a bench.

## IV.    Substantially the Same Defense

At the outset, the Court notes that it has already found that the United States has a significant interest in protecting the classified information at issue in this case. *United States v. Salah*, 412 F.Supp.3d 913, 926 (N.D. Ill. 2006). The question is whether the substitutions for that classified information will place Defendant in substantially the same ability to make his defense. In making this determination, the Court has considered the nature of Defendant's defense as articulated by Defendant during *ex parte* hearings.

In assessing whether the substitutions provide Defendant Salah with substantially the same ability to make his defense as would disclosure of the specific classified information at issue, the Court will first address the substantive content of the substitutions to ensure that they are consistent with the underlying classified information and provide Defendant with the benefit of that information in the context of his defense. The substitutions are fact specific to this case.

Next, the Court will analyze Defendant's confrontation rights under the Sixth Amendment of the United States Constitution. Because Defendant's right to confront a witness is a fundamental constitutional protection, in order to ensure that the substitutions provide Defendant Salah "with substantially the same ability to make his defense," this right must remain consistent with Defendant's Constitutional guaranties.

### A.    Content of Substitutions

The substitutions are admissions by the United States solely for purposes of this trial that

the United States cannot contradict at this proceeding. Further, the United States cannot submit contradictory evidence regarding the admission and cannot argue positions inconsistent with them. Furthermore, they are for the benefit of Defendant Salah. To the extent Defendant Salah chooses not to use them at trial, the United States is precluded from using them.

The substitutions provide Defendant Salah with the **REDACTED PURSUANT TO CIPA** By admitting to the facts that are equally beneficial to Defendant Salah or assist in his defense as those contained in the underlying classified information, Defendant has facts that he can argue to the jury to substantially similar effect as he could have if had he been provided use of the classified information.

The substitutions cover the following areas: authorized interrogation techniques for the ISA, the birds experience, cell wait, training, and IDF transportation. Regarding the authorized interrogation techniques, the Court had access to the

**REDACTED PURSUANT TO CIPA**

[3] Furthermore, the Court heard the testimony of ISA Interrogators Haim and Nadav regarding the ISA's authorized interrogation methods, as well as the other classified information at issue. As noted in the ruling on the motion to suppress, the Court found Haim and Nadav "extremely credible" and credited their respective testimony. *United States v. Salah*, 435 F.Supp.2d 708, 752 (N.D. Ill. 2006). Indeed, the Court "found them both forthright and truthful." *Id.* Moreover, their testimony was consistent with the

---

[3] The Court had access to the Landau Annex through the read and review process. This process is set forth in the sealed transcripts from the Section 4 portion of the suppression hearing.

written classified documentation.

To the extent Defendant Salah requested that the Court include information in the substitutions that was inconsistent with, or not supported by, the underlying classified information, the Court declined to do so because the substitutions must be based on the classified information. They cannot contain speculation.

### 1. Interrogation Methods

In Substitution No. 1, the United States has admitted for purposes of the trial to

**REDACTED PURSUANT TO CIPA**

Through these admissions, Defendant can argue that such methods were permitted by the guidelines and therefore the ISA used them on Defendant Salah. Nothing in the substitution prohibits Defendant from asking the witnesses if they actually used these (or any other) techniques when they questioned Defendant Salah.

Defendant Salah claims, for example, that he was slapped on his head and face. (R. 310-2 ¶ 10.) The substitution admits that when an interrogator determines that the detainee is withholding information that relates to an imminent threat to human life, and with supervisory approval, the interrogator can slap a detainee. **REDACTED PURSUANT TO CIPA**

Further, during the suppression hearing, the ISA witness admitted that Salah was a "ticking time bomb" because he had information that related to an imminent threat to human life. Accordingly, this substitution permits Defendant Salah to argue that the ISA interrogators slapped him consistent with the government's admission.

Furthermore, Substitution No. 1 specifies that the authorized interrogation methods were

"without regard to an adult detainee's age or citizenship." The ISA interrogators consistently testified that they treated Defendant Salah differently, in part, because he was a United States citizen and because he was older than most detainees. Accordingly, this portion of the substitution permits Defendant to argue that the "exceptions" were not provided for in the guidelines.

Overall, this substitution provides Defendant Salah with substantially the same ability to make his defense as would disclosure of the underlying **REDACTED PURSUANT TO CIPA**

### 2. The Birds' Exercise

Substitution No. 2 is **REDACTED PURSUANT TO CIPA**

and provides Defendant Salah with substantially the same ability to make his defense as would disclosure of the underlying classified information.

First, the government's admission that the ISA placed Defendant Salah "in two different prison facilities" during the birds exercise allows Defendant Salah to argue that different sets of prisoners were involved in the "exercise," thus adding to his state of apprehension and disorientation. This admission supports his defense that the ISA put him in disoriented circumstances to "soften him up."

