1                IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

   UNITED STATES OF AMERICA,        ) Docket No. 03 CR 978
4                             )
                 Plaintiff,    )
5                             )
            vs.           )
6                             )
   MUHAMMAD HAMID KHALIL SALAH AND    )
7  ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, ) Chicago, Illinois
                             ) October 19, 2006
8                 Defendants.   ) 4:02 o'clock p.m.

9

                  **E   X   C   E   R   P   T**
10             TRANSCRIPT OF TRIAL PROCEEDINGS
       BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
11

12   APPEARANCES:

13   For the Plaintiff:        HON. PATRICK J. FITZGERALD
                            United States Attorney
14                       BY:  MR. JOSEPH M. FERGUSON
                              MR. REID J. SCHAR
15                            MS. CARRIE E. HAMILTON
                       219 S. Dearborn St., Suite 500
16                       Chicago, Illinois  60604

17

   For Deft. Salah:          PEOPLE'S LAW OFFICES
18                       BY:  MR. MICHAEL EDWARD DEUTSCH
                              MS. ERICA THOMPSON
19                              MR. BENJAMIN ELSON
                       1180 North Milwaukee Avenue
20                       Chicago, Illinois  60622

21                       LAW OFFICE OF ROBERT BLOOM
                       BY:  MR. ROBERT JAY BLOOM
22                       3355 Richmond Boulevard
                       Oakland, California  94611

23

24   For Deft. Ashqar:       MR. KEITH ALLAN SPIELFOGEL
                       20 North Clark Street, Suite 1200
25                       Chicago, Illinois  60602

1    APPEARANCES (Cont'd):

2

     For Deft. Ashqar (Cont'd):  MR. WILLIAM MOFFITT
3                                11582 Greenwich Point Road
                                 Reston, Virginia  20194

4
                                 DEPAUL UNIVERSITY COLLEGE OF LAW
5                                BY:  MS. ANDREA D. LYON
                                 25 E. Jackson Blvd., Suite 1050
6                                Chicago, Illinois  60604

7
     Also Present:               S/A BRADLEY BENAVIDES, FBI
8                                S/A JILL PETORELLI, FBI

9
     Court Reporters:            KATHLEEN M. FENNELL, CSR, RMR, FCRR
10                               Official Court Reporter
                                 219 S. Dearborn St., Suite 2144A
11                               Chicago, Illinois  60604
                                 (312) 435-5569
12
                                 MR. JOSEPH RICKHOFF
13                               Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
14                               Chicago, Illinois  60604
                                 (312) 435-5562
15

16              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

17                       PROCEEDINGS RECORDED BY
                         MECHANICAL STENOGRAPHY
18               TRANSCRIPT PRODUCED BY COMPUTER

19

20

21

22

23

24

25

1                    *   *   *   *   *   *   *   *

2      (Jury enters courtroom.)

3              THE COURT:  You may be seated.

4              Mr. Ferguson, call your first witness.

5              MR. FERGUSON:  The government calls Matthew Levitt to

6      the stand.

7              THE COURT:  Please raise your right hand.

8      (Witness sworn.)

9              THE COURT:  You may be seated.

10         MATTHEW LEVITT, GOVERNMENT'S WITNESS, DULY SWORN,

11                          DIRECT EXAMINATION

12     BY MR. FERGUSON:

13     Q.  Good afternoon.  Would you please state your full name for

14     the record.

15     A.  Matthew Levitt.

16     Q.  Spell your last name.

17     A.  L-E-V-I-T-T.

18     Q.  Mr. Levitt, without getting into the substance of your

19     testimony in detail, are you here today to provide expert

20     testimony to the jury?

21     A.  I am.

22     Q.  How are you presently employed?

23     A.  I'm the Deputy Assistant Secretary For Intelligence and

24     Analysis at the Department of the Treasury.

25     Q.  And how long have you been in that position?

Levitt - direct by Ferguson

 1   A.   Since November of last year.

 2   Q.   Is -- that's November 2005?

 3   A.   Yes.

 4   Q.   Is that a political position or a career appointment?

 5   A.   That's a career appointment.

 6   Q.   In general terms, what were your job responsibilities and

 7   functions in your position?

 8   A.   I'm the deputy chief of the office.  I oversee and manage

 9   the office.  The various unit chiefs report to me, oversee the

10   analysis that's done and manage the process of production.

11   Q.   And in general terms, what sort of analysis are you

12   referring to?

13   A.   At the Treasury we focus particularly on financial

14   analysis, analysis of financial transactions, and financial

15   support for illicit activity.

16           MR. BLOOM:  I didn't hear the last.

17           MR. DEUTSCH:  Both of them, please.

18           THE COURT:  "And financial support for illicit

19   activity."

20           THE WITNESS:  Is that better?

21           MR. BLOOM:  Yes, it is.

22   BY MR. FERGUSON:

23   Q.   Prior to becoming a deputy assistant secretary at the

24   Department of Treasury, where were you employed?

25   A.   I was the director of terrorism studies and a senior

1   fellow at the Washington Institute For Near East Policy.

2   Q.  And what is that institution?

3           THE COURT:  I'm sorry, before you do that, did you

4   fill up the water?  I want to make sure it's fresh.  Did

5   somebody at your table fill it up this morning because we did

6   not.  Theresa, you didn't do that?

7           MR. FERGUSON:  No.

8           THE CLERK:  No.

9           THE COURT:  Mr. Schar, why don't you or somebody go

10  get fresh water.

11          THE WITNESS:  Thank you.

12          THE COURT:  Ron will do it.  Thank you.

13          MR. FERGUSON:  Thanks, Judge.

14  BY MR. FERGUSON:

15  Q.  The Washington Institute For Near East Policy, what is

16  that?

17  A.  It's an independent think tank in Washington that focuses

18  on U.S. policy in the Middle East.

19  Q.  And is it sectarian in any way?

20  A.  No.

21  Q.  Does it have any party affiliations?

22  A.  No.

23  Q.  Political affiliations?

24  A.  No.

25  Q.  Is it associated with any governments?

1   A.   No.

2   Q.   And what was your position there again?

3   A.   Director of terrorism studies and a senior fellow.

4   Q.   And how long were you there?

5   A.   Four years.

6   Q.   And a little bit more detail if you would.  What were your

7   job duties and functions when you were with the policy

8   institute?

9   A.   I directed the terrorism studies program, so I oversaw the

10  analysis related to international terrorism that others did.

11  I produced my own analysis, everything from op eds in the

12  newspaper to journal articles.  I wrote a monograph, which is

13  like a short book, for the institute.  I wrote a book of my

14  own.  I lectured frequently at colleges, at conferences.

15  Q.   What is your educational background?

16  A.   I have a bachelor of arts in political science from

17  Yeshiva University in New York, a master's of law and

18  diplomacy, concentrations in the Middle East negotiation

19  theory and securities studies from the Fletcher School of Law

20  and Diplomacy at Tufts in Boston, and a Ph.D. in international

21  relations with focus on terrorism and negotiation theory also

22  from the Fletcher School at Tufts.

23  Q.   And what was your Ph.D. dissertation about?

24           Take a moment.

25  A.   Excuse me.

1         The dissertation was on the impact of terrorist

2   attacks on ongoing negotiations.  It focused on acts by Jewish

3   terrorists and Islamist terrorists, focused on the period of

4   Oslo peace process from 1994 to 1996.

5   Q.  Have you taught at any colleges or universities?

6   A.  I was an adjunct professor at the School of Advanced

7   International Studies at Johns Hopkins University in

8   Washington.

9   Q.  And what did you teach at John Hopkins?

10  A.  I taught a course in international terrorism.  It was

11  renamed at one point.  I think the last name was contemporary

12  terrorism and the American response.

13  Q.  And was that an undergraduate-level course?

14  A.  This is a graduate school.

15  Q.  And before working at the Washington Institute For Near

16  East Policy and for Johns Hopkins, how were you employed?

17  A.  I was intelligence analyst at the FBI headquarters in

18  Washington.

19  Q.  And approximately what years were you there?

20  A.  1998 through 2001.

21  Q.  And in general terms, what were your responsibilities?

22  A.  I focused on Middle Eastern terrorist groups and their

23  presence here in the United States.

24  Q.  And did any of that work relate to financing and financial

25  connections of terrorist organizations to individuals in the

1    United States?

2    A.  Yes.

3    Q.  Have you published any books on terrorism, terrorist

4    organizations?

5    A.  Yes.

6    Q.  Could you please describe them to the jury.

7    A.  My most recent book was published by Yale University

8    Press.  It's called <u>Hamas Politics, Charity and Terrorism in</u>

9    <u>the Service of Jihad</u>.  I also published a monograph, which is

10   a short, you know, soft cover book through the Washington

11   Institute.  I think it came out in 2002 called <u>Targeting</u>

12   <u>Terror</u>, focused on Middle Eastern terrorist groups post-9/11.

13   Q.  And do you have any other books or publications pending

14   right now?

15   A.  A book version of the dissertation that we discussed a

16   minute ago is forthcoming.

17   Q.  Beyond works that are published in book form, have you

18   published in any other media or forums?

19   A.  Yes.  I've published in a variety of journals, in

20   newspapers, through the Washington Institute which publishes

21   its own short policy pieces and pamphlets; published a lot.

22   Q.  Could you give the jury a sense of what some of those

23   journals and newspapers are that you've published in?

