1            IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

UNITED STATES OF AMERICA,          ) Docket No. 03 CR 978
4                                   )
                   Plaintiff,       )
5                                   )
            vs.                     )
6                                   )
MUHAMMAD HAMID KHALIL SALAH AND     )
7  ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, ) Chicago, Illinois
                                    ) October 24, 2006
8                  Defendants.      ) 11:00 o'clock a.m.

9

                    VOLUME SIX
10          TRANSCRIPT OF TRIAL PROCEEDINGS
      BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
11

12  APPEARANCES:

13

   For the Plaintiff:          HON. PATRICK J. FITZGERALD
14                             United States Attorney
                               BY:  MR. JOSEPH M. FERGUSON
15                                   MR. REID J. SCHAR
                                     MS. CARRIE E. HAMILTON
16                             219 S. Dearborn St., Suite 500
                               Chicago, Illinois  60604
17

18  For Deft. Salah:           PEOPLE'S LAW OFFICES
                               BY:  MR. MICHAEL EDWARD DEUTSCH
19                                  MS. ERICA THOMPSON
                               1180 North Milwaukee Avenue
20                             Chicago, Illinois  60622

21                             LAW OFFICE OF ROBERT BLOOM
                               BY:  MR. ROBERT JAY BLOOM
22                             3355 Richmond Boulevard
                               Oakland, California  94611
23

24  For Deft. Ashqar:          MR. KEITH ALLAN SPIELFOGEL
                               20 North Clark Street, Suite 1200
25                             Chicago, Illinois  60602

```
 1   APPEARANCES (Cont'd):

 2

     For Deft. Ashqar (Cont'd): MR. WILLIAM MOFFITT
 3                              11582 Greenwich Point Road
                                Reston, Virginia  20194
 4

 5   Also Present:              S/A BRADLEY BENAVIDES, FBI
                                S/A JILL PETTORELLI, FBI
 6

 7   Court Reporter:            MR. JOSEPH RICKHOFF
                                Official Court Reporter
 8                              219 S. Dearborn St., Suite 1232
                                Chicago, Illinois  60604
 9                              (312) 435-5562

10                              MS. KATHLEEN FENNELL
                                Official Court Reporter
11                              219 S. Dearborn St., Suite 2144
                                Chicago, Illinois  60604
12                              (312) 435-5569

13                  * * * * * * * * * * * * * * * *

14
                          PROCEEDINGS RECORDED BY
15                        MECHANICAL STENOGRAPHY
                      TRANSCRIPT PRODUCED BY COMPUTER
16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  03 CR 978, USA vs. Muhammad Salah and

2    Abdelhaleem Ashqar.

3          THE COURT:  Good morning.

4          MR. MOFFITT:  Good morning, your Honor.

5          MR. DEUTSCH:  Good morning.

6          MR. SCHAR:  Good morning, Judge, Reid Schar and

7    Carrie Hamilton on behalf of the United States.  Mr. Ferguson

8    is on his way up.  He should be here by 11:00.

9          THE COURT:  Okay.

10          MR. DEUTSCH:  Michael Deutsch --

11          THE COURT:  It is 11:00.  That clock is slow, just so

12    you know.

13          MR. SCHAR:  Mr. Ferguson is late.

14          (Laughter.)

15          MR. DEUTSCH:  Michael Deutsch, Robert Bloom and

16    Muhammad Salah here for Muhammad Salah.

17          Ms. Thompson is -- will be here.

18          THE COURT:  Okay.

19          What happened with respect to Mr. Salah?  I thought

20    we were delaying today so he could go to mosque.

21          THE DEFENDANT SALAH:  Just -- they sighted the moon,

22    like, 11:00 p.m.  So, they decided to pray on Monday.

23          MR. DEUTSCH:  I guess at the last minute -- they look

24    at where the position of the moon is, and I guess at the last

25    minute they changed their position and decided to pray on

1    Monday.

2           THE COURT:  Okay.

3           MR. MOFFITT:  Good morning, your Honor, William

4    Moffitt, Keith Spielfogel and Dr. Ashqar.

5           THE COURT:  Good morning.

6           And Mr. Ferguson is present now.

7           I have two things I would like to take up.

8           The clock is slow, Mr. Ferguson.  I see you looking

9    at it.

10          I have two things I would like to take up, and then I

11   will take up anything else you have for me to take up.

12          I would like to take up where we left off with

13   respect to the testimony of Dr. Levitt -- and, Mr. Spielfogel,

14   I think this is you; you filed a motion with respect to it on

15   Monday, in response to my invitation to do so -- in

16   particular, addressing the issue of whether or not Dr. Levitt

17   can opine that, in his opinion, Hamas carried out certain

18   acts.

19          And, then, the other issue I would like to take up

20   this morning is the Court's instruction that I gave you on the

21   CIPA substitutions.

22          First, with respect to the motion regarding

23   Dr. Levitt, I did not see anything from the government

24   yesterday, Mr. Ferguson.

25          MR. FERGUSON:  The motion that was filed yesterday by

1  Dr. Ashqar, the government is prepared to respond orally,

2  Judge.

3          THE COURT:  Okay.  Go ahead.

4          MR. FERGUSON:  Ready?

5          THE COURT:  Go ahead.  I am ready.

6          MR. FERGUSON:  All right.

7          There are six separate arguments that were raised in

8  that motion.

9          Joe, if I start talking too fast, just throw up the

10  red flag.

11          The first is that Dr. Levitt's testimony because --

12  it is inappropriate because -- it is with respect to the

13  mental state or intent of the defendant.  Quite frankly,

14  Judge, I have no idea what that's about because Dr. Levitt in

15  no way is going to comment on Dr. Ashqar's mental state in any

16  respect.

17          What he is testifying to is the pattern of terrorist

18  acts undertaken by the enterprise which is charged in the

19  indictment, for which defendant is charged with conspiring to

20  further by various unlawful means.  He is not going to be

21  testifying as to Dr. Ashqar's mental state.

22          The second argument:  Testimony on the ultimate fact,

23  also characterized as "the usurpation of the jury's province."

24          Judge, our position there is, the ultimate fact here

25  is defendant Ashqar's participation in a conspiracy to assist

1    and provide facilitating support to the charged enterprise.

2    Dr. Levitt isn't testifying on that matter.

3         The government disagrees that it's improper for

4    Dr. Levitt, on the basis of his expertise in the field, to

5    offer an opinion on whether terrorist strikes that are to be

6    discussed were Hamas attacks.  However, for the sake of

7    getting us through the issue, we're prepared to limit

8    Dr. Levitt's testimony -- and it's something that was signaled

9    last Friday with respect to the Court's remarks -- limit his

10   testimony only to his expert opinion that the attacks

11   discussed were claimed by Hamas or were attacks for which

12   Hamas took credit or responsibility through various means.

13   Thus, leaving to argument and to ultimate findings by the jury

14   whether they were or were not Hamas attacks.

15        But Dr. Levitt is not going to testify that these --

16   he's not going to offer the -- I guess, the -- final position

17   that these were Hamas attacks.

18        That, I think, peeling it back to that point, largely

19   addresses all of the remaining arguments.  But in very quick

20   order, "the testimony goes beyond his qualifications."  That's

21   cast in terms of his qualification to offer on whether the

22   attack was a Hamas attack versus simply claiming

23   responsibility.

24        The 403 argument is cast on the same terms, as well.

25   But, in general, on the 403 issue, we would say, Judge, that

1   this is a case about conspiratorial involvement in a terrorist

2   organization.  We're going to talk about terrorism.

3          Finally, "that it's outside the scope of the expert

4   summary."

5          We think, Judge, that the expert summary or report or

6   disclosure or notice covered this base.  It's very broad.

7   That being said, by paring it back to what I have just

8   discussed, it is certainly within -- and I'm reading now from

9   the government's letter to defense counsel disclosing

10  Dr. Levitt as an expert --

11          THE COURT:  Is this Exhibit 1 to the motion?

12          MR. FERGUSON:  It is, Judge.

13          THE COURT:  Okay.

14          MR. FERGUSON:  -- "Hamas' uses of use of force and

15  violence to achieve its goals; but, more particularly, Hamas'

16  claims of responsibility for a variety of terrorist attacks,

17  as well as the method and means by which Hamas claims

18  responsibility for various terrorist attacks."

19          And that's what we're focused -- that's what we're

20  going to focus on here.

21          That being said, I think the final argument, as well,

22  with respect to the Sixth Amendment confrontation rights,

23  also, goes to the -- whether or not Dr. Levitt would be

24  opining as to whether they were not Hamas attacks.  That's not

25  the case here.

 1          But, in general, Judge, I would say the witness is on

 2    the stand.  He's certainly going to be confronted on

 3    cross-examination as to what it is he does say.

 4          THE COURT:  It sounds like your motion is moot.

 5          MR. MOFFITT:  I would only raise one other issue.

 6          THE COURT:  Sure.

 7          MR. MOFFITT:  And it goes to the Sixth Amendment

 8    issue.

 9          THE COURT:  Okay.

10          MR. MOFFITT:  Dr. Levitt, by his testimony, is

11    adopting what someone told him as the basis of his testimony.

12    If he has any notes or anything with regard to that -- those

13    interviews or where he got the information -- I would suggest

14    to the Court because of his adoption of that information,

15    that's Jencks material and should be provided.

16          THE COURT:  My impression from what he testified to

17    was that he has written about all of these topics in his

18    books, articles, et cetera, which address all of the issues he

19    is opining on have been disclosed to you.

20          MR. MOFFITT:  I don't disagree with that.  The book I

21    bought -- we bought -- personally.  All right?

22          But the book doesn't say, for instance, "I spoke to

23    James Jones.  James Jones told me X, Y and Z."  The book is

24    more of the historical record and it doesn't discuss it in

25    those terms.

1              What Dr. Levitt has testified to is that he used

2    newspapers, that he used interviews and various -- that kind

3    of background information.

4              THE COURT:  Web sites, reviewed Hamas --

5              MR. MOFFITT:  What I am --

6              THE COURT:  -- publications.

7              MR. MOFFITT:  Right.

8              THE COURT:  I am trying to remember the interview

9    part.

10             MR. FERGUSON:  Judge, let me give you --

11             THE COURT:  He spoke with diplomats, he said --

12             MR. FERGUSON:  Diplomats.

13             THE COURT:  -- state officials.

14             MR. FERGUSON:  Government officials on both sides.

15   And there was -- but he actually has also testified that he

16   has actually interviewed terrorists.  And there's one instance

17   in particular he spoke of -- which was the Park Hotel bombing,

18   I think, which occurred in 2002 -- in which he had interviewed

19   two of the people involved in the cell supporting the suicide

20   bomber in that respect.  That is in his book.

21             MR. DEUTSCH:  Judge, can I be heard, please?

22             THE COURT:  Sure.

23             MR. MOFFITT:  I want to finish.

24             MR. DEUTSCH:  I'm sorry.

25             MR. MOFFITT:  But go ahead.

1          MR. DEUTSCH:  No, no, go ahead.  Go ahead.

2          MR. MOFFITT:  To the extent he is relying on that

3     type of source material and adopting it, I believe that that

4     would be Jencks material and we should be entitled to it.

5          In other words, when the government says, "You have

6     the right to cross-examine him," I have a right to ask him

7     questions, but I don't have the right to cross-examine him if

8     I don't have the materials.

9          For instance, I can't say to Dr. Levitt, "On

10    such-and-such a day, you interviewed this person.  How did you

11    know that this person was involved in Hamas on -- "

12         THE COURT:  Sure you can.  You can say that.  Nothing

13    --

14         MR. MOFFITT:  Well, but I don't know the person that

15    he interviewed.  So, I'm asking a series of cross-examination

16    questions entirely in the dark and I have to make a decision

17    about whether or not I can ask them.

18         And I've never had an expert rely on that kind of

19    face-to-face contact.

20         THE COURT:  Are those sources not -- I have not

21    bought or read the book, but are those sources not identified

22    in his book or articles?

23         MR. FERGUSON:  Sources are identified.

24         Judge, as a general backdrop here, what we're talking

25    about is the reliance on hearsay by an expert, which is

1  completely appropriate.  I did elicit from Dr. Levitt at an

2  earlier stage of his testimony on Friday, I believe, that he

3  assessed the individuals to be Hamas because the individuals

4  told him that they were Hamas.  He writes of those individuals

5  and the instance in his book.

6       There is -- at some level here, there is -- an

7  attempt to push the concept of Jencks -- I mean, look, taken

8  to its logical conclusion, really what's being called upon

9  here is for Dr. Levitt to produce every bit of writing that he

10  has ever generated underlying his actual publications.

11       THE COURT:  Right.

12       MR. FERGUSON:  Every piece of paper.

13       That's just not how the expert testimony procedures

14  function here.  And they are on full notice as to what his

15  positions are and what the sources of these materials are,

16  generally.

17       THE COURT:  Does his book disclose these interviews

18  and substance of them?

19       MR. FERGUSON:  Judge, I don't -- I didn't -- I ran up

20  here, obviously, and --

21       MR. DEUTSCH:  It does not, Judge.

22       MR. MOFFITT:  Here it is.

23       MR. DEUTSCH:  Does not.

24       Let me be clear here.

25       THE COURT:  Wait.

1            Are you finished, Mr. Moffitt?

2            MR. MOFFITT:  No, I was actually -- I was allowing my

3    colleague to look at his book, if he wanted.

4            THE COURT:  I understand, but are you finished with

5    your argument?

6            MR. MOFFITT:  Yes.  Yes, ma'am.

7            THE COURT:  Okay.

8            MR. DEUTSCH:  Mr. Ferguson continues to refer to

9    Mr. Levitt's interview with Hamas terrorists.  Okay?

10           Those interviews occurred in, as I understand it, in

11   2002 and later.  Okay?

12           What I'm mostly concerned with are allegations that

13   are contained by Mr. Levitt that occur prior to the time that

14   Mr. Salah was arrested and in Israel, which is January of

15   1993.

16           And, particularly, I'm concerned with what's

17   indicated on this chart, which is dated February 13th, 1992,

18   which says, "The Al-Qassam Brigades identified as the Hamas

19   military wing."  And, then, after that it says, "Following the

20   February 9th, '92, bombing in Gaza which injured three"; that

21   "Al-Qassam Brigades claimed credit"; "Hamas military commander

22   Salah Shahadah is later identified as the Al-Qassam Brigades

23   founder."

24           It seems to me what's being said here is there was a

25   bombing in February 9th, '92, that somebody claimed credit

1    for.  And that is the basis of this kind of indirect notation.

2    Because it doesn't actually list the bombing.  It lists it as

3    something going back to -- it says 2-13-92 is when credit is

4    taken for something that happened 2-90- -- February 9th, '92.

5              THE COURT:  Okay.

6              MR. DEUTSCH:  Okay.

7              Mr. Levitt, in 1992, was a college student.  Okay?

8    He wasn't an expert.  He wasn't involved in anything.  So, he

9    obviously had some document which he's relying on to make this

10   conclusion.  I'm entitled to that document to say -- if it's

11   something taking credit, if it's a police report about what

12   happened, if it's some other person that told him that.

13             If I'm going to confront him about this, I need to

14   know what he's basing this conclusion on that this was a

15   bombing in Gaza in February, 1992.  I think that's critical to

16   my case.  For him to get on the witness stand and say there

17   was this, without giving us any background, is just unfair and

18   it denies Sixth Amendment right.  He doesn't talk about this

19   in his book.  He doesn't show us any type of basis for it in

20   his book or any of his writings.

21             So, specifically, I'm entitled to know what he bases

22   that entry on that there was a bombing on February 9th, '92,

23   in which some brigade allegedly associated with Hamas took

24   credit.

25             Beyond that, one other point I want to make.  And the

1    Court knows very well that I've tried to make this point with

2    Mr. Ferguson's direct.

3         According to his chart, there was a Hamas bombing

4    foiled on November 19th, '92, in which he says, "Al-Qassam

5    Brigade operatives attempted a car bombing in a heavily-

6    populated area in the center of the country." It doesn't even

7    say where it is. It doesn't say anything about it. What is

8    he basing that on? Is it a report? Is it a police report?

9    Is it a conversation with some intelligence -- Israeli

10   intelligence -- officer?

11        It gives the impression that there was some kind of

12   car bombing in November 19th, '92, in a heavily-populated area

13   in the center of the country. That's pretty vague. It's not

14   in his book. It's not in any of his writings. So, I think

15   we're entitled to know the basis of that conclusion, at least

16   what he's relying on. Of course he can rely on hearsay.

17   We're not saying he can't. But what is the hearsay he's

18   relying on?

19        Finally, April 16th, 1993, which is several months

20   after Mr. Salah was arrested, he indicates that there -- "a

21   Hamas suicide bombing, driving an explosive-laden van." And,

22   of course --

23        THE COURT:  I am sorry, what date was that?

24        MR. DEUTSCH:  That's February 16th, 1993.  That's the

25   first entry on the second page.

1           THE COURT:  Okay.

2           MR. DEUTSCH:  And, of course, this is very important.

3           THE COURT:  April 16th?

4           MR. DEUTSCH:  April 16th.

5           THE COURT:  Okay.  That is --

6           MR. DEUTSCH:  After -- it's after -- Mr. Salah is in

7    prison, but it's still important because I have read experts

8    who have written books about Hamas and who have said

9    repeatedly that the first Hamas suicide bombing was in April

10   of 1994, not '93.  And I think I'm entitled to know what he

11   bases this determination that this was a Hamas suicide bombing

12   on April 16th, 1993.  Again, I don't object to him testifying

13   on hearsay.  But, again, I think I'm entitled to have the

14   basis for his determination of that.

15           And, so, it seems to me if I'm going to at least

16   challenge his conclusion that -- the dates of these things and

17   whether they actually happened, we're entitled to know that.

18           THE COURT:  Mr. Ferguson?

19           MR. FERGUSON:  A lot of this will be elicited.  This

20   is a summary chart, Judge.  It is a summary simply to aid what

21   is a fairly long sequence -- and certainly not a complete

22   sequence -- of attacks.  The witness is going to testify as to

23   sourcing of materials for these various things.

24           And they're public sources.  We're talking public

25   sources.  He is an expert researcher and analyst on the

1  subject of Hamas, for whom the defense has substantial

2  publications and could equally have combed, on the basis of

3  the long list of publications that were provided in the CV of

4  Mr. Levitt, what he has out there.  It is no secret what he is

5  talking about.  The defense certainly had the capacity to go

6  and comb public databases.

7          I will tell you, Judge, for example, with respect to

8  the whole early sequence -- when I say "early," let's just say

9  1989 until 1997 -- Hamas published -- publishes -- what

10 Dr. Levitt has already referred to as a glory record.

11         THE COURT:  As a, what?

12         MR. FERGUSON:  The glory record, which is a listing

13 in laudatory terms of all sorts of terrorist attacks.  It's

14 publicly available.  These things generally, they're on the

15 glory record.  They're all on the glory record.

16         In some instances, he's going to talk about -- well,

17 in most instances, he's going to talk about -- the fact that

18 these things are broadly publicized.  In a number of

19 instances, he'll be talking about it in the glory record.  In

20 other instances, he'll be talking about Hamas declarations

21 that he -- that have been issued publicly.

22         None of this is a secret.  All of it's subject to

23 cross-examination.  If the witness doesn't have an adequate

24 basis for his offering that Hamas has claimed responsibility,

25 it certainly will come out on cross-examination.  If

1   Mr. Deutsch disagrees as to what other analysts would suggest

2   is the first Hamas date, that's cross-examination.

3           MR. MOFFITT:  Your Honor, I would raise with you, if

4   he's now testifying as a summary witness, Rule 1006.

5           THE COURT:  Well, I do not think he is --

6           MR. FERGUSON:  No, it's not --

7           THE COURT:  -- testifying as a summary.

8           MR. FERGUSON:  My --

9           THE COURT:  He is testifying -- my understanding --

10  as an expert.  And the timeline that we talked about last

11  Thursday is a demonstrative exhibit they want to use with him

12  to assist him in his testimony, not a summary that is going to

13  be admitted substantively into evidence.  It is just for

14  demonstrative purposes.

15          MR. FERGUSON:  Correct.

16          THE COURT:  So, that rule does not apply.

17          With respect -- go ahead.

18          MR. FERGUSON:  I just want to make a point here.  The

19  draft that existed last week, in light of the objections that

20  were raised by the defense with respect to what it

21  characterized as the ultimate issue -- that is, whether Hamas,

22  in fact, did these things -- we have edited this to remove

23  Hamas and the references to Hamas attack to attack to attack.

24  I think a lot of them actually say "a Hamas suicide bomber."

25  So, there is a cleaned-up version of that I will hand out --

1          THE COURT:  May I have a copy of that, too, please?

2          MR. FERGUSON:  -- to everybody.

3          THE COURT:  With re- --

4          (Document tendered to the Court.)

5          MR. DEUTSCH:  Judge, I would just ask if, in fact,

6     they have a document which Mr. Levitt relied on in reaching

7     his conclusion, for example, that there was a Hamas car

8     bombing foiled, which is indicated 11-19-92; or, that there

9     was in the center of the country, which is pretty vague, I

10    would submit to you.  If he has a document on which he's

11    relying on and the government has it, they should turn it over

12    to us.

13         THE COURT:  Well, if you look at the revised timeline

14    that I was just given, as well, it looks like a lot of these

15    Hamas references are taken out, as Mr. Ferguson just

16    explained.

17         Mr. Ferguson, do you have any specific underlying

18    documents?

19         MR. FERGUSON:  What I've handed up to the Court that

20    should include an edited-down timeline are additional

21    materials that include declarations, statements of attribution

22    by Hamas, by the Al-Qassam brigades, by the Hamas Web site;

23    other materials from the Hamas Web site.

24         I have -- and I will bring back with me shortly, if

25    the Court would like, and we will do so -- the Hamas glory

1    record which, I think, we have copied and should have been in

2    this packet.  And I apologize for not having it with me at the

3    moment.  That will speak to that, as well.

4         Beyond that, Judge, a lot of what we're talking about

5    is simply Lexis/Nexis search materials.  You take -- you do a

6    search, you get fifty hits, you get a hundred hits.  Have a

7    few been picked out?  Sure.  Do we have a stack somewhere?

8    Sure.  But it's just this is sort of opening us up to just an

9    absurd claim of what discovery requires here.

10        And if, you know, the defense would like to have

11   copies of that, we'll make copies of it.

12        THE COURT:  Rule 705 of the Federal Rules of Evidence

13   and the Seventh Circuit in the Lawson opinion make clear that

14   you do not have to turn over all of the underlying facts and

15   disclose all of the underlying data that an expert is relying

16   on.

17        Let us hear what his testimony is.

18        You have disclosed his writings, which, given the

19   peer review they have been through, I am assuming set forth

20   the sources clearly that he has relied upon in making his

21   assertions.

22        He's published many, many, many, many, articles that

23   were noted in his CV.  All of those have been identified and

24   turned over to give you adequate basis to cross-examine him.

25   We have not heard any testimony yet regarding these underlying

1    events.  Let us take it one at a time and see what the basis

2    is; and, if you have an objection at that point, you can raise

3    it.

4          And with respect to the motion that was filed to

5    exclude a portion of Dr. Levitt's testimony, your motion is

6    denied as moot, in light of the government's representation

7    that it is not going to elicit testimony from Dr. Levitt

8    regarding his opinion as to who was ultimately responsible for

9    these bombings.

10          MR. MOFFITT:  Your Honor, I'm --

11          THE COURT:  Without saying more, that is a wise

12    decision.

13          Yes?

14          MR. MOFFITT:  With respect to the admission of any

15    Internet information, I'm going to raise a question as to the

16    reliability of any Internet information, so that the Court

17    should know that; and, we'd like to be heard before the

18    government enters any Internet information.

19          THE COURT:  I do not think it plans to enter any into

20    evidence.  I think that is just part of what Dr. Levitt said

21    he relied on.

22          MR. FERGUSON:  It's part of what he relied on.  It's

23    the government's intention, however, to -- in light of all the

24    objections that have been raised in front of the jury and in

25    the sidebar and in the papers -- to actually put before

1    Dr. Levitt some of these declarations, for example, which can

2    be printed off of the Internet.  And he will testify as to

3    them being materials that are relied on within his field and

4    part of what causes him to conclude that Hamas has, in fact,

5    taken responsibility.

6         Our intention is to publish them as demonstratives so

7    that the jury can see the Arabic that says "Hamas" with the

8    seal of Hamas or Al-Qassam, and so on.  But it's not going to

9    be admitted into evidence as substantive evidence for the

10   jury.  Simply, they'll be a series of demonstratives which he

11   will testify to.

12        MR. MOFFITT:  The reliability of the Internet has got

13   to be of some question to everybody in this courtroom.  I

14   mean, we deal with things like false identities on the

15   Internet all the time.  The question -- there has to be a

16   question beyond what is said on the Internet, it seems to me,

17   as to whether or not you can rely on the Internet.

18        MR. FERGUSON:  Judge, it's cross-examination as to

19   reliability of the materials that the witness says he's relied

20   upon to form an opinion as to a claim of responsibility.

21        THE COURT:  I agree.

22        If you have a specific objection with respect to a

23   specific document, you can raise it; but, I agree that is a

24   weight issue.  And you are free to cross-examine on it.

25        MR. DEUTSCH:  Judge, we would --

1            THE COURT:  And, also, he -- I am sorry, one more

2      thing, Mr. Deutsch.

3            MR. DEUTSCH:  Sorry.

4            THE COURT:  He has testified that experts in the

5      field rely on this, and he is testifying as an expert.

6            Yes, Mr. Deutsch?

7            MR. DEUTSCH:  We've been given a folder of documents

8      just now by Mr. Ferguson.  And I, obviously, haven't had time

9      to read them, but I'm noticing that each one of the documents

10     that have been given to us starts out with an Arabic version

11     and, then, behind it there's a translation.  You can just look

12     at the first one.

13           THE COURT:  Yes, I see.

14           MR. DEUTSCH:  And if you notice, on top of the

15     document, it says, "Salah 00549."  I don't know if he intends

16     to show --

17           MR. FERGUSON:  Judge --

18           THE COURT:  Mine does not.

19           MR. DEUTSCH:  Oh.

20           MR. FERGUSON:  The translations are not going into

21     evidence.

22           THE COURT:  Oh, I see where you mean.  Okay.

23           MR. FERGUSON:  For --

24           THE COURT:  The Arabic does not on mine, the English

25     version does.

1       MR. FERGUSON:  Correct.  The Arabic would have a

2   stamping on it that's a YF number.

3       THE COURT:  Yes.

4       MR. FERGUSON:  There may be a document or two that

5   says "Salah" in the translation.  That's an oversight.

6       The translation is not going into evidence.  It's not

7   being put up on a screen.  Nothing --

8       MR. DEUTSCH:  Okay.

9       MR. FERGUSON:  -- at all.

10      I would add that the "YF" designation reflects

11  materials that were provided in discovery two years ago to the

12  defense.

13      THE COURT:  Okay.

14      Anything else on Dr. Levitt?

15      (No response.)

16      THE COURT:  Is he here?

17      MR. FERGUSON:  He's here, but I've got to go get him.

18  I think the Court's instruction was to be here at 11:45.

19      THE COURT:  I am just making sure he is --

20      MR. FERGUSON:  Okay.

21      THE COURT:  -- in the building or somewhere close.

22      MR. DEUTSCH:  Judge --

23      THE COURT:  We do not have a jury yet, so we cannot

24  begin.

25      MR. DEUTSCH:  Yeah.

```
1              THE COURT:  I would like to -- and, Mr. Deutsch, this

2    is more of your issue -- take up the Court instruction that I

3    gave you the other day on classified information.

4              MR. DEUTSCH:  Judge, I --

5              THE COURT:  I brought extra copies for you in case --

6    assuming you probably did not bring yours.

7              MR. DEUTSCH:  I was just going to suggest -- we had a

8    little logistics problem today.

9              MR. FERGUSON:  Judge, if I could step out --

10             THE COURT:  Sure.

11             MR. FERGUSON:  -- so that I could get --

12             THE COURT:  You may.

13             MR. FERGUSON:  -- the witness?

14             THE COURT:  Is Mr. Schar going to take --

15             MR. FERGUSON:  I'll get all the materials ready and

16   Mr. Schar will carry on.

17             THE COURT:  You may.

18             MR. FERGUSON:  Thank you.

19             MR. DEUTSCH:  Judge, we had a little logistics

20   problem today and Ms. Thompson had to leave and is going to be

21   back.  I know you want to do it now, but can we -- she's

22   really the one -- can we wait?

