422

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3
     UNITED STATES OF AMERICA,           ) Docket No. 03 CR 978
4                                         )
                         Plaintiff,       )
5                                         )
                 vs.                      )
6                                         )
     MUHAMMAD HAMID KHALIL SALAH AND      )
7    ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, ) Chicago, Illinois
                                          ) October 25, 2006
8                        Defendants.      ) 9:15 o'clock a.m.

9
                          VOLUME SEVEN
10            TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
11

12   APPEARANCES:

13
     For the Plaintiff:          HON. PATRICK J. FITZGERALD
14                               United States Attorney
                                 BY:  MR. JOSEPH M. FERGUSON
15                                    MR. REID J. SCHAR
                                      MS. CARRIE E. HAMILTON
16                               219 S. Dearborn St., Suite 500
                                 Chicago, Illinois  60604
17

18   For Deft. Salah:            PEOPLE'S LAW OFFICES
                                 BY:  MR. MICHAEL EDWARD DEUTSCH
19                                    MS. ERICA THOMPSON
                                      MR. BENJAMIN ELSON
20                               1180 North Milwaukee Avenue
                                 Chicago, Illinois  60622
21
                                 LAW OFFICE OF ROBERT BLOOM
22                               BY:  MR. ROBERT JAY BLOOM
                                 3355 Richmond Boulevard
23                               Oakland, California  94611

24
     For Deft. Ashqar:           MR. KEITH ALLAN SPIELFOGEL
25                               20 North Clark Street, Suite 1200
                                 Chicago, Illinois  60602

1    APPEARANCES (Cont'd):

2

3    For Deft. Ashqar (Cont'd):  MR. WILLIAM MOFFITT
                                  11582 Greenwich Point Road
                                  Reston, Virginia  20194

4

5    Also Present:               S/A BRADLEY BENAVIDES, FBI
                                  S/A JILL PETTORELLI, FBI

6

7    Court Reporter:             MR. JOSEPH RICKHOFF
                                  Official Court Reporter
8                                 219 S. Dearborn St., Suite 1232
                                  Chicago, Illinois  60604
9                                 (312) 435-5562

10

                  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11

                         PROCEEDINGS RECORDED BY
12                        MECHANICAL STENOGRAPHY
                   TRANSCRIPT PRODUCED BY COMPUTER
13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  03 CR 978, USA vs. Muhammad Salah and

2   Abdelhaleem Ashqar.  Jury trial continues.

3          THE COURT:  Good morning.

4          MR. FERGUSON:  Good morning, Judge, Joe Ferguson,

5   Reid Schar and Carrie Hamilton for the government.

6          MR. DEUTSCH:  Michael Deutsch and Ben Elson and

7   Muhammad Salah -- others will be here -- for Mr. Salah.

8          THE COURT:  Okay.

9          MR. MOFFITT:  William Moffitt, Keith Spielfogel and

10  Dr. Ashqar.

11         THE COURT:  Good morning.

12         I wanted to take up the substitution instruction this

13  morning.  I see Ms. Thompson is not here yet.

14         MR. DEUTSCH:  We've spoken about it and I'm prepared

15  to address the Court on it.

16         THE COURT:  Okay.

17         Before we turn to this, is there anything else I need

18  to take up before the jury comes in?

19         MR. FERGUSON:  Not for the government.

20         THE COURT:  Mr. Deutsch, anything else?

21         MR. DEUTSCH:  No, I have nothing, Judge.

22         THE COURT:  Mr. Moffitt?

23         MR. MOFFITT:  No.  No, ma'am.

24         THE COURT:  Okay.

25         All right.  Let us turn to the substitution.

1                I have provided you with a draft instruction.

2                Mr. Deutsch, I took into consideration what you had

3       presented to the Court during one of our ex parte situations

4       and added what I thought was appropriate.

5                MR. DEUTSCH:  Okay.

6                THE COURT:  I have not heard from either side on my

7       draft.

8                MR. DEUTSCH:  We have some suggestions --

9                THE COURT:  Okay.

10               MR. DEUTSCH:  -- or objections, if you will.

11               THE COURT:  Sure.

12               MR. DEUTSCH:  "This case involves classified

13      information," that's fine.

14               THE COURT:  I have the word "certain."  Are you

15      taking that out?

16               MR. DEUTSCH:  No.  "Certain classified information."

17               "Classified information is information or material

18      that has been determined by the United States government -- "

19      "has been determined" " -- that may not be disclosed by the

20      United States government."

21               We feel very strongly that the "reasons of national

22      security" is going to create some kind of higher level of

23      concern on the jurors' part.  All the jurors need to know,

24      it's classified and it may not be disclosed.  We don't

25      understand why the jury has to determine it's for reasons of

 1   national security.

 2          THE COURT:  So, you are okay with the second sentence

 3   other than the last few words, "for reasons of national

 4   security"?

 5          MR. DEUTSCH:  Yes, more or less.  Yes.  Yes.

 6          THE COURT:  Okay.

 7          And, then, the next, "in lieu of disclosing"?

 8          MR. DEUTSCH:  Yes, we have no problem with the next

 9   sentence or the sentence after that.

10          The next sentence, which starts, "The witnesses in

11   this case, as well as attorneys, are prohibited from

12   disclosing classified information; and, in the case of the

13   attorneys -- " we would add "are prohibited over their

14   objection from asking questions to any witness."

15          Now, oftentimes, you have a situation where the

16   defense objects to something and the Court -- the jury hears

17   the objection and, then, the Court rules on it.  And we want

18   the jury to know that we object to it.

19          So, it would be "in the case of the attorneys, are

20   prohibited, over their objection, from asking questions to any

21   witness which, if answered, would disclose classified

22   information."

23          So, that --

24          THE COURT:  What benefit would that give, though?

25   Because I told the jurors at the beginning of the case, and I

 1   will instruct them at the end, that you -- it is your

 2   obligation to object; your objections are not evidence; they

 3   should not speculate about your objections; they should not

 4   draw any conclusions from your objections or my rulings on

 5   them.

 6           I essentially tell them it is --

 7           MR. DEUTSCH:  Not evidence.

 8           THE COURT:  Exactly, and it is a legal matter, that

 9   you are required -- or not required, but expected to do when

10   you do not think something should come in, but they should

11   not -- that should not affect what they do in deliberating.

12           So, I am just wondering what you think, in light of

13   that and in how they are instructed, what benefit --

14           MR. DEUTSCH:  Well, the benefit --

15           THE COURT:   -- you think you get from this.

16           MR. DEUTSCH:  The benefit is that it would appear to

17   a jury that we're not vigorously cross-examining that witness,

18   that we are somehow not challenging the witness as to certain

19   matters that we would normally challenge them to in

20   cross-examination.

21           And, therefore, it seems to me that the jury should

22   know that we object to this limitation on our cross-

23   examination.  It seems to me it's a way to let the jury know

24   that this is something that is a limiting ruling on the right

25   of cross-examination.

1          THE COURT:  Okay.

2          MR. DEUTSCH:  Okay.

3          The next sentence --

4          THE COURT:  And I will hear from the government.

5          MR. DEUTSCH:  Okay.

6          THE COURT:  You look like you are anxious.

7          MR. DEUTSCH:  "Defendants may not cross-examine a

8   particular witness regarding underlying classified materials

9   set fort in these -- " you say "substitutions."  I say

10  "admissions."  They're admissions.

11         THE COURT:  Sure.  Okay.

12         MR. DEUTSCH:  Okay.

13         Now, the next sentence I'm troubled by:  "You may

14  decide what weight, if any, you feel the substitutions

15  deserve."

16         Again, they're admissions; but, it seems to me that

17  since they're admissions, they are admissions.  They -- I

18  don't -- it seems to me by saying "what weight, if any, the

19  substitutions deserve," it seems to me it limits and undercuts

20  the whole purpose of saying that these are admissions by the

21  government as to what, in fact, is contained in these

22  admissions.

23         And, actually, I would say at the beginning, "court

24  instruction admissions," not "substitutions."

25         THE COURT:  That was more for you --

1           MR. DEUTSCH:  Okay.

2           THE COURT:  -- than for anything, but --

3           MR. DEUTSCH:  My suggestion -- we had a suggestion

4   rather than that last sentence, put in "substitutions are

5   binding on the prosecution" or "admissions are binding on the

6   prosecution."  But if that seems too argumentative --

7           THE COURT:  Just take it out.

8           MR. DEUTSCH:  -- take out that last sentence, "decide

9   what weight, if any" and just leave it as "admissions."  And,

10  then, the government can argue, "You don't have to rely on

11  it," or, "it's not really that important in this case," and we

12  can argue the opposite.

13          THE COURT:  Okay.

14          Mr. Ferguson or Mr. Schar, address the instruction as

15  a whole because I have not heard your input on what I have

16  drafted, as well as Mr. Deutsch's proposals.

17          MR. SCHAR:  As you drafted it, Judge, it's fine with

18  the government.

19          THE COURT:  Okay.

20          MR. SCHAR:  So, we would have no proposed changes.

21          Taking Mr. Deutsch's in order -- and, perhaps, he can

22  remind me from time to time if I've missed one -- the

23  disclosure "for reasons of national security," that's actually

24  the definition of classified information.

25          THE COURT:  Yes.  I took it out of CIPA.

1          MR. SCHAR:  Yeah, it's directly out of CIPA, I

2  believe.

3          THE COURT:  It is.

4          MR. SCHAR:  So, that's -- to limit what actually is

5  the correct definition, we would object to that.

6          In addition, there is no -- I mean, if I'm missing

7  one, let me know, but there is no relevance to the defendant

8  objecting or the government objecting or anyone objecting;

9  and, to suggest to the jury that that has some relevance to

10  them within this instruction, I think, is wrong.

11          And, particularly, since, as I understand it, the

12  second-to-last sentence -- "defendants may not cross-examine a

13  particular witness regarding the underlying classified matters

14  set forth in these substitutions" -- seems to me to address

15  any issue that deals with "we object."  It's laid right out

16  there that they can't cross-examine on it.

17          And the fact that they object to it -- that they

18  can't cross-examine on it -- that's a legal issue that you've

19  resolved.  It's not a legal issue that should in any way

20  influence the jury.

21          And as for the last sentence --

22          THE COURT:  What about changing the word

23  "substitutions" to "admissions"?

24          MR. SCHAR:  They are substitutions.  They are

25  admissions.  So, I don't -- it's fine.

1              THE COURT:  Okay.

2              MR. SCHAR:  But I agree with it as written in the

3     sense that although they're admissions, like any piece of

4     evidence, they shouldn't be given the imprimatur in any way

5     that they should be taken or they should not be taken for more

6     weight or less weight.  The jury ultimately must decide with

7     every single piece of evidence and every witness what weight,

8     if any, they want to give it.

9              It is an admission.  I don't think there's any doubt

10    that Mr. Deutsch will argue it's an admission.  We're not

11    going to contest it's an admission.  But to somehow suggest

12    that deserves more weight or less weight, it's up to the jury

13    to decide what, if anything, they want to do with the

14    admission.

15             MR. DEUTSCH:  Judge, just two matters.

16             THE COURT:  Sure.

17             MR. DEUTSCH:  In our original proposal to you, we

18    suggested that this is classified information based upon the

19    Israeli government's assertion --

20             THE COURT:  But that is --

21             MR. DEUTSCH:  -- accepted by the -- we didn't put

22    that in there?

23             THE COURT:  You did, but I --

24             MR. DEUTSCH:  And I know you took it out.  And I

25    understand why you would take it out:  Because in the end it's

1    the government that decides that.

2          THE COURT:  Exactly.

3          MR. DEUTSCH:  But the reason that we put it in is

4    because we do not want this jury thinking that the United

5    States government has information that's based on national

6    security that the jury can't see.

7          I think it's prejudicial to the jury to think, "Oh,

8    my God, this case involves some kind of national security

9    issue for the United States government."  I think it's unfair.

10   I don't see why it's necessary to say that.  If it's

11   classified information, then it's classified.  Why it's

12   classified because it's national security, I don't think

13   that's relevant to the jury.  The issue is that we cannot

14   cross-examine the witness about certain information.  I don't

15   see why the jury has to know that.

16         MR. FERGUSON:  Here's why the jury has to know that.

17         In opening argument, there was already an insinuation

18   by Mr. Deutsch with respect to the witnesses from Israel not

19   testifying under their actual names.  And there was an

20   insinuation that there was something improper about that.

21         This instruction grounds -- as proposed by the Court,

22   grounds -- this in the center of the advocacy attempts on both

23   sides surrounding various aspects of information coming from

24   various sources in the case.  This is the Court that's

25   speaking.

1          What is being attempted here is something that pushes

2   towards that inappropriate insinuation, that we've already

3   seen and that, in the absence of a clear instruction grounded

4   in the law and the definitions by the law, the jury is going

5   to be moved towards.  It is appropriate here.

6          Judge, to the extent that the Court would in any way

7   consider the request by Mr. Deutsch to add the language "which

8   the defense has objected to," I think there would need to be

9   additional language beyond that that makes it clear that the

10  Court has ruled that it is inappropriate, as a matter of law,

11  with respect to what it is the defense is seeking, which is

12  actually what would happen in court:  It would be rejected.

13         MR. DEUTSCH:  Judge --

14         THE COURT:  Mr. Deutsch, you had one more point you

15  wanted to make.

16         MR. DEUTSCH:  Yeah.

17         I want to respond to this point because there's no --

18  when you tell a jury that this case -- somehow information

19  that's relevant in this case is not being given to you because

20  of national security, in this climate at this time, I believe

21  that's highly prejudicial and it's not necessary to tell the

22  jury that.  If it's classified, the Court is telling the jury,

23  "Based on the law, you cannot have that information."

24         The jury does not need to know that it involves

25  national security.  Of course, the Court very well knows that

1    we think the whole national security allegation is a sham.

2          THE COURT:  I understand.  And you know my rulings on

3    that.  We are not going to revisit that.

4          MR. DEUTSCH:  Yeah, I'm not going to revisit it,

5    either.

6          But I just think to interject national security now

7    is unfair and prejudicial.

8          THE COURT:  I understand your argument.

9          MR. DEUTSCH:  Okay.

10         THE COURT:  You had one other point.

11         MR. DEUTSCH:  Yeah, I did have one other thing, and

12   let me see if I can --

13         THE COURT:  Was it about taking out the last

14   sentence?

15         MR. DEUTSCH:  Yes, taking out the -- if the Court

16   wishes at the end of the case to instruct the jury that any

17   evidence, admissions or other evidence is for you to decide

18   what weight to give, we don't have a problem with that.  But

19   to put it in this, I think, diminishes the significance of it.

20         THE COURT:  Okay.

21         I will tweak this and give you -- take into

22   consideration both of your arguments and give you -- a final

23   instruction.

24         MR. SCHAR:  Judge, it does raise -- I'm sorry -- one

25   other issue, because it's possible we will begin to get to the

1   Israeli witnesses today.  And given Mr. Deutsch's opening, I

2   think it would be appropriate when they testify to provide

3   some instruction to the jury regarding the use of their name.

4   I'm not asking at this point that you instruct that you've

5   found for security purposes that they need not provide their

6   names, but I think there should be some admonition that you

7   have found legally they do not need to -- I just think there

8   should be -- provide a name.

9           THE COURT:  That they can testify underneath their --

10  the names they use at work?

11          MR. SCHAR:  Exactly.  Something of that sort, given

12  what happened in opening.

13          THE COURT:  Mr. Deutsch, do you have an objection to

14  telling the jury that the ISA agents are permitted to testify

15  using their -- the name that they use at work or something

16  along those lines?

17          MR. DEUTSCH:  No, because that's accurate.  The Court

18  has determined that they can testify on a name other than

19  their real name.

20          THE COURT:  Okay.

21          I will draft something this morning --

22          MR. SCHAR:  Thank you, Judge.

23          THE COURT:  -- and give it to you before they

24  testify.

25          We were missing one juror a moment ago.

1          Theresa, would you go double-check and see.

2          I know there were problems with some of the train

3     lines today, given the fire yesterday.

4          We are still missing one.

5          (Brief pause.)

6          THE COURT:  Is Dr. Levitt here?

7          MR. FERGUSON:  He is here, Judge.

8          (Brief pause.)

9          THE COURT:  Would you bring Dr. Levitt in, please.

10          The jury -- they are all here.

11          (Brief pause.)

12          THE COURT:  The jury will be in in a moment.

13          (Brief pause.)

14          (Jury in.)

15          THE COURT:  You may be seated.

16          Good morning, ladies and gentlemen.

17          You will see it is a little bit cooler in here today.

18     Hopefully, you are not cold.

19          We are going to continue with cross-examination of

20     Dr. Levitt.

21          Dr. Levitt, you are still under oath, sir.

22        MATTHEW LEVITT, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

23          THE COURT:  Mr. Deutsch, you may proceed.

24          MR. DEUTSCH:  Thank you, Judge.

25        CROSS-EXAMINATION ON BEHALF OF DEFENDANT SALAH - Resumed

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 16 of 159
Levitt - cross by Deutsch
437

1   BY MR. DEUTSCH:

2   Q.  Sir, yesterday we discussed the very deplorable conditions

3   that Palestinians were living under in the occupied

4   territories in the early '90s, correct?

5   A.  Yes.

6   Q.  And would you agree with me that based on those

7   conditions, it would be understandable for Palestinian

8   Americans to want to provide economic assistance for their

9   brothers and sisters living here --

10          MR. FERGUSON:  Object.

11  BY MR. DEUTSCH:

12  Q.  -- in the occupied territories?

13          MR. FERGUSON:  Objection.  Calls for speculation.

14          THE COURT:  Sustained.

15  BY MR. DEUTSCH:

16  Q.  Well, would --

17          MR. DEUTSCH:  Judge, I do not understand that

18  objection.

19          THE COURT:  See if you can lay a foundation that is

20  not asking him to speculate about something.

21  BY MR. DEUTSCH:

22  Q.  Well, the conditions were bad, right?

23  A.  Yes.

24  Q.  People were suffering, correct?

25  A.  Correct.

1  Q.  People -- there are Palestinian Americans living in the

2  United States, right?

3  A.  Correct.

4  Q.  And those people have more resources than the people in

5  the occupied territories, as a general rule, right?

6  A.  I would imagine so.

7  Q.  And would it be surprising to you that people with more

8  resources living in the United States would want to give money

9  and economic support to people suffering in the occupied

10  territories?

11      MR. FERGUSON:  Judge, same objection.  This --

12      THE COURT:  The question was, "Would it be surprising

13  to you?"

14      Just a "Yes" or a "No," if you can answer that

15  question.

16  BY THE WITNESS:

17  A.  I suppose not.

18  BY MR. DEUTSCH:

19  Q.  And, in fact, in 1992 and 1993, it wasn't illegal under

20  U.S. law to give money from the United States to people living

21  in the occupied territories, correct?

22      MR. FERGUSON:  Judge, I'm going to object, again.  It

23  calls for a legal conclusion.

24      THE COURT:  Sustained.

25  BY MR. DEUTSCH:

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 18 of 159
Levitt - cross by Deutsch
439

1   Q.  Well, you work now for the Treasury Department of the

2   United States government, don't you?

3   A.  I do.

4   Q.  And one of the things the Treasury Department does is

5   decide whether or not certain organizations are illegal and

6   you can't give money or have business relationships with them,

7   correct?

8   A.  Correct.

9   Q.  Okay.

10         And, in 1995 -- actually, January 24th, 1995 -- the

11   Treasury Department said that you could not have any

12   unlicensed transactions or business with Hamas, correct?

13   A.  Correct.

14   Q.  So, prior to January of 1995, you could have licensed

15   dealings -- unlicensed dealings -- with Hamas, correct?

16         MR. FERGUSON:  Judge, calls -- same objection.

17         THE COURT:  Sustained.

18         You can ask him if anything was in place at the

19   Treasury Department --

20         MR. DEUTSCH:  Okay.

21         THE COURT:  -- at that point.  But the way you are

22   phrasing the question is calling for a conclusion that he

23   cannot answer.

24         MR. DEUTSCH:  I'll ask your question, Judge.

25   BY MR. DEUTSCH:

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 19 of 159
Levitt - cross by Deutsch
440

 1   Q.  Was anything in place --

 2            THE COURT:  You can ask whatever you want, Mr.

 3   Deutsch.

 4            MR. DEUTSCH:  I know.

 5            THE COURT:  I am just --

 6            MR. DEUTSCH:  But I'm going to --

 7            THE COURT:  You are struggling with the objection.  I

 8   am trying to give you some guidance.

 9            MR. DEUTSCH:  I appreciate it.

10            THE COURT:  So --

11            MR. DEUTSCH:  I appreciate it.  I definitely do.

12   BY MR. DEUTSCH:

13   Q.  Was anything in place prior to January of 1995 that made

14   it illegal to give money to Hamas?

15   A.  If --

16            MR. FERGUSON:  Judge, we started out with the

17   Treasury Department --

18            MR. DEUTSCH:  Okay.  I'll amend it.

19            MR. FERGUSON:  -- and, then --

20            THE COURT:  Yes, rephrase.

21            MR. DEUTSCH:  Okay.

22   BY MR. DEUTSCH:

23   Q.  Was anything in place at the Treasury Department that made

24   it illegal to give money to Hamas prior to 1995?

25   A.  Any money going to Hamas or any other organization

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 20 of 159
Levitt - cross by Deutsch
441

1   involved in murder would have been illegal.

2   Q.  Wait a minute, sir.  I'm not asking you that question.

3   I'm asking you whether there was any rule or law or regulation

4   in place at the Treasury Department prior to 1995 that made it

5   illegal to give money to Hamas; "Yes" or "No"?

6   A.  No.

7   Q.  Now, we also talked yesterday about whether or not --

8   about these expulsions of people -- 450 people -- out of their

9   country in December of '92, correct?

10  A.  Correct.  415.

11  Q.  415, yes.

12          And we also mentioned there were 1600 people

13  arrested, as well as the 415 that were expelled from the

14  country, correct?

