```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,          ) Docket No. 03 CR 978
 4                                     )
                       Plaintiff,      )
 5                                     )
                  vs.                  )
 6                                     )
    MUHAMMAD HAMID KHALIL SALAH AND    )
 7  ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, ) Chicago, Illinois
                                       ) November 29, 2006
 8                     Defendants.     ) 9:15 o'clock a.m.

 9
                        VOLUME TWENTY-FIVE
10             EXCERPT OF TRIAL PROCEEDINGS
         BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
11

12  APPEARANCES:

13
    For the Plaintiff:        HON. PATRICK J. FITZGERALD
14                            United States Attorney
                              BY:  MR. JOSEPH M. FERGUSON
15                                 MR. REID J. SCHAR
                                   MS. CARRIE E. HAMILTON
16                            219 S. Dearborn St., Suite 500
                              Chicago, Illinois  60604
17

18  For Deft. Salah:         PEOPLE'S LAW OFFICES
                              BY:  MR. MICHAEL EDWARD DEUTSCH
19                                 MS. ERICA THOMPSON
                                   MR. BENJAMIN H. ELSON
20                            1180 North Milwaukee Avenue
                              Chicago, Illinois  60622
21

22  For Deft. Ashqar:        MR. KEITH ALLAN SPIELFOGEL
                              20 North Clark Street, Suite 1200
23                            Chicago, Illinois  60602

24                            MR. WILLIAM MOFFITT
                              11582 Greenwich Point Road
25                            Reston, Virginia  20194
```

1   APPEARANCES (Cont'd):

2

Also Present:                S/A BRADLEY BENAVIDES, FBI
3                            S/A JILL PETTORELLI, FBI

4

Court Reporter:              MR. JOSEPH RICKHOFF
5                            Official Court Reporter
                            219 S. Dearborn St., Suite 1232
6                            Chicago, Illinois  60604
                            (312) 435-5562

7

8              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9                    PROCEEDINGS RECORDED BY
                    MECHANICAL STENOGRAPHY
10             TRANSCRIPT PRODUCED BY COMPUTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE CLERK:  03 CR 978, USA vs. Muhammad Salah and

 2   Abdelhaleem Ashqar.  Jury trial continues.

 3                    *    *    *    *    *

 4            KENNETH KARAS, PLAINTIFF'S WITNESS, SWORN

 5                    DIRECT EXAMINATION

 6   BY MR. FERGUSON:

 7   Q.  Good morning, sir.

 8          Would you please state your name and spell your last

 9   name for the court reporter?

10   A.  Yes.  My name is Kenneth M., as in Michael, Karas,

11   K-a-r-a-s.

12   Q.  Mr. Karas, how are you presently employed?

13   A.  I'm currently a U.S. District Judge in the Southern

14   District of New York.

15   Q.  And approximately how long have you been a judge?

16   A.  A little over two years.

17   Q.  And prior to that, what did you do for a living?

18   A.  I was an assistant United States attorney in the U.S.

19   Attorney's Office in the Southern District of New York from

20   1992 until about June of 2004.

21   Q.  An assistant U.S. attorney, does that mean you were a

22   federal prosecutor?

23   A.  Yes, sir.

24   Q.  Was there or were there particular types of cases or

25   subject matters that you were principally assigned to at the

1   U.S. Attorney's Office in New York?

2   A.   Yes.   From beginning in about the spring of 1995, I

3   focused almost exclusively on international terrorism matters

4   working in the Terrorism/Organized Crime Unit in the U.S.

5   Attorney's Office.

6   Q.   And at some time, in the context of that general

7   assignment, were you assigned a federal grand jury

8   investigation regarding the organization known as Hamas?

9   A.   Yes.

10  Q.   And approximately when was it that you were assigned to

11  the Hamas investigation?

12  A.   Approximately late July of 1995.

13  Q.   And was there some precipitating event that triggered this

14  particular investigation?

15  A.   Yes.   I was assigned the case the day that Mr. Mousa

16  Mohammed Abu Marzook was detained at JFK Airport in New York.

17  Q.   And that was in July of 1995?

18  A.   Yes.   It was a Saturday, actually, in July of '95.

19  Q.   And you indicated that you were assigned to the case at

20  that time.   Did the case already exist?

21  A.   No.   It was -- the case began when we learned that

22  Mr. Marzook was at JFK Airport.

23  Q.   And would you please describe for the jury, in general

24  terms, the nature of the investigation that was opened and

25  then proceeded?

1   A.   Well, the investigation initially focused on Mr. Abu

2   Marzook because he was detained initially, I think, on

3   administrative charges.   There were immigration matters that

4   were being investigated not by me or my office, but we wanted

5   to look at any possible criminal involvement he had.   That

6   initially focused on his leadership role in Hamas and, then,

7   also his fundraising activities.

8          Eventually, that investigation broadened to include

9   others, principally in the United States -- who we believed

10  might be part of what we labeled an American Hamas network --

11  to look at financial transactions that we thought were

12  intended to help facilitate Hamas terrorist activities.

13  Q.   And were there particular types of federal violations that

14  you were exploring in the investigation?

15  A.   Yes.   Our principal focus was on the money laundering

16  statute, which criminalizes financial transactions which are

17  designed to promote -- specified unlawful activity, is the

18  legal term.   We were looking at the specific unlawful activity

19  of murder and kidnapping.

20  Q.   You've mentioned that the investigation expanded to look

21  at certain other individuals.   Were there some individuals

22  principal among those that you were looking at beyond

23  Mr. Marzook?

24  A.   Yes.   We began to look at Muhammad Salah, Abdelhaleem

25  Ashqar, Ismail Elbarasse, Alaa Abdelwahab, and the name Nasser

1    Al-Khatib rings a bell.  And there were others, but those are

2    the ones that come to mind.

3    Q.  And was your investigation conducted through a federal

4    grand jury sitting in New York?

5    A.  Yes.

6    Q.  And did there come a time that the investigation in the

7    Southern District of New York sought grand jury testimony from

8    Mr. Abdelhaleem Ashqar?

9    A.  Yes.

10   Q.  Approximately when was it that Mr. Ashqar's testimony was

11   first sought?

12   A.  I believe we issued the subpoena to Mr. Ashqar in late

13   November, early December of 1997.

14   Q.  And was it important to the investigation that you obtain

15   testimony from Mr. Ashqar?

16   A.  Yes, it was very important.  At that time, we had run into

17   some dead ends.  We --

18          MR. DEUTSCH:  Objection.  He asked for a "Yes" or

19   "No" question and he's now giving some kind of narrative

20   beyond that.

21          MR. FERGUSON:  That's fine, Judge.

22          THE COURT:  You can ask your next question.

23   BY MR. FERGUSON:

24   Q.  Why was it important?

25   A.  It was important because we were looking to put some meat

1  to the bones of the documentary evidence that we had

2  accumulated to that point.  We were aware of substantial

3  financial transactions involving a number of people, including

4  Abu Marzook and Ashqar and Elbarasse.  But what we were trying

5  to do is put those transactions into context.  And, in

6  particular, we were looking to get an insider's view to tell

7  us that the intent behind these transactions was, in fact, to

8  promote terrorist activities conducted by Hamas members and

9  associates.

10  Q.  And you used the term "insider's view."  Was there a

11  significant number of people who fell into the category of

12  potential insiders that could provide information of the type

13  that you just explained?

14         MR. MOFFITT:  Objection.  Hearsay.

15         THE COURT:  Overruled.  It is a "Yes" or "No."

16  BY THE WITNESS:

17  A.  I'm sorry, if you could repeat the question?

18  BY MR. FERGUSON:

19  Q.  How many people were there who fell into the category of

20  "insider" at the time you called Mr. Ashqar to the grand jury

21  who could provide, or who you understood might be able to

22  provide, information of the nature that you just explained?

23  A.  Well, there was a handful of people because some of the

24  names that had popped up on the financial transactions, we had

25  no reason to believe they were in the United States.  So, we

1    had no ability to subpoena them, for example.  So, we were

2    looking at principally Mr. Ashqar and maybe one or two others.

3    Q.  You indicated that a subpoena was served on Mr. Ashqar

4    approximately in November of 1997.  What specifically did the

5    subpoena require of him?

6    A.  It required that he come to provide testimony to the grand

7    jury that was involved in the money laundering investigation.

8    Q.  And was the initial scheduled appearance for Mr. Ashqar

9    approximately December 3rd of 1997?

10   A.  That sounds about right.

11   Q.  Did he appear before the grand jury at that time?

12   A.  He did not.

13   Q.  Why not?

14   A.  What had happened was an attorney on his behalf, Mr.

15   Michael Kennedy, reached out and indicated that Mr. Ashqar was

16   going to invoke his right not to incriminate himself.  So, we

17   adjourned the grand jury proceeding.

18   Q.  And did you take some specific action in response to the

19   information provided to you by Mr. Kennedy, who was Mr.

20   Ashqar's lawyer?

21   A.  Yes.  What we did after that was, in consultation with

22   some of my supervisors and other officials at the Justice

23   Department in Washington, we decided to seek an order

24   providing Mr. Ashqar with immunity from any testimony that he

25   gave before the grand jury.

1   Q.  And would you just explain generally to the jury what the

2   process is that you go through in order to be able to seek

3   immunity for an individual before the grand jury?

4   A.  As I recall, the process involved a review that had to

5   take place in the U.S. Attorney's Office.  And I think the

6   U.S. Attorney, herself, had to sign the request or initial the

7   request that would then be sent to the Justice Department.

8          There was a unit in the Justice Department that would

9   evaluate whether or not to approve the request for immunity.

10  And, so, that was sent to the appropriate officials in

11  Washington.

12         And, then, once that approval is obtained, then I had

13  to go and get a judge to sign the immunity order.

14  Q.  And did you, in fact, go to a federal judge in order to

15  get an immunity order signed respecting Mr. Ashqar?

16  A.  Yes.  I went to Judge Denise Cote, C-o-t-e.

17  Q.  And approximately when was it you went to Judge Cote with

18  the request for an immunity order?

19  A.  I believe it was mid-February of 1998.  Early to

20  mid-February of '98.

21  Q.  And did Judge Cote sign such an order?

22  A.  She did.

23  Q.  And, in general terms, what did the order provide?

24  A.  The order provided that Mr. Ashqar would testify; and, if

25  he testified, that nothing he said could be used against him

1    in any criminal proceedings, either directly or indirectly.

2    Q.   And would you explain a little bit what you mean by

3    "indirectly"?

4    A.   Sure.

5         The term is "use immunity."  And what it means is

6    that nothing that Mr. Ashqar would say to the grand jury could

7    either be quoted back to him in any prosecution of him, nor

8    could anything he said be used to get other information which

9    could then be used against him in any criminal prosecution.

10   Q.   And is there any condition as to the nature of his

11   testimony for which this protection attaches?

12   A.   Well, he'd have to tell the truth.  It does not protect

13   false statements.

14   Q.   Directing your attention -- well, once you got the order,

15   how did you proceed, then, with respect to Dr. Ashqar?

16   A.   I then contacted Mr. Kennedy and advised him that I had an

17   order -- an immunity order -- from a judge; and, so, we were

18   going to re-issue the subpoena to have Mr. Ashqar come testify

19   before the grand jury.

20   Q.   And did Mr. Ashqar, in fact, appear before the grand jury

21   subsequently?