Second, the government admits in this substitution to the extensive number of birds at both facilities – namely, "both comprised of between ten to twenty participants with whom defendant Salah was housed." This admission supports Defendant Salah's defense that he was placed in a cell with an intimidating number of prisoners, and gives credence to Defendant's

involuntariness arguments regarding his handwritten statement to the birds.

Third, in Substitution No. 2 the government effectively admits that the "birds" were acting as agents for the ISA and that they were instructed by the ISA on "how to carry out the Birds exercise."  This admission enables Defendant to argue, consistent with his defense, that the birds, as agents, utilized the same interrogation techniques employed by the ISA.

Fourth, through the government's admission that "the ISA/GSS did not monitor Salah through either audio or video while he was in the Birds exercise and, thus, there was no audiotaping or videotaping of any portion of Salah's time in the Birds exercise," Defendant's defense that the ISA does not really know what happened during the birds' exercise is completely supported.  Further, this aspect of the substitution supports Defendant's willfulness defense – that the ISA knew how to audio tape when they wanted to such as on March 18, 1993. The government's admission that there were no audio tapes or videotapes of the birds' exercise further permits the defense to argue that the ISA received the benefit of the birds exercise with the birds acting as their agents, but maintained their deniability as to what actually occurred.

Fifth, the benefits provided to the birds for their participation in the exercise are admitted by the government in this substitution.  Consistent with the classified information, the substitution provides that the participants in the Salah Birds exercise "were prisoners in jail for non-violent crimes who received reduced sentences, better prison conditions, and/or money" for their participation.  This portion of the substitution admitting benefits that the birds could have received enables Defendant to make the same arguments regarding benefits given to cooperating witnesses.  Moreover, it enables Defendant to argue that the birds received these benefits only if

they achieved the results the ISA wanted them to receive. It also supports Defendant's defense that the birds were criminals who cannot be trusted or presumed to follow any instructions, especially because the ISA neither audio taped or videotaped them.

**REDACTED PURSUANT TO CIPA**

in limited admission form, this substitution provides Defendant Salah with substantially the same ability to make his defense as would disclosure of the underlying classified information.

### 3.     Training

The training undergone by ISA Interrogators is classified information. In lieu of this classified information, the government admitted for purposes of the trial that the ISA Interrogators received several years of training. That training included training in "language skills (including Arabic); Arabic culture and religion; human psychology, including the development of personal relationships with individuals; methods to maneuver a person into providing information to an interrogator; and interrogation methods." This substitution is

**REDACTED PURSUANT TO CIPA**

This government admission provides Defendant Salah with substantially the same ability to make his defense as would disclosure of the underlying classified information on this topic. The admission makes clear that the ISA interrogators used their training during interrogations "in order to obtain information" from an interrogee. Defendant can use the admission to argue that the ISA Interrogators who questioned Defendant Salah used their training, including training in Defendant's culture, to attempt to extract information from Defendant. It is consistent with

Defendant Salah's defense that the ISA Interrogators had training in human psychology which enabled them to manipulate Defendant. It further – consistent with the defense – demonstrates a high level of sophistication on the part of the ISA. Additionally, Defendant Salah can use the admission to argue that the training the ISA Interrogators received enabled them to take advantage of their knowledge of the Palestinian male in order to maximize their ability to shame and intimidate him. Defendant can further argue that this knowledge and training enabled them to capitalize on the Palestinian male culture in order to decrease an interrogee's resistance and obtain statements from him.

### 4. Cell Wait

Substitution No. 4 refers to the time Defendant Salah was sent to "cell wait." The evidence shows that the ISA placed Defendant Salah in "cell wait" on one occasion – February 21, 1993 for approximately three hours. The configuration of the cell in which the ISA placed him is classified. In lieu of disclosing the classified details, the admission by the United States for trial purposes provides that "the waiting cell was tall enough for defendant Salah to stand but not large enough to lie down, and had a bench." This description **REDACTED PURSUANT TO CIPA** reviewed by the Court, and provides Defendant with the ability to argue that it was a "closet like cell." The substitution concedes the averments in Defendant's affidavit, and supports the defense that Defendant Salah was placed in isolated circumstances which led to his allegedly involuntary statements.

### 5. Transportation

Finally, in Substitution No. 5, the United States admits solely for the purposes of this trial

that in January 1993, it was the customary practice of the Israeli Defense Forces ("IDF") to

blindfold detainees during transport to a prison facility. This substitution is **REDACTED**

**PURSUANT TO CIPA**                                    the Court. It provides Defendant with the ability to

argue that the IDF blindfolded Defendant during his transportation to the Ramallah facility. It

supports Defendant's theory that the IDF and the ISA coordinated techniques in order to "soften

up" an interrogee. It further supports Defendant's argument that he was disoriented during his

transport to the facility and arrived at the facility for his interrogation in a state of apprehension.