24   A.  Journal of International Affairs, Mediation Quarterly,

25   Middle East Review of International Affairs, Washington Post,

1    Wall Street Journal.

2    Q.   Any periodicals or publications outside the United States?

3    A.   Yes.

4    Q.   Could you name a few?

5    A.   I've published Wall Street Journal Europe.  I've published

6    in the Australian.   Several others.

7    Q.   And in the course of your career, have you provided

8    testimony on terrorism issues to the United States Congress?

9    A.   Several times.

10   Q.   And can you describe the subject of some of the testimony

11   that you've provided in the past?

12   A.   I've testified on specific terrorist groups.   I've

13   testified on terror financing in general.   I've testified on

14   state sponsorship of terrorism.   I've probably testified at

15   least a half dozen times.

16   Q.   And the committees that you've testified to as best you

17   can recall?

18   A.   House International Relations a couple of times, Senate

19   Judiciary, Senate Banking.   I think House Finance perhaps.

20   Q.   And are you familiar with what is known as the 9/11

21   Commission?

22   A.   I am.

23   Q.   And what was it?

24   A.   The 9/11 Commission was --

25            MR. DEUTSCH:   Objection, relevance.

1          THE COURT:  Relevance.  What's the relevance?

2          MR. FERGUSON:  Part of qualifying of him, he did work

3    in relation to the 9/11 Commission, Judge.

4          THE COURT:  You can answer that question.

5          Are you familiar with what is known as the 9/11

6    Commission?

7    BY THE WITNESS:

8    A.  I am.

9    BY MR. FERGUSON:

10   Q.  And did you do work for the Commission in any fashion?

11   A.  Yes.  I consulted for them for a couple of months.

12   Q.  Have you been a member of any organizations that -- whose

13   activities are directed to the study or the examination of the

14   field of international relations?

15   A.  Yes.

16   Q.  Would you please describe some of them.

17   A.  Probably the most important is I'm a term member of the

18   Council on Foreign Relations.

19   Q.  And have you appeared by invitation at expert conferences

20   on topics that relate to terrorism and terrorist financing?

21   A.  I have.

22   Q.  And would you please describe some of those.

23   A.  I've spoken at international conferences in several places

24   in Europe, in the Middle East, throughout the United States,

25   several times on behalf of the State Department in cooperation

1  with think tanks abroad or universities abroad that they were

2  coordinating with.

3  Q.  Aside from your written published work, have you been

4  called upon to speak to the media based on your expertise in

5  the field of terrorism?

6  A.  I have.

7  Q.  And would you please tell the jury what some of those

8  arenas that you've spoken in?

9  A.  Some of the major media you'd think of, CNN, NBC, ABC,

10  NPR, a lot of initials.

11  Q.  Any outside the United States?

12  A.  Yes, sure.

13  Q.  For instance?

14  A.  The BBC in Great Britain, Al Jazeera in the Middle East.

15  When I've traveled abroad, I've been interviewed by the media

16  in that context as well.

17  Q.  And have you done any consulting for private or

18  governmental entities?

19  A.  I have.

20  Q.  And would you please describe some of that work for us?

21  A.  I've done some basic analysis for some law firms for the

22  Canadian government.  I've testified in trials for the U.S.

23  Government.  I've been brought in to be an expert at panels

24  put together for various parts of the U.S. Government.

25  Q.  I'd like you to describe what you have done to develop

 1  your expertise on Palestinian terrorist organizations in

 2  particular.

 3  A.  Well, aside from my academic research, which is important

 4  in this case --

 5          MR. DEUTSCH:  I'd like to interpose an objection to

 6  this constant use of the word terrorism.  There's no

 7  definition, and it's just -- it seems to me to be prejudicial

 8  and undefined.

 9          THE COURT:  Objection overruled.  I addressed some of

10  that in prior motions.

11          Go ahead.

12  BY MR. FERGUSON:

13  Q.  Again, if you would please tell us what you've done to

14  develop your expertise on Palestinian terrorist organizations

15  in particular.

16  A.  First and foremost, field research which started with my

17  graduate research and continued through the period of writing

18  through the Washington Institute.

19          Obviously now that I'm with the government, I'm not

20  conducting that kind of research.

21  Q.  And what is field research?

22  A.  Field research means getting up and going to that part of

23  the world, in this case, Gaza, the West Bank, Israel,

24  elsewhere in the Middle East, and because this is such an

25  important area of the world and issue for other governments,

 1  traveling to Europe in particular and interviewing people who

 2  are involved in the events that are going on, getting

 3  firsthand interviews, collecting primary research from

 4  documents to interviews.

 5          MR. DEUTSCH:  Can we get a date?

 6          THE COURT:  Sure.  You can clarify when he did the

 7  field research.

 8  BY MR. FERGUSON:

 9  Q.  Over what period of time have you developed your

10  expertise?

11  A.  My Ph.D. research was in 1997.  My last trip to the region

12  to do independent research would have been November 2004.  And

13  then there were a couple of other trips to Europe after that.

14          I returned to government service in November 2005, so

15  there is nothing more recent than that.

16  Q.  And what time span have you analyzed, examined, researched

17  in developing your expertise on Palestinian terrorist

18  organizations?

19  A.  Well, I've conducted research on the history of the peace

20  process, which goes back at least to the founding of the State

21  of Israel, but the majority of my research has been from the

22  period of the Oslo process and the peace talks that just

23  preceded it and onward.

24          MR. DEUTSCH:  Can we have a date of that?

25          THE WITNESS:  That would be about 1990, '91 and

 1 onwards.

 2         THE COURT:  Mr. Deutsch, if you have an objection,

 3 please stand up and make your objection.

 4         MR. DEUTSCH:  Okay.

 5         THE COURT:  Dr. Levitt, you'll have the opportunity

 6 to answer questions by Mr. Deutsch later, but focus on what

 7 Mr. Ferguson is asking you.

 8         THE WITNESS:  Yes, ma'am.

 9 BY MR. FERGUSON:

10 Q.  All right.  So field research is one of the things you've

11 done to develop your expertise.  What other types of things

12 have you done?

13 A.  You speak with other academics when you participate in

14 conferences.  You benefit from the research that others have

15 done, from the field research that others have done.  You

16 benefit from the written product research that others have

17 done and journals in particular, but other forms of media as

18 well.

19         Even press reports can be useful as lead information,

20 and then you need to go and try and verify facts as best you

21 can, again, primarily through field research.

22 Q.  And you've mentioned in the course of field research that

23 you've interviewed numerous individuals, is that right?

24 A.  Correct.

25 Q.  Have you interviewed government officials?

1   A.   Yes.

2   Q.   In the United States?

3   A.   Yes.

4   Q.   Abroad?

5   A.   Certainly.

6   Q.   Law enforcement officials?

7   A.   Yes.

8   Q.   Intelligence officials?

9   A.   Yes.

10   Q.   Diplomats?

11   A.   Yes.

12   Q.   Both foreign and domestic?

13   A.   Yes.

14   Q.   Terrorists or people who have been accused of terrorism?

15          MR. MOFFITT:  Objection, leading.

16          THE COURT:  Overruled.

17          You can answer that.

18   BY THE WITNESS:

19   A.   Yes.

20   BY MR. FERGUSON:

21   Q.   You mentioned that information from newspapers can be

22   reliable in some fashions.  What sort of newspaper information

23   is more reliable or inherently reliable based on your years of

24   research and study?

25   A.   Direct quotes from direct interviews; quotes from

1    documents, especially those that can then be verified

2    especially by getting your hands on those documents.  But what

3    they're most useful for is for lead information.

4           You know, good journalists would be able to find

5    things out that haven't been made public in the past, and a

6    good researcher will be able to follow up and find other

7    sources to confirm that information, to get their own copy of

8    the documents in question, underlying documents, to go and

9    interview officials and find out for themselves.

10   Q.  And the newspapers that you would draw information from,

11   are they strictly western media sources?

12   A.  No, not at all, especially when you're focused on another

13   region of the world.  It's important to follow foreign media.

14   Q.  And would that include Arabic media?

15   A.  It would.

16   Q.  And media in the Middle East?

17   A.  Absolutely.

18   Q.  Would it include or does it include newspapers or other

19   forms of publications for immigrant communities in the United

20   States?

21   A.  Sure.

22   Q.  Do you rely on primary documents in your field?

23   A.  Absolutely.  One hopes to find primary documents.

24   Q.  And would you please define primary documents as it

25   relates to your field of expertise.

Levitt - direct by Ferguson

1   A.  Hamas communiques, for example, that have been published.

2   Organizational charters or flow charts, something that can be

3   attributed back to a known entity, in this case either Hamas

4   or, if you're talking about a government document, to the

5   government.

6   Q.  Now, you've indicated that you've previously interviewed

7   terrorists or people accused of terrorism.  Have you

8   interviewed Hamas terrorists?

9   A.  Yes.

10          MR. DEUTSCH:  Objection, foundation.

11   BY MR. FERGUSON:

12   Q.  And --

13          THE COURT:  It was just a yes or no answer.  I think

14   he's trying to lay the foundation.

15   BY MR. FERGUSON:

16   Q.  And how did you know such individuals to be Hamas

17   terrorists?

18          MR. DEUTSCH:  Judge, can we have a date and time?

19          THE COURT:  Yes.

20          MR. FERGUSON:  Sure.

21          THE COURT:  Sustained.

22   BY MR. FERGUSON:

23   Q.  Would you please give us an example of a Hamas terrorist

24   that you have interviewed?

25   A.  In November 2004, I interviewed two individuals, one whose

1   name escapes me, the other is Abbas Al-Sayed who was not yet

2   but was subsequently convicted of his crimes.  He was very

3   open about the fact that he was a member of Hamas.