23             THE COURT:  Sure.

24             MR. DEUTSCH:  Thank you so much.

25             THE COURT:  All right.
```

1            The jury -- they are supposed to be here at 11:45.

2   If they are all here and ready to go a little bit early, I

3   will start a little bit early.

4            MR. DEUTSCH:  Fine.  Thank you.

5            THE COURT:  Anything else for me that I need to take

6   up, Mr. Deutsch?

7            Mr. Moffitt?

8            MR. MOFFITT:  No, ma'am.

9            THE COURT:  Anything else before --

10           MR. SCHAR:  No, Judge.

11           THE COURT:  -- Mr. Schar?

12           Okay.

13           I will be back when the jury is all here and we will

14  get going.

15           Dr. Levitt -- I will give you a warning before I

16  bring them in so you can put Dr. Levitt on the stand.

17           See you in about 20 minutes or so.

18           (Whereupon, a recess was taken at 11:27 o'clock a.m.,

19       until 12:00 o'clock p.m., after which the following

20       further proceedings were had in open court, to wit:)

21           THE COURT:  Is Dr. Levitt here?

22           MR. SCHAR:  Yes.

23           THE COURT:  Our jury is all here now.

24           Bring Dr. Levitt in, please, and I will bring in the

25  jury.

Levitt - direct

1              (Brief pause.)

2              THE COURT:  Please come forward, Dr. Levitt.

3              Theresa, would you go get the jury, please.

4              (Brief pause.)

5              (Jury in.)

6              THE COURT:  You may be seated.

7              Good afternoon, ladies and gentlemen.

8              We are going to continue with the presentation of

9    evidence.

10             Dr. Levitt is still on the stand.

11             Dr. Levitt, let me remind you that you are still

12   under oath, sir.

13        MATTHEW LEVITT, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

14             THE COURT:  Mr. Ferguson, you may continue.

15             MR. FERGUSON:  Thank you, Judge.

16                    DIRECT EXAMINATION - Resumed

17   BY MR. FERGUSON:

18   Q.  Good afternoon, Dr. Levitt.

19   A.  Good afternoon.

20   Q.  When we broke off on Friday, I think we were discussing

21   aspects of the structure and operation of the military wing of

22   Hamas.

23             Do you recall that?

24   A.  Yes.

25   Q.  Please remind us of the name of the military wing.

Levitt - direct

233

1   A.   The Iz Al-Din Al-Qassam Brigades.

2   Q.   And by what names are they generally referred to, as you

3   understand it from your field of expertise?

4   A.   The Brigades, the Battalions, Qassam Brigades, Qassam

5   Battalions.

6   Q.   If you could speak up?

7   A.   Qassam Brigades, Qassam Battalions.

8   Q.   Does the name "Iz Al-Din Al-Qassam" appear in the Hamas

9   Covenant or charter we were discussing last week?

10  A.   It does.

11  Q.   And last week, we also discussed the emblem or the seal of

12  Hamas.  Do the Al-Qassam Brigades or Battalions also have

13  their own emblem or seal by which they are known?

14  A.   They do.

15  Q.   Are you familiar with it?

16  A.   I am.

17          MR. FERGUSON:  Permission to approach?

18          THE COURT:  You may.

19  BY MR. FERGUSON:

20  Q.   Dr. Levitt, I'm handing you what's been marked Government

21  Exhibit Al-Qassam Emblem --

22          (Document tendered.)

23  BY MR. FERGUSON:

24  Q.   -- and ask whether you are familiar with what is depicted

25  on that page?

Levitt - direct

234

1   A.   I am.

2   Q.   What is it, generally?

3   A.   This is the emblem of the Qassam Brigades.

4   Q.   And where have you seen it before?

5   A.   On Hamas documents, on Hamas posters.

6   Q.   When you say "Hamas documents," could you describe what

7   sorts of documents you're referring to?

8   A.   Communiques from the Qassam Brigades, for example; Hamas

9   posters they've put out; Hamas Web sites.

10          MR. FERGUSON:  Judge, move to admit and publish

11  Government Exhibit Al-Qassam Brigades Emblem.

12          THE COURT:  Any objection?

13          MR. MOFFITT:  No, ma'am.

14          MR. DEUTSCH:  No, no objection.

15          THE COURT:  So admitted and you may publish.

16          (Government Exhibit Al-Qassam Brigades Emblem

17      received in evidence.)

18  BY MR. FERGUSON:

19  Q.   Dr. Levitt, in much of the same fashion that you offered

20  on the Hamas emblem, I'd like for you to discuss your

21  understanding of a number of the icons or images that appear

22  in the Al-Qassam Martyr Brigades emblem.

23          There is a dome structure of a sort in the center of

24  the seal.  What do you understand that to be?

25  A.   That's a depiction of the Dome of the Rock, the gold dome

Levitt - direct

1   on the Mount of Jerusalem.  It is the third holiest site in

2   Islam, the Noble Sanctuary.

3   Q.  Is that the same structure that appears on the Hamas

4   emblem?

5   A.  Yeah.

6   Q.  All right.

7           There is person depicted in front of the Dome of the

8   Rock.  Would you please explain what that is?

9   A.  This is a depiction of a Hamas militant wearing a Hamas

10  bandana -- the traditional kafia head covering -- covering his

11  head and, in this case, concealing his face, as is common with

12  militant operatives.

13          The person's holding a gun in one hand and what

14  appears to be the Koran in the other.

15  Q.  We ended on Friday with you discussing various of the

16  sources that you review and rely upon respecting the various

17  ways Hamas and its military wing claim responsibility or

18  credit for attacks that have occurred in the Middle East,

19  including suicide bombings.

20          Just very briefly, again, if you would review some of

21  the general materials that you and people in your field rely

22  upon in determining or -- in determining whether Hamas has

23  claimed credit for any particular event?

24  A.  Hamas issues communiques taking responsibility or claiming

25  credit for attacks.  Hamas leaders will appear on mass media

Levitt - direct

1    doing the same.  The living wills of terrorists before they

2    carry out their attacks are frequently published and made

3    available to the media, sometimes put on the Internet after

4    the actual attacks, in which the perpetrator claims to be a

5    member of Hamas and states that they're about to perpetrate an

6    attack.

7            Many of these claims of responsibility are not only

8    provided to the mass media in terms of, you know, radio and

9    television, but also subsequently put on the Internet.

10   Q.  And how does a person in your field go about finding these

11   various types of materials?

12   A.  They're not difficult to find at all.  Basic Internet

13   searches will reveal those that are available on the Internet.

14   Some in English, more in Arabic.  Lexis/Nexis or other

15   database searches will yield many examples of articles or, you

16   know, television transcripts where Hamas leaders take credit

17   for these attacks.

18   Q.  And in terms of their number or volume, how would you

19   describe the number of attacks that in some fashion you have

20   determined that Hamas has claimed credit for over the course

21   of its history?

22   A.  Dozens.

23   Q.  In preparation for your testimony here today, have you

24   prepared a chart that highlights some of those attacks?

25   A.  Yes, just a few.

Levitt - direct

1          MR. FERGUSON:  Permission to approach, Judge?

2          THE COURT:  You may.

3    BY MR. FERGUSON:

4    Q.  Dr. Levitt, I'm handing you what's marked as Government

5    Exhibit Levitt Timeline.

6          (Document tendered.)

7    BY MR. FERGUSON:

8    Q.  If you'd take a minute and review that document.

9          (Brief pause.)

10   BY MR. FERGUSON:

11   Q.  Is this the chart or summary you prepared?

12   A.  This is it.

13   Q.  And, just generally speaking, what field of information

14   have you recorded?

15   A.  There's the date of the attack and there's a summary of

16   the event.

17   Q.  And in -- is every Hamas -- every attack that you believe

18   that Hamas has taken credit for in some fashion, is that

19   denoted on this timeline?

20   A.  No.  This is a small sampling.  There are many other

21   attacks for which Hamas has claimed responsibility that are

22   not on this timeline.  But all the events --

23         MR. MOFFITT:  Your Honor --

24   BY THE WITNESS:

25   A.  -- on this timeline have, in fact, been claimed by Hamas.

1            MR. MOFFITT:  I'm going to object with regard to this

2    because of your earlier ruling.  This was a -- had to be

3    Dr. Levitt's belief.  It's not to be taken as fact.

4            THE COURT:  He is testifying in an opinion capacity.

5            So, overruled.

6            MR. FERGUSON:  With respect -- just so the record is

7    clear, with respect -- to his belief that Hamas has taken

8    credit for or responsibility for certain attacks that are

9    depicted there.

10   BY MR. FERGUSON:

11   Q.  And, Dr. Levitt, in general terms, what have you relied

12   upon in compiling this chart?

13   A.  Again, Hamas claims of responsibility, communiques,

14   statements of Hamas leaders to the media.  In some cases, I've

15   interviewed participants of attacks, the living wills, et

16   cetera.

17   Q.  And these materials that you drew upon, are they the same

18   sorts of materials that you draw upon in your work generally

19   in research and analysis on Hamas?

20   A.  Yes.

21   Q.  And what is the time period reflected in the chart?

22   A.  The chart runs from December, 1987, to August, 2004.

23           MR. FERGUSON:  Judge, I would move to publish for

24   demonstrative purposes Government Exhibit Levitt Timeline.

25           THE COURT:  Any objection for demonstrative purposes

Levitt - direct

239

1    only?

2              MR. DEUTSCH:  Judge, I have an objection.  I don't

3    think it's reliable information.

4              THE COURT:  Mr. Moffitt?

5              MR. MOFFITT:  I'll just join -- I will join my

6    colleague.

7              THE COURT:  Objection overruled.  It may be used for

8    demonstrative purposes only.

9              MR. FERGUSON:  Thank you, Judge.

10             Could we --

11             THE COURT:  Do you need it switched back?

12             MR. FERGUSON:  Switched over to Elmo.

13             (Brief pause.)

14             THE COURT:  Okay.

15   BY MR. FERGUSON:

16   Q.  Dr. Levitt, I'd like to focus your attention to the first

17   entries in your chart, which I hope to have up here shortly in

18   copy form for the jury.

19             Your first entry is for December 9th, 1987.  What's

20   that entry for?

21   A.  As we discussed last week, that's when the Palestinian

22   Intifada or uprising began.

23   Q.  And is that when Hamas itself was founded?

24   A.  Hamas was founded then, too, yes, right -- December, 1987.

25   Q.  And the second entry is August 18th, 1988.  And what is

1  the event that's depicted there?

2  A.  That's the publication of the Hamas charter that we went

3  through last week, and the date was on that publication.

4  Q.  Dr. Levitt, the first two entries -- February 16th, 1989,

5  and May 3rd, 1989 -- could you please elaborate on what those

6  two entries are for?

7  A.  These entries reflect abductions or kidnappings of Israeli

8  soldiers that were claimed by Hamas.

9  Q.  And the first one, IDF Sgt. Sasportas abducted?

10  A.  Uh-huh.

11  Q.  At the time of the abduction, as you understand it from

12  source materials that you reviewed, was Sgt. Sasportas on duty

13  and actively engaged when the kidnapping occurred?

14  A.  He was hitchhiking.

15  Q.  Was he off duty or on duty?

16  A.  Off duty.

17  Q.  And what do you rely upon to -- for the belief that Hamas

18  claimed responsibility for this particular attack -- or this

19  particular incident?

20  A.  Hamas has claimed responsibility for this attack in

21  several documents, including a document on means of Qassam

22  Brigades attacks, these and other kidnappings are listed.

23  Hamas at the time claimed responsibility.  This has been

24  reflected in Hamas communiques, as well.

25  Q.  Are you familiar with the term "glory record"?

1    A.   Yes.

2    Q.   What is the glory record?

3    A.   The glory record is a list and description of attacks

4    claimed by Hamas that appears on one of the Hamas Web sites

5    that lists a series of terrorist attacks which together Hamas

6    describes as part of its, well, glory record of -- of --

7    terrorist attacks.

8    Q.   I turn your attention to the second, May 3rd, 1989.

9    What's that event?

10   A.   Similarly, the abduction or kidnapping of an IDF Israeli

11   Defense Forces off-duty officer, also while he was

12   hitchhiking.

13   Q.   And what's his name?

14   A.   This was Ilan Sa'doan.

15   Q.   And was Corporal Sa'doan -- was he recovered from his

16   abductors?

17   A.   No.  He was killed and his body was found almost six years

18   later.

19   Q.   And what sorts of materials do you rely upon to come to

20   the conclusion that Hamas claimed responsibility for this

21   attack?

22   A.   The same:  Hamas communiques at the time; public

23   statements at the time; this Qassam document laying out

24   kidnapping attacks and types of Hamas kidnapping attacks,

25   which lists both of these and other kidnapping attacks.

1    Q.  Are these the first events, from your understanding, that

2    Hamas claimed some responsibility for?

3    A.  In this form, yes.

4    Q.  Would you explain what you mean by "in this form"?

5    A.  Later on, Hamas officials would claim that even before

6    Hamas was created under the name "Hamas" in December, 1997,

7    meaning when the Hamas -- the leaders who formed Hamas -- were

8    operating as the Palestinian Muslim Brotherhood, later on

9    those officials -- people like Khalid Mishal -- would state

10   that even prior to this date, they had engaged in some

11   low-scale attacks.  But these are the first attacks --

12           MR. DEUTSCH:  Could we have a foundation --

13   BY THE WITNESS:

14   A.  -- in Hamas' name.

15           MR. DEUTSCH:  -- for this?  Later on?  When later on?

16           THE COURT:  Can you clarify that with the witness?

17   BY MR. FERGUSON:

18   Q.  A couple things.  You're referring to statements of Khalid

19   Mishal.

20   A.  Yeah.

21   Q.  Who is Khalid Mishal?

22   A.  Khalid Mishal is the head of the Political Bureau of

23   Hamas.

24   Q.  And you seem to be referring to some specific statements

25   of Mr. Mishal; is that correct?

1  A.   Correct.

2  Q.   What specific statements and time frame are you referring

3  to?

4  A.   Khalid Mishal was interviewed in a series of interviews at

5  great length in Arab media.  I believe it was in Al Hayat.  It

6  was about two years ago.  The interview is available in

7  English on the Internet.

8  Q.   And what was the general subject of that interview?

9  A.   The history of Hamas, the history of the Palestinian

10 Muslim Brotherhood, his participation in it.

11 Q.   And it is in that context that he made the remarks that

12 you were referencing a couple minutes ago?

13 A.   Yes.

14 Q.   Now, you said these two incidents were the first in this

15 form.  Did they have any particular significance in terms of

16 Hamas within the public eye generally, the media and

17 elsewhere?

18 A.   This marked a turning point for Hamas as a terrorist

19 organization carrying out violent attacks.  Prior to this,

20 Hamas' primary concern was in political activity, social

21 welfare activity and educational activity that would Islamize

22 Palestinian society.  At this point, Hamas began conducting

23 violent attacks, as well, and it was the same political and

24 social leaders who were involved in these military attacks.

25 Q.   From your studies, were any leaders of Hamas in any way

Levitt - direct

244

1    held responsible or held to account for these two particular

2    incidents?

3    A.   One of the founders, the spiritual leader of Hamas, Sheikh

4    Yasin, was convicted in an Israeli court for his role in these

5    abductions and murders.

6    Q.   Was he accused of directly participating in the kidnapping

7    and murder?

8    A.   No.   He's a paraplegic.   He was accused of overseeing

9    them.

10   Q.   And just as a brief aside, when Sheikh Yasin was jailed in

11   association with these two attacks, who stood in his place as

12   the leader of Hamas?

13   A.   His primary deputy at the time was Abdel Aziz Al-Rantisi.

14   Q.   And was that on the inside or the outside, as you referred

15   to it before?

16   A.   Last week we talked about leadership inside in the West

17   Bank and Gaza --

18         MR. MOFFITT:   Judge --

19   BY THE WITNESS:

20   A.   -- and outside.   Rantisi, like Yasin, was on the inside in

21   Gaza.

22   BY MR. FERGUSON:

23   Q.   And was there --

24         MR. MOFFITT:   I ask that the witness be instructed to

25   answer the question.

Levitt - direct

1           THE COURT:  That was a long answer.

2           Overruled.

3           Listen to the question, Dr. Levitt.

4           THE WITNESS:  Yes, ma'am.

5    BY MR. FERGUSON:

6    Q.  And was there someone who emerged in the wake of Sheikh

7    Yasin's arrest and conviction as the leader on the outside?

8    A.  That would be Mousa Abu Marzook.

9    Q.  After the ascension of Marzook, were there any other

10   notable operations in which Israeli soldiers or personnel were

11   kidnapped or murdered?

12   A.  Yes.

13   Q.  And when?

14   A.  As we look down the chart, Israeli soldier Alon Caravani

15   is kidnapped, Israeli soldier Nissam Toledano.  Both kidnapped

16   and murdered.  There are others as we go farther along.

17   Q.  And with respect to Caravani, what's the date of that

18   incident?

19   A.  That's 9-18 -- September 18th -- 1992.

20   Q.  And was that a military engagement in which he was

21   kidnapped?

22   A.  No.  He was off duty at the time.

23   Q.  And what was he doing when he was kidnapped?

24   A.  Again, hitchhiking.

25   Q.  Is that another incident that you attribute as having been

1    claimed by Hamas?

2    A.   Yes.

3    Q.   And what's your basis for doing so?

4    A.   Hamas communiques, the glory record we discussed earlier,

5    et cetera.

6    Q.   Was this a publicized event?

7    A.   Well publicized.

8    Q.   When you say "well publicized," please describe what would

9    make something well publicized, in your view.

10   A.   Since these were the first major Hamas attacks, they got a

11   lot of publicity, as Hamas attacks tend to do in general.  But

12   because these were something new at the time, they were very

13   well covered in the media.

14   Q.   And the next incident that you mentioned is with respect

15   to Officer Nissam Toledano.  Would you please tell us when

16   that was and what that incident was?

17   A.   Toledano was abducted in December, 1992, on his way to

18   work one morning.  Hamas leaders claimed responsibility for

19   this and demanded the release of then-jailed Hamas spiritual

20   leader and founder Sheikh Ahmed Yasin.

21   Q.   And from your studies, is the utilization of kidnapped

22   soldiers to procure the release of some figure within Hamas a

23   common practice?

24   A.   Very.

25            MR. MOFFITT:  Objection.  Leading.

Levitt - direct

1              THE COURT:  Sustained.

2              Rephrase it.

3    BY MR. FERGUSON:

4    Q.   What strategic purposes, from your studies, have you

5    gleaned for the abduction of soldiers that have been claimed

6    by Hamas?

7    A.   The primary objective in almost every instance has been to

8    seek the release of jailed Hamas operatives.  Other goals have

9    included undermining the self-rule Palestinian Authority;

10   undermining negotiations then under way, including undermining

11   negotiations for the release of Palestinian prisoners.

12             Hamas has claimed at the time that it was their

13   belief, for example, that the Palestinian Authority was going

14   to seek the release of its own members -- members of Fatah, in

15   particular; Fatah, the group associated with Yasir Arafat --

16   as opposed to seeking the release, also, of Hamas operatives.

17   Q.   And are these two incidents, the abductions of Caravani

18   and Toledano, are they publicized in what you have referred to

19   as the glory record?

20   A.   Yes.

21   Q.   With respect to Toledano, were there any reprisals or

22   responses taken by Israel based on your review of public

23   materials?

24   A.   Well, I wouldn't say it was just in response to Toledano.

25   I'd say that Toledano was the straw that broke the camel's

 1  back.

 2        After this series of attacks, Israeli authorities

 3  detained over 400 Palestinian militants and deported them to

 4  southern Lebanon to a barren hilltop called Marj al-Zuhur.

 5  Q.  And what prominent members, past or present, were among

 6  those that were removed to this hilltop in Lebanon?

 7  A.  Abdel Aziz Al-Rantisi, Mahmoud Al-Zahar, Mahmoud Abu

 8  Hanoud.  There were over 400 not only Hamas, but including

 9  Hamas leaders.

10  Q.  And from your understanding, was it primarily one

11  organization or another that was -- that comprised the group

12  of those expelled?

13  A.  The majority were Hamas, but there were also members of

14  Islamic Jihad and others.

15  Q.  Did one person among the detainees -- based on

16  public-source materials, did one person among those detainees

17  assume a leadership or spokesperson position for the group?

18  A.  The spokesperson who emerged was Abdel Al-Aziz Al-Rantisi.

19  Q.  And was the expulsion permanent?

20  A.  No.

21  Q.  Approximately how long were these individuals expelled to

22  this hilltop in southern Lebanon?

23  A.  I think it was about a year.  They came back in two waves

24  -- or two waves of returns.

25  Q.  And from your studies, what impact did these deportations

1    have on Hamas on the inside?

2    A.   They were crushing.  The Hamas leadership was suddenly

3    absent.  Hamas operatives were suddenly absent.  It was an

4    absolutely crushing blow to Hamas at the time.

5    Q.   You used the word "crush" twice.  What was it about it

6    that constituted a major blow to the organization?

7    A.   Political leadership was absent.  Social welfare activists

8    tied to the political and military wings, absent.  Militants

9    capable of carrying out attacks, absent.  The ability through

10   people involved in Hamas infrastructure to raise, move and

11   distribute funds for political/military/charitable activities,

12   absent.

13         At every level of the Hamas infrastructure, at all --

14   through all -- types of its activity, its key leadership, its

15   key operatives were suddenly no longer on the ground.

16   Q.   In the context of the glory record that you've been

17   referring to, is this deportation action something that is

18   referenced?

19   A.   I don't recall.

20   Q.   The next event on your timeline here is something that is

21   titled "The Mekholah Bombing," and I'm sure I've mangled the

22   name.

23         What is that?

24   A.   This is a suicide bombing.  The driver pulled up his van

25   full of explosives in between two civilian buses at a

Levitt - direct

1    restaurant parking lot.  It wasn't as successful as Hamas

2    would later become, meaning only one person was killed and

3    five wounded.  But this is believed to be Hamas' first

4    successful suicide bombing.

5    Q.  You indicated the first successful suicide bombing.  Did

6    you have an understanding as to whether there were prior

7    unsuccessful suicide bombing attempts?

8    A.  There were prior bombing attempts, and it's not clear if

9    they were suicide or otherwise.

10   Q.  There is reference on your chart to an event on November

11   19th of 1992.  Is that a reference to a prior attempted

12   suicide bombing?

13   A.  Yes.

14   Q.  What forms your understanding that Hamas claimed

15   responsibility for the Mekholah bombing?

16   A.  Again --

17          MR. DEUTSCH:  Judge, excuse me.  Just so we're clear,

18   he's now going back to the other bombing, right?

19          MR. FERGUSON:  Judge --

20          MR. DEUTSCH:  I think he's just, you know, playing a

21   little fast and loose here.  He started to talk about this

22   failed bombing, and then he asked him the basis for the

23   Mekholah bombing.

24          THE COURT:  His questions are appropriate.

25          MR. DEUTSCH:  Okay.

Levitt - direct

1          THE COURT:  You are free to --

2          MR. DEUTSCH:  I just want --

3          THE COURT:  -- cross-examine on it.

4          MR. DEUTSCH:  -- to be clear that we're going back to

5     a different incident now.

6          THE COURT:  He is free to ask his questions however

7     he would like.  The government bears the burden.  They can put

8     in their case how they would like.

9          Yes?

10         MR. FERGUSON:  For the record, I object to the

11    argumentive nature of these objections.  That was a bit of a

12    speech with respect to what I was doing in the context of the

13    government's direct examination and I think it's

14    inappropriate.

15         THE COURT:  That one was overruled.

16         Ask your next question.

17    BY MR. FERGUSON:

18    Q.  Is the Mekholah bombing referenced in the Hamas glory

19    record?

20    A.  It is.

21    Q.  We've made a number of references to the glory record.

22         MR. FERGUSON:  Permission to approach, Judge?

23         THE COURT:  You may.

24    BY MR. FERGUSON:

25    Q.  Where, again, have you seen and do you understand the

1   glory record to have been published?

2   A.  It's on a Hamas Web site.

3   Q.  Have you seen English language versions of it published in

4   various places?

5   A.  I have.

6   Q.  I'm handing you what's marked as Government Exhibit Glory

7   Record --

8            (Document tendered.)

9   BY MR. FERGUSON:

10  Q.  -- and Translation.

11           Is this an example of a Web site publication of the

12  glory record that you're referring to?

13  A.  Yes.

14  Q.  It is in Arabic and -- is it not?

15  A.  It is.

16  Q.  All right.

17           You don't speak Arabic; is that right?

18  A.  Correct.

19  Q.  All right.

20           So, what do you do, in this instance and generally,

21  to determine what that document is and to conduct your

22  analysis of that document?

23  A.  I get a translation from an accredited Arabic language

24  translator and usually, as was the case in this case, also sit

25  down with that person to go over their translation in Arabic,

Levitt - direct

253

1   so that I can have a semblance of comfort that the translation

2   is accurate.

3           Often, I will sit down with another Arabic language

4   linguist to then independently confirm usually not every word,

5   but that the gist of the translation is accurate.  It's

6   important for me to be able to have that kind of comfort,

7   since I'm working off a document that I can't read myself.

8           In many cases, including this one, the glory record

9   is something that is used by many scholars.  And, so, many

10  others have gone through the same exercise, as well.  And that

11  gives me additional level of comfort.

12  Q.  At the very bottom of the page that's projected, Page 1 of

13  your chart, there's a reference to "the Oslo Accord

14  formalized."

15          Would you please explain what that entry is for?

16  A.  This is the White House ceremony at which the Oslo Accord

17  or the Declaration of Principles was signed between Israel and

18  the PLO -- the Palestine Liberation Organization -- marking

19  the official start of the Oslo peace process.

20  Q.  And September 13th, 1993, what specifically happened on

21  that day?

22  A.  I'm sorry?  Say again, please.

23  Q.  September 13th, 1993, was there some particular event or

24  ceremony that occurred that day?

25  A.  Yes.  That was the White House ceremony, the signing of

Levitt - direct

254

1    the treaty, the famous handshake between Arafat and Rabin on

2    the White House lawn.

3    Q.  All right.

4          Was this a publicized event?

5    A.  Yes.

6    Q.  What was Hamas' position with respect to the Oslo Accords?

7          MR. MOFFITT:  Objection.  Asked and answered.

8          THE COURT:  Overruled.

9    BY THE WITNESS:

10   A.  Hamas leaders opposed this event.

11   BY MR. FERGUSON:

12   Q.  I'm going to jump ahead to 1994 on the top of the second

13   page of your chart.  And there are two references there for

14   April of 1994.  I direct your attention to the first one

15   first, the Afulah car bombing.

16         What was that event?

17   A.  This was a suicide bombing at a bus stop in northern

18   Israel in the City of Afulah in which eight Israelis were

19   killed and five were injured.

20   Q.  And the second?

21   A.  This was a few days later, another bus bombing, also in

22   northern Israel, in Hadera, killing six and wounding 28.

23   Q.  And what's your basis for attributing claims of

24   responsibility to Hamas for these two incidents?

25   A.  These are recorded in the glory record.  Hamas issued

1    communiques and many statements for both of these describing

2    these as a seri- -- part of a series of attacks and claiming

3    more would come.

4    Q.  The glory record, to your knowledge and from your studies,

5    has it ever been renounced or disclaimed by any public member

6    of Hamas?

7          MR. MOFFITT:  I'm going to object.  There's no

8    requirement that anybody renounce anything.

9          THE COURT:  You can answer that "Yes" or "No."

10          And, then, you can lay a foundation.

11          The question was "to your knowledge."

12    BY THE WITNESS:

13    A.  No.

14    BY MR. FERGUSON:

15    Q.  Have you ever seen a public statement or a media report

16    reflecting that any leader of Hamas has renounced or

17    disclaimed the glory record?

18    A.  No.

19          MR. MOFFITT:  Same objection.

20          THE COURT:  Overruled.

21    BY MR. FERGUSON:

22    Q.  The next event on your chart, "May 4th, 1994, Gaza-Jericho

23    Agreement, Oslo 1."

24          What is that a reference to?

25    A.  Under the Oslo Accords, there were several milestones,

 1  specifically for when certain authorities would be given to

 2  the Palestinian self-rule government and when Israeli

 3  authorities would begin to withdraw from certain areas.  So,

 4  this was the first major milestone when Israeli authorities

 5  withdrew from most of the Gaza Strip -- there were still some

 6  settlements -- and the Jericho area in the West Bank.

 7  Q.   From your studies, is there any significance to the close

 8  proximity in the timing of the Afulah and Hadera bombings to

 9  the Gaza-Jericho agreement?

10  A.   Hamas traditionally conducts attacks in periods of

11  negotiations in an effort to undermine them.  This would fit

12  that pattern.

13  Q.   Is there any -- is there anything significant about the

14  April, 1994, time frame regarding these two particular bombing

15  attacks?

16  A.   This is in the period during which the Gaza-Jericho

17  agreement was being finalized.  Critical negotiations were

18  going on at the time leading up to the May 4th signing of this

19  interim agreement.  Until this point, the Israelis had not

20  withdrawn from territory.  This marked a watershed event that

21  Hamas sought to undermine.

22  Q.   Was there any prior event that your research of public

23  sources, including media reports, would reflect to be a

24  precipitant of these two bombings?

25  A.   There was an attack by a Jewish terrorist in Hebron in the

1   West Bank at the Ibrahimi Mosque, which is also referred to by

2   the Jews as the Cave of Patriarchs, where some 40 worshippers

3   were shot in the back as they knelt in prayer in cold blood.

4          The event was -- the event -- the attack -- was

5   condemned by Palestinians, Israelis and really everybody else

6   alike.  And Hamas claimed at the time that it would conduct a

7   series of attacks to avenge those 40-something murders.

8   Q.  And in relation to when the Hebron attack or the Hebron

9   massacre occurred versus the April 6th, 1994, Afulah car

10  bombing, what was the proximity in time?

11  A.  Weeks.

12  Q.  Is there a typical mourning period in Muslim -- in the

13  Muslim religion, as you understand it?

14          MR. MOFFITT:  I'm going to object.  Again, he's not

15  an expert on the Islamic religion.

16          THE COURT:  Rephrase your question.

17  BY MR. FERGUSON:

18  Q.  As you understand it, is there anything significant with

19  respect to the timing of these two attacks in relation to what

20  you understand to be the mourning period in the Muslim

21  religion?

22          MR. MOFFITT:  Same objection.

23          THE COURT:  Overruled.

24  BY THE WITNESS:

25  A.  There was significant media coverage at the time

1   reflecting that the attacks occurred after the traditional

2   mourning period within the Muslim religion, so that that time

3   had passed between the Hebron massacre by this Jewish

4   terrorist and, then, the terrorist attacks by Hamas.

5   BY MR. FERGUSON:

6   Q.  And engaging in what it claimed responsibility for as

7   suicide attacks, did Hamas -- from the materials that you have

8   seen in your work -- put aside the tactic of kidnapping or

9   abducting soldiers?

10  A.  It continued to abduct or kidnap soldiers.  It's a tactic

11  that it has used sporadically.

12  Q.  And when was the next time that such an abduction