15  A.  That's what you informed me; correct.

16  Q.  Okay.

17          I think you -- you didn't disagree with that, right?

18  A.  I have no basis for the number, but I understand there

19  were arrests.

20  Q.  Okay.

21          And I take it that the people that were either

22  arrested or expelled were men, right?  Do you know if there

23  were any women in those groups?

24  A.  I don't know.

25  Q.  Well, of the 415 that were expelled, do you know if there

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 21 of 159
Levitt - cross by Deutsch
442

1   were any women in that group?

2   A.  I don't.

3   Q.  These people that were expelled, they were heads of

4   households, correct?

5   A.  I imagine many were, but I don't know how many or --

6   Q.  They were working men, right?

7   A.  I presume.

8   Q.  And they could not continue to support their families if

9   they were in some forest in the wilds of Lebanon, could they?

10          MR. FERGUSON:  Objection.  Calls for speculation.

11          THE COURT:  Sustained.

12  BY MR. DEUTSCH:

13  Q.  Now, you also testified that as a result of these

14  expulsions, this was a crushing blow to the charitable and

15  welfare programs of Hamas, correct?

16  A.  I --

17  Q.  "Yes" or "No"?

18  A.  As asked, no.

19  Q.  Okay.

20          Didn't you testify that one of the results of these

21  expulsions was a blow to the social welfare programs of Hamas?

22  A.  As asked, no.

23  Q.  Well, was it a blow to the social welfare programs of

24  Hamas if 415 people were expelled?

25  A.  It was certainly a blow to Hamas overall.  I don't know

1   how many or really if any of the people who were among the 415

2   were heads or leaders or key people in those charities.  I

3   actually don't know if any of those charities run by Hamas at

4   the time were shut down or ceased operations because of it.

5   Q.  You didn't testify yesterday that among the people that

6   were expelled were social welfare activists?

7   A.  I don't remember how I put it yesterday.  It was Hamas

8   activists who were expelled, very likely including activists

9   from all parts of Hamas:  Social welfare, political, military.

10  But I don't --

11  Q.  So, when you're saying that it included people from all

12  sectors of Hamas, it would have included social welfare

13  activists, right?

14  A.  Yes.

15  Q.  And would you think it would be unreasonable that people

16  would want to bring money to the families of those

17  breadwinners that had been expelled to Lebanon?

18          MR. FERGUSON:  Judge, objection.  This witness isn't

19  qualified to speak to the reasonableness of the motivations of

20  people who want to give money --

21          THE COURT:  Sustained.

22          MR. FERGUSON:  -- to what's being asked here.

23  BY MR. DEUTSCH:

24  Q.  Well, if your family -- if your father -- was sent --

25  expelled from his home and put in a foreign country, would you

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 23 of 159
Levitt - cross by Deutsch
444

1    want to give money to support your family?

2            MR. FERGUSON:  Objection.  Relevance.

3            THE COURT:  Sustained.

4            Also, speculative.

5    BY MR. DEUTSCH:

6    Q.  Just one aside.  Yesterday, I think you mentioned that

7    you're not getting paid in this case, correct?

8    A.  That's correct.

9    Q.  That's because you work for the government, right?

10   A.  That's correct.

11   Q.  The government's paying you, right?

12   A.  Not for this case, no.

13   Q.  Well, are you being paid as you sit here on the witness

14   stand or are you taking a leave of absence from your

15   government job?

16   A.  I have not taken a leave of absence.

17   Q.  So, you're getting your paycheck as you sit here, right?

18   A.  Yes.

19   Q.  You're earning your money as you sit here, right?

20   A.  I'm earning my regular paycheck.

21   Q.  Now, you testified in direct several times that a

22   substantial part of your Ph.D. dissertation was about the

23   terrorist attack by Dr. Baruk Goldstein on 30 unarmed praying

24   civilians in a mosque, right?

25   A.  It was more like 40, yes.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 24 of 159
Levitt - cross by Deutsch
445

 1   Q.  Okay.

 2         40 were killed?

 3   A.  I believe 40-something were killed.

 4   Q.  And how many were injured, sir?

 5   A.  I don't know.  I don't remember offhand, but it was also

 6   significant.

 7   Q.  And Dr. Goldstein was a member of a right-wing settler

 8   group; was he not?

 9   A.  Not the way you put it, no.  It wasn't a settler group.

10   He was a member of a Jewish terrorist organization called Kah.

11   Extensive law enforcement activity into the attack did not

12   reveal that the group carried out the attack.  He carried it

13   out, but he was a member of this terrorist organization --

14   Jewish --

15   Q.  And he was --

16   A.  -- terrorist organization.

17   Q.  -- a reservist in the Israeli Army?

18   A.  Yes.

19   Q.  He carried an Israeli automatic machine gun when he

20   carried it out?

21   A.  Yes, illegally.

22         THE COURT REPORTER:  Sorry?

23   BY THE WITNESS:

24   A.  Illegally, yes.

25   BY MR. DEUTSCH:

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 25 of 159
Levitt - cross by Deutsch
446

1   Q.  And members of his group believed that all Palestinians

2   should be expelled from all the land of the British Mandate,

3   right?

4           MR. FERGUSON:  Objection.  Relevance.

5           THE COURT:  Sustained.

6   BY MR. DEUTSCH:

7   Q.  Now, I think you, in your dissertation, you found out or

8   you learned, or you researched and you found out -- and you

9   determined -- that the massacre came on the heels of an

10  increase in settler attacks and riots and fed a heightened

11  sense of vulnerability and insecurity among the Palestinians;

12  is that true?

13  A.  That's right.

14  Q.  There had been a series of these attacks on Palestinians,

15  correct?

16  A.  That's right.  Not like this one.  This was --

17  Q.  Of course.

18  A.  -- markedly different.

19  Q.  This was the worst of them?

20  A.  Right.

21          There was a series of mostly small-scale attacks, but

22  certainly to undermine the civilian Palestinian sense of

23  security, much like Palestinian terrorist attacks undermine

24  Israelis' sense of security.

25  Q.  Are you familiar with the work of a Jewish American

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 26 of 159
Levitt - cross by Deutsch
447

1   academic called Ian Lustig?

2   A.  I've read some of his work, yes.

3   Q.  And are you familiar with his study that between 19 --

4   excuse me, between 1984 and 1987, there were over 380 attacks

5   on -- by settler groups on Palestinians?

6           MR. FERGUSON:  Judge, I'm going to object to the

7   relevance.  Unless Mr. Deutsch is here to justify suicide

8   bombings as part of his defense, this is highly irrelevant.

9           MR. DEUTSCH:  Judge, I object to that.

10          MR. BLOOM:  I object.

11          MS. THOMPSON:  Yeah.

12          MR. DEUTSCH:  I object to his statement in front of

13  the jury.  I'm not here to justify suicide bombings.  I'm here

14  to tell the jury the context in which this happens.  The jury

15  is entitled to know that.  And if he's going to make those

16  speeches in front of the jury, I object to it.

17          THE COURT:  Objection as to relevance, consistent

18  with what I said at sidebar the other day, is sustained.

19          Mr. Ferguson, please limit your comments.

20          MR. FERGUSON:  I will, Judge.

21          THE COURT:  If we need a sidebar, you can ask for

22  one; if it is appropriate, I will call for one.

23          MR. FERGUSON:  Thank you, Judge.

24  BY MR. DEUTSCH:

25  Q.  Now, in fact, there was a poll taken and more than half

Levitt - cross by Deutsch

1   the Palestinian people believed that the Israeli Defense

2   Forces -- the Israeli military -- were somehow involved in

3   this attack by Baruk Goldstein, right?

4           MR. FERGUSON:  Objection.  Foundation.

5           THE COURT:  Overruled.

6   BY MR. DEUTSCH:

7   Q.  Well --

8           THE COURT:  If you can answer.

9   BY THE WITNESS:

10  A.  I don't recall.

11  BY MR. DEUTSCH:

12  Q.  You don't recall?

13  A.  That's correct.

14          MR. FERGUSON:  I'm also going to object on relevance

15  grounds, Judge.

16          THE COURT:  He does not recall, was the answer.  That

17  can stand.

18  BY MR. DEUTSCH:

19  Q.  There was a funeral for Mr. Goldstein.  Hundreds of

20  Israeli settlers attended, correct?  You wrote about it in

21  your dissertation; did you not?

22          MR. FERGUSON:  Objection.  Relevance.

23          THE COURT:  Overruled.

24          Although objection as to compound, I will sustain.

25          You asked him two questions there.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 28 of 159
Levitt - cross by Deutsch
449

1          MR. DEUTSCH:  I'll separate it.

2    BY MR. DEUTSCH:

3    Q.  Did you write about the funeral service of Baruk Goldstein

4    that was attended by hundreds of Israeli settlers?

5    A.  In my dissertation, I mentioned it.  I don't remember

6    offhand how many were there.

7    Q.  And you also mentioned that the rabbi gave the eulogy that

8    "Jews will inherit the land not by any peace agreement, but

9    only by shedding blood"?

10          MR. FERGUSON:  Objection.  Relevance.

11          THE COURT:  Sustained.

12   BY MR. DEUTSCH:

13   Q.  Mr. Goldstein was considered a hero by many, correct?

14          MR. FERGUSON:  Objection.

15   BY THE WITNESS:

16   A.  No.

17          MR. FERGUSON:  Relevance.

18          THE COURT:  Sustained.

19          (Brief pause.)

20   BY MR. DEUTSCH:

21   Q.  Now, after this attack by Dr. Goldstein -- he also was a

22   doctor?  He was a doctor, right?

23   A.  Yes.

24   Q.  Okay.

25          Palestinians were killed by the Israeli Defense

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 29 of 159
Levitt - cross by Deutsch
450

1    Forces, correct?

2    A.   There were riots, then, soon afterwards; and, in those

3    riots, people were killed, yes.

4    Q.   How many Palestinians were killed by the Israeli Army

5    after this?

6    A.   I don't recall.

7    Q.   Okay.

8         And as a result of the Goldstein attack and the

9    aftermath, the entire City -- Palestinian City -- of Hebron

10   was put under curfew, correct?

11        MR. FERGUSON:  Objection.  Relevance.

12        THE COURT:  Sustained.

13   BY MR. DEUTSCH:

14   Q.   Were the settlers put under curfew, sir?

15        MR. FERGUSON:  Objection.  Relevance.

16        THE COURT:  Sustained.

17   BY MR. DEUTSCH:

18   Q.   Now, I want to direct your attention to some of your

19   testimony about the creation of Hamas.  And you talked at

20   length about the period prior to the creation of Hamas.

21        Let's -- for simplicity purposes, let's -- talk about

22   between 1980 and 1987, okay?

23   A.   Uh-huh.

24   Q.   And, in fact, during that period, there was a myriad of

25   Islamic social welfare groups that were serving the people in

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 30 of 159
Levitt - cross by Deutsch
451

1    the occupied territories, correct?

2    A.  "Myriad" may be misleading.  There certainly is a myriad

3    now.  At the time, there were really two major umbrella

4    organizations under which most of the others worked.  But,

5    yes, there were.

6    Q.  Well, there were medical clinics operating?

7    A.  Medical clinics, schools, et cetera.

8    Q.  Hospitals?

9    A.  Yes.

10   Q.  Orphanages?

11   A.  Yes.

12   Q.  Sports -- sports clubs?

13   A.  Yes.

14   Q.  Daycare centers?

15   A.  Yes.

16   Q.  Nurseries?

17   A.  I presume.

18   Q.  Women's groups?

19   A.  Again, I presume.

20   Q.  Well, you presume.  I mean, you didn't -- this isn't part

21   of your expertise?

22   A.  If you're asking me to tell you how many or if there were

23   women's groups operating between 1980 and 1987, no, I never

24   researched that.

25   Q.  Well, you did testify at length about the Muslim

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 31 of 159
Levitt - cross by Deutsch
452

1  Brotherhood; did you not?

2  A.  Yes.

3  Q.  And that was a period of time in which many of these

4  organizations that were serving the needs of the Palestinian

5  people were operating under some kind of umbrella that you

6  referred to as the Muslim Brotherhood, right?

7  A.  As I testified yesterday, there were some that operated

8  under this umbrella compared to the -- to those that operated

9  under the umbrella of the UN.  It was a small segment.  So, we

10  shouldn't make it appear to be larger than it is.

11       But, yes, there was a segment of Palestinian social

12  welfare which provided an important segment through the Muslim

13  Brotherhood.

14  Q.  And do you know how many people were served by these

15  organizations?

16  A.  No.  I don't know of any study that actually counts them

17  out.

18  Q.  Well, would it be hundreds of thousands of people?

19  A.  Still don't know.

20  Q.  And did these organizations also provide some form of

21  civil society allowing people to function because under

22  occupation there was really no civil society?

23       MR. FERGUSON:  Objection as to form.

24       THE COURT:  Sustained.

25  BY MR. DEUTSCH:

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 32 of 159
Levitt - cross by Deutsch
453

1  Q.  Well, did these groups mediate conflicts between people?

2  A.  I believe so, yeah.

3  Q.  Yeah.

4      And did they provide some form of civil law or some

5  kind of justice system that wasn't available to the people?

6  A.  Well, I'm not sure what you mean by "not available to the

7  people."  My understanding is there was some.  I don't know

8  what the extent of it was.  My understanding is that this is

9  something that's more informal within Muslim societies in

10  general, but this is beyond the scope of my expertise.

11  Q.  Okay.

12      Well, there were military courts operating in the

13  occupied territories, right?

14  A.  Yes.  Yes.

15  Q.  And these were Israeli military courts, correct?

16  A.  Correct.

17  Q.  And these were presided over by Israeli soldiers, right?

18  A.  I presume, yes.

19  Q.  You don't know?

20  A.  I presume the military court is presided over by soldiers,

21  but I am not an expert in them.  I don't know if they have

22  civilian lawyers working for the military.  I don't know.

23  Q.  And if somebody was accused of some violation of the law,

24  they would be brought not before a Palestinian court, but

25  before an Israeli military court, correct?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 33 of 159
Levitt - cross by Deutsch
454

 1            MR. FERGUSON:  Judge, I'm going to object.  He said

 2    it's beyond the scope of --

 3            THE COURT:  Sustained.

 4            MR. FERGUSON:  -- his expertise.

 5    BY MR. DEUTSCH:

 6    Q.  You're not an expert in that area, either; is that right?

 7    A.  That's right.

 8    Q.  Do you know when the Islamic University was first

 9    established in Gaza?

10    A.  I believe it was the early 1980s.  I remember -- I know I

11    had written about it, but I don't remember the exact date

12    offhand.  Might have been the late '70s.

13    Q.  And, generally, there was -- as you testified to, there

14    was -- kind of an overall name for all the Islamic social

15    welfare groups.  It was called the Umah; is that right?

16    A.  No.

17    Q.  Didn't you testify that the Umah or Mujamah was a

18    combination of religious and social activity going on in the

19    occupied territories?

20    A.  That would be correct, but I haven't testified to that.

21    Q.  That is correct?

22    A.  "Umah" means nation.  Mujamah is an organization I haven't

23    spoken about in this courtroom.

24    Q.  Okay.

25    A.  I think what you were trying to ask me about was the Dawa.

Levitt - cross by Deutsch

1   Q.  Okay.

2          I'm going to ask you about the Dawa, but I'm asking

3   you about, kind of, the overall name for all the social

4   welfare organizations that were operating -- Islamic social

5   welfare organizations operating -- in the occupied

6   territories.  Would that be fair to refer to them as the

7   Mujamah?

8   A.  As asked, no.

9          The Mujamah was one of two major Palestinian Muslim

10  Brotherhood umbrella organizations through which most of the

11  Palestinian Muslim Brotherhood social welfare organizations

12  worked.

13  Q.  Okay.

14  A.  There are other organizations, as well; but, the ones that

15  operated through the Palestinian Muslim Brotherhood primarily

16  worked through the Mujamah and another umbrella organization,

17  both of which were founded by Sheikh Yasin.

18  Q.  Okay.

19         How many organizations -- social welfare

20  organizations -- were operating, more or less, in Gaza prior

21  to 1987?

22  A.  I don't know.

23  Q.  Do you have any idea?

24  A.  Still don't know.

25  Q.  Well, was it over a hundred?

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 35 of 159
Levitt - cross by Deutsch
456

1       MR. FERGUSON:  Objection.

2       THE COURT:  Sustained.

3   BY MR. DEUTSCH:

4   Q.  And how many social welfare organizations were operating

5   in the West Bank prior to 1987?

6   A.  Don't know.

7   Q.  Would it be fair to say that there was a substantial

8   amount of different organizations providing for the needs of

9   the people?

10  A.  I honestly don't know how extensive it was.  There were

11  some organizations.  It has become much more extensive over

12  time.

13  Q.  Well, are you familiar with the Nusarat Refugee Camp?

14  A.  Yes.

15  Q.  And have you been there?

16  A.  Yes.

17  Q.  And prior to 1987, did you know that there were five

18  branches of social welfare programs in the refugee camp, five

19  kindergartens, five women's groups, 50 people working there?

20  Would that be somewhat accurate?

21  A.  You're asking me if I know or if it's accurate?  You asked

22  both.

23  Q.  Well, would you say it was accurate?

24  A.  I would say I'd have no basis to know the numbers, but I

25  wouldn't be surprised that there were activities -- social

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 36 of 159
Levitt - cross by Deutsch
457

1  welfare activities -- going on in the camps, some by the

2  Palestinian Muslim Brotherhood, some by the UN.

3  Q.  Okay.

4       And isn't it fair to say, sir, that the -- those

5  social welfare groups and the Pal- -- the Muslim Brotherhood

6  were not involved in participating in the resistance to the

7  occupation that other groups were participating in?

8  A.  What period are you asking?

9  Q.  I'm talking about prior to 1987.

10  A.  Prior to 1987, no.  There were times when the Palestinian

11  Muslim Brotherhood organizations were non-violent and,

12  therefore, were held up actually by the Israelis as a

13  non-violent option to the secular Palestinian groups that were

14  conducting terrorist attacks at the time.

15       And, then, from, kind of, the mid-1980s on, Hamas

16  leaders themselves have talked about violent activities that

17  the Palestinian Muslim Brotherhood engaged in.

18  Q.  Wasn't there a split in the Muslim Brotherhood and a group

19  called the Islamic Jihad left the Muslim Brotherhood about

20  1985?

21  A.  Whether it was 1985 or earlier is another issue.  Separate

22  from Hamas and separate, really, from the Palestinian Muslim

23  Brotherhood because the Palestinian Islamic Jihad really grew

24  out of Palestinians who had studied in Egyptian universities

25  and, therefore, grew up in the Egyptian Muslim Brotherhood

1    and, when they left and went back to the Palestinian occupied

2    territories, started Palestinian Islamic Jihad; which was, in

3    fact, a breakaway from the Muslim Brotherhood.

4    Q.  Okay.

5         So, your long, roundabout answer to my question is

6    "Yes" --

7         MR. FERGUSON:  Objection.

8    BY MR. DEUTSCH:

9    Q.  -- there was a group that left the Muslim Brotherhood

10   called Islamic Jihad, correct?

11   A.  As asking now, yes.

12   Q.  Okay.

13        And, in fact, the reason that they left is because

14   the Muslim Brotherhood was not involved in acts of resistance

15   and they wanted to carry out acts of resistance; isn't that

16   fair?

17   A.  In part, yes.  Although I'd call it terrorism, not

18   resistance.

19   Q.  Well, do you believe that people have the right to resist

20   occupation?

21        MR. FERGUSON:  Objection.  Relevance.

22        MR. DEUTSCH:  Well, he's the one that --

23        THE COURT:  Sustained.

24   BY MR. DEUTSCH:

25   Q.  Do you know, for example, how many orphans were being

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 38 of 159
Levitt - cross by Deutsch
459

1    supported by the Muslim Brotherhood groups prior to 1987?

2    A.   I know neither, how many were supported by the Muslim

3    Brotherhood or other organizations.

4    Q.   Do you know how much money was being spent on the support

5    of orphans?

6    A.   No.

7    Q.   Was $4 million a figure that would be surprising to you?

8         MR. FERGUSON:  Objection.

9         THE COURT:  Sustained.

10   BY MR. DEUTSCH:

11   Q.   Now, wasn't it the reputation of these organizations --

12   these social welfare organizations -- operating under the

13   broad aegis of the Muslim Brotherhood that they were honest

14   and not corrupt?

15   A.   With time, that certainly became a very important issue.

16   It really became a much larger issue in the 1990s.

17   Q.   Okay.

18        But was there a belief that they were actually

19   providing these services without taking money and enriching

20   themselves?

21   A.   I believe so.

22   Q.   Now, you testified in 1987 the Intifada occurred and,

23   along with it, there was the emergence of a group called

24   Hamas, correct?

25   A.   More or less, yes.

Levitt - cross by Deutsch

460

1  Q.  Okay.

2       And do you know who David Aufhauser is?

3  A.  Yes.

4  Q.  And is he part of your Treasury organization?

5  A.  No.

6  Q.  Was he?

7  A.  Yes.

8  Q.  Okay.

9  A.  Before I was there.

10 Q.  Okay.

11      Would you agree with his testimony that "Hamas is a

12 loosely structured -- " "Hamas is loosely structured with some

13 elements working clandestinely and others working openly

14 through mosque and social service institutions to recruit

15 members, raise money, organize activities and distribute

16 propaganda"?

17 A.  It's almost exactly what I testified to the other day.

18 Q.  Okay.

19      And are you aware that after the creation of Hamas,

20 the American Consulate was distributing money to the occupied

21 territories through individuals?

22 A.  I'm sorry, can you ask the question, again?

23 Q.  Okay.

24      Are you aware that the American Consulate distributed

25 money to the occupied territories through individuals?

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 40 of 159
Levitt - cross by Deutsch
461

1  A.  Again, I'm not familiar with your time frame or

2  individuals, but the U.S. government, because of its concern

3  for the plight of Palestinians, has throughout the

4  Arab-Israeli conflict been supplying aid to Palestinians

5  through USAID and other forms, Aid to the United Nations, the

6  program -- the United Nations program for Palestinian

7  refugees.