22   A.   He did.  He appeared on February 23rd of 1998.

23   Q.   And at the time that he appeared on February 23rd, was he

24   accompanied by his lawyer, Mr. Kennedy?

25   A.   Yes.

1  Q.  And at the point that he appeared, did you have an

2  understanding as to how Mr. Ashqar intended to proceed in

3  light of the immunity order?

4  A.  I did have an idea of how he intended to proceed, yes.

5  Q.  And from whom did you have that understanding?

6  A.  From Mr. Kennedy.

7  Q.  And what was that understanding?

8  A.  Mr. Kennedy sent me a letter indicating that Mr. Ashqar,

9  notwithstanding the immunity order, was going to refuse to

10  testify before the grand jury.

11  Q.  And directing your attention to February 23rd, 1998, were

12  you personally present when Mr. Ashqar appeared at the grand

13  jury pursuant to further subpoena?

14  A.  Yes.  I conducted the inquiry.

15  Q.  The person who you understood to be Mr. Ashqar when he

16  appeared on February 23rd, 1998, do you see him in the

17  courtroom today?

18        MR. MOFFITT:  I'll stipulate that Dr. Ashqar is in

19  the courtroom today.

20        THE COURT:  Would you like the witness to identify

21  him or are you --

22        MR. FERGUSON:  I would like the witness to identify

23  him.

24        THE COURT:  Okay.

25  BY THE WITNESS:

1   A.   He is sitting in the back table near the projector screen

2   wearing the -- I don't know, it's a maroon or dark orange

3   shirt and a tie and glasses and a beard.

4           MR. FERGUSON:   I ask the record to reflect that the

5   witness has identified the defendant Abdelhaleem Ashqar.

6           THE COURT:   The record will so reflect.

7   BY MR. FERGUSON:

8   Q.   Once you're in the grand jury room -- let me ask you,

9   besides yourself and Dr. Ashqar, who else was in the grand

10  jury room that day?

11  A.   The grand jurors and the court reporter.

12  Q.   And once Dr. Ashqar was present in the grand jury room

13  before this group, was he sworn in?

14  A.   He was.

15  Q.   All right.

16          And how did you proceed from that point?

17  A.   I began by advising Mr. Ashqar about what the grand jury's

18  function was.   I explained to him that the grand jury could --

19  conducts investigations and, also, is empowered to return

20  indictments where they believe that probable cause supports

21  criminal charges.

22          I also advised him of the nature of the

23  investigation.   And I also advised him of his rights,

24  including his right not to incriminate himself and his right

25  to consult with his attorney, who I knew was outside the grand

1    jury room.

2    Q.   And since you had an immunity order, did you do anything

3    with respect to explaining to him his rights, given the

4    immunity order?

5    A.   I did.   I actually gave him a copy of the immunity order,

6    and I also explained to him what use immunity was.   I

7    explained to him that, as I explained earlier, that nothing he

8    said directly could be used against him or indirectly.   And I

9    also allowed him to take the immunity order, to go outside and

10   show it to his attorney.

11   Q.   And did you then proceed to question defendant Ashqar?

12   A.   I did.

13   Q.   What was the nature of the initial questions that you

14   asked him?

15   A.   The initial questions were mostly just personal

16   information -- pedigree information -- about where he was

17   born, where he was educated, where he worked, things like

18   that.

19   Q.   And did he answer those questions?

20   A.   He largely did.   He started to indicate he was going to

21   refuse to testify when we got to his then-current employment.

22   Q.   Did he indicate who he was employed by at the time?

23   A.   He indicated that he worked for -- I know the acronym is

24   UASR.   I don't remember what it stands for.   But he indicated

25   he did some research for a group called UASR.   Now, he didn't

Karas - direct

14

1    use "UASR," but that's the group that I recall.

2    Q.   And did you proceed with further questioning of Dr. Ashqar

3    on that subject?

4    A.   Well, what happened was -- the answer is "Yes," but what

5    happened was, I -- when I asked him a question about where he

6    worked, I think he answered that; and, then, I asked him about

7    either what he did there or who he worked for, and that's when

8    he -- I think he -- read a statement.  But he might have gone

9    to ask to speak to his lawyer before he read the statement.

10            There were times when even though he answered my

11   questions, he did so only after going outside and speaking

12   with Mr. Kennedy.

13   Q.   And, so, Mr. Ashqar was afforded the opportunity to step

14   outside the grand jury room and consult with counsel on

15   multiple occasions on this day?

16   A.   Of course.  And he took advantage of that opportunity.

17   Q.   And from that point forward, did you attempt to question

18   Dr. Ashqar about various individuals who you were pursuing in

19   the context of your criminal money laundering investigation?

20   A.   Yes.  I asked -- I asked -- Mr. Ashqar about his knowledge

21   of Mousa Mohammed Abu Marzook, Ismail Elbarasse, Alaa

22   Abdelwahab.  I might have also asked him about Nasser

23   Al-Khatib.  And there may have been a couple of others.

24   Q.   And these were subjects of your investigation?

25   A.   They were.

 1   Q.   And did Mr. Ashqar answer any of those questions?

 2   A.   He refused.

 3          MR. FERGUSON:   Permission to approach, Judge?

 4          THE COURT:   You may.

 5   BY MR. FERGUSON:

 6   Q.   I'm showing you, Mr. Karas, what's marked as Government

 7   Exhibit Ashqar 2-23-98 Grand Jury Transcript --

 8          (Document tendered.)

 9   BY MR. FERGUSON:

10   Q.   -- and ask that you take a moment to examine that

11   document.

12          (Brief pause.)

13   BY MR. FERGUSON:

14   Q.   Is this document familiar to you?

15   A.   Yes.

16   Q.   In general terms, what is it?

17   A.   This is a transcript of the grand jury proceedings on

18   February 23rd of 1998.

19   Q.   The grand jury proceedings in which Dr. Ashqar refused to

20   answer questions put to him by you regarding subjects of your

21   investigation after having been immunized?

22   A.   That's correct.

23   Q.   And was this transcript part of the official grand jury

24   record and court record utilized and relied upon in subsequent

25   proceedings?

1   A.   Yes.

2   Q.   Does the document constitute a fair and accurate

3   transcription of Dr. Ashqar's appearance before the grand jury

4   that day in your presence?

5   A.   To the best of my recollection, yes.

6            MR. FERGUSON:   Judge, I'd move admission of

7   Government Exhibit Ashqar 2-23-98 Grand Jury Transcript.

8            THE COURT:   Any objection?

9            MR. MOFFITT:   No objection.

10            MR. DEUTSCH:   No.

11            THE COURT:   So admitted.

12            (Government Exhibit Ashqar 2-23-98 Grand Jury

13         Transcript received in evidence.)

14   BY MR. FERGUSON:

15   Q.   After Mr. Ashqar refused to answer questions with respect

16   to specific subjects of your investigation on February 23rd of

17   1998, what happened next?

18   A.   Well, I had asked the foreperson of the grand jury to

19   direct Mr. Ashqar to answer the questions, which she -- which

20   she -- did.

21   Q.   And did he answer the questions?

22   A.   He did not.

23   Q.   And what happened next?

24   A.   I then adjourned the grand jury proceeding -- or I sought

25   permission from the foreperson to adjourn the grand jury

1    proceeding -- and the foreperson, myself, Mr. Kennedy and

2    Mr. Ashqar, and maybe one or two others and I, went to see

3    Judge Cote, who was sitting in what we call Part 1 Duty --

4    Miscellaneous Duty -- to seek relief from her.

5    Q.   And Judge Cote was the judge who had signed the immunity

6    order?

7    A.   That's correct.

8    Q.   And was this appearance before Judge Cote an open or

9    closed session?

10   A.   That one, I believe, was a closed session.

11   Q.   And once before Judge Cote, what happened?

12   A.   I had -- I advised Judge Cote of what had happened in the

13   grand jury room, that questions had been posed and Mr. Ashqar

14   had refused to answer the questions, even though Judge Cote

15   had signed an immunity order.

16        Judge Cote then made some inquiry to confirm that

17   that's, in fact, what had happened.  And there was a colloquy

18   back and forth between Mr. Kennedy and Judge Cote, the result

19   of which Judge Cote made sure herself to explain on the record

20   to Mr. Ashqar about what the immunity order required him to do

21   and the consequences of not complying with the order.

22   Q.   And, at that point, did Dr. Ashqar return to the grand

23   jury room?

24   A.   He did not.  Mr. Kennedy, I think, advised that it was not

25   necessary for him to go back and, once again, made clear his

1  refusal to testify.

2  Q.  And what action, if any, did you take at that point?

3  A.  At that point, I believe I asked the foreperson of the

4  grand jury to request of Judge Cote that Mr. Ashqar be held in

5  contempt for his refusal to answer the questions.

6  Q.  And how did Judge Cote rule on that request?

7  A.  Judge Cote granted the request, held Mr. Ashqar in

8  contempt and elected to use the remedy of imprisonment to

9  attempt to change Mr. Ashqar's mind to testify.

10 Q.  Was this -- what type of contempt was Mr. Ashqar held in?

11 A.  Civil contempt.

12 Q.  All right.

13      And you indicated that he was imprisoned by the

14 judge.  Was this a form of punishment for his refusal to

15 comply with the Court's order?

16 A.  Not at all.

17 Q.  Would you please explain to the grand jury exactly what

18 the purpose of the incarceration was, then?

19 A.  The purpose, pursuant to a congressional statute, is to

20 use imprisonment to try to persuade somebody to testify.  The

21 statute provides that somebody can be imprisoned as a method

22 of coercion for up to 18 months or the life of the grand jury

23 conducting the investigation.

24 Q.  And is there any act or circumstance in the witness'

25 control that would bring an end to the civil contempt?

1    A.   Yes.   The witness can testify.

2    Q.   And once Mr. Ashqar was imprisoned, held in contempt by

3    the judge, did he continue to refuse to testify for

4    approximately six months until Judge Cote entered a subsequent

5    order releasing him, based on a finding that further

6    incarceration would not have the effect that was sought?

7    A.   That sounds about right, yes.

8    Q.   While Dr. Ashqar was being held in civil contempt in New

9    York, did your investigation seek grand jury testimony from an

10   individual by the name of Ismail Elbarasse?

11   A.   Yes.

12   Q.   And, in general, why was it important to the investigation

13   to try to obtain Mr. Elbarasse's testimony?

14   A.   It was the same reason that we had issued a subpoena to

15   Mr. Ashqar.  He was one of a handful of people left in the

16   United States who we believed could provide an insider's view

17   to the financial transactions that we suspected were being

18   used to promote Hamas terrorist activity.

19   Q.   And was Mr. Elbarasse subpoenaed to appear before the same

20   grand jury as Dr. Ashqar had been?

21   A.   Yes.

22   Q.   And approximately when was it that Mr. Elbarasse was

23   subpoenaed to the grand jury?

24   A.   I believe it was in late March of 1998.

25   Q.   And did Mr. Elbarasse appear before the grand jury in

1  March of 1998?

2  A.  He did not.

3  Q.  And do you have an understanding as to why?

4  A.  Yes.  His attorney, Mr. Stanley Cohen, indicated to me,

5  that Mr. Elbarasse intended to invoke his right not to

6  incriminate himself.

7  Q.  And, in light of that, what action did you take, if any?

8  A.  I, again, went through the process of consulting with my

9  supervisors in the U.S. Attorney's Office and others in the

10 Justice Department and ultimately sought their permission to

11 seek an immunity order for Mr. Elbarasse.