### B.    Right to Confront

Defendant Salah argues that the substitutions violate his Sixth Amendment right to

confront the witnesses with the underlying information in the substitutions. As the Court

recognized during an *ex parte* hearing with Defendant Salah's counsel regarding the content of

the stipulations, some tension exists between CIPA's procedures and a defendant's right to

confront a witness. The Court must strike a balance between Defendant's right to confrontation

and the mandates of CIPA to protect and restrict classified information "in a way that does not

impair the defendant's right to a fair trial." *Dumeisi*, 424 F.3d at 578. If the substitutions would

deprive Defendant of his constitutions rights, then the Court can dismiss the indictment or take

other appropriate actions. Here, the substitutions provide a balance between Defendant's Sixth

Amendment rights and protecting classified information from unauthorized disclosure.

"[T]he confrontation clause, however, generally only 'guarantees an *opportunity* for

effective cross-examination, not cross-examination that is effective in whatever way, and to

whatever extent, the defense may wish.'" *United States v. Zapata,* 871 F.2d 616, 623 (7th Cir.

1989) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 294, 88 L. Ed. 2d 15 (1985) (per curiam) (emphasis in original)). The Seventh Circuit has made clear that "trial judges retain 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Dunlap v. Hepp*, 436 F.3d 739 741-42 (7th Cir. 2006), quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). *See also United States v. McLee*, 436 F.3d 751, 761 (7th Cir.2006). Such "[l]imitations on cross-examination do not interfere with the defendant's Sixth Amendment rights provided that cross-examination was sufficient to enable a jury to evaluate [the defendant's] theory of defense and to make a discriminating appraisal of the witness's motives and bias." *United States v. Muhammad*, 928 F.2d 1461, 1467 (7th Cir. 1991) (citations and quotations omitted); *United States v. Arocho*, 305 F.3d 627, 636 (7th Cir. 2002), quoting *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998) ("So long as cross-examination elicits adequate information to allow a jury to assess a witness' credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination."). Further, rulings on the confrontation clause "involve case-by-case determinations." *Hepp*, 436 F.3d at 744.

### 1.     Defendant's Confrontation Rights

Here, there is no confrontation clause violation because Defendant Salah will have ample opportunity to cross examine the ISA agents and to present his theory of the defense through these agents. Defendant can confront these witnesses on myriad topics including, how they

treated Defendant when he was in their custody, their potential bias against Palestinians, their potential bias in favor of the United States, and their prior testimony during the suppression hearing or the Israeli hearing to the extent such testimony is impeaching. This extensive cross examination will satisfy Defendant's confrontation rights. *See United States v. Curz-Velasco*, 224 F.3d 654, 662 n.1 (7th Cir. 2000) ("Because defendant Trevino was able to adequately question Chavez as to the fact of the government payments, the district courts' refusal to allow more detailed questioning on that subject does not constitute a denial of defendant Trevino's Sixth Amendment rights."). Moreover, that CIPA may slightly limit the scope of cross examination does not alter this conclusion. Indeed, the Supreme Court has recognized that the Confrontation Clause "must occasionally give way to consideration of public policy and the necessities of the case." *Maryland v. Craig*, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165 (1990). The public policy prohibiting the unauthorized disclosure of classified information is important, but alone not sufficient to trump a defendant's confrontation rights. Where the defendant not only has an extensive opportunity to cross examine witnesses so the jury can evaluate the demeanor and bias of such witnesses, but significantly has the impeaching facts before the jury in the form of admissions, the defendant's right to confront is not violated.

The Seventh Circuit addressed an analogous situation in *United States v. Kaufmann*, 985 F.2d 884 (7th Cir. 1993) where court struck a balance "between [defendant's] right to confrontation and [the witness's] privilege against self-incrimination." *Id.* at 898. In *Kaufmann*, the defendant claimed that his Sixth Amendment right to confront had been violated when the district court precluded him from asking questions about potential criminal matters on which the

witness intended to assert his Fifth Amendment privilege against self incrimination. Instead, the district court allowed cross examination regarding another criminal matter that the witness answered, rather than asserting his Fifth Amendment privilege. The Seventh Circuit upheld the district court's cross examination limitations because the permitted questioning allowed the jury to make a "discriminating appraisal" of the witness's motive and bias. Similarly, here, the extensive permissible areas of cross examination will provide the jury with more than ample opportunity to appraise the ISA witnesses' respective testimony. The extensive permissible areas of cross examination will fully enable the jury to assess the demeanor of the witnesses, and evaluate any potential bias or motive.