4          MR. MOFFITT:  Objection, hearsay.

5          THE COURT:  What's your response?

6          MR. FERGUSON:  The question was how he knew an

7   individual to be or how he came to understand the individual

8   was a terrorist or a Hamas terrorist.  The response was it was

9   self-acknowledged, further details being provided.  I'm not

10  seeking any more detail or the particulars.  I'm simply

11  looking for the simple fact.  It was self-acknowledged, Judge.

12         THE COURT:  Okay.  Then I think he's answered that

13  question.

14  BY MR. FERGUSON:

15  Q.  You indicated that as part of your field research, you do

16  traveling.

17         Would you please describe or tell us some of the

18  places that you have traveled in developing your expertise in

19  the Middle East and particularly in the field of Palestinian

20  terrorist organizations?

21         MR. DEUTSCH:  Excuse me.  I don't mean to interrupt.

22  Can we have him give us years?

23         THE COURT:  Yes.

24         MR. DEUTSCH:  Thank you.

25         THE COURT:  Sustained.

 1   BY MR. FERGUSON:

 2   Q.  Where have you traveled to in the Middle East in

 3   developing your expertise?  And please provide approximately

 4   the times that you were in those locations.

 5   A.  All right.  I'll do the best I can with the times because

 6   there were many trips.

 7          But I've traveled many times to the Gaza Strip, West

 8   Bank and Israel.  When I was with the Washington Institute, I

 9   would probably make those trips twice, sometimes three times a

10   year.

11          I know the last one was in November 2004.  I don't

12   remember the dates of the previous ones, but they were

13   probably twice a year over that four-year period, from 2001 to

14   2005.

15          Also spent -- made several trips to Jordan.  Again, I

16   apologize, I don't have the dates, but I made probably at

17   least three trips during that period of time also, the same

18   four years.

19          Traveled once to Turkey, once to Egypt also during

20   those four years.  Many trips to Europe, where I met with

21   officials responsible for their countries or the European

22   Union's dealings with the region and this conflict, in many

23   cases specifically with Hamas.  And, again, there were many

24   trips, probably at least a dozen over that four-year period.

25   Q.  When you receive these various forms of information, do

1    you analyze them in some fashion to assess their reliability?

2    A.   Certainly.   Some information is inherently more reliable

3    than others.   Newspaper articles are less reliable, for

4    example, than primary source data.

5             But even, you know, primary interviews, for example,

6    need to be considered.   Just because someone tells you

7    something doesn't mean that it's necessarily, you know, God's

8    truth.   Everybody has -- sometimes people have agendas, so you

9    really need to vet your information.

10            So you do that by bouncing the information that you

11   have gathered against what others in the field have gathered

12   against the available information and, you know, that is

13   available out there, and it is a -- it is a real vetting

14   process.

15            You do a lot of that on your own in the process of

16   your research.   Better researchers are more robust in this

17   process.   And then depending on how and where you publish,

18   there is still another level to that in what is called peer

19   review.

20   Q.   And what is peer review?

21   A.   Peer review is, well, really what it sounds like.   It's a

22   review of your written work, your analysis based on your

23   research, by peers.   And that does not necessarily mean

24   friends or people you know.   In fact, quite the opposite.

25            It is others in the academic community, credentialed,

Levitt - direct by Ferguson

1   who don't know you, who have no vested interest in you, excuse

2   me, and who review your work and provide comment.

3          So, for example, when publishing in a journal, you

4   almost always have peer review.  Even when I publish just

5   within the Washington Institute, the Institute had a policy of

6   peer review, and either others in the Institute or individuals

7   outside the Institute would be called in to review work.

8          And then I'd have to say that the most robust peer

9   review experience I had -- and that's not necessarily a

10  pleasant experience for a writer -- was with the book I

11  published for Yale on Hamas, where, by virtue of it being

12  published through an academic press and Yale in particular,

13  there was very, very robust peer review.

14  Q.  Have you yourself played a role in peer reviewing the work

15  of other people in your field?

16  A.  I have.

17  Q.  Would you please describe for us the process that you've

18  gone through in preparing to provide expert testimony today?

19  A.  I've reviewed my book, and I've reviewed some key

20  documents like the Hamas charter.  I've reviewed a chronology

21  of key events, and that's pretty much it.

22  Q.  And what do you do to remain current in your field?

23  A.  I read.  I read a lot.  I'm no longer, you know, an

24  academic doing academic research.  I don't have that luxury.

25  And so to remain current, I read from the newspaper to

1   journals, and there's been a lot of coverage of the Middle

2   East and terrorism and peace processes and wars.

3   Unfortunately, there's been a lot to write about, so there's

4   been a lot to read.

5   Q.  And as part of your present and prior government work,

6   have you had security clearances?

7   A.  Yes.

8   Q.  And in preparing to testify here today, are you relying

9   upon any materials you might have seen that required your

10  security clearance?

11  A.  No.

12  Q.  Have you testified in federal court as an expert before?

13  A.  I have.

14  Q.  Could you name some of the places you've testified?

15  A.  I've testified in Brooklyn.  I've testified in Cleveland.

16  I've testified in Charlotte, in Tampa, in Chicago.  I think

17  that's it.

18  Q.  And in any of those places that you've testified, have you

19  testified about matters concerning Palestinian terrorist

20  groups?

21  A.  Several times.

22  Q.  And have you testified in the past about Hamas in any of

23  those cases?

24  A.  Yes.

25  Q.  And on all prior occasions that you appeared to testify,

1    were you qualified as an expert for those purposes?

2    A.  Yes.

3          MR. FERGUSON:  Your Honor, we would tender Mr. Levitt

4    to the Court as an expert of Middle Eastern and Islamic

5    terrorist organizations, including most particularly Hamas.

6          THE COURT:  Okay.  You may proceed.

7          MR. DEUTSCH:  Judge, excuse me, we object based on

8    what was said prior to --

9          THE COURT:  Okay.  And my same ruling before stands.

10          You may proceed.

11    BY MR. FERGUSON:

12    Q.  Mr. Levitt, what is Hamas?

13    A.  Hamas is a Middle Eastern group.  The word is actually an

14    acronym for, in English, the Islamic Resistance Movement.  It

15    is a movement, an organization, whose goal is to destroy

16    Israel and replace it with an Islamist state in all of

17    historic Palestine.

18    Q.  Where was it founded?

19    A.  It was founded in Gaza.

20    Q.  And what do you mean by Islamist state?

21    A.  An Islamist state would be a state that is governed that

22    is governed by Islamist Muslim principles, Islamic law, which

23    is Sharia.  It is not a secular state.

24    Q.  Would you define the term secular for us?

25    A.  Secular meaning non-sectarian or not religious.  In other

1   words, it would be a religious country.  It would be an

2   Islamic country.

3   Q.  From your academic work and field study, are you familiar

4   with the territorial and geographic boundaries of Gaza, the

5   West Bank and Israel?

6   A.  I am.

7           MR. FERGUSON:  Judge, permission to approach?

8           THE COURT:  You may.

9   BY MR. FERGUSON:

10  Q.  Mr. Levitt, I'm showing you what has been marked for

11  identification purposes as Government Exhibit Levitt Map, and

12  without speaking in detail, would you please describe

13  generally what that is.

14  A.  This is a map of Israel, Gaza and the West Bank in its

15  center and then the countries that surround it.

16  Q.  And does it in general terms fairly and accurately depict

17  the general scale and boundaries of the area that is generally

18  referred to as Gaza, the West Bank and Israel?

19  A.  Yes.

20          MR. FERGUSON:  Judge, I'd move to admit Government

21  Exhibit Map and publish it.

22          THE COURT:  Is there any objection?

23          MR. MOFFITT:  Yes.

24          THE COURT:  What's the objection?

25          MR. MOFFITT:  The map has no scale on it.  I don't

1   know what he's talking about in terms of scale.  The map does

2   not have a scale on it.

3   BY MR. FERGUSON:

4   Q.  Does the map -- does the map from your knowledge and

5   experience fairly depict the boundaries in approximate terms

6   of the territories in Gaza, the West Bank and Israel?

7   A.  It does.

8           MR. DEUTSCH:  Judge, I have a further objection.  The

9   map does not indicate all the settlements that are in the Gaza

10  and West Bank by Israeli settlers; therefore, it is not an

11  accurate depiction of that area.

12          MR. FERGUSON:  I'm not advancing it for that purpose,

13  Judge.

14          MR. DEUTSCH:  Well, it's not accurate then.  Because

15  there's -- a lot of the territory that's in Gaza and the West

16  Bank, particularly the West Bank now, which is occupied by

17  Israeli settlers.

18          THE COURT:  Do you want to voir dire him on it?

19          MR. DEUTSCH:  Yeah.

20                    VOIR DIRE EXAMINATION

21  BY MR. DEUTSCH:

22  Q.  Mr. Levitt, you see on the map it indicates the West Bank,

23  does it not?

24  A.  It does.

25  Q.  And is there not territory of the West Bank that is

1   controlled and occupied by Israeli settlers?

2   A.  It is.

3   Q.  And what percentage of the land of the West Bank is

4   controlled by Israeli settlers?

5   A.  I don't know.

6   Q.  What part -- are there special roads that are only allowed

7   for Israelis to travel on that are part of the settlements?

8           MR. FERGUSON:  Objection.

9           THE COURT:  Sustained.  Sustained.  You're going

10  beyond.