13  occurred, at least as you have it recorded in your timeline?

14  A.  That would be October, 1994.

15  Q.  And what was that incident?

16  A.  An Israeli soldier, who also happened to be an American

17  citizen, named Nahshon Wachsman was kidnapped in Israel.  The

18  event transpired over several days during which he was

19  kidnapped.  Hamas leaders publicly took credit for the

20  kidnapping; announced that they were holding him; demanded the

21  release of Hamas prisoners; and, threatened to kill him if

22  Sheikh Yasin and others were not released.

23          Israeli commandos working with their Palestinian

24  counterparts identified the hideout, raided it; and, in the

25  context of the raid, several Hamas operatives were killed,

Levitt - direct

259

1  Wachsman was killed and one of the Israeli commandos was

2  killed.

3  Q.  And were these all publicly-reported events?

4  A.  Yes.

5  Q.  And is this incident also in the glory record?

6  A.  I believe it is.

7  Q.  I turn your attention to specifically the translation that

8  you have in front of you to No. 94.

9  A.  Yes.

10  Q.  So, the Wachsman incident is reported in the glory record?

11  A.  Yes.

12       MR. DEUTSCH:  Judge, I'm going to object.  If he

13  doesn't want me to say it in front of the jury, I think I'll

14  need to say it to you outside the presence of the jury.

15       THE COURT:  Can you give me any further hint about --

16       MR. DEUTSCH:  I just think this -- there's no

17  authentication of this so-called glory record.  He got it off

18  a Web site.

19       THE COURT:  Okay.

20       It is a foundation as to the glory record.

21  BY MR. FERGUSON:

22  Q.  Turn your attention to the first page of the glory record

23  and to the first page as translated.

24       What do you understand the header information to

25  reflect as to the source of this information?

Levitt - direct

260

1   A.   From a Web site called the Palestine Information Center.

2   In my translation, it's translated as Palestinian Information

3   Center.   I think the actual Web site is Palestine, i-n-e at

4   the end.

5        This is widely known within the academic community

6   and regarded by Hamas to be a Hamas Web site.

7        MR. DEUTSCH:   Objection.

8        THE COURT:   Overruled.

9   BY MR. FERGUSON:

10  Q.   Was there any consequence to the Wachsman kidnapping and

11  murder to the relations between the Israelis and Palestinian

12  Authority?

13  A.   Israel and the Palestinian Authority had been engaged in

14  negotiations over several things, including an economic accord

15  and an agreement to release still further Palestinian

16  prisoners.   Those negotiations were suspended because of this

17  attack.

18  Q.   And, as reflected in your chart, was there another

19  significant event that occurred soon after the Wachsman

20  abduction?

21  A.   Yes.

22        Almost immediately, several days later, there was

23  another suicide bombing aboard a bus in Tel Aviv.

24  Q.   And how many people died in that attack?

25  A.   21 people were killed and 56 injured.

Levitt - direct

1   Q.  And was this event recorded in the Hamas glory record?

2   A.  Yes, I believe it was.

3   Q.  Do you want to check?

4   A.  Sure.

5          MR. DEUTSCH:  Judge, I object to his use of this

6   glory record.  I don't think they've established any

7   reliability as to what -- who published it, whether it's

8   accurate, whether it's linked to Hamas.  He just says -- I'll

9   just leave it at that.

10         THE COURT:  Mr. Ferguson?

11         MR. FERGUSON:  Judge, that sounds like cross-

12   examination.

13         THE COURT:  He --

14         MR. FERGUSON:  He's identified this particular

15   publication of the glory record as coming from the Palestine

16   Information Center, which is relied upon generally in his

17   field of expertise as a source of materials regarding Hamas.

18         THE COURT:  Objection overruled.

19         And the document itself is not coming in as evidence.

20   He is relying on it in giving his opinion.  You are free to

21   cross-examine on that.

22   BY MR. FERGUSON:

23   Q.  Let me ask you -- I keep going back to the glory record --

24   in all of these instances that we've been discussing, are the

25   events and claims of responsibility in some fashion publicized

1  in any other media?

2  A.  Certainly.  All these attacks have been covered in the --

3  been covered in the media.

4  Q.  And what sorts of media?

5  A.  Western media, CNN; American media, NBC; radio,

6  television, print; Chicago Tribune.

7  Q.  How about the Middle East?

8  A.  Certainly.

9  Q.  And in the context of the publicizing of those events, do

10  the media reference statements or claims by Hamas or Hamas

11  leadership?

12  A.  They do.  They'll often reference claims by Hamas

13  leadership and they'll reference claims that have been made on

14  the Internet, especially on known Hamas Web sites, statements

15  Hamas leaders make to the press, Hamas communiques, et cetera.

16  Q.  And with respect to the events that we have been

17  specifically talking about, have any Hamas leadership

18  retracted their claim of responsibility respecting the event?

19          MR. MOFFITT:  Objection.

20  BY THE WITNESS:

21  A.  Not to my knowledge.

22          THE COURT:  Overruled.

23  BY THE WITNESS:

24  A.  Not to my knowledge.

25  BY MR. FERGUSON:

Levitt - direct

1  Q.  The Web site of the Palestine Information Center, the one

2  that you've referenced as regarded in your field as tied to

3  Hamas, are there other Web sites that, in your field, experts

4  regard as a source of material coming directly from Hamas?

5  A.  Yes.

6  Q.  And can you name some of them?

7  A.  Qassam, as in the Qassam Brigades, has its own Web site.

8  The Hamas student groups on campuses, Islamic Bloc -- in

9  Arabic, Kutla Islamiya -- have both an overall Web site and

10  many of the individual Islamic Bloc student groups on

11  individual campuses have their own Web sites.

12        Hamas is known to run a Web site geared at children

13  called Al-Fateh.  There are several.

14  Q.  And you've reviewed information from those sites in the

15  past?

16  A.  Yes.

17  Q.  And you've relied upon translators to assist you in that

18  process?

19  A.  When they're not in English, yes.

20  Q.  And are some of them in English?

21  A.  Yes.

22  Q.  Are they published solely in the Middle East?

23  A.  Not the ones that are on the Internet for sure.  You can

24  get them anyway -- anywhere.

25  Q.  Are there English language versions of these Web sites?

1   A.   Yes.   The glory record, for example, is published, I

2   believe, in Arabic.   Others appear in English.

3   Q.   And have you researched and, in the course of your work,

4   reviewed statements or published remarks that are on those

5   English language versions of those Web sites?

6   A.   I have.

7   Q.   And have any of them reflected a disclaiming of what is in

8   the glory record?

9   A.   No.

10  Q.   October 19th, 1994, we've been discussing the suicide

11  bombing aboard the Dizengoff Street bus.   What sorts --

12  without reading from the glory record, what sorts -- of

13  information is stated in the glory record with respect to that

14  particular attack?

15  A.   I'd have to look at the glory record to tell you anything

16  specific to this attack.   In general, the entries will name

17  the perpetrator of the attack; will describe the attack; will

18  laud the attack, present it as a victory over the Israeli

19  enemy, penetration of the Israeli defenses; describe the

20  number of killed and wounded.

21  Q.   The next event in your timeline, "August 21st, 1995,

22  Jerusalem bus bombing."   Would you please tell the jury what

23  this refers to?

24  A.   This was another suicide bombing targeting a Jerusalem

25  civilian bus in which four people were killed and nearly a

Levitt -
265

1    hundred wounded.  One of the people killed was an American

2    from Connecticut.

3    Q.  We were talking about Sgt. Wachsman a little while ago.

4    From your review of public source materials, is there anything

5    to reflect whether he had any ties to the United States?

6            MR. DEUTSCH:  Judge, I object.  First of all, it was

7    brought out.  Second of all, it's irrelevant and prejudicial

8    and purposely done to prejudice us.

9            THE COURT:  Do you want to respond?

10           MR. FERGUSON:  I'd love to respond, but it will take

11   the form of fairly extensive argument.  I think -- it is

12   prejudicial, Judge.  I think it's appropriate in this context.

13   We have a case here about the support from the United States

14   of --

15           MR. MOFFITT:  Your Honor, I --

16           MR. FERGUSON:  -- activities --

17           THE COURT:  Yes, wait, wait.  Let us go to sidebar.

18           (Proceedings had at sidebar:)

19           MR. DEUTSCH:  Can I make myself a little more clear,

20   because I didn't want to in front of the jury?

21           It was my understanding that the Court told the

22   government to take those American flags off the --

23           THE COURT:  I did.

24           MR. DEUTSCH:  -- flow of the record.  And it seemed

25   to me what underlying the Court's ruling was, is that we're

Levitt -

1    not going to distinguish who the victims of these bombings

2    are, if they're -- if they happen to be an American citizen or

3    a Dutch citizen or an Israeli citizen.  It's a suicide

4    bombing.

5          And they shouldn't be able to underline, as they did

6    and snuck in, all the people who are victims that are U.S.

7    citizens.  I don't see that has any relevance here.

8          THE COURT:  That was not the focus of my prior

9    ruling.  My prior ruling was I thought the American flag icon

10   was prejudicial.  I also made them take out the Hamas icon

11   flag that was next to -- or banner that was next to -- each of

12   the entries.

13         You are raising a separate objection now:  Can they

14   even go into the underlying text -- or subject matter --

15         MR. DEUTSCH:  The nationality.

16         THE COURT:  -- that an American was killed.

17         MR. FERGUSON:  First off, the objection as stated by

18   Mr. Deutsch before was with respect to the suggestiveness of

19   the icon of the American flag.  It was not with respect to the

20   identity.

21         THE COURT:  That is what my ruling was on.

22         MR. FERGUSON:  Second of all, all of the versions of

23   this have included this information and there was no prior

24   objection.

25         Third, this is a case about support from the United

1    States, a conspiracy to support from the United States an

2    enterprise that's engaged in terrorist acts abroad.  And its

3    significance, given the arguments that have been stated in

4    opening to an American jury standing in judgment of the

5    meaning of all of this, I think, is highly relevant.  It

6    matters.

7         It matters that there are illegal acts being taken

8    from the United States to serve an enterprise engaged in a

9    pattern of murderous activities and murder conspiracy, as

10   stated in the indictment, that result in the deaths of

11   Americans.  Highly relevant.

12        MR. MOFFITT:  Your Honor, the statute does not

13   require a death of an American.  The statute itself doesn't

14   speak to the death of an American.

15        THE COURT:  That is correct.

16        MR. MOFFITT:  The sole purpose for putting this in is

17   to attempt to smear.  There's no -- it's not relevant whether

18   it's an American or not.  If the statute is to be accepted, if

19   the government -- there's no need to prove it was an American.

20   And the truth of the matter is even the government's own

21   evidence will show that Hamas has never attacked a place

22   outside the occupied territories.

23        So, what is the relevance of them being American to

24   the government's proof?

25        MR. FERGUSON:  The argument that was made by the

Levitt -
268

1   defense is this is purely freedom fighting that's occurring

2   over in Palestine.  It's not, Judge.  The intentional --

3   sorry, the collateral damage for intentionally reckless acts

4   of murder have resulted in the deaths of Americans.  And given

5   the fact that the jury has been -- had suggested to them by

6   the defense that this is all something that's going on over

7   there, analogous to the American Revolution, it's not.

8          It's something that has an impact on America and

9   Americans, and is properly within the scope of this case.  And

10  it is an understood and publicized outcome of the broader

11  activities of the enterprise that has been charged here with

12  engaging in these murderous attacks.

13         THE COURT:  Last response, and then I am going to

14  rule.

15         MR. MOFFITT:  The fact that it's publicized is

16  irrelevant.

17         THE COURT:  I agree about that.

18         MR. MOFFITT:  Absolutely doesn't have any -- I mean,

19  the idea that there might have been a collateral casualty -- I

20  mean, we talk about collateral casualties in virtually every

21  war and everything -- I'm suggesting to you that you don't --

22  they don't need to prove it to prove their case, and the only

23  point of it is to -- is prejudice here -- is an attempt to

24  prejudice the jury.

25         MR. FERGUSON:  Judge, first of all, the organization

1   is reckless in how it goes about these attacks and certainly

2   does not act to avoid direct impact to Americans.

3          Second of all, it is engaged in attacks that are in

4   places where it could reasonably be expected that Americans

5   were going to die, one of them occurring at a bar that is

6   literally yards from the American Embassy.

7          THE COURT:  Your objection is overruled.

8          I find that it is probative, and it does directly

9   respond to arguments that you made in opening statements.  The

10  probative value is not substantially outweighed by any

11  prejudicial effect.  And you are free to cross-examine and

12  cross-examine the expert on the fact that no bombings have

13  been targeted on United States ground.

14         Objection overruled.

15         (Proceedings had in open court:)

16         MR. MOFFITT:  May I have a continuing line of

17  objection?

18         THE COURT:  You may.  The record will reflect that.

19         MR. FERGUSON:  I'm not sure if the question was

20  answered before, Judge.  Could I have it read back?

21         THE COURT:  Yes.

22         (Record read.)

23         MR. DEUTSCH:  Judge, I object.  That was asked and

24  responded to that he was an Israeli Defense Force military

25  soldier and an American citizen.

1           THE COURT:  You may answer.

2    BY THE WITNESS:

3    A.  He was an American citizen.

4    BY MR. FERGUSON:

5    Q.  Jump ahead to a string of incidents that are dated in

6    February and March of 1996, starting "February 25th, 1996,

7    Jerusalem No. 18, Suicide Bus Bombing 1."

8           Would you please tell the jury what you are

9    referencing in that item?

10   A.  This is another suicide bus bombing for which Hamas

11   claimed responsibility.  It was the bombing of the No. 18 line

12   bus in Jerusalem near the central bus station, killing 26

13   people and injuring 80, including two Americans.

14   Q.  And the second incident, March 3rd, 1996, approximately a

15   week later, what is that to?

16   A.  That is another bombing of that same bus line, the 18 bus,

17   almost -- almost -- a week to the hour from the previous one,

18   killing 19 and injuring six.

19   Q.  And a third one, the very next day, March 4th, 1996,

20   Dizengoff Square suicide bombing.  What's that a reference to?

21   A.  That's a suicide bombing in Tel Aviv in one of the largest

22   pedestrian squares downtown called Dizengoff.  It was claimed

23   by Hamas and killed 12.

24   Q.  Each of these were publicly reported events?

25   A.  Yes.

Levitt - direct

1  Q.  Do they appear in the Hamas glory record?

2  A.  I believe so.

3  Q.  Would you --

4  A.  Sure.

5  Q.  -- like to check.

6          (Brief pause.)

7  BY THE WITNESS:

8  A.  The two attacks on the No. 18 bus are in here, and it does

9  not appear that the Dizengoff attack is in here.

10  BY MR. FERGUSON:

11  Q.  These three bombings, I want to focus on having you

12  discuss a little bit as to their strategic significance.

13          Have you studied in particular the dynamics between

14  suicide -- between terrorist attacks and negotiations, and

15  specifically negotiations on the peace process?

16  A.  Yes.

17  Q.  And have you researched, analyzed and written about this

18  particular sequence?

19  A.  In detail.

20  Q.  And where -- have you published anything on that subject?

21  A.  Yes.  My Ph.D. dissertation includes three case studies.

22  One of them is this string of attacks.

23  Q.  And from your work, research and analysis on this

24  particular string of attacks, did you -- have you come to any

25  conclusions about their strategic significance to peace

Levitt - direct

1   negotiations?

2   A.   Strategically, they are, in part, aimed and intended to

3   undermine those negotiations.

4   Q.   And would you please explain in the context of what was

5   going on at that particular period in Israeli-Palestinian

6   relationships why you come to that conclusion?

7   A.   Shortly before these attacks, a Jewish extremist had

8   assassinated Israeli Prime Minister Rabin.  His deputy,

9   then-Foreign Minister Shimon Peres, became the Acting Prime

10  Minister and called for early elections in Israel.

11          He, Peres, was riding a significant wave of sympathy

12  and support, in large part, because of the Rabin

13  assassination.  Peres, Rabin and Arafat had won the Nobel

14  Peace Prize for their efforts on -- in terms of the Oslo

15  Accords.  And it was widely expected that Peres was going to

16  win the election with a significant mandate.  And he had very

17  publicly announced that his primary intention would be to

18  finalize the Oslo Peace Accords and come to a permanent peace

19  settlement with the Palestinians.

20  Q.   And, as you've written about it, what was the impact of

21  these three bombings on that particular set of facts and

22  circumstances?

23  A.   The bombings, the fact there were so many bombings,

24  multiple bombings in the same locations completely undermined

25  Israelis' sense of security.  Many Israelis believed that the

Levitt - direct

273

1   Palestinian Authority had not done enough to crack down on

2   Hamas and, therefore, was not an appropriate partner for

3   peace.

4           Peres' opponent, Benjamin Netanyahu, portrayed Peres

5   as someone who was going to give all or part of Jerusalem to

6   the Palestinians in negotiations.  Coming on the heels of

7   bombings in Jerusalem and, in general, Jerusalem being an

8   issue that is a core negotiating issue for both Palestinians

9   and Israelis, that was a significant shot at Peres.

10          The lead was quickly eliminated and, in fact, Peres

11  lost.

12  Q.  And from that strategic vantage point, then, were these

13  incidents successful?

14  A.  At multiple levels.  Strategically, in terms of

15  undermining the peace process; undermining the Israeli

16  proponents for peace; equally undermining Palestinian

17  proponents for peace whose reputations are intimately

18  intertwined with the peace process.

19          Tactically, in terms of carrying out successful

20  attacks; murdering large numbers of individuals; undermining

21  Israeli civilians' sense of security.

22  Q.  You touched on a number of incidents in which Americans

23  died.  Based on your studies have you found any evidence that

24  Americans were specifically targeted in attacks claimed by

25  Hamas.

1   A.   There's evidence that Hamas has knowingly conducted

2   attacks in places where Americans are known to be present.

3   Attacks, for example, at --

4           MR. MOFFITT:  Objection.  Foundation.

5           THE COURT:  Do you want to clarify the foundation?

6           Sustained.

7   BY MR. FERGUSON:

8   Q.   Let's break this down.

9           Have you encountered any -- focusing on this

10  particular time frame -- that being the mid-1990s and the

11  period up to March of 1996 -- from the public-source

12  materials, including statements of Hamas leaders and published

13  materials from sites associated with Hamas, have you seen any

14  statements or declarations attributed to Hamas that

15  specifically claims that the attacks or incidents were

16  directed to Americans?

17  A.   Not in terms of this string of attacks.  Hamas --

18          MR. MOFFITT:  Asked and answered.

19          THE COURT:  Sustained.

20  BY MR. FERGUSON:

21  Q.   With respect to this specific string of attacks in which

22  some Americans died, was there anything that you read

23  attributable to Hamas or its leadership to indicate that it

24  was their intention specifically to kill Americans?

25  A.   Not specifically to kill Americans.

Levitt - direct

1    Q.  From your research on the strategic operations of Hamas

2    and its military, is there anything about the locations where

3    some of these bus bombings occurred that would make it more or

4    less likely that Americans or interna- -- people from other

5    countries might be impacted physically directly by these

6    attacks?

7    A.  This string of attacks, and many others we've discussed --

8              MR. MOFFITT:  Objection.  Is that "Yes" or "No," your

9    Honor?

10             THE COURT:  Correct.

11             Answer that "Yes" or "No."

12             And, then, you can lay your foundation.

13   BY THE WITNESS:

14   A.  Yes.

15   BY MR. FERGUSON:

16   Q.  And have you been focusing on this string of attacks?

17   Have you been to these locations personally?

18   A.  Yes.

19   Q.  And have you reviewed and observed these locations with

20   reference to specific attacks that have occurred that you

21   referenced in this chart?

22   A.  Yes.

23   Q.  And have you spoken, in the course of your studies, to

24   officials, to individuals from various walks of life directly

25   familiar with these locations on the subject of the tactical

Levitt - direct

276

1   choice of these particular locations?

2   A.  Yes.

3   Q.  And from all of that, have you, from your work, come to

4   any conclusions about the likelihood that these public attacks

5   may or may not result in harm to people from countries other

6   than Israel?

7   A.  These three attacks are all in central tourist locations.

8        MR. MOFFITT:  Objection.  "Yes" or "No"?

9        THE COURT:  Overruled.

10  BY MR. FERGUSON:

11  Q.  What are your conclusions in that regard?

12  A.  These three attacks are all in locations that are central

13  tourist locations where tourists from all over the world

14  congregate.

15       They're also targeting generally civilian areas with

16  a means of attack -- suicide bombing -- that is

17  indiscriminate.  And, so, certainly, the attackers cannot

18  claim to have been targeting one civilian over another.  When

19  you conduct an indiscriminate suicide bombing in a civilian

20  area, certainly one that is a tourist attraction, one should

21  expect that civilians of multiple nationalities are going to

22  be killed.

23  Q.  Are you familiar with the name "David Boim" from your work

24  on the book "Hamas"?

25  A.  I am.

1  Q.  And who do you understand David Boim to be?

2  A.  David Boim was an American citizen living in Israel in the

3  West Bank who was shot in an attack claimed by Hamas and -- by

4  operatives driving by a group of teenagers.  He was a

5  teenager.  He was killed and one other person was injured.

6  Q.  Was there anything with respect to the claims of

7  responsibility from Hamas that would reflect that they

8  intended specifically to kill an American?

9  A.  No.

10  Q.  Your next two entries -- July 30th, 1997, at the bottom of

11  Page 2; and, September 4th, 1997 -- two more suicide bombing

12  incidents.

13          First, reference to the first, July 30th, 1997.

14  What's being referenced in that event?

15  A.  This was a double suicide bombing, meaning there were two

16  suicide bombers deployed, who detonated themselves and

17  explosives they were wearing inside the Mahane Yehuda Market,

18  an outdoor but enclosed -- partially; parts of it are

19  enclosed; the parts where the attack was are enclosed --

20  market in Jerusalem.  16 people were killed, including an

21  American.  178 were wounded, including two Americans.

22  Q.  And the September 4th, 1997, incident?

23  A.  This is a triple suicide bombing, also claimed by Hamas.

24  Q.  When you say "triple" --

25  A.  Means three suicide bombers who were deployed.  And

Levitt - direct

278

1   they'll be deployed not standing next to each other, but

2   within eyesight usually of each other but some distance, as a

3   means to further casualties.

4   Q.  Okay.

5          And I interrupted you.  More generally, what was this

6   incident?

7   A.  Three suicide bombers deployed and detonated themselves --

8   five people were killed, 181 wounded -- along the Ben Yehuda

9   Pedestrian Mall.  It's an area blocked off from cars.  Cafes,

10  stores, a major tourist attraction in downtown Jerusalem.  One

11  American citizen was killed, six were wounded.

12  Q.  These two incidents, did they appear in the Hamas glory

13  record?

14  A.  I don't recall.

15          (Brief pause.)

16  BY THE WITNESS:

17  A.  They do.

18  BY MR. FERGUSON:

19  Q.  And do you have any personal familiarity with either of

20  these two incidents?

21  A.  I was in the West Bank for the first one, July 30th.  I

22  believe we referenced this last week.  This is the one that I

23  then observed after the fact that evening.  Observed the

24  location, not the attack.

25  Q.  And by -- and, in general, your understanding in your

Levitt - direct

279

1   review of materials and your studies, was there anything

2   strategically being sought with respect to these two

3   incidents?

4   A.   There were peace processes, peace negotiations going on at

5   that time.   One of them, I forget which, immediately preceded

6   a major diplomatic visit by, I think it was, then-Secretary of

7   State Madeleine Albright.

8   Q.   Your timeline next picks up in 2001.   Does that reflect

9   that suicide bombings and other terrorist attacks stopped

10  during the intervening period?

11  A.   No.   We do reference one here in 1998.   There were others.

12  Like I said, this is a selection.

13  Q.   At some point, your chart picks up, again, with other

14  suicide bombing incidents.   Is that a reflection of any

15  particular events that were occurring in Israeli-Palestinian

16  relationships?

17  A.   Two.   First, in the late 1990s, Israelis and the

18  Palestinian Authority went on a significant push to try and

19  secure a peace deal.   And that included a significant

20  crackdown by both Israeli and Palestinian authorities which

21  thwarted a significant number of attacks.   So, there was

22  actually a period where there were fewer successful, though

23  not necessarily fewer attempted, attacks.

24          But, in September, 2000, after that surge in peace

25  negotiations failed, the violence flared, again.

Levitt - direct

1   Q.  And was that flaring of violence in connection with any

2   particular event?

3   A.   The eruption of the second intifada or the second uprising

4   in September, 2000, and the collapse of the peace process,

5   which had culminated in a very high-profile effort to secure a

6   final peace deal here in the United States at Camp David with

7   significant presidential -- U.S. presidential -- involvement.

8   When that failed and the intifada -- or second intifada --

9   erupted, this second intifada was far more violent than the

10  first and suicide bombings, in particular, started at a quick

11  pace.

12  Q.  And, in general, the second intifada, what impact, based

13  on your studies, did it have on the standing of the leader of

14  the Palestinian Authority at the time?

15  A.   It undermined his authority -- Yasir Arafat at the time --

16  significantly, as well as the authority of Israeli leaders

17  whose reputations had been pegged to the success of this peace

18  process.

19          MR. FERGUSON:  Judge, I'm wondering if we could take

20  a short break right now.

21          THE COURT:  Sure.

22          We will pick up at about 1:30.

23          (Jury out.)

24          THE COURT:  Do you need the Court, Mr. Ferguson?

25          MR. FERGUSON:  No, Judge.

Levitt - direct by Ferguson

1          THE COURT:  Okay.

2          I will see you at 1:30.

3          (Brief recess.)

4     (Jury enters courtroom.)

5          THE COURT:  You may be seated.

6          Ladies and gentlemen, I apologize for the warm

7     temperature.  I've got the thermostat as low as it will go and

8     I've requested somebody to come up and see what they can do.

9          So I'm hoping next thing will happen is you'll be

10    freezing in here, but I'm hoping to get it adjusted.

11          Mr. Ferguson, you may continue.

12          MR. FERGUSON:  Thank you, Judge.

13    BY MR. FERGUSON:

14    Q.  Just before we broke, Dr. Levitt, we were having some

15    discussion about the indiscriminate nature of some of these

16    attacks.

17          I'm going to turn your attention to entry on

18    October 29, 1998 that is reflected in your timeline and ask

19    you to please describe for the jury what event is being

20    referenced there?

21    A.  This was a suicide bombing in the Gaza Strip at a Jewish

22    settlement targeting a school bus carrying children.  The bus

23    had an Israeli military escort vehicle which was able to

24    position itself between the bomber's car and the bus before it

25    could reach the bus.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 76 of 215
Levitt - direct by Ferguson
282

1              So the children in the bus were saved, but the

2    drivers in the military vehicle, the soldiers, were killed.

3    Q.  And this was before the second Intifada, is that right?

4    A.  Correct.

5    Q.  And approximately when was it the second Intifada emerged?

6    A.  September 2000.

7    Q.  All right.  Moving forward to 2001, which is when your

8    next entry is, March 4, 2001, what is that incident reflected

9    there?

10   A.  A bombing at a bus stop, a suicide bomber detonated his

11   explosive at a central bus station in the northern Israeli

12   city of Netanya.  There were multiple statements issued by

13   Hamas leaders taking credit for this attack, including Abdel

14   Al-Aziz Al-Rantisi and Mahmoud Al-Zahar.

15   Q.  And, again, continuing on, with respect to all of these

16   attacks, they were all highly publicized events?

17   A.  Yes.

18   Q.  And as reported in the general media, each of them having

19   some form of statement or declaration from Hamas claiming

20   responsibility?

21   A.  Yes.

22   Q.  June 1, 2001, Dolphinarium bombing.  What's that a

23   reference to?

24   A.  Dolphinarium is a night club along the beach in Tel Aviv,

25   Israel.  This was a suicide bombing.  The bomber moved himself

Levitt - direct by Ferguson

1   into the middle of a crowd of teenagers on a Saturday night,

2   killing 20 and injuring over 120.

3   Q.   August 9, 2001.

4   A.   Suicide bombing at a pizzeria at one of the busiest

5   corners in downtown Jerusalem, killing 15 and wounding more

6   than 90, including several children.

7   Q.   And three or four weeks after that, September 4th, 2001?

8   A.   Another suicide bombing in downtown Jerusalem, 13 people

9   were injured.  It was in the middle of the morning rush hour.

10  Q.   Five days later, September 9th of 2001, what's referenced

11  there?

12  A.   Bombing at a train station in far northern Israel, not far

13  from the border of Lebanon, Nahariya.  Three people are killed

14  and approximately 90 injured when a bomber detonated his

15  explosive at a train station.

16  Q.   From your study and research, I'm going to ask you

17  questions, these attacks that you've been going through, Tel

18  Aviv, Netanya, Jerusalem, these are in different locations

19  within the country.

20          From your studies, what is the strategic

21  significance, if any, for the fact of these attacks occurring

22  in different places in Israel?

23  A.   The purpose is to undermine public --

24          MR. MOFFITT:  Objection.  Some of these attacks are

25  in the occupied territories.

Levitt - direct by Ferguson

284

1  BY MR. FERGUSON:

2  Q.  And the occupied territories.

3  A.  The purpose of attacks is to undermine Israeli sense of

4  public security.  Most of these are in Israel proper.  Some of

5  these are targeting Jewish settlements.  There's that one in

6  1998.

7       By attacking all over the country, it sends a message

8  that Israelis aren't safe anywhere in the country.

9  Q.  December of 2001, there are two entries on back-to-back

10  days, December 1st and December 2nd.  What do those entries

11  reference?

12  A.  Another suicide bombing at the Jerusalem Pedestrian Mall.

13  11 dead, over 100 injured.  This was also a double suicide

14  bombing, meaning two suicide bombers were deployed in this

15  case 20 minutes apart at different locations along the mall.

16       The one the next day was in Haifa in northern Israel.

17  15 Israelis were killed and 60 wounded when a suicide bomber

18  detonated his explosive on a bus in a jointly Arab-Jewish

19  neighborhood.  Haifa in particular is known for the