8  Q.  Now, are you familiar with a book called, "The Palestinian

9  Hamas" by Shaul Mishal and Avraham Sela?

10 A.  Yes.

11 Q.  And those are two Israeli academics, correct?

12 A.  Yes.

13 Q.  And they're distinguished and respected historians?

14 A.  Yes.

15 Q.  And would you agree with the statements that they made;

16 specifically, "Hamas is a social movement providing services

17 to community responding to hardships and concerns"?  Would you

18 agree with that?

19 A.  Out of context, I'd say it's a partial answer at best.

20 Q.  Would you agree with the statement that "Hamas is deeply

21 rooted in the Palestinian society"?

22 A.  Would I agree?  Yes.

23 Q.  Okay.

24        And would you also agree that it contains members in

25 all walks of life, university grads, merchants, farmers,

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 41 of 159
Levitt - cross by Deutsch
462

1  engineers, lawyers, young and old women and men?

2  A.  It is certainly part of Hamas' strategy to recruit from

3  all walks of life, yes.

4  Q.  Okay.

5       And that it combines social and cultural Islamic

6  values implemented through traditional institutions?

7  A.  Again, out of context, I'd say that's a partial statement;

8  but, yes.

9  Q.  Okay.

10      Now, more or less, Hamas began sometime in '87,

11  correct?

12  A.  Generally --

13  Q.  The charter wasn't -- I'm going to ask you about the

14  charter in detail in a minute; but, basically, the charter

15  didn't appear at the same time that Hamas appeared, correct?

16  A.  The date of Hamas' appearance is not exact.  Most scholars

17  peg it to December '87.  The charter came out a few months

18  later.

19  Q.  Okay.

20      In '88 the charter's dated, right?

21  A.  I believe it's August 18th, '88.

22  Q.  Okay.

23      And is it not true, sir, that in July of 1989, more

24  or less 18 months after the beginning of the Intifada, the

25  government of Israel declared Hamas illegal?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 42 of 159
Levitt - cross by Deutsch
463

1    A.   Yes.  I'm not sure on the exact time frame, but they did

2    around that time, yes.

3    Q.   And they outlawed membership in Hamas?

4    A.   Correct.

5    Q.   And they placed them under tight controls?

6    A.   I don't know what you mean by "tight controls."

7    Q.   All right.

8         Mosques were raided and closed, correct?

9    A.   Not randomly, no.  Mosques that were believed to have, you

10   know, been associated with Hamas, used to cache weapons, used

11   hide fugitives, these were raided, yes.  Mosques --

12   Q.   But it was illegal --

13   A.   -- were not raided --

14   Q.   I'm sorry to interrupt.

15   A.   Mosques were not raided just, you know, willy-nilly.

16   Q.   Okay.

17        Mosques that they believed were associated with Hamas

18   were raided, right?

19   A.   And Hamas illegal activity, yes.

20   Q.   Well, when Israel declared Hamas illegal, that meant it

21   was illegal to be a member of Hamas, right?

22   A.   I presume.

23        MR. FERGUSON:  Objection.  Calls for a legal

24   conclusion as to the law in Israel.

25        THE COURT:  Sustained.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 43 of 159
Levitt - cross by Deutsch
464

1  BY MR. DEUTSCH:

2  Q.  Well, last week you told this jury that Hamas had a bank

3  in the occupied territories in 1991 and 1992.  Is that -- was

4  that -- is that what -- your testimony?

5  A.  I don't know if I gave exact dates, but Hamas ran a bank,

6  yes.

7  Q.  Are you saying they ran a bank after the Israeli

8  government declared the organization illegal?

9  A.  Again, I'm not -- I'm not -- exactly sure on the time, but

10  there was at least one bank -- Bayt al-Mal -- which the

11  Israelis and U.S. government later shut.  I'm not -- I think

12  it was shut after Hamas was banned, likely because the

13  investigation into the bank after the banning of Hamas

14  determined that it was a Hamas bank.

15  Q.  So, it's -- if Hamas was banned by the Israeli government,

16  when they say "banned," it's like what they did with

17  organizations in South Africa; they were banned because they

18  said they were illegal --

19          MR. FERGUSON:  Objection.

20  BY MR. DEUTSCH:

21  Q.  -- like the African National Congress, right?

22          THE COURT:  Sustained.

23  BY MR. DEUTSCH:

24  Q.  Now, if the Israeli government banned Hamas in July of

25  '89, by 1992 you would think, if they had a bank, that bank

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 44 of 159
Levitt - cross by Deutsch
465

 1  would be -- would have been shut down, correct?

 2          MR. FERGUSON:  Objection.  Calls for speculation.

 3          THE COURT:  Sustained.

 4  BY MR. DEUTSCH:

 5  Q.  Would it be -- would -- if you had money and you wanted to

 6  give it to the Palestinian people, would you put it in a Hamas

 7  bank that was banned by the Israeli government, sir?

 8  A.  If it was banned, it was shut and you wouldn't be able to

 9  put it there.

10  Q.  Thank you.

11          So, if it was banned in '89, there was no Palestinian

12  Hamas bank to put money in there in 1992; is that right?

13  A.  Again, I've testified now several times that I don't have

14  the exact dates.  I'm quite certain this was after 1989 the

15  bank was shut.  These investigations are complicated and take

16  a very long time.

17  Q.  Now, let's talk about the Hamas charter.  You talked about

18  it at quite great length in your direct testimony, correct?

19  A.  Yes.

20  Q.  Who wrote the Hamas charter, sir?

21  A.  It's not clear.

22  Q.  You don't know who wrote the charter, right?

23  A.  We know who published it.  We don't know who wrote it.

24  Q.  Okay.

25          And who signed the Hamas charter, sir?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 45 of 159
Levitt - cross by Deutsch
466

1  A.  I don't think it is signed.

2  Q.  Is there a provision, either with the charter or published

3  along with the charter, that provides for a procedure to amend

4  the charter; for example, like our Constitution?

5  A.  Not to my knowledge.

6  Q.  So, you don't know who wrote it; you don't know who signed

7  it; and, there's no provision to change it, right?

8  A.  I don't know that a charter per se requires a provision to

9  change it or that it needs to be signed by someone or to have

10 a known author to be authentic.

11 Q.  Okay.

12         And can you tell us what the consultative process was

13 in the creation of the charter?  Was there a draft sent out to

14 people saying, "This is a draft, give me your input," take the

15 input and, then, amend it and -- for a final version?

16 A.  It's an interesting question because the nature of a

17 covert organization like Hamas -- and it is covert overall --

18 is not to engage in such a process.  But Hamas --

19 Q.  So, you don't know about any kind of consultative process

20 that was involved; is that your testimony?

21 A.  Well, as I was saying, my testimony is that despite that,

22 we do know that Hamas is run by a consultative council, a

23 Shura council.  And, so, the presumption is that there was

24 some consultative process within Hamas.

25 Q.  You're presuming, sir; is that right?

1  A.  Based on some facts, yes.

2  Q.  Well, can you tell us specifically, if you know, what

3  people were involved in this consultative process?

4  A.  No, I can't.

5  Q.  Are you familiar with the scholar Khaled Hroub?

6  A.  Scholar, I don't know.  But I'm familiar with his work.

7  Q.  Okay.

8       And he is actually a professor at Cambridge in

9  Britain, right?  Cambridge University?

10  A.  I don't know.

11  Q.  Okay.

12       You don't know where he does his research and work?

13  A.  That's correct.

14  Q.  Have you read his books?

15  A.  I've read one of his books, yes.

16  Q.  Okay.

17       And would you disagree with this statement that he

18  made that, "The charter -- " called referring to the Hamas

19  document " -- was written in early 1988 by one individual and

20  was made public without appropriate general Hamas

21  consultation, revision or consensus, to the regret of Hamas

22  leaders in later years"?

23  A.  I'd say that's an example of the type of sloppy

24  scholarship he's known for.

25  Q.  Well, if it's sloppy scholarship, what specific

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 47 of 159
Levitt - cross by Deutsch
468

1  information do you have that contradicts that?

2  A.  Simply what we know about how Hamas operates.  There's a

3  lot of evidence that there is a consultative process, and this

4  -- he's the only person to claim otherwise.

5  Q.  But you just told this jury you have no idea who was

6  involved in that process, right?

7  A.  We know that that's -- there is a process.  We don't know

8  who was involved in the process.  We know that Hamas leaders

9  since then have spoken and stood by the Hamas Covenant,

10 including recently.  So, we know that they hold by the

11 Covenant.  They continue to refer to it and reference it.

12 Q.  Well, I guess you'd disagree with this statement:  "Hamas

13 leaders and spokespeople have rarely referred to the charter

14 or quoted from it.  Evidence that it has come to be seen as a

15 burden rather than an intellectual platform that embraces the

16 movement's principles"?

17         MR. FERGUSON:  Objection to form.

18         THE COURT:  Sustained.

19 BY MR. DEUTSCH:

20 Q.  Do you disagree with that statement?

21 A.  The book is written sometime ago.  So, I can't actually

22 comment on whether or not it was accurate at the time.  But,

23 certainly, it is not current and accurate today.

24 Q.  This book is published in 2006, sir.

25 A.  Then it's not the book that I'm familiar with or it is a

1   more recent edition of the one on Hamas that he's written

2   which was not published in 2006.  If he did publish it in

3   2006, it's sloppy because I can think of at least one quote in

4   January of 2006 where Mahmoud Zahar made statements to the

5   effect the Hamas Covenant will not be changed.

6   Q.  Now, in fact, there has been statements made in

7   contradiction to what's in the Hamas charter; has there not?

8   A.  I don't know.

9   Q.  Well, are you familiar with this published document in

10   1990, which says, "The non-Zionist Jew is one who belongs to

11   the Jewish culture, whether as a believer in the Jewish faith

12   or simply by accident of birth, who takes no part in

13   aggressive actions against our land and our nation.  Hamas

14   will not adopt -- "

15         MR. FERGUSON:  Objection.  Form, foundation.

16   BY MR. DEUTSCH:

17   Q.  " -- a hostile position in practice against anyone because

18   of his ideas or his creed, but will adopt such a position if

19   those ideas and creed are translated into hostile or damaging

20   actions against our people"?

21         THE COURT:  Objection to form and foundation

22   sustained.

23   BY MR. DEUTSCH:

24   Q.  Have you been aware of statements made after this document

25   was written amending or changing some of the views in there?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 49 of 159
Levitt - cross by Deutsch
470

 1  A.  I haven't seen this document.  I can't verify this

 2  document.  I don't know what this document is or what its date

 3  is.  I can't tell you it's authentic itself.  So, to tell you

 4  that I've heard of statements contradicting a document that I

 5  haven't seen or verified, gone through my own academic vetting

 6  process, is --

 7  Q.  Well, you don't --

 8  A.  -- not a reasonable question.

 9  Q.  You don't know -- the document that you quoted at length,

10  this Covenant, you don't know who wrote it, right?

11  A.  As I've stated.

12  Q.  Right.

13        And you don't know the process by which it was

14  developed, right?

15  A.  As I've stated.

16  Q.  And I'm asking you whether or not you are aware of

17  statements by Hamas leaders changing their -- the obviously

18  anti-Semitic remarks that are in the original charter saying,

19  "We have nothing against the Jewish people.  We're only

20  against people who aggressively are trying to take our land"?

21  A.  I can't point to one.

22  Q.  Okay.

23        Now, there is an idea that's expressed in that

24  Covenant or charter which, basically, says that Hamas wants to

25  make the entire land of the British Mandate an Islamic state,

Levitt - cross by Deutsch

1   correct?  You referred to that several times, correct?

2   A.  Correct.

3   Q.  Now, are you familiar with statements by Hamas leaders

4   which have said that, "Creating an Islamic state is not

5   something that we're pursuing and sidelined it, and it's

6   surpassed by other goals, including ending the occupation"?

7   A.  As stated, no.

8        What Hamas leaders have said is that they would be

9   willing to entertain a temporary truce, and that their

10   long-term goal of establishing an Islamic state in all of

11   historic Palestine could be a long-term goal.  But, to my

12   knowledge, they have never renounced that.

13        In other words, they'd be willing to accept an

14   interim though not permanent cease-fire.

15   Q.  And, basically, what they've said is, is that if the

16   Israelis leave the occupied territories, they're willing to

17   engage in some kind of prolonged truce, right?

18   A.  Again, how that prolonged truce is defined is an issue of

19   debate.  And how the withdrawal from West Bank and Gaza is

20   defined is, also.

21        But, generally, yes, they've offered some type of

22   long-term -- and what "long-term" means is also unclear --

23   cease-fire in return for their definition of an Israeli

24   withdrawal from all of the West Bank and Gaza.  By some

25   understandings, it's more than the West Bank and Gaza.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 51 of 159
Levitt - cross by Deutsch
472

1   Q.  And even the spiritual leader, Sheikh Yasin, the one that

2   was the paraplegic that was assassinated, he talked about a

3   truce as long as 20 years, didn't he?

4   A.  Sheikh Yasin, the same one who was jailed for the

5   kidnappings and murders, yes, he had talked about a

6   cease-fire, though I don't know the years.

7   Q.  Now, someone that's working as a nurse in a

8   Hamas-affiliated medical clinic, they don't have to swear an

9   allegiance to this 1988 charter before they can provide

10  services, do they?

11  A.  I don't know what the process is.

12  Q.  Well, have you ever heard of anyone having to sign an

13  allegiance to this charter?

14  A.  I've never heard of making any kind of pledge of

15  allegiance to any group like this.

16  Q.  Okay.

17       So, you don't -- if you assist Hamas, if you work in

18  their Dawa organizations, if you teach in their schools, if

19  you work in their daycare center, before you do that, you

20  don't have to swear an allegiance to this charter, do you?

21  A.  To choose -- excuse me.

22       To choose to work for Hamas, as opposed to some of

23  the other organizations working on the ground, is at a minimum

24  at some level to subscribe to the group's ideology and goals.

25  Social services can be provided in the Palestinian territories

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 52 of 159
Levitt - cross by Deutsch
473

1  without working with a group that is also involved in

2  terrorism.

3  Q.  Well, let's look at that question.

4       Over 60 percent of the people voted for Hamas in the

5  last national election, correct?

6  A.  No, actually.

7  Q.  You don't know?

8  A.  I said, "No."

9  Q.  Okay.

10      Did they get a majority vote in the national

11  election?

12  A.  They --

13      MR. FERGUSON:  Object as to relevance.

14      THE COURT:  You can answer that question.

15  BY THE WITNESS:

16  A.  They got a 40-something-percent vote, that was a majority

17  vote, and they're now the ruling coalition.

18  BY MR. DEUTSCH:

19  Q.  And, more or less, how many thousands of people would have

20  voted for Hamas?

21  A.  The number is unclear, nor is the reason for them to vote

22  for Hamas.

23  Q.  Well, I'll get to the reason.

24      But the question I'm asking you, is it over several

25  hundred thousand people?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 53 of 159
Levitt - cross by Deutsch
474

1  A.  I presume.  I don't know how many people voted or what the

2  percentage represents.

3  Q.  Now, are you saying that everybody that votes for Hamas

4  takes an oath to support this charter?

5  A.  I'm saying people who vote for Hamas choose to vote for an

6  organization that is engaged not only in political and social

7  work, but also in terrorism.

8  Q.  So, you're saying that everybody that voted for Hamas

9  supported the goals of Hamas?

10        MR. FERGUSON:  Judge, objection.  Relevance.  This is

11  past the period that is at issue in this case.

12        THE COURT:  Asked and answered, too.

13  BY MR. DEUTSCH:

14  Q.  Is it not true, sir, that many of the people who voted for

15  Hamas don't support this idea of an Islamic state in the

16  entire territory of the British Mandate?

17        MR. FERGUSON:  Objection.  Form.  Calls for

18  speculation.

19        THE COURT:  Sustained.

20        He has already said he does not know.

21  BY MR. DEUTSCH:

22  Q.  Well, you've studied this question, sir, haven't you,

23  about Hamas and who supports Hamas?

24  A.  I have.

25  Q.  And you looked at the election of a Hamas government,

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 54 of 159
Levitt - cross by Deutsch
475

 1   haven't you?

 2   A.  I have.

 3   Q.  And isn't it true that many, many of the people who voted

 4   for Hamas do not support an Islamic state in the entire

 5   British Mandate territory?

 6           MR. FERGUSON:  Objection.  Form, calls for

 7   speculation, and relevance.

 8           THE COURT:  Sustained.

 9   BY MR. DEUTSCH:

10   Q.  Have you studied who voted for Hamas and why they voted

11   for them?

12   A.  I haven't studied it as an issue -- a discrete issue.  I

13   have looked at it briefly in terms of the conclusion of my

14   book.

15   Q.  And what was the conclusion, sir?

16   A.  The conclusion of the book?

17           MR. MOFFITT:  Objection.

18   BY MR. DEUTSCH:

19   Q.  Now, one of the reasons that --

20           THE COURT:  You are moving on?  Okay.  I thought you

21   were going to answer.

22           MR. DEUTSCH:  I'll withdraw that question.

23           THE COURT:  Good idea.

24           MR. DEUTSCH:  Okay.

25   BY MR. DEUTSCH:

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 55 of 159
Levitt - cross by Deutsch
476

1   Q.  One of the reasons that Hamas was successful was because,

2   in fact, they were seen as not corrupt and not taking money

3   for their own personal aggrandizement, right?

4   A.  One of the reasons Hamas is successful is because the

5   political alternative -- the Fatah movement -- not only had

6   tremendous infighting and fielded a great many candidates for

7   each position, but because many of those candidates were from

8   the old guard within Fatah who were largely seen as corrupt.

9   Whereas, Hamas would not spend money on themselves, they'd

10  spend money on their own activities, to include social,

11  political and military activities.

12  Q.  Now, would you say that their participation in the

13  national election was inconsistent with what their charter

14  said?

15  A.  That is a very interesting question.  I would --

16  Q.  Just answer it, please.  I don't need your comment on

17  whether the question is interesting or not.

18          MR. FERGUSON:  Objection, Judge.

19          THE COURT:  Dr. Levitt, listen to the question.

20  Answer the question.

21  BY THE WITNESS:

22  A.  Can you restate the question?

23  BY MR. DEUTSCH:

24  Q.  My question is:  Is not their participation in the

25  national election inconsistent with what their charter says?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 56 of 159
Levitt - cross by Deutsch
477

1    A.   No.

2    Q.   Now, is it not true, sir, that not everyone who operates a

3    Hamas Dawa or supports Dawa activity with money is consciously

4    or actively involved with Hamas military resistance?

5            MR. FERGUSON:   Objection.   Calls for speculation.

6            THE COURT:   Sustained.

7            MR. DEUTSCH:   Well, he stated that --

8    BY MR. DEUTSCH:

9    Q.   Let me ask you this, sir:  You testified in the Boim case;

10   did you not?

11   A.   I did.

12           MR. FERGUSON:   Judge, I assume he's not simply going

13   to read testimony into the record here.

14           MR. DEUTSCH:   This is what he testified to under oath

15   in that case.

16           THE COURT:   But there are two things you can do with

17   prior testimony.   Are you attempting to refresh his

18   recollection?

19           MR. DEUTSCH:   Yes.   Yes.

20           THE COURT:   Then you need to show it.   The proper

21   way, Mr. Deutsch, as you know, is to show it to him.

22           If you want to impeach him, then you can read it.

23           MR. FERGUSON:   Judge, the objection -- first of all,

24   the witness didn't say he did not have a recollection on this.

25   There was an objection to the question itself which was

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 57 of 159
Levitt - cross by Deutsch
478

1    sustained, and we've gone simply into -- there is no predicate

2    right now for going to the transcript at all.

3           THE COURT:  Ask your question.  You know what you can

4    do with it.

5           And, then, if you want to object if he is not trying

6    to refresh his recollection -- I do not recall him saying he

7    did not know, but --

8           MR. DEUTSCH:  Okay.

9           THE COURT:  -- go ahead, ask your question.

10   BY MR. DEUTSCH:

11   Q.  Do you recall testifying under oath in the Boim case --

12          THE COURT:  Wait.  Mr. Deutsch, are you attempting

13   impeach him now?

14          You said you --

15          MR. DEUTSCH:  No, I'm asking --

16          THE COURT:  -- wanted to refresh --

17          MR. DEUTSCH:  I'm asking him whether he -- I want to

18   see whether he recalls it or not, if --

19          THE COURT:  You cannot just ask him if he recalls

20   testifying to X, Y and Z.

21          If you are trying -- you can use prior testimony to

22   either impeach or refresh recollection.

23          MR. DEUTSCH:  Well --

24          THE COURT:  If you want to try to refresh his

25   recollection on something, you need to establish that he needs

Case 1:03-cr-00978  Document 1066   Filed 01/05/09  Page 58 of 159
Levitt - cross by Deutsch
479

1    it refreshed and, then, show him --

2            MR. DEUTSCH:  Okay.

3            THE COURT:  -- the testimony.

4    BY MR. DEUTSCH:

5    Q.  Do you recall your testimony in the Boim case, sir?

6    A.  I recall testifying.  Do I recall everything I testified

7    to offhand?  No.

8    Q.  Well, do you recall testifying about whether everybody

9    who --

10           THE COURT:  Mr. Deutsch --

11           MR. FERGUSON:  Objection, Judge.

12           THE COURT:  You are not listening to what I have just

13   directed.

14           Objection sustained.

15   BY MR. DEUTSCH:

16   Q.  Well, do you remember testifying about people being

17   involved in the Dawa being also involved in the military?