12 Q.  And did you, in fact, get that authorization?

13 A.  Yes, I did.

14 Q.  And did you appear before a district court judge to obtain

15 an immunity order for Mr. Elbarasse's testimony?

16 A.  Yes.  I went to Judge Mukasey.

17 Q.  And approximately when was it that Judge Mukasey signed

18 this order?

19 A.  Late March or early April of 1998.

20 Q.  And this is the same type of order as you've described

21 with respect to Dr. Ashqar?

22 A.  Yes.

23 Q.  And once you had the order in hand, did you renew the

24 subpoena for Mr. Elbarasse?

25 A.  I did.

1  Q.  And approximately when was it that Mr. Elbarasse was to

2  come to the grand jury?

3  A.  I believe it was April 6th of 1998.

4  Q.  And were you present for Mr. Elbarasse's appearance before

5  the grand jury that day?

6  A.  Yes.

7  Q.  Did you lead the questioning of him?

8  A.  I did.

9  Q.  Who else was present in the grand jury?

10 A.  Mr. Elbarasse, the grand jurors and a court reporter.

11 Q.  And Mr. Elbarasse was sworn in at the beginning of this

12 session?

13 A.  He was.

14 Q.  And what happened next?

15 A.  As I did with Mr. Ashqar, I advised Mr. Elbarasse of the

16 purpose of the grand jury.  I advised him of his rights:  His

17 right not to incriminate himself and his right to consult with

18 an attorney.  And I knew that Mr. Cohen was outside the grand

19 jury room.

20         I explained to him that I had an immunity order; and,

21 I explained to him, again, use immunity, what it provided for

22 him by way of immunity; and, I explained to him that he had to

23 testify truthfully to get the protections of the immunity

24 order.

25 Q.  You mentioned the name "Mr. Cohen" -- "Stanley Cohen" -- a

 1    couple times.  Was Mr. Cohen involved in any of the related

 2    proceedings surrounding your investigation?

 3            MR. MOFFITT:  Objection.  Relevance.

 4            THE COURT:  What is the relevance, Mr. Ferguson?

 5            MR. FERGUSON:  I'm not sure I should speak in front

 6    of the jury, Judge.

 7            THE COURT:  Okay.  We can do a sidebar.

 8            (Proceedings had at sidebar:)

 9            MR. FERGUSON:  Judge, Mr. Cohen was counsel for

10    Mr. Marzook at the very same time that Mr. Elba- -- he was

11    representing Mr. Elbarasse in the parallel criminal

12    proceedings that were an investigation of Mr. Marzook,

13    himself, among others.  And Mr. Marzook -- sorry, Mr. Cohen --

14    has generally referred to himself in the public as "the house

15    lawyer for Hamas."  The fact that Mr. Elbarasse chose a lawyer

16    who was representing Mr. Marzook at the time, I think, is

17    evidence of the conspiracy that existed and the association of

18    the Hamas conspiracy, in fact, in the United States.

19            THE COURT:  Do you plan on bringing out that he

20    represented Dr. Ashqar in this case?

21            MR. MOFFITT:  No.

22            Mr. Cohen?

23            THE COURT:  At the very beginning he did.  He

24    appeared here.

25            MR. SCHAR:  It's already in evidence.

1           MR. FERGUSON:  It's in evidence, Judge, I think.

2           THE COURT:  Is it?  Okay.  I do not --

3           MR. SCHAR:  In the transcript.

4           MR. FERGUSON:  Yeah, it's in the transcript that

5    Mr. Cohen was who Mr. Ashqar consulted while he was in the

6    grand jury for his appearance in Chicago.

7           THE COURT:  Okay.

8           Yes?

9           MR. MOFFITT:  The fact that he chose Mr. Kennedy, is

10   that not a fact?  On the fact that he chose me, is that not --

11   is that not in furtherance?  Does that show that he's not a

12   part of the conspiracy?

13          I mean, I don't understand this.  I mean, he has a

14   right to choose any lawyer that he wants.  If the government

15   had a problem with Mr. Cohen representing Dr. Ashqar, they

16   could have filed a motion --

17          MR. FERGUSON:  Well, actually --

18          MR. MOFFITT:  -- to have Mr. --

19          MR. FERGUSON:  Actually, we did file a motion.

20          THE COURT:  They did.

21          MR. FERGUSON:  There were multiple motions both in

22   the civil contempt proceedings and, then, in the criminal

23   proceedings at the outset of this case.

24          MR. DEUTSCH:  Judge --

25          THE COURT:  Did you want to add something?

1          MR. DEUTSCH:  Yes.

2          Well, I don't know if you are finished.

3          MR. MOFFITT:  Go ahead.

4          MR. DEUTSCH:  This is very troubling to me because

5   it's trying to tie the conspiracy through what lawyer somebody

6   chooses.  And he tried to do that last week with Ms. Jarad,

7   who represented her -- some relative.

8          MR. MOFFITT:  Ms. Jarad, yeah.

9          MR. DEUTSCH:  And I don't think we're about trying to

10  prove criminal activity by the lawyer you choose.  Obviously,

11  these are very unpopular people.  There's only a small group

12  of lawyers that are willing to come forward at that particular

13  time and represent them.  And the fact that there's some

14  overlap of lawyers is really not credible evidence, and I

15  think it's prejudicial.

16         MR. FERGUSON:  Judge --

17         MS. THOMPSON:  I think it, also, is an attempt to

18  prejudice defense counsel here today because we are

19  representing people, and I think that prejudice is going to

20  spill over to the jury about current counsel.  And if

21  Mr. Cohen wasn't charged with anything and hasn't been

22  charged, isn't included in the indictment, then to suggest

23  that he has been engaged in some kind of criminal activity is

24  simply an attempt to prejudice everything about this case and

25  current --

1          MR. FERGUSON:  We see no prejudice with respect to

2    counsel in the room right now.  No counsel present in this

3    room has taken the course of representing Mr. Marzook or

4    representing other -- representing Mr. Elbarasse or any of the

5    other --

6          MR. MOFFITT:  I represented Sami Al-Arian.

7          MR. FERGUSON:  -- indicted or unindicted

8    co-conspirators.  There isn't the same connection.

9          This is absolutely -- there has been, I think, raised

10   in the opening argument by Mr. Moffitt, implications that the

11   government was -- in its dealings with Mr. Ashqar back in the

12   early 1990s -- had made statements to Mr. Ashqar to try to

13   encourage certain actions on his part that included the type

14   of representation that he got and whether that representation

15   was going to be somebody who was actually representing the

16   organization rather than him individually.

17         The choice to take on as your counsel the individual

18   who is representing the leader of Hamas is, obviously, a

19   significant fact.

20         Judge Mukasey subsequently -- in his order in which

21   he ultimately released Mr. Elbarasse after eight months of

22   incarceration, having determined that no -- that further

23   incarceration would not have a coercive effect -- made

24   specific note of the fact in the public record that his choice

25   of counsel was significant in this matter.  And the fact that

1   he was being represented by the political leader of Hamas at

2   that time actually factored into Judge Mukasey's decision to

3   release him because it was indicative to Judge Mukasey of the

4   fact that this was somebody who really was a high-level figure

5   in a terrorist organization that was not going to budge from

6   his position.

7          THE COURT:  I am not going to let you go into Judge

8   Mukasey's order.

9          MR. FERGUSON:  And I have no intention.

10          THE COURT:  Okay.

11          The objection is overruled.  I will let the witness

12   answer this question.

13          I do not think that by answering this there is any

14   implication that anybody here is doing anything wrong.  If you

15   think an instruction at the end of the case is appropriate, I

16   will certainly consider one because I do not want that effect.

17   I do not think anything about this particular answer causes

18   it, but I will consider an instruction later on.

19          MR. DEUTSCH:  Judge, what troubles me is that this is

20   fuel for closing argument about lawyers and, "He had the same

21   lawyer and -- " that's what troubles me.

22          THE COURT:  I can take that --

23          MR. DEUTSCH:  Okay.

24          THE COURT:  I understand where you are going; but,

25   given the Marzook connection -- which is different than the

 1  objection I sustained that you made the other day -- I will

 2  allow this.

 3          (Proceedings had in open court:)

 4          THE COURT:  The objection is overruled.

 5          Do you want the question read back?

 6          MR. FERGUSON:  Please, Judge.

 7          (Whereupon, the record was read by the Court.)

 8          THE COURT:  You may answer that.

 9          THE WITNESS:  Thank you.

10  BY THE WITNESS:

11  A.  Yes.  Mr. Cohen represented Mr. Abu Marzook in connection

12  with an extradition proceeding that was also ongoing in the

13  Southern District of New York.

14  BY MR. FERGUSON:

15  Q.  Once you explained to Mr. Elbarasse his general rights in

16  the situation before the grand jury and the nature of your

17  investigation, did you proceed to pose to him specific

18  questions?

19  A.  Yes.  I think, as with Mr. Ashqar, I began with some

20  general questions about himself.

21  Q.  And did Mr. Elbarasse answer any of your questions?

22  A.  No, he refused.

23  Q.  And did you nevertheless proceed to ask him questions

24  about subjects of your investigation at the time?

25  A.  Yes.  Later on in the grand jury proceeding, I did, yes.

1  Q.  And he refused in all instances?

2  A.  He did.

3          MR. FERGUSON:  Permission to approach, Judge?

4          THE COURT:  You may.

5  BY MR. FERGUSON:

6  Q.  Mr. Karas, I'm showing you what's marked Government

7  Exhibit Elbarasse 4-6-98 Grand Jury Transcript, and ask if you

8  would take a quick look at that and let us know if you are

9  familiar with it.

10          (Document tendered.)

11          (Brief pause.)

12  BY THE WITNESS:

13  A.  Yes, I'm familiar with it.

14  BY MR. FERGUSON:

15  Q.  What is it?

16  A.  This is a transcript of the grand jury proceeding on April

17  6th, 1998, where Mr. Elbarasse was brought as a witness.

18  Q.  And this was the appearance on April 6th at which you were

19  present questioning Mr. Elbarasse?

20  A.  That's correct.

21  Q.  In which he refused to answer despite being immunized and

22  compelled by an order of the court?

23  A.  Yes.

24  Q.  And was this transcript part of the official grand jury

25  court record utilized and relied upon in further proceedings

1  related to your investigation?

2  A.  Yes.

3  Q.  And does this document constitute a fair and accurate

4  transcription of the appearance of Mr. Elbarasse as questioned

5  by you and others before the grand jury on April 6th of 1998?

6  A.  Yes, to the best of my recollection.

7        MR. FERGUSON:  Judge, I'd move admission of

8  Government Exhibit Elbarasse 4-6-98 Grand Jury Transcript.

9        THE COURT:  Any objection, Mr. Moffitt?

10       MR. MOFFITT:  No, ma'am.

11       THE COURT:  Mr. Deutsch?

12       MR. DEUTSCH:  No.

13       THE COURT:  So admitted.

14       (Government Exhibit Elbarasse 4-6-98 Grand Jury

15        Transcript received in evidence.)

16 BY MR. FERGUSON:

17 Q.  After Mr. Elbarasse refused to answer your questions to

18 him, what was the next step that was taken?

19 A.  Well, as I did with Mr. Ashqar, I asked that the

20 foreperson direct Mr. Elbarasse to answer the questions.