> **2.** **The Jury Will Have the Potentially Incriminating Facts Before it In The Form of Government Admissions**

Furthermore, unlike cases where cross examination is limited and the jury never hears certain information that is excluded, the substitutions place potentially impeaching facts before the jury in the form of admissions from which the jury can make reasonable inferences in Defendant's favor. The substitutions do not contain information that incriminates Defendant. Instead, they contain admissions of fact that supports his defense and that have potential impeachment value. Defendant can use these substitutions during the cross examination of the appropriate witnesses and, by concurrently introducing impeaching facts, the jury will have sufficient information to assess the witnesses' credibility, as well as the witnesses' motive and bias. For example, if an ISA witness testifies that he did not use certain interrogation methods provided for in Substitution No. 1, counsel can read Substitution No. 1 to the jury during the cross examination to convey potential impeaching facts – facts that, as CIPA admissions, neither

the witness nor the government cannot contradict. The jury can then determine if it believes the witness's testimony.

For these reasons, the substitutions are sufficient to inform the jury of possible impeachment and the theory of the defense. *See United States v. Kaufmann*, 985 F.2d 884, 897-98 (7th Cir. 1993) (upholding district court's determination that defendant's confrontation rights were not violated where witness involved privilege against self incrimination and refused to answer certain questions because "the jury had sufficient information to make a discriminating appraisal of [defendant's] motive and bias."). Indeed, the substitutions provide Defendant Salah with the **REDACTED PURSUANT TO CIPA** Defendant is free to use this information during arguments as he sees fit.

## C. Jury Instruction

In order to address Defendant's concerns that the jury may question why they are not asking certain questions regarding classified information, the Court will give the following instruction to the jury each time after Defendant reads one of the stipulations to the jury.

> This case involves certain classified information. Classified information is information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure. In lieu of disclosing specific classified information, I anticipate that you will hear certain substitutions for the classified information during this trial. These substitutions are admissions of relevant facts by the United States for purposes of this trial. The witnesses in this case as well as attorneys are prohibited from disclosing classified information and, in the case of the attorneys, are prohibited from asking questions to any witness which if answered would disclose classified information. Defendants may not cross examine a particular witness regarding the underlying classified matters set forth in these admissions. You must decide what weight, if any, to give to these admissions.

This instruction informs the jury that the stipulations were provided in place of classified information, that the substitutions were admissions by the United States, and that the attorneys could not cross examine or ask other questions regarding the classified information. Accordingly, it addresses Defendant's concerns that the jury will question why he is not asking questions about the classified information, and instead using the substitutions.

## V.    Trial

The Court waited to issue this written opinion (although the content of this opinion and the Court's detailed rulings were orally given to the parties) until after the Israeli witnesses testified with whom these substitutions were used.  Having observed their testimony, the Court reaffirms that the CIPA substitutions provided Defendant Salah with substantially the same ability to make his defense as would disclosure of the specific classified information at issue.

Defendant Salah confronted each of these witnesses face to face, and the witnesses appeared in person before the jury.  Defendant cross examined the main ISA Interrogator – Nadav – for almost four full days.  The Court permitted Defendant to pursue extensive cross examination except in the limited areas that would elicit classified information.  The vast majority of the topics covered during cross examination did not involve classified information, and the Israeli witnesses fully answered counsel's questions in these areas.  During this time, the jury had more than ample opportunity to observe and evaluate the demeanor of the ISA witnesses.  This extensive cross examination provided Defendant with a full opportunity to probe and expose any infirmities in their testimony, to test their recollections, and to challenge their credibility.  Further, it was sufficient to allow the jury to assess the ISA witnesses' credibility,

motives, and bias.  *See United States v. Muhammad*, 928 F.2d 1461, 1467 (7th Cir. 1991)

("Limitations on cross-examination do not interfere with the defendant's Sixth Amendment

rights provided that cross-examination was sufficient to enable a jury to evaluate [the

defendant's] theory of defense and to make a discriminating appraisal of the witness's motives

and bias").

Additionally, Defendant used each of the substitutions during the cross examination of

the witnesses, some of them multiple times.  He used these substitutions governing the classified

information to effectively place potentially impeaching information and relevant facts before the

jury.  In sum, the jury had the impeaching facts before it, and had sufficient information to make

"a discriminating appraisal of [the] witness' motive and bias."  *United States v. Williams*, 858

F.2d 1218, 1223 (7th Cir. 1988).

**CONCLUSION**

For the reasons stated above, the Court approves the above substitutions pursuant to Section 6(c) of CIPA.


Dated: November 16, 2006                    ENTERED


                                            _____
                                            AMY J. ST. EVE
                                            United States District Judge