11          MR. DEUTSCH:  He's saying there is and this map does

12  not reflect that and he doesn't know.

13          THE COURT:  He did not say there is because he didn't

14  answer the question.  The objection --

15          MR. DEUTSCH:  No, I'm sorry, Judge.  The question

16  before, he indicated that there were part of the territory of

17  the West Bank that belong to the Israeli settlers.

18          THE COURT:  Yes.  He did answer that yes.

19          MR. DEUTSCH:  What I'm saying is this map does not

20  show that so it gives the impression that somehow the West

21  Bank is populated solely by Palestinians, and it gives an

22  incorrect impression.  That's my objection to the map.

23          THE COURT:  Your objection is overruled.  So

24  admitted.

25     (Government Exhibit Levitt Map received in evidence.)

Levitt - direct by Ferguson

27

 1          THE COURT:  You may proceed.

 2          MR. FERGUSON:  May I publish?

 3          THE COURT:  You may.

 4                   DIRECT EXAMINATION (RESUMED)

 5   BY MR. FERGUSON:

 6   Q.  Is the screen on in front of you there, Dr. Levitt?

 7   A.  Yes.

 8   Q.  Would you please describe for the jury the location of the

 9   area that is known as the Gaza or Gaza Strip?

10   A.  You can see the area marked over here.

11   Q.  All right.  And that would be in the lower left-hand

12   corner -- sorry -- lower left center of the picture?

13   A.  Yes.  There's an area, it's marked Gaza Strip, and it's

14   got lines going through it.

15   Q.  All right.  And the West Bank is -- if you'd point that

16   out, please?  All right.

17          Why is the West Bank called the West Bank?

18   A.  It is on the west side of the Jordan River and is,

19   therefore, called the West Bank.  Jordan, the country Jordan,

20   is on the east bank of -- of the Jordan River.

21   Q.  And Israel is what area on this map?

22   A.  Israel is the area marked in dark red, which you can --

23   it's not letting me be very particular.  It kind of went a

24   little into the Gaza Strip there, but as you can see, from

25   north to south, the dark red area.

Levitt - direct by Ferguson

 1  Q.  And the area comprised of Gaza and the West Bank, is it

 2  generally referred to by any other term?

 3  A.  Palestinian territories or the territories, occupied

 4  territories.

 5  Q.  The occupied territories?

 6  A.  Uh-huh.

 7  Q.  Today is Gaza occupied?

 8  A.  It is not.

 9  Q.  How about the West Bank?

10  A.  It is.

11  Q.  When you referred to an Islamist state in I think your

12  term was historic Palestine, what area on this map would

13  constitute historic Palestine?

14  A.  It would include the entire area that is Israel, meaning

15  red, Gaza Strip and West Bank, meaning red and gray.  From

16  here in the north to here in the south, the entire area.

17  Q.  And if Hamas were to achieve its goal, as you've generally

18  stated it, of an Islamist state in historic Palestine, where

19  would Israel be on this map?

20  A.  Israel would not be on this map.

21  Q.  What is Hamas's position on compromise with Israel on the

22  disputes over this territory that both entities seek or

23  desire?

24          MR. DEUTSCH:  Judge, I object.

25          MR. MOFFITT:  Objection, foundation.

1          MR. DEUTSCH:  I also object because he's talking

2     about an entity and asking what the position of an entity is.

3     I guess foundation is the proper objection.

4          THE COURT:  Mr. Ferguson?

5     BY MR. FERGUSON:

6     Q.  Are these territories disputed in any fashion?

7     A.  They are.

8     Q.  By whom?

9     A.  By Israelis and Palestinians.

10    Q.  And what is Hamas's position with respect to the dispute

11    between the Palestinians and the Israelis over the territory

12    depicted on the map?

13         MR. DEUTSCH:  Objection, foundation.

14         THE COURT:  What's your response, Mr. Ferguson?

15         MR. FERGUSON:  Judge, he has been qualified as an

16    expert on Hamas.  He's here to give opinion testimony.

17         MR. DEUTSCH:  Judge, he's asking the opinion of a

18    mass organization.  Is it an opinion of the leaders or -- it

19    just doesn't make sense.  It's like asking what is the opinion

20    of the Republican Party as to a certain thing.  I don't

21    understand how he can have an opinion as to a certain --

22    what's the foundation of it?

23         MR. FERGUSON:  Judge, this sounds like

24    cross-examination.

25         MR. MOFFITT:  I have a different objection.

Levitt - direct by Ferguson

30

1          THE COURT:  Yes.  What's your objection?

2          MR. MOFFITT:  Hamas is the government of -- of

3  these -- at this point, it's not even a distinct entity from

4  the government.  The fair question would be what is the

5  position of the government of --

6          THE COURT:  Was your question as of today or at a

7  different time frame?

8  BY MR. FERGUSON:

9  Q.  Prior to April -- prior to January of 2006, what was the

10  position of Hamas with respect to the dispute between

11  Palestinians and Israelis over the territories that you have

12  described?

13          MR. DEUTSCH:  Objection, foundation.  What is he

14  relying on for this opinion?  Where is he getting this opinion

15  of this mass organization that's made up of thousands of

16  people?

17          THE COURT:  He's already established his credentials.

18          MR. DEUTSCH:  I don't understand it.

19          THE COURT:  Objection overruled.

20          You may answer.

21  BY THE WITNESS:

22  A.  According to the Hamas charter, which is very clear, Hamas

23  rejects negotiations explicitly, rejects peace talks

24  explicitly, and maintains that the only way to resolve the

25  conflict is through violence.

1  BY MR. FERGUSON:

2  Q.  And is there any element of the Palestinian people or

3  governing parties or entities of the Palestinian people prior

4  to January of 2006 that take an alternate view with respect to

5  the dispute over the territories that we are discussing here?

6          MR. MOFFITT:  Objection, relevance.

7          THE COURT:  What's your response --

8          MR. FERGUSON:  Judge --

9          THE COURT:  -- to relevance.

10         MR. FERGUSON:  I think it's quite relevant.

11         THE COURT:  To?

12         MR. FERGUSON:  I'll withdraw the question.

13         THE COURT:  Okay.

14  BY MR. FERGUSON:

15  Q.  Have there been a series of attempts at negotiating peace

16  specifically with reference to the dispute over the

17  territories that we've been discussing?

18  A.  There have been.

19  Q.  And are you familiar with the term the Oslo Accords?

20  A.  I am.

21  Q.  Would you please tell the jury what the Oslo Accords are?

22  A.  The Oslo Accords were an attempt at peaceful negotiations

23  between Israel and the Palestine Liberation Organization, or

24  the PLO, to recognize one another and cease violence and

25  negotiate a two-state solution, meaning that there would be a

1   State of Israel, and in all or part of the West Bank and Gaza,

2   perhaps also with some border shiftings to be negotiated,

3   there would be an independent State of Palestine.

4   Q.   And what is Hamas's -- what was Hamas's position with

5   respect to the Oslo Accords?

6   A.   It opposed them.

7          MR. DEUTSCH:  Judge, objection, foundation.

8          THE COURT:  Objection overruled.  He's testifying in

9   his expert capacity.

10  BY MR. FERGUSON:

11  Q.   Who were the participants in the Oslo peace process?

12  A.   The primary participants were Israel and the PLO.  They

13  were negotiated by Norwegian diplomats, and later after the

14  basis for the peace process was concluded, other parts of the

15  international community were brought in.  There was a signing

16  on the White House lawn.

17  Q.   You mentioned the term PLO.  What's the PLO?

18  A.   The PLO, or the Palestine Liberation Organization, is the

19  Palestinian organization that, since the Arab League

20  conference in the '70s, has been the sole legitimate

21  representative of the Palestinian people --

22          MR. MOFFITT:  Objection.  Sole legitimate?  There had

23  been an election in --

24          THE COURT:  Overruled.  This is argument.  Overruled.

25          MR. MOFFITT:  I would suggest that it's argumentative

 1   to suggest that it is the sole legitimate.

 2          THE COURT:  You'll have the opportunity to

 3   cross-examine him.

 4          You may continue.

 5          MR. FERGUSON:  This -- Judge, we would object to the

 6   speaking objections.

 7          THE COURT:  Ask your next question, or if you want

 8   the witness to continue his answer, he can.

 9          MR. FERGUSON:  I would like the witness to continue

10   his answer.  Thank you.

11          THE WITNESS:  It was the Arab League that came up

12   with this term, sole legitimate representative of the

13   Palestinian people, and that has not changed.

14   BY MR. FERGUSON:

15   Q.  What was the time frame of the Oslo peace process?

16   A.  Negotiations were in 1993 to come to a Declaration of

17   Principles as it was called, and then the peace process that

18   followed was started in the 1994 and basically went on through

19   2000.

20   Q.  Have there been any negotiations or peace processes that

21   preceded Oslo with respect to these territories?

22   A.  Yes.

23   Q.  And could you describe those?

24   A.  The most important was the Madrid peace conference that

25   followed the first war in Iraq in 1991.

1          Following the Madrid peace conference, there were

2     negotiations, follow-up negotiations, in Washington.  Those

3     were superseded by the Oslo Accords, which had started -- the

4     negotiations in Oslo had started in secret towards the tail

5     end of those peace talks in Washington.

6     Q.  Did the Oslo Accords actually bring about peace with

7     respect to the dispute over the territories?

8     A.  It brought progress.  It did not bring peace, meaning it

9     led to Israeli recognition of the PLO and the plight of

10    Palestinians, Palestinian Liberation Organization recognition

11    of Israel.