20  Jewish-Arab co-existence there.

21  Q.  For many of these incidents, you've indicated that one of

22  the sources of information that you relied upon in your field

23  would include that Hamas claimed responsibility or

24  declarations or statements issued by the organization in some

25  form, is that right?

Levitt - direct by Ferguson

285

1  A.  Correct.

2  Q.  Have you personally seen examples of such declarations or

3  statements?

4  A.  Yes.

5  Q.  And what form generally do they usually take?

6  A.  The declarations are usually Arabic language, one- or

7  two-page statements with either the Hamas or the Qassam

8  Brigade emblem on them.

9         Sometimes they'll be distributed to mass media.

10 Often they will subsequently appear on the Internet, sometimes

11 immediately on the Internet.

12 Q.  And are they, aside from the Internet, are they published

13 or collected in any other types of locations?

14 A.  They're published in magazines by Hamas.  They appear on

15 the streets distributed at mosques.

16 Q.  Are they gathered or archived in any sorts of institutions

17 of higher education?

18 A.  Yes.

19 Q.  For example?

20 A.  The Center For Special Studies in Israel tries to collect

21 these as an archive.  There are others.

22 Q.  And do you rely upon all of these sources for purposes of

23 gathering such declarations for purposes of your analysis?

24 A.  I do, and then I also collect other sources of information

25 so that I'm never relying just on any one source.

Levitt - direct by Ferguson

1          All of these, for example, will be prominently

2     featured in the media.

3          MR. FERGUSON:  Permission to approach, Judge?

4          THE COURT:  You may.

5     BY MR. FERGUSON:

6     Q.  Dr. Levitt, handing you what's marked Government Exhibit

7     Declaration 1 -- here's a stamped copy -- have you seen this

8     document before?

9     A.  I have.

10    Q.  And, in general terms -- and I should say it's Government

11    Declaration 1 and Translation.

12          It is in Arabic, is it not, sir?

13    A.  It is.

14    Q.  Is there anything from its Arabic form that informs for

15    you exactly what it is?

16    A.  Not that the Arabic language.  The Hamas symbol is there.

17    The name Hamas, and the full name of Hamas, the Islamic

18    Resistance Movement, are there in English.

19    Q.  And what do you do in your work to identify exactly what a

20    document of this nature is and to understand its contents and

21    analyze it?

22    A.  I have it translated by a professional translator.

23    Q.  And let me ask you, do you simply accept translations as

24    they appear to you?

25    A.  No.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 81 of 215
Levitt - direct by Ferguson
287

1    Q.  What do you do?

2    A.  As I said earlier, often I will then sit with another

3    linguist.  When I can, another professional translator, but

4    often someone who speaks Arabic and sit with them to confirm

5    that the translation of the certified translator is, in fact,

6    accurate.

7    Q.  And is that what you did with respect to this document?

8    A.  Yes.

9    Q.  And is there some specific incident or event that this

10   document is referring to?

11   A.  This refers to the -- excuse me -- September 4th attack

12   that we have on here on page 3, the suicide bombing in

13   downtown Jerusalem.

14   Q.  And is this the sort of statement or declaration that you

15   rely upon in the field of your expertise, specifically Hamas

16   and its activities and specifically the activities of its

17   military wing?

18   A.  Yes.

19         MR. FERGUSON:  Permission to publish as

20   demonstrative, Judge?

21         THE COURT:  Any objection?

22         MR. DEUTSCH:  Judge, I don't have an objection, but I

23   do -- are you going to do --

24     (Counsel conferring.)

25         MR. FERGUSON:  Only publishing the first page.

Levitt - direct by Ferguson

288

 1          MR. DEUTSCH:  Okay.

 2          THE COURT:  Consistent with my ruling regarding the

 3    English translation.

 4          MR. DEUTSCH:  Right.  Thank you.

 5          THE COURT:  Go ahead, you may publish.

 6    BY MR. FERGUSON:

 7    Q.  Directing your attention to the top of Declaration 1,

 8    there is a seal there.  What is that?

 9    A.  That's the Hamas emblem.

10    Q.  And the Islamic Resistance Movement, Hamas Palestine is

11    specifically stated in English, is that correct?

12    A.  Yes.

13    Q.  Is that uncommon?

14    A.  No.

15    Q.  And in this instance, does this document reflect Hamas is

16    specifically taking some form of responsibility for the event

17    that occurred on September 4th, 2001?

18    A.  Yes.

19    Q.  And that specifically is a suicide bombing in downtown

20    Jerusalem that appears on your chart?

21    A.  Yes.

22    Q.  You've spoken of a December 1st, 2001 suicide bombing

23    attack in a Jerusalem pedestrian mall a minute ago.  Do you

24    recall that?

25    A.  Yes.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 83 of 215
Levitt - direct by Ferguson
289

1          MR. FERGUSON:  Permission to approach?

2          THE COURT:  You may.

3   BY MR. FERGUSON:

4   Q.  Handing you what's marked Government Exhibit Declaration 2

5   and Translation.  What's the nature of that document that you

6   hold?

7   A.  Again, this is another -- I'm sorry?  Oh, I thought you

8   said something.

9          This is another Hamas communique.

10         MR. FERGUSON:  If I start talking to myself, let me

11  know, but I didn't say anything.

12         THE COURT:  I'll let you know, Mr. Ferguson.

13         MR. FERGUSON:  Thank you.

14         THE WITNESS:  Maybe I'm just hearing things.

15         This is another Hamas communique, this one claiming

16  responsibility for the December 1st attack in Jerusalem.

17  BY MR. FERGUSON:

18  Q.  And what is it about that document that indicates it's a

19  Hamas communique?

20  A.  Again, the face of the document is the same, the Hamas

21  emblem, and then the name in English and then the translated

22  text.

23  Q.  And is this consistent with the sorts of declarations that

24  you relied upon in forming your expertise with respect to

25  Hamas and its military operations?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 84 of 215
Levitt - direct by Ferguson
290

1   A.  It is.

2   Q.  And did you go through the same process of having a

3   translation and speaking with the translator about the

4   contents of the document specifically to form your

5   understanding?

6   A.  I did.

7   Q.  And is it part of what you relied upon to attribute to

8   Hamas as having claimed responsibility for this specific

9   attack?

10  A.  Yes.

11          MR. FERGUSON:  Permission to publish as a

12  demonstrative, Judge?

13          THE COURT:  Any objection?

14          MR. DEUTSCH:  No objection.

15          THE COURT:  You may publish as a demonstrative.

16  BY MR. FERGUSON:

17  Q.  And, again, the emblem that appears at the center of the

18  first page of this document?

19  A.  The same emblem of Hamas and the name in English to the

20  left of it.

21  Q.  And, generally speaking, including in this document, what

22  categories of information are specifically offered in this

23  document and documents like it on behalf of Hamas?

24  A.  A description of the attack; the names of the

25  perpetrators; often one or more, for lack of a better word,

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 85 of 215
Levitt - direct by Ferguson
291

1  justifications or reasons, often they are tied to revenge for

2  some past action; usually a call for further attacks and, in

3  general, glorifying the existent attack.

4  Q.  From your understanding of your research, the media

5  reports of declarations issued by Hamas for the Qassam

6  Brigades, is this the sort of document that the media refers

7  to in making those statements?

8  A.  Sometimes, yes, they'll refer to these documents and/or to

9  other public statements.

10  Q.  Moving forward on your chart to March 9th, 2002, entry for

11  the Moment Cafe bombing.  What is that a reference to?

12  A.  This was a suicide bombing inside a Jerusalem cafe in

13  which 11 people were killed and over 50 wounded.

14  Q.  And was this a broadly publicized event?

15  A.  Yes.

16  Q.  Based on your research of public sources, materials, did

17  Hamas take responsibility for this particular event?

18  A.  Yes.

19  Q.  Turning your attention to page 4 of your chart, there are

20  two more events listed here for March of 2002.  The entries

21  are for the Park Hotel bombing and the Matza Restaurant

22  bombing, and if you would, sir, let's take the first one --

23  the last one first, the Matza attack.  What's that a reference

24  to?

25  A.  The Matza attack was a suicide bombing at a restaurant in,

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 86 of 215
Levitt - direct by Ferguson
292

 1   again, the northern city of Haifa.  15 people were killed and

 2   over 35 wounded, a Sunday morning attack.

 3   Q.  And the first one, March 27th, 2001, Park Hotel.  What's

 4   that a reference to?

 5   A.  This was a suicide bombing attack inside the Park Hotel in

 6   Netanya in northern Israel, targeting a group of elderly

 7   people celebrating the Passover holiday.  29 people were

 8   killed and over 150 wounded.

 9   Q.  That is an attack that you have devoted some more

10   particular study and research to, is it not?

11   A.  It is.

12   Q.  And have you written about it?

13   A.  Yes.

14           MR. FERGUSON:  Permission to approach?

15           THE COURT:  You may.

16   BY MR. FERGUSON:

17   Q.  Handing you what's marked Government Exhibit Declaration

18   3.  What's the nature of the document you have in front of

19   you?

20   A.  This is a Hamas communique.

21   Q.  And on the face of it -- it, too, is in Arabic, is that

22   right?

23   A.  It is.

24   Q.  And on the face of it, what indicates it to be a Hamas

25   communique?

Levitt - direct by Ferguson

1    A.   The Hamas emblem, the name of Hamas in English in the top

2    left like the others.

3    Q.   And did you follow the same procedures that you described

4    before as utilizing a translator, were you able to question

5    about specific aspects of this document?

6    A.   Yes.

7    Q.   And is it of the nature that you rely upon in forming your

8    expertise in coming to the conclusion that Hamas took

9    responsibility for certain attacks?

10   A.   Yes.

11   Q.   And what attacks did Hamas take responsibility for with

12   this specific document -- with this specific document?

13   A.   This is the Matza Restaurant bombing.

14   Q.   And is there any other attack that's referenced in there?

15   A.   As I recall, the Park Hotel is referenced in here, too,

16   but I don't have the full English translation in here.

17   Q.   You should have the declaration with translation.

18   A.   Thank you.

19   Q.   And you have a copy of the translation.

20          Does that allow you to determine whether the Park

21   Hotel was specifically referenced and responsibility was

22   claimed --

23   A.   Yes.

24   Q.   -- by Hamas?

25   A.   Yes.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 88 of 215
Levitt - direct by Ferguson
294

1    Q.  All right.  Besides the declaration here and media reports

2    regarding these two events, what other information have you

3    become aware of and have explored with respect to the Park

4    Hotel bombing that specifically brings you to your conclusion

5    that Hamas has claimed responsibility for it?

6    A.  I interviewed the mastermind of the attack.  I interviewed

7    the individual who drove the suicide bomber to the Park Hotel,

8    both of whom said they were Hamas members and that they were

9    involved in this attack and that the attack was carried out by

10   Hamas.

11           I've seen obviously significant press reporting on

12   it.  I've also seen some of the indictment and other material

13   regarding this attack.

14   Q.  And the individuals that you interviewed, did they

15   identify themselves as members of Hamas to you?

16   A.  They did.

17   Q.  In association with the bombing?

18   A.  Yes.

19   Q.  Turn your attention next to entry for July 31st, 2002 that

20   is in your chart.  Hebrew University bombing.  What's that a

21   reference to?

22   A.  This was a suicide bombing inside a cafeteria at Hebrew

23   University.  Nine people were killed and 70 wounded, including

24   the death of five Americans.

25   Q.  And was this a broadly publicized event?

Levitt - direct by Ferguson

1    A.   It was.

2    Q.   And did Hamas, from your review of public source

3    materials, claim responsibility for this attack?

4    A.   They did.

5            MR. FERGUSON:  Permission to approach, Judge?

6            THE COURT:  You may.

7    BY MR. FERGUSON:

8    Q.   Handing you what's marked Government Exhibit Declaration 4

9    and Translation.

10   A.   Thank you.

11   Q.   Ask you whether you've seen those documents before?

12   A.   I have.

13   Q.   And what are they?

14   A.   These are Hamas communiques.

15   Q.   And what identifies them as such to you?

16   A.   Again, the Hamas logo in the center, the names in English

17   on the left, and the translation that I had done.

18   Q.   And is -- did you put this document through the same

19   analysis and vetting process with a translator that you've

20   discussed with respect to some of the others we have mentioned

21   in court here?

22   A.   Yes.

23   Q.   And what specifically is being referenced in this

24   document?

25   A.   Among other things, the Hebrew University bombing on July

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 90 of 215
Levitt - direct by Ferguson
296

1    31st.

2              MR. FERGUSON:  Permission to publish as a

3    demonstrative?

4              THE COURT:  You may.

5    BY MR. FERGUSON:

6    Q.  And, again, the upper portion of the first page of the

7    document, that's the Hamas emblem?

8    A.  Yes.

9    Q.  And is this part of what you relied upon to come to the

10   conclusion that Hamas, in fact, claimed responsibility for the

11   Hebrew University bombing?

12   A.  Yes.

13   Q.  Is there any other attack that is referenced in this

14   document?

15   A.  There is.

16   Q.  Are you familiar with the attack that's referenced in the

17   document?

18   A.  Vaguely.  It's not one that I selected for our chart.

19   Q.  All right.  Again, your chart is not intended to be

20   inclusive as to every Hamas-claimed attack or event, is that

21   right?

22   A.  Correct.

23   Q.  Turning your attention back to the chart, there's an

24   incident, jumping ahead a couple, April 30th, 2003, about

25   two-thirds of the way down the page, Mike's Place bombing.

Levitt - direct by Ferguson

1    What is that a reference to?

2    A.  This was a suicide bombing inside Mike's Place, which is a

3    bar right next to the American Embassy in Tel Aviv.  It is

4    frequented by U.S. and other foreign embassy personnel.  Three

5    people were killed, some 55 wounded, including an American.

6    Q.  Have you seen Mike's Place?

7    A.  Yes.

8    Q.  Approximately how far is it from the American Embassy?

9    A.  Literally next door.

10           MR. FERGUSON:  Permission to approach?

11           THE COURT:  You may.

12   BY MR. FERGUSON:

13   Q.  Showing you what's marked Government Exhibit Declaration 5

14   and Translation.

15   A.  Thank you.

16   Q.  I'll ask you whether you've seen that document before?

17   A.  I have.

18   Q.  And is this also a Hamas declaration?

19   A.  It is.

20   Q.  And what from the face of it identifies it as a Hamas

21   declaration?

22   A.  The Hamas emblem and Hamas name in English on the top

23   left.

24   Q.  And did you go through the same vetting process that you

25   described with respect to a number of the other declarations

Levitt - direct by Ferguson

298

1   that we've discussed here today?

2   A.  Yes.

3   Q.  And from that, what do you understand this document

4   specifically to be a reference to?

5   A.  This is a claim of responsibility for this attack.

6   Q.  Which attack?

7   A.  The Mike's Place bombing.

8   Q.  I skipped a couple of events in your chart.  We are

9   getting to the end.

10         November 21st, 2002, Jerusalem bus bombing.  What is

11  that a reference to?

12  A.  Another rush hour suicide bombing in Jerusalem, ten people

13  killed and 50 injured.

14  Q.  And from the same public sources that you've generally

15  referenced here, did Hamas take responsibility for that

16  attack?

17  A.  Yes.

18  Q.  And there is an entry for March 5th, 2003.  What is that a

19  reference to?

20  A.  This is another bus bombing again in the northern city of

21  Haifa.  15 people are killed and 40 are wounded on an

22  intercity bus that was departing Haifa to go to Tel Aviv.  One

23  of the dead was an American teenager.

24  Q.  And from your review of public source materials, has Hamas

25  taken responsibility for that attack?

 1   A.  Yes.

 2          MR. FERGUSON:  Permission to approach?

 3          THE COURT:  You may.

 4   BY MR. FERGUSON:

 5   Q.  Dr. Levitt, I'm handing you three separate exhibits,

 6   Government Exhibit Declaration 6A and Translation, 6B and

 7   Translation, and 6C and translation.

 8   A.  Thank you.

 9   Q.  Take a moment to look at those, sir.  And I'll ask you

10   whether you've seen those documents before.

11   A.  I have.

12   Q.  And in general terms, what are they?

13   A.  These are three copies of the same Hamas communique

14   claiming responsibility for this attack as they appeared on

15   three different Hamas-related web sites.

16   Q.  And is your understanding formulated on the basis of the

17   same process that you've described with respect to other

18   declarations that we have discussed here this afternoon?

19   A.  Yes.

20          MR. FERGUSON:  Permission to publish as

21   demonstratives?

22          THE COURT:  Any objection?

23          MR. DEUTSCH:  No.

24          THE COURT:  You may publish as demonstratives.

25   BY MR. FERGUSON:

Levitt - direct by Ferguson

300

1   Q.  You've indicated, Dr. Levitt, that these are three

2   different versions of the same declaration.  What identifies

3   them to you as such?

4   A.  First of all -- excuse me.  First of all, the declarations

5   themselves are identical.

6   Q.  Now, when you say the declarations themselves, you're

7   referring to the content or the wording?

8   A.  The content.  Excuse me.  I'm sorry.  Yes.

9   Q.  Okay.  Continue.

10  A.  The content is identical.  In all three they claim

11  responsibility for this attack.

12          The web sites on which they appear are web sites that

13  are known in the academic community to be associated with

14  Hamas.  One is the Palestine Information Center that we

15  discussed earlier.

16  Q.  And you indicated the contents is identical.  I put the

17  heading -- the header of all three of them up there on the

18  screen in front of you.

19          The top one has a seal or emblem in the middle.

20  What's that emblem?

21  A.  The top one is the same emblem of Hamas and the name of

22  the group in English in the top left.

23  Q.  And does your inquiry into this document, with the

24  assistance of a translator, reflect this to be a statement

25  issued by Hamas itself?

Levitt - direct by Ferguson

1   A.   Yes.

2   Q.   The second document has an emblem or a seal in the header

3   as well.  Is that the Hamas emblem?

4   A.   The second document is a Hamas emblem.  It is the emblem

5   of the Qassam Brigades that we looked at earlier today.

6   Q.   And in that respect, do you understand this to be a

7   document, a version of the declaration issued by the Hamas

8   organization itself?

9   A.   Yes.

10  Q.   But a particular branch of it?

11  A.   This version appears on the web site for the Qassam

12  Brigades, Iz Edeen web site.

13  Q.   And then the bottom one.  This does not have an emblem on

14  it, but from working with a translator, what do you understand

15  the header to reflect?

16  A.   This is the one from Palestine Information Center.

17  Q.   So three different publications and sources for a single

18  declaration, is that right?

19  A.   Correct.

20  Q.   June 11, 2003, Jerusalem bus bombing.  What's that a

21  reference to?

22  A.   Another suicide bombing on a Jerusalem bus, killing 15 and

23  injuring 50.

24  Q.   August 19th, 2003.  Jerusalem bus bombing.  What's that a

25  reference to?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 96 of 215
Levitt - direct by Ferguson
302

1    A.   Another suicide bombing on a Jerusalem bus killing 21

2    people and wounding 102.  Five of the dead were Americans.

3    Q.   And in both instances, did all the reporting of these

4    particular events include claims by Hamas of responsibility or

5    credit?

6    A.   Yes.

7    Q.   The last event, Dr. Levitt, Cafe Hillel bombing,

8    September 9th, 2003.  What's that a reference to?

9    A.   Suicide bombing at a Jerusalem cafe.  Seven people are

10   killed and 30 wounded.

11   Q.   And did Hamas take responsibility, based on public source

12   materials, for that particular incident?

13   A.   Yes.

14        MR. FERGUSON:  Permission to approach?

15        THE COURT:  You may.

16   BY MR. FERGUSON:

17   Q.   Handing you what's marked Government Exhibit Declaration 7

18   and Translation.

19   A.   Thank you.

20   Q.   Are you familiar with that document?

21   A.   I am.

22   Q.   What's the source of that document?

23   A.   This is on the Hamas Iz Edeen Al-Qassam, terrorist wing of

24   Hamas web site.

25   Q.   Dr. Levitt, have you ever heard of Wikipedia?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 97 of 215
Levitt - direct by Ferguson
303

1   A.   I have.

2   Q.   What's Wikipedia?

3   A.   It's a search function on the Internet.

4   Q.   And is that regarded as a highly reliable source of

5   information on the Internet?

6   A.   Yes.

7              MR. DEUTSCH:  Objection.

8              MR. MOFFITT:  Objection.

9              THE COURT:  Sustained.

10  BY MR. FERGUSON:

11  Q.   The declaration that you have in front of you, did you put

12  it through the same vetting process with a translator as the

13  others that we've been discussing here?

14  A.   Yes.

15             MR. FERGUSON:  Permission to publish as a

16  demonstrative?

17             THE COURT:  Any objection?

18             MR. DEUTSCH:  No objection.

19             THE COURT:  You may publish as a demonstrative.

20  BY MR. FERGUSON:

21  Q.   And Dr. Levitt, under whose emblem or seal or letterhead

22  does this particular declaration issue?

23  A.   The Qassam Brigades.

24  Q.   The military wing of Hamas?

25  A.   Correct.

Levitt - direct by Ferguson

1   Q.  And what is the substance of what is being referenced in

2   this document?

3   A.  Two attacks, one of them being the attack carried out in

4   Jerusalem on the 9th.

5   Q.  Dr. Levitt, with respect to these declarations and others

6   like them that you've seen, when in proximity to the event do

7   they tip -- do these declarations typically issue or be issued

8   to the public?

9   A.  Most often, immediately, especially in the age of the

10  Internet, but sometimes later.

11  Q.  And do the claims of responsibility or credit end with

12  those nearly contemporaneous declarations?

13  A.  No.

14  Q.  What other sorts of materials are utilized by Hamas and

15  its various components that reflect their claim or continuing

16  claim of credit or responsibility for terrorist actions

17  generally and specific incidents?

18  A.  Often Hamas documents including communiques will reference

19  back to prior attacks, sometimes in the context of claiming

20  responsibility for more recent attacks.

21       Hamas publications, magazines, for example, will

22  publish claims of responsibility, will publish the text of

23  martyrs' wills.  The videotapes, living wills or martyrs'

24  wills are also published sometimes on the Internet, sometimes

25  to the media.  There are a variety of means, including other

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 99 of 215
Levitt - direct by Ferguson
305

1    public statements by Hamas leaders.

2    Q.  You've testified earlier that these separate wings of

3    Hamas are interrelated in some facets of their operation and

4    structure.  Is that fair?

5    A.  Yes.

6    Q.  Are there materials that are issued and that are seen in

7    the public domain from your travels in the West Bank and

8    otherwise that reflect that interconnectivity?

9    A.  Yes.

10   Q.  Can you give some examples?

11   A.  Hamas materials, especially visual materials, posters in

12   particular, will depict the group's political leadership

13   alongside its military leadership or superimpose --

14           MR. DEUTSCH:  Objection, foundation as to dates when

15   he observed these.

16           THE COURT:  Sustained.  You can clarify with him.

17   BY MR. FERGUSON:

18   Q.  Have you traveled in the territories, Dr. Levitt?

19   A.  I have.

20   Q.  And when have you been in the territories?

21   A.  Many times.  I think the last one was late 2004.

22   Q.  And do you remember approximately the first time?

23   A.  July 1997.

24   Q.  And in traveling in the territories, have you had

25   opportunity to observe some of these posters or photographic

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 100 of 215
Levitt - direct by Ferguson
306

1  depictions that draw the associations --

2          MR. MOFFITT:  I object.  Posters are the least

3  reliable thing that we talked about.  You can put a poster

4  together, two people on a poster and they don't even have to

5  be in the same place.

6          THE COURT:  The question just called for a yes or a

7  no.

8          Objection overruled.  You can answer that question

9  yes or no, and then see what he's going to do with it.  You

10 can object again.

11         Do you need it read back?

12         THE WITNESS:  No, thank you.

13 BY THE WITNESS:

14 A.  Yes.

15 BY MR. FERGUSON:

16 Q.  And what sorts of places have you seen these posters or

17 photographic depictions associated with Hamas?

18 A.  Seen them in a variety of locations, health clinics,

19 schools.  I haven't spent significant time touring those types

20 of locations.

21         These types of posters are widely available and are

22 now collected by a variety of academic institutions, also

23 widely available on the Internet, so you don't need to go to

24 the territories to see them.

25 Q.  From your research on the Internet and other locations,

Levitt - direct by Ferguson

1  are there places where one can go and buy these posters?

2  A.  Yes.

3  Q.  And as an individual like yourself who drives through the

4  streets of Ramallah or other places in the West Bank, are

5  these posters that draw association with Hamas and its various

6  activities, are they seen on the street?

7  A.  Yes.

8  Q.  In what sorts of places?

9        MR. DEUTSCH:  Judge, I object.  This -- this is

10 just -- I don't see where he's going with this.  It's

11 irrelevant, what posters are put up by people in the streets

12 of Ramallah.

13       MR. FERGUSON:  Judge, they asked for foundation.  I'm

14 detailing all of the --

15       THE COURT:  Objection overruled.

16       You may answer.

17 BY MR. FERGUSON:

18 Q.  You spoke earlier, Dr. Levitt, about the proselytizing

19 function of the Dawa.  From your studies, including studies of

20 poster and photographic and video depictions of Hamas and its

21 various activities, have you come to form an opinion as to the

22 role that they play in the proselytizing and I think you also

23 said radicalizing or Islamicizing element of Hamas's

24 operation?

25 A.  Yes.

Levitt - direct by Ferguson

308

1  Q.  And what opinions have you formed in that regard?

2  A.  These posters and other material placed in mosques, in

3  kindergartens, in clinic waiting rooms surround Palestinians

4  with images of terrorists, sometimes suicide bombers,

5  frequently on the same poster or superimposed against a

6  picture of an attack appearing with political leadership of

7  Hamas.

8          MR. FERGUSON:  Permission to approach?

9          THE COURT:  You may.

10  BY MR. FERGUSON:

11  Q.  Dr. Levitt, handing you what's marked Government Exhibit

12  Photo 1.  If you'll wait a minute while I do my tour of the

13  room.

14          Without specifying the content of Government Exhibit

15  Photo 1, is this demonstrative or emblematic of the type of

16  photographic materials that you see, you personally have seen

17  in schools, in hospitals, in public locations on the street in

18  the West Bank that relate to Hamas?

19  A.  Yes.

20          MR. FERGUSON:  Permission to publish as demonstrative

21  Government Exhibit Photo 1.

22          THE COURT:  Any objection?

23          MR. DEUTSCH:  I object.  I don't see -- I don't see

24  what it's relevant to.  It's certainly not relevant to the

25  case against Mr. Salah.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 103 of 215
Levitt - direct by Ferguson
309

1           MR. FERGUSON:  It's relevant as a demonstrative for

2    exactly how Hamas conducts its proselytizing and radicalizing

3    through the dissemination and publications of materials such

4    as this.

5           THE COURT:  You may use it as a demonstrative only.

6    BY MR. FERGUSON:

7    Q.  Dr. Levitt, Government Exhibit Photo 1, are you familiar

8    with the individual who is depicted on the right side of this

9    exhibit?

10   A.  It's Abdel Aziz Al-Rantisi.

11   Q.  And to the left on this exhibit, there is depicted another

12   individual.  Do you have an understanding as to what that is

13   representative of?

14   A.  It's an individual representing a Hamas suicide bomber.

15   The person is wearing a Hamas head band and real or fake

16   suicide belt, bombing belt.

17   Q.  And there is a structure at the bottom of the photo.  Are

18   you familiar, can you identify what that structure is?

19   A.  This is the Al Aqsa mosque, which is the second dome, the

20   silver dome, the actual mosque on the noble sanctuary or the

21   Temple Mount in Jerusalem.

22          MR. DEUTSCH:  Judge, can we have a date on which this

23   poster was made or when Mr. Levitt saw this poster?

24          THE COURT:  Mr. Ferguson?

25          MR. FERGUSON:  Judge, it's being offered as a

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 104 of 215
Levitt - direct by Ferguson
310

1   demonstrative exhibit.  The foundation for time, place, manner

2   is -- if we do that, I think it then becomes fully admissible

3   as a substantive exhibit demonstrative of what Dr. Levitt is

4   testifying to.

5          I'm not sure that that's what the defense would like,

6   but I don't believe such a foundation is necessary for

7   purposes of a demonstration as to the type of materials that

8   Hamas issues for the purpose of proselytizing.

9          THE COURT:  And he testified that he saw these

10  materials back in 1997, so --

11         MR. FERGUSON:  These types of materials.

12         THE COURT:  These types of materials, correct.

13  BY MR. FERGUSON:

14  Q.  So what do you construe this photo to mean in the context

15  of proselytizing and Islamicizing with respect to Hamas?

16  A.  The most important message here is the juxtaposition of

17  what is clearly Hamas military activity with what Hamas

18  describes as Hamas political activity.

19         Abdel Aziz Al-Rantisi was at one time one of Hamas's

20  chief spokesmen, a public figure described as a political

21  leader, at one time briefly he actually was the political

22  leader of Hamas.

23         Juxtaposing him next to a suicide bomber is a visual

24  depiction of the fact that these are two sides of the same

25  coin.

Levitt - direct by Ferguson

311

1          MR. DEUTSCH:  Objection.  Who -- who made this?  Who

2    produced this?  I don't understand how we can --

3          THE COURT:  It's not admitted into evidence,

4    Mr. Deutsch.

5          MR. DEUTSCH:  Okay.  Thank you, Judge.

6          THE COURT:  It's for demonstrative purposes.

7    Overruled.

8    BY MR. FERGUSON:

9    Q.  From your study, Dr. Levitt, have you seen either pictures

10   or news videos of Hamas leadership appearing before media

11   cameras and microphones offering statements?

12   A.  Yes.

13         MR. FERGUSON:  Permission to approach?

14         THE COURT:  You may.

15   BY MR. FERGUSON:

16   Q.  Handing you what's marked as Government Exhibit Photo 2.

17         In your experience, Dr. Levitt, as part of Hamas's

18   publicizing efforts, does it appear -- do its figures appear

19   in front of symbolically significant backdrops?

20   A.  Yes.

21   Q.  Do you recognize, without describing the details of what

22   is in Photo 2, do you recognize the figure depicted there?

23   A.  Yes.

24   Q.  Is it a Hamas leader?

25   A.  Yes.

Levitt - direct by Ferguson

312

1   Q.  And what is the leader depicted as doing in this photo?

2   A.  He's giving a press conference.

3   Q.  And is it emblematic of the type of --

4         MR. DEUTSCH:  Can we have a date?

5         THE COURT:  He's not done and he has not moved for

6   any admission or publication of it yet.

7   BY MR. FERGUSON:

8   Q.  And is it representative of the types of news photo and

9   video and video stills of Hamas leaders giving public

10  interviews that you have seen and relied upon in forming your

11  expertise?

12  A.  Yes.