18   A.  Yes.

19   Q.  Okay.

20           And do you recall it saying not everyone involved in

21   the Dawa is consciously --

22           MR. FERGUSON:  Objection, Judge.

23   BY MR. DEUTSCH:

24   Q.  -- or actively --

25           THE COURT:  Sustained.

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 59 of 159
Levitt - cross by Deutsch
480

1           MR. DEUTSCH:  What is the basis of the objection?

2           THE COURT:  The objection is you are not using prior

3    testimony properly.  You said -- if you want to try to refresh

4    his recollection about something --

5           MR. DEUTSCH:  Well, let me --

6           THE COURT:  -- you cannot --

7           MR. DEUTSCH:  -- show it to him.

8           THE COURT:  -- just read -- you know this -- you

9    cannot just read prior testimony into the record.

10           MR. FERGUSON:  Judge, he's trying to refresh

11    recollection on an issue that isn't even established yet.  A

12    question isn't standing.  He's simply going to the transcript.

13    What's the question that's at issue?

14           MR. DEUTSCH:  My question at issue, which you

15    objected to --

16           THE COURT:  Mr. Deutsch -- Mr. Deutsch -- direct your

17    comments to me.

18           MR. DEUTSCH:  Okay.

19           THE COURT:  We do not need this.

20           MR. DEUTSCH:  My question is -- which is directly

21    relevant to the issues in this case:  Is everyone who is

22    involved in Hamas Dawa or gives money to Hamas Dawa

23    consciously or actively involved in Hamas terrorism?

24           THE COURT:  You can ask him that question.

25           MR. DEUTSCH:  I did ask him that question.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 60 of 159
Levitt - cross by Deutsch
481

1          THE COURT:  Okay.

2          MR. DEUTSCH:  And he objected.

3          And you --

4          THE COURT:  No.

5          MR. DEUTSCH:  -- sustained it.

6          THE COURT:  But your question that you asked was:

7    "Did you previously testify to this?"

8          MR. DEUTSCH:  Okay.  I don't want to --

9          THE COURT:  Rephrase your question.

10         MR. DEUTSCH:  Okay.

11   BY MR. DEUTSCH:

12   Q.  Is it not true, sir, that not everyone who operates in

13   Hamas Dawa is consciously or actively involved in Hamas

14   terrorism?

15   A.  It is true.

16   Q.  Okay.  Thank you.

17         And, in fact, many of the people who are involved in

18   the military or the resistance wear two hats, correct?

19   A.  What do you mean by "two hats"?

20   Q.  Well, by -- they work in the Dawa in a social welfare

21   program to give them legitimacy and, then, later on or at

22   another time they're involved in military activity, correct?

23   A.  That is correct.  And not necessarily at another time,

24   either.  The Dawa provides day jobs and cover to Hamas

25   military operatives.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 61 of 159
Levitt - cross by Deutsch
482

1  Q.  So, the person that's working in the Dawa is given -- is

2  provided some kind of cover or legitimacy to show that they're

3  not involved in -- to give the impression they're not involved

4  in -- illegal activities, correct?

5  A.  In some cases, yes.

6  Q.  Yeah.

7         And, then, secretly they're also involved -- some of

8  these people -- in military activity, right?

9  A.  When you say "secretly," it's not necessarily a secret to

10  those who are involved, including some in the Hamas Dawa,

11  including some who are involved in funding these activities

12  through the Hamas Dawa.  But it's certainly covert and secret

13  to the general public.

14  Q.  And it may be secret to -- they don't wear signs saying,

15  if they're working in a medical clinic, "Oh, by the way, I'm

16  also a part of the military," correct?

17  A.  That's correct.

18  Q.  So, everybody that comes in contact with them doesn't

19  necessarily know that they're also involved in the military,

20  right?

21  A.  Correct.

22  Q.  And they work in these social programs to give them

23  legitimacy and cover, correct?

24  A.  Correct.

25  Q.  So, if you go to a hospital or if you go to an orphanage

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 62 of 159
Levitt - cross by Deutsch
483

1  and you meet the director or the nurse there, they're not

2  going to necessarily tell you that, "Oh, I also work as a

3  clandestine operative in the military," right?

4  A.   Those who are active in the clandestine military will be

5  aware of it.

6  Q.   Right.

7         Those who are --

8  A.   Those --

9  Q.   -- not active, who are not involved in the military don't

10  know.  They just think they're public, legitimate members of

11  the Dawa, right?

12         MR. FERGUSON:  I'm just going to object as to

13  interrupting the witness in mid answer.

14         THE COURT:  Sustained.

15         You may answer that question.

16  BY THE WITNESS:

17  A.   Your earlier example of someone walking into a clinic for

18  services is a much more clear-cut one, in which case you're

19  right, people in general aren't going to know or even really

20  care, you know, if someone's a Hamas operative.  They're there

21  to get services.

22         When you're talking about a director and you get into

23  higher levels, it's less clear because once you get into the

24  higher levels of any part of an institution, you need to have

25  access.

Levitt - cross by Deutsch

484

1    BY MR. DEUTSCH:

2    Q.  So, somebody that is in the military and works in the

3    Dawa, basically, wears two hats.  That's what I meant by "two

4    hats."

5            Would you agree with that?

6    A.  Meaning -- "two hats" meaning -- they both work in social

7    welfare and they're also engaged in military activity?

8    Q.  And -- right.

9    A.  Correct.

10   Q.  And the military activity is clandestine, right?  Secret?

11   A.  Yes.

12   Q.  Now --

13           MR. DEUTSCH:  Can we take a break now or is it too

14   early?

15           THE COURT:  If you are ready for one, we can take

16   one.

17           MR. DEUTSCH:  Okay.  I am.

18           THE COURT:  Ladies and gentlemen, we will take our

19   morning break and pick up at about 20 to 11:00.

20           (Jury out.)

21           THE COURT:  You may step down.  Please be back here a

22   little before 20 till.

23           (Brief recess.)

24           (Jury in.)

25           THE COURT:  You may be seated.

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 64 of 159
Levitt - cross by Deutsch
485

1          Mr. Deutsch, you may continue.

2          MR. DEUTSCH:  Thank you, Judge.

3     BY MR. DEUTSCH:

4     Q.  Sir, are you familiar with writings by scholars on Hamas

5     that date the first suicide bombing to be April of 1994,

6     following the Baruk Goldstein massacre?

7     A.  I can't cite any, but I wouldn't be surprised.

8     Q.  Professor Hroub states, "The first wave of these suicide

9     attacks was carried out in 1994 in retaliation for the Hebron

10    massacre."

11         Do you disagree with that?

12    A.  He states the first wave; and, in that, he is certainly

13    correct:  The first wave or string of attacks.

14         There's debate as to whether it was only because of

15    the massacre by the Jewish terrorist.  It certainly was, at

16    least in part, in response to that.  But it doesn't appear

17    from that phrase he's saying that was necessarily the first.

18    Q.  I'll read to you, again, from another part of his book:

19         "The first use of this tactic, referring to suicide

20    bombing, was in 1994 in retaliation for a massacre of

21    Palestinians praying in a mosque in the Palestinian city of

22    Hebron."

23    A.  That's incorrect.

24    Q.  You disagree with that, right?

25    A.  Yeah.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 65 of 159
Levitt - cross by Deutsch
486

1   Q.  And it's your position that the first suicide bombing was

2   in April 16th, 1993, correct?

3   A.  Yes.

4   Q.  That's at least several months after January 25th, 1993,

5   correct?

6   A.  Correct.

7   Q.  And that was the first time that Hamas carried out a

8   suicide bombing, correct?

9   A.  It was the first time they carried out a successful one.

10  There is some debate as to whether or not there were earlier

11  attempts.

12  Q.  There is debate about that.  You're not clear whether or

13  not there were earlier attempts, correct?

14  A.  That's right.

15  Q.  And, in fact, you do indicate in your chart here that

16  there was a car bombing foiled in November 19th, '92, right?

17  A.  That's right.

18  Q.  But there's a debate about really whether that was a Hamas

19  action, right?

20  A.  Not so much.

21  Q.  Well, in this chart, you indicate it was a attempted

22  suicide car bombing in a heavily-populated area in the center

23  of the country.  You can't -- where?  Where was it?  Do you

24  know where it was?

25  A.  I believe it was in Tel Aviv, but I'd have to check and

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 66 of 159
Levitt - cross by Deutsch
487

1  look.

2  Q.  You don't know?

3  A.  Correct.  I can't --

4  Q.  Did you interview anybody that was involved in this

5  attempted suicide bombing?

6  A.  No.

7  Q.  Did you review any police reports about this suicide

8  bombing?

9  A.  No.

10  Q.  So, that's the basis of your testimony that there is

11  disagreement about earlier attempts, but the first one is

12  March of 19 -- excuse me, April of 1993, correct?

13  A.  Without having it in front of me, I believe that's the

14  date, yes.

15  Q.  And would you agree that between March of 1993 and April

16  of 1994, following the Baruk Goldstein attack, there were no

17  suicide bombings?

18  A.  There were no successful bombing -- suicide bombings,

19  correct.

20  Q.  Well, you keep saying "successful."  And you're saying you

21  had said before there's differences of opinion whether there

22  were or were not attempts, right?

23  A.  The reason I say "successful" is because when determining

24  intent with a terrorist organization about the use of a tactic

25  like suicide bombing and basing that --

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 67 of 159
Levitt - cross by Deutsch
488

1          MR. MOFFITT:  Objection.

2    BY THE WITNESS:

3    A.  -- analysis --

4          MR. MOFFITT:  704(b), and determining intent.

5          THE COURT:  Overruled.

6          They are talking about Hamas in general.

7    BY MR. DEUTSCH:

8    Q.  Let me withdraw the question and ask you, can you tell

9    this jury beyond a reasonable doubt that there were attempted

10   bombings prior to March of '93?

11         MR. FERGUSON:  Objection --

12         MR. MOFFITT:  Objection.

13         MR. FERGUSON:  -- to form.

14         THE COURT:  Sustained.

15   BY MR. DEUTSCH:

16   Q.  Can you tell this jury that there were foiled attempted

17   bombings prior to 1994, August -- October -- April?  I'm

18   sorry.

19   A.  I believe there's one in the chart, which doesn't mean

20   it's the only one.

21   Q.  Would it be fair to say that subsequent to January 25th,

22   1993 -- and, really, subsequent to April of '94 -- is when

23   allegedly Hamas began a strategy of suicide bombings?

24   A.  That the strings of suicide bombings for which Hamas has

25   now become renowned really began in earnest with April, 1994,

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 68 of 159
Levitt - cross by Deutsch
489

1   is accurate.

2   Q.  And that's after the Baruk Goldstein massacre, right?

3   A.  That is.

4   Q.  And would you disagree that these -- at least in the early

5   stages, '94, '96, that these -- bombings were always directly

6   linked to some specific Israeli atrocity against Palestinian

7   civilians?

8   A.  I would not.

9   Q.  Now, you indicated that -- yesterday Mr. Ferguson gave you

10  a whole slew of, I guess, credit -- taking credit -- for

11  bombings -- suicide bombings -- by Hamas.  And we showed the

12  logo on the screen and you indicated that this was a bombing

13  that Hamas took credit for, right?  You remember that?

14  A.  We put the Hamas communiques --

15  Q.  Yeah.

16  A.  -- on the screen, yes.

17  Q.  There was about -- one, two, three, four, five, six,

18  seven, eight, nine -- ten of these, correct?

19  A.  There were several.

20  Q.  Yeah.

21      Can you tell me whether any of these communiques

22  have -- deal with bombings prior to the year 2000?

23  A.  They do.

24  Q.  Okay.

25      Can you pick out the --

Case 1:03-cr-00978  Document 1066   Filed 01/05/09  Page 69 of 159
Levitt - cross by Deutsch
490

1    A.  I believe.  I'd have to go through them all to see.  I

2    don't recall offhand which bombings we talked about with each

3    one.

4    Q.  Can you look at them and see if there's any that are prior

5    to the year 2000?

6    A.  Sure.

7            These were exemplary.  Let's see what they are.

8    Q.  Well, did you have any examples of bombings prior to

9    January 25th, 1993?

10   A.  No.

11           (Brief pause.)

12   BY THE WITNESS:

13   A.  These are all after 2000.

14   BY MR. DEUTSCH:

15   Q.  All after 2000.

16           Well, did Mr. Ferguson give you any that took place

17   in 1993 that Hamas took credit for?

18   A.  No.

19   Q.  Did he give you any in 1994 that Hamas took credit for?

20   A.  He gave me the ones that you just showed me.

21   Q.  So, they were all eight -- seven, eight -- years after

22   January 25th, 1993, right?

23   A.  That selection is all after that date.

24   Q.  Now, you testified yesterday about looking at the Internet

25   for claims of Hamas credit for bombings, right?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 70 of 159
Levitt - cross by Deutsch
491

1    A.   Looking at the Internet as one of several sources, yes.

2    Q.   When did you first start surfing the Internet for Hamas

3    Web sites?

4    A.   Oh, I -- I -- can't give you a precise date.  Probably

5    some point in the researching of the dissertation -- which is

6    around when the Internet really started being developed and

7    things started being put on the Internet -- which would have

8    been -- the Internet really wasn't fully developed when I was

9    starting this in the late '90s.  It would probably be after

10   2000 it really -- there was enough material available and

11   significantly-capable search engines to find them.

12   Q.   So, you were looking at the Internet in about 2000, and

13   you're looking for alleged credit for bombings that took place

14   in '94, right?

15   A.   I was looking for material on Hamas that predated and went

16   up to the period of those researches.  It's one of the great

17   things about research, is that you can find material from the

18   past.

19   Q.   But, of course, whatever you found in 2000 concerning 1993

20   or 1994 bombings were things that were put on the Internet in

21   the past or were put on in the present about things in the

22   past, correct?

23   A.   Yes.

24   Q.   And I take it, as someone that uses the Internet, you're

25   familiar with Internet fraud, right?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 71 of 159
Levitt - cross by Deutsch
492

1   A.   I'm familiar with the term.

2   Q.   Well, people -- you've heard of somebody putting on a Web

3   site saying they were Wal-Mart and they weren't, in fact,

4   Wal-Mart, right?

5   A.   I haven't heard of that.  But be- -- but you're right that

6   you have to be very careful in how you use the Internet, what

7   sites you consider reliable.  And, in general -- certainly, in

8   my case -- I don't rely on anything off the Internet alone

9   simply by virtue of the fact that it was on the Internet.

10  Q.   Well, are you able to produce for this jury any communique

11  taking credit for any suicide bombing prior to January 25th,

12  1993?

13  A.   No.

14  Q.   What about prior to April of '94?

15  A.   No.

16  Q.   Now, I think you -- let me ask you this other question.

17          Are you familiar with a platform that Hamas ran on in

18  the national elections in 2006?

19  A.   Not in detail.

20  Q.   Well, did they quote their charter or alleged charter in

21  1996?

22  A.   I don't know.

23  Q.   Did they tell -- did they say, "We want all the land of

24  the British Mandate," in 1996?

25  A.   I don't know.

1  Q.  Did they say, "We want to drive Israel out of their land,"

2  in 1996?

3  A.  I don't know.

4  Q.  Have you read in the Washington Post in the last year an

5  op-ed by Abu Marzook, one of the political leaders of Hamas?

6  A.  There was an op-ed by Marzook.

7  Q.  And did he not say they have no intention of taking

8  Israel's land?

9  A.  I don't remember what the whole context was, but it was

10  more conciliatory than he usually is, yes.

11  Q.  I think you testified last week that Hamas social welfare

12  programs are only for members of Hamas, right?

13  A.  No.

14  Q.  That's not true, right?

15  A.  Well, it's not what I said.

16  Q.  Okay.

17       Did you say they only provide services for people who

18  say, "We support Hamas"?

19  A.  What I said was they give preference to people who support

20  Hamas.

21  Q.  Well, do you remember testifying in the Boim case about

22  whether they provide services for people who don't support

23  Hamas?

24  A.  I don't recall testimony, but -- excuse me -- it certainly

25  is the case that among the many supporters are people who may

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 73 of 159
Levitt - cross by Deutsch
494

1    not be supporters of Hamas, which doesn't contradict their

2    fact that they do give preference to those who are supporters.

3    Q.  Well, did you testify to this, Page 347, that, "While

4    providing supp- -- "

5            MR. FERGUSON:  Judge, I'm not sure why he's reading

6    it.

7            MR. DEUTSCH:  I'm impeaching him.

8            Well, let me withdraw that.  Let me withdraw that.

9    BY MR. DEUTSCH:

10   Q.  As you sit here now, you're not telling this jury that

11   people who are not supporters of Hamas do not get services

12   from the Islamic Dawa that's affiliated with Hamas?

13   A.  I'm sorry, there are three negatives in there.  Can you

14   ask that, again?

15   Q.  Okay.

16           Do people who are not affiliated with Hamas get

17   services from the Dawa of the social welfare programs?

18   A.  Yes.

19   Q.  And I think you -- well, let me ask you this:  Hamas does

20   not discriminate against Christians, does it?

21   A.  There's evidence that they have.

22   Q.  Well, haven't -- weren't -- didn't many Christians vote

23   for Hamas in the election?

24   A.  I don't know.

25   Q.  Well, isn't there a member of the Hamas cabinet who is a

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 74 of 159
Levitt - cross by Deutsch
495

1  Christian?

2        MR. FERGUSON:  Judge, I'm going to object to

3  relevance.  We are --

4        THE COURT:  Sustained.

5  BY MR. DEUTSCH:

6  Q.  Do you know who the Minister of Tourism is of the Hamas

7  cabinet?

8        MR. FERGUSON:  Objection.

9        THE COURT:  Sustained on relevance grounds.

10  BY MR. DEUTSCH:

11  Q.  Would you agree with this statement, sir:  "Hamas has been

12  vigorously strict avoiding any direct or indirect engagement

13  in armed activities in the West or encouraging or approving of

14  any action in the direction undertaken by its supporters"?

15  A.  I'd say it's too vague.  Hamas has not conducted attacks

16  in the West as an organization.

17        In my book, I analyze the issue of Hamas conducting

18  attacks in the West and the levels of an analysis:  Would

19  Hamas as an organization?  Would individual cells?  Would

20  individual members.

21        Because there is evidence of Hamas elements

22  considering attacks in the West.

23  Q.  Now, sir, are you aware that there are Christians in

24  Israeli prisons because of their resistance to Israeli

25  occupation?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 75 of 159
Levitt - cross by Deutsch
496

1          MR. FERGUSON:  Objection.

2          THE COURT:  Sustained on relevance.

3   BY MR. DEUTSCH:

4   Q.  Now, you testified extensively about what you called the

5   Oslo peace process, right?

6   A.  The Oslo peace process or the Oslo Accords.

7   Q.  Yeah.

8          There are quite a few people who don't consider the

9   Oslo Accords a legitimate peace process; isn't that right?

10  A.  By and large, they're in the minority.  There are, and

11  they oppose it through a variety of means, some legitimate,

12  some illegitimate.

13  Q.  Well, isn't it true that at least 50 percent of the

14  Palestinian people do not consider the Oslo Accords a

15  legitimate peace process?

16         MR. FERGUSON:  Objection.  Time frame, foundation,

17  relevance.

18         THE COURT:  If you can answer, go ahead.

19  BY THE WITNESS:

20  A.  The time frame is the issue.  It depends when the poll is

21  conducted.  There have been times when a great majority of

22  Palestinians were in favor of the peace process and there have

23  been times when they haven't.  The same applies to the Israeli

24  side.

25         In both cases, in large measure it has to do with the

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 76 of 159
Levitt - cross by Deutsch
497

1    level of security they feel on the street.

2    BY MR. DEUTSCH:

3    Q.  Now, the people that were opposed to the Oslo process,

4    they're not -- they were not -- just those people who were

5    Hamas, correct?

6    A.  Correct.

7    Q.  They were not just people who were other Palestinian

8    groups, right?

9    A.  I don't know what you mean.

10   Q.  Well, there were Israelis that didn't think it was a fair

11   process, correct?

12   A.  I don't know how to comment on the fair process.  There

13   are Israelis, certainly, on the right of the spectrum.  There

14   were Israelis on the right who did not -- do not -- believe in

15   a two-state solution.  They were in the minority.  There were

16   Palestinians of an Islamist, of a nationalist bent for a

17   variety of movements who also, for whatever reasons, opposed a

18   two-state solution or this two-state solution.

19   Q.  Well, wait a second.  Let's step back.

20          There are people who support a two-state solution

21   that did not support the Oslo process, correct?

22   A.  My understanding is there are people who support a

23   two-state solution and didn't support parts of the Oslo

24   process, meaning they supported the Oslo process overall, but

25   they might have disagreed with whether enough land was being

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 77 of 159
Levitt - cross by Deutsch
498

1  given or returned to Palestinians, or whether sufficient

2  numbers of prisoners were being released, or whether Israelis

3  or Palestinians were living up to their Oslo commitments in a

4  timely manner.  There were specific time frames in which

5  things were supposed to have been carried out, and on both

6  sides they were almost always delayed.

7  Q.  Well, are you familiar with people who, basically, said

8  that the Oslo process was not a real peace plan, but an effort

9  to solidify the occupation?  Have you heard that?

10 A.  Yes.

11 Q.  And have you heard that the aim was not to end the

12 occupation, but to normalize it?

13         You've heard people say that, right?

14 A.  Have I heard it?  Yes.

15 Q.  Okay.

16         And, in fact, the initial Oslo agreement did not end

17 the occupation, did it; true or false?

18 A.  I'm unclear as stated.

19         When the Oslo Accords were agreed upon, nothing yet

20 had happened in terms of Israeli withdrawal.  That was a phase

21 withdrawal.  So, did the signing of the agreement immediately

22 end occupation?  No.

23 Q.  And --

24 A.  Over time, Israelis did withdraw from significant areas at

25 the end of the process, from almost all the Gaza Strip and

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 78 of 159
Levitt - cross by Deutsch
499

1   almost all the West Bank.

2   Q.  Are you saying that 200,000 settlers who were in the West

3   Bank and Gaza withdrew?

4   A.  What I'm saying is that settlers -- settlers withdrew from

5   all of Gaza; some settlements, a small number, were removed

6   from the northern West Bank; and, that the status and timing

7   of removal or what would happen to the settlers in the rest of

8   it was something that was supposed to be negotiated.