21 Q.  And did the foreperson do that?

22 A.  She did.

23 Q.  And did Mr. Elbarasse change his position?

24 A.  No.

25 Q.  Did you attempt to explain to Mr. Elbarasse at that time

1    the consequences of his refusal to answer questions?

2    A.   I did.

3    Q.   And what generally did you explain to him?

4    A.   I explained to him -- I think I even read him the statute,

5    but I explained to him -- the consequences or the possibility

6    of being held in civil contempt, which could include

7    imprisonment for up to 18 months or the life of the grand

8    jury.

9    Q.   And when he continued to refuse, what was the next thing

10   that occurred?

11   A.   I had asked that the grand jury proceeding be adjourned;

12   and, myself, Mr. Elbarasse, the foreperson and Mr. Cohen and

13   maybe a colleague and I, went up to see Judge Mukasey, who had

14   signed the immunity order.

15   Q.   And what happened at that point in time before Judge

16   Mukasey?

17   A.   I explained to Judge Mukasey what had happened in the

18   grand jury proceeding and Judge Mukasey heard from Mr. Cohen,

19   who was told that Mr. Elbarasse would have refused to testify.

20          Judge Mukasey advised Mr. Elbarasse of the

21   possibility of being held in civil contempt and directed that

22   we all go back to the grand jury to give Mr. Elbarasse another

23   chance to answer the questions.

24   Q.   And did you all go back to the grand jury?

25   A.   We did.

1   Q.   And when Judge Mukasey advised Mr. Elbarasse as to the

2   situation, his obligations, was his lawyer present?

3   A.   Oh, yes.

4   Q.   And when you all returned to the grand jury room, was

5   Mr. Elbarasse's lawyer present outside the grand jury room?

6   A.   Yes.

7   Q.   And once back in the grand jury room, what happened?

8   A.   I asked Mr. Elbarasse some more questions and he refused.

9   He read a statement in refusing.

10  Q.   And after he again refused, what was the next step you

11  took?

12  A.   We then went back to Judge Mukasey and, through the

13  foreperson, I asked that Mr. Elbarasse be held in contempt and

14  that he be imprisoned as part of that contempt.

15  Q.   And did Judge Mukasey rule at that time on your request?

16  A.   Yes.  He held Mr. Elbarasse in contempt and instructed

17  that he be imprisoned for up to 18 months or the life of the

18  grand jury.

19  Q.   And was he -- and, again, this is the same type of

20  contempt:  Civil contempt?

21  A.   Yes.

22  Q.   And was Mr. Elbarasse jailed on that day?

23  A.   No.  At Mr. Cohen's request and with my consent, Judge

24  Mukasey adjourned it, I believe, for about a week.

25  Q.   And did Mr. Elbarasse ultimately report to prison?

1   A.   Yes.

2   Q.   And where was he civilly confined?

3   A.   At the Metropolitan Correctional Center in Lower

4   Manhattan.

5   Q.   In approximately December of 1998, did Judge Mukasey enter

6   an order releasing Mr. Elbarasse from the civil contempt order

7   after concluding that further incarceration would not coerce

8   his testimony?

9   A.   Yes.

10  Q.   From the -- and throughout the period April 6th of 1998

11  into December of 1998, when he's released, did Mr. Elbarasse

12  have it in his power to terminate the civil contempt and the

13  incarceration on the civil contempt that was ordered against

14  him?

15  A.   Yes.

16  Q.   And what was it that he would have needed to do in order

17  to release himself from the contempt?

18  A.   Testify in the grand jury.

19  Q.   And did he testify at any point in time?

20  A.   He did not.

21          MR. FERGUSON:  I have no further questions.

22          THE COURT:  Cross-examination.

23          MR. MOFFITT:  I am going to go first, your Honor.

24          THE COURT:  Okay.

25          CROSS-EXAMINATION ON BEHALF OF DEFENDANT ASHQAR

1    BY MR. MOFFITT:

2    Q.   Good morning, sir.

3    A.   Good morning.

4    Q.   When a witness is subpoenaed before a grand jury, he or

5    she has several choices to make; isn't that right?

6    A.   That's correct.

7    Q.   And, certainly, among the choices that that witness has to

8    make is whether or not they testify, correct?

9    A.   That's correct.

10   Q.   Whether they refuse to testify on the basis of their Fifth

11   Amendment right, correct?

12   A.   That's correct.

13   Q.   Whether they answer the subpoena -- show up -- right?

14   A.   Correct.

15   Q.   All right.

16        Whether they lie, correct?

17        You are familiar that people have gone into the grand

18   juries and lied --

19   A.   I am --

20   Q.   -- correct?

21   A.   -- quite familiar.

22   Q.   Okay.

23        Or whether they remain mute, correct?

24   A.   Correct.

25   Q.   Now, if they don't answer the subpoena, they're subject to

1    being chased to get them to answer the subpoena, right?

2    A.   Well, they're subject to the contempt power, yes.

3    Q.   Right.

4         If they lie, they're subject to a perjury charge,

5    correct?

6    A.   Correct.

7    Q.   So, there aren't a lot of good choices in that situation,

8    correct?

9    A.   I don't know what situation you mean.  You mean, in

10   general?

11   Q.   In general.

12   A.   Sure.  Testify truthfully.

13   Q.   All right.

14        But some people sometimes don't testify truthful --

15   or testify -- or stand mute because other principles in their

16   mind might be involved; am I right?

17   A.   It's very hard to answer that in the abstract, frankly.

18   Q.   All right.

19        Well, in this case, you were told -- with respect to

20   Dr. Ashqar, you were told -- that there were other principles

21   involved here, correct?

22   A.   That's what was represented, yes.

23   Q.   Now, let me talk to you about the immunity -- the

24   obtaining of immunity -- for Dr. Ashqar.

25        Dr. Ashqar, you said, was one of the people that came

1   up on your radar screen; am I right?

2   A.   That's correct.

3   Q.   Well, when you decided to obtain immunity, you decided

4   that it was more important to get his testimony than it was to

5   prosecute him; isn't that right?

6   A.   No, that's not the choice that's necessarily being made.

7   Q.   Well, you know that it would be extremely difficult to

8   prosecute an individual after you had obtained immunity for

9   them and they had testified, correct?

10   A.   It's certainly harder because you can't use their

11   statements, right.

12   Q.   All right.

13        Well, are you saying to me that you still intended to

14   prosecute Dr. Ashqar if he had testified before the grand

15   jury?

16   A.   I don't know what I was gonna do because I didn't know

17   where the chips were gonna fall.

18   Q.   So, if Dr. Ashqar testified, that might not have avoided

19   prosecution for him, correct?

20   A.   I certainly could not have promised that.

21   Q.   All right.

22        But what you're saying today is it would not have

23   necessarily avoided prosecution for Dr. Ashqar to come in and

24   testify truthfully, correct?  That's what you're saying to me?

25   A.   I'm sorry, can you repeat that?

1    Q.   That it would not have avoided prosecution for Dr. Ashqar

2    to have come into the grand jury and testified truthfully?

3    A.   That's correct.

4    Q.   All right.

5          Now, when you made your immunity decision with

6    respect to Dr. Ashqar, you were aware -- you can answer this

7    "Yes" or "No" -- that Dr. Ashqar had had several meetings with

8    the FBI in Oxford, Mississippi?

9    A.   I had been told that there had been meetings in Oxford,

10   Mississippi, yes.

11   Q.   And you had been told that the meetings in Oxford,

12   Mississippi, Dr. Ashqar had cooperated in many of those

13   meetings, weren't you?

14   A.   Well, if you mean by cooperation that he met with law

15   enforcement officials and answered their questions, yes.

16   Q.   All right.

17          And you, in fact, even had available to you what

18   questions were asked and what answers he had given, correct?

19   A.   I did not have a verbatim transcript, no.

20   Q.   Well, you had what is called an FBI 302 to that effect,

21   didn't you?

22   A.   That's correct.

23   Q.   You also had the ability to get on the telephone and call

24   the FBI agents that were involved, correct?

25   A.   I had that ability, yes.

1   Q.   You, also, were aware that the head of the Criminal

2   Division in Oxford, Mississippi, was a participant in the

3   questioning, correct?

4   A.   That's correct.

5   Q.   Now, you were -- you didn't call anybody with regard to

6   it, did you?

7   A.   I'm sorry, I didn't call anybody with regard to, what?

8   Q.   His meetings with the FBI and the U.S. Attorney in Oxford,

9   Mississippi.

10  A.   I did not have any conversations with any of the FBI

11  agents, but I might have spoken to Mr. Hailman.

12  Q.   Mr. Hailman was who?

13  A.   He was the person you referred to, the person from the

14  U.S. Attorney's Office in Mississippi.

15  Q.   All right.

16         And were you aware of certain promises that were made

17  to Dr. Ashqar as a result of his meetings in Oxford,

18  Mississippi?

19  A.   Well, when you say "aware," I was not personally aware of

20  anything that happened down there, no.

21  Q.   So, were you aware or were you not aware?

22  A.   Well, I'm trying to understand what you mean by "aware."

23  Are you asking whether or not somebody told me that or whether

24  or not I read that?

25  Q.   I'm asking whether you were conscious of it, of promises

1    that were made to Dr. Ashqar in Oxford, Mississippi.

2    A.  I don't recall any promises, no.

3    Q.  All right.

4            Did you read the 302s?

5    A.  I read them many years ago.  I haven't read them since

6    1998.

7    Q.  So, you don't remember what was in them?

8    A.  I do not remember what was in them, that's correct.

9    Q.  Do you recall in a 302 that -- someone suggesting to

10   Dr. Ashqar that it might be very bad for him if Hamas found

11   out that he was giving information?

12   A.  I don't remember that from the 302s.  I remember that, I

13   think, from statements that Mr. Ashqar made.

14   Q.  All right.

15           And you were aware that Dr. Ashqar had made

16   statements to the FBI?

17   A.  Yes.

18   Q.  All right.

19           And what he was asked, you had no information at all

20   that he lied about when he talked to the FBI in Oxford,

21   Mississippi?

22   A.  You know what?  I'd have to see the 302s.  I'm not sure I

23   have that recollection.

24   Q.  You have to see the 302s.

25           (Brief pause.)

1  BY MR. MOFFITT:

2  Q.  Was Mr. Hailman the only person that you talked to?

3  A.  Well, we have to get time frame straight here because in

4  terms of the convers- --

5  Q.  Before Dr. Ashqar was called to your grand jury while you

6  were dealing with the idea that you were going to get him

7  immunity.

8  A.  Well, let me -- let me -- try to clarify that.  When you

9  say "before," I had meetings with the FBI agents from

10  Mississippi, but I don't recall whether or not I spoke to them

11  about their meetings with Mr. Ashqar.

12          So, earlier, when I said conversations with them

13  about those meetings --

14  Q.  Well, I --

15  A.  -- I'm pretty sure I spoke to Mr. Hailman, but I think

16  that was it.

17  Q.  Let me ask you, you weren't curious about those meetings

18  that he had with the FBI?

19  A.  Sure.

20  Q.  And, so, you don't know whether or not you had

21  conversations with the FBI about the meetings they had with

22  Dr. Ashqar?

23  A.  No, because I had the 302s.  So, I mean, my curiosity was

24  satisfied by reading the 302s.