12          It led to the creation of the Palestinian Authority

13    and the withdrawal of Israeli forces from significant portions

14    of Gaza and the West Bank.

15          Hostilities continued.  Terrorist attacks continued.

16    Israeli reprisals continued, and we are still today without a

17    peace accord.

18    Q.  And since the Oslo period, have there been further

19    attempts to try to negotiate peace between the Palestinians

20    and the Israelis?

21    A.  There have been in fits and starts.  The conditions on the

22    ground and the continuing violence have made that very

23    difficult.

24          There was something a couple years ago called the

25    Geneva Initiative, where some Israelis, mostly out of

government, and Palestinians, also mostly out of government,

tried to come up with the basic framework of what could be at

least the foundation of a peace treaty, and that has not taken

root either.

Q.   Did Hamas participate in any of these various rounds of

peace negotiations?

A.   It did not.

Q.   What was its position with respect to the attempts to

broker a two-state solution or peace with respect to these

territories?

A.   It opposed it and considered it a sell-out.

Q.   Is Hamas still in existence today?

A.   Excuse me.   Yes.

Q.   And in what form does it exist today?

A.   It exists today in several forms.   Hamas won elections in

January of this year and is now the ruling coalition, ruling

element in the Palestinian Authority.   That is, prior to

January, the Palestinian Authority was governed by the Fatah

party, which had been led by Yasser Arafat.

          In January 2006, Hamas participated for the first

time in national elections, did well enough to put together a

government.

Q.   And since coming to be part of government in Palestine,

has it changed its position with respect to a two-state

solution and peace with the Israelis?

1   A.  It has not.

2   Q.  I want to step back to the founding period of Hamas.  When

3   was Hamas founded?

4   A.  Generally, people place the founding of Hamas around

5   December of 1987.  There's some discussion about whether it

6   was technically founded a little bit later.

7   Q.  And who was its founding leader?

8   A.  If you're asking for one individual, I'd have to say

9   Sheikh Ahmed Yassin, though there were several people who

10  participated in the founding.

11  Q.  You used the term Sheikh.  What does that mean?

12  A.  Well, Sheikh can mean -- be a religious title for one who

13  has received training, like a priest or a rabbi.  It can also

14  be an honorary title given to one because out of respect for

15  that person.

16  Q.  You mentioned that Sheikh Yassin founded Hamas with

17  others.  Can you name some of those others for us?

18  A.  Sure.  Abdel Aziz Al-Rantisi, Salah Shahadah, Mahmoud

19  Zahar, Ismail Haniya, for example.

20  Q.  Have you heard the name Mousa Abu Marzook?

21  A.  I have.

22  Q.  And who is he?

23  A.  Mousa Abu Marzook is a senior leader in Hamas.  At one

24  time, he was the head of the political bureau, which is the

25  highest level decision-making body for Hamas.  Today he is the

 1  deputy chief of the political bureau.

 2  Q.  And was he an early member of Hamas?

 3  A.  Yes.

 4  Q.  Have you heard the name Jamil Hamami?

 5  A.  Yes.

 6  Q.  And who is Jamil Hamami?

 7  A.  Jamil Hamami was a senior Hamas personality in the West

 8  Bank and participated in the founding of Hamas on the West

 9  Bank side.

10  Q.  From your work, your field studies, your studies of

11  various sources, are you familiar and can you identify these

12  leaders by picture or sight?

13  A.  Sure.

14  Q.  And what sorts of sources have you relied upon that permit

15  you to do that?

16  A.  Most, if not all of them, have been portrayed in the

17  media, but I've also seen pictures of them in my interviews

18  with officials in the Middle East and Europe, here.

19          MR. FERGUSON:  Permission to approach, Judge?

20          THE COURT:  You may.

21  BY MR. FERGUSON:

22  Q.  Handing you what is marked for identification purposes as

23  Government Exhibit Levitt Photo 1, 2, 3, 4 and 5.

24          And directing your attention specifically to Levitt

25  Photo 1, do you recognize the individual depicted in that

Levitt - direct by Ferguson

1  picture?

2  A.  This is Mousa Abu Marzook.

3  Q.  And how are you able to identify him?

4  A.  He's been portrayed in the media many, many times.

5        MR. FERGUSON:  Permission to admit and publish Photo

6  1?

7        THE COURT:  Any objection?

8        MR. DEUTSCH:  No objection.

9        THE COURT:  Mr. Moffitt?

10        MR. MOFFITT:  No.

11        THE COURT:  So admitted.  You may publish.

12    (Government Exhibit Levitt Photo 1 received in

13    evidence.)

14  BY MR. FERGUSON:

15  Q.  Turn your attention specifically to Levitt Photo No. 2,

16  ask you the same question.  Do you recognize the individual in

17  that photo?

18  A.  This is Salah Shahada.

19  Q.  And Salah Shahada is who?

20  A.  He was one of the founding members of Hamas overall and

21  the founder of the Iz Edeen Al-Qassam Brigades, which is

22  Hamas's terrorist wing.

23  Q.  Which we'll talk about a little bit later.  How are you

24  familiar with his appearance?

25  A.  Also I've seen his picture.

1          MR. FERGUSON:  Move for admission of Levitt Photo 2.

2          THE COURT:  Any objection?

3          MR. MOFFITT:  No, ma'am.

4          MR. FERGUSON:  Permission to publish?

5          THE COURT:  So admitted.  You may publish.

6      (Government Exhibit Levitt Photo 2 received in

7      evidence.)

8   BY MR. FERGUSON:

9   Q.  Turn your attention to Levitt Photo 3 and ask you the same

10  question.  Do you recognize the individual depicted in that

11  photo?

12  A.  This is Abdel Aziz Al-Rantisi.

13  Q.  How are you familiar with his appearance?

14  A.  He has also been in the media many times.

15  Q.  Does he have any sort of role that places him more or less

16  in the media?

17  A.  He was at one time the spokesman for Hamas, was in the

18  media a lot, and then very briefly was the leader of Hamas.

19          MR. FERGUSON:  Move admission of Government Exhibit

20  Levitt Photo 3.

21          THE COURT:  Is there an objection?

22          MR. DEUTSCH:  No objection.

23          THE COURT:  Mr. Moffitt?

24          MR. MOFFITT:  No, ma'am.

25          THE COURT:  So admitted.

1          MR. FERGUSON:  Permission to publish?

2          THE COURT:  You may.

3      (Government Exhibit Levitt Photo 3 received in

4      evidence.)

5   BY MR. FERGUSON:

6   Q.  Turn your attention to Levitt Photo 4, ask the same

7   question.  Do you recognize that individual?

8   A.  This is Mahmoud Al-Zahar.

9   Q.  And who is Mahmoud Al-Zahar?

10  A.  Again, a founding member of Hamas.  He's currently, I

11  believe, the foreign minister for Hamas in the Hamas

12  government.

13  Q.  And does he similarly have a history that places him in

14  the media and the public eye?

15  A.  Yes.  He was also spokesperson at one point, a senior

16  leader.  He's been in the media a lot.

17          MR. FERGUSON:  Move admission of Levitt Photo 4.

18          THE COURT:  Any objection?

19          MR. MOFFITT:  No, ma'am.

20          MR. DEUTSCH:  No, no objection.

21          THE COURT:  So admitted.  You may publish.

22      (Government Exhibit Levitt Photo 4 received in

23      evidence.)

24  BY MR. FERGUSON:

25  Q.  And, finally, Government Exhibit Levitt Photo 5.  Who is

1    that individual?

2    A.   This is Sheikh Ahmed Yassin, the founder, sometimes

3    described as spiritual leader or founder of Hamas.

4    Q.   And your basis for identifying him is the same with

5    respect to the others?

6    A.   Yes, he's been in the media a lot.

7            MR. FERGUSON:  Move admission for Levitt Photo 5.

8            THE COURT:  Any objection?

9            MR. DEUTSCH:  No objection.

10           THE COURT:  So admitted.  You may publish.

11     (Government Exhibit Levitt Photo 5 received in

12     evidence.)

13   BY MR. FERGUSON:

14   Q.   Did Hamas emerge from any prior or predecessor

15   organization?

16   A.   Excuse me.  Yes.

17   Q.   What was that organization?

18   A.   The Muslim Brotherhood.

19   Q.   What is the Muslim Brotherhood?

20   A.   The Muslim Brotherhood was an international organization

21   founded in Egypt in the 1920s.  It opposed what it saw as a

22   drift towards secularization within the Muslim world.

23   Q.   Let me ask you who was the founder of the Muslim

24   Brotherhood?

25           MR. BLOOM:  I'm sorry, what was the question?

1          THE COURT:  "Who was the founder of the Muslim

2   Brotherhood?"

3          THE WITNESS:  The founder was a man named Hassan

4   al-Banna.

5   BY MR. FERGUSON:

6   Q.  What was the ideology of the Muslim Brotherhood?

7   A.  The ideology of the Muslim Brotherhood was to roll back

8   the secularization that was going on, that they perceived

9   going on in the Muslim world and roll back Western influence.

10          The Muslim Brotherhood wanted a return to an Islamic

11  society.  To do that, the Muslim Brotherhood called for the

12  people to better themselves and return to the core faith of

13  Islam as it was practiced in the past.

14  Q.  And approximately when was the Brotherhood founded?

15  A.  In the late 1920s.

16  Q.  And at any point during its history, did its ideology take

17  a turn?

18  A.  Elements of the Muslim Brotherhood took a turn in terms of

19  their ideology.