13        MR. FERGUSON:  Move to publish Photo 2 as a

14  demonstrative.

15        MR. DEUTSCH:  Judge, I object.  I don't think it

16  even -- it has no relevance.  I don't see what publishing it

17  does in terms of assisting the jury in deciding the real facts

18  of this case, and I object.

19        THE COURT:  Mr. Ferguson?

20        MR. FERGUSON:  Judge -- let me ask a couple more

21  questions, Judge.

22        THE COURT:  Okay.

23  BY MR. FERGUSON:

24  Q.  With respect to Government Exhibit Photo 1, you've

25  indicated that to be representative of some of the visual

Levitt - direct by Ferguson

313

1   media that is the manner in which Hamas proselytizes or

2   Islamicizes, is that correct?

3   A.   Yes.

4   Q.   In your travels in the West Bank, have you seen murals or

5   other postings that perform the same function with respect to

6   Hamas's efforts at proselytizing and radicalizing?

7   A.   I've certainly seen video and pictures of murals.  I can't

8   recall if I've seen them myself.

9   Q.   Is the mural that is depicted behind the Hamas leader in

10  Government Exhibit Photo 2 representative of the sorts of

11  painted imagery that you have seen reflective of Hamas's

12  proselytizing activities?

13  A.   Yes.

14        MR. FERGUSON:  Move to publish Photo 2 as a

15  demonstrative, Judge.

16        MR. DEUTSCH:  Objection.

17        THE COURT:  Sustained to the objection.  Get a time

18  frame from him, since his answer on Photo 2 is different than

19  Photo 1.

20        MR. FERGUSON:  Sure.

21  BY MR. FERGUSON:

22  Q.   Sheikh Yassin I think you indicated earlier was jailed and

23  convicted in association -- for his activities in association

24  with the abducting and murder of --

25        MR. DEUTSCH:  Objection --

Levitt - direct by Ferguson

314

 1   BY MR. FERGUSON:

 2   Q.  -- IDF soldiers Avi --

 3           MR. DEUTSCH:  Objection, Judge.  Objection.  I object

 4   to that.  He's putting that evidence in, and that's not what

 5   you asked for.  You asked for a time frame.

 6           MR. FERGUSON:  Judge, I need --

 7           MR. DEUTSCH:  He's just putting that evidence in just

 8   to prejudice us.

 9           THE COURT:  I think he's referring back to this

10   witness's testimony.  I did ask for a time frame.

11   BY MR. FERGUSON:

12   Q.  Approximately when was it that Sheikh Yassin was jailed

13   and convicted for those activities?

14   A.  Late 1980s.

15   Q.  And approximately how long was Sheikh Yassin in jail for

16   those activities?

17   A.  I think it was three years.

18   Q.  And was Sheikh Yassin jailed at any other point in time

19   during the history of Hamas?

20   A.  Yes.

21   Q.  Off the top of your head, can you recall specific

22   additional periods in which he may have been jailed?

23   A.  He was released again in 1995.  I don't remember when he

24   was incarcerated.

25   Q.  And was he released -- was he released again in 1997?

Levitt - direct by Ferguson

315

1   A.   Excuse me, it was 1997, yes.

2   Q.   Okay.  And you indicated from your testimony numerous

3   events where Hamas sought the release of Sheikh Yassin, is

4   that correct?

5   A.   Correct.

6   Q.   And that occurred through much of the 1990s, is that

7   correct?

8            MR. DEUTSCH:  Objection, leading.

9            THE COURT:  Sustained.

10  BY MR. FERGUSON:

11  Q.   You've seen -- have you seen numerous pictures of Sheikh

12  Yassin?

13  A.   Yes.

14  Q.   Is Government Exhibit Photo 2 with respect to the

15  1987-to-2003 time frame, is this a later-year depiction of him

16  or an earlier-year depiction of him?

17  A.   It's impossible to know, but from the context, it appears

18  to have been an earlier.

19  Q.   But he was in jail for much of the earlier period?

20  A.   Yes.  I'm trying to answer this without getting into more

21  details of the picture.

22  Q.   Sure.  Is there something in the picture that would allow

23  you to identify it as to general time frame without telling me

24  what it is?

25  A.   There's something in the picture that suggests general

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 110 of 215
Levitt - direct by Ferguson
316

1   time frame.  I don't know the time frame for this picture.

2   Q.  Okay.  And what -- what is the general time frame that

3   appears to be suggested by the picture without -- without

4   speaking of specific details?

5   A.  It would likely be a picture from shortly after his

6   release from prison in one of those two instances.

7           MR. BLOOM:  I didn't hear that.

8           THE COURT:  "In one of those two instances."

9           MR. BLOOM:  Thank you.

10  BY MR. FERGUSON:

11  Q.  So would it be fair to say in all likelihood this was a

12  picture taken of him after 1993?

13          MR. MOFFITT:  Objection, Judge.

14          MR. DEUTSCH:  Objection.

15          THE COURT:  Sustained.

16  BY MR. FERGUSON:

17  Q.  After one of his two releases, which two releases again?

18  A.  1993 and 1997.

19  Q.  So what is depicted in this picture, would it suggest --

20  does it suggest to you a likely time frame that post-dates

21  1993?

22  A.  Yes.

23          MR. FERGUSON:  Move to publish Photo 2 as a

24  demonstrative.

25          MR. SPIELFOGEL:  I would object and ask for a side

Case 1:03-cr-00978  Document 1065   Filed 01/05/09  Page 111 of 215
Levitt - direct by Ferguson
317

1   bar.

2           THE COURT:  Your objection is sustained.  We don't

3   need a side bar.

4   BY MR. FERGUSON:

5   Q.  Dr. Levitt, you've indicated that part of how Hamas claims

6   and continues to claim responsibility for various attacks is

7   the publishing of suicide video wills, is that right?

8   A.  Yes.

9           MR. FERGUSON:  Permission to approach?

10          THE COURT:  You may.

11  BY MR. FERGUSON:

12  Q.  Dr. Levitt, I'm handing you what is marked as Government

13  Exhibit Photo Group 6A, 6B and 6C and Translation and ask you

14  whether you are familiar with the imagery that appears in

15  these three photos?

16  A.  I am.

17  Q.  In general terms, Government Exhibit Photo Group 6,

18  specifically 6A, what generally is depicted there without

19  going into details?

20  A.  This is a picture or what appears to be a specific frame

21  from a videotaped living will.

22  Q.  And do you recognize the individual or figure that is

23  depicted in all three, 6A, 6B and 6C?

24  A.  Yes.

25  Q.  And are you familiar from your work with the specific -- a

Levitt - direct by Ferguson

318

1   specific terrorist incident that would be associated with this

2   particular imagery?

3   A.   Yes.

4   Q.   Approximately when did that occur?

5   A.   It was in the context of the second Intifada after 2000.

6   I think it was around 2004, 2005.

7   Q.   And the second of these, would you describe it generally,

8   Photo Group 6B specifically, in general terms without

9   detailing the imagery.

10  A.   This appears to be the same image of the individual,

11  superimposed against a different backdrop in a poster in part

12  of it, and then the other part there are three other pictures

13  of the individual.

14  Q.   And Photo Group 6C in general terms?

15  A.   Again, another depiction, likely from that same living

16  will video, she's wearing the same outfit, the same clothing,

17  superimposed against another background in a poster format.

18  Q.   And all in relation to an individual who has claimed to

19  have committed a suicide attack in the 2000s, is that right?

20  A.   Yes.

21  Q.   All right.

22  A.   Claimed prior to the attack obviously.

23  Q.   And is -- are these three, 6A, 6B and 6C, representative

24  of the various ways in which Hamas continues after the fact of

25  an incident to claim and utilize for its own benefit specific

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 113 of 215
Levitt - direct by Ferguson
319

1  attacks?

2  A.  Yes.

3  Q.  And is it reflective of the various ways in which Hamas

4  proselytizes and radicalizes on the basis of specific

5  incidents or attacks?

6  A.  Yes.

7         MR. FERGUSON:  Move to publish Photo Group 6A, 6B and

8  6C.

9         MR. DEUTSCH:  I object on 403 grounds.

10        THE COURT:  Objection overruled.  You may publish for

11  demonstrative purposes only.

12  BY MR. FERGUSON:

13  Q.  With respect to Photo Group 6A, you indicated that you are

14  familiar with who the individual depicted here is.  Do you

15  recall a name?

16  A.  Her name is Rima Al-Riashi.

17  Q.  And what is she depicted as doing --

18        MR. MOFFITT:  Objection.

19  BY MR. FERGUSON:

20  Q.  -- in the photo?

21        MR. MOFFITT:  I object.  This photo speaks for

22  itself.  He doesn't need to say what she's depicted as doing.

23        THE COURT:  Mr. Ferguson?

24        MR. FERGUSON:  I disagree, Judge.  There is -- there

25  are specific -- there's a specific stance, specific items and

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 114 of 215
Levitt - direct by Ferguson
320

1   specific backdrop that all relate to the iconography of the

2   organization we've been discussing --

3              THE COURT:  Okay.

4              MR. FERGUSON:  -- which I think the jury is entitled

5   to hear.

6              THE COURT:  Overruled.

7              You may answer.

8              THE WITNESS:  Can you ask the question again?

9   BY MR. FERGUSON:

10  Q.  What is this particular individual depicted as doing in

11  the photo?

12  A.  She's wearing camouflage, standing in front of a Hamas

13  banner, wearing a Hamas bandana of sorts and another theme

14  across her chest.  She is holding some type of assault rifle.

15  She has a pistol and a grenade strapped on to her.  In her

16  other hand, she's holding what appears to be the Quran.

17  Q.  And what's significant to the particular posing garb and

18  iconography depicted in this photo does this have with respect

19  to Hamas?

20  A.  This is the traditional pose for the living will of a

21  martyr video.  This particular video was widely circulated.

22  Q.  I turn your attention to Government Exhibit Photo Group

23  6C, and would you please tell us what is depicted in this

24  photograph -- I'm sorry -- in this image?

25  A.  Again, Ms. Riashi is posing with an assault weapon in

Levitt - direct by Ferguson

321

1   military fatigues.  There's a background of the emblem of the

2   Qassam Brigades, the terrorist wing of Hamas.  In the bottom

3   foreground, there is a depiction of the Al Aqsa mosque in

4   Jerusalem.

5   Q.  And directing your attention back to 6A, depicting the

6   individual holding a firearm and the Quran, what significance

7   does that have in relation to the iconography of the Al-Qassam

8   Brigades?

9   A.  The symbolism of fighting with the holy book in one hand

10  and weapons in the other.

11  Q.  And is that reflected in the emblem of the Al-Qassam

12  Brigades?

13  A.  It is.

14  Q.  In addition to individual suicide bombers, does Hamas and

15  its leadership issue statements glorifying or lionizing others

16  of its leaders?

17  A.  Yes.

18  Q.  And what sorts of places have you seen these statements

19  published or issued?

20  A.  Magazines, leaflets, communiques, web sites.

21  Q.  Within your field, are you aware of whether or not there

22  are any specific magazines that are regarded as published by

23  Hamas?

24  A.  Yes.

25  Q.  Can you name -- can you name a couple?

Levitt - direct by Ferguson

322

1   A.   The one that I'm familiar with is a Filistine Al-Muslema.

2   Q.   And you've seen issues of Filistine Al-Muslema?

3   A.   I have.

4   Q.   And what sorts of purposes does Hamas put that publication

5   to?

6   A.   Its radicalizing propaganda.  It covers the plight of

7   Palestinians in general, particularly Palestinians in various

8   refugee camps, not only in the West Bank and Gaza but in other

9   parts of the Muslim world; but it also will publish the text

10  of the living will of suicide bombers, poems and articles

11  lauding them and their activities.

12          They will sometimes lay claim of responsibility for

13  attacks in the context of those -- those articles.

14  Q.   And as you have seen, reviewed and analyzed that

15  publication and materials from it, does the publication

16  reflect any sort of division or separation of the political

17  branches -- of the branches of Hamas?

18  A.   Absolutely not.

19          MR. FERGUSON:  Permission to approach?

20          THE COURT:  You may.

21  BY MR. FERGUSON:

22  Q.   Handing you what's marked as Government Exhibit Filistine

23  Al-Muslema, specifically the back page of that publication.

24          In general terms, without identifying the specifics,

25  let me ask you, first of all, are you familiar with the

Levitt - direct by Ferguson

323

1    magazine that you have in your hand?

2    A.  I am.

3    Q.  And are you familiar with the back page specifically of

4    that magazine that you have in your hands, Government Exhibit

5    Filistine Al-Muslema?

6    A.  Yes.

7    Q.  And without identifying the particulars, what is generally

8    depicted in that, the back page of the publication?

9    A.  It's a letter.  There's a small picture in the top right

10   corner of the author of the letter, and the text of the letter

11   is superimposed over an image of the person about whom the

12   letter is writing.

13   Q.  And this is a 1996 issue of the publication, yes?

14   A.  It is.

15          MR. MOFFITT:  Can we see what he's looking at, your

16   Honor?

17          MR. FERGUSON:  Sure.

18          MR. MOFFITT:  Is it just the back page?

19          THE COURT:  That's my understanding.

20          MR. FERGUSON:  He has only the back page in front,

21   but I'm happy to show Mr. Moffitt --

22          THE COURT:  Okay.

23          MR. FERGUSON:  -- the full publication.  We're only

24   going to speak from the back page.

25   BY MR. FERGUSON:

Levitt - direct by Ferguson

324

Q.  And is the back page reflective of the sorts of statements

that you're familiar with in which one Hamas leader lionizes

or glorifies another member of Hamas?

A.  It is.

        MR. DEUTSCH:  Judge, excuse me, he's looking at a

document in Arabic, correct?

        THE COURT:  I don't think he has anything before him

now.  Mr. Moffitt has it.

        MR. DEUTSCH:  Well, the document he's looking at that

was handed to me is in Arabic.  He doesn't read Arabic, so I

don't understand what he's testifying to.

        THE COURT:  Lay your foundation.

BY MR. FERGUSON:

Q.  Dr. Levitt, with respect to your understanding as to what

this particular document is, what have you done to form that

understanding?

A.  I sat down with a certified Arabic language expert and had

some of the magazine, this particular volume, translated, and

then -- in written form, and then went through the rest of the

magazine together with the translator face-to-face.

        Some of it I didn't feel the need to have translated

on paper and some I did, but we went through almost the

entirety of the magazine and the back page in great detail.

Q.  And from that, did you form a general understanding as to

the content of what appears on the back page of the magazine?

Levitt - direct by Ferguson

325

1   A.  Yes.

2           MR. FERGUSON:  Move to publish as a demonstrative the

3   back page of Government Exhibit Filistine Al-Muslema.

4           MR. MOFFITT:  I object.

5           THE COURT:  On what basis?

6           MR. MOFFITT:  Rule of completeness.  Separating the

7   back page from the magazine.  It's a publication.  It's not

8   really fair to separate the back.

9           THE COURT:  Do you want him to publish the entire

10  thing?

11          MR. MOFFITT:  Yes.

12          THE COURT:  Okay.

13          MR. FERGUSON:  I would publish the entire thing.

14          THE COURT:  You may.

15          MR. FERGUSON:  Including the back page.  May I have

16  permission?

17          THE COURT:  You may.  Yes, you may publish the entire

18  magazine.

19  BY MR. FERGUSON:

20  Q.  From the process that you went through that you just

21  described, I'd like you to tell us your understanding as to

22  what this back page of the document actually is.  There's a

23  photo in the upper right.  Do you recognize the individual in

24  that photo?

25  A.  Yes.

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 120 of 215
Levitt - direct by Ferguson
326

1  Q.  Who is it?

2  A.  That is Mousa Abu Marzook.

3  Q.  And what's Mr. Marzook's position within Hamas?

4  A.  He is the deputy chief of the Hamas political bureau.

5  Q.  Okay.  And in the center, the backdrop of this document,

6  there's another individual who is depicted.  Do you recognize

7  that individual?

8  A.  Yes.

9  Q.  Who is it?

10 A.  That is Yehiya Ayyash.

11 Q.  And who is Yehiya Ayyash?

12 A.  Yehiya Ayyash was a notorious Hamas bomb maker.

13 Q.  And what was the time frame within which Yehiya Ayyash

14 engaged in these activities as you understand them?

15 A.  1994 when the string of Hamas suicide bombings picked up

16 in earnest as we saw earlier until he was killed in 1996.

17 Q.  And what's your understanding as to this statement or the

18 content of the written portion of the back page of Government

19 Exhibit Filistine Al-Muslema?

20 A.  There's a date just below what we're able to see here in

21 Arabic which indicates this is from early 1996, shortly after

22 Ayyash was killed.  This is a letter by Marzook, lauding and

23 lionizing Ayyash and his contribution to the cause in the form

24 of producing bombs for Hamas.

25 Q.  And is there anything about the statement as you

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 121 of 215
Levitt - cross by Deutsch
327

1  understand it in which Mr. Marzook shies away from the

2  terrorist activities of Yehiya Ayyash?

3  A.  No.

4  Q.  Dr. Levitt as you sit here today, has Hamas to your

5  knowledge ever renounced claims of responsibility for the

6  incidents which you have discussed in court?

7          MR. MOFFITT:  Asked and answered.

8          THE COURT:  Sustained.

9  BY MR. FERGUSON:

10 Q.  As you sit here today, Dr. Levitt, to your knowledge, has

11 Hamas ever issued statements to the media stating that it was

12 not in the terrorist or suicide bombing business as broadly

13 perceived by the rest of the world?

14 A.  No.

15 Q.  And as you sit here today, Dr. Levitt, has Hamas ever

16 renounced jihadist violence in the pursuit of its territorial

17 objectives as stated in its charter?

18 A.  No.

19 Q.  And as you sit here today, to your knowledge, has Hamas

20 ever renounced or modified its charter to outlaw or at least

21 no longer endorse violent jihad?

22 A.  No.

23          MR. FERGUSON:  No further questions.

24          THE COURT:  Cross-examination.

25                      CROSS-EXAMINATION

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 122 of 215
Levitt - cross by Deutsch
328

1    BY MR. DEUTSCH:

2    Q.  Sir, in this event timeline that you prepared, I notice

3    that you didn't put in any of the killings of civilian

4    Palestinians by the Israeli military or armed settlers, is

5    that correct?

6    A.  That's correct.

7    Q.  You left all those out, right?

8    A.  They're not on trial here.

9    Q.  Yes or no?  Did you leave them out of your timeline?

10   A.  They are not there, yes.

11   Q.  And you're familiar with the Israeli human rights

12   organization B'Tselem, are you not?

13   A.  B'Tselem, yes.

14   Q.  Okay.  And would you disagree with this finding by

15   B'Tselem:  That between 1987 and April of 2006, the human

16   rights organization B'Tselem showed that 1,426 Israeli

17   military personnel and civilians were killed by Palestinian

18   factions --

19          MR. FERGUSON:  I'm going to object --

20   BY MR. DEUTSCH:

21   Q.  -- compared with 5,050 Palestinians killed by Israelis

22   during those years?

23          Would you disagree with that?

24          THE COURT:  What's your objection?

25          MR. FERGUSON:  Judge, he's simply reading into the

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 123 of 215
Levitt - cross by Deutsch
329

 1  record a quote from -- a hearsay quote from other sources.  He

 2  hasn't laid proper foundation for even discussing this

 3  particular matter.  He should ask the witness what he knows

 4  about the subject matter first at least.

 5          MR. DEUTSCH:  Judge --

 6          THE COURT:  Objection overruled.  The question was

 7  would you disagree with it.

 8          MR. DEUTSCH:  Right.

 9          THE COURT:  If he doesn't have any basis -- wait a

10  minute.  Let me finish, Mr. Deutsch.  If he doesn't have any

11  basis to answer, he can respond to that.

12  BY MR. DEUTSCH:

13  Q.  Do you need me to repeat the question, sir?

14  A.  No, sir.

15  Q.  Okay.  I'll rephrase it though.  In the period between

16  1987 and April of 2006, there was about 1,400 Israelis killed,

17  military personnel and civilians, while at the same time 5,000

18  Palestinians were killed by Israelis.

19          Do you disagree with that?

20  A.  I have no basis to answer.

21  Q.  Well, you have a lot of expertise on Israeli civilians

22  killed by Hamas, do you not?

23  A.  That's part of my expertise, yes.

24  Q.  Are you not interested in the fact that Palestinian

25  civilians, unarmed Palestinian people, are killed by Israelis

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 124 of 215
Levitt - cross by Deutsch
330

1    five times more?

2    A.  I can't speak to five times more, but, of course, I'm

3    concerned when any civilians are hurt.

4    Q.  Well, did you ever read the Israeli human rights report

5    that talked about the killing of Palestinian civilians by

6    Israeli military and armed settlers?

7             MR. FERGUSON:  Judge, I object.  Two bases:  First,

8    this is -- flies directly in the face of the motion in limine.

9             Second, it's beyond the witness's stated expertise,

10   which is specifically on the subject of Palestinian terrorist

11   organizations and specifically Hamas.

12            MR. DEUTSCH:  It goes directly to the bias of this

13   witness, Judge.

14            THE COURT:  The question was -- overruled.

15            Your objection, the question was did you ever read,

16   and you may answer that question.  If you need the whole

17   question, I can read it back.

18            THE WITNESS:  No, it's okay.

19   BY THE WITNESS:

20   A.  I've read many reports, including the human rights

21   organizations.  I don't know if I've read that one.

22   BY MR. DEUTSCH:

23   Q.  Well, do you know whether or not approximately five times

24   more unarmed Palestinian civilians have been killed than

25   Israeli civilians?

Levitt - cross by Deutsch

1   A.  I don't.

2   Q.  Do you disagree with that?

3   A.  I have no basis to agree or disagree.

4   Q.  Okay.  Now, back in 1992 and up to January of '93, you

5   weren't holding yourself out as an expert on Hamas, were you,

6   sir?

7   A.  No.

8   Q.  How old were you back in 1992?

9   A.  22.

10  Q.  You were a college student back then, weren't you?

11  A.  I was.

12  Q.  And, in fact, you were a student at the Yeshiva

13  University, were you not?

14  A.  I was.

15  Q.  And that's a Jewish institution, is it not?

16  A.  It is.

17  Q.  And it has very close relations with Israel, does it not?

18  A.  I actually don't know.

19  Q.  Well, does it have an extension of the university that's

20  in Israel?

21  A.  I don't know.

22  Q.  Well, are you familiar with the S. Daniel Abraham Israel

23  Program?

24  A.  No.

25  Q.  How about the Hebron Fund?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 126 of 215
Levitt - cross by Deutsch
332

1   A.   No.

2   Q.   How about the Israeli Club at Yeshiva University?

3   A.   No.

4   Q.   How come you went to the Yeshiva University, sir?

5   A.   It was an opportunity for me, before I engaged in full

6   life and didn't have the time, to explore my Jewish heritage,

7   to engage in a dual curriculum, Jewish studies and secular

8   studies.

9   Q.   Are you familiar with the fact that the Yeshiva University

10  annually gives an honorary degree to the prime minister of

11  Israel?

12  A.   No.

13  Q.   Do you know that it gave honorary degrees to seven prime

14  ministers of Israel?

15  A.   No.

16  Q.   Now, I think you told the jury last week that one of the

17  most important part of your expertise is your field study,

18  where you actually went out and had firsthand interaction with

19  the subjects of your expertise, is that right?

20  A.   In part, yes.

21  Q.   And you indicated that was very important, right?

22  A.   Sure.

23  Q.   And, of course, you didn't start your field study until

24  1997, correct?

25  A.   Correct.

Levitt - cross by Deutsch

333

1    Q.  In fact, you didn't go to the occupied territories of the

2    West Bank until 1997, correct?

3    A.  Not to do research.

4    Q.  And prior to 1997, you had been to Israel many times,

5    hadn't you?

6    A.  I've been.  Not many times.

7    Q.  Well, you lived in Israel for two years, didn't you?

8    A.  Yes.

9    Q.  And what was the occasion that had you living in the State

10   of Israel?

11   A.  My father worked for an American drug company in its

12   Israel operations.

13   Q.  And your father's name is Israel, isn't it?

14   A.  No.

15   Q.  Who is Israel Levitt?

16   A.  That's my grandfather.

17   Q.  Okay.

18   A.  Actually, his name is Irving.

19   Q.  Now, is it fair to say then that prior to your trip to do

20   your field study in 1997, the information that you have about

21   the period between let's say 1992 and January of 1993 is based

22   on what you read over the Internet, what you read in

23   publications and what conversations you had with other people?

24   A.  No.

25   Q.  Well, did you have any firsthand information prior to 1997

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 128 of 215
Levitt - cross by Deutsch
334

1   of the conditions or the events in the occupied territories?

2   A.  Yes.

3   Q.  Now, did you ever do any field research in the occupied

4   territories prior to 1997?

5   A.  No.

6   Q.  Now, is it true that your information then is provided to

7   you based on what other people told you and what you read?

8   A.  When you say what other people told me to include

9   interviews of people who were on the ground in that time

10  period, yes.

11  Q.  Yeah, what other -- you weren't on the ground.

12  A.  Correct.

13  Q.  You had to talk to other people, correct?

14  A.  Correct.

15  Q.  And you don't speak Arabic, do you, sir?

16  A.  Correct.

17  Q.  And you don't read Arabic, right?

18  A.  Correct.

19  Q.  But you do speak Hebrew, don't you?

20  A.  I do.

21  Q.  And you do read Hebrew.

22  A.  I do.

23  Q.  And isn't it fair to say that, therefore, you would be

24  able to read Israeli documents in their original language?

25  A.  Depending on how complicated they are.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 129 of 215
Levitt - cross by Deutsch
335

1    Q.   Okay.  And would you be able to speak to Israelis in their

2    language?

3    A.   Again, depending.

4    Q.   But the information that you have to get from people who

5    speak and write Arabic would have to go through a translator,

6    correct?

7    A.   In some cases.  Very often the people I speak to in the

8    territories speak English.

9    Q.   When you say territories, sir, you're talking about

10   occupied territories, right?

11   A.   Talking about the West Bank and Gaza.

12   Q.   Are you talking about territories that are militarily

13   occupied by the Israeli army?

14   A.   You can call it military occupied.  You can call it

15   disputed.

16   Q.   Well, is it or isn't it?

17           THE COURT:  Mr. Deutsch, let him finish his answer.

18           MR. DEUTSCH:  Okay.  I'm sorry.

19           THE COURT:  I'll give you all the time you need to

20   cross-examine, but we need to hear the witness.

21           MR. DEUTSCH:  Okay.

22   BY THE WITNESS:

23   A.   They are military occupied.  They are disputed.  They

24   should hopefully be the Palestinian state some day.  You can

25   call them what you like.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 130 of 215
Levitt - cross by Deutsch
336

BY MR. DEUTSCH:

Q.  Well, I would like to call them what's accurate.

Are those territories occupied by the Israeli Defense Forces?

Let's go back to '92, okay?  Were they occupied by the Israeli Defense Forces?

A.  Yes.

Q.  And, therefore, isn't it correct to call them occupied territories?

A.  I'm sorry, I couldn't hear you.

Q.  I said, therefore, isn't it correct to call them occupied territories?

A.  Certainly.

Q.  Why do you call them territories then instead of occupied territories?

A.  It's -- I call them both frankly.  It's whatever comes off the tongue.

Political science usually refers to them as occupied territories or territories.

Q.  Now, did you ever think it was important, based on your expertise, to learn to read and speak Arabic?

A.  Yes.

Q.  But you haven't.

A.  I've started several times, and the -- trying to do that, Arabic is a very complicated language to learn, while

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 131 of 215
Levitt - cross by Deutsch
337

1    finishing a Ph.D. and raising a family is difficult.  It's

2    something I still hope to do.

3             I have started, but I don't claim to have mastered

4    anywhere near enough to be able to say that I speak or read

5    really any Arabic.

6    Q.  That's a limitation on your expertise, is it not?

7    A.  It's a significant one that I can overcome.

8    Q.  That you think you overcome.

9    A.  No, I overcome it.

10   Q.  Now, you testified last week that you identified, as the

11   government flashed up on the screen, leaders of Hamas,

12   correct?

13   A.  Correct.

14   Q.  And one of the leaders that was flashed up was Sheikh

15   Yassin, right?

16   A.  Correct.

17   Q.  You never met Sheikh Yassin, right?

18   A.  That's correct.

19   Q.  You never interviewed Sheikh Yassin, right?

20   A.  Correct.

21   Q.  In fact, Sheikh Yassin was a paraplegic, right, from ten

22   years old, isn't that correct?

23   A.  That's correct.

24   Q.  And, in fact, in 2004, he was killed with nine other

25   people by an Israeli missile, isn't that right?

1  A.  That is correct.

2  Q.  He wasn't carrying a bomb when he was killed, right?

3  A.  I don't know.

4  Q.  Well, did you read about how he was killed?

5  A.  I did.

6  Q.  And was he carrying a bomb?

7  A.  It didn't say.

8  Q.  Was he carrying a weapon when he was killed in his

9  wheelchair by an Israeli missile?

10  A.  Didn't say.  It's unlikely, but --

11  Q.  And you also showed -- they also showed you a picture and

12  you identified a man by the name of Rantisi, right?

13  A.  Correct.

14  Q.  You never met Mr. Rantisi, right?

15  A.  Right.

16  Q.  You never interviewed Mr. Rantisi, right?

17  A.  Right.

18  Q.  And by the way, Mr. Rantisi, he was a political leader of

19  Hamas, you said, right?

20  A.  Yes.

21  Q.  And he was also killed by an Israeli missile, was he not?

22  A.  Yes.

23  Q.  Assassinated, correct?

24  A.  Sure.

25  Q.  Sure?

Levitt - cross by Deutsch

339

1   A.   If that's the term you choose to use.

2   Q.   Well, do you agree that he was assassinated?

3   A.   Yes.

4   Q.   Was he carrying a weapon when an Israeli missile shot him

5   down?

6   A.   Again, I don't know, but he was certainly assassinated.

7   Q.   You also identified a man by the name of Shahada, right?

8   Salah Shahada?

9   A.   Salah Shahada, yes.

10  Q.   And you never met him, right?

11  A.   No.

12  Q.   You never interviewed him, right?

13  A.   No.

14  Q.   And by the way, he was -- the Israelis dropped a two-ton

15  bomb on the apartment building where he lived and he was

16  assassinated, right?

17  A.   Correct.

18  Q.   How many other people, civilians, were killed when he was

19  killed?

20  A.   There were many.

21  Q.   Many.

22  A.   I don't know the number.

23  Q.   More than 20?

24  A.   I don't know, but it was a tragedy.

25  Q.   Tragic.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 134 of 215
Levitt - cross by Deutsch
340

1    A.   Yeah.

2    Q.   And you also identified Khalid Mishal, right?

3    A.   Correct.

4    Q.   And you said that he is the political leader of Hamas,

5    correct?

6    A.   Correct.

7    Q.   And you never met him, right?

8    A.   Correct.

9    Q.   You never interviewed him, correct?

10   A.   Correct.

11   Q.   And do you recall that the Israeli secret police tried to

12   assassinate Mishal when he was in Jordan?

13   A.   That's right.

14   Q.   They put some poison in his ear, right?

15   A.   That's right.

16   Q.   And, in fact, President Clinton had to call the Israelis

17   to demand the antidote so his life could be saved, correct?

18   A.   That's right.

19   Q.   Is that shocking to you, too, sir?

20   A.   Yes.

21   Q.   And you also identified Dr. Mahmoud Al-Zahar, right?

22   A.   Correct.

23   Q.   You never met Dr. Mahmoud Al-Zahar, did you?

24   A.   No.

25   Q.   You never interviewed him, did you?

Levitt - cross by Deutsch

341

1    A.   No.

2    Q.   And by the way, you know, though, that the Israelis bombed

3    his house, did they not?

4    A.   I don't know actually.

5    Q.   Do you know his son was killed by an Israeli bomb in his

6    home?

7    A.   I did not know.

8    Q.   And I think you told the jury -- correct me if I'm

9    mistaken -- actually, the first Hamas you referred to

10   terrorist person you interviewed was in 2004, is that correct?

11   A.   Correct.