9   Q.  When the Oslo process began in 1993 -- about September of

10  1993, right?

11  A.  Yeah.

12  Q.  -- there was about a hundred thousand settlers in the West

13  Bank and Gaza, correct?

14  A.  You've given me that number before.  I don't have a basis

15  for it.  But there were many settlers.

16  Q.  And by 1998 --

17          MR. FERGUSON:  Objection to this line on relevance

18  grounds.

19          MR. DEUTSCH:  Well --

20          THE COURT:  Ask your next question.

21  BY MR. DEUTSCH:

22  Q.  By 1998, there were about 200,000 settlers in the West

23  Bank and Gaza, correct?

24          MR. FERGUSON:  Objection.  Relevance.

25          THE COURT:  Overruled.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 79 of 159
Levitt - cross by Deutsch
500

1          I will give you some leeway, but you are pushing it.

2    BY THE WITNESS:

3    A.  Again, I don't know the numbers, but the number had

4    increased.

5    BY MR. DEUTSCH:

6    Q.  Substantially, correct?

7    A.  It had increased.  I don't know by how much.

8    Q.  Well, let me ask you, sir, would that be consistent with a

9    peace process, to substantially increase the number of

10   settlers over a period of time?

11         Would that indicate to you that there was some lack

12   of goodwill on the part of one of the parties if they were

13   populating the occupied territory with foreigners?

14         MR. FERGUSON:  Objection to form.

15         THE COURT:  Sustained.

16   BY MR. DEUTSCH:

17   Q.  Do you know whether or not more land was confiscated

18   during the so-called Oslo peace process -- more Palestinian

19   land was confiscated by the Israelis during that process?

20         MR. FERGUSON:  Object to relevance.

21         THE COURT:  Sustained.

22   BY MR. DEUTSCH:

23   Q.  Do you know whether or not the peace process recognized

24   the United Nations' resolutions in calling for Israel to

25   remove themselves from the occupied territories and allow the

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 80 of 159
Levitt - cross by Deutsch
501

1  people who were driven out the right of return?

2  A.  I'm not sure I understand the question.  The peace process

3  had many of those issues as part of the issues to be

4  negotiated.  Since it wasn't a UN process, I don't think it

5  referenced UN resolutions; but, I don't know.

6  Q.  Well, did the peace process recognize the right of the

7  Palestinians to self-determination over their land?

8  A.  Using the word "self-determination," I don't know if that

9  was used.

10  Q.  Did it call for the complete removal of all settlers from

11  the Palestinian land?

12  A.  Again, I don't know if those terms were used, but the

13  clear purpose of the negotiation process was to create a

14  Palestinian state, which would mean that the Israeli presence

15  would have to be removed in the West Bank and Gaza.

16  Q.  Was there any mention in the process of the right of the

17  Palestinian people to return to their land?

18  A.  I don't know if it was in the document, but it came up

19  frequently in negotiations.  The -- their standing description

20  was that Palestinians would have a right to return to the

21  Palestinian state.

22  Q.  Was there an agreement to return East Jerusalem to the

23  Palestinian people in this Oslo agreement?

24  A.  That was one of the issues under negotiation, and it was

25  something that had been offered by the Israeli side at one

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 81 of 159
Levitt - cross by Deutsch
502

1    point.

2    Q.  In fact, the peace -- so-called peace -- process was a way

3    to institutionalize the control of Israel of Palestinian land

4    and resources, wasn't it?

5    A.  If you're asking my opinion, I think that's patently

6    ridiculous.

7    Q.  Well, other people disagree with you, right, sir?

8    A.  You can call them.

9    Q.  Yeah.

10          You know Sara Roy from Harvard University?

11   A.  No.

12   Q.  You never heard of her?

13   A.  I've heard of her.  I don't know her.

14   Q.  Okay.

15          Well, you know her writings on the so-called Oslo

16   peace process?

17   A.  I've read some of her stuff a long time ago.

18   Q.  And she called it a way to solidify the occupation,

19   correct?

20          MR. FERGUSON:  Objection.

21          THE COURT:  Sustained.

22   BY MR. DEUTSCH:

23   Q.  And isn't it true, sir, that during this so-called peace

24   process there was an increase in closing the checkpoints

25   allowing Palestinians to go and work in Israel?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 82 of 159
Levitt - cross by Deutsch
503

1          MR. FERGUSON:  Objection.  Relevance.

2          THE COURT:  Sustained.

3   BY MR. DEUTSCH:

4   Q.  Isn't it true that there was an increase in curfews,

5   locking up Palestinian people in their homes and not allowing

6   them to leave for long periods of time?

7          MR. FERGUSON:  Same objection.

8          THE COURT:  Sustained.

9   BY MR. DEUTSCH:

10  Q.  Were the Palestinians allowed through this process to have

11  their own borders and their own trade as a result of this

12  agreement?

13  A.  At times, yes.

14  Q.  Now, do you know how many Palestinians are refugees around

15  the world who have been driven from their land?

16  A.  I don't.

17  Q.  Would 5 million be a term that you would agree with?

18  A.  There's disagreement on how to count the refugees -- I'm

19  not a demographer -- whether you count the number of people

20  who left after each of the wars, whether you count all of

21  their descendents.  In either case, it's a very large number.

22  Q.  And there was no agreement in this peace process to either

23  compensate the people who have been driven from their land or

24  allow them to return, was there?

25  A.  Actually, there was discussion and I understand at some

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 83 of 159
Levitt - cross by Deutsch
504

1  point at least partial agreement on:  A, compensation, in

2  terms of money; B, allowing some number of Palestinians to

3  return to what is now Israel proper; and, C, allowing any

4  other Palestinians the right to return to what would have been

5  the Palestinian state.

6  Q.  Who agreed to that, sir?

7  A.  What I said is it was part of an agreement that they were

8  negotiating since the --

9  Q.  There was no agreement by Israel, was there?

10  A.  Israel had offered all those three things.  The agreement

11  was never finalized, and so it never took place.

12  Q.  Well, you know who Shimon Peres is, right?

13  A.  I referred to him earlier as the --

14  Q.  Yeah.

15  A.  -- former Foreign Minister.

16  Q.  And he said there will be no evacuation from Judea and

17  Samaria, the occupied territories.  Oslo begins and ends in

18  Gaza.

19          Do you know him saying that, making that statement?

20  A.  I'd ask when it was.

21  Q.  Well, it was in 1996, sir.

22  A.  Right after the string of suicide bombings, perhaps?

23  Q.  I don't know, sir.  It was --

24  A.  You'll have to give me more time.

25  Q.  -- in 1996.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 84 of 159
Levitt - cross by Deutsch
505

1          So, you're saying at that point, he changed his

2     position?

3     A.  As I described earlier, at that point he was running for

4     the Prime Minister.  After the string of suicide bombings, his

5     political standing was shot.  I don't know this quote per se,

6     but I wouldn't be surprised if he was trying to shore up his

7     security credentials and telling the Israeli people after the

8     string of suicide bombings that the negotiations would stop

9     until the Palestinians proved themselves legitimate partners,

10    again.

11    Q.  You know Yitzhak -- who Yitzhak -- Rabin was, right?

12    A.  As I testified earlier.

13    Q.  Yeah.

14         And he said in 1995 the interim agreements, which did

15    not deal with the removal of the settlements or the right of

16    return or the right to Jerusalem, were interim and final; do

17    you remember him saying that?

18    A.  I'm sorry, was that all a quote or were you adding in the

19    middle?

20    Q.  That's a quote.  "Interim and final."  He referred to the

21    Oslo agreements as interim and final?

22    A.  Which they were.  They were interim agreements as part of

23    the Oslo process leading up to a final agreement.  In 1995,

24    they would have been right in the middle of the interim

25    period.

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 85 of 159
Levitt - cross by Deutsch
506

1    Q.  Well, in 1995, when they had that agreement, it wasn't to

2    remove all the settlers, right?

3    A.  I'm not sure at what point -- it was around 1995, but late

4    1995, I think -- that they finished negotiations over the most

5    significant Israeli withdrawals.  So, at that point, that

6    might have predated those withdrawals.

7    Q.  And wasn't there a way to divide the Palestinian land into

8    what's called bantustans, little areas that were surrounded by

9    settlements and military checkpoints?

10           MR. FERGUSON:  I'm going to object to the use of the

11   term "bantustans."

12           THE COURT:  Sustained.

13   BY MR. DEUTSCH:

14   Q.  Well, cantons then?  Isolated cantons?

15   A.  These are charged terms, and they're terms that are used

16   by people who oppose the peace process.

17           Mainstream --

18   Q.  Why don't we take the word "peace process" out of the

19   equation and call it "the process."  Okay?

20           MR. FERGUSON:  Objection.

21   BY MR. DEUTSCH:

22   Q.  People who oppose it --

23           MR. FERGUSON:  Objection.

24   BY MR. DEUTSCH:

25   Q.  -- don't consider --

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 86 of 159
Levitt - cross by Deutsch
507

1          THE COURT:  Sustained.

2    BY MR. DEUTSCH:

3    Q.  -- it a peace process.

4          THE COURT:  Mr. Deutsch, do not argue with the

5    witness.

6          MR. DEUTSCH:  Sorry, Judge.

7          THE COURT:  Ask your questions.

8          MR. DEUTSCH:  Okay.

9    BY MR. DEUTSCH:

10   Q.  Those -- that's true, though, that there was a way that

11   the Palestinians were forced to live in cantons isolated from

12   each other that are surrounded by Israeli checkpoints and

13   settlers, right?

14         MR. FERGUSON:  Judge, I'm going to object to

15   relevance.

16         THE COURT:  You can answer, if you can.

17   BY THE WITNESS:

18   A.  Palestinians weren't forced to live in specific areas --

19   grouped and, then, forced to live in specific areas.  There

20   were some right-wing settlers who would try and establish not

21   even really settlements, but illegal hilltop settlements in

22   trying to do that.  That was not mainstream.

23         There were a great many checkpoints and the curfews

24   you've described over this period of time and the closures of

25   -- meaning not allowing people to cross from the West Bank or

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 87 of 159
Levitt - cross by Deutsch
508

1  Gaza into Israel, though I would object to the classification

2  of those being tied to the peace process.  Those were tied to

3  the fact that over the course of this peace process, as we've

4  discussed -- 1995, 1996, in particular -- there were a great

5  many terrorist attacks.

6          And these were a product -- a part of the security

7  measures enacted in response to those attacks.  They were not

8  helpful to the peace process.  In fact, there was a great

9  movement within Israel to try to avoid those types of

10  activities in an effort to give a boost to the peace process.

11  BY MR. DEUTSCH:

12  Q.  The final proposed process would have isolated Palestinian

13  territories from each other; is that right or wrong?

14  A.  I'm sorry, what process?

15  Q.  The final proposed process by the Israelis --

16  A.  I don't --

17  Q.  -- would have separated Palestinian territory from each

18  other?

19  A.  What process proposed by the Israelis?

20  Q.  Well, let me ask you this:  If you live in the south West

21  Bank and you want to go to the north West Bank, you have to go

22  through Jerusalem, correct?

23  A.  Not necessarily, no.

24  Q.  Well, do you have to cross into Jerusalem to get from

25  the -- one part of the West Bank to the other?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 88 of 159
Levitt - cross by Deutsch
509

1    A.   Not necessarily.

2    Q.   How do you get there?

3    A.   There are other roads that go through other areas.

4    Q.   Are there roads for Palestinians or are there roads for

5    Israeli settlers?

6    A.   I'm not a cartographer.  I can't tell you how many roads.

7    But there are roads for both.

8    Q.   Do you need special permission to go cross through

9    Jerusalem into another part of the West Bank?

10            MR. FERGUSON:  Objection.  Relevance.

11            THE COURT:  Sustained.

12   BY MR. DEUTSCH:

13   Q.   Now, there are -- the two-state solution that you've

14   referred to is not the only solution to the Palestinian-

15   Israeli conflict, correct?

16   A.   Is it the -- is it not the only theoretical solution or is

17   it the only solution that in practice was being pursued?

18            In practice, it was the only one that was on the

19   table.

20   Q.   Yeah, but there are solutions to have a bi-national state,

21   right, where the land is jointly shared and there's two

22   nations living under one overall system, like a confederation,

23   right?  You've heard of that, right?

24            MR. FERGUSON:  Objection.  Relevance.

25            THE COURT:  Sustained.  And as to form.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 89 of 159
Levitt - cross by Deutsch
510

1   BY MR. DEUTSCH:

2   Q.  Have you heard of the efforts or the suggestion that there

3   can be a unitary state where the land is shared by both the

4   people who live there?

5   A.  Have I heard of such a position?  Usually, espoused by

6   extremists who know that such a solution would never work,

7   yes.

8   Q.  Well, are you saying that a proposal where both

9   Palestinians and Israelis would live in peace together and

10  have their own national identity in a confederation is a

11  position proposed by extremists?

12          MR. FERGUSON:  Judge, I'm just going to object to

13  this line of questioning as being irrelevant.

14          THE COURT:  Sustained.

15  BY MR. DEUTSCH:

16  Q.  Are you saying that anybody that opposes a two-state

17  solution is a terrorist?

18  A.  I didn't say that.

19  Q.  Okay.

20          Are you saying that anyone who opposes a two-state

21  solution wants to drive Israel off its land?

22  A.  No.  Those who want to do that are usually pretty clear

23  about it.

24  Q.  And you've read writings about people who have proposed a

25  way that the Israelis and Palestinians can live in peace on

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 90 of 159
Levitt - cross by Deutsch
511

1    the same land, haven't you, in a confederated state?

2         MR. FERGUSON:  Objection.  Relevance.

3    BY MR. DEUTSCH:

4    Q.  Just like we have here.  We have many states, right?

5         MR. FERGUSON:  Ob- --

6         THE COURT:  Sustained.

7    BY MR. DEUTSCH:

8    Q.  There could be a confederated state where people have

9    their -- exercise their -- freedom of religion and have their

10   rights just like in the United States, right?

11        MR. FERGUSON:  Objection.  Relevance.

12        THE COURT:  Sustained.

13   BY MR. DEUTSCH:

14   Q.  Now, I take it you studied as part of your expertise the

15   period beginning in 1991 leading up to efforts by the U.S.

16   government in '95 and '97 to criminalize support for Hamas,

17   right?

18   A.  Yes.

19   Q.  Okay.

20        And I think we've already established that it was

21   first criminalized by the Treasury Department in '95, right?

22   A.  Correct.

23   Q.  And, then, two years later, in '97, it was a crime to give

24   material support to Hamas, correct, if you know?

25   A.  I think what you're trying to describe is that it was

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 91 of 159
Levitt - cross by Deutsch
512

1   first designated as a terrorist organization by the Treasury

2   Department in '95 and, then, again by the State Department as

3   a foreign terrorist organization in '97.

4   Q.  Okay.

5           And there were debates in the State Department and in

6   the Congress and in the public about whether or not that these

7   laws should be passed, right?

8   A.  As with all laws, yes.

9   Q.  Okay.

10          And were you familiar with efforts by the Israeli

11  government to influence the U.S. lawmakers to try and ban

12  material support and monetary support for groups in the

13  occupied territories?

14          MR. FERGUSON:  Objection.  Relevance.

15          THE COURT:  Sustained.

16          MR. DEUTSCH:  Judge, can I be heard on this?

17          THE COURT:  Ask your next question.

18  BY MR. DEUTSCH:

19  Q.  Well, have you learned that the Prime Minister of Israel

20  was trying to pressure the U.S. government in 1992, early '93,

21  to stop monies from Palestinian Americans going to the

22  occupied territories?

23  A.  My understanding is that the Israeli government had

24  conversations with the United States government about stopping

25  the flow of funds -- from whoever it may be -- abroad to

1    specific Palestinian groups, like Hamas, that were engaged in

2    terrorism; not stopping funds to the West Bank and Gaza, in

3    particular.

4         In fact, at that time, as today, the United States

5    government was providing foreign funding to the West Bank and

6    Gaza, to specific groups involved in violence.

7    Q.  So, the U.S. gov- -- the Israeli government was trying to

8    get the U.S. government to stop funding groups like Hamas; is

9    that what you're saying?

10        MR. FERGUSON:  Objection.  Mischaracterizes the

11   testimony.

12        MR. DEUTSCH:  I'm asking.

13        THE COURT:  Overruled.

14        You may answer.

15   BY THE WITNESS:

16   A.  The Israeli government was not trying to get the U.S.

17   government to stop giving money.  That's not what I said.

18   What I said is that the Israeli government, facing acts of

19   violence by groups of like Hamas, was trying to get foreign

20   governments, including the United States government, through

21   bi- -- by regular bilateral diplomatic talks -- to help in

22   curbing the flow of funds to those specific groups that were

23   engaged in violence.

24   BY MR. DEUTSCH:

25   Q.  And in 1992, 1993, the U.S. wasn't responding the way the

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 93 of 159
Levitt - cross by Deutsch
514

1    Israeli government wanted it to; is that right?

2    A.   That's too general.  I would say the way you've

3    characterized it, no.

4    Q.   Well, did they pass statutes in '92 or '93 or '94 stopping

5    money from being given to groups like Hamas?

6    A.   The way to judge whether the U.S. did anything is not only

7    by whether or not they passed specific laws banning these

8    groups, which didn't happen until '95.  They did other things.

9    Q.   So -- but in '92 and '93, it was not against U.S. law to

10   bring -- give money to organizations that may have been

11   affiliated with Hamas, right?

12          MR. FERGUSON:  Judge, we've been here before.

13          THE COURT:  Sustained.

14          MR. FERGUSON:  It calls for a legal conclusion.

15          THE COURT:  Asked and answered.

16   BY MR. DEUTSCH:

17   Q.   Did you follow the testimony of State Department officials

18   opposing stopping monies and criminalizing people who were

19   affiliated with Hamas?

20          MR. FERGUSON:  Objection.  Relevance.

21          THE COURT:  That is a "Yes" or "No."

22          You can answer.

23   BY THE WITNESS:

24   A.   No.

25   BY MR. DEUTSCH:

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 94 of 159
Levitt - cross by Deutsch
515

1   Q.  Are you familiar with Mary Ryan, Assistant Secretary for

2   Consular Affairs, who testified in the Congress against --

3             MR. FERGUSON:  Objection.  Relevance.

4             THE COURT:  Sustained.

5   BY MR. DEUTSCH:

6   Q.  -- criminalizing Hamas?

7             THE COURT:  He said he did not follow this, Mr.

8   Deutsch.

9   BY MR. DEUTSCH:

10  Q.  Were you also aware, sir, that in '92 and up until April

11  of '93, the United States government was having informal

12  meetings with the leadership of Hamas?

13  A.  It's the role of the State Department diplomats to meet

14  with a whole host of characters.  It doesn't surprise me at

15  all that in the period following the formation of Hamas, U.S.

16  diplomats were trying to feel out what exactly Hamas was,

17  whether it was more violent or less.  The State Department has

18  had negotiate- -- well, not -- negotiation's the wrong term,

19  but conversations -- with other elements of the Muslim

20  Brotherhood worldwide for the same purpose.

21             But at the same time that they were having those

22  discussions, the State Department noted, for example, the

23  arrest of Sheikh Yasin for the kidnapping and murders of two

24  soldiers and started describing Hamas as a terrorist

25  organization in its annual reports.

1   Q.  So, in '92, '93 -- five, six years after the creation of

2   Hamas -- the State Department, as far as you know, was meeting

3   with Hamas leaders -- Hamas political leaders -- correct?

4   A.  I've read about such meetings in '91, but not after.

5   Q.  Now, in this -- in the events that you -- this event

6   timeline that you -- testified to about yesterday, you talked

7   about a series of soldiers that were abducted between 1989 and

8   1992, correct?

9   A.  Correct.

10  Q.  And these were soldiers that were part of the Israeli

11  occupation force, correct?

12  A.  I don't know if -- what you mean by that, if "occupation

13  force" means soldiers who were on duty in the West Bank and

14  Gaza performing military occupation duties, if by your

15  definition anybody in the Israeli military would be occupation

16  force.

17          I believe that all three -- at least, two of them --

18  were off-duty at the time.  By State Department definitions

19  that's non-combatant.  Your question is too vague.

20  Q.  Well, they were abducted in the occupied territories,

21  correct?  They weren't abducted in Israel proper, right?

22  A.  I think at least one was.

23  Q.  Okay.

24          And would you say that prior to what you claim is the

25  first suicide bombing -- which was in March of '93 -- that

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 96 of 159
Levitt - cross by Deutsch
517

1   this was the kind of activity that allegedly the Hamas

2   military was engaged in?

3   A.   Hamas took credit for kidnappings, murders, stabbings,

4   shootings in that early period.

5   Q.   Sir, as part of your expertise on terrorism, have you

6   investigated and learned about state terrorism?

7   A.   Yes.

8   Q.   And would you consider a state that carries out

9   assassinations by death squads and destroys an infrastructure

10   of a people and tortures citizens committing state terrorism?

11           MR. FERGUSON:  Objection.

12           THE COURT:  Sustained.

13   BY MR. DEUTSCH:

14   Q.   Do you think that Israel carries out acts of state

15   terrorism against the Palestinian people?

16           MR. FERGUSON:  Objection.

17           THE COURT:  Sustained.

18           MR. DEUTSCH:  Just one second, Judge.

19           THE COURT:  Okay.

20           (Brief pause.)

21   BY MR. DEUTSCH:

22   Q.   Do you know who Rachel Corey was?

23   A.   I'm sorry, can you -- I didn't --

24   Q.   Do you know who Rachel Corey was?

25   A.   I've heard of her.  I didn't know her.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 97 of 159
Levitt - cross by Moffitt
518

1    Q.  Do you know how she died?

2    A.  Yes.

3    Q.  She was an American citizen, right?

4    A.  She was.

5    Q.  She was 21 years old, right?

6    A.  I think so.

7    Q.  She was run over by an --

8         MR. FERGUSON:  Objection.  Relevance.

9    BY MR. DEUTSCH:

10   Q.  -- Israeli bulldozer, right?

11        THE COURT:  Sustained.

12   BY MR. DEUTSCH:

13   Q.  Now, every suicide bombing that you told this jury about

14   yesterday, every single one of them happened after January 25,

15   1993, correct?