25  Q.  All right.

1       So, you wouldn't have called them and asked whether

2  they thought he was a good witness, whether he was reporting

3  to them correctly or anything like that?  You wouldn't have

4  done that?

5  A.  I just don't remember that I spoke -- I may have spoken to

6  them about it.  I don't recall it.  I do recall speaking to

7  Mr. Hailman about it.

8  Q.  Well, this was an important witness for you; was it not?

9  A.  Yes.  I'm just saying I don't recall --

10  Q.  Do you --

11  A.  -- eight years ago.

12  Q.  -- recall how many meetings Dr. Ashqar had with the FBI in

13  Mississippi?

14  A.  I would say -- my recollection is 11 or 12.

15  Q.  Where was Dr. Ashqar living when you issued your subpoena

16  for him?

17  A.  He was living, I believe, in Northern Virginia.

18  Q.  So, he had moved from Mississippi?

19  A.  That's correct.

20  Q.  Were you aware that in 1993, while the FBI was talking to

21  Dr. Ashqar, there was a search of his home?

22  A.  Yes, I was aware of that.

23  Q.  Were you aware that while Dr. Ashqar was talking to the

24  FBI, that his phone was tapped?

25       MR. FERGUSON:  Judge, I think that assumes an

1  incorrect fact here, with respect to the time frame of when

2  the FBI was speaking to Dr. Ashqar.

3          THE COURT:  Rephrase your question.

4  BY MR. MOFFITT:

5  Q.  When was the first time that you can recall the FBI had a

6  conversation with Dr. Ashqar?

7  A.  When was the first time I learned about it or when was the

8  first time they had a conversation.

9  Q.  When they actually had the conversation, as best you can

10 recollect.

11 A.  You know, I really don't remember that.  I know that there

12 were conversations in, I believe, October of '96.  There were

13 a series of meetings.  But I'm not sure that that's the

14 earliest that they began.

15 Q.  Now, you applied for immunity to the Department -- the

16 Justice Department; am I right?  That was what you did?

17 A.  Yeah.  I can't go to a judge until I get the Justice

18 Department's approval, right.

19 Q.  And you have to get approval, correct?

20 A.  That's correct.

21 Q.  And there was a series of forms that you filled out to get

22 that approval; am I right?

23 A.  Now that you mention it, yes, that's right.

24 Q.  Do you know where those forms are?

25 A.  No.

1   Q.  Have you seen those forms in your preparation for your

2   testimony today?

3   A.  No, sir.

4   Q.  All right.

5           Do you recall some of the things that are on those

6   forms to fill out?

7   A.  I really don't, no.

8   Q.  Do you recall how long the form is that you've got to fill

9   out to make this application for immunity?

10  A.  No, I don't.

11  Q.  Do you know where they are today?

12  A.  I don't.

13  Q.  Have my colleagues, Mr. Ferguson or Mr. Schar, showed you

14  the forms that you filled out during that time?

15  A.  No, sir.

16  Q.  They are both employees of the Justice Department,

17  correct?

18  A.  As far as I know, yes.

19          MR. MOFFITT:  Your Honor, can we take a break?  I

20  have a few things I need to get.

21          THE COURT:  Sure.

22          We will take a morning break.

23          (Jury out.)

24          THE COURT:  We will pick up in about ten, fifteen

25  minutes.

1            (Brief recess.)

2            THE COURT:  Did you find what you needed, Mr.

3    Moffitt?  Are you ready?

4            MR. MOFFITT:  Yes, ma'am.

5            MR. SPIELFOGEL:  Do you need another minute, Bill,

6    for us to tab this?

7            MR. MOFFITT:  Yeah.

8            Just one moment.

9            THE COURT:  Okay.

10           MR. FERGUSON:  Before we start, Judge, I just want to

11   raise an issue with the Court based on Mr. Moffitt's offerings

12   during the break.

13           THE COURT:  With or without the witness?

14           MR. FERGUSON:  I think it should be without the

15   witness.

16           THE COURT:  Okay.

17           (Witness excused from courtroom.)

18           MR. FERGUSON:  Mr. Moffitt has shown me a February

19   19th, 1998, letter directed to Mr. Karas from -- purporting to

20   be from -- Michael Kennedy, Mr. Ashqar's lawyer at the time,

21   stating Mr. Ashqar's intent to refuse to testify,

22   notwithstanding any immunity order and stating, at great

23   length, the reasons.

24           Additionally, Mr. Moffitt has indicated his intention

25   to present to Mr. Karas a series of reports or FBI 302s dating

1   back to 1996 and early 1997 out of Mississippi.  Exactly what

2   his objective is at the moment isn't entirely clear.

3          My concern is that all of this is hearsay and,

4   really, what this is, is an attempt to get in through this

5   witness what are hearsay statements.

6          With respect to the Kennedy letter specifically,

7   there is a very long offering and:  One, it's hearsay because

8   it's Mr. Kennedy's statements; second of all, to the extent

9   he's purporting to speak on behalf of Dr. Ashqar, it's double

10  hearsay.  And, so, the content of these and the content of the

11  302s themselves really should not be elicited through this

12  witness.

13         And if Mr. Moffitt wants to call the individuals for

14  a proper purpose in his case, I think that's appropriate; but,

15  it's not appropriate to attempt to elicit the substance

16  through this witness.

17         THE COURT:  What are you -- let us start with the

18  letter, Mr. Moffitt.

19         MR. MOFFITT:  Well, it was Mr. Ferguson who

20  introduced the letter into this mix here by suggesting that he

21  had gotten a letter from Mr. Kennedy, and eliciting from him

22  that Dr. Ashqar wasn't going to testify and there was other --

23  there were reasons that were stated in the letter.

24         The letter is -- I have the letter that was sent.

25  I intend to show him the letter, ask him is this the letter

 1   that he got from Mr. Kennedy, and move it into evidence.

 2            MR. FERGUSON:  Judge --

 3            THE COURT:  How do you get around hearsay?

 4            MR. MOFFITT:  Well, it's not hearsay.  Mr. Kennedy is

 5   the agent for Dr. Ashqar as his lawyer.  It's not hearsay.  He

 6   has the right to make those representations on behalf of

 7   Dr. Ashqar.

 8            THE COURT:  But it is an out-of-court statement being

 9   offered for the truth of the matter, and it is also --

10            MR. MOFFITT:  But it was --

11            THE COURT:  Wait.

12            Through the agency argument, it is a statement of

13   your client, who is not a party opponent.  How do you get that

14   in?

15            MR. MOFFITT:  It was already offered for the truth,

16   except --

17            THE COURT:  No.  The statements did not come through.

18            MR. FERGUSON:  Judge, all that --

19            THE COURT:  The fact that a letter came out came --

20            MR. MOFFITT:  But he --

21            THE COURT:  Or that he had a communication from

22   Mr. Kennedy --

23            MR. MOFFITT:  Well, no, but he specifically elicited

24   what was in the letter.

25            MR. FERGUSON:  No, Judge.

1              THE COURT:  No, he did not.

2              MR. FERGUSON:  That's absolutely not right.  I

3   indicated whether he had an understanding as to what

4   Mr. Ashqar's position was going to be with respect to

5   testifying once the immunity order was issued.  And he said he

6   did have an understanding from Mr. Kennedy that Mr. Ashqar was

7   not going to testify.

8              MR. MOFFITT:  And that there were --

9              MR. FERGUSON:  That was it.

10             MR. MOFFITT:  There were other statements made in the

11  letter.  He elicited that from this witness.

12             THE COURT:  But he did not go into the content of

13  them, coming back to how do you get around hearsay?

14             MR. MOFFITT:  I don't think it's hearsay when a

15  person who has the right to make a statement on behalf of

16  another individual makes a statement on behalf of that

17  individual.  It would be admissible if the government wanted

18  to prove it because of the agency relationship between Mr.

19  Kennedy and Dr. Ashqar.

20             THE COURT:  But if the government sought to introduce

21  it, it would be a statement of a party opponent -- which makes

22  it different -- through an agent.  You are not a party --

23  statements of your client --

24             MR. MOFFITT:  I could --

25             THE COURT:  -- are not party-opponent statements.

1          MR. MOFFITT:  But, again, I was not going to put the

2     letter in until the government sought to get information

3     regarding it.  They didn't need to do that.  They didn't need

4     to discuss anything that Mr. Kennedy did.  They've accepted it

5     as a representation of Mr. Kennedy that Dr. Ashqar was not

6     going to testify.  So, they accepted the agency relationship

7     with respect to the statement that Mr. Ashqar is not going --

8     Dr. Ashqar wasn't going to testify.

9          I don't understand how they get a full loaf and we

10    don't get any.  Because they put it in for the purpose of

11    saying that Dr. Ashqar wasn't going to testify.  Now, all I'm

12    trying to do is put in the entire statement that was made.

13         MR. FERGUSON:  We introduced no loaf whatsoever.  And

14    what this really is, is an offering of -- by Mr. Moffitt's own

15    representation -- basically, Mr. Ashqar's words and positions

16    through his agent, and there is no party -- there is no

17    party-opponent avenue to do it.  I think this is entirely

18    improper, Judge.

19         THE COURT:  You may show him the letter.  You can ask

20    him if that is what he received and if that is what he is

21    referring to.  I will sustain any objection to admitting it

22    into evidence, or trying to elicit the statements that are in

23    the letter, because they are hearsay.

24         MR. MOFFITT:  All right.

25         THE COURT:  Now, with respect --

1          MR. MOFFITT:  May I have it marked and made a part of

2    the record?

3          THE COURT:  You can have it marked and -- it can be

4    part of the record, but not an exhibit.

5          MR. MOFFITT:  I understand.  I understand.  I just

6    want to -- if we have to go to a court of appeals, I want

7    to --

8          THE COURT:  Certainly.  Certainly.

9          And now the FBI 302s.

10         MR. MOFFITT:  I'm going to show him the FBI 302s.

11   I'm going to ask him if that refreshes his recollection with

12   regard to the 302s.  And I'm going to ask him not what is

13   said; I might ask him a question about what an asset is.

14         THE COURT:  Okay.

15         I will take those questions as they come, then.

16         MR. MOFFITT:  Okay.

17         THE COURT:  I take it you do not -- you are not going

18   to try to introduce those into evidence, Mr. Moffitt?

19         (No response.)

20         THE COURT:  Mr. Moffitt?

21         MR. MOFFITT:  I'm sorry.

22         THE COURT:  I take it you are not going to seek to

23   introduce the 302s into evidence.

24         MR. MOFFITT:  I'm trying to see if there's some way

25   that I can do that.

1          (Laughter.)

2          THE COURT:  Mr. Spielfogel, maybe I should ask you.

3          (Laughter.)

4          MR. FERGUSON:  The 302s or the contents, the

5     substance of the 302s.

6          Additionally, Mr. Moffitt's representation that he's

7     going to ask the witness whether he's familiar with the term

8     "asset" and what it is would appear to be a predicate question

9     to a subject that this Court has already ruled on as not

10    something that's in play here at all.  So, I'm not -- I don't

11    believe it's relevant in this circumstance.

12         MR. MOFFITT:  Well, you ruled that I couldn't use it

13    in opening statement.  But I'm telling you that I can make it

14    relevant right now.

15         THE COURT:  Okay.

16         I will hear the questions; and, if there is an

17    objection, I will take them.

18         So, back to my 302 question.

19         MR. MOFFITT:  At this point, I'm not going to try to

20    introduce the whole set of 302s, but I am going to show them

21    to him.