20  Q.  Would you describe that, please?

21  A.  In other words, the Muslim Brotherhood felt that it was

22  incumbent upon Muslims to return to core elements of the

23  faith, for the Muslim nation, for the ummah, to return to the

24  proper practice of Islam, and they called that a jihad, in

25  this context, an effort at personal betterment.

1          They felt that after the ummah, the Islamic nation,

2    had returned to the proper practice of Islam, then it would be

3    in a position to defend Islam against the perceived enemies of

4    Islam, and that was also called a jihad and in that context

5    was more defined as a holy war.

6          To the Muslim Brotherhood, the personal improvement

7    and the return to the faith had to come first.  The break was

8    with several elements of the Muslim Brotherhood who took issue

9    with that chronology, with that order, and felt that taking --

10   enacting a jihad, a holy war, against the perceived enemies of

11   Islam should not wait until the ummah, or nation, had

12   returned to the core practice of Islam but, rather, that they

13   should be done simultaneously and that one would facilitate

14   the other.

15         People would come to practice Islam as it was

16   supposed to be practiced by virtue of participating in the

17   battle against the perceived enemies of Islam, and people

18   would be willing to participate in the battle against the

19   perceived enemies of Islam by virtue of coming back to the

20   faith.

21   Q.  You used the term ummah a couple times.  What exactly is

22   that?

23   A.  Ummah means nation.  In this context, it refers to the

24   Muslim nation, not in any political or geographic terms, but

25   the Muslim community in the world.

1   Q.  And where did Hamas come in all of this?

2   A.  Hamas identifies itself, in its charter and elsewhere, as

3   the Palestinian branch of the Muslim Brotherhood.  The

4   individuals that we've talked about, Sheikh Ahmed Yassin in

5   particular, and others were the leaders of the Palestinian

6   Muslim Brotherhood until they decided to adopt the name Hamas.

7   Q.   And with respect to the two views as to the ordering or

8   priority of the two views of jihad, what was Hamas's position?

9   A.  Hamas's position was that the battle against the perceived

10  enemies of Islam needed to be done at present.

11  Q.  What led to the formation of Hamas separate from the

12  Muslim Brotherhood?

13  A.  Well, there were several -- there were underlying

14  preconditions that were existing, and then there were also

15  precipitant, meaning near-term, events or sparks.

16          The near-term spark was an escalation in violence.

17  There had been a series of attacks carried out by a group

18  called Islamic jihad.

19          An Israeli truck driver drove a truck into a crowded

20  area of Palestinians, killing and wounding many, and that is

21  often pointed at as the spark or the precipitating specific

22  event or series of events.

23          But, of course, there were preconditions.  There were

24  things that were happening for some time already that made

25  that environment ripe for something major to happen after a

1    specific event.

2          Palestinians had been living under occupation for

3    some time.  That occupation is very, very difficult on

4    Palestinians.

5          The Palestinian Muslim Brotherhood had been

6    Islamizing society for some time.  It had even begun to

7    participate in some small-scale attacks even prior to the

8    official founding of Hamas under the name Hamas.

9          So there were organizations that were starting to

10   oppose Israel violently already.  There were very difficult

11   living conditions on the ground in the West Bank and Gaza

12   already, and those are important preconditions.

13   Q.  What -- what role, if any, did the leading founders of

14   Hamas play in the guise of the Muslim Brotherhood prior to the

15   actual formation of Hamas itself?

16   A.  The Palestinian Muslim Brotherhood was extremely active on

17   the ground as a grass roots organization building mosques,

18   building health centers and schools, and these were used to

19   promote Hamas's particular ideology and view of the world.

20         This is an Islamist ideology.  It opposes secularism.

21   It -- one of Hamas's key goals is to Islamize Palestinian

22   society.

23   Q.  Was it involved in any sort of violent activities?

24   A.  Yes.  Palestinian Muslim Brotherhood as early as 1983 was

25   involved in violent activity and procurement of weapons for

1   violent activity.  Sheikh Ahmed Yassin had been arrested in

2   the mid 1980s in particular.

3   Q.  You described I think your term was precipitant, sounds

4   more like a spark, an event that occurred in December 1987.

5   How was it that that particular incident led to the founding

6   of Hamas?

7   A.  While there had been preconditions, while there had been

8   preexisting situations and the Palestinian Muslim Brotherhood

9   had been very active long before this particular spark, the

10  spark and really more to the point the reaction to the spark

11  took everyone by surprise.

12          This uprising, or Intifada, was a grass roots

13  uprising.  It caught the Israelis by surprise.  It caught the

14  Palestine Liberation Organization by surprise.  It caught

15  Hamas and other groups all by surprise.

16          And all these groups, the Palestinian groups in

17  particular, immediately tried to capitalize on the uprising

18  and gain control of the uprising to further their agenda and

19  to establish themselves as one of or the primary Palestinian

20  organizations on the ground.

21  Q.  You used the term -- you used the term reaction, uprising,

22  Intifada.  What exactly was this thing that took place?

23  A.  It was literally a grass roots uprising.  People started

24  throwing stones.  People started actively opposing Israeli

25  soldiers.  Whereas prior, the type of activity was more

1    passive, here it was much more organized and included things

2    from rock throwing to refusing to pay taxes and generally

3    deciding not to acknowledge the Israeli occupation authority.

4    Q.  And what did the leaders or the founding members of Hamas

5    do to try to capitalize on this uprising as you described it?

6    A.  Well, Hamas hadn't existed as such.  The Palestinian

7    Muslim Brotherhood existed.  And Hamas decided, or I should

8    say the leaders of the Palestinian Muslim Brotherhood decided

9    to recast their organization as Hamas and to begin to take a

10   more active role in the uprising, and that role would be

11   three-fold.  They would be engaged as they had been to date in

12   social welfare activity through which they'd be able to

13   further indoctrinate Palestinian society and Islamize

14   Palestinian society.

15        They would be engaged in political activity,

16   especially vis-a-vis the other Palestinian groups on the

17   ground to try to establish their own primacy.

18        And they would be engaged -- and this is the real

19   shift -- in significantly more military activity.

20   Q.  And in forming this new entity or organization, Hamas, was

21   there any sort of articulation of goals or ideology?

22   A.  Within months of the establishment of Hamas, the group

23   came out with a charter, some describe it as a covenant, that

24   lays out the group's goals, ideology, world view.

25   Q.  And is this charter something that you've seen and you

 1   rely upon within your field of expertise?

 2   A.  It is.

 3   Q.  And from what sources have you seen this document?

 4   A.  I've seen primary Arabic language versions of it.  I've

 5   sat with Arabic translators to go through it.

 6           I've also used English translations of it.  The one

 7   that I and most scholars use is one that was published by Yale

 8   University.  It's called the Avalon Project.

 9           MR. FERGUSON:  Permission to approach?

10           THE COURT:  You may.

11   BY MR. FERGUSON:

12   Q.  I'm showing you what's marked as Government Exhibit Hamas

13   Charter Yale.  Is that the document you're referring to?

14   A.  This is it.

15   Q.  And where is that published?

16   A.  This is published by Yale, but it's on the Internet.

17   Q.  And I think you indicated it is an English language

18   version which is relied upon generally by people in your field

19   of expertise?

20   A.  It is.  And as we mentioned earlier kind of the vetting

21   process, when I sat down, for example, to write my book and

22   was deciding which translation to use, I spoke with other

23   scholars.  They use this.  I sat down with Arabic language

24   experts.  They said this was a good translation.

25           MR. FERGUSON:  Move to admit Government Exhibit Hamas

 1  Charter Yale.

 2          THE COURT:  Objection?

 3          MR. MOFFITT:  None here.

 4          THE COURT:  Okay.  So admitted.

 5     (Government Exhibit Hamas Charter Yale received in

 6     evidence.)

 7          THE COURT:  Let's end for the evening.  It is 5:00.

 8          Ladies and gentlemen, we are done for the day.

 9  Tomorrow is Friday, so our schedule tomorrow, we'll start in

10  court by 9:00 and go until 1:00, and you'll be excused for the

11  rest of the day by 1:00.

12          Please make sure that you come to the second floor by

13  8:45.  There will be coffee and donuts up here when you're

14  brought up here.

15          Remember, do not discuss the case and please do not

16  listen to or read any media coverage of the case.  Have a good

17  evening, and I'll see you tomorrow morning.

18     (Jury exits courtroom.)

19          THE COURT:  Dr. Levitt, you may step down.  Please be

20  back here tomorrow morning at 8:45.  We have an issue we need

21  to do at side bar?

22          MR. FERGUSON:  We do, Judge.

23          THE COURT:  Okay, counsel.

24          (Whereupon, there was a sidebar ordered sealed

25          pursuant to CIPA, after which the following further

1        proceedings were had in open court:)

2              THE COURT:  Two things.

3              Mr. Moffitt, your motion to exclude the government

4    purported expert, I have denied it with respect to Mr. Levitt.

5    I will take it up with respect to Mr. Fighel, not tonight.

6              MR. MOFFITT:  I understand.

7              THE COURT:  I do not have his CV.  I am not able to

8    make the same determination with respect to him.  I will hear

9    from the government on that, not tonight.

10             Are you calling Mr. Fighel as your next witness?

11             MR. FERGUSON:  No, Judge.

12             THE COURT:  Okay.

13             Mr. Deutsch, I have yours still.

14             MR. DEUTSCH:  Okay.

15             THE COURT:  You have given me a Hamas event timeline

16   December, 1987, to August '04.  It looks like a computer-

17   generated document with a timeline and summary of events.