12   Q.   So in 1992 to January of 1993, you never interviewed any

13   Hamas people, correct?

14   A.   Correct.

15   Q.   The first one was literally almost a decade later, right?

16   A.   Actually, I think I did interview some in 1997.

17   Q.   Okay.  They told you they were Hamas people?

18   A.   I don't recall.

19   Q.   Okay.  So you don't have any specifics.  You think you

20   did.

21   A.   Correct.

22   Q.   You're not sure.

23   A.   Correct.

24   Q.   But you're sure in 2004 you did interview someone that

25   said they were a Hamas person, right?

Levitt - cross by Deutsch

342

1   A.   Yes.

2   Q.   Okay.  So the information that you're giving to the jury

3   as to the circumstances and the situation from 1992 to January

4   of 1993 is not based on any interviews with any Hamas leaders,

5   correct?

6   A.   I can't recall --

7   Q.   Your own interviews from 1992 to January of 1993.  Did you

8   do any personal interviews with Hamas leaders?

9   A.   Those are two different questions.  Which one are you

10  asking?

11  Q.   The question I'm asking you, sir, is from -- through 1992

12  up to January of 1993, did you interview, personally

13  interview, any Hamas leaders?

14  A.   No, as I said earlier.

15  Q.   Now, after you left the Yeshiva University, you went on to

16  the Fletcher School of Law and Diplomacy at Tufts, right?

17  A.   Correct.

18  Q.   In fact, you were there in two occasions, in 1995 and then

19  again you got your Ph.D. there in 2005, is that right?

20  A.   I was actually there for the duration, from 1993 to 1998,

21  one year at Harvard, but still in the program.  Technically, I

22  was still enrolled at the school finishing my doctorate until

23  last year.

24  Q.   Now, let me ask you, sir, did you choose to go to Tufts

25  because of its close links with the Israeli security

Levitt - cross by Deutsch

1   establishment?

2   A.  Actually, I don't know of such links.  The reason I went

3   actually is because it has such a good program on the Middle

4   East, which is known to be Arabist in nature, which I felt

5   would be good exposure.

6   Q.  Well, did you know that Jonathan Pollard who spied for

7   Israel, spied on the United States for Israel was trained at

8   Tufts, that program you were in?

9   A.  He was in the program for a year.  It's a big joke at the

10  school.

11  Q.  Yeah.  And what about Meir Lanski, a top figure in the

12  Israeli lobby, was also trained there.  Did you know her?

13  A.  Don't know her.  Never heard of her.

14  Q.  Okay.  And did you know that the major benefactor of the

15  Tufts program is the Scaife Foundation, C-A-I-F-E?

16  A.  I know there are Scaife support as well as Kuwaiti support

17  and Qatari support and lots of Arab support for the Fletcher

18  School.

19  Q.  Any Palestinians in the program with you?

20  A.  Sure.

21  Q.  What were their names, sir?

22  A.  I don't remember.

23  Q.  Oh, sure, but you don't remember their names.

24  A.  There were a lot of Arab students with us, Palestinians,

25  Bahrainis, Syrians, Kuwaitis.  I was friends with many of

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 138 of 215
Levitt - cross by Deutsch
344

1   them.  I haven't stayed in touch with almost any of the people

2   I went to school with then --

3   Q.  Now, you also know -- excuse me.  Are you done?

4   A.  You interrupted me.  I'm finished.

5   Q.  Go ahead if you have anything more to say.

6   A.  I'm fine.

7   Q.  And also, you also knew that this Tufts program has a lot

8   of corporate support from military contractors, right?  U.S.

9   military contractors?

10  A.  Actually, I didn't.

11  Q.  Raytheon?

12  A.  Didn't know.

13  Q.  Do you know Theodore Elliott?

14  A.  No.

15  Q.  Do you know that the senior vice president of Raytheon,

16  which makes missiles that U.S. gives to Israel, sits on the

17  board of Tufts?

18          MR. FERGUSON:  Objection.  He said he doesn't know,

19  Judge.

20          THE COURT:  Overruled.  He can answer that.

21  BY THE WITNESS:

22  A.  No.

23  BY MR. DEUTSCH:

24  Q.  Then after you -- in the period after '95, '96, you went

25  to work for the FBI in 1998, correct?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 139 of 215
Levitt - cross by Deutsch
345

1   A.   That's right.

2   Q.   And you know that there are FBI agents involved in this

3   case, correct?

4   A.   Correct.

5   Q.   And you know the FBI conduct could be an issue in this

6   case.  Did you know that?

7   A.   You're telling me now.

8   Q.   Well, you didn't know that.

9   A.   I had no reason to believe FBI conduct would be an issue

10   in this case, but, okay.

11   Q.   All right.  And you're testifying in a case in which your

12   former colleagues of the FBI are involved, is that right?

13   A.   I don't know if any of my actual colleagues were involved,

14   but I was -- I was employed at the FBI.  There is FBI

15   involvement.

16   Q.   And then after you left the FBI, you went to the

17   Washington Institute For Near East Policy, correct?

18   A.   That's correct.

19   Q.   Sir, what is AIPAC?

20   A.   AIPAC is the American Israel Public Affairs Committee, and

21   it is the largest pro-Israel lobby in the United States.

22   Q.   And there is a very strong pro-Israel lobby in this

23   country, is there not?

24   A.   Yes.

25   Q.   And that -- that -- those group of people led by AIPAC try

Levitt - cross by Deutsch

346

1   to influence U.S. policy when it comes to Israel, isn't that

2   right?

3   A.  Yes, within the system, sure.

4   Q.  And it's accurate to say that the U.S. gives more money

5   and military aid and other aid to Israel than it does to

6   Africa, Latin America and the Caribbean combined, isn't that

7   right?

8           MR. FERGUSON:  Objection.  Relevance, scope.

9           THE COURT:  You're pushing it on the outer edges, but

10  overruled, you can answer that if you can.

11          THE WITNESS:  America gives more aid to Egypt and

12  Israel than anybody else.

13  BY MR. DEUTSCH:

14  Q.  Sir, would you answer my question?  Does the United States

15  give more aid to Israel than Africa, Latin America and the

16  Caribbean combined?

17  A.  I don't know what America gives to those areas of the

18  world combined.

19  Q.  How much money does the U.S. Government give to Israel

20  every year?

21  A.  I think --

22          MR. FERGUSON:  Objection.  Relevance, scope.

23          THE COURT:  Sustained.

24  BY MR. DEUTSCH:

25  Q.  Now, the man that actually started the Washington

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 141 of 215
Levitt - cross by Deutsch
347

1  Institute For Near East Policy, the think tank that you joined

2  in 2001 --

3  A.  In 1998.

4  Q.  -- was a man by the name of Martin Indyk, right?

5  A.  It was 1998.

6  Q.  Yeah, I'm sorry -- no -- 1998, yeah.

7  A.  I'm sorry, you're right, 2001.

8          Yes, Martin Indyk.

9  Q.  And Martin Indyk was the former director of research at

10  AIPAC, right?

11  A.  I don't know what his title was, but he had worked at

12  AIPAC, then at the State Department.

13  Q.  So he was active at AIPAC before he started the Washington

14  Institute For Near East Policy, right?

15  A.  He was active at AIPAC.  I actually don't know how

16  involved he was in setting it up.  He was the first director

17  briefly before going to the State Department.

18  Q.  And Barbie Weinberg, do you know who she is?

19  A.  Yes.

20  Q.  She's a former vice president of AIPAC, right?

21  A.  I don't know.

22  Q.  Well, she was involved with AIPAC, was she not?

23  A.  I don't know.

24  Q.  Well, was she -- is she a trustee of the institute, the

25  think tank that you were part of?

Levitt - cross by Deutsch

1  A.  She was a trustee of the Washington Institute.  Is, I

2  believe.

3  Q.  And she's very involved in pro-Israel affairs, is she not?

4  A.  I don't know.

5  Q.  And what about Fred Lafer, L-A-F-E-R, former president of

6  the Jewish Federation of New Jersey.  You know who he is,

7  right?

8  A.  Fred Lafer, yes.

9  Q.  And he's one of the trustees, right?

10  A.  Was, I think still is.

11  Q.  And you -- when you were at the Washington Institute, you

12  worked with a man by the name of David Makowski who was a

13  senior fellow with you, is that right?

14  A.  Yes.

15  Q.  Former editor of the Jerusalem Post, right?

16  A.  And an editor at U.S. News and World Report.

17  Q.  And the institute you were involved with worked very

18  closely with the Jaffee Center For Strategic Studies, correct?

19  A.  No.

20  Q.  You didn't work with the Jaffee Center?

21  A.  I never did.

22  Q.  Did your institute work with the Jaffee Center?

23  A.  I don't know what you mean by worked with.  I don't think

24  we ever had a joint event that I know of.

25  Q.  Well, what about --

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 143 of 215
Levitt - cross by Deutsch
349

1  A.  At least while I was there.

2  Q.  You know Ze'ev Schiff?

3  A.  Yes.

4  Q.  And Ehud Yaari?

5  A.  Yes.

6  Q.  They're both Israeli scholars from the Jaffee Institute,

7  right?

8  A.  They're both Israeli journalists.  I don't know what their

9  other affiliations are.

10  Q.  Now, would you agree with Mr. Indyk, the founder of your

11  institute's statement that the central objective of the

12  institute is to keep the strategic relationship of Israel at

13  the center of U.S. Middle East policy?

14  A.  I'm not familiar with that quote.  I don't know where it's

15  from.  I would certainly say that at least while I was there,

16  that's not what the Washington Institute was all about.

17  Q.  Well, would you characterize it as a pro-Israeli think

18  tank?

19  A.  No.  I would and frequently have been asked that question,

20  and I've always answered that my personal analysis and

21  Washington Institute's -- bless you -- overall analysis should

22  be judged on the merits of its analysis alone, not whether we

23  have Jewish trustees or what color the skin of our trustees

24  are, not whether we're Jewish or Muslim or otherwise, but is

25  the actual analysis sound.

Levitt - cross by Deutsch

350

1   Q.  Well, isn't your analysis been consistently to favor the

2   State of Israel on all points?

3   A.  No.  Actually, I've been criticized for being

4   insufficiently pro-Israel and insufficiently pro-Arab, which

5   means I'm -- I think I'm probably somewhere right in the

6   middle.

7   Q.  Who criticized you as being pro-Arab, sir?

8   A.  Lots of people.  Reviews of my book recently.

9   Q.  Well, have you read a review of your book by Khalid Hroub,

10  H-R-O-U-B?

11  A.  No.

12          THE COURT:  Mr. Deutsch, let me know whenever you're

13  ready for a break.

14          MR. DEUTSCH:  Okay.  I think this is good.  I can

15  stop right here for now.

16          THE COURT:  We'll take our second break of the day

17  and pick up in about 15 minutes, about 25 after.

18    (Jury exits courtroom.)

19          THE COURT:  Mr. Ferguson, I'll give you your exhibits

20  back, and I'll see you at 25 after.

21    (Recess from 3:12 to 3:25 p.m.)

22    (Jury enters courtroom.)

23          THE COURT:  You may be seated.

24          Mr. Deutsch, you may continue.

25          MR. DEUTSCH:  Thank you, Judge.

Levitt - cross by Deutsch

351

BY MR. DEUTSCH:

Q.  Sir, the dissertation you wrote for your -- when you were
at Tufts University, it's In Honor of Israel Levitt, is that
right?

A.  Yes.

Q.  I thought you just told us a little while ago before the
break that that wasn't a person named Israel Levitt.

A.  Irving is his name.  My grandmother, for reasons I
honestly don't know, calls him Israel.  It's my grandfather.

Q.  Well, you put Israel Levitt in your book, right?  You
didn't put Irving, right?

A.  I honestly don't remember, but my grandmother calls him
Israel.  That's probably what I did.

Q.  Do you need for me to show it to you or do you accept my
representation?

A.  I accept your representation.

Q.  Okay.

A.  It's not particularly important.

Q.  And your grandmother called him Israel in honor of the
State of Israel?

A.  No.  I think that Israel is his Hebrew name, having
nothing to do with the country.

Q.  Okay.  And when you lived in Israel, was that during the
time of the occupation of the West Bank and Gaza and East
Jerusalem?

Levitt - cross by Deutsch

352

1   A.   Yes.

2   Q.   Now, after you left the Washington Institute, you went

3   back to work for the government, is that correct?

4   A.   Correct.

5   Q.   And, in fact, you're working for the Treasury Department,

6   correct?

7   A.   Correct.

8   Q.   And, in fact, you know the Treasury Department has issued

9   some opinions about Hamas in this -- in this situation, right?

10  A.   In what situation?

11  Q.   They've issued some opinions about Hamas, correct?

12  A.   Uh --

13  Q.   They have a certain view of Hamas, the Treasury

14  Department, correct?

15  A.   No.

16  Q.   No, they don't?

17  A.   The Treasury Department --

18  Q.   They're neutral as to Hamas?  They're neutral as to Hamas?

19          MR. FERGUSON:  Objection.

20  BY THE WITNESS:

21  A.   Yes, they are.

22          THE COURT:  Let him finish his answer.

23  BY MR. DEUTSCH:

24  Q.   Are you telling this jury that the U.S. Treasury is

25  neutral as to Hamas?

Levitt - cross by Deutsch

353

1  A.  Your question is vague.  If you're asking if the

2  Treasury --

3  Q.  Well, wait a minute.  If my question is vague, sir, I'll

4  rephrase it for you, okay?

5  A.  That would be great.

6  Q.  Are you saying that the U.S. Treasury Department doesn't

7  have an opinion as to Hamas?

8  A.  The U.S. Treasury Department has designated Hamas as a

9  terrorist organization.

10  Q.  Okay.

11  A.  But --

12  Q.  And those are the people you work for, right?

13  A.  But I'm not sure what you mean by opinion.

14  Q.  Well, those -- the people that you work for have taken a

15  position about Hamas, is that correct?

16  A.  Hamas was designated --

17  Q.  Sir, it is a yes or no question.

18  A.  As phrased, no.

19  Q.  Does -- do the people that you work for, have they taken a

20  position about Hamas?  Yes or no?

21  A.  Okay.  As asked, no.

22  Q.  No.  So they don't have any view of Hamas, the U.S.

23  Treasury Department.

24  A.  I'm sorry, are you asking if the individuals or the

25  department?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 148 of 215
Levitt - cross by Deutsch
354

1  Q.  No, I'm talking about the department, the U.S. Treasury

2  Department that you work for.  They've taken a public position

3  against Hamas, haven't they?  Yes or no.

4  A.  The U.S. Treasury Department has designated Hamas a

5  terrorist organization.  Taken a public position against is

6  not in the Treasury Department's vocabulary.

7  Q.  Well, when they designated Hamas as a terrorist

8  organization, that's a position against Hamas, isn't it?

9  A.  It could be construed that way, yes.

10  Q.  Thank you.  Thank you.

11        Now, a lot of the information that you rely on that

12  you've testified to in the last -- last week and today come

13  from Israeli intelligence, does it not?

14  A.  I can't tell you how much, but some does, and it's vetted

15  and corroborated against other sources.

16  Q.  Does a substantial amount of information that you have

17  testified to come from Israeli intelligence sources?

18  A.  Some of it does, yes.

19  Q.  And you trust them, right?

20  A.  As I said, I don't trust anything just because anybody

21  says it.  The academic rigor requires that you try and vet it

22  against other sources and other scholars, so --

23  Q.  They trust you, right?

24  A.  You'd have to ask them.

25  Q.  They talk to you, right?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 149 of 215
Levitt - cross by Deutsch
355

1    A.   And other journalists and academics.

2    Q.   Yeah.  And they give you information, correct?

3    A.   Along with many others, sure.

4    Q.   And they -- and they're selective about the information

5    they give you, wouldn't you say?

6    A.   Actually, I don't know, but I act on the presumption that

7    anybody who gives me information is selective in what they

8    give.

9    Q.   Okay.  They give you information that they want you to

10   somehow disseminate in your books and in your articles and in

11   your testimony, correct?

12              MR. FERGUSON:  Objection.  Calls for speculation.

13              THE COURT:  Overruled.

14              If you can answer.

15   BY THE WITNESS:

16   A.   I don't know.

17   BY MR. DEUTSCH:

18   Q.   Have -- and you've also, among the Israeli intelligence

19   agencies that you've met with is the Shaba'k, right?

20   A.   It's a nickname for the Shin Bet, yes.

21   Q.   Shin Bet is another name for Shaba'k, right?

22   A.   Shaba'k is a nickname.  Shin Bet is what it's called, yes.

23   Q.   Okay.  And Shaba'k means those who must not be seen,

24   right?

25   A.   No.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 150 of 215
Levitt - cross by Deutsch
356

1  Q.  No?  Okay.  And they're the ones that interrogate and get

2  confessions from Palestinians who are arrested in the occupied

3  territories, correct, among other things?

4  A.  Shin Bet and Israeli police both participate in those

5  types of procedures, yes.

6  Q.  But the Shin Bet are the ones that interrogate them in

7  secret places, isn't that right?

8  A.  I don't have any way to answer that question.

9  Q.  Well, last week, you told this jury a couple of times that

10 you read Human Rights Watch Report about the relationship

11 between Hamas political and military, correct?

12 A.  Correct.

13 Q.  I take it you read the Human Rights Reports of the Human

14 Rights Watch?

15 A.  And B'Tselem and many others.

16 Q.  Okay.  And you know then that Human Rights Watch and

17 B'Tselem have condemned the Shaba'k as carrying out systematic

18 torture and coercion of Palestinians who were arrested and

19 detained.

20        You've read that, right?

21 A.  I've read that.

22 Q.  Okay.  And is there any reason that you don't believe

23 that?

24 A.  It's complicated.  I haven't done academic research into

25 it, so that I haven't vetted the sources against others.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 151 of 215
Levitt - cross by Deutsch
357

1          It is disputed.  It is a sensitive issue.  I haven't

2    viewed or certainly not participated in that --

3    Q.  You're not an expert on that, right?  Is that what you're

4    saying?

5    A.  I'm saying that, and that the reports that I've used have

6    been by the Israeli police, which doesn't --

7    Q.  Oh, you -- you have on one side the Human Rights Watch

8    which you designated twice last week as something that you

9    relied on, and B'Tselem, which is an Israeli human rights

10   group, and then on the other side you have the Israeli police,

11   and that's what makes it complicated, right?

12   A.  No, what makes it complicated is that however that

13   information is derived, and I can't comment as to the

14   specifics of how, the information I've used is corroborated by

15   other sources.

16   Q.  Well, I'm asking you, sir, whether or not you have read

17   that the Shaba'k or Shin Bet, as you call it, participate in

18   systematic torture and coercion against Palestinian detainees?

19          MR. FERGUSON:  I'm going to object, relevance, scope,

20   expertise.

21          MR. DEUTSCH:  No, Judge, it's totally relevant

22   because he's relying on information given to him by these

23   people which is based on statements of people who were

24   tortured.  I want to find out his -- his -- the basis for it.

25          MR. FERGUSON:  The witness has made very clear he

Levitt - cross by Deutsch

358

1   relies on police reports.  The question here is with respect

2   to Shin Bet.

3           MR. DEUTSCH:  Okay.  I'll clear it up.

4           THE COURT:  Rephrase it.  Clear it up.

5   BY MR. DEUTSCH:

6   Q.  You say when you're making your determinations and your

7   opinion, you're relying on Israeli police reports, is that

8   right?

9   A.  When we're talking about reports from so-called

10  confessions, yes.

11  Q.  What -- and do you also rely on the Shin Bet reports of

12  confessions?

13  A.  I've never seen such a report.

14  Q.  You've never seen any Shin Bet reports.

15  A.  No, sir.

16  Q.  Okay.  Do you know that the Shin Bet works very closely

17  with the Israeli police?

18  A.  I assume the -- all Israeli law enforcement and

19  intelligence work closely together.

20  Q.  And do you know that first the Shin Bet coerces the person

21  and gets them to break down, and then they give them to the

22  Israeli police to make a statement?

23  A.  I don't --

24          MR. FERGUSON:  I object, relevance and scope and

25  expertise.

Levitt - cross by Deutsch

359

1           THE COURT:  Sustained.

2    BY MR. DEUTSCH:

3    Q.  Well, do you think it would be important when you're

4    relying on information to make expert determinations to

5    determine whether or not the information is reliable?  Yes or

6    no.

7    A.  Absolutely.

8    Q.  And if you knew that the Israeli police were relying on

9    information that came from torture, would you discredit that

10   then?

11   A.  If it could not be verified by vetting against other

12   sources, yes.

13   Q.  And if it was just based on torture and could be verified,

14   then you'd rely on it, is that your testimony?  It doesn't

15   bother you that relying on tortured evidence --

16           MR. FERGUSON:  Objection, compound, argumentative.

17           THE COURT:  Sustained.

18   BY MR. DEUTSCH:

19   Q.  Now, I take it you're familiar with the Israeli Supreme

20   Court opinions finding that the methods of the Shin Bet

21   violated international law and violated Israeli law and

22   constituted torture.

23           MR. FERGUSON:  Objection, relevance, scope.

24           MR. DEUTSCH:  It goes again to what he's relying on.

25           THE COURT:  That's a yes or no question.  Are you

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 154 of 215
Levitt - cross by Deutsch
360

1  familiar with as Mr. Deutsch has just described?

2        THE WITNESS:  No.

3  BY MR. DEUTSCH:

4  Q.  Are you telling us that you're not familiar with the

5  Israeli Supreme Court opinion of 1999?

6        MR. FERGUSON:  Objection, asked and answered.

7        THE WITNESS:  Never read it.

8        THE COURT:  Sustained.

9  BY MR. DEUTSCH:

10  Q.  Never read it.  It's not important, right?

11        MR. FERGUSON:  Objection, argumentative.

12        THE COURT:  Sustained.  He's not familiar with it.

13  Let's move on.

14  BY MR. DEUTSCH:

15  Q.  Well, is part of your expertise trying to understand what

16  happens to the Palestinian people who are living under

17  occupation?  Is that within your expertise?

18  A.  I don't know if it's within my expertise.  It wasn't what

19  I was qualified for here, but it is something I try and do.

20  Q.  Okay.  And in order to try and do it, wouldn't you want to

21  know what happens to 5,000 Palestinians that were arrested

22  every year during the Intifada and subject to interrogation by

23  the Shaba'k?

24  A.  I'm not sure how I'd go about doing that, and, again, it's

25  not an Arab expertise that I research, but I have, because of

Levitt - cross by Deutsch

361

1   this, an interest in the Palestinian plight, spent time in the

2   West Bank and Gaza, including the refugee camps, to understand

3   the difficult conditions in which they live.

4   Q.  So you -- you've read the B'Tselem Human Rights Report

5   about torture of Palestinian detainees.  Is that what you're

6   telling us?

7   A.  No, I didn't say that.  I said I've read B'Tselem reports.

8   I couldn't sit here and tell you which ones I have or have not

9   read.

10  Q.  How about the Human Rights Report on torture of

11  Palestinians under detention?

12  A.  The same.

13  Q.  You don't remember that?

14  A.  I read a tremendous amount of material.  It's possible I

15  read it.  It would be something I'd be interested in reading.

16  Don't know if I did.

17  Q.  Didn't make an impression on you, right?

18          MR. FERGUSON:  Objection --

19          THE COURT:  Sustained.

20          MR. FERGUSON:  -- relevance, argumentative.

21  BY MR. DEUTSCH:

22  Q.  What about the United States State Department reports,

23  human rights reports on torture in the occupied territories?

24  Have you read those?

25  A.  I've seen some of them.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 156 of 215
Levitt - cross by Deutsch
362

1   Q.  And they -- what do you recall about those?

2   A.  I don't offhand.  I didn't review them in preparation for

3   this case.

4   Q.  Well, all you reviewed in preparation for this case was

5   your book, right, and this chart you made and the Hamas

6   charter, right?  Isn't that what you testified to?

7   A.  Immediately preceding this case, correct.

8   Q.  So everything that you may have read about Palestinians

9   being tortured under detention, you forgot, is that what

10  you're saying?

11         MR. FERGUSON:  Judge, I'm going to object to

12  relevance here.  The witness is not an expert and he has said

13  he is not expert and has not been qualified as an expert with

14  respect to the issues that are being inquired here.  The

15  defense can call whomever they want, but that is not proper

16  cross-examination here.

17         THE COURT:  Objection sustained.  Also that last

18  question was argumentative.

19  BY MR. DEUTSCH:

20  Q.  Is it not true, sir, that much of the available evidence

21  linking Hamas political leaders to terrorist activities come

22  from Israeli sources?

23  A.  Some of it does.

24  Q.  No, let me ask you this again, okay?  I want to be very

25  clear with you.

Levitt - cross by Deutsch

363

1          Much of the available evidence linking Hamas

2   political leaders to terrorist activities come from Israeli

3   sources.

4   A.  Yes.

5   Q.  Yes?

6   A.  Yes.

7   Q.  Well, of course, you say yes.  You said it right in your

8   book at page 48, right?

9          MR. FERGUSON:  Objection.

10          THE WITNESS:  Excellent.

11          THE COURT:  Sustained.

12  BY MR. DEUTSCH:

13  Q.  And your book relies on the CIA information, right?

14  A.  Only declassified information, nothing secret.

15  Q.  The FBI?

16  A.  Yes.

17  Q.  The Department of Homeland Securities?

18  A.  Again, all declassified material.

19  Q.  The Canadian Secret Police?

20  A.  Same.

21  Q.  The Shaba'k or Shin Bet?

22  A.  Same.  Interviews mostly and some seized documents.

23  Q.  So when you're testifying to this jury about the link

24  between Hamas political leaders and terrorist activities,

25  that's coming from the Israeli intelligence sources, correct?

Levitt - cross by Deutsch

364

1    A.   It's coming from multiple sources.

2    Q.   Well, most of it is coming -- much of it is coming from

3    the Israeli sources, correct?

4    A.   And if it's in there, it's corroborated by other sources

5    as well.

6    Q.   You said that in your book, didn't you?

7    A.   I believe I did.

8    Q.   Okay.  Now, you testified last week that you've testified

9    in several different cases, correct?

10   A.   That's right.

11   Q.   I think you testified in Cleveland, correct?

12   A.   Correct.

13   Q.   That was for the U.S. Government, the prosecution, right?

14   A.   Correct.

15   Q.   And you were paid about $200 an hour, correct?

16   A.   In that case, yes.

17   Q.   And I take it you were paid for the time you spent

18   preparing and the time you spent testifying.

19   A.   In that case, yes.

20   Q.   And how much money total did you make in that case when

21   you testified for the U.S. Government?

22   A.   I don't know.

23   Q.   You forgot?

24   A.   Yes.

25            MR. FERGUSON:  Judge, I'm going to object as to

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 159 of 215
Levitt - cross by Deutsch
365

1    relevance as to other cases in this respect.

2          MR. DEUTSCH:  Judge, this goes to his bias, his

3    prejudice.  He testifies for the U.S. Government in all these

4    cases.  I think it's totally proper to ask him these

5    questions.

6          MR. FERGUSON:  How much money he previously earned

7    for services previously provided and completely rendered I

8    don't think is relevant to what's going on here now.

9          THE COURT:  Objection overruled.

10   BY MR. DEUTSCH:

11   Q.  Okay.  You also testified in a case in Charlotte, North

12   Carolina, correct?

13   A.  Correct.

14   Q.  You testified for the U.S. Government, right?

15   A.  Correct.

16   Q.  For the prosecution, right?

17   A.  Correct.

18   Q.  And you were paid $200 an hour in that case?

19   A.  Yes.

20   Q.  And I take it you don't remember how much money you made.

21   A.  No, I don't.

22   Q.  Okay.  And then you testified in Brooklyn, New York for

23   the prosecution, for the U.S. Government, correct?

24   A.  Correct.

25   Q.  And you were paid $200 an hour in that case?

Levitt - cross by Deutsch

366

 1  A.  Correct.

 2  Q.  And how -- and what year was that case?

 3  A.  The Brooklyn case was I think 2004, maybe early 2005.

 4  Q.  A couple years ago, right?

 5  A.  One or two years ago.

 6  Q.  How much money did you make in that case?

 7  A.  I have no idea.

 8  Q.  You don't remember what happened two years ago, how much

 9  money you made in a case two years ago?

10  A.  Exactly.

11  Q.  But you're telling this jury what happened in 1992 and '93

12  when you were 22 years old, is that your testimony?

13  A.  Based on the extensive research I've done, absolutely; and

14  if I did research into my earnings and looked it up, I can

15  tell you what it is.  I just can't tell you by recollection

16  now.

17  Q.  Well, maybe you can look it up and when you come back

18  tomorrow you can tell us.  Is that possible?

19          MR. FERGUSON:  Objection.

20          THE COURT:  Sustained.

21  BY MR. DEUTSCH:

22  Q.  And then you also testified in a case in Tampa, Florida,

23  correct?

24  A.  Correct.

25  Q.  How much money -- and it was for the government again,

Levitt - cross by Deutsch

367

1    right?

2    A.   Yes.

3    Q.   And the prosecution, right?

4    A.   Yes.

5    Q.   And you made $200 an hour in that case?

6    A.   Yes.

7    Q.   And how much money did you make in that case?  You don't

8    remember, right?

9    A.   I was about to guess.  I have no idea.

10   Q.   Well, give me a ballpark.  I've just named four cases

11   where you testified for the government, for the prosecution.

12   $100,000?

13   A.   Ballpark, I'd say probably total 50, 60.  Honestly, I

14   don't have that recall here, but I made $200 an hour.

15   Q.   Okay.  So it's somewhere above $60,000, is that fair?

16   A.   Maybe.  Honestly, I -- you know, I want to be as

17   responsive to you as possible, but --

18   Q.   And also you testified for the family of David Boim in a

19   civil case in Chicago, correct?

20   A.   Correct.

21   Q.   And you were paid $200 an hour in that case?

22   A.   Yes.

23   Q.   Okay.  And you were paid by the Anti-Defamation League in

24   that case?

25   A.   No.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 162 of 215
Levitt - cross by Deutsch
368

1   Q.   Well, were you hired by a man by the name of Nathan Lewin?

2   A.   No.

3   Q.   Who hired you in the Boim case?

4   A.   Two lawyers from here in Chicago whose names are escaping

5   me, but --

6   Q.   Did you work with Nathan Lewin in that case?

7   A.   I didn't work directly with him.  The Chicago law firm

8   that I worked with did work with Nathan Lewin.

9         My personal interaction was not with that law firm in

10  D.C. but with the law firm here in Chicago.

11  Q.   But you know Nathan Lewin, right?

12  A.   Uh --

13  Q.   You know who he is?

14  A.   I know who he is.  I don't really know him.

15  Q.   He's very much involved in the pro-Israel lobby in the

16  United States, is he not?

17  A.   I really don't know.

18  Q.   He's a leading figure in the Israeli -- in the pro-Israeli

19  Anti-Defamation League, is he not?

20  A.   I have no idea.

21  Q.   Do you know that the Anti-Defamation League was the one

22  that funded the Boim case?

23  A.   I did not.

24  Q.   But you developed a little cottage industry for yourself

25  going around the country testifying for the government in

Levitt - cross by Deutsch

369

1    these cases, right?

2    A.  I've developed expertise that federal judges have

3    recognized.

4    Q.  And you've made a nice little pocket full of change for

5    yourself talking about things you read on the Internet and

6    read in books, correct?

7    A.  It's about things that I've done research on, though not

8    in this case.

9    Q.  Okay.

10   A.  I haven't been paid here.

11   Q.  Now, last week you gave the jury some background on the

12   Palestinian-Israeli conflict, correct?  You mentioned some

13   things.  I want to kind of review those with you.

14        Are you an expert on that?

15   A.  I'm qualified here as an expert on Middle Eastern

16   terrorist groups.

17   Q.  Oh, okay.  What about what led up to the creation of

18   Middle Eastern terrorist groups?  What causes it?  Are you an

19   expert on it?

20   A.  I believe I am an expert in what causes terrorism, but I'm

21   not sure that that is what you're looking for if what you're

22   looking for is historical expertise in the history of the

23   Middle East.

24   Q.  Well, you probably have read and studied the history of

25   the Middle East, right?

Levitt - cross by Deutsch

370

1    A.  I have.