16   A.  That's right.

17        MR. DEUTSCH:  I have no further questions.  Thank

18   you, sir.

19        THE COURT:  Mr. Moffitt, cross-examination.

20        CROSS-EXAMINATION ON BEHALF OF DEFENDANT ASHQAR

21   BY MR. MOFFITT:

22   Q.  Hello, Dr. Levitt.

23   A.  Mr. Moffitt.

24   Q.  Nice to see you, again.

25   A.  It's a pleasure as always.

Levitt - cross by Moffitt

519

1   Q.  Dr. Levitt, I'm curious about your expertise.  You are not

2   an Islamic scholar; am I right?

3   A.  That's correct.

4   Q.  You're not a Koranic scholar?

5   A.  Correct.

6   Q.  You are not a scholar in the religion of Islam; am I

7   right?

8   A.  Correct.

9   Q.  You do not speak Arabic?

10  A.  As stated.

11  Q.  Right, as stated.

12          But you do not speak Arabic?

13  A.  Still don't.

14  Q.  Right.

15          You have not lived in the occupied territories; am I

16  right?

17  A.  I visited.  I have not lived.

18  Q.  You have not lived in the occupied territories?

19  A.  That's right.

20  Q.  You spoke about visiting the occupied territories.  How

21  many times have you visited the occupied territories?

22  A.  I don't know.  Maybe a dozen.

23  Q.  How long did you stay in the occupied territories?

24  A.  I would stay a day at a time.

25  Q.  All right.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 99 of 159
Levitt - cross by Moffitt
520

1           So, your stays in the occupied territories were

2   temporary?

3   A.  Correct.

4   Q.  You are not of the Palestinian culture, are you?

5   A.  I don't know what it means to be of the Palestinian

6   culture.  I'm not --

7   Q.  You're not --

8   A.  -- a Palestinian.

9   Q.  -- born in Palestine?

10  A.  No.

11  Q.  You are not Islamic?

12  A.  Correct.

13  Q.  You are not an ethnic Palestinian?

14  A.  Correct.

15  Q.  You are not a part of that culture?

16  A.  Correct.

17  Q.  And you are not a psychologist?

18  A.  That's correct.

19  Q.  You are not a forensics expert?

20  A.  Correct.

21  Q.  Your area of expertise is that you've studied Hamas; is

22  that right?

23  A.  Hamas and other Middle Eastern terrorist groups; terrorism

24  in general, including Hamas.

25  Q.  Well, the others that you've studied are the Islamic

Levitt - cross by Moffitt

521

1   Jihad?

2   A.  It includes Palestinian Islamic Jihad.

3   Q.  And Hizballah, correct?

4   A.  And it includes Hizballah, as well, and others.

5   Q.  All right.

6        Which others have you studied other than Hamas,

7   Hizballah and the PIJ?

8   A.  Al Qaeda; Egyptian Islamic Jihad; Gamaat al-Islamiya;

9   North African groups; the newly-emerging groups in Iraq.  Many

10  groups.

11  Q.  Now, particular with respect to Palestine, in some part,

12  the groups in Palestine are a reaction to an occupation; am I

13  right?

14  A.  In some part, yes.

15  Q.  They are in some ways very different from some of the

16  other groups that you studied, correct?

17  A.  In multiple ways.

18  Q.  There is a history of conflict that's set forth that

19  prescribes or describes the Palestinian experience, correct?

20  A.  There is a history of conflict.  I don't know what you

21  mean by prescribing or describing.

22  Q.  Well --

23  A.  Other --

24  Q.  -- let me see if I can relate it better.

25        In part, these groups are reactions to over 50 years

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 101 of 159
Levitt - cross by Moffitt
522

1   of conflict between the Palestinians and the Israelis?

2   A.   These groups and others -- violent, non-violent -- part of

3   their cause is because of this history, yes.

4   Q.   All right.

5          And much of the rhetoric that goes on, goes on

6   regarding ending the occupation; does it not?

7   A.   The rhetoric, yes.

8   Q.   All right.

9          And resistance to the occupation is something that

10  characterizes these Palestinian groups?

11  A.   We'd have to define what resistance occupation is.

12  Q.   Well, let's suggest -- let me suggest -- they are all

13  angry about the fact that Israel occupies Palestine or what

14  passes for Palestine, correct?

15  A.   That is one of the things they are angry about.  As the

16  charter made clear, there are others.

17  Q.   All right.

18          Now, Hamas is called the Islamic Resistance Movement;

19  isn't that right?

20  A.   That's right.

21  Q.   Now, to the extent that you have discussed all of these

22  other things, religion -- you discussed religion; did you not?

23  A.   I did not discuss religion in terms of, you know, a kind

24  of a dissertation on religion.  What I have discussed is

25  religion as it pertains to the study of these types of groups.

Levitt - cross by Moffitt

523

1    The ones that we're discussing at any rate are religious

2    groups.  To fully understand them, I've had to better

3    understand some of the religious underpinnings.

4    Q.  All right.

5    A.  Which goes for the Jewish groups, too, by the way.

6    Q.  All right.

7            But you are Jewish; are you not?

8    A.  I am.

9    Q.  All right.

10           And, so, you are part of that culture?

11   A.  I am.

12   Q.  And that distinguishes you with respect to your study of

13   Jewish groups and Palestinian groups, correct?

14   A.  I would disagree.  A scholar does not need to be a part of

15   a culture to understand that culture.

16   Q.  All right.

17           I want to talk to you a little bit about some of the

18   things that you said about scholarship here.

19           You have described, even in discussing the charter, a

20   group of scholars that have agreed upon certain things.

21           Who are those scholars?

22   A.  I'm not sure I can answer that question as asked in so

23   general a terminology.

24           What --

25   Q.  Well --

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 103 of 159
Levitt - cross by Moffitt
524

1  A.  -- specifically --

2  Q.  -- when you discussed --

3  A.  -- are you asking?

4  Q.  -- the charter, you discussed a group of scholars that

5  agreed upon the translation of the charter.

6         Who are they?

7  A.  No, I didn't say there's a group.  I said, in general,

8  scholars tend to agree.  And, so, you will find the charter

9  cited in group -- in books.

10  Q.  Well, who are the group that agreed on the Yale

11  translation?  Who are those people?

12  A.  You keep using "group" like there's a singular entity out

13  there.  It might have been --

14  Q.  Are there a number of scholars that agreed on the Yale

15  translation?

16  A.  What I have seen is the Yale translation used time and

17  again by various scholars.  Can I name them?

18  Q.  Who are they?

19  A.  I can't name them here.  I don't carry lists like that

20  around.

21         But if you talk to scholars in academia, the Yale

22  translation will be the one that people use.

23  Q.  You can't name one of them as you sit there?

24  A.  Avraham Sela and Shaul Mishal, the two Israeli authors

25  that your co-lawyer described as authoritative, they've used

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 104 of 159
Levitt - cross by Moffitt
525

 1   it.  I think Khaled Hroub has used it.

 2   Q.  You think Khaled Hroub has used it?

 3        Are you familiar with this book (indicating)?

 4   A.  Yes.

 5   Q.  There's a translation in here?

 6   A.  Pardon?

 7   Q.  There is a translation of the charter in here?

 8   A.  I think so.  It's been a long time since --

 9   Q.  Is it the Yale translation?

10   A.  I don't know.

11   Q.  Do you want to look at it and see if it's the Yale

12   translation?

13   A.  Are you asking me to?

14   Q.  Well, sir, you said to me that Mr. Hroub uses it.  You've

15   read this book; have you not?

16   A.  What I said is I think he's used it.  I also didn't say

17   that he's used it in that book.

18   Q.  You've read this book; have you not?

19   A.  I have.

20   Q.  You looked at the translation, correct?

21   A.  Long time ago.

22   Q.  You don't remember --

23   A.  That's right.

24   Q.  -- whether he used the Yale translation?

25   A.  That's right.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 105 of 159
Levitt - cross by Moffitt
526

1    Q.  So, you're not sure?

2    A.  Correct.

3          Mind you, the other translations are not far off from

4    the Yale translation.  There really isn't any disagreement on

5    the translations.

6    Q.  How many translations are there, sir?

7    A.  There could be innumerable.

8          You just lost your place.

9    Q.  Well, you're quite capable of finding the charter in the

10   book; are you not?

11   A.  If you want to take all day to flip through the book.

12   Q.  Give it to me, then, sir.  I won't take all day, I assure

13   you.

14   A.  That's great.

15          (Document tendered to counsel.)

16          (Document tendered to witness.)

17   BY THE WITNESS:

18   A.  Thank you.

19          (Brief pause.)

20   BY THE WITNESS:

21   A.  This may be his own translation or maybe another.  He

22   doesn't say.

23   BY MR. MOFFITT:

24   Q.  It's not the Yale translation, though, is it?

25   A.  It doesn't say.

Levitt - cross by Moffitt

527

1   Q.  Well, sir, can you -- I'm assuming that you've examined

2   the Yale translation, correct?

3   A.  Examined might be too specific a word.  I've used it as a

4   reference, yes.

5   Q.  All right.

6        But you spoke quite generally about the Yale

7   translation with my colleague, Mr. Ferguson; did you not?

8   A.  No.  I spoke about the document, not about the translation

9   per se.

10  Q.  Well, wasn't the first question, wasn't that this is the

11  most authoritative translation?  Didn't you say that, sir?

12  A.  Is it the most authoritative translation I know of?  Yes.

13  Q.  All right.

14       But there are other translations, correct?

15  A.  All of which are very, very similar.  I don't know --

16  Q.  There are other translations, sir?

17  A.  Yeah.

18  Q.  May I have my book back?

19       (Document tendered.)

20  BY MR. MOFFITT:

21  Q.  Now, do you know whether there is an authoritative

22  translation that people who speak Arabic use?

23  A.  I presume that there's the one authoritative Arabic

24  translation that was distributed in 1988.  I've seen that.

25  But, again, I've had that translated.  I haven't read it

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 107 of 159
Levitt - cross by Moffitt
528

1 myself.  I don't speak Arabic.

2 Q.  You, in fact, couldn't read it yourself, could you?

3 A.  That's right.

4 Q.  All right.

5    Now, I also want to talk to you about your sources of

6 information and how you do this.

7    You talked about interviews, correct?

8 A.  Correct.

9 Q.  Now -- and these are interviews with people who profess

10 from time to time to be members of Hamas, correct?

11 A.  Yes.

12 Q.  Where did these interviews take place?

13 A.  In prison.

14 Q.  In prison.

15    And who is running the prisons?

16 A.  The prison authorities.  Israeli prison authorities in

17 this case.

18 Q.  Israeli prison authorities, correct?

19 A.  That's right.

20 Q.  All right.

21    And you and your translator go to the prison,

22 correct?

23 A.  Uh-huh.

24 Q.  And do you meet with Israeli authorities?

25 A.  No.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 108 of 159
Levitt - cross by Moffitt
529

1  Q.  You don't meet with Israeli authorities?

2  A.  We'll be met at the door by Israeli authorities.

3  Q.  Uh-huh.

4  A.  But I don't have a meeting with them.  They don't

5  participate in the interview.

6  Q.  All right.

7       Now, this is as a result -- you decide to interview

8  these people as a result of you having a police report or some

9  information independent of the day that you go to the prison,

10  correct?

11  A.  Correct.  It won't always be a police report.  Sometimes

12  it could just be media articles and, you know, that will help

13  determine who are people that might be useful to interview.

14  Q.  Well, let's assume you have a police report.  You would

15  normally have a police report from Israeli authorities,

16  correct?

17  A.  Normally, no.

18  Q.  Normally, no?  You don't get police reports from Israeli

19  authorities?

20  A.  I have received police reports.  Usually in the context of

21  police reports that have been submitted in cases in the United

22  States.  So, not directly from Israeli authorities.

23       I have received --

24  Q.  Well, hold on.

25  A.  -- some --

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 109 of 159
Levitt - cross by Moffitt
530

1    Q.  Let me understand that, because I don't quite understand

2    what you're saying.

3    A.  Sure.

4    Q.  You received Israeli police reports from United States

5    authorities?

6    A.  Some from United States authorities, more -- for example,

7    in cases like the Boim case that was referenced earlier, a lot

8    of these have become documents in the public domain now.

9    Q.  You mean Israeli police reports become -- are documents

10   that have come into the public domain?

11   A.  Correct.

12   Q.  Okay.

13        And, then, you decide who you want to see and you go

14   to a prison, correct?

15   A.  I'm not sure on the "then," what we're tying this to.

16   Q.  All right.

17   A.  Chronologically, yes.

18   Q.  Let me change the question for a second.

19   A.  Thank you.

20   Q.  All right.

21        You have some source material, either a police report

22   or a newspaper article, correct?

23   A.  You keep throwing in police report.  I would say that it's

24   probably a hundred percent of the time this is done based off

25   of regular media.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 110 of 159
Levitt - cross by Moffitt
531

1  Q.  All right.

2        Well, let's talk about -- what are we talking about

3  regular media?  We're talking about television?

4  A.  Usually print media.

5  Q.  All right.

6        Where is the print media from you most generally

7  have?

8  A.  It varies.  Excuse me.

9        When --

10  Q.  How large a percentage is from Israeli print media?

11  A.  Percentage, I don't know because -- let's take the case of

12  Hamas.  If I'm studying something specific on Hamas, I will

13  make it a point to look at Israeli media because there'll be

14  more coverage of Hamas there.  But, again, I'm not referring

15  on any one piece of media.  Could be New York Times, Chicago

16  Tribune, European press, Arab press.

17  Q.  And, oftentimes, the media is reporting sometimes --

18  sometimes -- what other media has said about something,

19  correct?

20  A.  Some- --

21  Q.  It's a secondary source?

22  A.  Sometimes.  You do need to be careful.

23  Q.  All right.

24        And it might even be a tertiary source, correct?

25  A.  True.

1    Q.   Okay.

2    A.   Poor journalism.

3    Q.   So, it clearly is not a primary source; am I right?

4    A.   You can usually use first-person quotes with a sense of

5    authoritativeness; but, otherwise, they should at least be

6    considered secondary at best.  I think I testified earlier

7    that for me, sources of the media are primarily useful for

8    lead purposes; and, this would be a good example.

9    Q.   For lead purposes?

10   A.   Correct.

11   Q.   In other words, to lead you to a particular place or

12   person?

13   A.   To conduct an interview, to collect primary source

14   documents, yes.

15   Q.   Now, in the course of interviewing people who are in

16   prison in Israel or in the occupied territories, you are aware

17   that there is some history or concern about the use of stress

18   techniques and various other things with respect to get

19   statements from people; am I right?

20   A.   Yeah.

21   Q.   So, you also have to be careful about when you interview

22   people under those circumstances, don't you?

23   A.   I don't interview people under those circumstances.

24   Q.   Well, who have been subjected to stress and given

25   statements?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 112 of 159
Levitt - cross by Moffitt
533

1   A.   Again, you're talking --

2   Q.   You have to be careful when you interview people who might

3   have come under some sort of stress technique or torture in

4   assessing whether what they're saying is true, don't you?

5   A.   I'm not interviewing anybody under any stress --

6   Q.   I'm not suggesting --

7   A.   -- positions or techniques.

8   Q.   -- that you are, Doctor.  I'm suggesting that perhaps

9   their original statement was taken under those circumstances.

10  A.   Original statement is different than my interview.

11  Q.   I understand.

12       But when you interview people who have been subjected

13  to that, you have to be careful, don't you?

14  A.   One has to be careful with any interview.

15  Q.   Particularly when people have been subjected to stress or

16  torture, correct?

17  A.   If one were to know that that had happened, one should be

18  very careful; probably shouldn't conduct the interview.

19       If you're suggesting that one needs to be

20  particularly careful in interviewing anybody who's ever been

21  in an Israeli prison because they've been put under what

22  you're calling stressful conditions, the conditions in which I

23  interview them are not stressful and I don't take everything

24  --

25  Q.   I'm not talking about --

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 113 of 159
Levitt - cross by Moffitt
534

1    A.   -- that they say --

2    Q.   -- the conditions that you --

3    A.   -- at face value.

4    Q.   Sir, I've never asked you a question or suggested to you,

5    have I, that the conditions that you put anyone in are those

6    conditions, have I?  I've never suggested that, have I?

7    A.   I responded this way because your question's been

8    sufficiently vague to suggest that you have.

9    Q.   It's vague that you have to be careful with people who

10   have given statements under torture?  That's a vague question

11   to you?

12   A.   That's a different question.

13   Q.   Okay.

14         I don't want to fence with you, sir.

15   A.   I appreciate that.

16   Q.   Now, are you -- can you be sure that some of the people

17   you have interviewed have not been subjected to those kinds of

18   conditions and given statements under those kinds of

19   conditions?

20   A.   Generally, no, not knowing what those conditions that

21   you're referring to vaguely are.

22   Q.   Well, let's assume -- I've had a whole series of questions

23   about stress and torture.  So, let's assume that's what I'm

24   talking about -- okay? -- for the purposes of our discussion,

25   all right?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 114 of 159
Levitt - cross by Moffitt
535

1          Is that vague to you?

2     A.  Assumptions, yes.

3     Q.  Okay, Doctor.

4          Let me ask you, who would you consider the

5     authorities in this field, other than yourself?

6     A.  That's kind of you.

7     Q.  Well, I'm sure you consider yourself an authority in this

8     field.

9     A.  I strive.

10    Q.  Who else?

11    A.  When you say "this field," are you talking about terrorism

12    studies in general?

13    Q.  Talking about Hamas right now.  I'm not talking about

14    terrorism studies in general.  I'm talking about -- because

15    we're here to talk about Hamas, correct?

16    A.  I'm here to answer whatever questions you have.

17    Q.  We're here -- you came here to talk about Hamas, didn't

18    you?

19    A.  I came here to talk about this case, which is related to

20    Hamas, yes.

21    Q.  All right.

22         Do I have -- is there a problem with me articulating

23    the English language to you?

24         MR. FERGUSON:  Objection.

25    BY MR. MOFFITT:

 1   Q.  Are you having trouble --

 2          THE COURT:  Sustained.

 3   BY MR. MOFFITT:

 4   Q.  -- understanding me?

 5          MR. FERGUSON:  Objection.

 6          THE COURT:  Sustained.

 7          Ask your question, Mr. Moffitt.

 8          Dr. Levitt, listen to the question.  Answer --

 9   BY MR. MOFFITT:

10   Q.  This case is about Hamas, correct?

11   A.  That's right.

12   Q.  You knew that when you came?

13   A.  That's right.

14   Q.  All right.

15          Who else do you consider an authority in this

16   particular area?

17   A.  There have been several people who have written books on

18   Hamas.  Mishal and Sela probably wrote the other most

19   important book.  We've referred to Khaled Hroub, though I find

20   many of his conclusions, as we discussed earlier --

21   Q.  I didn't ask you about what you found, sir.

22   A.  Well, you asked --

23   Q.  I asked you who were the other authorities.

24   A.  Well, authority is about what I'm getting to.

25   Q.  Well --

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 116 of 159
Levitt - cross by Moffitt
537

1   A.   Having been --

2   Q.   -- but I didn't ask you what you thought about Mr. Hroub's

3   conclusions, did I?

4            I'm not asking you to volunteer anything.  I'll ask

5   you if I want to know.

6            MR. FERGUSON:  Judge, the witness was attempting to

7   answer the question.

8            THE COURT:  Overruled.

9            Answer the question.

10  BY MR. MOFFITT:

11  Q.   Who else do you consider authorities in this field?

12  A.   Ziad Abu-Amr has written a very good book.  Those are the

13  main books that have been written.

14           I'm not sure how to define "authority" beyond those

15  who have written books.  There are a great many others who

16  have a lot of insight into Hamas.  And outside academia could

17  probably still be -- and I would consider -- authorities.

18  Q.   Well, who are they?

19  A.   Members of the Muslim Brotherhood; the Islamic Action

20  Front, for example, in Jordan, several of whom I've

21  interviewed; a great many Palestinians who live on the ground,

22  whether they are affiliated with Hamas or not, have --

23  Q.   Are you fam- --

24  A.   -- tremendous insight into Hamas.

25  Q.   All right.

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 117 of 159
Levitt - cross by Moffitt
538

1              Are you familiar with Haim Malka?

2    A.  I know him, yes.

3    Q.  You know him?

4    A.  I've met him.

5    Q.  You've met him?

6    A.  That's right.

7    Q.  Has he written on Hamas?

8    A.  He has.

9    Q.  Do you consider his writings authoritative?

10   A.  I only remember one article.  I don't know if one article

11   would be considered authoritative.  But, as I recall, though I

12   don't recall the details of the article, it was a good

13   article.

14   Q.  It was a good article?

15   A.  He interviewed me for it.

16   Q.  He interviewed you for it?

17   A.  That's right.

18   Q.  Okay.

19           That article was "Forcing Choices, Testing the

20   Transformation of Hamas"?

21   A.  I don't know.

22   Q.  Can I show it to you?

23   A.  Sure.

24           MR. MOFFITT:  May I approach, your Honor?

25           THE COURT:  You may.

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 118 of 159
Levitt - cross by Moffitt
539

1              (Document tendered.)

2    BY THE WITNESS:

3    A.  Thank you.

4    BY MR. MOFFITT:

5    Q.  You're welcome.

6              THE COURT:  Does that have an exhibit --

7              MR. MOFFITT:  No.

8              THE COURT:  -- sticker?

9              MR. MOFFITT:  I don't intend to put it in evidence,

10   your Honor.

11             THE COURT:  You should put one on just for the

12   record, but go ahead.

13             I do not care if you write on it.  That is fine.

14             Mr. Moffitt, for the record, even though you are not

15   going to introduce it, it needs some type of exhibit number or

16   identification.