22         THE COURT:  Okay.  That is fine, to refresh

23    recollection.

24         Bring in the witness, please, and then the jury.

25         (Jury in.)

1              THE COURT:  You may be seated.

2              Mr. Moffitt, you may continue.

3    BY MR. MOFFITT:

4    Q.  I'm going to show you what has been marked as Ashqar

5    Letter.

6              (Document tendered.)

7    BY MR. MOFFITT:

8    Q.  Would you examine that, please?

9    A.  Sure.

10             (Brief pause.)

11   BY THE WITNESS:

12   A.  Okay.

13   BY MR. MOFFITT:

14   Q.  Have you seen that letter before?

15   A.  Yes, sir.

16   Q.  Is that the letter that you referred to receiving from

17   Dr. Ashqar's lawyer?

18   A.  Yes, where he indicated he would not testify.

19   Q.  And who was that lawyer?

20   A.  Mr. Michael Kennedy.

21   Q.  Okay.

22             And what year was that?

23   A.  February of 1998.

24   Q.  Okay.

25             I'm going to show you -- I know this is a lot of work

1    for you to do, but I'm --

2    A.   That's what I'm here for.

3    Q.   -- I'm going to show you a notebook.   The 302s are tabbed

4    here.

5    A.   Okay.

6    Q.   Would you take a look at those, please?

7    A.   Which ones are they?   Are they -- all these are the 302s

8    or --

9    Q.   No, not the whole notebook.   Just these are --

10   A.   Oh, these here.   Okay.

11   Q.   These are tabbed.

12   A.   All right.

13   Q.   There's some of them tabbed, not all of them.   But they're

14   all --

15   A.   But you want me to look at --

16   Q.   They're all in the notebook.   Okay?   All --

17   A.   Do you want me to look at the ones that are tabbed or --

18   Q.   You can look at any 302 in the notebook, but those are

19   tabbed.   Okay?

20            MR. FERGUSON:   Judge, I think we need a clearer

21   record here.

22            First of all, we don't have exactly what's being

23   shown to the witness, although I do have a general

24   understanding.   But what is being stated right now gives no

25   indication as to what the witness is actually being shown,

1    being asked to look at.

2            MR. MOFFITT:  I'm showing him the 302s that were

3    prepared by the officers -- the FBI agents -- in Mississippi,

4    along with letters that were prepared by Mr. Hailman of the

5    U.S. Attorney's Office in Mississippi regarding Dr. Ashqar.

6            THE COURT:  Mr. Moffitt, you have handed him this

7    collection of documents and asked him to look at it and saying

8    he can look at any one without a question on the table.

9            MR. MOFFITT:  Okay.  I'll ask him a question.

10           THE COURT:  Okay.  That would probably -- you can

11   leave that with him, if you would like.  But --

12   BY MR. MOFFITT:

13   Q.  If you saw the 302s in this case and the correspondence

14   from Mr. Hailman, would that refresh your recollection,

15   perhaps, about them?

16   A.  About?

17   Q.  The 302s.

18           MR. FERGUSON:  Objection, Judge.  Refresh his

19   recollection as to, what?

20           THE COURT:  Rephrase your question to show that he

21   needs --

22   BY MR. MOFFITT:

23   Q.  Didn't you just --

24           THE COURT:  -- it refreshed.

25   BY MR. MOFFITT:

1   Q.   -- testify, sir, that you couldn't remember the nature of

2   the 302s, what was in the 302s?  Didn't you testify to that on

3   cross-examination?

4   A.   Well, I don't remember if it was -- if what I said was I

5   don't remember anything that's in the 302s or if there were --

6   I think the question earlier was about promises.

7   Q.   That's right.

8   A.   Yeah.

9        And I don't remember whether or not there's anything

10  about promises in the 302s.  That is true, I do not remember

11  either way.

12  Q.   All right.

13       Do you remember about how Dr. Ashqar is referred to

14  in 302s?  What FBI acronym is used to refer to Dr. Ashqar?

15       MR. FERGUSON:   I'm going to object as to relevance

16  and hearsay.

17       THE COURT:   Overruled.

18       Do you remember, "Yes" or "No," how he is referred

19  to?

20  BY THE WITNESS:

21  A.   Actually, I don't.

22  BY MR. MOFFITT:

23  Q.   Do you have a remembrance of any of the specifics of the

24  302s?

25  A.   No.

1    Q.  Do you think if you saw the 302s, it might refresh your

2    recollection?

3    A.  Well --

4            MR. FERGUSON:  Objection.

5    BY THE WITNESS:

6    A.  -- about, what?  I'm not sure about --

7    BY MR. MOFFITT:

8    Q.  About any promises made to Dr. Ashqar, the way Dr. Ashqar

9    is referred to in the 302s.

10           Do you --

11   A.  In terms of, for example, how he's referred to, that --

12   sure, that might refresh my recollection.

13   Q.  All right.

14           How about the promises?

15   A.  Sure.  I'm happy to look at them to see if it refreshes my

16   recollection.  I just don't remember either way.

17           MR. FERGUSON:  Judge, I don't understand the point of

18   refreshing the recollection here, because the content and the

19   substance is hearsay.

20           THE COURT:  Mr. Moffitt?

21           MR. MOFFITT:  When he decided to make a decision

22   about whether to seek information concerning Dr. Ashqar's

23   immunity, he was aware of these 302s; and, I would suggest

24   that the information in the 302s were part of his

25   decision-making process in deciding whether to seek immunity.

1        MR. FERGUSON:  Judge, that's Mr. Moffitt's

2   suggestion.  The witness hasn't been asked any questions that

3   would establish that in the first instance.

4        MR. MOFFITT:  Well, ask him --

5        THE COURT:  I will overrule the last objection to the

6   question, "Would this refresh your recollection?"

7        Ask your next question.

8        And if there is an objection, you can raise it.

9        MR. MOFFITT:  All right.

10  BY MR. MOFFITT:

11  Q.  When you were making an immunity decision regarding --

12  when you make an immunity decision regarding anybody, you want

13  as much information as you possibly can get, don't you?

14  A.  Yes.

15  Q.  And it would be important to know what Dr. Ashqar said to

16  the FBI agents in Mississippi, and whether he spoke to the FBI

17  agents in Mississippi, in making your immunity decision?

18  A.  Well, I would want to know what he said, but I don't know

19  that the decision hinged on that.

20  Q.  I'm not asking you did it hinge.  I didn't use the word

21  "hinge," did I?

22        I asked, wasn't it important to know?  That's what I

23  asked.

24  A.  It was -- well, as I said earlier, it's important to know

25  anything that I can get by way of information, sure.

Karas - direct

56

1   Q.  Do you know whether you included the 302s in your

2   submission to the Department of Justice with respect to your

3   immunity -- your attempt to get immunity -- for Dr. Ashqar?

4   A.  I don't remember what I sent to the Justice Department.

5   Q.  Might it refresh your recollection that you sent the 302s

6   to the Justice Department if you looked at them?

7   A.  No, that wouldn't help me.

8   Q.  Would you normally send 302s to the Justice Department,

9   when you request immunity for a witness --

10  A.  No.

11  Q.  -- of interviews that they had previously?

12  A.  No.

13  Q.  You testified you, at least, were aware that there were

14  numerous meetings with the FBI in Mississippi, correct?

15  A.  That's what I was led to believe, yes.

16  Q.  Well, you don't think the FBI misled you?

17  A.  No, but I -- I just want to make clear I did not attend

18  any such meetings.  So, I either knew about them because

19  people told me or because I read reports.

20  Q.  Normally when you read an FBI 302 as an assistant U.S.

21  attorney, you didn't contest the fact that there had been a

22  meeting with somebody and that the FBI had written down what

23  they thought was said at the meeting, did you?

24  A.  That's correct.  Normally, I would not contest it.

25  Q.  And you didn't do it in this case, did you?

Karas - direct

1   A.   No, I didn't -- I didn't -- doubt that they had meetings.

2   I'm just trying to make clear that I was not at them.   That's

3   my only point.

4   Q.   Okay.  Let's concede that you were not at them.

5        Now, you said something earlier about not -- we

6   talked about prosecuting people that you got immunity for,

7   correct?  Remember we spoke --

8   A.   I remember we talked about that topic, yes.

9   Q.   All right.

10        Can you recall how many people you prosecuted that

11   you got immunity for?

12   A.   Well, how many people I prosecuted --

13   Q.   That you --

14   A.   That I charged?

15        MR. FERGUSON:   Judge --

16   BY MR. MOFFITT:

17   Q.   That you pro- --

18        THE COURT:   Wait, wait, wait.  There is an objection.

19        MR. FERGUSON:   Is this with respect to people who

20   testified under the immunity or simply immunity generally, in

21   which case this is a hopelessly open question?

22        THE COURT:   Yes, the question is vague.

23        Ask another question.

24        Sustained.

25   BY MR. MOFFITT:

Karas - direct

58

1  Q.  How many people that testified, that you got immunity for,

2  did you prosecute?

3  A.  Well, what do you mean by "prosecute"?  I'm not sure I

4  understand.

5  Q.  Bring a charge based upon not the information that they

6  said in the grand jury, but a charge that was a part of the

7  information that they said in the grand jury.  Not where you

8  used their testimony, but where you used other evidence to

9  prosecute those people after having testified in the grand

10  jury.

11  A.  Actually charged, zero.

12  Q.  So, Dr. Ashqar, if he had testified, might have been an

13  exception?

14  A.  He might have been.

15  Q.  Do you recall how many conversations you had with Mr.

16  Hailman?

17  A.  No.

18  Q.  Did you keep notes anywhere with regard to your grand jury

19  investigation?

20  A.  Did I keep notes with regard to this grand jury

21  investigation?

22  Q.  Yes.

23  A.  I might have, yes.

24  Q.  Would you have kept notes of your phone calls with Mr.

25  Hailman?

1  A.  I doubt it.

2  Q.  Have you examined your file to see if you have any notes

3  of a phone call with Mr. Hailman?

4  A.  I haven't seen the file in this case in years; so, no.

5  Q.  So, in your preparation for this case, you never -- you

6  didn't get a chance to look back at the file?

7  A.  I did not look at my file, no.

8         MR. MOFFITT:  Bear with me, your Honor.

9         THE COURT:  Okay.

10        (Brief pause.)

11 BY MR. MOFFITT:

12 Q.  Now, in your -- when Dr. Ashqar was taken into the grand

13 jury and he refused to testify, he stated in the grand jury

14 that he was concerned that the Israelis might get this

15 information and it might be used against him, correct?

16 A.  Correct.

17 Q.  Did you tell him anything with regard to that?

18 A.  At that time?

19 Q.  Yes.

20 A.  I don't believe so, no, not in the grand jury.

21 Q.  So, when he was in the grand jury and in front of the

22 grand jurors, you never said anything to him about that issue?

23 A.  I -- I -- don't have a recollection of doing it in the

24 grand jury.

25        MR. MOFFITT:  Do you have the grand jury testimony?

1              (Brief pause.)

2    BY MR. MOFFITT:

3    Q.   I'm going to show you the same grand jury testimony that

4    my colleague did.

5              THE COURT:   What is the exhibit number or label?

6              MR. FERGUSON:   Government Exhibit Ashqar 2-23-98

7    Grand Jury Transcript.

8              (Document tendered.)