18             What is this?

19             MR. DEUTSCH:  Well, I think Mr. Moffitt is going to

20   have some comments, which I will join; but, my concern

21   initially is this idea that we're going to indicate in this

22   timeline, with little American flags, Americans that were

23   victims of this, for want of a better word, terrorist act.

24             I don't -- that just seems to be unduly prejudicial.

25   You put an American flag there and you say this is Americans.

1    I don't get it.  What's the purpose of it?

2            MR. FERGUSON:  It signifies those particular attacks

3    in which Americans died or were injured, and it is a visual

4    aid to focus attention, obviously.  The witness is going to

5    testify about it, Judge.  We really don't have any strong

6    feelings about it.

7            THE COURT:  Take it out.

8            MR. FERGUSON:  We'll remove it.

9            THE COURT:  I do not like it.

10           Remove the flag.  He can testify about it --

11           MR. FERGUSON:  And understand --

12           THE COURT:  -- but remove the flag.

13           MR. FERGUSON:  And understand, this is a

14   demonstrative exhibit.

15           THE COURT:  Okay.  That was my next question.

16           MR. FERGUSON:  And it is a summary that is a very

17   reduced summary of numerous events that are reported in

18   voluminous public materials that the witness has -- has been

19   the subject of the witness' prior research studies and

20   analysis; particularly, with respect to its impact on the

21   peace process -- and, particularly, the Oslo peace process --

22   and other negotiations.

23           It is a long string.  And the witness is going to go

24   through a substantial string of these things.  It certainly

25   doesn't purport to be complete in terms of every Hamas attack.

1   And the witness is prepared to speak to the particulars to the

2   extent that the defense wants to cross-examine on any

3   particular one.  It is simply an aid to the jury for a stretch

4   of the testimony that is going to be very, very dense in

5   particulars.

6           MR. DEUTSCH:  Judge, I don't think Mr. Ferguson

7   understands my point.  My point is what relevance does it have

8   to the elements and the charges in this case that an American

9   was -- died in --

10          THE COURT:  Well, the flags are coming out.

11          MR. DEUTSCH:  Okay.

12          THE COURT:  I have ruled that.

13          MR. DEUTSCH:  Okay.

14          But, also --

15          THE COURT:  I agree with you on that.

16          MR. DEUTSCH:  -- do you think that he can say, "And

17  in this one, there were 13 Israelis killed and one American"?

18          I have the same objection.

19          THE COURT:  Mr. Ferguson, what is your response to --

20          MR. FERGUSON:  Judge --

21          THE COURT:  -- the testimony that Americans were

22  killed in these attacks?

23          MR. FERGUSON:  It's a couple-fold, Judge.

24          First of all, the implication of a couple lines of

25  defense opening argument here is to take us over to the Middle

Levitt - direct by Ferguson

 1   East.  These are crimes that are charged as American crimes.

 2   And it is certainly significant, therefore, that it has impact

 3   on Americans and the jury should understand that it has an

 4   impact on Americans and American interests.  That's one.

 5        Second is that the -- to the extent that these things

 6   have an impact on Americans and victimize Americans, both in

 7   the form of their deaths and grave injuries, they are a matter

 8   of great public concern and public notoriety and attention in

 9   the United States, and goes to serve notice to the

10   defendants -- or aspects of notice to the defendants -- as to

11   exactly what Hamas is, was and did during the entire period of

12   the conspiracy, that should have put them on notice that what

13   they were doing was providing assistance to an organization

14   deeply engaged in terrorism and terrorism against Americans.

15        MS. HAMILTON:  And, your Honor, can I add one thing?

16        THE COURT:  Sure.

17        MS. HAMILTON:  A lot the defense opening tries to

18   make it seem like this is just about the war between

19   Palestinians and Israelis fighting over a piece of land, and

20   that it's just about them and there are Israeli settlers doing

21   all these horrible things.  The fact of the matter is, and

22   what we are going to prove is, that Hamas is a terrorist

23   organization targeting innocent people.  And part of the way

24   we need to show that is that they don't care who they kill.

25   They kill people from -- citizens -- all over the world.  And

 1    that is relevant to what we intend to prove about them.

 2              THE COURT:  Mr. Moffitt, you had another objection.

 3              Let us start with the document.

 4              Mr. Deutsch, if I understand it, your only objection

 5    to the timeline was the flag.

 6              MR. DEUTSCH:  No.  And I also object to eliciting the

 7    nationality American from any victims.

 8              THE COURT:  Okay.

 9              MR. DEUTSCH:  Also, I --

10              THE COURT:  But what about the document itself?  Any

11    other objections?

12              MR. DEUTSCH:  I don't have any other objection.

13              THE COURT:  Okay.

14              MR. DEUTSCH:  Mr. Moffitt does, and I would join in

15    those.

16              But, also, I just want to point out that the first

17    time an American flag appears in this document is --

18              THE COURT:  Page 3.

19              MR. DEUTSCH:  -- the October 9th --

20              THE COURT:  Wachsman.

21              MR. DEUTSCH:  -- 1994, which is almost a year after

22    Mr. Salah is arrested and had carried out his money efforts.

23    So, I don't even understand the notice and relevance of that

24    to Mr. Salah.

25              THE COURT:  It is still within the time frame of the

 1    charged conspiracy.

 2           Mr. Moffitt, what is your objection to this?

 3           MR. MOFFITT:  Well, I'm not sure I understand what

 4    the government is going to try to prove.

 5           THE COURT:  To prove --

 6           MR. MOFFITT:  I understand --

 7           THE COURT:  -- or --

 8           MR. MOFFITT:  To prove with this document.

 9           THE COURT:  Okay.

10           My understanding is they are not going to try to

11    prove anything with the document.  They are not seeking to

12    introduce it into evidence.  They just want to use it as a

13    demonstrative aid to Dr. Levitt to assist him in his

14    testimony.  That is what Mr. Ferguson just said.

15           MR. MOFFITT:  My assumption is that Dr. Levitt is

16    going to say that, "This happened and that Hamas did it."  And

17    I'm not sure --

18           THE COURT:  And that Hamas didn't?  Is that what

19    you --

20           MR. MOFFITT:  That Hamas --

21           THE COURT:  Oh, did it.

22           MR. MOFFITT:  -- did it.

23           And I'm not sure Dr. Levitt is qualified to do that.

24           THE COURT:  Mr. Ferguson?

25           MR. MOFFITT:  I think he may be qualified to discuss

1  Hamas in general terms, but I don't think he's qualified to

2  make a conclusion about Hamas' guilt of -- on these particular

3  issues.  He's not a forensic expert.  He didn't do any

4  forensic study of any of this stuff.

5      He would be required to -- under normal

6  circumstances, it would seem to me, that there would be some

7  burden of proof if the government is seeking to put this in as

8  part of the conspiracy; and, that merely putting Mr. Levitt on

9  to say he has information with respect to Hamas doesn't prove

10 that Hamas -- or shouldn't be allowed to prove that Hamas --

11 did it.  That makes him a guilt, sort of, expert with respect

12 to what Hamas' activity was.

13      MR. FERGUSON:  Mr. Levitt has already indicated that

14 a significant basis for his attribution of Hamas association

15 and Hamas activities are the admissions of Hamas.  And he is

16 going to be testifying, actually, in laying a foundation for

17 utilization of this in this track of testimony exactly what he

18 relies upon to come up with the attribution for Hamas.  These

19 are publicized events which Hamas itself publicizes in the

20 form of official declarations, statements by its political

21 leadership that are published in the Arab news media, the

22 international newswires.

23      THE COURT:  Can you say that with respect to every

24 event that is in here that is attributed to Hamas?

25      MR. FERGUSON:  The answer is "Yes," Judge.

 1          MR. MOFFITT:  I respectfully submit that if asked,

 2   Dr. Levitt would say that there have been events that both

 3   Hamas and the PIJ fought over -- the Palestinian Islamic Jihad

 4   -- with respect to who actually committed it.

 5          I would also -- and they fought with public documents

 6   back and forth.

 7          I suggest that if the government were offering a

 8   document today where Hamas said it did something, your Honor

 9   would have to suggest -- the government would have to prove --

10   that there was some basis in that, in that assertion, even if

11   Hamas said it in its -- they couldn't just simply offer the

12   document for the truth of the document or whatever was in the

13   document.

14          So, they seek to prove these suicide bombings or

15   these bombings without having to put any evidence on

16   whatsoever, other than Mr. Levitt to say he may have read a

17   press account that said Hamas did this and there's no other

18   evidence that supports it or corroborates it.

19          THE COURT:  But are you putting this in for the fact

20   that Hamas did it or that Hamas took credit for it?

21          MR. FERGUSON:  It is -- well, it's that Hamas did it

22   on the basis of Hamas taking credit for it.

23          And with respect to the point that's being made

24   regarding conflicting claims of responsibility, to the extent

25   that Hamas might not have been the party that actually carried

1   out a particular suicide bombing as opposed to the Palestinian

2   Islamic Jihad, its claim of responsibility is certainly an

3   adoption of that act that would be relevant for these

4   purposes.

5          That being said, we have removed from this document

6   and not included in this document any situation in which there

7   was a significant dispute over who was actually responsible.