2    Q.  Okay.  And you did testify last week that there was a

3    partition of the British mandate by the United Nations in '47,

4    '48, correct?

5    A.  That's correct.

6    Q.  And as a result of that partition, originally the land was

7    divided maybe 52 percent for the Israelis and 48 percent for

8    the Palestinians.  Is that fair?

9    A.  I don't know.

10   Q.  You don't even know how the UN partitioned the British

11   mandate?

12   A.  By percentage?  No.

13   Q.  Well, is it -- am I off?  What do you think it is?

14           MR. FERGUSON:  Objection.

15           THE COURT:  Sustained.

16   BY MR. DEUTSCH:

17   Q.  You're telling us that you are an expert on the Middle

18   East and terrorist groups, and you cannot tell this jury how

19   the UN partitioned the British mandate?

20   A.  Down to the single-digit percentage, no.

21   Q.  Well, give me what your best -- your best understanding

22   is.

23           MR. FERGUSON:  Objection.  Judge, he's not letting

24   the witness answer.

25           THE COURT:  Sustained.  Mr. Deutsch, Kathy's going to

Levitt - cross by Deutsch

371

1   have a very hard time getting down everything that's said if

2   you keep interrupting the witness, and I'm concerned that

3   maybe the jury can't hear his answers.  So let him complete

4   his answer, please.

5          MR. DEUTSCH:  Okay.  Let me just show you this chart

6   that we've developed.  There's also a map I could show you as

7   well, and maybe I'll do that.  Maybe I'm going to put the map

8   on the witness stand.

9          MR. FERGUSON:  Judge, we don't have a copy of what is

10   being utilized here.

11          MR. DEUTSCH:  I'm going to use the map.

12          MR. FERGUSON:  But there's lots of writing on what is

13   going to be utilized.

14          THE COURT:  Show Mr. Ferguson what you plan on using

15   first.

16          MR. DEUTSCH:  Show him -- but I'm not even going to

17   use that.

18          Excuse me, Judge, I just need to find --

19          THE COURT:  That's fine.  Take your time.

20          MR. DEUTSCH:  Thank you.

21     (Pause.)

22          MR. DEUTSCH:  Here it is, sorry.  Please forgive me.

23          THE COURT:  Show it to Mr. Ferguson, please.

24          MR. DEUTSCH:  Oh, he's seen this one.

25          THE COURT:  Nice try, Mr. Deutsch.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 166 of 215
Levitt - cross by Deutsch
372

1      (Laughter.)

2              MR. FERGUSON:  I've seen it before, yes.

3              THE COURT:  Okay.  Do you have -- Mr. Deutsch, before

4   you put it up, do you have an exhibit number for it --

5              MR. DEUTSCH:  No.

6              THE COURT:  -- for the record?

7              MR. DEUTSCH:  I will put an exhibit number on it.

8              THE COURT:  Okay.  Please do that for the record.

9   You can hand write it.  That's fine.

10             MR. DEUTSCH:  Defendant Salah Exhibit 1.

11             THE COURT:  Whatever you want to call it is fine with

12  me.

13             MR. DEUTSCH:  Okay.

14             THE COURT:  It's not my exhibit.

15             MR. DEUTSCH:  Okay.

16  BY MR. DEUTSCH:

17  Q.  Okay.  Those maps look -- have any familiarity to you,

18  Mr. Expert?

19  A.  Yes.  I'm sorry?

20  Q.  I'm asking if they have any familiarity to you?

21  A.  They are familiar.

22  Q.  Okay.  And the one on the left is the entire Palestine

23  that was the British mandate, correct?

24  A.  That is British mandate Palestine, yes.

25  Q.  Yeah.  And then the one in the middle is the partition

Levitt - cross by Deutsch

373

1    that was created by the United Nations, correct?

2    A.  Yes.

3    Q.  And it says the partition provided 48 percent of the land

4    for a Palestinian state and a 52 percent for the State of

5    Israel.  Does that refresh your recollection as to the

6    history?

7            MR. FERGUSON:  Objection.  It's not recollection

8    refreshed.  The witness said he simply could not speak to

9    percentages.  He is not an expert in this realm.

10           THE COURT:  The question was does that refresh your

11   recollection which requires a yes or a no.

12   BY THE WITNESS:

13   A.  No.

14   BY MR. DEUTSCH:

15   Q.  Well, based on your study of this -- I take it being

16   someone who's an expert on the Middle East terrorist groups,

17   one of the things you would be studying would be the history

18   of the conflict between the Palestinians and the Israelis,

19   right?

20   A.  Yes.

21   Q.  That would be a basic part of your information, right?

22   A.  Yes.

23   Q.  Okay.  And based on your study, what's your best

24   recollection of how that land was partitioned by the United

25   Nations?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 168 of 215
Levitt - cross by Deutsch
374

1    A.  Are you asking me how the United Nations decided how to

2    partition it?

3    Q.  No.  I'm asking you when the United Nations partitioned

4    the land, what's your best understanding of how much of the

5    land was given to the Palestinians for a state and how much

6    was given to Israel for a state or for the Jewish people for a

7    state?

8    A.  We can --

9            MR. FERGUSON:  Judge, so we're clear, is he asking

10   for a lay opinion because the witness is very clear that he is

11   not an expert in these matters.

12           THE COURT:  Sustained.  If you can lay a foundation

13   that he can give some answer, that's fine, but you're asking

14   him to speculate.

15           MR. DEUTSCH:  Okay.

16   BY MR. DEUTSCH:

17   Q.  When you were at the Yeshiva University, did you have a

18   course on Middle Eastern history?

19   A.  I don't know.

20   Q.  What do you mean you don't know?

21   A.  I took courses in Jewish history as part of the Judaic

22   studies part of it.  I don't think I took a Middle East

23   history course while I was there, but we're talking about a

24   while back now.

25   Q.  Well, they give you a course -- two courses on Jewish

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 169 of 215
Levitt - cross by Deutsch
375

1    history.  Does that deal with the Palestinians, or it's just

2    about Jewish people?

3    A.  This was ancient Jewish history.

4    Q.  Okay.

5    A.  Not necessarily in the Middle East.

6    Q.  Okay.

7    A.  Maybe Jewish history in Europe, for example.

8    Q.  Okay.

9    A.  It's an opportunity to study things I wouldn't get a

10   chance to do any other time.

11   Q.  Okay.  Now, you -- after you left there, you went to the

12   Fletcher School of International Diplomacy, right?

13   A.  Fletcher School of Law and Diplomacy.

14   Q.  Law and Diplomacy.

15        And you got a master's there?

16   A.  I did, and a Ph.D.

17   Q.  And got a Ph.D. there, and you're a doctor, right?

18   A.  Yes.

19   Q.  And as part of your education at Fletcher, did you study

20   the history of the Palestinian-Israeli conflict just beginning

21   at the time that the land was partitioned, 1947?

22   A.  I never took a course specifically on this, but it was

23   covered in many different things.  I spent a lot of time

24   reading and studying it.

25        These maps you show reflect generally how I recall

Levitt - cross by Deutsch

376

1    the maps to be, but you can ask me as many times as you like

2    what the percentages were, and I still don't remember.

3    Q.   Okay.  That's fair enough.  The maps show on the left the

4    entire land of the British mandate and then the middle map is

5    how the partition was -- how the land was divided by the

6    United Nations more or less.  I'm not going to hold you to 52

7    or 48 --

8    A.   Yes.

9    Q.   Okay.  Thank you.

10        And it was your understanding based on your study

11   that these were supposed to be two states, a Jewish state that

12   was going to be called Israel and a Palestinian state, is that

13   right?

14   A.   Correct.

15   Q.   Okay.  And then I think you testified last week there was

16   a war after the partition.  After the UN voted and they

17   partitioned the land, there was a war, right?

18   A.   There was.

19   Q.   Okay.  And you referred -- you said that the Israelis call

20   it the war of independence, right?

21   A.   Correct.

22   Q.   And the Palestinians call it Al Nachba, right?

23   A.   Correct, catastrophe.

24   Q.   Which is translated the catastrophe, right?

25   A.   Yes.

Levitt - cross by Deutsch

377

1    Q.  So for the Israelis it was some type of war of

2    independence, right?  Independence from who?

3    A.  Independence not necessarily from whom, but independence

4    as in gaining sovereignty and an independent state.  It wasn't

5    necessarily --

6    Q.  Well, the UN gave them an independent state, didn't they?

7    When they partitioned the land, they said here, Jewish people,

8    you're going to have this state.  You call it Israel.  This is

9    your land, right?  Before the war of independence, they had a

10   state that was given to them.

11   A.  That's misleading in the extreme.

12   Q.  Okay.  Well, let me ask you this:  After the war of

13   independence, did the -- did the Jewish state get about

14   25 percent more land than was given to them by the United

15   Nations?

16   A.  Again, I don't know percentages but it got significantly

17   more land after the war.

18   Q.  And that land that they got after that war was not given

19   to them by the UN in that partition, right?

20   A.  Correct.

21   Q.  They conquered that land, right, by war?

22   A.  Okay.

23   Q.  Okay?  And that, therefore, that map -- the third map, all

24   the way on the right, shows how much land after that war

25   Israel had, or the Jewish state, and how much was left to the

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 172 of 215
Levitt - cross by Deutsch
378

1   Palestinians, correct, more or less?

2   A.   Yeah, this line of questioning is misleading, and I'm wary

3   of answering it this way in part because --

4   Q.   Okay.  Well, let me ask you another question, okay?

5   A.   Sure.

6   Q.   After that war, and you probably know this from your vast

7   knowledge of this, current events, the Palestinians wound up

8   with about 22 percent of the British mandate, correct?

9   A.   They wound up with what you're seeing here, whatever

10  number that is.

11  Q.   Well, it's about 22 percent, isn't it?

12  A.   If you say so.  I -- you know, I would love to give you a

13  specific number.  I don't know what it is.

14  Q.   Well, you know that the -- okay.  But you accept my -- my

15  statement that it's 22 percent, right?  You have no reason to

16  doubt me.

17  A.   I have no reason to -- to doubt it, to support it.  I

18  don't know where you got that figure from.

19       I can tell you these maps depict -- you know, they're

20  vague -- you know, they're large-scale maps, but they

21  generally depict the way things panned out.

22  Q.   Okay.

23  A.   I apologize I can't do you more on the numbers.  You might

24  want to get a cartographer.

25  Q.   What I'm trying to find out is, again, I've asked you this

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 173 of 215
Levitt - cross by Deutsch
379

 1   question.  I didn't really understand.  You said the war of

 2   independence.  The Israelis call it the war of independence,

 3   and I asked you war of independence against whom?

 4          And you said -- was it like when the United States

 5   was the 13 colonies and we had a war, it was the war against

 6   the British.  It was a war of independence, right?

 7   A.  After the part --

 8          MR. FERGUSON:  Objection, relevance.

 9          THE COURT:  Objection to the form of the question is

10   sustained.

11   BY MR. DEUTSCH:

12   Q.  Let me phrase another question.

13          The Palestinians call it the catastrophe because as a

14   result of the war, 800,000 people, more or less, became

15   refugees, is that fair?

16   A.  As a result of the war and because neither Palestinians

17   nor Arab states accepted the 1947 partition, therefore, it was

18   misleading to say that Israel was given the land.  It wasn't

19   accepted, and they were -- fought on the battlefield.

20          As a result of the war, the Palestinians ended up

21   with far less land than they would have, and there were many

22   refugees.  I can't speak with authority, but there's a lot of

23   authorship, scholarly authorship out there on some who were

24   kicked out by Israelis.  Others who left because they were

25   told by the Arabs leave your homes, we'll kick the Jews into

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 174 of 215
Levitt - cross by Deutsch
380

1    the sea.

2            I'm not an expert in that.  I've read on it, but --

3    Q.  That's not your area of expertise.

4    A.  But it clearly was a catastrophe for the Palestinians.

5    Q.  Okay.  You agree it was a catastrophe for the

6    Palestinians, right?

7    A.  I can certainly see why Palestinians describe it as such.

8    Q.  And you would also agree that, not holding you to the

9    exact number, but hundreds of thousands of people became

10   refugees as a result of this post-partition war.

11   A.  Some forced, some voluntary, yes.

12   Q.  Okay.  And I take it you also know that once -- that the

13   people who left their land, the refugees, the Palestinians,

14   they left everything.  They left their houses, they left their

15   belongings, and they just fled, right?

16   A.  I presume.

17   Q.  Okay.  And you also, do you know that the Israelis then

18   destroyed over 500 of those villages, tore down the houses,

19   destroyed the villages and took over that land, correct?

20   A.  I -- I don't know, but I -- I'm not sure how I'm qualified

21   to answer that question.  Numbers of villages, villages that

22   were destroyed, villages that were occupied, villages that

23   were abandoned, villages that were destroyed.  All this

24   happened.

25           I can't speak to it just because I've read some books

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 175 of 215
Levitt - cross by Deutsch
381

1    on it with any greater authority than you can.

2    Q.  Are you saying that because you weren't there and didn't

3    personally experience it and you just read it in books you're

4    not an authority on it?

5    A.  If I wanted to be an authority on it, I'd conduct field

6    research.  I'd interview people.  I'd also read books and

7    journals, and I'd spend much more time and effort researching

8    it, as I have on the areas that I have been qualified as an

9    expert, and this I haven't.

10   Q.  You don't think it's relevant when you're an expert on

11   Palestinian terrorist groups to have some kind of

12   understanding of what preceded the creation or the emergence

13   of those groups?

14   A.  Between having an understanding and being an expert,

15   there's a world of difference.

16   Q.  Okay.

17   A.  I have a very strong understanding, but I'm not going to

18   tell you that I'm an expert in something other than what I've

19   trained myself to be.

20   Q.  Well, do you have a general understanding of the fact that

21   when the Palestinians fled their homes, the Israelis came in

22   and destroyed a lot of villages, took all the land?

23   A.  I have read that it happened.  I can't speak to how much,

24   how little, how much actually was destroyed, how much was

25   simply occupied, whether those people were forced to leave,

Levitt - cross by Deutsch

382

1    they volunteered to leave.

2           I've never done any scholarly research into the 1948

3    war or the '47 armistice.

4    Q.  Now, would you agree with me that the land that the

5    Israelis conquered in their war of independence was land that

6    was never given to them by the United Nations?  It was never

7    part of the State -- original part of the State of Israel?

8    A.  Again, original part of the State of Israel is a

9    misleading statement since the UN partitioned British mandate

10   Palestine.  The Israelis accepted the partition.  The Arab

11   states and Palestinian leadership did not.

12          So it's not clear that it officially took effect.  It

13   takes both sides to agree to a partition.

14   Q.  So what you're saying is the fact that the Palestinians

15   didn't accept it allowed the Israelis to take as much land as

16   they could by conquering it?

17   A.  No, that's what you're saying.

18   Q.  Well, I'm asking you if you disagree with that.

19   A.  I'm saying that there was an attempt to have peaceable

20   division of the land.  That attempt failed because both sides

21   didn't accept it and one side in particular.

22   Q.  Both sides didn't accept it.

23   A.  No.  One side accepted it.  It takes both sides to accept

24   it.  One side accepted it, one side did not.  That led to

25   war --

Levitt - cross by Deutsch

383

1    Q.   Okay.

2    A.   -- an invasion of Arab armies.  If you wanted to know what

3    Israel's independence from, you'd have to ask an Israeli.  I'm

4    not Israeli, but I imagine they feel they got independence

5    from the Arab armies who went to war with them, but that's

6    just my supposition.

7    Q.   So what you're saying is that when the partition wasn't

8    accepted, that gave a green light to the Israel or the Jewish

9    state to conquer as much land as possible?

10        MR. FERGUSON:  Objection.  Argumentative and --

11        MR. DEUTSCH:  I'm asking him.

12        MR. FERGUSON:  -- this is repeatedly and

13   fundamentally beyond the scope of what this witness has

14   repeatedly said his field of expertise is and what he has

15   testified to.

16        THE COURT:  Sustained.  We're way beyond his

17   expertise.

18   BY MR. DEUTSCH:

19   Q.   Now, when they partitioned the land, the United Nations,

20   it was for the Palestinians to have a state, too, correct?

21   A.   Correct.

22   Q.   And after this war of independence, Israel made an

23   agreement with Jordan and Egypt to give Egypt the Gaza Strip

24   and Jordan the West Bank, right?

25   A.   I don't know how much of an -- excuse me -- agreement it

Levitt - cross by Deutsch

384

 1   was.  I don't remember the history of how it happened.  But I

 2   think it was as much a fact of that there were Jordanian and

 3   Egyptian forces on the ground at the time.  I don't know that

 4   it was Israel that gave it to them, but the fact is that right

 5   after the 1948 war, Gaza was under Egyptian military

 6   occupation, and the West Bank was under Jordanian.

 7   Q.   Palestinians didn't get a state, correct?

 8   A.   That's right.

 9   Q.   Okay.  Now, there was another war in 1967, correct?

10   A.   Correct.

11   Q.   And that's when that more or less 22 percent of the yellow

12   on the map on the right was occupied by the Israeli army,

13   correct?

14   A.   Correct.  Talking about these two portions here.

15   Q.   And that land that they occupied in 1967, the Israeli

16   army, that was never part of the Israeli state, right?

17   A.   Again, you'd have to ask -- there's Israelis who say it

18   was, there's Israelis who say it wasn't.  I'm not an

19   international legal expert.

20   Q.   There's Israelis that want the whole British mandate for

21   themselves, right?  They want all the Arabs out, right?

22        MR. FERGUSON:  Objection.  Argumentative, beyond the

23   scope, relevance.

24        THE COURT:  Sustained.  And form.

25   BY MR. DEUTSCH:

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 179 of 215
Levitt - cross by Deutsch
385

1   Q.  Okay.  Also, as part of the -- prior to 1967, the city of

2   Jerusalem was divided between the Jordanian east side and the

3   Israeli west side, correct?

4   A.  By barbed wire.

5   Q.  Yeah.  And in 1967, when Israeli occupied the West Bank

6   and Gaza Strip, they also took over the city of Jerusalem,

7   correct?

8   A.  They -- they -- they did.  They removed the barriers.

9   There was still the Arab side to Jerusalem.

10          There are basically two segregated sides to

11  Jerusalem.  After '67, both sides came under Israeli

12  authority.

13  Q.  It's kind of even -- it's different than the occupied

14  territories of the Gaza and the West Bank.  Those are

15  occupied.  But Jerusalem was basically brought in under the

16  sovereignty of Israel, right, after 1967?

17  A.  The Palestinians would say that they're occupied as much

18  in East Jerusalem as they were until recently in Gaza and the

19  West Bank.  Israel annexed East Jerusalem, Palestinian part of

20  Jerusalem, and the Golan Heights in the way north into Israel.

21  They didn't expel the Arabs.  There still is today the Arab

22  half of Jerusalem, but from an Israeli perspective, that is

23  what they call a unified city under Israeli sovereignty.

24  Q.  Okay.  So the answer to the question is yes, they did take

25  the sovereignty of Jerusalem as a spoil of the 1967 war.  Yes?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 180 of 215
Levitt - cross by Deutsch
386

1   A.  You're throwing in all kinds of loaded words like spoil,

2   but, yes, I think my answer is pretty clear.

3   Q.  Okay.  Now, after 20 years of occupation, there was an

4   Intifada, and you testified about that last week, correct?

5   A.  Correct.

6   Q.  And I think you described it as a grass roots, nonviolent

7   uprising in response to 20 years of occupation in settlement

8   policies.  Is that fair?

9   A.  That would be an accurate description.

10  Q.  Okay.  And it was demonstrations, correct?  Mass people

11  out demonstrating?

12  A.  It was demonstrations.  There was refusal to pay taxes.

13  It wasn't 100 percent nonviolent.  There was stone throwing.

14  There was some shooting attacks.  It was nothing like the

15  second Intifada that we saw start in September 2000.

16  Q.  And there were work strikes?

17  A.  Work strikes, yes.

18  Q.  And people closing roads.  It was kind of a mass uprising,

19  right?

20  A.  It was.

21  Q.  Okay.  And would you say that it was triggered by the

22  suffering and frustration of the Israeli occupation and

23  settlement policy?

24  A.  I think the way I put it last week largely parallels that

25  by describing it as a combination of precipitance and

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 181 of 215
Levitt - cross by Deutsch
387

1    preconditions, so, yes.

2    Q.  Okay.  And by the way, in 1967 after the war and the

3    occupation, there was a process that began of Israel sending

4    Jewish people into the occupied territories to settle there,

5    isn't that right?

6    A.  That's right.

7    Q.  Okay.  And those people are generally known as Israeli

8    settlers, right?

9    A.  Yes.

10   Q.  And these people built settlements in the territories that

11   was occupied in the West Bank and Gaza, correct?

12   A.  Correct.

13   Q.  And by 1987, 20 years later, there was almost 100,000 of

14   those settlers living in that occupied territories, right?

15   A.  I don't know the number, but there was a significant

16   settler presence.

17   Q.  Right.  And, of course, you told us that the settlement

18   was one of the aggravating factors to the -- causing the

19   Intifada, the occupation and the settlements, right?

20   A.  Yes.

21   Q.  Okay.  And just so the jury gets an idea, you have written

22   about the incredible economic hardships of living under

23   occupation, haven't you?

24   A.  I have.

25   Q.  Okay.  And I think you said that at one point, 75 percent

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 182 of 215
Levitt - cross by Deutsch
388

1    of the families living in the occupied territories were living

2    on $2 a day or less, right?

3    A.  I'd have to see it in front of me to verify all the

4    numbers, but that sounds right, and I don't know what the time

5    frame is either.

6    Q.  Okay.  Do you want to see your book and look at what you

7    said or --

8    A.  If you want me to verify something I said in the book,

9    sure.

10   Q.  Okay.  Well, let me ask you a few other questions, and

11   then I'll show you your book.

12   A.  Sure.

13   Q.  Unemployment was incredibly high, over 30 percent?

14   A.  It varied over this period of time, but at some points it

15   was at least that.

16   Q.  And there was a problem with chronic malnutrition of

17   children.  30 percent of the children suffered from

18   malnutrition?

19   A.  Especially in Gaza.  Again, the numbers I'd have to

20   verify.

21   Q.  Okay.  And there was a high infant mortality rate, much

22   higher than in our country, right?

23   A.  Yes.

24   Q.  Probably seven or eight times higher?

25   A.  Again, I don't know, but it was terrible.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 183 of 215
Levitt - cross by Deutsch
389

1    Q.   Uh-huh.

2    A.   And probably still is.

3    Q.   And is it fair to say that as a result of the economic,

4    social and health conditions in the occupied territory, life

5    there was truly miserable?

6    A.   Yeah, it sounds familiar.

7    Q.   Yeah, it does.

8         And is it also fair to say that clearly the vast

9    majority of Palestinian people were in desperate need of

10   assistance from unemployment compensation to food, child care

11   and access to proper medical care?

12   A.   Yes, and that's primarily what the UN does.

13   Q.   Yeah.  And a deplorable standard of living for those

14   people?

15   A.   Yeah, again, it varies, but there certainly is -- I mean

16   for the vast majority it is deplorable.  On the flip side, you

17   have Palestinians who live in luxury.

18   Q.   Okay.  And is it also fair to say that the Israeli

19   government has consistently failed to provide essential

20   services to the Palestinian people?

21   A.   As the occupying entity, yes.

22   Q.   And they have -- if they're an occupying force, they have

23   that responsibility under the Geneva convention, don't they?

24   A.   I believe that's accurate.  Certainly they failed to do

25   so.

Levitt - cross by Deutsch

390

1   Q.   Okay.   And the refugee camps.   You've been to a refugee

2   camp, right?

3   A.   I have.

4   Q.   After 1997, right?

5   A.   Yes.

6   Q.   Okay.   And I think you described them as very sad, very

7   horrible, right?

8   A.   Yes.

9   Q.   People living in squalor, right?

10  A.   Yes.

11  Q.   In fact, Gaza, the camps in Gaza has the world's highest

12  density population, right?

13  A.   Gaza overall has the highest density population.

14  Q.   And would you agree with me that there's a dire need for

15  social services for those people living under occupation?

16  A.   Clearly.

17  Q.   And, in fact, just looking at it in 1987, when the

18  Intifada began, that if there weren't the charitable

19  activities in the occupied territories by different groups,

20  people could die of starvation, is that fair?

21  A.   The role that the international community played was

22  critical in preventing that starvation.

23  Q.   Well, also not only the international community, but there

24  were groups on the ground that were providing charitable

25  social welfare assistance, correct?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 185 of 215
Levitt - cross by Deutsch
391

1    A.   Compared to the level of assistance provided by the

2    international groups, it was a pittance; but, yes, there are a

3    great many groups on the ground providing estimated in the

4    tens of millions of dollars compared to I believe it's over a

5    billion dollars, one point something billion dollars that the

6    various UN agencies --

7    Q.   Right.   The United Nations was providing a great amount of

8    food and housing for the people living in the refugee camps,

9    right?

10   A.   Was and is.

11   Q.   Yeah, but you're saying tens of millions of dollars were

12   being provided in services for the people -- by the people on

13   the ground, the people running these charitable groups, right?

14   A.   Tens of millions of dollars went through these various

15   groups.   Not all of that necessarily went to charity work.

16   Q.   Let me ask you this:   Have you ever heard the fact that

17   the potential of starvation was so bad that when people went

18   to visit their loved ones who were in prison, the prisoners

19   actually smuggled food out to give to their family members?

20   Have you ever heard that?

21   A.   I haven't heard that.

22   Q.   Now, do you know Benny Morris, who Benny Morris is?

23   A.   I know of him.   I don't know him.

24   Q.   And you know he is a very respected Israeli historian,

25   correct?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 186 of 215
Levitt - cross by Deutsch
392

1    A.  He's respected and he's equally contentious.  There's many

2    people who would describe him as respected as those who would

3    say he's very much the opposite.

4    Q.  Okay.  Let me ask you this if you agree with this

5    statement by Benny Morris:  "Israelis like to believe and tell

6    the world that they were running an enlightened or benign

7    occupation, qualitatively different from other military

8    occupations the world had seen.  The truth was radically

9    different.  Like all occupations, Israeli's was founded on

10   brute force, repression and fear, collaboration and treachery,

11   beatings and torture chambers and daily intimidation,

12   humiliation and manipulation."

13          Would you agree with that?

14   A.  Again, I'm not sure I'm expert to get into all that

15   detail, especially since it would involve, as it's stated,

16   being able to compare it to other occupations.

17          MR. FERGUSON:  Judge, why are we publishing this?  I

18   object.

19          MR. DEUTSCH:  I want him to --

20          THE COURT:  Mr. Deutsch, if you want him to see it,

21   you can show it to him.  This exhibit or document you're

22   putting up on the overhead has not been admitted into evidence

23   or moved to be used as a demonstrative, so it's not proper to

24   show it.

25          MR. DEUTSCH:  All right.  I'd like to move to use it

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 187 of 215
Levitt - cross by Deutsch
393

1  as a demonstrative so he can look at it and respond to my

2  questioning.

3          MR. FERGUSON:  Judge --

4          MR. DEUTSCH:  And the jury can see it, too.  I mean I

5  read it, they could hear it, but if they see it, then they're

6  able to --

7          THE COURT:  There are rules about what they can and

8  can't see.

9          Yes, Mr. Ferguson.

10          MR. FERGUSON:  He read it.  They heard it.  The

11  witness is responding to it, and the only thing it's

12  demonstrative of is Benny Morris's particular view in that

13  particular publication, which has no relevance here.

14          THE COURT:  Objection sustained.

15  BY MR. DEUTSCH:

16  Q.  Okay.  I'm sorry, you were answering my question whether

17  you agree with what Benny Morris, the historian, said about

18  the occupation.

19  A.  I think my statement that it's beyond my expertise and is

20  Benny Morris's opinion is best said.

21  Q.  Is what?

22  A.  Is the best way to put it.  You can call Benny Morris.  He

23  can tell you better.

24  Q.  Okay.  So you're not an expert on the occupation, right?

25  A.  Correct.

Levitt - cross by Deutsch

394

1  Q.  You're not an expert on the history of the division of the

2  land, correct?

3  A.  Correct.

4  Q.  Okay.  But would you agree that as a result of the

5  Intifada, this grass roots uprising, things got a lot worse

6  for the people in the occupied territories?

7  A.  I honestly can't say because I haven't read comparative

8  studies.  Israeli forces would sometimes respond especially to

9  rock throwing, et cetera.  I don't know how the quality of

10  life changed specifically then.

11  Q.  Well, let me ask you this:  As a result of the Intifada,

12  were there sustained closures of the check points between the

13  occupied territories and Israel?

14  A.  I would say no.  There were sustained closures because

15  there were terrorist attacks the Israelis were trying to

16  thwart.

17  Q.  Wait a second.

18  A.  I don't know of evidence that the closures at check points

19  were necessarily part of the occupation strategy.

20  Q.  In -- what period of time did the first Intifada last,

21  1987 till about 1992?

22  A.  1992, yes, '93.

23  Q.  Okay.  And these -- you did tell the jury that this was a

24  mostly nonviolent uprising, right?

25  A.  Compared to the second one --

Levitt - cross by Deutsch

1  Q.  Yes.

2  A.  -- certainly.

3  Q.  Yes.

4  A.  But there was plenty of violence there, too.

5  Q.  Yeah.  And are you saying that they closed the check

6  points as a result of -- in order to prevent people from going

7  into Israel from the occupied territories?  Is that fair to

8  say?

9  A.  I think that would be part of it.

10  Q.  Yeah.

11  A.  But you're asking a question about why and when the

12  Israelis did.  You're best calling an Israeli.

13  Q.  Okay.  But you would agree with me that a great majority

14  of the Palestinian people, whether they were protesting or

15  not, were actually -- worked, made their livelihood by going

16  into Israel, correct, to work?

17  A.  Correct.  As whether the occupation was benign or not, one

18  thing the Israelis did do in an effort to try and maintain the

19  fledgling Palestinian economy is to allow Palestinian workers

20  into Israel proper to work there.

21  Q.  Rather than helping their own economy build up in the

22  occupied territories, they let them go and work for -- be the

23  maids and the lowest level workers in Israel, right?