17             MR. MOFFITT:  Okay.

18             THE COURT:  Mr. Ferguson?

19             MR. FERGUSON:  I'd just like the opportunity to see

20   what --

21             MR. MOFFITT:  I intend to let Mr. Ferguson see it.

22   I'm sorry I didn't hand it to him.

23             THE COURT:  Okay.

24   BY MR. MOFFITT:

25   Q.  Have you examined it?

Levitt - cross by Moffitt

540

1    A.   Yes.

2    Q.   Is that the article?

3    A.   This is the article.

4         MR. MOFFITT:  Your Honor, I'm going to mark that

5    Defendant's Exhibit 1,000 for identification.  Okay?

6         THE COURT:  Thank you.

7         MR. MOFFITT:  All right.

8    BY MR. MOFFITT:

9    Q.   This is the article he consulted you on?

10   A.   That's right.

11   Q.   Excuse me?

12   A.   That's right.

13        Sorry.  Is this close enough?

14   Q.   He wrote in that article that, "In the year 2000, 65

15   percent of all education below secretary -- " "secondary level

16   in Gaza is Islamic and is controlled by Hamas"; is that

17   correct?

18   A.   I don't have it in front of me.  And that may be the case.

19   I don't know.

20   Q.   You want to look at the article, again?

21   A.   If you want me to say on -- officially that's what the

22   article says, yes.

23        (Document tendered.)

24   BY THE WITNESS:

25   A.   Thank you.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 120 of 159
Levitt - cross by Moffitt
541

1          It says here that one study estimated.  It doesn't

2    say that that is, in fact, what was.

3          Thank you for showing it to me.

4    BY MR. MOFFITT:

5    Q.  All right.

6          Do you doubt that study?

7    A.  I don't know what study it was.  I don't know if I can

8    doubt it or not.

9    Q.  Well, hold on.  I'll tell you in a minute.

10   A.  Great.

11   Q.  All right.

12         Do you disagree that more than 2,000 -- or 275,000 --

13   Palestinians were given support by institutions run by Hamas?

14   A.  Again, I can't confirm the number for you, but I would not

15   be surprised that some 200,000 people received some type of

16   support at some time from Hamas.  I wouldn't be surprised at

17   all.

18   Q.  All right.

19         Hold on.

20         (Brief pause.)

21   BY MR. MOFFITT:

22   Q.  He cites for that proposition Sara Roy.  Do you know who

23   she is?

24   A.  As I mentioned earlier, I'm familiar with her name.  I

25   don't know her.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 121 of 159
Levitt - cross by Moffitt
542

1   Q.  Do you know that she writes on this -- in these areas?

2   A.  I do.

3   Q.  Have you read her articles?

4   A.  Some.

5   Q.  She's another -- was she a person that you would consider

6   an authority in this area?

7   A.  On Hamas, no.

8   Q.  Okay.

9        Now, you mentioned Ziad Abu-Amr, correct?

10  A.  Ziad Abu-Amr, yes.

11  Q.  Yes.

12       He is a Palestinian?

13  A.  He is.

14  Q.  He does speak the language?

15  A.  He does.

16  Q.  He is also of the culture?

17  A.  He is.

18  Q.  Is he one of the people that peer reviewed your book?

19  A.  I don't know who peer reviewed the book.  It's anonymous.

20  He and I have had discussions on my work.  He has been a

21  visiting fellow with the Washington Institute.  I've had long

22  discussions with him about my work.

23       I don't know if it was in the context of any

24  particular writing, and I don't know if he actually peer

25  reviewed my book.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 122 of 159
Levitt - cross by Moffitt
543

1    Q.  Well, he's somebody you respect in the field; am I right?

2    A.  Yes.

3    Q.  Did you send him an advance copy of your book?

4    A.  I don't know who Yale sent copies to, but I --

5    Q.  You had the power to send copies yourself, right?

6    A.  I was given 15 copies, which I sent to family members.

7    Q.  Did you send Ziad Abu-Amr your book?

8    A.  No.  I'm hoping he'll buy a copy.

9    Q.  Excuse me?

10   A.  I'm hoping he'll buy a copy.

11   Q.  Don't worry, all the lawyers are buying it.

12          (Laughter.)

13   BY THE WITNESS:

14   A.  I noticed, and I'm very grateful.

15          (Laughter.)

16   BY MR. MOFFITT:

17   Q.  Are you familiar with Glenn Robinson?

18   A.  I know the name, but I'm not familiar with him.

19   Q.  Have you read anything written by Glenn Robinson?

20   A.  I don't know.  I don't think so.

21   Q.  Do you know whether he writes with respect to Hamas?

22   A.  I think that this is someone in the UK who has written on

23   Hamas.  I can't recall.  There is someone in the UK who is

24   writing on Hamas and either just did or is about to publish a

25   book on Hamas, and that might be this person.  I can't recall.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 123 of 159
Levitt - cross by Moffitt
544

1  Q.  I think Mr. Robinson is at the School of International

2  Graduate Studies at the Naval Postgraduate School in

3  California?

4  A.  Then I don't know him.

5  Q.  You've never read any of his articles?

6  A.  Not to my knowledge.

7  Q.  If people are writing about Hamas, you certainly would

8  like to know about it, right?

9  A.  Yes.  And depending on when it came out -- I'm not able to

10 read everything today as I was before I went back to

11 government service.  So, part of it would be when these things

12 came out.  I'd be surprised if something came out of the Naval

13 Postgraduate School while I was at the Institute that I didn't

14 know about, since I've published through them.

15 Q.  Where were you in 2001?

16 A.  Most of 2001 I was with the FBI.

17 Q.  All right.

18      Are you familiar with the Middle Eastern Studies

19 Association?

20 A.  The Middle East Studies Association?

21 Q.  Uh-huh.

22 A.  Yes.

23 Q.  Is that a group that you consider authoritative?

24 A.  Depends on what.  And as a group, it's an umbrella group.

25 I don't know how you'd describe the group as authoritative.

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 124 of 159
Levitt - cross by Moffitt
545

1  It's an umbrella group for academics in the United States

2  studying Middle Eastern studies.  Some are very good, some are

3  very not.

4  Q.  Are you familiar with Muhammad Muslih, M-u-s-l-i-h?

5  A.  No.

6  Q.  Are you familiar with the Council on Foreign Relations?

7  A.  I am a term member of the Council on Foreign Relations.

8  Q.  Did you know that Mr. Muslih wrote an article for the

9  Council on Foreign Relations with regard to Hamas?

10  A.  No.  And I don't know when, either.

11  Q.  1999.

12  A.  While I was with the FBI.

13  Q.  Well, but I'm asking you in your research, do you look for

14  other articles written by other authors regarding Hamas?

15  A.  Certainly.  I've read and forgotten more articles on Hamas

16  than I can tell you.

17  Q.  And you are unfamiliar with an article written by

18  Mr. Muslih regarding the foreign policy of Hamas?

19  A.  Unfamiliar in the sense that I don't know if I've read it

20  or not.  I may have.  I read a tremendous amount of material.

21  To ask me if I remember a specific article from 1997 is

22  demanding a bit much.

23  Q.  It wasn't written in 1997, Doctor.  It was written in

24  1999.

25  A.  In 1999 would still be a bit much.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 125 of 159
Levitt - cross by Moffitt
546

1    Q.  And you don't know this individual at all?

2    A.  I don't.

3    Q.  So, this is a very small group of people that you know

4    that are writing in this area; am I right?  You've named

5    three.

6    A.  Well, you didn't ask me to name people who have written on

7    the area.  You've asked me for people who are authoritative.

8    Writing an article doesn't necessarily make one authoritative.

9    I focused on people who have written serious studies in book

10   form.

11          I'm sure there are many people -- I know of many

12   other people -- who have written on Hamas, either because they

13   are focused on Middle Eastern studies or Arab-Israeli conflict

14   studies or terrorism issues.  But that doesn't necessarily

15   make them authoritative.  Some of those articles are fantastic

16   and some are not.

17   Q.  All right.

18          Do you have any recollections of any of the fantastic

19   ones?

20   A.  Offhand, no.

21   Q.  Laura Drake, are you familiar with her?

22   A.  I've heard of her.

23   Q.  You've heard of her.

24          She writes in these areas, as well?

25   A.  Yes.  I believe she was affiliated with the think tank

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 126 of 159
Levitt - cross by Moffitt
547

1  that Mousa Abu Marzook founded.

2  Q.  Have you read any of her stuff?

3  A.  I'm sure I have.

4  Q.  You don't remember, then?

5  A.  No.

6  Q.  Let me ask you this:  Looking at your book and looking at

7  some of the other things you've written, how much does it cost

8  to run a hospital in the West Bank?

9  A.  I don't know.  In my book I tried to give some semblance

10  of cost.

11  Q.  Excuse me.

12          You don't know?

13  A.  I don't know.

14  Q.  That's your answer, correct?

15  A.  Correct.

16  Q.  All right.

17          How much does it cost to run a kindergarten in the

18  West Bank?

19  A.  I don't know.

20  Q.  Okay.

21          Hamas runs other social services in the West Bank,

22  correct?

23  A.  Correct.

24  Q.  Do you know how much it costs to run any of those services

25  in the West Bank?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 127 of 159
Levitt - cross by Moffitt
548

1    A.   No.

2    Q.   And you work for the Treasury Department, right?

3    A.   I do now.

4    Q.   How long have you been working for the Treasury

5    Department?

6    A.   Almost a year.

7    Q.   Almost a year?

8    A.   Since November.

9    Q.   They deal with numbers, right, and money, correct?

10   A.   They do.

11   Q.   So, none of your articles discuss the amount of money

12   that's required to run these social services, correct?

13   A.   Correct.

14        All of those are also written before I came to

15   Treasury.

16   Q.   None of the articles you've written discuss how much it

17   costs to run all of these social services, correct?

18   A.   Correct.

19   Q.   None of the articles you've written have discussed what

20   percentage of money goes to -- that Hamas raises goes to the

21   social services, does it?

22   A.   My book does.

23   Q.   All right.

24        What percentage, sir?

25   A.   I forget.   We'd have to look at the book.

Levitt - cross by Moffitt

549

1    Q.  You don't recall?

2            MR. MOFFITT:  I should have borrowed Mr. Ferguson's

3    copy and show you how many have been bought.

4            (Laughter.)

5            (Document tendered.)

6            THE COURT:  I do not have a copy up here, Mr.

7    Moffitt.

8            MR. MOFFITT:  I'll give you a copy, your Honor.

9    There are copies all over the place.

10            (Laughter.)

11            (Document tendered to the Court.)

12            THE COURT:  Thank you.

13    BY THE WITNESS:

14    A.  Page 237.

15    BY MR. MOFFITT:

16    Q.  What do you say, sir?

17    A.  "Hamas' annual budget, which would include all, is

18    estimated -- " well, you're asking for the percentage.  Here I

19    have, "80 to 85 percent is spent on the group's political and

20    social activities."  So, it's not just the social.  But 80 to

21    85 percent is the estimate I have.

22    Q.  Thank you.

23            Now, in -- do you know, in your intensive research

24    that you've done, how many hospitals Hamas runs?

25    A.  No.

Levitt - cross by Moffitt

550

1    Q.   Do you know how many schools Hamas runs?

2    A.   No.

3    Q.   Let me ask you another question.

4          Now, as part of the occupation, one of the things

5    that characterizes the occupation is censorship; am I right?

6    A.   I don't know.

7    Q.   You don't know?

8    A.   Censorship of what by whom?

9    Q.   Censorship of books and articles and literature.

10   A.   I don't know of any examples like that, but I know -- I'm

11   not an expert on that.  I can't tell you.

12   Q.   Well --

13   A.   I know the Israeli military does censor Israeli issues.  I

14   don't know --

15   Q.   Let me ask you a question.

16   A.   -- what they've done on Palestinians.

17   Q.   In Tampa -- where you testified, correct?

18   A.   Correct.

19   Q.   -- Ziad Abu-Amr testified, as well, correct?

20   A.   I don't know.  I wasn't there.

21   Q.   I see.

22          So, you never heard that Dr. Amr testified?

23   A.   Actually, I had not until you just told me.  I knew he was

24   a potential witness.  Until you just told me, I did not know

25   he had testified.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 130 of 159
Levitt - cross by Moffitt
551

1    Q.   In fact, he testified as a government witness and you were

2    a government witness?

3    A.   I was, and I now know that he was.

4    Q.   And you weren't curious at all about his testimony, since

5    he was an authoritative person?

6    A.   If I had known that he had testified, I definitely would

7    have --

8    Q.   Well, you knew --

9    A.   -- sought --

10   Q.   -- that he was -- you just told me that you knew you

11   thought that he might testify, correct?

12   A.   No, I said I knew that he was a potential witness.  I'll

13   have to --

14   Q.   And you --

15   A.   -- raise it with the prosecutors.

16   Q.   And you never did --

17   A.   They didn't tell me.

18   Q.   You never -- you never -- did anything to find out

19   whether, in fact, he testified?

20   A.   No.  I moved on.

21   Q.   So, you don't know about censorship, correct --

22   A.   Correct.

23   Q.   -- with respect to the Palestinian people?

24          Let me ask you this:  Among the things that are paid

25   for by this 85 percent of the Hamas budget are books; am I

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 131 of 159
Levitt - cross by Moffitt
552

1    right?

2    A.   Hamas publishes books, yes.

3    Q.   It publishes books.  It buys -- well, let me ask you, if

4    you run a kindergarten or you run a school, you've got to buy

5    books for it, right?

6    A.   I presume.

7    Q.   You presume?  You don't know?

8    A.   I don't know if they're donated, if they're bought, if

9    they're inherited from other schools.  I'm not in education.

10   I can't tell you how it works.

11   Q.   As a part of your field studies of Hamas, you didn't study

12   their social organizations?

13   A.   To the extent of knowing how books were purchased or

14   obtained, no.

15   Q.   To the extent of knowing how much money was spent in a

16   given school or a given place.

17   A.   I have some instances in the book where I was able to get

18   some documentation of how much charities spent on certain

19   types of activities.  I used that with caveats that this was

20   not necessarily representative of everything, but rather of

21   the tiny universe of information I got my hands on; and,

22   therefore, was exemplary, not the end-all and be-all.

23        But, no, I don't have detailed information on how

24   much any particular social or charity entity spent at a

25   certain time on a certain issue.

Case 1:03-cr-00978  Document 1066  Filed 01/05/09  Page 132 of 159
Levitt - cross by Moffitt
553

1   Q.  You spoke about the university in Gaza --

2   A.  The Islam- --

3   Q.  -- correct?

4   A.  The Islamic --

5   Q.  The Islamic University in Gaza?

6   A.  Yes.

7   Q.  Correct.

8           How much does it cost to run the Islamic University

9   in Gaza?

10  A.  I don't know.

11  Q.  Do you know where the Islamic University in Gaza gets its

12  books from?

13  A.  No.

14  Q.  All right.

15          Do you know how it pays its professors?

16  A.  No.

17  Q.  One would assume that, like any other university, it has

18  to do things like that, correct?

19  A.  One would assume.

20  Q.  All right.

21          And a university also has to have a library, correct?

22  A.  One would presume, yes.

23  Q.  And I think we've talked about the fact that Palestinian

24  people are -- there are a lot of them that are very

25  well-educated; am I right?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 133 of 159
Levitt - cross by Moffitt
554

1   A.   Yes.

2   Q.   All right.

3           So, it seems despite the occupation, Palestinian

4   people have been able to get very good educations?

5   A.   Yes, in some cases.  I mean, I don't want to make it seem

6   like this is -- there are many people who aren't highly

7   educated.   There is an educated class.   Some educated --

8   excuse me -- in the West Bank and Gaza; some in America or

9   Europe; some actually in Israel.

10  Q.   Well, some people are actually educated in the West Bank

11  and Gaza, right?

12  A.   That's what I just said, yes.

13  Q.   All right.

14          And education is expensive; is it not?

15  A.   That varies.  I don't know how much education costs there.

16  Hamas tends to subsidize its activities significantly.   So,

17  it's possible some people pay and some don't.  I don't know.

18  Q.   And, as you said, you have no idea how Hamas gets its

19  books?

20  A.   Correct.

21  Q.   For things like the Islamic University in Gaza, correct?

22  A.   Correct.

23  Q.   That's not part of your expertise?

24  A.   It's nothing I have researched per se and, therefore, is

25  not part of my expertise.

Levitt - cross by Moffitt

555

1          MR. MOFFITT:  Excuse me a second.

2          THE COURT:  Yes, that is fine.

3          (Brief pause.)

4     BY MR. MOFFITT:

5     Q.  Now, let me ask you -- let me turn a moment back to the

6     charter with you.  Okay?

7     A.  Uh-huh.

8     Q.  Are you familiar with any documents at all that Hamas has

9     issued that modify some of the statements that it made in the

10    charter?

11    A.  Documents, no.

12    Q.  Are you familiar with what has been called the Islamic

13    Resistance Movement's Hamas Introductory Memorandum?

14    A.  No.

15    Q.  May I show it to you?

16          MR. MOFFITT:  May I approach?

17          THE COURT:  You may approach.

18          (Document tendered.)

19          THE COURT:  What are you showing the witness?

20          MR. MOFFITT:  I'm showing him Mr. Hroub's book.

21    BY THE WITNESS:

22    A.  This is -- appears to be -- part of the Appendix, Document

23    No. 3, Islamic Resistance Movement, Hamas Introductory

24    Memorandum.  It does not give a source.  I can't authenticate

25    it.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 135 of 159
Levitt - cross by Moffitt
556

BY MR. MOFFITT:

Q.  You've never seen it, though?

A.  I've read his book.  So, I'm sure I've seen it when I read

his book sometime ago.  But I don't recall it, nor can I

authenticate it.

Q.  What is a hudna?

A.  I'm sorry?

Q.  A hudna, h-u-d-n-a.

A.  A hudna.

    A hudna is a temporary cease-fire.

Q.  That's the armistice that you talked about earlier, right,

just a little while ago with my colleague?

A.  I don't know if we used the term "armistice."  I don't

want to get confused with technical military jargon from when

we were talking about the 1947/'48 war or other wars.  It is

the temporary cease-fire that we talked about.

Q.  And is it -- where does that word come from, sir?

A.  It is an Arabic word.

Q.  It's an Arabic word.

    Is there a history in the Koran of hudnas?

A.  I believe there is, and I've only seen them in reference.

But, again, as you've pointed out, I'm not an Islamic scholar.

Q.  And the suggestion has been that Hamas enter a hudna with

the Israelis; am I right?

A.  The suggestion has been Hamas or individual members of

Levitt - cross by Moffitt

557

1   Hamas have at times floated the idea of a hudna, as have

2   others.

3   Q.  Well, not only have individual members, the leadership of

4   Hamas has, correct?

5   A.  Memb- -- leaders of Hamas have floated the idea of a

6   hudna, yes.

7   Q.  And that is a cessation of hostilities between the people;

8   am I right?

9   A.  I would not call it a cessation.  It is what it says.  It

10  is a temporary cease-fire.  And, so, what opponents of the

11  hudna would say is --

12  Q.  I didn't ask you what opponents would say.

13  A.  You're asking me if it's a cessation of violence.  No.

14  Q.  It's not a cessation of violence?

15  A.  As stated, no.

16  Q.  In other words, if there was a 20-year period of hudna,

17  that would not be a 20-year period of a cessation of violence?

18  A.  That's a different question.  A 20-year hudna -- that's a

19  different question.  A 20-year hudna could conceivably be 20

20  years of a cessation of violence and on Year 21 it could

21  resume, again.

22  Q.  Or it could not, correct?

23  A.  A hudna makes no reference to a continuing cease-fire.  A

24  hudna --

25  Q.  I understand.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 137 of 159
Levitt - cross by Moffitt
558

1    A.    -- is temporary in nature, by its definition.

2    Q.    But temporary could be as much as 20 or 30 years?

3    A.    You're asking me to make suppositions.  All I know is that

4    a hudna is temporary.

5    Q.    So, let me suggest to you that at least the leadership of

6    Hamas, from time to time, has suggested engaging in a

7    cessation of violence, correct?

8    A.    What they've suggested is a cessation of violence on the

9    one hand and a permanent withdrawal from territory on the

10   other.

11           And, so, that's why there are many who oppose it.

12   Because there's one hand, it's temporary in terms of the

13   cessation of violence.  On the other hand, what they're asking

14   of the Israelis is permanent.

15   Q.    Well, let me ask a question.

16           Hamas is not the only group in the world that has

17   suggested that the Israelis withdraw from the territories; am

18   I right?

19   A.    Correct.

20   Q.    In fact, UN Resolution 242 tells the Israelis that they

21   should withdraw from the territories, correct?

22   A.    More specifically, it says they should withdraw from

23   territories, leading to the disagreement over all territories,

24   some territories, and the reason there's a need for

25   negotiation.

Levitt - cross by Moffitt

559

1  Q.  So, there is a UN resolution -- a United Nations -- a

2  spirit of the United Nations resolution -- saying that the

3  Israelis should withdraw from the terri- -- the occupied

4  territories, correct?

5  A.  That Israelis should withdraw from occupied territories.

6  Q.  And that UN resolution occurred when?

7  A.  I don't recall.

8  Q.  It was in the late '60s or early '70s; am I right?

9  A.  It was in the wake of the 1967 war, yes.

10  Q.  So, it was over 20 years ago, correct?

11  A.  Correct.

12  Q.  The first withdrawal from any territory occurred in the

13  Gaza Strip last year, correct?

14  A.  Incorrect.

15  Q.  Incorrect.  Okay.

16       When did the Israelis withdraw from territory?

17  A.  As we discussed earlier, in the context of the Oslo peace

18  process, Israeli authorities withdrew from significant

19  portions of territory.  The first withdrawal writ large,

20  meaning including both military and settler populations from

21  Gaza was more recent.  Because of the vagueness of the UN

22  Resolution 242, some -- I'm not saying they're right --

23  interpreted it as any withdrawal satisfies 242.  I'm not

24  saying that's correct.  That's --

25  Q.  That sounds like an Israeli interpretation, correct?

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 139 of 159
Levitt - cross by Moffitt
560

1   A.   That's an interpretation by a variety of international

2   legal scholars, and they're welcome to their opinion.   Again,

3   I'm not --

4   Q.   Have any Arab legal scholars suggested that that was the

5   case?