9    BY MR. MOFFITT:

10   Q.   Could you examine it for me?

11   A.   Is there a particular page you want me to look at, sir, or

12   do you want me to just read the whole thing?

13   Q.   I want you to see if you can find anywhere in there where

14   you said to Dr. Ashqar -- you responded to his notion that

15   this information might get in the hands of the Israelis.

16   A.   Okay.

17              (Brief pause.)

18              MR. FERGUSON:   Judge, I'm going to object as to

19   relevance; and, if further explanation is desired, I can do it

20   at sidebar.

21              THE COURT:   Mr. Moffitt?

22              MR. MOFFITT:   I'm happy to let him do it at sidebar.

23              THE COURT:   While the witness is looking, we can have

24   a sidebar.

25              (Proceedings had at sidebar:)

1      MR. FERGUSON:  Judge, I think this line of

2  questioning -- or at least what I'm anticipating is the line

3  of questioning, but certainly the one that's on the table

4  already -- is, basically, an attempt to put out a

5  nullification argument.  Dr. Ashqar, with the representation

6  of counsel, had the opportunity to fully litigate his reasons

7  and whether or not contempt was appropriate in the

8  circumstances and he should have to testify.

9      This is res judicata; collateral estoppel; thoroughly

10 ruled on by the court in New York; and, whether or not the --

11 whether or not this witness offered any explanation as to what

12 the situation was with the Israelis, that issue, generally,

13 was addressed by the Court.  And I just don't think it's

14 relevant here except as an attempt at nullification.

15     MR. MOFFITT:  There is a reason that it is relevant

16 here, and Mr. Ferguson knows exactly why it's relevant here.

17     THE COURT:  Well, tell me, please, because I do not.

18     MR. FERGUSON:  I don't.

19     MR. MOFFITT:  Dr. Ashqar was concerned about the

20 grand jury leaking information.  In this very jurisdiction,

21 with regard to the HLF investigation, there has been articles

22 in the newspaper about the leak of grand jury material and the

23 fact that Judith -- that's part of the motion that we gave you

24 today -- and the fact that Judith Miller, who was a witness in

25 this case called by the government, is now being investigated

1   for leaking information -- secret government information --

2   about the HLF investigation.

3          Dr. Ashqar had no assurances from anybody that this

4   information was not going to be leaked.  And I'm worried --

5          MR. FERGUSON:  First of all -- first of all --time

6   frame.  This is 1998 and his appearance before the grand jury

7   here in Chicago was in 2003.  What Mr. Moffitt is referring to

8   are -- first of all, with respect to the HLF, if my

9   recollection is correct on this, this is in the 2005 time

10  frame that this comes into play, first; and, then, with

11  respect to Judith Miller, I'm not sure how any of that --

12  which long post-dates this 1998 appearance -- factors into

13  Dr. Ashqar's frame of mind.

14          Regardless, whether or not it was his frame of mind

15  or not, it has been addressed as not a legal defense and not

16  -- and did not put him in a defensible position with his

17  refusal to comply with the court's order.  It's not relevant.

18          THE COURT:  I will overrule the objection as to this

19  particular question.

20          You are certainly not going down any Judith Miller

21  questions with this witness.  That is not appropriate.

22          MR. MOFFITT:  Depends on what he opens up.

23          THE COURT:  I am -- you are not going down --

24          MR. FERGUSON:  You can't open your own door.

25          THE COURT:  I know.

 1          You are not going down Judith Miller questions with

 2   this particular witness.

 3          MR. MOFFITT:  I am not going to ask him about Judith

 4   Miller.  But if he opens up anything about grand juries

 5   leaking, I'm going to go that way.

 6          THE COURT:  Well, I will see what the answers to the

 7   questions are; and, if there is an objection --

 8          MR. SCHAR:  The only relevance -- and I only briefly

 9   looked at the motion, which we will address later -- but there

10   has to be some connection between some leak and his

11   understanding.

12          THE COURT:  Right.  Right.

13          MR. SCHAR:  And there's been nothing proffered on

14   that at all.

15          THE COURT:  I will allow this question to be

16   answered.

17          (Proceedings had in open court:)

18   BY THE WITNESS:

19   A.  Can you tell me what the question is?

20   BY MR. MOFFITT:

21   Q.  I wanted to know if you had --

22          MR. MOFFITT:  Can you read the question so I do it

23   exactly the way it's -- I said it?

24          THE COURT:  Sure.

25          Well, I will give you the last question and answer.

1    We may need to go back further.

2              (Whereupon, the record was read by the Court.)

3              THE COURT:  So, why do you not -- you may want to ask

4    another question from that.

5              MR. MOFFITT:  Okay.  I'd like to have that answered

6    first.

7    BY THE WITNESS:

8    A.   Okay.  I've reviewed the transcript quickly while you were

9    at the sidebar and the subject did not come up.

10             MR. MOFFITT:  Would you indulge me for a second?

11             THE COURT:  Yes.

12             (Brief pause.)

13             MR. MOFFITT:  Your Honor, I have no further

14   questions.

15             THE COURT:  Mr. Deutsch.

16             CROSS-EXAMINATION ON BEHALF OF DEFENDANT SALAH

17   BY MR. DEUTSCH:

18   Q.   Good morning, sir.

19   A.   Good morning, sir.

20   Q.   You testified on direct examination that Mr. Elbarasse and

21   Dr. Ashqar were given use immunity, correct?

22   A.   Yes, sir.

23   Q.   And you explained to the jury that that meant that what

24   they said could not be used against them in a federal or state

25   prosecution, correct?

1    A.   I don't think I specified federal or state.  I just said

2    in a criminal prosecution.

3    Q.   Criminal prosecution.

4         And you also said that it could not be used

5    indirectly.  In other words, what they said could not lead you

6    to other evidence that could be used against them, right?

7    A.   Yes, sir.

8    Q.   But, of course, it's true, is it not, that that -- what

9    they said could be used against them in a prosecution in

10   Israel, correct?

11   A.   Well, only if the Israelis are given the information.

12   Q.   Right.

13        And it, also, could be used to arrest him in Israel,

14   right?

15   A.   Actually -- and I don't know Israeli law; but, as a

16   precursor, they would have to get it first.

17   Q.   Well, do you know that, in fact, it could not be used

18   against him?

19   A.   Like I said, I don't know Israeli law.

20   Q.   Well, what about -- does the immunity that was given to

21   him by your office protect him from a foreign prosecution?

22   A.   The order that Judge Cote signed and Judge Mukasey signed

23   says nothing about foreign prosecution.

24   Q.   So, it does not protect him from a foreign prosecution,

25   correct?

1  A.   Like I said, the order does not say anything about foreign

2  prosecution.

3  Q.   Well, in your experience as a U.S. attorney -- and I'm

4  sure you've had other cases in which someone was given

5  immunity -- that immunity does not protect them from any

6  foreign prosecution, does it?

7         MR. FERGUSON:   Judge, I'm going to object to

8  relevance on the same grounds that I articulated at the

9  sidebar.

10         MR. DEUTSCH:   I don't know -- I don't see where that

11  has --

12         THE COURT:   Overruled.

13         You can answer.

14  BY THE WITNESS:

15  A.   If the question is whether or not, in my experience,

16  immunity would cover foreign prosecutions, my answer -- my

17  experience -- would say no, it does not.

18  BY MR. DEUTSCH:

19  Q.   Okay.

20         And unless the Israelis had some kind of special law

21  that you don't know about, it wouldn't protect him from a

22  prosecution in Israel -- Dr. Ashqar or Mr. Elbarasse --

23  correct?

24         MR. FERGUSON:   Objection.

25         THE COURT:   Sustained to form.

1   BY MR. DEUTSCH:

2   Q.  Did you know at the time that you were seeking information

3   from Mr. Elbarasse that it was a crime in Israel merely to be

4   associated with Hamas?

5   A.  I don't know that I knew that at the time, no.

6   Q.  So, would it be true that, in fact, if either person had

7   any assoc- -- testified about any association with Hamas, they

8   could be prosecuted by the government of Israel merely based

9   on mere association?

10          MR. FERGUSON:  Objection.

11          THE COURT:  Sustained.

12          You are asking him to speculate.

13  BY MR. DEUTSCH:

14  Q.  Now, in the course of your investigation -- this grand

15  jury investigation -- you were in touch with Israeli

16  officials; were you not?

17  A.  We -- the answer is "Yes."  We were in touch with Israeli

18  officials.

19  Q.  And I would take it, from time to time, they shared

20  information with you and you shared information with them?

21  A.  There was only one series of meetings we had, and there

22  was some sharing of information, mostly by them.

23  Q.  All right.

24          And you had no specific rule in the U.S. Attorney's

25  Office that you could not share information with the Israelis

 1   if it was appropriate, did you?

 2   A.   If it was appropriate.

 3   Q.   You didn't have an absolute rule against that, right?

 4   A.   I could only share what the law allowed me to share,

 5   that's right.

 6   Q.   Okay.

 7        And did you know at the time that there was any

 8   prohibition in your office to share information with the

 9   Israelis?

10   A.   At the time I met with them?

11   Q.   Yeah.

12   A.   There was no prohibition beyond whatever the law

13   proscribed.

14   Q.   Okay.

15        Now, are you familiar with the use of military

16   tribunals by the Israelis in prosecuting Palestinians?

17   A.   No.

18   Q.   At the time you're conducting your grand jury

19   investigation, were you familiar with the methods of

20   interrogation used by the Shin Bet or Shaba'k, which is the

21   Israeli secret police?

22   A.   Well, I'm stuck on the word "familiar."  I mean, I

23   certainly had read -- I had read books, I had read articles

24   about these methods.  So, based on that -- I mean, I had read

25   things, sure.  And I think we had some conversations with

1  Israeli officials about, mostly, the use of the statements in

2  court proceedings, and a little bit on how they're taken.

3  Q.  So, based on what you read, you knew that there were

4  claims that the Shin Bet systematically used coercive torture

5  methods on detainees; is that right?

6         MR. FERGUSON:  Object.  Beyond the scope.

7         THE COURT:  Sustained.

8  BY MR. DEUTSCH:

9  Q.  At the time that you were conducting your grand jury

10  investigation in 1998, were you provided with statements that

11  were alleged to have been given by Mr. Salah?

12  A.  Provided by the Israelis?

13  Q.  Uh-huh.

14  A.  Well, I think what I -- the answer is I reviewed the

15  extradition request package that the Israelis had sent as part

16  of the Abu Marzook extradition.  So, in that sense, they were

17  provided by the Israelis, but it wasn't as if I was the

18  addressee or anything.

19  Q.  Okay.

20         So, the Israelis provided these statements alleged to

21  have been by Mr. Salah in support of their request to

22  extradite Mr. Marzook, correct?

23  A.  Yes.

24  Q.  And as part of your job, you reviewed those, right?

25  A.  As part of the investigation, I reviewed those, yes.

1    Q.   Now, as part of the investigation, did you do any

2    independent investigation into the methods under which those

3    statements were obtained?

4    A.   Well, what I did was -- I think I mentioned when we had

5    our meetings with them, I made some inquiries; again, mostly

6    about how the statements are offered in court proceedings.

7    But I didn't speak, for example, to any of the individuals who

8    took any of the statements from Mr. Salah.

9    Q.   Or did any independent investigation as to the methods

10   that were used on Mr. Salah?

11   A.   Well, by asking them questions, I guess that would be

12   considered my own independent investigation.