8          MR. DEUTSCH:  Judge --

9          MR. MOFFITT:  Let me finish, please.

10         MR. DEUTSCH:  Okay.

11         MR. MOFFITT:  Let me finish.

12         So, if I suggest that I killed JonBenet Ramsey, as

13  recently happened --

14         MR. FERGUSON:  This is a hypothetical?

15         MR. MOFFITT:  -- that that is sufficient --

16         THE COURT:  Yes.

17         MR. MOFFITT:  -- to suggest that it's an adoptive

18  admission on my part, even if there's no evidence to support

19  the fact that -- and that the government doesn't have to put

20  any evidence on other than Mr. Levitt's conclusion that

21  this -- these particular events were -- occurred as a result

22  of Hamas?

23         We don't even know whether it is accurate in this

24  document the manner in which it is suggested that these events

25  occurred.  That's not -- Mr. Levitt is concluding that they

 1  occurred and attributing them to Hamas.  The document itself

 2  goes beyond that, talks about the number of people killed and

 3  all the rest of that.  There's absolutely no way I can

 4  cross-examine Mr. Levitt on these issues.

 5        MR. FERGUSON:  It sounds like he's doing a wonderful

 6  cross-examination right now, Judge.  These matters certainly

 7  can be inquired into in cross-examination.

 8        And with respect to the issue on the adoption of the

 9  matter, it's a statement against interest; it's a statement

10  against interest by the enterprise that's been charged here;

11  and, for that reason, it certainly is relevant to these

12  proceedings.

13        MR. DEUTSCH:  Judge --

14        THE COURT:  Where is the information coming from that

15  you have in here where you talk about the number of people

16  shot or -- let us take the "2-16-1989 IDF Sgt. Sasportas

17  abducted.  IDF Sergeant Avi Sasportas was kidnapped while

18  hitchhiking at the Hodaya Junction and subsequently shot to

19  death.  His body was buried at the Givati Junction in southern

20  Israel and was discovered on 7 May, 1989."

21        Where does that come from?

22        MR. FERGUSON:  It would come -- I can't personally

23  tell you everything that goes into that one.  Let me say a

24  couple of things here.

25        The subject of Hamas terrorist attacks is part and

Levitt - direct by Ferguson

60

1    parcel and intrinsic to Dr. Levitt's Ph.D. dissertation, which

2    is now being published.  There is a whole annex to that which

3    lists terrorist acts by Hamas and sources out in significant

4    part many of the incidents here.

5         With respect to that particular incident, I can tell

6    the Court it certainly was published information.  And

7    Dr. Levitt generally, as he has already testified, reviews

8    court records, confessions, trial transcripts, public source

9    information, interviews government officials -- Israeli

10   government officials, Palestinian government officials.

11        These are matters that, in significant part, Judge, I

12   would submit, we can take public notice of, in fact, they

13   having occurred all with the exception of the fact that's

14   being disputed here, or sought to be disputed here, that it

15   was Hamas who did it.

16        What the witness is going to say is Hamas has taken

17   responsibility for it in some fashion or another and that's

18   the basis for it showing up in here and being attributed to

19   Hamas.

20        THE COURT:  Okay.

21        With respect to this demonstrative exhibit, the

22   flag -- the American flag -- should come out.

23        I, also, would like the "denotes Hamas-related

24   attack" to come out.

25        I will hear his testimony when you attempt to lay a

1  foundation to see if he can lay the proper foundation with

2  respect to this.

3          When I say the "denotes Hamas-related attack," I just

4  want the icon to come out.  I am not saying he cannot --

5  assuming he can lay the foundation -- say that Hamas has taken

6  credit for this.  But I -- without hearing more, I do not want

7  the icon in.

8          And I will see if he can lay a foundation tomorrow --

9          MR. MOFFITT:  Yes, ma'am.

10          THE COURT:  -- when he's testifying.  You are telling

11  me what you think he is going to say and you are not sure what

12  he is going to say about certain things.  But let us hear what

13  he has to say tomorrow.  If you can lay the foundation, he can

14  use it.

15          MR. MOFFITT:  Are you going to allow him to do that

16  in front of the jury, your Honor, before you make a --

17          THE COURT:  I do not see the problem with doing it in

18  front of the jury, as long as he does not go into the

19  substance of what is in there.  "What is this comprised of?

20  There are events in here.  Where do you take these from?  How

21  are you obtaining this information?"

22          I do not see the harm of doing that in front of the

23  jury.

24          MR. MOFFITT:  And we can be heard?

25          THE COURT:  Certainly.

1          MR. MOFFITT:  Okay.

2          THE COURT:  You can always be heard, Mr. Moffitt.

3          MR. DEUTSCH:  Judge, one thing that I'm not clear

4   about, is this a substitute for the government proving beyond

5   a reasonable doubt the predicate acts underlying the RICO

6   charge?

7          THE COURT:  I --

8          MR. FERGUSON:  I'm not sure --

9          MR. DEUTSCH:  In other words --

10         MR. FERGUSON:  -- I wanted him to answer that

11  question.

12         MR. DEUTSCH:  -- they've said that there's predicate

13  acts here.  My understanding of the law is they have to be

14  proven beyond a reasonable doubt.  And if this is the way

15  they're going to do it, then we've got a big problem here.

16         MR. FERGUSON:  This sounds like argument.

17         THE COURT:  Do you have additional evidence of the

18  underlying predicate acts?

19         MR. FERGUSON:  Sure, Judge.

20         MR. DEUTSCH:  Okay.  So, it's not the way.  This is

21  just an overview.

22         THE COURT:  This is an overview.  It is expert

23  testimony.  It is some evidence.  Whether it is beyond a

24  reasonable doubt, I --

25         MR. FERGUSON:  Judge, let me add that what has been

 1  charged here is a conspiracy.  There does not need to be

 2  specific proof of predicate acts or all the predicate acts.

 3  What are alleged in the indictment are numerous acts in

 4  furtherance of the conspiracy.

 5         MR. MOFFITT:  But to the extent they seek to use

 6  these acts --

 7         THE COURT:  Yes.

 8         MR. MOFFITT:  -- it seems to me that they have to

 9  prove these acts beyond a reasonable doubt.

10         THE COURT:  That will be taken care of in jury

11  instructions.  This is expert testimony for whatever weight

12  the jury decides to put on it.

13         MR. SCHAR:  Speaking of jury instructions, Judge, if

14  we're off this topic now, I just want to, again, highlight a

15  couple things that happened in opening.

16         Mr. Deutsch in particular suggested to the jury that

17  the government was blocking their ability --

18         THE COURT:  They were, what?

19         MR. SCHAR:  We were blocking their ability to

20  cross-examine.  The word "blocking" was used.

21         And, then, he also argued about why these individuals

22  won't provide names, despite the fact that, obviously, you've

23  ruled they don't have to, in part, for security reasons.

24         And I think that both those are not only legally

25  wrong, but they're misleading.  And I'm not sure if we can

 1   really respond to it.  I don't want to argue in front of the

 2   jury about why certain things are classified.  And, obviously,

 3   the names are classified and you've ruled based on

 4   information.

 5            So, I'm not asking necessarily -- I know we're going

 6   to deal with that instruction at some point as to classified

 7   information.  But I just want to highlight these, that I think

 8   a closing instruction, we may want to -- the government may

 9   offer some that deal with comments that were comments made

10   today.

11            THE COURT:  Sure.  You can always --

12            MR. SCHAR:  I know it's going to be way down the

13   road, but --

14            THE COURT:  That is down the road.  You can always

15   propose additional instructions.

16            MR. MOFFITT:  I hope --

17            THE COURT:  We are a ways away from that.

18            I would like, tomorrow after court, to address the

19   substitution --

20            MR. DEUTSCH:  Yeah, and I was --

21            THE COURT:  -- because I want to give this whenever

22   you want to use your substitutions.

23            MR. DEUTSCH:  Yes.

24            THE COURT:  And I do not want you not to be able to

25   use them because we have not agreed on that.

1          MR. DEUTSCH:  And I was just trying to take from what

2     I thought was in there about we are --

3          THE COURT:  I understand.

4          MR. DEUTSCH:  -- cross -- we are limited on our

5     cross-examination.  I thought that was in there.

6          THE COURT:  It is in here.  This just has not been

7     vetted --

8          MR. DEUTSCH:  Yeah, I understand.

9          THE COURT:  -- and approved.  This was my initial

10    draft.

11         MR. DEUTSCH:  Can I have that document back?

12         THE COURT:  Sure.

13         MR. DEUTSCH:  No, no, not that one.

14         THE COURT:  Oh, that is mine.  Sorry.

15         MR. SCHAR:  Judge, I think it's the attribution to

16    us.  It's not that there's not going to be some instruction

17    that there's no limited cross-examination because of

18    classified information.  The suggestion was we decided to

19    limit --

20         THE COURT:  I understand.  The instruction will clear

21    that up.

22         Anything else we need to take care of tonight?

23         MR. FERGUSON:  No, Judge.

24         THE COURT:  Please be here by 8:45 tomorrow and we

25    will pick up with the continuation of Dr. Levitt.

Levitt - direct by Ferguson

66

1            MR. MOFFITT:  Have a nice evening.

2            THE COURT:  You, too.

3            (Whereupon, an adjournment was taken at 5:30 o'clock

4       p.m., until 8:45 o'clock a.m., the following day, October

5       20, 2006.)

6                   *    *    *    *    *

7    We certify that the foregoing is a correct excerpt from the
     record of proceedings in the above-entitled matter.
8

9

     _____          _____, 2006
10   Joseph Rickhoff

11

12   _____          _____, 2006
     Kathleen Fennell
13

14

15

16

17

18

19

20

21

22

23

24

25