24          MR. FERGUSON:  Objection to form.

25          THE COURT:  Sustained.

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 190 of 215
Levitt - cross by Deutsch
396

1  BY MR. DEUTSCH:

2  Q.  But it's fair to say, regardless of why they closed --

3  they did close those check points as a result of the Intifada,

4  right?

5  A.  They were open.  They were closed.  There were check

6  points that --

7  Q.  It cut down quite a bit on the people's ability to work in

8  Israel and earn a living, right?

9  A.  When those closures happened, yes.

10  Q.  Okay.  And it's closed as to people regardless of whether

11  they were involved in the acts of the Intifada.  It's kind of

12  a collective punishment, right?

13  A.  One could also say that because the activities of groups

14  like Hamas are covert and they don't wear uniforms or carry

15  I.D.s saying they're Hamas, therefore, the Israelis couldn't

16  identify who they had to stop or not.  In balance, in trying

17  to prevent attacks against civilians and trying to maintain a

18  level of existence for Palestinians, this is what they did.

19  I'm not saying it was good.  This was just what it was.

20  Q.  Well, you agree with me that imposes a collective

21  punishment on a large population in response to the crimes of

22  a few?

23  A.  Unfortunately, yes.

24  Q.  Okay.  And I want to be clear because the Intifada started

25  in 1987.  According to your chart, Hamas began around that

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 191 of 215
Levitt - cross by Deutsch
397

1   time, and there was no -- the first -- according to your

2   chart, the first suicide bombing attack against a civilian of

3   that nature began in March or April of '93, right?

4   A.   The first successful attack of that nature was in the

5   spring of '93 --

6   Q.   Okay.

7   A.   -- of a suicide nature.

8   Q.   Okay.  So I take it they weren't closing the check points

9   and preventing the people from going to work between 1987 and

10  January of 1993 because of suicide bombings because there

11  hadn't been any, correct?

12  A.   There were other attacks, and I also don't know how

13  extensive and regular those closures were.

14       My assumption would be that they became a much larger

15  issue much later in the process --

16  Q.   Okay.

17  A.   -- in the time line.

18  Q.   In addition to the closing of the check points, as part of

19  the Intifada, and I'm talking about a period from '87 to '92

20  more or less, okay?

21  A.   Uh-huh.

22  Q.   There were also curfews imposed on the people who lived in

23  the occupied territories, right?

24  A.   Again, I know there have been curfews.  I don't know how

25  much or how few in that particular period of time; but there

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 192 of 215
Levitt - cross by Deutsch
398

1  were, as Israeli authorities tried to calm tensions on the

2  street and prevent violence.

3  Q.  Okay.  And that's also a form of collective punishment.

4  Curfew means nobody can go out of their house for periods of

5  time, right?

6  A.  First of all, there's water if you'd like.

7  Q.  Okay, thank you.

8  A.  That's what curfews mean, yes.

9  Q.  Okay.  And these are not curfews that necessarily last one

10  day.  They could last 30 days or 60 days, right?

11  A.  I honestly don't know.  That would strike me as irregular

12  at best.  I don't know.

13  Q.  And, of course, there were a lot of arrests during the

14  Intifada, right?

15  A.  I would assume so, but, again, I don't know.

16  Q.  You're not an expert on the Intifada.

17  A.  I don't have at my fingertips the kind of data that you're

18  hoping I can have.

19  Q.  Well, I'm not asking you for any specifics.  I asked you

20  if there were a lot of arrests.

21  A.  I assume there were.  I don't know.

22  Q.  Okay.  Thousands of arrests every year, right?

23  A.  That's possible.  Given activities on the ground, it's

24  probably likely.

25  Q.  And, of course, you said that there was people throwing

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 193 of 215
Levitt - cross by Deutsch
399

1  stones at the soldiers and at their tanks, right?

2  A.   There were stone throwers and tax evaders and all kinds of

3  protests.

4  Q.   Okay.  And several hundred children were killed by the

5  soldiers, weren't they, during the Intifada?

6  A.   Again, I don't know the numbers, but one of the great

7  tragedies is that not just children, certainly plenty of

8  children, but all kinds of civilians were killed, some in what

9  might be perceived as more legitimate fighting and many more

10  in just Israeli efforts to quell stone throwing and other, you

11  know, tragedies.

12  Q.   Well, I mean, what would be a legitimate fight between an

13  Israeli tank and somebody who was unarmed?

14           MR. FERGUSON:  Objection to form.

15           THE COURT:  Sustained.

16  BY MR. DEUTSCH:

17  Q.   And also there were the beginnings of house demolitions,

18  right?  If the Israeli military thought that you were a leader

19  or involved in the Intifada, they could come and take a

20  bulldozer and knock your house down, correct?

21  A.   I don't know when it started, but the Israelis did do

22  that.  They would get some type of Israeli court approval for

23  it, but that's what they did.

24  Q.   And are you familiar with in May of 1987, the killing of

25  seven Palestinian laborers in Rishon LeZion by an Israeli

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 194 of 215
Levitt - cross by Deutsch
400

 1   reservist soldier?

 2   A.  Not specifically, no.

 3   Q.  But you know there were acts of killing unarmed civilians

 4   in retaliation for the nonviolent demonstrations, right?

 5          MR. FERGUSON:  Judge, I'm going to object.  It

 6   precedes the time at issue in the indictment, and I just don't

 7   see how it's relevant.

 8          THE COURT:  Sustained, and he said he wasn't aware.

 9   BY MR. DEUTSCH:

10   Q.  And I think you agreed with me, not as to the exact

11   number, but by 1987, there were merely a hundred thousand

12   settlers living in those territories, right?

13   A.  Many settlers.

14   Q.  Many settlers.

15   A.  I don't know the number.

16   Q.  And those settlers kind of had their own land, right?

17   A.  The settlers would purchase land and establish a

18   settlement, usually put a fence around it, prevent intruders,

19   and they would occupy that land.

20   Q.  They had their own roads, too, right?

21   A.  Actually, I think their own roads started later, much

22   later, but eventually they did.

23   Q.  Okay.

24   A.  Mostly used bypass roads so they wouldn't be driving

25   through Palestinian towns and villages.

Levitt - cross by Deutsch

401

 1  Q.  And, in fact, the settlers refer to these areas not as

 2  Palestinian occupied territory or territories.  They had names

 3  for them.  Judea and Samaria, right?

 4  A.  Judea and Samaria are the Biblical names for those areas,

 5  so they're not necessarily settler terms.  Because some, there

 6  are all kinds of settlers there, some who are extreme, some

 7  who are not, but those settlers who felt that there was, from

 8  a Jewish perspective, a Biblical injunction to settle all of

 9  what they perceived as holy land.  There are Jews who see it

10  all as holy land like there are Islamists that see it all

11  as holy land.  They often refer to it by its Biblical title.

12  Q.  You know who Abba Eban was, right?

13  A.  He was an Israeli foreign minister.

14  Q.  And he was a member of the Israeli legislature called the

15  Knesset, right?

16  A.  Yes.

17  Q.  Respected member of Israeli society?

18  A.  He was a major political dovish figure.

19  Q.  Okay.  Let me ask you if you agree with how he described

20  the relationship between the settlers and the Palestinian

21  people:  "In the areas of Judea and Samaria, which are, he

22  says, Israel's appellations for the West Bank and Gaza, today

23  there are 1.3 million Arabs and less than 50 Israeli settlers.

24  The Arabs cannot vote or be elected at any level, have no

25  degree of juridical control over the government that

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 196 of 215
Levitt - cross by Deutsch
402

1  determines the conditions of their existence, have no rights

2  or appeal against the judgments of the military courts, and

3  are not free to leave their land with assurance of a right to

4  return, are not immune from judgments of expulsion from their

5  birth place and homeland" --

6       MR. FERGUSON:  I'm going to object, irrelevance,

7  compound.  This is just -- this is speechifying through

8  reading a very lengthy quote.  If he has a particular question

9  on a particular subject, let him ask it.

10      MR. DEUTSCH:  Judge, I'm asking him about what the

11 prime minister -- the foreign minister of Israel said about

12 the issue of the settlers which directly relates to the issues

13 in this case.

14      MR. FERGUSON:  Judge, he's giving a speech of --

15      MR. DEUTSCH:  I'll just put it up on the --

16      THE COURT:  No, you won't.  No, you won't.

17      Objection sustained.  If you want to break down your

18 question --

19      MR. DEUTSCH:  Okay.

20      THE COURT:  -- go ahead, or if you want to ask the

21 witness to read it to himself and see if he agrees, you can do

22 that.

23 BY MR. DEUTSCH:

24 Q.  Well, let me ask you this:  Would you agree that the Jews

25 who live as settlers have totally different rights and

Levitt - cross by Deutsch

403

1    immunities than the Palestinian people?

2    A.  To the Jews who live in the West Bank -- at the time,

3    Gaza, too -- have different rights than Palestinians, I

4    believe so --

5              MR. FERGUSON:  Judge --

6    BY THE WITNESS:

7    A.  -- but again, that's a legal issue.  I --

8    BY MR. DEUTSCH:

9    Q.  Would you agree --

10             MR. FERGUSON:  I just would like a time frame for all

11   of this.  There have been many changes and evolutions in all

12   of this.

13             THE COURT:  Sustained.  Clarify a time frame.

14             MR. DEUTSCH:  1987, the beginning of the Intifada.

15   This is what he said at the beginning of the Intifada about

16   the relationship between the people, the indigenous people in

17   the occupied territories and the people who are settlers.

18             I'll ask you just one more question without reading

19   it.

20   BY MR. DEUTSCH:

21   Q.  Would you agree that there is a society in the West Bank

22   and Gaza in which a man's rights are defined not by his

23   conduct or by any egalitarian principle but by his ethnic

24   identity?

25   A.  No, I wouldn't.  I think it had more to do with national

Levitt - cross by Deutsch

404

1   identity, and I'm not saying I agreed with it, but the point

2   was that by virtue of those Palestinians not taking Israeli

3   citizenship, they didn't have full Israeli rights.  Many

4   Palestinians did take Israeli citizenship.

5          I'm not saying that they should have.  This is the

6   nature of occupation, and I'm not saying occupation is good;

7   but it had less to do with an ethnic issue and more to do with

8   a nationalist conflict.

9   Q.  Well, the people who lived in the occupied territories,

10  the ones that lived in the refugee camps, they didn't have a

11  right to take Israeli citizenship, did they?

12  A.  Not the ones who lived in camps, no.

13  Q.  No, right?  In fact, if you're a Jewish person anywhere in

14  the world, you have a right to go and live in Israel and

15  become a citizen, right?

16  A.  Yes.

17  Q.  It's called the right of return, right?

18  A.  Correct.

19  Q.  The Palestinian people don't have a right even to return

20  to their own little 22 percent land under the occupied

21  territories, right?

22  A.  If there were to be a Palestinian state and especially in

23  the context of a two-state solution, they would.  Currently --

24  Q.  But they don't -- they didn't in 1992, did they?

25  A.  As a non-sovereign entity, they did not.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 199 of 215
Levitt - cross by Deutsch
405

1    Q.  So -- and if they left the occupied territories to go

2    somewhere to visit a relative, they might not be allowed to

3    come back, right?

4    A.  That's right.

5    Q.  And who decided whether they could come back to their land

6    in the occupied territories?  Whose decision would it have

7    been?

8    A.  That would have been the Israeli authority's decision.

9    Q.  Now, there is an ideology.  You talked quite a bit last

10   week about the charter and you read from the Hamas charter and

11   quoted at length some ideology that was in the charter,

12   correct?

13   A.  That's right.

14   Q.  All right.  And it was referred to as some ideology that

15   the land belongs to the Palestinian people, right?  All the

16   land.  They want all the land, right?

17   A.  That's --

18   Q.  That was the thrust of your reading that charter, correct?

19   A.  It's not my thrust.  It's what the charter says.  That's

20   Hamas's position.

21   Q.  Right.  You were presenting it, you and Mr. Ferguson were

22   presenting it back and forth, right?

23   A.  Correct.

24   Q.  Okay.  There is an ideology among the Jewish people, too,

25   that all the land, that whole mandate, British mandate,

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 200 of 215
Levitt - cross by Deutsch
406

1    belongs to them, right?

2    A.   There is.

3    Q.   And, in fact, the idea is that God gave them that land,

4    and they have the right to have that land for themself,

5    correct?

6    A.   There are some who believe that way.

7    Q.   Yeah.  And, of course, there is an ideology that the

8    Jewish people are the chosen people by God, right?

9    A.   There are some who believe that, too.

10   Q.   Yeah.  And do you know what the word Amekelites mean?

11   A-M-E-K-E-L-I-T-I-S -- T-E-S.

12   A.   I think what you're trying to read to me is from the root

13   of Amalek, which is kind of in Jewish ancient history the

14   quintessential enemy of the Jewish people.

15   Q.   And Arabs are often called that, right?

16   A.   Jewish extremists have all kinds of nasty names for Arabs

17   as Arab extremists do for Jews.  It's ugly on both sides.

18   Q.   All right.  And you're talking about Jewish extremists,

19   right?  But there is actually a political party in Israel at

20   least in 1991 and 1992 called the Moledet party,

21   M-O-L-E-D-E-T, correct?

22        MR. FERGUSON:  Judge, I'm going to object to

23   relevance on all of this.

24        MR. DEUTSCH:  It's directly relevant.

25        MR. FERGUSON:  The fact that there's --

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 201 of 215
Levitt - cross by Deutsch
407

 1            MR. DEUTSCH:  I want --

 2            MR. FERGUSON:  The fact that there's some extremists

 3  on the other side does not countenance, forgive, justify the

 4  terrorist issues that are -- the terrorist activities that are

 5  at issue here.

 6            MR. DEUTSCH:  This is not about extremists on the

 7  other side.  This is about people who are part of the Israel

 8  government, the Israel legislature.  And I would point out

 9  that the term Judea and Samaria, which is the term that these

10  people use, is the same term that the GSS, the Shaba'k used.

11            THE COURT:  Mr. Deutsch, but you are asking

12  Dr. Levitt this who's been qualified as an expert in Hamas

13  terrorist acts.

14            MR. DEUTSCH:  Judge, do want me to --

15            MR. FERGUSON:  Can we do this at side bar?

16            THE COURT:  We can do it at side bar.

17            Ladies and gentlemen, if you need to stand up and

18  stretch, go ahead.

19     (Proceedings heard at side bar:)

20            MR. DEUTSCH:  I think it's unfair to have a witness

21  come on the stand and say I'm an expert on terrorist groups

22  and Hamas, but anything else I don't have any expertise on.

23            This directly involved whether or not this Hamas is

24  in fact a terrorist group, whether --

25            THE COURT:  How does the Israeli political party,

Levitt - cross by Deutsch

408

1    extremist political party in 1991 relate to it?

2            MR. DEUTSCH:  Because -- here's how it relates.

3    Mr. Salah is charged, among other things, with bringing

4    money --

5            THE COURT:  Right.

6            MR. DEUTSCH:  -- in 1992 and early 1993, and I'm

7    going to bring out from this witness at that particular time

8    there was extremist settlement groups that were attacking

9    Palestinians and as a result of that, the Palestinians were

10   suffering greatly and had great need for the funds that he was

11   bringing.

12           It's part of the Intifada, and that I want to bring

13   out -- they were allowed to bring out this whole very

14   prejudicial thing about the charter and how Hamas believes

15   that they're entitled to all the land there and that the Jews

16   are bad, et cetera, and I think that I'm entitled to show

17   that, in fact, there are people on the other side that are

18   doing the very same thing and that, in fact, this is one of

19   the reasons why the Palestinians have suffered so much and why

20   they, in fact, need the economic aid that Mr. Salah brought.

21           MR. FERGUSON:  Judge, this is really in the form of

22   selective prosecution.  Who's on trial here right now are

23   defendants charged with conspiring to facilitate Hamas, a

24   designated terrorist organization, but a group engaged in

25   terrorist acts regardless of whether it was designated or not

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 203 of 215
Levitt - cross by Deutsch
409

1    at any particular time.

2           Whether or not there are extremist groups out there

3    does not in any way constitute a defense or justification for

4    the provision of support for military activities by a

5    non-governmental entity such as Hamas here.  This is simply an

6    attempt to introduce the notion that there are extremists that

7    are not being brought before the bar here by the government --

8           MR. DEUTSCH:  No.

9           MR. FERGUSON:  -- in this particular action, and

10   there has been a long line of cross-examination that we did

11   not object to in which Mr. Levitt has discussed the social

12   situation, the economic situation, various aspects of life in

13   Palestinian society coming at the time of the Intifada and

14   then during the Intifada and moving forward that all seem to

15   constitute the relevant justification for what really has been

16   stated as the defense here, which is the movement of money was

17   simply to support charity and social services.

18          What an extremist Jewish group's ideology has to do

19   with any of that is completely beyond me.

20          MR. DEUTSCH:  He's testified on direct about Baruch

21   Goldstein going into a mosque and shooting down unarmed Muslim

22   prayers, and then he says that as a result of that, there were

23   these bombings, okay?

24          I think I'm entitled to probe from him the situation

25   that was existing on the ground when Mr. Salah decided he was

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 204 of 215
Levitt - cross by Deutsch
410

 1    going to go there with that money or help bring that money,

 2    and for the jury to understand it.  It's not just about what

 3    the Israelis were doing.  The settlers were part of the

 4    Israeli state.

 5           THE COURT:  If you want to bring out the conditions,

 6    because I know that's your defense and that Mr. Salah was

 7    bringing money in to -- for the refugees for the conditions,

 8    that's fine and I've let you go into that, but we're not going

 9    into political parties who are extremists and that's, A, going

10    beyond this witness's expertise, and, B, not appropriately

11    brought out here.

12           So I'm sustaining the objection to the last question.

13    Again, you can go into with him, to the extent he can answer,

14    the social conditions that Mr. -- you are claiming Mr. Salah

15    was bringing money to, but you've gone beyond that.

16           Objection sustained.

17      (Proceedings heard in open court:)

18           THE COURT:  Mr. Deutsch, just for planning purposes,

19    you have about 15 more minutes for this evening before we pick

20    up tomorrow.

21           MR. DEUTSCH:  Okay.  Thank you.

22    BY MR. DEUTSCH:

23    Q.  You testified I think today and I'm sure last week maybe

24    about a situation in which about 450 accused or believed

25    militants were expelled from their country and put into some

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 205 of 215
Levitt - cross by Deutsch
411

1  mountain camp in Lebanon, right?

2  A.  400 --

3  Q.  Yes or no?

4  A.  415.

5  Q.  415, okay.

6  A.  Yes.

7  Q.  And am I correct in saying that they were just summarily

8  arrested and taken out of their country and put in another

9  country?  Is that a fair description of what happened?

10  A.  Yes.

11  Q.  Okay.  They didn't have a trial, right?

12  A.  Correct.

13  Q.  No one said you did X, Y and Z and we're going to decide

14  whether you're guilty or not, right?

15  A.  Correct.

16  Q.  Okay.  And there was a concern even before that that there

17  was some kind of effort to expel Palestinian people from their

18  own land, correct?

19          Among the Palestinian people, there was a concern

20  that there was going to be some ethnic cleansing, where people

21  would be moved out of their own territory.

22          MR. FERGUSON:  I'm going to object as to vagueness,

23  foundation, time frame.

24          THE COURT:  Sustained.

25  BY MR. DEUTSCH:

Levitt - cross by Deutsch

412

1    Q.  Well, at the time that these deportations happened or

2    expulsions.

3          By the way, there was no judicial process by which

4    these people were taken away from their families and put in

5    another country, right?

6    A.  I don't know if there was some excuse for a judicial

7    process.  I don't know how the Israelis decided or selected

8    individuals, but for the purposes of Western standards, there

9    was not, and the U.S. Government condemned it.

10   Q.  Okay.  That's right.  The U.S. Government condemned it and

11   the United Nations condemned it, right?

12   A.  Yeah, I believe so.

13   Q.  And was there not a -- beyond the people and families of

14   the people who suffered as a result of it, was there not a

15   concern expressed by Palestinian people that this was a

16   prelude to mass expulsion of people from their land?

17   A.  I hadn't heard that.

18   Q.  Okay.  You do know that there were people, Israeli people

19   that advocated that, right?

20   A.  There's an extreme fringe that advocates that, but I don't

21   know that there was any type of mainstream voice for that.

22   Q.  Well, would you consider the Likud party an extreme

23   fringe?

24          MR. FERGUSON:  Judge, I'm going to object.

25          THE COURT:  Sustained.

Levitt - cross by Deutsch

413

1    BY MR. DEUTSCH:

2    Q.  Well, have you ever heard of the term engineered

3    immigration?

4    A.  No.

5    Q.  Do you know of a man by the name of Rechavam Ze'evi,

6    member of the Knesset, member of the ministerial committee on

7    defense and security?

8              MR. FERGUSON:  Objection.

9              THE COURT:  The question is do you know a man by that

10   name.

11   BY MR. DEUTSCH:

12   Q.  Not personally.

13   A.  I think you're referring to Rechavam Ze'evi.

14   Q.  Yeah.

15   A.  I've heard of him.  I don't know him.

16   Q.  Okay.  And he openly advocates expelling --

17             MR. FERGUSON:  Objection.

18   BY MR. DEUTSCH:

19   Q.  -- all Palestinians from the occupied territory.

20             THE COURT:  Sustained.  Sustained.

21   BY MR. DEUTSCH:

22   Q.  The people that were deported, the 415, there were other

23   people that were also arrested at that time and put in prison,

24   right?

25   A.  I believe so.

Levitt - cross by Deutsch

414

1    Q.   About 1,600 more people, right?

2    A.   I don't know.

3    Q.   They didn't have charges or trials.  They were just

4    rounded up and arrested, right, as far as you know?

5    A.   I -- it's not as far as I know.  I don't know.

6    Q.   Okay.  Did you know that at least 25 percent of the people

7    who were deported or expelled from their country were faculty

8    and students at Palestinian universities?

9    A.   I did not.

10   Q.   Now, at the time of -- in the '91, '92, do you know how

11   much of the land of the West Bank was controlled by the

12   settlers?

13   A.   No.

14   Q.   It's true, is it not, that a lot of these settlers are

15   armed with machine guns, correct?

16   A.   I've seen settlers with pistols for defensive purposes.

17   I've seen -- there's plenty of Israeli army presence, and they

18   will have other weapons.

19   Q.   Well, everybody -- every Jewish person who is a citizen of

20   the State of Israel has to serve in the army, correct?

21   A.   Almost without exception.

22   Q.   And then you become a reservist.  After your term of duty,

23   you become a reservist, correct?

24           MR. FERGUSON:  Objection, relevance.

25           THE COURT:  Sustained.

Levitt - cross by Deutsch

415

 1  BY MR. DEUTSCH:

 2  Q.  You visit -- I take it you have visited the settlements in

 3  the West Bank, right?

 4  A.  I have.

 5  Q.  And you have seen that they have swimming pools, correct?

 6  A.  I actually haven't seen the swimming pools, but I've heard

 7  that there are some that do, yes.

 8  Q.  And some of them have villas on hills.  They're very nice,

 9  aren't they?

10          MR. FERGUSON:  Judge, objection, relevance.

11          MR. DEUTSCH:  Again, Judge, it goes to what was going

12  on at the time that Mr. Salah brought that money.

13          THE COURT:  Objection to the swimming pool question

14  is sustained.

15          If you can tie it back up consistent with what I

16  said, go ahead --

17          MR. DEUTSCH:  Okay.

18          THE COURT:  -- but you're not there.

19  BY MR. DEUTSCH:

20  Q.  The people that are the settlers -- not all of them, but a

21  certain percentage of them are very hostile to the

22  Palestinians, correct?

23  A.  There are some, yes.

24  Q.  They -- they call them all kinds of derogatory names,

25  right?

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 210 of 215
Levitt - cross by Deutsch
416

1    A.   Like I said, there's horrible name calling on both sides.

2    Q.   Okay.  And the settlers, though, they're kind of --

3    they're protected by the Israeli army, right?

4    A.   To one extent or another, yes.

5    Q.   And they have tremendous security around their

6    settlements, right?

7    A.   Again, tremendous, I don't know.  It varies.

8              Those settlements that have been attacked in

9    terrorist attacks tend to have more security.  Those that are

10   deeper into the West Bank tend to have more security.  It

11   varies.

12   Q.   And if you know, the settlers are actually encouraged by

13   the Israeli government to go and settle in the Palestinian

14   lands, right?

15   A.   There have been times in Israeli history where there have

16   been administrations that have pushed that, and there have

17   been other times where there have been administrations who not

18   only opposed it but withdrew settlements.

19   Q.   All right.  Well, what about in '91, '92, were they -- or

20   '87 to '92, were they encouraging people to go and settle in

21   that territory?

22             MR. FERGUSON:  Judge, objection, relevance.

23             THE COURT:  Sustained, and vague.

24   BY MR. DEUTSCH:

25   Q.   Okay.  And the natural resources of the land, the water,

Case 1:03-cr-00978  Document 1065  Filed 01/05/09  Page 211 of 215
Levitt - cross by Deutsch
417

 1  is disproportionately used by the settlers as compared to the

 2  Palestinians, right?

 3  A.  In some cases, yes.

 4        There have been other cases where settlements have

 5  been delayed opening or not opened because water was reserved

 6  for Palestinians, but there's no question that there is a

 7  severe water shortage, and it's an important part of the

 8  conflict.

 9  Q.  You're familiar with Maron Benvenisti?

10  A.  No.

11  Q.  Never heard of him?

12  A.  I don't think so.

13  Q.  Well, would you agree or disagree with his statement:

14        "The total amount of water planned for allocation in

15  the Arab sector, agriculture and domestic consumption, at the

16  end of the decade of 1980 is 137 million cubic meters --

17        MR. FERGUSON:  Objection, time frame, relevance.

18        THE COURT:  Sustained, and he doesn't know him.

19        MR. DEUTSCH:  I'm asking him if he agrees with his

20  statement.  He's saying that --

21        THE COURT:  Sustained.

22        MR. DEUTSCH:  -- the settlers use all the water.

23        THE COURT:  Ask your next question.

24  BY MR. DEUTSCH:

25  Q.  Okay.  Now, are the settlements basically placed in areas

Levitt - cross by Deutsch

418

1  to prevent a contiguous Palestinian state developing?

2  A.  There's debate about that.

3      It's more accurate that settlements were originally

4  strategically placed in defensive measures after the wars on

5  the Jordan ridge, for example, around Jerusalem to solidify

6  Israel's claim to Jerusalem.

7      Sometimes settlements were just put in certain places

8  because that's where the Israelis who were moving to settle

9  that area could find the land that some Palestinian would sell

10 them.  So it varied.

11 Q.  Are you familiar with Naomi Chasen, deputy speaker of the

12 Israeli Knesset?

13 A.  No.

14 Q.  Never heard of her?

15 A.  No.

16 Q.  Would you disagree with her statement that settlements

17 were purposely placed in areas that would separate Palestinian

18 population clusters --

19      MR. FERGUSON:  Objection to form.

20 BY MR. DEUTSCH:

21 Q.  -- denying the possibility of Palestinian integrity?

22      MR. FERGUSON:  Judge, objection.

23      THE COURT:  Sustained.

24 BY MR. DEUTSCH:

25 Q.  Would you agree that because a lot of the settlers are

Levitt - cross by Deutsch
419

1    reservists in the army -- well, strike that.

2           Do the people who are reservists in the army have a

3    right to carry their weapons?

4    A.  My understanding is that they are not allowed to carry

5    their weapons when they're not on duty.

6           But Israelis, like Americans here, can get permits to

7    carry weapons.  Not their, but official issue.  At least

8    that's what I've observed.  I'm really not an expert on this.

9    Q.  Okay.  And in your observations, have you observed a lot

10   of settlers, armed settlers?

11   A.  I've seen settlers with side arms.

12          I don't -- I've never tallied, but I've actually

13   commented in the past that I was surprised there were as few,

14   that I observed as few as I did, given how much people talk

15   about how settlers are armed.

16   Q.  Well, would you agree that there's -- the line between a

17   civilian and a settler is a blurred one?

18   A.  No.

19   Q.  You wouldn't agree.

20   A.  No.

21          MR. DEUTSCH:  Okay.  Judge, this is actually a good

22   time to break.

23          THE COURT:  Okay.  Ladies and gentlemen, we are done

24   for the evening.  9:15 tomorrow morning.  We're back on our

25   regular schedule.

Case 1:03-cr-00978   Document 1065   Filed 01/05/09   Page 214 of 215
Levitt - cross by Deutsch
420

1        9:15, meet on the second floor where you've been

2    meeting, and please do not discuss the case, and don't watch

3    any media coverage.  Thank you.   Have a good evening.

4      (Jury exits courtroom.)

5        THE COURT:  Dr. Levitt, you may step down.  Two

6    things before you do.

7        First of all, please be back here tomorrow morning by

8    9:15.  You have been tendered for cross-examination, so you

9    may not discuss your testimony with any of the prosecutors.

10        Have a good evening.

11        THE WITNESS:  Thank you.

12        THE COURT:  With respect to everybody else, please be

13    here by 9:15 tomorrow morning.

14        If Ms. Thompson could be here, I would like to take

15    up at that point the jury instruction on CIPA material.

16        MR. DEUTSCH:  Okay.

17        THE COURT:  How much longer roughly do you think you

18    have, ballpark?  One hour or six hours?

19        MR. DEUTSCH:  Two hours, two or three hours.

20        THE COURT:  Okay.  Then, Mr. Moffitt, you will go.

21        My guess is Dr. Levitt will be on the stand a chunk

22    of tomorrow, if not all of it.  And then the translators are

23    next.

24        MR. FERGUSON:  Yes, Judge.

25        THE COURT:  Okay.  How many of them?

1          MS. HAMILTON:  Three after a stipulation.

2          THE COURT:  Okay.  My guess is that will take us

3    through most of tomorrow.  Have a good evening.  I'll see you

4    at 9:15.

5          MR. BLOOM:  If we finish with them tomorrow, could we

6    be notified as to who the next witness will be after that?

7          MR. FERGUSON:  We'll let the defense know.

8          THE COURT:  Okay.  I'll see you tomorrow.

9                          CERTIFICATE

10     I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12

13   _____          _____
     Joseph Rickhoff                      Date
14   Official Court Reporter

15

16   _____          _____
     Kathleen M. Fennell                      Date
17   Official Court Reporter

18

19

20

21

22

23

24

25