6   A.   I doubt it.

7   Q.   Okay.

8            So, let me see if I understand.   At the outset of the

9   Oslo process, there has been some withdrawal; is that what you

10  say?

11  A.   There were a series of withdrawals, most of which --

12  Q.   How much land did the Israelis withdraw from at the

13  beginning of the Oslo process?

14  A.   I don't know the percentages; and, depending on when you

15  are talking about, it was increasingly more.   The final --

16  Q.   During the whole process, the occupied territories

17  remained occupied; did they not?

18  A.   They did.

19  Q.   Now, you talked with Mr. Deutsch about a one-state/two-

20  state solution for a moment, correct?

21  A.   Correct.

22  Q.   How many people of Palestinian heritage live in what --

23  Israel and the occupied territories?

24  A.   Live in Israel and the occupied territories?

25  Q.   Yes, sir.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 140 of 159
Levitt - cross by Moffitt
561

1    A.  Several million.  I don't know the number.  Probably three

2    or four million.  I think it's about a million in Israel

3    proper and, then, all the Palestinians in the West Bank and

4    Gaza, which have to be several million more.

5    Q.  How many people who are -- who consider themselves --

6    Israeli live in that same area -- land?

7    A.  I believe the Israeli population is about 5 million, which

8    includes the 1 million Israeli-Arab citizens of Israel.

9    Q.  There are more Palestinian people living on that land than

10   there are Israeli people, correct?

11   A.  I don't know.  Actually, I think it's pretty close.  It

12   might even be more Israelis right now, but the demographic

13   trends are such that if it isn't already, it likely will be

14   that way.

15   Q.  All right.

16        And Israel is aware of that, correct?

17   A.  I presume.

18   Q.  If you're aware of it, you're sure they're aware of it,

19   right?

20   A.  I presume they are aware of it.

21   Q.  So, the demographic trend would be that the Palestinians

22   would soon outnumber the Israelis?

23        MR. FERGUSON:  Objection to the relevance of this

24   line.

25        THE COURT:  Overruled.

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 141 of 159
Levitt - cross by Moffitt
562

1    BY MR. MOFFITT:

2    Q.   Correct?

3    A.   I'm sorry, can you restate?

4    Q.   The demographic trend would be that the Palestinians would

5    ultimately outnumber the Israelis, correct?

6    A.   In what is all of what we call --

7    Q.   What is all of --

8    A.   -- British Mandate --

9    Q.   -- historic -- historic -- Palestine?

10   A.   Exactly.  Yes.

11   Q.   So, a democratic situation, a single-state solution, might

12   mean that the Palestinians could outvote the Israelis?

13           MR. FERGUSON:  Objection.  Relevance.

14           THE COURT:  Sustained.

15   BY MR. MOFFITT:

16   Q.   Now, you've talked about secular states versus religious

17   states.  You talked about the -- that the people who were in

18   Hamas don't want a secular state, correct?

19   A.   I talked about the ideology of Hamas, but yes.  I don't

20   know if we put it in terms of individual people in Hamas.  I'm

21   not sure what difference --

22   Q.   Israel is not a secular state, is it?

23   A.   Pardon?

24   Q.   Israel is not a secular state?

25   A.   That's not a clear "Yes" or "No" question.  Israel is not

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 142 of 159
Levitt - cross by Moffitt
563

1   run by religious law in most areas.  It is a Jewish state in

2   ethnic sense.  And there are some areas of Jewish -- of

3   Israeli law that rely on Jewish law for purposes of marriage

4   and death and things like that.

5   Q.  How about citizenship?

6   A.  In general, it is a secular state.

7   Q.  How about citizenship?

8   A.  There are over a million Muslim citizens of Israel and

9   plenty Christians, as well.

10          (Brief pause.)

11  BY MR. MOFFITT:

12  Q.  Dr. Levitt, I think one of the other things I'd like to

13  ask you is when you compare the organizations sometimes, I

14  want you to -- I want to talk with you about a comparison of

15  what happens in the United States here, and I want to talk to

16  you about the differences in Hamas and Hizballah.

17          You testified in the Hizballah case, correct?

18  A.  I testified in a Hizballah case, yes.

19  Q.  And you testified that Hizballah was engaged in the United

20  States in all sorts of criminal activity, correct?

21  A.  I don't remember if that was part of the testimony, but it

22  is accurate.

23  Q.  So, you don't remember what you testified to?

24  A.  That case was several years ago.  It involved Hizballah

25  criminal activity.  So, I presume we talked about that but --

1   Q.  Cigarette smuggling --

2   A.  Exactly.

3   Q.  -- and all sorts of things like that, correct?

4           Kidnappings and phoney marriages and --

5   A.  I don't know about kidnappings, but phoney marriages, yes.

6   Visa fraud.  There were a variety of things.

7           But if you're going to ask me specific did I say the

8   following in that case, you'd have to show me.  I don't

9   remember.

10  Q.  I won't waste your time.

11          MR. MOFFITT:  I'm done.

12          THE COURT:  Okay.

13          Mr. Ferguson, do you have redirect?

14          MR. FERGUSON:  I may, Judge.  This seems to be an

15  appropriate time for a lunch break.

16          THE COURT:  Okay.

17          MR. FERGUSON:  If we do have any redirect, it would

18  be short.

19          THE COURT:  Fine.

20          Ladies and gentlemen, we will break for lunch now.

21  We will pick up -- why do you not meet back, if you would,

22  please, on the 2nd Floor by 1:30 and we will pick up in here

23  at about 25 to 2:00.

24          Have a good lunch.

25          (Jury out.)

1        THE COURT:  Dr. Levitt, you may step down.  Please

2   make sure you are back by about 1:30.

3        THE WITNESS:  Yes, ma'am.

4        THE COURT:  So, after lunch, we will see if you have

5   redirect.  If so, we will finish with Dr. Levitt and, then,

6   the translators.

7        MR. FERGUSON:  Correct.

8        THE COURT:  Do you think that will take the rest of

9   the afternoon?

10        MR. FERGUSON:  Judge, I think our expectation is

11   about an hour, but that would all depend on cross-examination

12   of translators, which we are not anticipating, but I suppose

13   is possible.

14        THE COURT:  Always possible.

15        MR. SPIELFOGEL:  Your Honor, I just want to let you

16   know that from quarter to 4:00 until quarter to 5:00, I will

17   not be able to be here.

18        THE COURT:  Okay.

19        MR. SPIELFOGEL:  But I will run in and out.

20        THE COURT:  Okay.  That is fine.  Just come and go as

21   you need to.

22        MR. DEUTSCH:  Judge, I think we need to meet with you

23   ex parte about the CIPA restrictions so we're clear on certain

24   things because it sounds like the next witness after --

25        THE COURT:  I was going to ask, who is your next

1    witness?

2            MR. FERGUSON:  After the translators, Judge --

3            THE COURT:  Yes.

4            MR. FERGUSON:  -- it would be the first Israeli

5    Security witness.

6            THE COURT:  Okay.

7            We probably do not need to do that before the Israeli

8    witness gets on because we will go through direct, not

9    through --

10           MR. DEUTSCH:  That's true.

11           MS. THOMPSON:  This matter is potentially for

12   objections by us to that testimony is all.  So --

13           MR. DEUTSCH:  I think we need some clarification.  We

14   were thinking about it yesterday and we realized there's

15   certain things we're not clear about and we --

16           THE COURT:  Okay.  I will talk to you at some point

17   before.

18           MR. DEUTSCH:  Okay.

19           THE COURT:  And, also, I will come back with that

20   final jury instruction --

21           MR. DEUTSCH:  Okay.

22           THE COURT:  -- for you of what I plan on giving them.

23           I think that takes care of everything.  I will see

24   you back here by 25 till.

25           MR. FERGUSON:  Thank you, Judge.

567

1          (Whereupon, a recess was taken at 12:25 o'clock p.m.,

2      until 1:35 o'clock p.m., of the same afternoon.)

3                    *     *     *     *     *

4

5  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

6

7

   _____   _____, 2006

8  Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,          ) Docket No. 03 CR 978
 4                                      )
                          Plaintiff,    )
 5                                      )
                    vs.                 )
 6                                      )
     MUHAMMAD HAMID KHALIL SALAH AND     )
 7   ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, ) Chicago, Illinois
                                        ) October 25, 2006
 8                       Defendants.     ) 1:35 o'clock p.m.

 9
                     EXCERPT OF TRIAL PROCEEDINGS
10         BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11
     APPEARANCES:
12

13   For the Plaintiff:         HON. PATRICK J. FITZGERALD
                                 United States Attorney
14                               BY:  MR. JOSEPH M. FERGUSON
                                      MR. REID J. SCHAR
15                                    MS. CARRIE E. HAMILTON
                                 219 S. Dearborn St., Suite 500
16                               Chicago, Illinois   60604

17
     For Deft. Salah:           PEOPLE'S LAW OFFICES
18                               BY:  MR. MICHAEL EDWARD DEUTSCH
                                      MS. ERICA THOMPSON
19                                    MR. BENJAMIN ELSON
                                 1180 North Milwaukee Avenue
20                               Chicago, Illinois   60622

21                               LAW OFFICE OF ROBERT BLOOM
                                 BY:  MR. ROBERT JAY BLOOM
22                               3355 Richmond Boulevard
                                 Oakland, California   94611
23

24   For Deft. Ashqar:          MR. KEITH ALLAN SPIELFOGEL
                                 20 North Clark Street, Suite 1200
25                               Chicago, Illinois   60602
```

569

```
 1   APPEARANCES (Cont'd):

 2

     For Deft. Ashqar (Cont'd):  MR. WILLIAM MOFFITT
 3                               11582 Greenwich Point Road
                                 Reston, Virginia  20194
 4

 5   Also Present:               S/A BRADLEY BENAVIDES, FBI
                                 S/A JILL PETTORELLI, FBI
 6

 7   Court Reporter:             MR. JOSEPH RICKHOFF
                                 Official Court Reporter
 8                               219 S. Dearborn St., Suite 1232
                                 Chicago, Illinois  60604
 9                               (312) 435-5562

10

                 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11

                          PROCEEDINGS RECORDED BY
12                         MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED BY COMPUTER
13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1            THE CLERK:  03 CR 978, USA vs. Muhammad Salah and

 2    Abdelhaleem Ashqar.  Jury trial continues.

 3            MR. DEUTSCH:  Judge, Mr. Moffitt gave you my copy

 4    of --

 5            THE COURT:  That was nice of him.

 6            MR. DEUTSCH:  Yeah, it was.

 7            THE COURT:  You may have it back.

 8            MR. DEUTSCH:  Thank you.

 9            THE COURT:  I take it you have redirect.

10            MR. FERGUSON:  Very brief.

11            THE COURT:  Okay.

12            Before we do that, I want to give you my proposed

13    instruction on the ISA agents and we will take it up -- I am

14    going to break after the translators before the first ISA

15    agent takes the stand, and I will address these two

16    instructions.

17            And, Mr. Deutsch, I will hear from you ex parte

18    regarding the CIPA --

19            MR. DEUTSCH:  Okay.

20            THE COURT:  -- direction.

21            MS. HAMILTON:  Judge, when you asked yesterday, I

22    told you there were three translators.  There's actually four.

23            THE COURT:  Okay.

24            (Brief pause.)

25            (Jury in.)

1          THE COURT:  You may be seated.

2          Mr. Ferguson, redirect.

3          MR. FERGUSON:  Thank you, Judge.

4      MATTHEW LEVITT, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

5                    REDIRECT EXAMINATION

6  BY MR. FERGUSON:

7  Q.  Dr. Levitt, I have just a couple of questions for you.

8          For the period of 1987 through August of 2004, during

9  Hamas' existence over that span, were there channels or means

10 through which an individual who wanted to donate money to

11 social service organizations or causes in the Palestinian

12 territories, were there ways for them to do that?

13 A.  Yes.

14         MR. MOFFITT:  Objection.

15         THE COURT:  What is your objection?

16         MR. MOFFITT:  Beyond his expertise.  It's beyond what

17 he's been proffered as an expert here in this courtroom.

18         THE COURT:  What is your response, Mr. Ferguson?

19         MR. FERGUSON:  I'll lay some foundation.

20         THE COURT:  Okay.

21 BY MR. FERGUSON:

22 Q.  Dr. Levitt, as part of your studies, research and writing

23 on Hamas, terrorist organizations and the financing of

24 terrorist organizations in the Palestinian territories, have

25 you studied and researched the various means available to

1   individuals to move money in and out of the territories?

2   A.  Yes.

3   Q.  And what significance does that particular subject have to

4   your opinions and your analysis with respect to what terrorist

5   organizations do, specifically Hamas, with respect to moving

6   money in and out of the territories?

7   A.  Since Hamas primarily raises and transfers funds through

8   its social welfare activities -- funds that are not just for

9   its social welfare activities, but for the political and

10  military activities, as well -- it's important that when you

11  are analyzing the means of financing this particular group, to

12  study the means by which the group raises and transfers

13  funds -- covertly sometimes, overtly sometimes -- and, as part

14  of that, whether there are other alternative mechanisms

15  available if a person wanted to provide the much-needed social

16  welfare support to the Palestinians through other means other

17  than Hamas.

18  Q.  And has your knowledge of the means -- various means -- by

19  which money is moved in and out of the Palestinian territories

20  for social services and other purposes, has your knowledge in

21  that field been further developed through your work for the

22  Treasury Department?

23  A.  None of what I've testified to here has drawn on my

24  experience at the Treasury Department.  It's all drawn upon my

25  academic research and my research for my book.

Levitt - redirect

573

1  Q.  And you've testified already on cross-examination and

2  direct as to the comparative amounts of money going to social

3  welfare causes and organizations in the territories from

4  various types of channels; is that correct?

5  A.  Correct.

6  Q.  And would you please refresh us on what the comparative

7  amounts are with respect to non-Hamas entities versus Hamas

8  entities?

9        MR. DEUTSCH:  Objection.  Repetitive.

10       THE COURT:  Overruled.  He is laying the foundation

11  for the question that was objected to.

12  BY THE WITNESS:

13  A.  The general estimate for the amount of social welfare

14  support that Hamas provides annually is in the low tens of

15  millions.  30, 40, maybe 50 million a year; again, depending

16  on the year.  That figure -- that range -- is probably most

17  accurate in the 1990s.

18       Whereas, the amount of money estimated to go annually

19  through the various United Nations bodies -- United Nations

20  Relief Works Agency, United Nations Development Program,

21  UNICEF for Children, et cetera -- is estimated to be -- I

22  think it's 1.3 billion.

23  BY MR. FERGUSON:

24  Q.  And are you aware of whether or not those particular

25  organizations accept donations from individuals and

Levitt - redirect

574

1    organizations here and elsewhere around the world that want to

2    direct money to Palestinian social services?

3    A.   They do.

4    Q.   And from your studies, research and analysis, are you

5    aware for the period of 1987 to 2004, whether there are any

6    private organizations that one similarly could direct money

7    to, to be applied to Palestinian social services and needs?

8    A.   There are.   There's some here in the United States.   There

9    are some international organizations, like the Palestinian Red

10   Crescent, which is the local version of the Red Cross.

11   They're also active in social welfare activities on the ground

12   in West Bank and Gaza.

13   Q.   You mentioned on cross-examination, in response to a

14   question, I think, from Mr. Moffitt, that based on your book,

15   that 80 to 85 percent of the Hamas budget is directed to

16   social welfare or political purposes; is that correct?

17   A.   That's right.

18   Q.   What specifically is that money applied to, based on your

19   studies and research?

20   A.   That means that the 15 to 20 percent that's outside that

21   80 to 85 percent is estimated to go towards military

22   activities directly.

23        The 80 to 85 percent goes towards the social welfare

24   and political infrastructure.   That would include the support

25   for social services as we would think of them in the West.   It

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 154 of 159
Levitt - recross by Deutsch
575

1   would also go to support the infrastructure.  That

2   infrastructure is used for social welfare purposes.  It's used

3   for military purposes.  It's used for other purposes.

4        It would include the financing of the families of

5   incarcerated terrorists or martyrs who have killed themselves

6   or been killed in suicide or other attacks.

7        So, money -- that 80 to 85 percent -- that goes to

8   the social welfare wing of Hamas includes regular social

9   welfare activities, as well as the radicalization,

10  indoctrination and other activities we've discussed.

11        MR. FERGUSON:  No further questions.

12        THE COURT:  Recross.

13        RECROSS EXAMINATION ON BEHALF OF DEFENDANT SALAH

14  BY MR. DEUTSCH:

15  Q.  The total Hamas budget for '92/'93 was $40 million; is

16  that what you're saying?

17  A.  No.

18  Q.  30 to 40 million?

19  A.  No.

20  Q.  Well, what was the total Hamas budget from '92 to '93?

21  A.  I don't know what the total Hamas budget was for '92 to

22  '93.  30 to 40 million is based -- is based -- on an

23  approximation of what 80 to 85 percent of the Hamas budget

24  would be based on the estimates of U.S., Israeli, Jordanian.

25  There might have been some other estimates that I got.

1   They're all in the book.

2   Q.   This is all your just speculation, isn't it?

3   A.   I describe in the book it's not speculation, but it is, it

4   would be fair to say, guesstimation.   In other words --

5   Q.   Guesstimation?

6   A.   In other words, there is some fact and we try and

7   extrapolate from it.   I don't pretend in the book to say that

8   this is definitive, but it is a good ballpark figure.   And I

9   try to caveat that properly in the book.

10  Q.   Well, you've told this jury that you don't know how many

11  social welfare programs there are, right?

12  A.   That's right.

13  Q.   You don't know how many people are served by the social

14  welfare programs --

15  A.   That's right.

16  Q.   -- correct?

17          You don't know how many employees there are of these

18  social welfare programs?

19  A.   Correct.

20  Q.   So, it's basically just guessing work that you're involved

21  in here now, right?

22  A.   Again, it's not guessing like I'm just pulling something

23  out of my ear.   I've gotten various -- you know, some from

24  congressional testimony, some from interviews, et cetera.

25  There are various estimations of what the Hamas budget is

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 156 of 159
Levitt - recross by Moffitt
577

1    overall.

2           And there seems to be general consensus that

3    approximately 80 to 85 percent of that budget goes to the

4    social welfare and political wings of the organization and the

5    activities they finance.

6           MR. DEUTSCH:  I have --

7    BY THE WITNESS:

8    A.  So, then extrapolating, that was the figure.

9           MR. DEUTSCH:  I have nothing further.

10           THE COURT:  Mr. Moffitt?

11         RECROSS EXAMINATION ON BEHALF OF DEFENDANT ASHQAR

12   BY MR. MOFFITT:

13   Q.  Is it fair to say, sir, if you suddenly removed all of the

14   Hamas infrastructure and social welfare programs, a great many

15   of the Palestinian people would suffer as a result thereof?

16   A.  If these -- if these -- entities --

17   Q.  I ask just a "Yes" or "No."

18   A.  Basically.

19           It's a difficult "Yes" or "No" question, but it would

20   be --

21   Q.  Okay.

22           Is it fair to say that there are other estimates that

23   -- about the Hamas annual budget -- that estimates as much as

24   70 million?

25   A.  Yes.  And that's included in what I have in the book.

Levitt - recross by Moffitt

578

1    Q.  Well, your estimate was 40 million a year?

2    A.  No.

3    Q.  Or 50?

4    A.  My estimate was that's what the estimate was for the

5    social welfare spending.  I have in my book the larger es- --

6    the range of estimates for the Hamas overall budget, which

7    includes estimates, I believe, even larger than 70 million.

8    Q.  Hasn't it been estimated that 70 million went to social

9    welfare programs?

10   A.  I don't know of any.

11   Q.  And in many places, the only hospital that there is, is a

12   hospital run by Hamas; am I right?

13   A.  I don't know that to be true.

14   Q.  You don't know that to be true.

15          You don't know where all the hospitals are?

16   A.  Correct.

17   Q.  And, in fact, you don't know whether or not the only

18   hospitals in many places is a Hamas hospital?

19   A.  In many or any.

20   Q.  And, in many places, the only social services that there

21   are, are run by Hamas?

22   A.  I don't think that's accurate at all.

23   Q.  Do you know, sir?

24   A.  I know that the United Nations is active throughout the

25   Gaza Strip and West Bank.  So, therefore, to say that Hamas

Case 1:03-cr-00978   Document 1066   Filed 01/05/09   Page 158 of 159
Levitt - recross by Moffitt
579

1   provides the majority of social services --

2   Q.  I said many.

3   A.  -- in any place is wrong.

4   Q.  I said in many places.

5   A.  I don't think that's true.

6   Q.  But you're not an expert on that, are you?

7   A.  On, what?

8   Q.  On who runs all the social services for Palestinians.

9   A.  All of them, no.

10  Q.  And, in all your studies, you don't have any idea how many

11  people Hamas serves in the social services aspect of its

12  program, do you?

13  A.  I don't have a number.

14  Q.  It could be millions, couldn't it?

15  A.  Based on the amount of money that's estimated Hamas

16  spends, no.

17  Q.  You've never done any analytical studies with numbers,

18  have you; and, you've never written about any analytical

19  studies about numbers, have you?

20  A.  No.

21          MR. MOFFITT:  No further questions.

22          THE COURT:  Thank you, Dr. Levitt.  You may step

23  down.

24          THE WITNESS:  Thank you.

25          (Witness excused.)

1          (Whereupon, there were further proceedings, which

2      were not ordered transcribed.)

3                    *     *     *     *     *

4  I certify that the foregoing is a correct excerpt from the
   record of proceedings in the above-entitled matter.

5

6  _____     _____, 2006

7  Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25