13   Q.   But, of course, you would agree with me that just asking

14   someone whether or not Mr. Salah was coerced or tortured is

15   not really an independent investigation, if you're just asking

16   the Israelis themselves, right?

17           MR. FERGUSON:  Object to form.

18           THE COURT:  Sustained on form.

19   BY MR. DEUTSCH:

20   Q.   Did you go to Israel and do any independent investigation

21   as to the methods that were used on Mr. Salah?

22           MR. FERGUSON:  Judge, again, beyond the scope.

23           THE COURT:  Sustained.

24   BY MR. DEUTSCH:

25   Q.   Now, do you have in front of you Mr. Elbarasse's grand

1   jury testimony that was admitted into evidence?

2   A.  No, sir, I don't.

3   Q.  Okay.  We're going to provide you with a copy.

4          MR. DEUTSCH:  May I approach, Judge?

5          THE COURT:  You may.

6          MR. DEUTSCH:  Okay.

7   BY MR. DEUTSCH:

8   Q.  I'm going to turn your attention to Page 16.

9          (Document tendered.)

10  BY THE WITNESS:

11  A.  Okay.

12  BY MR. DEUTSCH:

13  Q.  I'm going to ask you whether or not this is what -- part

14  of what -- Mr. Elbarasse told the grand jury in response to

15  your request for him to testify in the face of immunity.

16          You'll find it at the beginning of the first full

17  paragraph on Page 16.

18          THE COURT:  Do you want to give a line number?

19  BY THE WITNESS:

20  A.  Is it Line 8?

21  BY MR. DEUTSCH:

22  Q.  Oh, yeah, Line 8.

23  A.  Okay.

24  Q.  "As a Palestinian and duty-bound citizen of the United

25  States, I am compelled to make you aware of the injustice that

1    is furthered by the U.S. government upon this Grand Jury and

2    the court through this subpoena.

3           "I cannot and will not, under any circumstances,

4    testify before this Grand Jury or any other grand jury.  This

5    process seeks to harass, discriminate against and criminalize

6    innocent people.

7           "Having committed no crime, I find myself persecuted

8    because of my religious ethnicity and nationality.  I was born

9    in Gaza City after World War II and before the brutal Israeli

10   occupation of my homeland.

11          "Today Gaza is the most densely populated area in the

12   world with the poorest of living conditions.  We Palestinians

13   seek only to redress wrongs committed and rights usurped?

14          "As a Muslim, my religion prohibits me from making

15   any statements that will be used to further the interests of

16   falsehood and injustice.  For me, it is a matter of paradise

17   or hellfire.

18          "I will not betray my religious, personal and

19   political convictions, even if it means my being incarcerated.

20          "I choose to practice my constitutionally-granted

21   rights of freedom of religion, speech, assembly and

22   association and, accordingly, will not testify before this

23   Grand Jury or any matter -- " and " -- any, no matter what my

24   punishment, no matter how long my sentence?"

25          Did Mr. Elbarasse say that before the grand jury?

1    A.   Yeah, that's the -- I recall roughly that statement, yes.

2    Q.   Okay.

3         Now, you did testify that you already had the

4    financial documents which showed transfer of money between

5    Mr. Elbarasse and others, correct?

6    A.   I had documents to that effect, yes.

7    Q.   Yeah.

8         And you testified that what you wanted was to show

9    the intent behind the transfer of the money, correct?

10   A.   Yes.  That was the principal objective at that point.

11   Q.   And, in fact, that's one of the things that has to be

12   proven based on a money laundering or any other crime -- what

13   is the intent of the person transferring the money or

14   conveying the money -- correct?

15   A.   Well, my focus was on money laundering; so, yes, intent

16   was important.

17   Q.   Okay.

18        And we had some testimony -- let me back up.

19        Your grand jury didn't indict anyone, did they?

20   A.   In connection with this case?

21   Q.   Yes.

22   A.   No.  We didn't ask them to.

23   Q.   And we heard testimony last week that the Northern

24   District of Illinois grand jury -- U.S. Attorney's Office has

25   a beyond-a-reasonable-doubt standard before they ask for an

1  indictment.  Does the Southern District U.S. Attorney's Office

2  have the same standard?

3  A.  No, sir.

4  Q.  So, your standard is whether or not there's probable cause

5  to believe a crime was committed, right?

6  A.  Well, I don't know if the standard's changed; but, at the

7  time I was doing this investigation, that's correct.

8  Q.  And part of showing probable cause was to show what the

9  intent of the person that was transferring the money was,

10  whether he was transferring it for criminal activity or

11  non-criminal activity; is that fair?

12  A.  That's fair.

13  Q.  Now, that probable cause standard is a lesser standard or

14  a more easy -- easier -- standard to make out than beyond-a-

15  reasonable-doubt standard, right?

16  A.  It's less burdensome.

17  Q.  Yeah.

18       And you need less evidence to show that than you

19  would to show beyond a reasonable doubt, right?

20  A.  Well, an indictment can be returned on only a finding of

21  probable cause.

22  Q.  Right.

23       Which is a lesser standard of proof than beyond a

24  reasonable doubt, right?

25  A.  Correct.

1   Q.   Okay.

2        Now, do you recall, as part of your work in

3   investigating this case, that you became aware of an affidavit

4   that was filed on behalf of Mr. Marzook by Mr. Salah?

5   A.   I think there were -- there may have been -- there was at

6   least one, I think --

7   Q.   Right.

8   A.   -- right?

9   Q.   And do you recall that in that affidavit Mr. Salah, in

10  great detail, enumerated how he had been tortured under --

11       MR. FERGUSON:   Objection.

12  BY MR. DEUTSCH:

13  Q.   -- Israeli custody?

14       THE COURT:   Sustained.   Asking for hearsay.

15  BY MR. DEUTSCH:

16  Q.   Did you -- in looking at that affidavit, did you -- take

17  any steps to investigate the matters in that affidavit?

18  A.   Again, other than what I said earlier, which I considered

19  taking steps -- I mean, I've already answered that.

20  Q.   Okay.

21       Basically, what you said earlier is you talked to

22  some Israeli officials about it?

23       MR. FERGUSON:   Judge, I'm going to object.   We are

24  completely beyond the scope --

25       THE COURT:   Sustained.

1          MR. FERGUSON:   -- of Dr. Ashqar.

2    BY MR. DEUTSCH:

3    Q.   And you also testified on direct that prior to Mr. Marzook

4    being detained on immigration charges, you really didn't have

5    any kind of investigation that was proceeding in the Southern

6    District; is that fair?

7    A.   The investigation began the day he came to JFK.

8    Q.   Okay.

9          And that was in July of 1995?

10   A.   Yes, sir.

11   Q.   And Baruch Weiss, is he somebody that worked with you?

12   A.   Yes.   He was an assistant U.S. attorney in the same office

13   as I was.

14   Q.   Okay.

15         And do you know whether or not he was involved in

16   either this grand jury or the Marzook case?

17   A.   Mr. Weiss was the senior prosecutor in charge of the

18   extradition.   What happened was the Israeli government filed

19   the request with, I believe, the State Department; and, it

20   filtered down to the U.S. Attorney's Office; and, he was the

21   principal prosecutor in charge of that.

22         I headed up the other track, which was the criminal

23   investigation.

24   Q.   And you would consult from time to time about your

25   parallel efforts?

1   A.   Sure.  I wanted to, for example, look at the documents

2   that had been sent over.

3   Q.   Did you know that Mr. Weiss made an inquiry of the State

4   Department consulate office about whether or not Mr. Salah's

5   claims of torture were consistent throughout his time in

6   Israeli custody?

7            MR. FERGUSON:  Judge, I'm going to object.  Beyond

8   the scope.

9            THE COURT:  Sustained.

10   BY MR. DEUTSCH:

11   Q.   Do you know whether or not Mr. Weiss did any investigation

12   of the claims of Mr. Salah about torture?

13            MR. FERGUSON:  Same objection.

14            THE COURT:  Sustained.

15   BY MR. DEUTSCH:

16   Q.   Now, when somebody testifies under an immunity grant, the

17   determination about --

18            MR. DEUTSCH:  Strike that.

19   BY MR. DEUTSCH:

20   Q.   When somebody testifies under an immunity grant, that

21   immunity doesn't cover testifying falsely, correct?

22   A.   Correct.

23   Q.   And, in the first instance, it is you or other U.S.

24   attorneys that decide whether somebody testified falsely or

25   not, right?

Karas - cross by Deutsch

1   A.   Well, we might make an assessment at the time the person's

2   testifying, but that doesn't mean that the grand jurors aren't

3   also making their own assessment --

4   Q.   Right.

5   A.   -- at the time.

6   Q.   But if you make that assessment, you can go ahead and ask

7   that grand jury to indict somebody for testifying falsely in

8   front of them?

9   A.   If there's a basis to believe somebody lied under oath,

10  yes.

11  Q.   So, you have a tremendous amount of power to make an

12  initial determination whether someone's being truthful or not

13  in front of the grand jury, correct?

14  A.   Well, as I said, when anybody -- whenever anybody's

15  testifying, you know, as prosecutors, we would make an

16  assessment.  And if we thought someone was lying, then we

17  would decide what, if anything, could be done about it.

18  Q.   Right.

19           And, of course, you would agree that although the

20  grand jury is in theory an independent body, the prosecutor,

21  basically, controls to a great extent whether the grand jury

22  indicts or not?

23  A.   Well, a grand jury can't indict somebody on its own.

24  Evidence has to be presented and a request to indict has to be

25  made.

1   Q.   And when you ask a grand jury to return an indictment, in

2   more cases than not, they will agree and return an indictment,

3   right?

4   A.   That was my experience, yes.

5   Q.   In fact, how many years were you with the U.S. Attorney's

6   Office?

7   A.   I was there about 11-and-a-half years.

8   Q.   Did you ever have a situation where you asked a grand jury

9   to return an indictment and they said "No"?

10   A.   I don't believe so.

11   Q.   And how many times would you say in those 11 years --

12   well, how many indictments do you think you asked a grand jury

13   to return in those 11 years?

14   A.   It would be a pure guess to give an exact number.  I would

15   say maybe over a hundred, and I don't know how much more over

16   a hundred.

17   Q.   And I think you even testified on direct that you had the

18   financial documents, the financial transactions, but you

19   needed to put -- if I'm using your words correctly -- meat on

20   the bones, right?

21   A.   I don't know that I had every financial document, but I

22   had financial documents.

23   Q.   Right.

24   A.   Yes.

25   Q.   But without proof -- at least proof of probable cause of

1   the intent of the people involved in transferring the money --

2   you didn't really have a case, right?

3   A.   I thought we needed somebody to, sort of, give life to the

4   documents and tell us what this was all about.

5   Q.   And what the intent of the persons were, right?

6   A.   Correct.

7          MR. DEUTSCH:  I have no further questions.

8          THE COURT:  Mr. Ferguson, any redirect?

9          MR. FERGUSON:  Nothing, Judge.

10          THE COURT:  Thank you, sir.

11          You may step down.

12          (Witness excused.)

13          (Whereupon, there were further proceedings which were

14      not ordered transcribed.)

15                    *    *    *    *    *

16

17   I certify that the foregoing is a correct excerpt from the
     record of proceedings in the above-entitled matter.
18

19

     _____   _____, 2006
20   Official Court Reporter

21

22

23

24

25