```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,           ) Docket No. 03 CR 978
 4                                        )
                          Plaintiff,      )
 5                                        )
                 vs.                      )
 6                                        )
     MUHAMMAD HAMID KHALIL SALAH AND       )
 7   ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, ) Chicago, Illinois
                                          ) November 17, 2006
 8                        Defendants.     ) 9:00 o'clock a.m.

 9
                         VOLUME TWENTY-TWO
10               EXCERPT OF TRIAL PROCEEDINGS
           BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
11

12   APPEARANCES:

13
     For the Plaintiff:          HON. PATRICK J. FITZGERALD
14                               United States Attorney
                                 BY:  MR. JOSEPH M. FERGUSON
15                                     MR. REID J. SCHAR
                                       MS. CARRIE E. HAMILTON
16                               219 S. Dearborn St., Suite 500
                                 Chicago, Illinois  60604
17

18   For Deft. Salah:            PEOPLE'S LAW OFFICES
                                 BY:  MR. MICHAEL EDWARD DEUTSCH
19                                     MS. ERICA THOMPSON
                                       MR. BENJAMIN H. ELSON
20                               1180 North Milwaukee Avenue
                                 Chicago, Illinois  60622
21

22   For Deft. Ashqar:           MR. KEITH ALLAN SPIELFOGEL
                                 20 North Clark Street, Suite 1200
23                               Chicago, Illinois  60602

24
                                 MR. WILLIAM MOFFITT
25                               11582 Greenwich Point Road
                                 Reston, Virginia  20194
```

1   APPEARANCES (Cont'd):

2

    Also Present:              S/A BRADLEY BENAVIDES, FBI
3                              S/A JILL PETTORELLI, FBI

4

    Court Reporter:            MR. JOSEPH RICKHOFF
5                              Official Court Reporter
                               219 S. Dearborn St., Suite 1232
6                              Chicago, Illinois  60604
                               (312) 435-5562
7

8              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9                       PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
10              TRANSCRIPT PRODUCED BY COMPUTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE CLERK:  03 CR 978, USA vs. Muhammad Salah and

2    Abdelhaleem Ashqar.  Jury trial continues.

3              THE COURT:  Good morning.

4              MR. FERGUSON:  Good morning, Judge, Joe Ferguson,

5    Reid Schar, Carrie Hamilton for the government.

6              MR. DEUTSCH:  Michael Deutsch and Erica Thompson and

7    Muhammad Salah for Mr. Salah.

8              MS. THOMPSON:  He is here.  He's just getting water.

9              THE COURT:  Yes, I saw him earlier.

10             MR. MOFFITT:  William Moffitt and Keith Spielfogel,

11   and we are awaiting Dr. Ashqar.

12             THE COURT:  Okay.

13             MR. MOFFITT:  We have no reason to believe that he

14   won't be here or wouldn't be here.

15             THE COURT:  Do you want to check outside and see if

16   he is --

17             MR. SPIELFOGEL:  I just did.

18             MR. MOFFITT:  We know that he is driving.  Sometimes

19   he gets lost.  I've been with him when that has happened.

20             THE COURT:  Okay.

21             Well, we cannot start the trial without him.

22             Do you have a cell phone or a way of contacting him?

23             MR. MOFFITT:  I do, but it's over -- it's over in the

24   office where --

25             MR. SPIELFOGEL:  I can call him, Judge.

1            THE COURT:  Would you please?

2            MR. SPIELFOGEL:  I will.

3            THE COURT:  Thank you.

4            MR. MOFFITT:  And I left my cell phone because we

5     were having trouble turning it off.

6            THE COURT:  That is probably a good idea.

7            Here he comes.  He is on his way.

8            (Brief pause.)

9            MR. SPIELFOGEL:  For the record, Dr. Ashqar is

10    present in court.

11           THE COURT:  Okay.

12           Please bring in the jury.

13           Mr. Spielfogel, are you ready?

14           MR. SPIELFOGEL:  I am, Judge.

15           (Jury in.)

16           THE COURT:  You may be seated.

17           Good morning.

18           I see you brought your sweaters with you.

19           (Laughter.)

20           THE COURT:  I do not blame you.

21           We are going to continue today with the presentation

22    of evidence.  Remember today is a half-day.

23           Mr. Spielfogel, you may continue.

24           Agent --

25           MR. SPIELFOGEL:  Thank you, your Honor.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 5 of 121
Miranda - cross by Spielfogel
185

 1          THE COURT:  -- before you do, let me remind you that

 2  you are still under oath.

 3          THE WITNESS:  Yes, ma'am.

 4      ROBERT MIRANDA, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

 5      CROSS-EXAMINATION ON BEHALF OF DEFENDANT ASHQAR - Resumed

 6  BY MR. SPIELFOGEL:

 7  Q.  Good morning, Agent Miranda.

 8  A.  Good morning, sir.

 9  Q.  Agent, during the course of the conversations that went on

10  at the Philadelphia meeting, there were several topics that

11  were discussed by the participants, as far as how the movement

12  would now be viewed in light of the Oslo Accord; is that

13  correct?

14  A.  Yes, sir.

15  Q.  And they had some real fears about some of the things that

16  the Accord would mean as to the Islamic people; isn't that

17  correct?

18  A.  Yes, sir.

19  Q.  Well, one of the things that they were concerned about was

20  that now if anyone took a position against the Accords, they

21  would be termed terrorists; isn't that correct?

22  A.  That's partially correct, yes, sir.

23  Q.  And, in fact, that was discussed during the meeting.

24          MR. SPIELFOGEL:  And I would ask, your Honor, if you

25  would direct the jury to Tab 19, Page 1.

Case 1:03-cr-00978  Document 1075   Filed 01/05/09  Page 6 of 121
Miranda - cross by Spielfogel
186

1              THE COURT:  Of Philadelphia Conference, correct?

2              MR. SPIELFOGEL:  Everything is Philadelphia

3   Conference.

4              THE COURT:  Okay.

5              Please grab your Philadelphia Conference binder.

6              When you get it, turn to Tab 19, please.  Page 1, Tab

7   19.

8   BY MR. SPIELFOGEL:

9   Q.  I'm going to direct your attention to Lines 30 through 42

10  on that page.

11             Agent, during the course of that meeting on the issue

12  that I just discussed, the person with the initials "Ak" made

13  the following statement; is that correct?

14             Line 30:  "For example, there was a seminar at George

15  Washington University a week ago about the Middle East process

16  and terrorism.  This was its title.  They brought experts

17  from -- er, from the Center of Strategic International

18  Studies, from the Near East Policies, from the Israeli

19  Embassy, the military attache and his deputy.  I mean, there

20  were some people who were trying to present the Israeli point

21  of view mostly about how the coming stage will be like.  I

22  just wanted to mention some of the points which they

23  unanimously agreed on, as these will be the points we will

24  work on in the future.  For example, instead of saying that

25  terrorism now is -- so that all of you are in the picture,

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 7 of 121
Miranda - cross by Spielfogel
187

1    they defined terrorism as anyone who is opposed to the

2    agreement.  You are against peace and a terrorist if you

3    oppose the agreement.  The issue of being opposed to the

4    agreement as a point of view is no longer there with them.

5    You are against peace.  If you are opposed to peace, it means

6    that it is okay to slaughter you in any suitable manner they

7    deem fit."

8            Was that said during the course of this conference?

9    A.  Yes, it was.

10   Q.  There was also a tremendous amount of concern by many of

11   the participants that Yasir Arafat would now have his people

12   running Gaza and the West Bank, and that his people's number

13   one goal was the elimination of the Islamic movement; isn't

14   that correct?

15   A.  Yes, it was a concern.

16   Q.  He was -- they were concerned -- and, by the way, Yasir

17   Arafat's people, prior to the Oslo Accord, they were at war

18   with Israel; isn't that correct?

19   A.  The PLO, sir?

20   Q.  That's correct.

21   A.  Yes, sir.

22   Q.  Then, one day you have this agreement reached and the next

23   day they're working with the Israelis; isn't that correct?

24           By and large.

25   A.  By and large.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 8 of 121
Miranda - cross by Spielfogel
188

1  Q.  Okay.

2       So, one of the concerns that the movement had at this

3  conference was that now that the PLO people were out of jails,

4  they would be running the situation in Gaza; they would be the

5  ones with weapons; and, they would be coming against the

6  people who were part of the movement; isn't that correct?

7  A.  That's partially correct.

8  Q.  Well, let me turn your attention, if we could, to Tab 7.

9       THE COURT:  Please turn to Tab 7 in this binder.

10      MR. SPIELFOGEL:  Page 5.

11      THE COURT:  Page 5 of Tab 7.

12      MR. SPIELFOGEL:  And I would ask you to please look

13  at Lines 15 through 22.

14  BY MR. SPIELFOGEL:

15  Q.  A person with the initials "Ga," did he make the following

16  statement at the meeting:

17      "Number one is the reality and it will be.  There are

18  available information -- unintelligible -- that Abou Ammar --

19  " who is Abou Ammar?

20  A.  That is an alias for Arafat.

21  Q.  " -- has authorized his special forces to erect the

22  gallows for the movement in Gaza.  This is one.  Two, Fatah --

23  unintelligible -- they used to be persecuted, on the run and

24  locked up like you, I mean, in jails.  That is what -- in the

25  jails they're just like you.  How about when they have

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 9 of 121
Miranda - cross by Spielfogel
189

1   authority, an -- a flag, an Army, money and a job, jobs and

2   ID's?  What do you expect will happen?  They will be murderer

3   criminals, my brothers.  Even the doctors among them.  Doctors

4   among them have criminal mentalities."

5        Was that said during the course of that conference?

6   A.  Yes, it was.

7   Q.  We heard a lot of transcripts and a lot of transcripts

8   were played as far as things that Dr. Ashqar, himself, said

9   during the course of the Philadelphia conference; is that

10  correct?

11  A.  Yes, sir.

12  Q.  I know that this one on Tab --

13        MR. SPIELFOGEL:  I'd ask if the jury could go to Tab

14  11, Page 10 and 11.

15        THE COURT:  Please turn to Tab 11, Page 10.

16  BY MR. SPIELFOGEL:

17  Q.  And this was an address that Doctor -- we're going to

18  start on Line 22.

19        This is an address that Dr. Ashqar gave at the

20  conference; is that correct?

21  A.  Yes, sir.

22  Q.  And I know that we played this on the computer and we put

23  it up on the screen.

24        Do you remember that?

25  A.  Yes, sir.

Miranda - cross by Spielfogel

190

1    Q.  And we went through it quickly at that time.

2             Do you remember that?

3    A.  Yes, sir.

4    Q.  I want to ask you, again, if this is what Dr. Ashqar had

5    to say to these people in the meeting in Philadelphia:

6             "I resort to God from the pelted devil.  As you know,

7    of course, due to the bad situation of education in the

8    inside, there was a need for specialized centers abroad.

9    Education is the movement's capital in the inside.  The future

10   of the struggle depends on education, whether we like it or

11   not.  Also, due to the deterioration of -- or the bad level of

12   education in -- unintelligible -- are mostly laborers in

13   Israeli factories.  It was very hard to find a college

14   graduate from the 48, the territories.  Maybe in the '60s.  In

15   the '70s, you wouldn't find one college graduate.  This is

16   generally speaking.  The reality is even worse in the Islamic

17   surroundings and the Islamic movement.  College graduates are

18   very few.  College graduates are very few -- " I'm sorry -- "

19   and a large segment of laborers support them.  As for the

20   educated ones, they're few in number.  The danger is that --

21   this is like a building without columns, especially when it

22   comes to Sharia education.  People send very few people to

23   education.  To build a college called David of Dawa'a and

24   Islamic Sciences and they carried their papers to all parts of

25   the world:  America, Kuwait and Saudi Arabia.  And, until now,

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 11 of 121
Miranda - cross by Spielfogel
191

1    it still doesn't have a building or a college staff of its

2    own.  Their college staff is from the West Bank and Gaza.

3    They come upon order from the military commander and return

4    every day.  The building is still housed in the Noble Quran

5    House made up of four or five rooms only.  They had a project

6    and they went to the municipality where they got a lot of

7    land, but the project is not completed.  It seems that a donor

8    from Britain or something had donated a hundred thousand to

9    this project.  Anyway, we at the Al Aqsa fund, briefly, had a

10   fundraising campaign during the month of Ramadan, which wasn't

11   successful.  It wasn't as we hoped.  But we hope it will be a

12   good start, God's willing.  We set as goals for us the

13   following:  First of all, supporting the specializations which

14   we need in the inside; particularly, media, journalism, law,

15   political sciences.  Two, supporting higher education and

16   higher studies in Arab countries, as their cost is small and

17   we are ready to support any specialized higher studies in Arab

18   countries.  It is true that we have allocated a humble budget;

19   a specialization in the inside, a thousand dollars annually;

20   1500 annually for higher studies in Arab countries.  Three,

21   attempting to benefit from our brothers in colleges to get

22   accepted for higher studies in America.  We don't have an

23   ability right now -- right now we don't have an ability to

24   support any students for higher studies in America.  A student

25   costs between 15,000 and 20,000.  But it is possible that we

Miranda - cross by Spielfogel

1   have his -- unintelligible -- and they prepare his file and we

2   try through our brothers in colleges to get him accepted

3   through a scholarship.  This is, of course, inapplicable to -- "

4   "this is, of course, is applicable to higher studies in

5   America.  Talking about the future, if God renders things easy

6   for the fund, we can support some of the Islamic brothers who

7   can come to America to do a specialized study in the three

8   fields I mentioned before:  Law, advertising and journalism,

9   and political sciences, if things go well.  As for the near

10  future, we have an upcoming visit by a brother from the

11  faculty of Dawa'a and Fundamentals of Religion, Jerusalem

12  University.  He was recommended by our brothers in Jerusalem.

13  His name is Mr. Ahmad Moustafa Waffaqa.  He will arrive next

14  Wednesday and, God's willing, we will arrange with the fund a

15  tour in some of the cities hoping that we can raise as much as

16  we can to achieve the goals we have.  In addition to that,

17  there is an attempt to sell the project for the college of

18  Dawa'as and Islamic Sciences in Um El-Fahem.  And I speak from

19  a position of someone who knows the current status of

20  education and knows that -- unintelligible -- 90 percent or 95

21  percent of the ranks of our Islamic brothers in the Islamic

22  Movement do not -- unintelligible.  There must be equality.

23  This is it.  They can carry out any project, but --

24  unintelligible.

25          "A quick comment.  The true blessings then come from

1    the laborers and -- all those who have college degrees are the

2    ones who are behind."  I guess there was laughter.

3          "As for the institutional activism, I don't disagree

4    with the person who -- part of the problem of our brothers --

5    unintelligible -- is that they are all educated.  But I'm

6    saying that it is a matter of balance.  The other project

7    which are trying to sell is the labs of the College of

8    Engineering at the Islamic University.  They opened a new

9    college for engineering.  The entire number of students at the

10   Islamic University was 5,000 students.  Now the students are

11   less than 2,000.  Of course -- unintelligible -- there is no

12   time for details right now.  Generally speaking, other

13   universities were built to steal the show from the Islamic

14   University.  There is a competition between them and the

15   Islamic University.  Al Azhar University started new

16   specializations, which they are needed in society, such as

17   pharmacy, agricultural -- things which people need.  For the

18   Islamic University, in order for it to exist, it had to change

19   its specializations, at least, and start a college for

20   engineering.  But the College of Engineering right now has no

21   lab or educational staff.  We will try, God willing, to sell

22   these projects.  May God reward you well."

23         Was that what Dr. Ashqar told the people gathered in

24   Philadelphia?

25   A.  Yes, it is, sir.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 14 of 121
Miranda - cross by Spielfogel
194

1  Q.  He spoke about several other things that he felt were

2  necessary that the people who were gathered tried to advance.

3  He talked about the need for official delegations of the

4  Islamic community to go visit families of those who had been

5  deported; is that correct?

6  A.  Yes, sir.

7  Q.  And he talked about the need to get assistance to the

8  families of those people; is that correct?

9  A.  That's correct, sir.

10  Q.  And, as a matter of fact, at one point, he asked a

11  congregation, "My God, what crime has the child of a person in

12  prison committed?"

13        Isn't that correct?

14  A.  I think he makes a comment like that, yes, sir.

15  Q.  He talked about the dire need for charitable work in

16  America; isn't that correct?

17  A.  Yes, sir.

18  Q.  And the need to raise human rights issues, that they had

19  to be brought up in the United States; isn't that correct?

20  A.  He addresses that.

21  Q.  And he talked about the fact that we needed to establish

22  an archive for all of the materials relating to the

23  Palestinian people; did he not?

24  A.  No.  He said an archive for the movement, which is Hamas.

25  Q.  The movement --

1    A.   The movement's clear- --

2    Q.   Your --

3    A.   Go ahead, sir.

4    Q.   -- definition --

5    A.   Pardon me.

6    Q.   -- of the movement is anyone who is involved in the

7    movement who believes in the rights of the Palestinian people,

8    that person is Hamas; is that correct?

9    A.   No, sir.  I am using the definition established in the

10   committee here where they would say "the movement equals

11   Samah," "Islamic movement equals Samah," "Hamas equals the

12   movement."

13   Q.   You cannot be in favor of the Islamic people's rights, in

14   your mind, and not be a member of Hamas; is that what you're

15   telling us?

16   A.   No.  What I'm saying is you're saying that Ashqar said

17   something, and I'm telling you that's not what he said.

18   Q.   Let's look at exactly --

19   A.   Yes, sir.

20   Q.   -- what he said.

21   A.   Let's do that.

22        MR. SPIELFOGEL:  I'd ask if the jury could please

23   turn to Tab 8, Page 7.

24        THE COURT:  Please turn to Tab 8 and Page 7 within

25   Tab 8.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 16 of 121
Miranda - cross by Spielfogel
196

1            MR. SPIELFOGEL:  And I would go to Line 2 of the top

2    of Page 7.

3            THE COURT:  Okay.

4    BY MR. SPIELFOGEL:

5    Q.  Did he say the following:  "Receiving delegations, as

6    well.  Keeping an archive.  The entire archive in the inside

7    might be confiscated entirely.  If there was really no

8    duplicate for it, the Movement will really become without a

9    heritage and every moment will begin from zero --

10   unintelligible."

11           Is that what he said?

12   A.  Well, actually, he said "and every movement will begin

13   from zero"; but, yes, that's what he said.

14   Q.  "The movement will really become without a heritage."

15   He's talking about a heritage there; isn't that correct?

16   A.  He uses the word "heritage."

17   Q.  It's a heritage of the Palestinian people, Agent; isn't

18   that correct?

19   A.  No.  You are wrong, sir.

20   Q.  Okay.

21           He talked about the fact that it was very important

22   to invest in the inside; spoke about investments that would

23   yield a high dividend, that will employ the youths who live in

24   the Palestinian -- in Gaza and in West Bank; isn't that

25   correct?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 17 of 121
Miranda - cross by Spielfogel
197

1  A.  Yes, sir.

2  Q.  Were those youths all Hamas people that he's talking about

3  there?

4  A.  He doesn't say that there, sir.

5  Q.  But I thought he would only be concerned about people who

6  were in Hamas?

7  A.  I think he's primarily concerned about people in Hamas.

8  Q.  Now, he got ready to leave the conference; isn't that

9  correct?

10 A.  Yes.

11 Q.  And he said, "There's a couple things I just want to talk

12 about before I leave"; is that correct?

13 A.  Yes, sir.

14 Q.  And, actually, there were three things that he wanted to

15 talk about; do you recall that?

16 A.  He had some points, yes.

17 Q.  Okay.

18       The first one was he wanted more rights for women in

19 the movement; isn't that correct?

20 A.  I'm not sure if he said that or another individual said

21 that, sir.

22 Q.  Well, you don't recall him saying that women needed larger

23 roles?

24 A.  I recall that an individual said that, but I wasn't

25 certain --

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 18 of 121
Miranda - cross by Spielfogel
198

1   Q.  Let's go to Tab --

2   A.  -- if it was him or another individual.

3   Q.  Let's go to Tab 25, if we could, please.

4            THE COURT:  Please turn to Tab 25.

5            MR. SPIELFOGEL:  I'm looking for the page, your

6   Honor.

7            THE COURT:  Okay.  Take your time.

8            (Brief pause.)

9            MR. SPIELFOGEL:  And I'd ask you to please turn to

10  Page 19.

11           THE COURT:  Page 19 of Tab 25.

12           MR. SPIELFOGEL:  And I direct you to Line 11.

13  BY MR. SPIELFOGEL:

14  Q.  Do you have that, Agent?

15  A.  Yes, sir.

16  Q.  "As" is Ashqar; is that correct?

17  A.  That's correct, sir.

18  Q.  Line 11:  "Really, we should be opening the woman subject.

19           Unidentified -- a person who you don't know who it

20  was -- says, "The woman."

21           Ashqar:  "The community and its women.  It is true --

22  unidentified -- first of all, our women, our sisters."

23           Someone says, "May God have mercy on Dr. Bishtaqi's

24  soul."

25           "Amen."

Miranda - cross by Spielfogel

1              Ashqar:  "The right thing to do is to give them

2    political representation in a manner which gives the ability

3    -- to give something, that is.  In addition to their role in

4    organizing activities and attempting to highlight their role

5    in the activities of the association, charity work or anything

6    else."

7              Is that what Dr. Ashqar said?

8    A.  Yes, sir.

9    Q.  He also talked about, before he left the conference, that,

10   "We need to get better speakers to go and give talks on the

11   inside and here in the United States"; isn't that correct?

12   A.  Yes, sir.

13   Q.  And, finally, he spoke about the fact that we needed to

14   try to get minority scholarships for Muslim students so that

15   they could attend law schools here in the United States; is

16   that correct?

17   A.  Yes, sir.

18   Q.  Now, he then left the conference; is that correct?

19   A.  Yes, sir.

20   Q.  The conference continued; is that right?

21   A.  Yes, sir.

22   Q.  There were more informal meetings that occurred at that

23   point?  Do you know?

24   A.  There was a continued discussion, yes, sir, that was

25   captured.

Miranda - cross by Spielfogel

1   Q.  The meeting that took place in Philadelphia, as we've

2   already established, this was at a public hotel; is that

3   correct?

4   A.  Yes, sir.

5   Q.  There were no locks on the doors; is that correct?

6   A.  I have no idea about locks on the doors, sir.

7   Q.  Well, you think walking in the front door of the

8   conference, that the front door was locked --

9   A.  I --

10  Q.  -- of the hotel?

11  A.  I have no idea, but I seriously doubt it.

12  Q.  Do you seriously doubt that the door going into the

13  conference room in Conference Room B was locked?  Do you doubt

14  that?

15  A.  I have no idea.  I couldn't see the door from the

16  videotape, sir.

17  Q.  Okay.

18        But, in your mind, maybe it was locked; is that

19  right?

20  A.  No, I'm not saying that at all.  I'm saying I have no

21  idea.

22  Q.  Okay.

23        MR. SPIELFOGEL:  I have nothing further, your Honor.

24        THE COURT:  Mr. Deutsch?

25        Ms. Thompson?

Case 1:03-cr-00978  Document 1075  Filed 01/05/09  Page 21 of 121
Miranda - cross by Thompson
201

1          MR. DEUTSCH:  Ms. Thompson.

2          MS. THOMPSON:  Thank you, Judge.

3          CROSS-EXAMINATION ON BEHALF OF DEFENDANT SALAH

4   BY MS. THOMPSON:

5   Q.  Good morning, Agent Miranda.  How are you?

6   A.  Good, ma'am.

7   Q.  I may find it necessary to refer to a couple of documents

8   in the Ashqar Search Documents, as well as in the Philadelphia

9   conference transcripts.

10          Do you have both of those available to you --

11  A.  No, ma'am.

12  Q.  -- up there?

13          MS. THOMPSON:  Thank you.

14          MS. HAMILTON:  Judge, I'm going to hand the Search

15  Documents binder to the witness.

16          THE COURT:  Okay.  You may.

17          (Document tendered.)

18          THE WITNESS:  Thank you.

19          MS. THOMPSON:  Thank you, Ms. Hamilton.

20  BY MS. THOMPSON:

21  Q.  Now, Agent Miranda, you were not an agent when -- with the

22  FBI in 1993, were you?

23  A.  Not with the FBI.

24  Q.  Okay.

25          And this conference in Philadelphia that you've been

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 22 of 121
Miranda - cross by Thompson
202

1  talking about, in fact, took place in October of 1993; isn't

2  that correct?

3  A.  That's correct, ma'am.

4  Q.  And just so the jury is absolutely clear, this conference

5  in Philadelphia -- which we have been talking about for a

6  couple of days now -- took place before the time that Hamas

7  was designated a terrorist organization by the United States;

8  isn't that right?

9  A.  That is correct.

10  Q.  And, so, since you weren't with the FBI in 1993, when the

11  conference took place, it's fair to say that you weren't

12  listening to the conference at the time it took place; is that

13  right?

14  A.  That's correct.

15  Q.  And it would be fair to say, also, that you were not part

16  of any FBI surveillance of the Marriott Hotel in 1993, either,

17  were you?

18  A.  That's correct, ma'am.

19  Q.  And, so -- and you don't -- I think you explained

20  yesterday that you don't really speak Arabic fluently; is that

21  correct?

22  A.  That's correct, ma'am.

23  Q.  And, certainly, in 1993, you didn't even, for lack of a

24  better way to put it, hear Arabic fluently; isn't that

25  correct?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 23 of 121
Miranda - cross by Thompson
203

1   A.   That would be correct.

2   Q.   Okay.

3        And, so, what you are familiar with, sir, is the

4   transcripts of the translations into English of a conference

5   which was pretty much exclusively conducted in Arabic; is that

6   right?

7   A.   Correct.

8   Q.   Okay.

9        And I think you told the jury yesterday that you had

10  read over those translations -- those English translations --

11  of those documents -- that took place in a conference 13 years

12  ago -- that you had read those over a couple times?

13  A.   That's correct, ma'am.

14  Q.   And the conference lasted approximately three days; is

15  that right?

16  A.   That's right, ma'am.

17  Q.   And you know as you sit there that the FBI, in fact,

18  bugged the entire conference 13 years ago; isn't that right?

19  A.   Yes, ma'am.

20  Q.   Now, you have no information whatsoever that Muhammad

21  Salah was present at that Philadelphia conference 13 years

22  ago, do you?

23  A.   No.  He was in jail.

24  Q.   He was in prison, in fact, wasn't he?

25  A.   That's correct.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 24 of 121
Miranda - cross by Thompson
204

1    Q.  And he was under the custody, detention and interrogation

2    of Shin Bet at the Ramallah interrogation center; isn't that

3    right?

4    A.  The Israelis.  I'm not sure Shin Bet or not, but certainly

5    in Israeli custody.

6    Q.  All right.

7            And, so, after reviewing those English translations a

8    couple of times, as you told the jury yesterday, you then came

9    here to Chicago and you have -- with Ms. Hamilton, you went

10   through a number of those translations on direct examination;

11   is that right?

12   A.  That's correct.

13   Q.  And you and Ms. Hamilton didn't go through those

14   translations in order, did you?

15   A.  Actually, yes, we did.

16   Q.  On direct examination --

17   A.  Oh, pardon me.  I didn't --

18   Q.  On direct examination to this jury --

19   A.  No, not --

20   Q.  -- you and Ms. Hamilton -- let me finish my question, sir.

21   A.  Pardon me, ma'am.

22   Q.  On your direct examination by Ms. Hamilton in front of

23   this jury, you did not go through the translations of those

24   three days of conference in order, did you?

25   A.  Correct, ma'am.

Miranda - cross by Thompson

1    Q.  In fact, we would go from Tab 25 to Tab 8 to Tab 11 and

2    sort of jumped all over the book; isn't that fair to say, sir?

3    A.  Yes.

4    Q.  And how many --

5            MS. THOMPSON:  Well, strike that.

6    BY MS. THOMPSON:

7    Q.  And, in fact, you and Ms. Hamilton on direct examination

8    certainly didn't go through all of the English translations of

9    the three days of FBI bugging at the conference, did you?

10   A.  No, we didn't go through all three days.

11   Q.  And how many hours would you estimate that you have spent,

12   either with or without Ms. Hamilton, deciding which parts of

13   this conference and in what order you wanted to present them?

14   A.  There's two questions there.  I think maybe I spent a week

15   going through this.  A solid week.

16           In terms of how much time we've spent deciding what

17   order, she decides the order.  I probably worked with her -- I

18   know I worked with her -- a good five hours last Saturday over

19   a phone and maybe a couple hours here, and that's about it.

20   Q.  All right.

21           And it's fair to say that the process that you went

22   through was to sort of, what we'd call, to cherry-pick which

23   parts of a three-day bugging by the FBI you wanted to present;

24   is that right?

25   A.  No --

Case 1:03-cr-00978  Document 1075  Filed 01/05/09  Page 26 of 121
Miranda - cross by Thompson
206

1          MS. HAMILTON:  Objection.

2     BY THE WITNESS:

3     A.  -- I would disagree.

4     BY MS. THOMPSON:

5     Q.  Now, other than, I believe, at one mention in your direct

6     examination by Ms. Hamilton -- and I've been through these

7     transcripts a number of times, and I think I saw one other

8     mention of the term "jihad" mentioned.

9          There is, in fact -- in three days of FBI bugging,

10    there isn't one word about planning any military activity at

11    that conference, is there?

12    A.  No.  This is not a conference about that.

13    Q.  There is no mention in a three-day conference at the

14    Marriott Hotel of building a military structure, is there?

15    A.  No, there is not.

16    Q.  There is no mention, in a three-day conference -- one word

17    -- about planning any military action, is there?

18    A.  That's correct, ma'am.

19    Q.  There is no mention anywhere in a three-day conference of

20    purchasing any weapons, is there?

21    A.  That's correct, ma'am.

22    Q.  There is no mention anywhere in a three-day conference --

23    which the FBI bugged -- of building any bombs, is there?

24    A.  That's correct, ma'am.

25    Q.  There is no mention anywhere in a three-day conference --

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 27 of 121
Miranda - cross by Thompson
207

1   every moment of which was bugged -- of anything having to do

2   with suicide bombings; is there, sir?

3   A.   That's correct, ma'am.

4   Q.   There is no mention anywhere in a three-day conference of

5   anything having to do with any kind of military purchase, is

6   there?

7   A.   Correct.

8   Q.   And, in fact, there is no mention -- in three days of FBI

9   bugging at the Marriott Hotel in October of 1993, no mention

10  whatsoever -- of even purchasing any kind of ammunition, is

11  there?

12  A.   Correct.

13  Q.   Now, just to be clear, because we don't want the jury to

14  be confused --

15          MS. THOMPSON:   Judge, if we could direct the jury to

16  Tab 23 of the Philadelphia Conference binder.

17          THE COURT:   Please turn to Tab 23.

18          MS. THOMPSON:   On Page 2 --

19          THE COURT:   Page 2 of Tab 23.

20          MS. THOMPSON:   -- of that document, on the first

21  line.

22  BY MS. THOMPSON:

23  Q.   Just because we don't want the jury to be confused, in

24  that first line -- and I'll read -- was this said:

25          "Okay.   The points which were mentioned, our

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 28 of 121
Miranda - cross by Thompson
208

1    brothers, are as follows:  The summary of the issues is what

2    is needed is points, bullets, all of it."

3            Just so the jury is clear, we're talking about

4    talking points here, aren't we?

5    A.  Yes, ma'am.

6    Q.  We're not talking about bullet points coming from a gun,

7    are we?

8    A.  No, ma'am, we're not.

9    Q.  We're talking about, figuratively, the pen rather than the

10   sword, aren't we?

11   A.  We're talking about bullet points.

12   Q.  And we're talking about bullet points which would be found

13   to be issues summarizing a dialogue; isn't that accurate?

14   A.  Yes, ma'am.

15   Q.  Now, there's certainly no mention -- in these entire three

16   days of FBI bugging at the Marriott Hotel, there's certainly

17   no mention -- anywhere about any act of violence contemplated

18   to be committed on American soil, is there?

19   A.  No, I don't think there is.

20   Q.  Now, you did tell Ms. Hamilton on direct examination

21   yesterday afternoon, you said, in answer to her question,

22   "People at the conference talked about destroying Israel's

23   military," didn't you?

24   A.  Yes, I did.

25   Q.  Well, you're aware, aren't you, sir, that Israel has the

1  second most sophisticated and well-armed military in the

2  world, aren't you?

3          MS. HAMILTON:  Objection.

4          THE COURT:  Sustained.

5          MS. THOMPSON:  Judge, I just -- he can answer if he

6  knows or not.

7          THE COURT:  Ms. Hamilton?

8          MS. HAMILTON:  If he knows at the time that this

9  conference was being recorded, I would agree, but not

10  generally.

11          THE COURT:  Yes, rephrase your question.

12          MS. THOMPSON:  Well, I think -- I'll break it down,

13  Judge.

14          THE COURT:  Rephrase your question.

15  BY MS. THOMPSON:

16  Q.  First of all, as you sit there today, are you aware that

17  there has been any significant change in the amount of funding

18  provided by the United States to Israel's military since 1993

19  till today?

20          MS. HAMILTON:  Objection.

21          THE COURT:  Sustained on relevance grounds.

22  BY MS. THOMPSON:

23  Q.  In 1993 -- or -- in 1993, were you aware that the United

24  States, in fact, spent over a billion dollars a year, that

25  they gave to Israel, to fund their military?

Case 1:03-cr-00978  Document 1075  Filed 01/05/09  Page 30 of 121
Miranda - cross by Thompson
210

1           MS. HAMILTON:  Objection.

2           THE COURT:  Sustained on relevance grounds.

3   BY MS. THOMPSON:

4   Q.  Are you aware that in 1993, Israel was the only country to

5   whom the United States gave money that did not have to report

6   at all what they used those expenditures for?

7           MS. HAMILTON:  Objection.

8           THE COURT:  Sustained on relevance grounds.

9   BY MS. THOMPSON:

10  Q.  This was a conference about political issues at an

11  historic juncture for the Palestinian people, wasn't it?

12  A.  I wouldn't characterize it that way.

13  Q.  Well, this wasn't a conference about drug smuggling, was

14  it?

15  A.  No, it was not a conference about drug smuggling.

16  Q.  Was it a conference to do with drug lord territory?

17  A.  No.

18  Q.  It wasn't a conference that had anything to do with the

19  Mafia, was it?

20  A.  No.

21  Q.  It wasn't a conference that had anything to do with

22  gambling, was it?

23  A.  No.

24  Q.  It wasn't a conference that had anything to do with drug

25  cartels, was it?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 31 of 121
Miranda - cross by Thompson
211

1   A.   No.

2   Q.   In fact, this was a conference about trying to get an

3   understanding and support in America for the Palestinian

4   struggle against occupation in the face of the powerful

5   Israeli lobby, wasn't it?

6   A.   No.   I would say that this was a conference about

7   supporting Hamas and aligning the organizations that support

8   Hamas in the United States in light of the Oslo Accords and

9   what they thought the actions were going to be to their

10   organizations, both in the territories, in Israel and in the

11   United States.

12   Q.   This was a political conference, wasn't it?

13   A.   "Political" is a broad term.   This is a conference --

14   Q.   Is it --

15   A.   -- about supporting terrorism.

16   Q.   Was -- sir, didn't you just tell this jury that there was

17   not a word mentioned anywhere, in three days of FBI bugging,

18   about a planned military action at -- any kind of ammunition,

19   bombs or violence, either overseas or on American soil?

20   Didn't you just tell this jury that?

21   A.   I sure did.

22   Q.   Okay.

23          MS. THOMPSON:   Now, if we could direct the jury,

24   Judge, to the Philadelphia conference at Tab 8?

25          THE COURT:   Please turn to Tab 8.

 1          MS. THOMPSON:  And it's at Page 8, Line --

 2          THE COURT:  Page 8, also?  Tab 8, Page 8?

 3          MS. THOMPSON:  Tab 8, Page 8, Judge.

 4          THE COURT:  Okay.

 5          MS. THOMPSON:  And Line -- it's sort of toward the

 6  end of Line 11.

 7  BY MS. THOMPSON:

 8  Q.  Didn't someone at the conference say the following:

 9          "We are not an agent.  We provide services to these

10  people, either by sending monies, spreading their news or by

11  informing them with this and that.  I imagine that 75 percent

12  of our work is for relief and 25 percent concern with the

13  American -- " and the translator has inserted "front."

14  "Should we now work 75 percent for America and 25 percent

15  for -- " and then there's an unintelligible notation.

16          Isn't it true that when they are talking about the

17  current situation, that they are spending -- 75 percent of the

18  efforts of the conference participants are spent on social

19  service relief?  Isn't that accurate?

20  A.  That's correct, ma'am.

21  Q.  And they're saying that 25 percent of their current effort

22  of the participants at the conference is spent trying to lobby

23  in the United States to gain an understanding from U.S.

24  lawmakers about the plight of the Palestinian people; isn't

25  that right?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 33 of 121
Miranda - cross by Thompson
213

1   A.   I think that's one aspect of it.

2   Q.   And what's being suggested here, is it not, is that at

3   this particular historical juncture, people are discussing

4   whether or not -- given the importance and strength of the

5   United States, whether or not -- 75 percent of their effort

6   shouldn't be to try and raise the consciousness of the

7   American people?

8           Isn't that what's being suggested here?

9   A.   I -- I -- think that's just a small aspect of what it is.

10  Q.   Well, the word "front," as inserted on Line 14, that's the

11  translator's word, right?

12  A.   In that particular instance, it is; but, I'm pretty sure

13  it's used by some of the --

14  Q.   And --

15  A.   -- speakers, as well.

16  Q.   I'm asking about that particular instance.

17  A.   Yes, ma'am, in that particular instance.

18  Q.   And that's an FBI translator, right?

19  A.   That's correct.

20  Q.   And that's the FBI translator that you told the jury has

21  the office right across from yours, right?

22  A.   That's correct.

23  Q.   And you're certainly aware, sir, as you sit there, both

24  now and back in 1993, about just how powerful the pro-Israeli

25  lobby in this country is, aren't you?

Case 1:03-cr-00978  Document 1075  Filed 01/05/09  Page 34 of 121
Miranda - cross by Thompson
214

1              MS. HAMILTON:  Objection.

2              THE COURT:  Sustained on relevance.

3    BY MS. THOMPSON:

4    Q.  Now, you said before that you weren't particularly sure

5    about the strength of the Israeli military back in 1993; is

6    that right?

7              MS. HAMILTON:  Objection.

8              THE COURT:  What is the objection?

9              MS. HAMILTON:  I don't know that that was his answer.

10   I don't think that question was actually ever asked or

11   answered.

12             THE COURT:  Overruled.

13             You can answer.

14             The question was:  "You said before."

15   BY THE WITNESS:

16   A.  I don't think I answered that question.

17   BY MS. THOMPSON:

18   Q.  Well, are you aware that in 1993, Israel was and, in fact,

19   remains the second most powerful military in the world?

20   A.  Repeat that, again, one more time.

21   Q.  Were you aware in 1993 that Israel was the second most

22   powerful and sophisticated military in the world?

23             MS. HAMILTON:  I'm going to object to form.

24             THE COURT:  Overruled.

25             You can answer that, if you can, or if you are aware.

Case 1:03-cr-00978  Document 1075   Filed 01/05/09  Page 35 of 121
Miranda - cross by Thompson
215

 1  BY THE WITNESS:

 2  A.  As a military officer in 1993, I would wholeheartedly

 3  disagree with that statement.  There were a lot more powerful

 4  militaries than Israel in 1993 and even now.

 5  BY MS. THOMPSON:

 6  Q.  They were the most sophisticated, besides the United

 7  States, in terms of weaponry; were they not?

 8  A.  No --

 9         MS. HAMILTON:  Objection.

10  BY THE WITNESS:

11  A.  -- I would wholeheartedly disagree with that.

12         THE COURT:  It can stand.  He has answered.

13  BY MS. THOMPSON:

14  Q.  Are they, in fact, funded more heavily by the United

15  States than the entire continent of Africa?

16         MS. HAMILTON:  Objection.

17         THE COURT:  Sustained on relevance.

18  BY MS. THOMPSON:

19  Q.  Now, in the early 1993 -- and that's the same year that

20  the FBI bugged this conference, right?  In 1993?

21  A.  Yes, ma'am.

22  Q.  -- Israel was, in fact, engaged in a major media campaign

23  to stop funding to Palestinians living under occupation,

24  weren't they?

25  A.  I'm not aware of that.

Miranda - cross by Thompson

1    Q.  Well, certainly, you were aware that Israel was engaged in

2    a major media campaign to deflect attention from their summary

3    deportation of 415 Palestinian men in December of 1992,

4    weren't you?

5    A.  I am aware of the 413 individuals from Hamas and

6    Palestinian Islamic Jihad who were deported to Marj al-Zuhur

7    in Lebanon, yes.

8    Q.  And, in fact, that was an act condemned by the United

9    Nations, wasn't it?

10   A.  I think it was.

11   Q.  And that was an act, in fact, highly criticized and

12   initially condemned by the United States, wasn't it?

13   A.  I don't really know the U.S.'s position on that.

14   Q.  And, in fact, Israel's campaign to stop any kind of

15   funding to the Palestinian cause of people living under

16   occupation was a result, sir, was it not, of trying to deflect

17   attention from those illegal deportations, wasn't it?

18   A.  No.  It was my understanding that Israel was trying to get

19   a handle on the terrorism and deported 413 leaders of Hamas

20   and the Palestinian Islamic Jihad.

21   Q.  Is that your understanding in 1993, sir?

22   A.  No, that's -- that's -- my understanding from the work

23   I've done as a result of the Holy Land Foundation, which

24   supported those deportees.  And, in that work, I've reviewed

25   numerous videotapes in their possession that covered that --

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 37 of 121
Miranda - cross by Thompson
217

1   the deportation -- and interviews of the deportees --

2   Q.  So --

3   A.  -- including significant -- can I finish my answer, ma'am?

4   Q.  You may.

5   A.  -- including significant Hamas leaders who were deported,

6   such as Abdel Aziz Rantisi and others.

7   Q.  So, you have chosen, in fact, have you not, sir, in your

8   analysis of the deportations, to take the side of Israel in

9   summary deportations, an act which was, in fact, criticized by

10  the entire world except Israel; and, as you sit there today,

11  you take the position that Israel was simply protecting

12  itself; is that accurate?

13  A.  No.  All I'm doing is --

14  Q.  Thank you.  That was a "Yes" or "No" question, sir.

15          MS. THOMPSON:  Now, I would ask, Judge, if we have

16  them turn in the Search Documents to Tab 5.

17          THE COURT:  Please switch binders and grab Search

18  Documents binder.  Tab 5 in the Search Documents binder.

19          (Brief pause.)

20          THE COURT:  Tab 5.

21  BY MS. THOMPSON:

22  Q.  Now, if I could --

23          THE COURT:  One moment.

24          MS. THOMPSON:  Sorry.  Okay.  I'll listen.

25          THE COURT:  A lot of binders.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 38 of 121
Miranda - cross by Thompson
218

 1           Tab 5.

 2           MS. THOMPSON:  In the first page of that document.

 3           THE COURT:  Okay.

 4           You may proceed.

 5           MS. THOMPSON:  Thank you, Judge.

 6  BY MS. THOMPSON:

 7  Q.  And, on the first page of that document, behind Page 5,

 8  which is enumerated No. 1, does that not say, "The FBI

 9  Assistant Director completely denied -- " or "denied

10  completely that they are investigating or there is any plan to

11  investigate Arabs or Muslims based on the recent Israeli-led

12  media campaign.  The FBI position is that they are not driven

13  by media to instigate an investigation and they are aware of

14  the fact that Israel is doing this to divert attention from

15  the deportees issue.  In addition, it is the right of the

16  people in this country to raise funds."

17           Do you see that --

18  A.  I see --

19  Q.  -- in that document?

20  A.  I see that.

21  Q.  And you're aware of that; aren't you, sir?  You read that

22  for Ms. Hamilton in direct examination yesterday, didn't you?

23  A.  We read that.

24  Q.  And, in fact, there was a media campaign by Israel to

25  deflect attention from the deportations, wasn't there?

Miranda - cross by Thompson

219

1    A.  All I know is what this author wrote with respect to that.

2    Q.  Well, now, there was a meeting that took place on February

3    24th of 1993 between representatives of the IAP and the FBI,

4    wasn't there?

5    A.  Yes, there was.

6    Q.  And, in fact, present at that meeting was Neil Gallagher,

7    who was the Assistant Director of the FBI, isn't he?

8    A.  Not anymore.  That's what it says.

9    Q.  At that time?

10   A.  At that time, ma'am.

11   Q.  And have you seen the corresponding FBI memo, either by

12   Gallagher or someone else in the FBI?

13   A.  I'm not aware that there is one.

14   Q.  Did you make any effort to try and find that, sir?

15   A.  Personally, me, no.

16   Q.  Yes.

17   A.  Other agents did.

18   Q.  Might that have been something you would have been

19   interested in seeing?

20   A.  Other agents did, ma'am.

21   Q.  But as you sit there, you did not; is that accurate?

22   A.  Other agents did, ma'am.

23   Q.  My question is, sir:  Did you make any effort?

24   A.  Did I personally?

25   Q.  Yes.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 40 of 121
Miranda - cross by Thompson
220

1  A.  No, ma'am, I did not personally.

2  Q.  Thank you.

3      Now, I'd like you to turn to Page 2 of that same

4  document.

5      THE COURT:  Page 2.

6      MS. THOMPSON:  Tab 5.

7      THE COURT:  Of Tab 5.

8  BY MS. THOMPSON:

9  Q.  Now, in Page 2 of this document, which I believe you read

10  for Ms. Hamilton yesterday, doesn't it say that the FBI knew

11  that Israel's claim that the U.S. is the base for high-level

12  command leadership in Hamas is just simply part of their media

13  blitz and an exaggeration?

14  A.  That's what the author of this document wrote, yes.

15  Q.  And, again, that's a meeting which took place with the

16  then-Assistant Director of the FBI, Neil Gallagher; isn't that

17  right?

18  A.  That's what's written in this document.

19  Q.  And surely, sir, you know that on February 17th -- which

20  it would have been exactly one week prior to this meeting, but

21  -- with Mr. Gallagher and members of the IAP -- that, in fact,

22  the New York Times ran a front-page story by Judith Miller

23  claiming that Muhammad Salah was a high-level member of Hamas

24  living in the United States; isn't that right?

25  A.  I recall the article.  I don't know if he was referred to

Case 1:03-cr-00978  Document 1075   Filed 01/05/09  Page 41 of 121
Miranda - cross by Thompson
221

1   as a high-level member.  It's been a while since I've read

2   that article.

3   Q.  And, certainly, that was considered and, in fact, was

4   exactly what the Assistant Director of the FBI was claiming

5   was simply media blitz and exaggeration; isn't that right?

6   A.  I don't know if he --

7           MS. HAMILTON:  Objection.

8           THE COURT:  Sustained on foundation.

9   BY MS. THOMPSON:

10  Q.  What is the ADC?

11  A.  Arab Discrimination Council.

12  Q.  And what is that?

13  A.  Sounds like a organization to support Arab rights.

14  Something along those lines.

15  Q.  It's a major national civil rights group advocating on

16  behalf of Arab Americans in the United States, isn't it?

17  A.  I don't know.

18  Q.  You don't -- you don't -- have any interest in knowing

19  what that organization is, sir, in your work?

20  A.  Not unless it's Hamas.

21  Q.  Have you ever met with them?

22  A.  No, I haven't.

23  Q.  Have you ever sought, perhaps, the opinion of the Arab

24  civil rights bar on any of the issues that you address in your

25  work?

Miranda - cross by Thompson

222

1  A.  Actually, I think we have discussed with Arab community

2  members and civil rights leaders from the Arab community.  We

3  do meet regularly.

4  Q.  Well, do you know Craig Nojeim?

5  A.  No, I don't think I do.

6  Q.  Do you know whether other people in your office know him

7  and consult with him?

8  A.  I have no idea.  I'm from Dallas.  This guy could be

9  anywhere.

10  Q.  I'm from Houston.

11       MS. THOMPSON:  Now, if we could turn now to Tab 8 of

12  the Philadelphia Conference binder, Judge.

13       THE COURT:  Please switch binders, ladies and

14  gentlemen.  Go to Tab 8.

15       (Brief pause.)

16       MS. THOMPSON:  And behind Tab 8 in the Philadelphia

17  Conference, I would refer the jury and the Court and the

18  witness to Page 4.

19       THE COURT:  Page 4 of Tab 8.

20       Okay.

21       MS. THOMPSON:  And it's Line 37.

22  BY MS. THOMPSON:

23  Q.  Did someone at the conference say the following:  "First

24  of all, the incident of Muhammad Salah.  I won't linger on it

25  in a narrative way.  But you are all aware of it.  And the

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 43 of 121
Miranda - cross by Thompson
223

1  media has exaggerated it.  The first result, conclusion or

2  lesson from the incident of Muhammad Salah is that bearers of

3  U.S. passports are not above the reach of the law.  But if the

4  issue has to do with -- unintelligible -- they're the same as

5  those who carry an Egyptian travel document or those who carry

6  an Israeli travel document.  It is the same thing in front of

7  Israeli law.  This is something which ought to be taken into

8  consideration."

9         Was that said at the Philadelphia conference?

10  A.  Absolutely.

11  Q.  I would now refer to -- flipping back and forth like

12  this -- the Search Documents at Tab 24.

13         THE COURT:  We are back to Search Documents, Tab 24.

14         (Brief pause.)

15         THE COURT:  Tab 24.

16  BY MS. THOMPSON:

17  Q.  And on that document, under "No. 1," does it not say,

18  "Muhammad Salah-we are not above the law-accuracy-caution"?

19  Is that right?

20  A.  Yes, ma'am.

21  Q.  Is that what's reflected in that document?

22  A.  Yes, ma'am.

23  Q.  Would you say that those are consistent, the message being

24  communicated both at the conference and in that document?

25  A.  Yes, ma'am.

1   Q.  And, in fact, the message being communicated here is that

2   Palestinian Americans are not immune; is that right?

3   A.  No, that's not the message, ma'am.

4   Q.  The conference participant, from what we read, is saying

5   that if you're Palestinian, even if you are an American

6   citizen and want to provide humanitarian assistance to people

7   living under occupation, you are, in fact, subject to summary

8   arrest, interrogation and detention by the Shin Bet and the

9   IDF in Israel; isn't that right, sir?

10  A.  With all due respect, ma'am, you're not even close.

11  Q.  Well, you know that when Muhammad Salah was arrested in

12  January 25th of 1993, he was taken to the Ramallah

13  interrogation facility, wasn't he?

14  A.  I don't know what facility he was taken to.

15  Q.  Well, in fact, he was taken to the Ramallah interrogation

16  facility.  And are you aware, sir, that the reason that Shin

17  Bet and the IDF claim that he was taken to that particular

18  facility was because 26 years prior to that, he had grown up

19  in a refugee camp in the Ramallah district?

20          Are you aware of that, sir?

21  A.  I am not aware of that.

22          MS. HAMILTON:  Objection.

23          THE COURT:  Sustained.

24  BY MS. THOMPSON:

25  Q.  And, in fact, the message is, "Once you're a Palestinian,

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 45 of 121
Miranda - cross by Thompson
225

1   it doesn't matter if you have an American citizenship; you are

2   always a Palestinian in the eyes of Israel," isn't it?

3   A.  With respect to the documents you've asked me about --

4   Q.  "Yes" or "No" question, sir.

5   A.  I don't know.

6   Q.  Now, I'm going to shift a bit to talk about the Oslo

7   Accords.  Okay?

8        Now, the conference participants, as Mr. Spielfogel

9   talked to you about earlier, were very concerned about being

10  labeled terrorists because they were opposed to the Oslo

11  Accords; isn't that accurate?

12  A.  That's one aspect of it.

13  Q.  Kind of like being labeled unpatriotic if you're opposed

14  to the war these days, isn't it?

15  A.  No.  I wouldn't put those analogies together.

16  Q.  Well, they were concerned about Islamists and Muslims

17  being labeled terrorists because they were opposed to the Oslo

18  Accords, though; isn't that right?

19  A.  They were concerned with what was going to happen to

20  Hamas.

21  Q.  The conference attendees were concerned that the Oslo

22  Accords were simply not going to be able to change the

23  horrendous conditions of daily life -- the sewage in the

24  streets -- under which Palestinians were living every day;

25  isn't that right?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 46 of 121
Miranda - cross by Thompson
226

1    A.   They mentioned the sewage.  They mentioned that as a

2    description of the bad condition there.

3    Q.   And the conditions were bad there; isn't that true?

4    A.   I suspect they were.

5    Q.   And they remain bad there; isn't that right?

6    A.   I haven't been there.

7    Q.   You've been to Israel, though, haven't you?

8    A.   Yes, ma'am.

9    Q.   You've been to Israel on a number of occasions, haven't

10   you?

11   A.   I think four times.

12   Q.   Okay.

13        And during the time that you've been to Israel, you

14   never decided that you were going to go visit the occupied

15   territories to see what the situation is like?

16   A.   I drove through the occupied territories, a portion of it.

17   But, otherwise, it's too dangerous.

18   Q.   It's too dangerous and the conditions are just too bad.

19   It wouldn't be where you'd opt to stay, would it?

20        MS. HAMILTON:  Objection.

21        THE COURT:  Sustained.

22        Do not argue with the witness.

23   BY MS. THOMPSON:

24   Q.   And the people at the conference were concerned that the

25   effect of the Oslo Accords would be that the Americans, in

Case 1:03-cr-00978  Document 1075  Filed 01/05/09  Page 47 of 121
Miranda - cross by Thompson
227

1  particular, would believe that the humanitarian crisis would

2  be over and the Americans would turn their back on the plight

3  of the Palestinians; isn't that right?

4  A.  Well, the attendance were -- of the committee were --

5  certainly concerned that --

6  Q.  Is that true, what I've just said?

7  A.  I'm trying to answer your question, ma'am.

8  Q.  My question to you is:  Were the participants at the

9  Philadelphia conference concerned that the Oslo Accords would

10  have the effect of convincing the American public that the

11  humanitarian crisis was over and simply turn their backs on

12  the issue; "Yes" or "No"?

13  A.  No.

14  Q.  Well, the Americans do -- we Americans, would you agree

15  with me, are a media-consuming culture, aren't we?

16  A.  I haven't polled every American.  I could speak --

17  Q.  Well --

18  A.  -- for myself.

19  Q.  -- isn't it fair to say that when the images of

20  suffering -- say, of the Katrina hurricane -- go off the

21  screen and we believe relief has been provided, that we tend

22  to just sort of move on?

23          MS. HAMILTON:  Objection.

24  BY MS. THOMPSON:

25  Q.  Isn't that accurate?

Case 1:03-cr-00978  Document 1075  Filed 01/05/09  Page 48 of 121
Miranda - cross by Thompson
228

1              THE COURT:  Objection to form and relevance

2    sustained.

3    BY MS. THOMPSON:

4    Q.  Well, that's what the people at the conference were

5    concerned about; isn't it, sir?

6    A.  No, it's not.

7    Q.  Well, let's refer to Tab 19 of the Philadelphia

8    conference.

9              THE COURT:  Tab 19 of the Philadelphia conference.

10             MS. THOMPSON:  And it is on Page 1 of Tab 19.

11             THE COURT:  Okay.

12   BY MS. THOMPSON:

13   Q.  Now, I want to ask you about a statement which was read --

14   or, pardon me, which was stated at the Philadelphia

15   conference.

16             And I apologize that I think a couple of these lines

17   were read by Mr. Spielfogel, but I want to give you the

18   context.  Because context is important; is it not?

19   A.  Absolutely.

20   Q.  Right.

21             So, did someone -- one of the participants -- "Ak" --

22   say the following -- and I would direct you to the middle of

23   Line 19 of Page 1.

24             "The second thing is that we must know the future

25   media strategy of the Jews in regard to the media campaign

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 49 of 121
Miranda - cross by Thompson
229

 1   they will launch against us in America and even in Palestine

 2   itself.  It is clear that the main enemy of the agreement

 3   right now is the Islamists.  The other people don't have a

 4   public -- a weight like the Islamists.  And it is clear that

 5   the attack will be on the Islamists.  In their minds, they

 6   have no one else to focus on other than the Islamists.  Not

 7   only do they want a Jew to attack the Islamist, but they also,

 8   the entire world, to march behind them to attack the

 9   Islamists, as well.  This will reflect on us here in America

10   because in the end, we will see that the American media, with

11   the Jewish media in America and Palestine implied in it,

12   discuss these issues.  And we will be forced to respond to an

13   issue wherever one is raised.  All of our positions will be

14   reactions and they won't have -- unintelligible -- what we are

15   expecting to happen, how to prepare for it so that we are not

16   surprised with the unexpected every time.  For example, there

17   was a seminar at George Washington University a week ago about

18   the Middle East process and terrorism.  This was its title.

19   They brought experts from -- er, the Center For Strategic

20   International Studies, from the Near East Policies, from the

21   Israeli Embassy, the military attache and its deputy.  I mean,

22   there was some people who were trying to present the Israeli

23   point of view mostly about how the coming stage will be like.

24   I just want to mention some of the points which they

25   unanimously agreed on, as these will be points we will work on

1    in the future.  For example, instead of saying that terrorism

2    now is -- so that all of you are in the picture, they defined

3    terrorism as anyone who is opposed to the agreement."

4           That's the Oslo agreement; isn't it, sir?

5    A.  Yes.

6    Q.  "You are against peace and a terrorist if you oppose the

7    agreement.  The issue of being opposed to the agreement as a

8    point of view is no longer there with them.  You are against

9    peace.  If you are opposed to peace, it means it is okay to

10   slaughter you in any suitable manner they deem fit.  They're

11   trying to discuss this issue and how they are going to present

12   it to the media in the future, in order to discredit those who

13   are opposed to peace.  And the important party they talk about

14   is -- they didn't ask it like us.  They say Hossam and stuff.

15   They are saying Hamas is our main goal in the next stage.

16   (Laughter).  "So -- "

17          Unidentified male says:  "You're quoting them?"

18          "Ak:  Yes.  That is what they said.

19          "Sh:  Quote-unquote.  He is quoting them.  Don't you

20   hear them?

21          "Ak:  They came up with some points, some of which is

22   that the near future will witness terrorism against the

23   Palestinians.  There was almost complete accord that in the

24   next stage the Jews are used to terrorism.  It is not

25   something strange to them.  And the Americans are --

1   unintelligible -- and they deal with it.

2          "But the Palestinian people -- the new arriving

3   government is not used to terrorism and doesn't know how to

4   deal with terrorism.  It still doesn't have the experiences to

5   deal with terrorism -- " there's unintelligible brief group

6   talk at that point " -- against the agreement in Palestine.

7   Therefore, it is something we ought to be ready for from now.

8   There is always -- unintelligible -- how to address even the

9   Americans and tell them that so -- " "those who oppose the

10  agreement do not oppose peace, for instance.  We should

11  address the American mentality, which is one of their

12  convictions they always preach saying that, for instance, the

13  people who accepted the agreement and signed the agreement

14  didn't get an authorization from the people, nor did they get

15  an authorization from its organizations.  I mean, some things

16  like that, in order to give credibility to the people who

17  oppose the agreement from now.  You don't wait until the

18  self-rule takes place and, then, say, 'By God, we are against

19  the self-rule because it is not legal and stuff.'  No.  You

20  work on it from now in your media, so that you give -- so that

21  you prepare for the future opposition of the self-rule which

22  is about to take effect.  You have to defend it as a real

23  target, as the real target is the Islamic movement over there.

24  This is the first thing.  The second thing which must be

25  focused on is that we must attempt to improve the living

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 52 of 121
Miranda - cross by Thompson
232

1   conditions of the Palestinians."

2        Was that said at the Philadelphia conference, sir?

3   A.  Yes, ma'am.

4   Q.  Now, the conference participants were concerned that the

5   Oslo Accord was going to put a corrupt puppet government led

6   by Yasir Arafat and the PLO, as you mentioned, in power to

7   enforce the occupation under the guise of self-rule; isn't

8   that right?

9   A.  I think that's only partly correct, ma'am.

10  Q.  Well, let's turn to Tab 5 of the Philadelphia conference.

11        THE COURT:  Please turn to Tab 5 of the Philadelphia

12  Conference Transcripts binder.

13  BY MS. THOMPSON:

14  Q.  And while people are finding their place at Page 5, when

15  the term "Jews" is used in the context of the Philadelphia

16  conference, it's simply the way that people refer to Israelis

17  in the same way that you have said "Islamists" or "Muslims,"

18  isn't it?

19  A.  No, not necessarily.

20  Q.  But, in this instance, sir, there is nothing derogatory

21  about the use of the word "Jews" as a religion in any instance

22  in here other than to represent the position of the Israeli

23  government; isn't that right?

24  A.  I think you'd have to ask a participant what they had in

25  mind when they used that term.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 53 of 121
Miranda - cross by Thompson
233

1    Q.  Okay.

2            So, if we are now at Tab 5 of the Philadelphia

3    conference at Page 8 --

4            THE COURT:  Page 8 of Tab 5.

5            MS. THOMPSON:  And Line 20 on that page.

6    BY MS. THOMPSON:

7    Q.  Did the person identified as "Om" -- and I would refer

8    people to the beginning page; I won't go back to the names

9    here -- say the following at the Philadelphia conference:

10           "There is an article -- someone wrote about the facts

11   of the agreement.  An Israeli, Dr. Israel Shabib, you know him

12   -- unintelligible.  He wrote a 13-page article in which he

13   analyzes the issue.  I read it.  He is saying that the current

14   situation -- the signed agreement -- is the worst thing to

15   happen to Palestinians.  The Jews will now give Arafat what he

16   wants since he has now become like King Hussein or --

17   unintelligible.  They're not planning to hold elections.  The

18   whole thing is all lies, the elections things.  They don't

19   want to have elections in the first place.  They want Arafat

20   to remain -- unintelligible.  Then he is saying that the

21   deportations was conducted by a joint operation between the

22   Israeli Intelligence and Arafat and the Palestinian Liberation

23   Organization.  There were intelligence meetings and the first

24   aspect to have coordination between Jews and Arafat was

25   through intelligence.

Miranda - cross by Thompson

234

1              "Sh:  Really!

2              "Om:  It is an incredible article by an Israeli."

3              Is that right, Agent?

4    A.  That's what they're saying.

5    Q.  Then another -- well, unintelligible.  Then Om says, "No,

6    before that.  He was saying that this was before the

7    deportation process.  I mean, he is saying that the

8    deportation was planned by both sides or at least it was

9    approved by two sides."

10             The unidentified male says, "Oh, you mean the

11   Palestinian Liberation Organization approved it?

12             "Om:  The Palestinian Liberation Organization

13   approved it along with Israel."

14             Were those words said at the Philadelphia conference,

15   sir?

16   A.  Yes, they were.

17   Q.  Now, the conference participants were concerned that the

18   PLO -- the Palestinian Liberation Organization -- and Israel

19   were going to effectuate brutal oppression on the Muslims and

20   their widespread social service work as a result of the Oslo

21   Accords; isn't that right?

22   A.  No, it was Hamas.

23   Q.  Now, you say "Hamas," but when we talk about Hamas, sir,

24   isn't it accurate that Hamas is, in fact, a broad-based social

25   movement?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 55 of 121
Miranda - cross by Thompson
235

1    A.   It's a terrorist group with a social wing.

2    Q.   In fact, it supports the social services, the life

3    services of thousands upon thousands of people living in the

4    occupied territories, doesn't it?

5    A.   It is a -- it has a --

6    Q.   That is a "Yes" or "No" question, sir.  Please answer my

7    question so that the jury can understand the answer to my

8    question.

9    A.   Please repeat your question.

10   Q.   My question is:  Is Hamas provide needed social services

11   to thousands of people in the occupied territories; "Yes" or

12   "No"?

13   A.   Yes.

14   Q.   Now, if I could direct you to Tab 6 --

15        THE COURT:  Please turn to Tab 6.

16   BY MS. THOMPSON:

17   Q.   -- of the Philadelphia conference binder, and Page 16 of

18   Tab 6.

19        THE COURT:  Page 16 of Tab 6.

20   BY MS. THOMPSON:

21   Q.   Now, looking at Line 7 on Page 16 beginning there, did

22   someone referred to as "Ga" -- and just for reference, the

23   names are included in the front of this binder; is that right?

24   A.   Correct, ma'am.

25   Q.   Did someone named "Ga" then say the following:

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 56 of 121
Miranda - cross by Thompson
236

1    "Therefore, retaliation will be widespread against our

2    individuals, our organizations, our supporters, our mosques,

3    our presentations, our media, our boys, our girls, our women,

4    our relationship with our brothers in the other Arab

5    countries.  All of these will be affected, unfortunately, in a

6    negative way at least in the first phase.  The --

7    unintelligible -- is that we ought to look at matters keeping

8    in mind that we are at an historical crossroads."

9           Is that what "Ga" said at the Philadelphia

10   conference?

11   A.  Yes, ma'am.

12   Q.  Now, many scholars at major universities across the world

13   have, in fact, opined that Oslo was, in fact, calculated to

14   preclude the existence ever of a viable, functioning

15   Palestinian state; isn't that right?

16   A.  I have no idea.

17   Q.  Well, are you familiar with the scholarly opinions of the

18   late Edward Sa'id?

19   A.  I'm familiar with Edward Sa'id as the author of

20   Orientalism and some other books; but, no, I'm not familiar

21   with that opinion.

22   Q.  Are you familiar with the opinions on the subject of the

23   Oslo Accords from Dr. Sara Roy at Harvard?

24   A.  No.  I am familiar with Dr. Sara Roy as a author of Middle

25   Eastern and Central Asian studies, but I'm not familiar with

Miranda - cross by Thompson

237

1   that opinion.

2   Q.  In fact, Dr. Sara Roy has spent many, many years living in

3   Gaza and studying the economic conditions and conditions of

4   daily life in Gaza.  You're not familiar with that?

5   A.  No, I'm not.

6   Q.  Are you familiar with the research and opinions regarding

7   the calculated failure of the Oslo Accords of Rashid Khalidi

8   at Columbia University?

9   A.  I'm not familiar with that.

10  Q.  Are you familiar with the opinions of Professor Glenn

11  Robinson at the Naval Postgraduate School that Oslo was

12  calculated, in fact, to fail and to get the world to forget

13  about the plight of the Palestinian people?

14  A.  Dr. Glenn Robinson was my professor for my thesis work at

15  the Naval Postgraduate School.  And I am familiar with him as

16  a Palestinian expert, but I do not know his opinion on that.

17  Q.  Okay.

18          And he is, in fact, very much an expert on the

19  subject of the Palestinian-Israeli conflict; is that accurate

20  to say?

21  A.  That's what I understand.

22  Q.  And, surely, you know that the Oslo Accords left open

23  entirely the issue of the right of Palestinians to return to

24  their homeland, aren't you?

25  A.  I'm not -- as I said yesterday, I'm not -- an expert on

Miranda - cross by Thompson

238

1   the Oslo Accords.  I'm a counter-terrorism guy.

2   Q.  Kind of a singular tunnel vision kind of focus; is that

3   fair to say?

4   A.  No, I wouldn't say that at all.  I would just --

5   Q.  Well, you're not familiar with -- you're not an expert on

6   the Oslo Accords, right?

7   A.  I'll admit that.

8   Q.  And, yet, you're coming in here and you gave an opinion on

9   cross-examination that you're convinced that the reason that

10   the Oslo Accords failed is all because of Hamas' opposition,

11   right?

12   A.  Well, I think Hamas had a big part to do with it.  I think

13   --

14   Q.  Well --

15   A.  -- anybody --

16   Q.  -- if you're not an expert on the Oslo --

17   A.  I'm sorry, I wasn't done with my answer.

18          THE COURT:  Ms. Thompson, give him a chance to finish

19   his answer.

20   BY THE WITNESS:

21   A.  I was gonna say that I think anybody reading the paper

22   would see that the violence supported by Hamas and other

23   groups opposed to the Oslo Accord was a major factor in

24   undermining any credibility and in eroding the confidence of

25   the Israeli government with the Palestinian Authority to work

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 59 of 121
Miranda - cross by Thompson
239

1   together.

2   BY MS. THOMPSON:

3   Q.  So, you got your information --

4   A.  It was effective.

5   Q.  -- from the media on why Oslo failed; is that accurate to

6   say?

7   A.  I've probably read some intelligence reports along the

8   way; but, yeah, I'm gonna say the media, in general.

9   Q.  But it's fair to say what you have focused on -- and I

10  think you've said this about five times already -- is you

11  focused on simply Hamas' relationship to the Oslo Accords?

12  A.  No.  What I focus on is Hamas in the United States.

13  Q.  Okay.

14        But with regard to your opinions that you've given

15  here about the Oslo Accords, your opinion is you're a Hamas

16  guy; that's what you study; that's what you look at; and, it's

17  your opinion that they caused Oslo to fail; is that right?

18  A.  Well, I'm a -- I'm a -- counter-terrorism agent, not just

19  Hamas.  But, yes, that is my opinion.

20  Q.  Okay.

21  A.  That I think Hamas was a significant factor in the failure

22  of the Oslo Peace Accords.

23  Q.  But it's fair to say that you haven't studied a number of

24  Israeli scholars' opinions on why Oslo failed, right?

25  A.  Correct.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 60 of 121
Miranda - cross by Thompson
240

1  Q.  You haven't read Sara Roy's article on the post-mortem of

2  the Oslo Accords, have you?

3  A.  No, I haven't.

4  Q.  And it's fair to say that you think maybe one of the

5  reasons the Oslo Accords could have failed was because Prime

6  Minister Rabin was assassinated by an Israeli?

7  A.  That could be an aspect of it.

8  Q.  Okay.

9       And have you studied the effect on the failure of

10  Oslo by the violence of the Israelis, including that of Baruk

11  Goldstein?

12  A.  No.

13  Q.  But you certainly must be aware that the Oslo negotiations

14  entirely left out the question of Jerusalem?

15       MS. HAMILTON:  Objection.  He's already stated

16  numerous times that he's not an expert on what precisely is in

17  the Accords.

18       THE COURT:  He has said he is not an expert.

19       You can answer --

20       MS. THOMPSON:  But he --

21       THE COURT:  -- that question.  If you are aware or

22  not --

23       MS. THOMPSON:  Yes.

24       THE COURT:  -- is the question.

25       MS. THOMPSON:  That's what I am asking because it

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 61 of 121
Miranda - cross by Thompson
241

1    seems to vacillate.

2    BY THE WITNESS:

3    A.  I think Jerusalem was left out.  I am not certain of that

4    factor.

5    BY MS. THOMPSON:

6    Q.  Okay.

7         And Oslo also -- at no point did it recognize any

8    right, under international law, of the Palestinians to even

9    one inch of land, did it?

10   A.  Can you rephrase that, please?

11   Q.  Did Oslo recognize, as a matter of international law, that

12   the Palestinians were entitled to any land?

13   A.  I don't know the answer to that.

14   Q.  Okay.

15   A.  That's a complex question.

16   Q.  And Oslo did not at all address the issue of Israeli

17   settlements, did it?

18   A.  I am not certain of the settlement issue.

19   Q.  Now, in fact, are you aware as you sit there today that

20   during the period of Oslo, the number of Israeli

21   settlements -- people deliberately sanctioned by the Israeli

22   government to move on to disputed lands -- doubled during that

23   period?

24         MS. HAMILTON:  Objection.

25         THE COURT:  Sustained.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 62 of 121
Miranda - cross by Thompson
242

1    BY MS. THOMPSON:

2    Q.  Are you aware that the number of settlements doubled

3    during the period of the Oslo Accord --

4             MS. HAMILTON:  Objection.

5    BY MS. THOMPSON:

6    Q.  -- negotiations?

7             MS. HAMILTON:  Relevance.

8             THE COURT:  You can answer, if you are aware.

9    BY THE WITNESS:

10   A.  I'm not aware, ma'am.

11   BY MS. THOMPSON:

12   Q.  Now, you know as you sit there today that it was, in fact,

13   Israel that wanted the United States to bug the Philadelphia

14   conference, don't you?

15   A.  No, I have no idea of that.

16   Q.  It was Israel that convinced the FBI, in fact, to trod

17   upon the rights of the First Amendment to discuss political

18   issues --

19            MS. HAMILTON:  Objection.

20   BY MS. THOMPSON:

21   Q.  -- isn't that right?

22            THE COURT:  Sustained.

23   BY MS. THOMPSON:

24   Q.  Well, would you agree with me that the Israeli-Palestinian

25   conflict is a topic of public concern and public debate?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 63 of 121
Miranda - cross by Thompson
243

1    A.   Yes.

2    Q.   Would you agree that it is one worthy of debate and

3    dialogue?

4    A.   Yes, if done legally.

5    Q.   Would you agree with me that people have a right to

6    discuss their opinion on government policies in their country?

7    A.   Yes, if done legally.

8    Q.   Do you believe that people have a right to gather and

9    discuss these issues?

10   A.   Yes, if done legally.

11   Q.   And because you continue to throw in that phrase "if done

12   legally," can we remind the jury that nowhere in three days of

13   FBI bugging was there one word about planning a military

14   action, sir?  Not one word, was there?

15   A.   Correct.

16   Q.   And you know as you sit there that, in fact, the United

17   States shared the information gathered in October of 1993 with

18   Israeli security agencies, aren't you?

19   A.   No, I'm not aware of that, ma'am.

20   Q.   Well, is it your position that the FBI did not give the

21   information at the Philadelphia conference to the Israelis?

22   A.   Ma'am, I am not aware what the FBI did with this

23   particular information relative to the Israeli government.

24   Q.   Well, you certainly know that Shin Bet uses the

25   information provided by the U.S. in this intelligence

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 64 of 121
Miranda - cross by Thompson
244

1   gathering, don't you?

2          MS. HAMILTON:  Objection.

3          THE COURT:  Sustained.

4   BY MS. THOMPSON:

5   Q.  They use it in their interrogations, don't they?

6          MS. HAMILTON:  Objection.

7          THE COURT:  Sustained.

8   BY MS. THOMPSON:

9   Q.  Well, certainly, you're aware that when the Israelis

10  create bird documents, they use information provided to them

11  from the Americans about the identity and affiliations of

12  people here, don't they?

13         MS. HAMILTON:  Objection.

14         THE COURT:  Sustained.

15  BY MS. THOMPSON:

16  Q.  Well, people here who go to a conference, as

17  Mr. Spielfogel pointed out in his cross-examination, gave

18  their names and identities at the door of the hotel, didn't

19  they?

20  A.  They sure did.

21  Q.  Credit card numbers?

22  A.  They sure did.

23  Q.  Airline information?

24  A.  No, they didn't give their airline information, but

25  there's airline information available.

Miranda - cross by Thompson

1   Q.  There is airline information, though?

2   A.  Available, yes, ma'am.

3   Q.  Was anything at all, to your knowledge, done illegally to

4   set up the Philadelphia conference?

5   A.  Illegally to set it up?  I think that's debatable.

6   Q.  Okay.

7         Well, nobody used fake names, to your knowledge; is

8   that right?

9   A.  Wasn't necessary.

10  Q.  In fact, they didn't -- to the extent that somebody's

11  identified as "last name unknown" or "unidentified male," it's

12  simply because the FBI wouldn't go in there, knock on the door

13  and say, "Could you give me your name?"  Because they probably

14  would have given it, wouldn't they?

15  A.  I seriously doubt that.

16  Q.  Well, you don't have any information that they would not

17  have, would you?

18  A.  You asked me an opinion and I just gave you an opinion.

19  Q.  Okay.

20        THE COURT:  Ms. Thompson, roughly how much more do

21  you have?

22        MS. THOMPSON:  Just a few minutes, Judge.

23        THE COURT:  Okay.

24        I am just trying to decide timing of the break.

25        MS. THOMPSON:  Okay.  It shouldn't be too much

Case 1:03-cr-00978  Document 1075  Filed 01/05/09  Page 66 of 121
Miranda - cross by Thompson
246

1    longer.

2            We can take a break now.

3            THE COURT:  Okay.

4            Let us take our first break.

5            (Jury out.)

6            THE COURT:  Let us pick up in about 15 minutes.

7            (Brief recess.)

8            (Jury in.)

9            THE COURT:  You may be seated.

10           Ms. Thompson, you may proceed.

11           MS. THOMPSON:  Thank you, Judge.

12   BY MS. THOMPSON:

13   Q.  One thing I neglected to ask you, Agent, when we were

14   talking about the Oslo Accords is that, certainly, you know

15   that Farouk Kaddoumi, the second under Arafat and one of the

16   founders of the Fatah party, in fact, opposed the Oslo Accords

17   from its inception until today?

18   A.  I'm not familiar with that.

19   Q.  Now, as you sit there, you are aware that information is

20   exchanged on intelligence matters between the United States

21   and Israel, aren't you?

22   A.  I'm aware of that.

23   Q.  Okay.

24           And as you sit there, you know that Israel gives

25   information that it gathers in its interrogations by Shin Bet

Miranda - cross by Thompson

247

1    and other agencies to the United States, don't you?

2    A.   I'm aware of an exchange of intelligence information on --

3    Q.   Okay.

4    A.   -- terrorism matters, yes, ma'am.

5    Q.   And you know that Israel, in fact, provided in this case

6    the statements obtained by Shin Bet of Mr. Salah, aren't you?

7    A.   Yes, ma'am.

8    Q.   And you're aware that Israel provided in this case the

9    Shin Bet-authored interrogation logs, right?

10   A.   I don't know about the description of "Shin Bet authored."

11   I just understand that the interrogation was provided as part

12   of a extradition package on Mousa Abu Marzook.

13   Q.   Okay.

14        And those materials were provided in the Marzook

15   litigation, right?

16   A.   I'm not actually familiar with them from the Marzook

17   litigation.  We found them elsewhere.

18   Q.   Okay.

19        But, certainly, those documents originated in Israel,

20   didn't they?

21   A.   Yes, ma'am.

22   Q.   And they were supplied by Israel for use by the United

23   States in American courtrooms; is that right?

24   A.   That's correct, ma'am.

25   Q.   Okay.

Miranda - cross by Thompson

1          And are you -- you're certainly aware that in this

2    case -- and, perhaps, others with which you are familiar --

3    that the State of Israel sends agents with code names to help

4    the prosecution prove their case, right?

5    A.  I am aware that we've had some agents recently testify in

6    terrorism matters in U.S. courts.

7    Q.  Okay.

8          And you know as you sit there that, in fact, this is

9    a cycle of information between the United States and Israel

10   which is really attempting to launder Israeli torture; isn't

11   that right?

12   A.  That is a ridiculous statement.

13   Q.  And, in fact, it's really a kind of rendition, isn't it?

14   A.  I would not characterize that as a rendition.

15   Q.  Well, certainly, you would agree with me that there is a

16   cooperative investigative and intelligence joint relationship

17   between the United States and Israel, isn't there?

18   A.  The United States and Israel do cooperate on terrorism

19   matters that are of interest to the national security of both

20   countries.  That's correct, ma'am.

21   Q.  And, in fact, you, yourself, have shared information with

22   Israeli intelligence service people, haven't you?

23   A.  I don't know if I can discuss what I've done with the

24   Israeli government, ma'am.

25   Q.  Well, have you met with them before?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 69 of 121
Miranda - cross by Thompson
249

1    A.  I have.

2    Q.  And you've met with them on certainly more than one

3    occasion; isn't it fair to say?

4    A.  That -- it's correct, ma'am.

5    Q.  You've met with them on a number of occasions; isn't that

6    true?

7    A.  Probably at least four.

8    Q.  Okay.

9         And you've met with how many different Israeli

10   intelligence officers in your career?

11        MS. HAMILTON:  Objection.

12        THE COURT:  Sustained.

13   BY MS. THOMPSON:

14   Q.  Well, in fact, Agent, you are aware as you sit there today

15   that this case, with all of this old evidence generated in

16   Israel 13 years ago, is a test case to see whether a strategy

17   of laundering Israeli torture is going to work in an American

18   courtroom, isn't it?

19   A.  Wrong.

20        MS. THOMPSON:  No further questions.

21        THE COURT:  Redirect?

22        MS. HAMILTON:  Yes, your Honor.

23        MS. THOMPSON:  I will advise Ms. Hamilton I didn't

24   spill the water.

25        (Laughter.)

1          THE COURT:  Is there water up there?

2          MS. THOMPSON:  It was there when I got here.

3          I think I have a napkin.

4          (Brief pause.)

5                    REDIRECT EXAMINATION

6  BY MS. HAMILTON:

7  Q.  Agent Miranda, you were just asked some questions about

8  cooperation between the FBI and agents of Israel, correct?

9  A.  Yes, ma'am.

10 Q.  Does the FBI work with agents of countries throughout the

11 world who are concerned about fighting terrorism?

12 A.  Regularly.

13          MS. THOMPSON:  Objection.  Relevance to this case,

14 Judge.

15          THE COURT:  Overruled.  It is redirect in direct

16 response to cross.

17 BY MS. HAMILTON:

18 Q.  And you --

19          MS. HAMILTON:  I just want to make sure the answer

20 got out.  I think it was muffled by the objection.

21          THE COURT:  The answer was:  "Regularly."

22 BY MS. HAMILTON:

23 Q.  And you were asked about your knowledge that Israel sent

24 agents here to testify, correct?

25 A.  Yes, ma'am.

Miranda - redirect

251

1    Q.  Is it your understanding that this is the first time

2    Israel has ever sent agents to testify for a U.S. case?

3    A.  Yes, ma'am.  It's a very difficult and rare process.

4    Q.  You were asked a number of questions about your

5    understanding of the Philadelphia conference?

6    A.  Yes, ma'am.

7    Q.  What is your understanding of what was happening at the

8    Philadelphia conference?

9           MR. MOFFITT:  I'm going to object.

10          MS. THOMPSON:  Objection.

11          THE COURT:  Give --

12          (Laughter.)

13          MR. MOFFITT:  Sorry.

14          His understanding is not relevant.

15          MS. HAMILTON:  I did not elicit his understanding on

16   direct examination.  It was elicited through a number of

17   questions on cross-examination.

18          THE COURT:  Objection --

19          MS. THOMPSON:  Judge, I believe that the questions we

20   asked was what was said during the course of the Philadelphia

21   conference.  And he was not tendered for any other reason.

22   And I think he said he's completely unfamiliar other than

23   having read through it a couple of times.

24          THE COURT:  There were questions regarding his

25   understanding.

1            You may answer that question.

2            THE WITNESS:  Yes, ma'am.

3    BY THE WITNESS:

4    A.  Here's my understanding.

5            The Philadelphia conference, as Omar Ahmad states in

6    the introduction, is a meeting of the Palestine Committee.

7    The Palestine Committee, at least partially, is described in

8    Ashqar Document 185, I believe, the Palestine six important

9    numbers in the United States.  The top name:  Mousa Abu

10   Marzook, current number two man in Hamas.

11           We can go through the list if you like and I'll point

12   out other Hamas members.  But, in fact, it's even Omar Ahmad,

13   head of Hamas in the United States -- recognized by the FBI as

14   the head of Hamas in the United States -- who gives those

15   introductory remarks.

16           The cover position, as stated by Shukri Abu Baker,

17   the head of the now specially-designated group the Holy Land

18   Foundation, is that this is a meeting between the IAP and the

19   HLF --

20           MR. MOFFITT:  I object.

21   BY THE WITNESS:

22   A.  -- in case anybody asks.

23           MR. MOFFITT:  I object.

24           May we come to side, please?

25           THE COURT:  Yes.

1          (Proceedings had at sidebar:)

2          MR. MOFFITT:  In 1993, when this meeting occurred,

3   the Holy Land Foundation was not a specially-designated

4   terrorist organization.  So, it has absolutely no relevance to

5   what was going on in 1993.

6          Secondarily, I think it's now time for an instruction

7   to the jury regarding mere membership in an organization,

8   because this person is taking the position from the witness

9   stand that it is enough -- mere membership in Hamas is

10  enough -- to create a situation that makes something illegal.

11  He's tried to say that this meeting was illegal in answer to

12  Erica's questions.  And that's not appropriate.  And this

13  jury, I believe, now needs to be informed that they've got to

14  go beyond membership in proving this case.

15         MS. HAMILTON:  I totally disagree with that.

16         THE COURT:  Take both the objection and the

17  instruction.

18         And I will tell you now, I do not think it is

19  appropriate to instruct at this point.  I will instruct them

20  on the law at the end of the case, after they have heard all

21  of the evidence, to the extent that there is not a successful

22  Rule 29 motion.

23         MS. HAMILTON:  Agent Miranda was asked a series of

24  questions about his understanding of the purpose of the

25  meeting.  I am asking the same question.

1          His understanding is based on a number of things.

2     The questions on cross were not, "Based upon your review of

3     the transcripts, what is your understanding of this part or

4     this part of the meeting or the purpose of the meeting?"

5     Because of that, he should be entitled to give his

6     understanding based on whatever his understanding is based on,

7     whether it was current in 1993 or it's based on what he now

8     knows, based upon further investigation of things that have

9     been illuminated about HLF or the people who were present at

10    the meeting.

11          MR. DEUTSCH:  Judge, you think that there were

12    questions asked about his understanding --

13          THE COURT:  There were.

14          MR. DEUTSCH:  -- and the purpose of the meeting.  I

15    don't recall that.

16          THE COURT:  There definitely were, because I was

17    waiting for the government to object and they did not.

18          MR. DEUTSCH:  Well, be that as it may, I don't think

19    it's proper for him to get up and give just, like, a narrative

20    answer which throws in stuff that happened in 2001 --

21          MS. THOMPSON:  He will be on the stand four more

22    days.

23          MR. DEUTSCH:  -- what he knows from his work as an

24    FBI agent ten years later, referring to wiretaps and video.  I

25    mean, that's ridiculous.  He should just give an answer, "I

1  think it's X, Y, Z."  He's not supposed to give a speech up

2  there.

3        THE COURT:  He is going beyond the scope of your

4  question, what is his understanding.  You should focus him

5  more.  The Philadelphia conference was a long event.  He was

6  just going on and on.  So, you can focus him more on specific

7  aspects, if you want.

8        I think he has answered the question, at least in

9  part.  But a long narrative speech is not appropriate.

10        But I do think the questions -- "What is your

11  understanding?" -- based on the door being opened on cross are

12  appropriate.

13        MR. DEUTSCH:  But here's what I'm concerned about.

14  As you said, he gave a long answer already.  What more --

15        THE COURT:  He was stopped, but --

16        MR. DEUTSCH:  Well, can you strike the answer -- the

17  part of the answer -- that goes beyond that?

18        I don't think she should ask another question which

19  gives him a chance to make a further answer.

20        MS. THOMPSON:  It's also the idea that he is starting

21  to talk about information about the Holy Land Foundation,

22  which is not in this indictment, has nothing to do with this

23  indictment, is completely one to subsume -- it could keep him

24  on the stand two or three more days -- and bring up profound

25  discovery issues in this case, about that litigation and those

1  prosecutions.

2          MS. HAMILTON:  Judge, the Holy Land Foundation --

3          MS. THOMPSON:  He's answered it.

4          MS. HAMILTON:  -- is represented by people at the

5  Philadelphia conference.

6          THE COURT:  Right.

7          MS. HAMILTON:  There have been questions about the

8  Holy Land Foundation that there have been insinuations this

9  was just people getting together to talk about charity.  He

10  should absolutely be able to talk about what the Holy Land

11  Foundation is, from his understanding.

12          MR. SPIELFOGEL:  Your Honor, one other thing.

13          THE COURT:  Yes.

14          MR. SPIELFOGEL:  The questions that we asked were

15  what his understanding was as to specific questions.  Nobody

16  on cross --

17          THE COURT:  Which is why I just told her to go back

18  and focus her questions.

19          MR. MOFFITT:  Your Honor, for purpose of the record,

20  I renew my objection with regard to the First Amendment

21  aspects of the Philadelphia meeting; that this was clearly a

22  meeting where people discussed political views; that the

23  entire meeting was about political views.  There is not one

24  statement, by the terms of this witness' testimony, concerning

25  violent activity or violence or anything like that --

 1           MS. THOMPSON:  And that's --

 2           MR. MOFFITT:  -- anywhere.

 3           And the First Amendment allows the American Nazi

 4  Party to have that kind of a meeting.  The First Amendment

 5  allows the Ku Klux Klan to have that kind of a meeting.  What

 6  is it different about these people that they can't have that

 7  same kind of meeting?

 8           MR. SCHAR:  You can have a meeting.  That doesn't

 9  make it any less incriminating.  The issue is not whether you

10  are allowed to get up -- defendant Salah has a right to

11  confess if he wants.  He has a First Amendment right to do it.

12  It doesn't make it any less incriminating.  And that's the

13  issue.

14           MR. MOFFITT:  It's not incriminating --

15           THE COURT:  You know what?  Wait, counsel.

16           You have made your record.  I have addressed the

17  issue already.

18           MR. DEUTSCH:  Can I just make one suggestion?

19           THE COURT:  Brief.  You can make a suggestion.

20           MR. DEUTSCH:  Yeah.

21           Can you strike the question and answer and ask her to

22  rephrase it; and, then, that will give a chance to --

23  otherwise, we're going to just repeat what he's already said.

24           THE COURT:  No, I am not going to do that, because he

25  did answer, generally, what his understanding of the

1    Philadelphia conference was.

2            I am directing her, though, that if she asks any more

3    "understanding" questions, that they be more focused.

4            (Proceedings had in open court:)

5            THE COURT:  Ask your next question.

6    BY MS. HAMILTON:

7    Q.  Agent Miranda, you were asked a question about the

8    conference attendees being concerned that they were not going

9    to be able to change the conditions of daily life.  And you

10   said that was part of your understanding, correct?

11   A.  Correct, ma'am.

12   Q.  What is the full part of your understanding to that

13   question?

14   A.  The participants were concerned that with the takeover or

15   the establishment of the --

16           MR. MOFFITT:  Objection.  Rule 704(b).

17           THE COURT:  Overruled.

18   BY THE WITNESS:

19   A.  -- with the establishment of the Palestinian Authority

20   coming into power, that their organizations -- their Hamas

21   fronts in Gaza and the West Bank -- were going to be closed

22   down.  That was one aspect of it.

23   BY MS. HAMILTON:

24   Q.  And you were asked a number of questions about the fact

25   that there was no planning of any military activity at this

Miranda - redirect

259

1   meeting, right?

2   A.  Correct, ma'am.

3   Q.  And in your answer to that question, you still classified

4   this meeting as a conference about terrorism?

5   A.  That's correct, ma'am.

6   Q.  Even though there was no discussion about military

7   activity, why do you classify this as a conference about

8   terrorism?

9   A.  Well, as Ms. Thompson was correct in her question to me,

10  Hamas has a very well-established social wing.  The social

11  wing is an integral part of Hamas' operations, just as it is

12  with other terrorist organizations, such as Hizballah.

13          The social wing is -- is -- what gives life to the

14  Hamas movement.  That's how Hamas is able to recruit so well.

15  That's how come they have so much support.  That's how --

16  that's why they're able to do the things they're able to do:

17  Because they go ahead and provide social services, from the

18  kindergartens to the hospitals.  If you support Hamas, Hamas

19  is going to support you.

20  Q.  And were the organizations that were represented -- what's

21  your understanding of the organizations and the people who

22  were actually present at the meeting, what their relationship

23  is to Hamas?

24  A.  Right.  Well, first off, you have to look at it in the

25  context.  As Ms. Thompson said, you have to look at the

1   context, which is important.  I wholeheartedly agree with her.

2          You have to look at the context of who is there.

3   It's a Palestine Committee meeting.  As you know from my

4   testimony, this was labeled through the documents as an IAP

5   Information Services meeting.  That's, at least, how the rooms

6   were reserved, which was brought up yesterday on my

7   cross-examination.

8          It wasn't listed as a Palestine Committee meeting.

9   Why?  Because that's a secret organization.  That's Hamas.

10          Who is on that list?  Marzook, Izzat Mansour, an

11   individual that Salah, in his confession --

12   Q.  Agent Miranda, let me --

13          MR. DEUTSCH:  Judge, this is --

14   BY MS. HAMILTON:

15   Q.  -- stop you there.

16   A.  Yes, ma'am.

17          MR. DEUTSCH:  Judge, this is wrong, what he's doing

18   now.  And I object to it.

19          THE COURT:  Ms. Hamilton?

20          MS. HAMILTON:  Your Honor, this all goes to the

21   purpose of the meeting and who the attendees were at the

22   meeting and how Agent Miranda knows that.

23          MR. MOFFITT:  I --

24          MS. HAMILTON:  And I can focus him on the particular

25   participants.

1            THE COURT:  I am going to strike the last portion of

2    the Agent's answer, and the jury should disregard it.

3            Ask your next question.

4    BY MS. HAMILTON:

5    Q.  Just focusing on the people who were --

6    A.  Yes, ma'am.

7    Q.  -- at the conference --

8    A.  Yes, ma'am.

9    Q.  -- what is your understanding of what their relationship

10   is to Hamas, if any?

11           MR. MOFFITT:  Objection.  Objection, relevance.

12           MS. HAMILTON:  Your Honor, there were --

13           MR. MOFFITT:  On the very grounds that we talked

14   about at the bench.

15           THE COURT:  Overruled.

16   BY THE WITNESS:

17   A.  Well, I'll start with the participants who represented the

18   Holy Land Foundation.

19           Holy Land Foundation, specially-designated terrorist

20   group --

21           MR. DEUTSCH:  Objection.

22           MS. THOMPSON:  Objection --

23           MR. SPIELFOGEL:  Objection.

24           MS. THOMPSON:  -- Judge.  There's nothing in the

25   indictment about the Holy Land Foundation.  This man is up

Miranda - redirect

1    here trying to prejudice in front of this jury.

2              MR. SPIELFOGEL:  And --

3              MS. THOMPSON:  And he's not -- this is way beyond the

4    scope.

5              MR. SPIELFOGEL:  And it wasn't in 1993.

6              THE COURT:  He has already testified to that.

7              Why do you not focus your question on the time period

8    at issue.

9    BY MS. HAMILTON:

10   Q.  Let's go to the cover sheet.

11             THE COURT:  Sustained.

12   BY THE WITNESS:

13   A.  Yes, ma'am.  Yes, ma'am.

14   BY MS. HAMILTON:

15   Q.  First list, Shukri Abu Baker.  What's your understanding

16   of what his relationship is to Hamas, just generally?

17             MR. MOFFITT:  Objection.

18             THE COURT:  In 1993?

19   BY MS. HAMILTON:

20   Q.  In 1993.

21   A.  Hamas member.

22             THE COURT:  Overruled.

23   BY MS. HAMILTON:

24   Q.  Omar --

25             MR. MOFFITT:  May I make a motion at the bench?

1           THE COURT:  You can.

2           (Proceedings had at sidebar:)

3           MR. MOFFITT:  They are focusing this issue on

4    membership and, because of that, your Honor, most

5    respectfully, I have to ask for a mistrial.  We can't get an

6    instruction on the issue of membership, of membership not

7    being by itself an issue.  You can be a member of Hamas.

8           Now what's happening is he's testifying that all

9    these people are members of Hamas, and that's being left

10   unattended in this record as if that in and of itself is some

11   act -- criminal act.  For that reason, with all due respect to

12   your Honor's rulings, I ask for a mistrial.

13          THE COURT:  Your motion is denied for the same

14   reasons that I detailed in prior rulings in this case

15   regarding the bifarious nature of the allegations in this

16   case.

17          Mere membership, you are correct, is not a crime.

18   But there is a bifarious aspect here, and that is what is

19   being presented to the jury.

20          So, your motion is denied.

21          MR. DEUTSCH:  Judge --

22          MS. THOMPSON:  If I can just say with regard to the

23   Holy Land Foundation, which seems to be the only thing he has

24   worked on, there are no allegations in the indictment about

25   the Holy Land Foundation.  There is no -- nothing that

1   suggests that that is one of the front organizations in the

2   occupied territories.

3           THE COURT:  And I sustained your prior objection

4   regarding the Holy Land Foundation when he said that they were

5   a designated terrorist organization.

6           The Holy Land Foundation was represented at the

7   Philadelphia conference, from the testimony that has come

8   through.

9           But I am not sure what you plan, if anything, on

10  asking about the Holy Land Foundation.

11          MS. HAMILTON:  I'm not going to get into specifics.

12          The point --

13          MR. DEUTSCH:  No, you're just going to get into

14  having him just say everybody at the conference is a

15  terrorist.  That's what --

16          THE COURT:  Mr. Deutsch --

17          MR. DEUTSCH:  -- you're doing.

18          THE COURT:  Mr. Deutsch, wait a minute.

19          MR. DEUTSCH:  Sorry, Judge.

20          THE COURT:  Take a deep breath.

21          MR. DEUTSCH:  Yes, ma'am.

22          THE COURT:  There is no need to start arguing with

23  counsel here.

24          MS. HAMILTON:  Judge, there were numerous questions

25  insinuating that this was a meeting about a movement that was

1   not Hamas, that was something much more general than that.  It

2   is -- I believe it's -- absolutely fair for this witness to be

3   able to explain why he believes this was a Hamas meeting and

4   why when they say "movement" and "Samah," they're talking

5   about Hamas.  Each one of these people is Hamas, by his

6   understanding; and, that's part of what informs his answer.

7           THE COURT:  And when you ask him questions about

8   "What is your understanding of who this person was in 1993 in

9   Hamas," I am assuming he is going to give an answer about what

10  their role was, not, "Oh, they were a terrorist"?

11          MS. HAMILTON:  No, he's not going to say they were a

12  terrorist.  He will talk about particular entities that they

13  were aligned with or specific things he knows about them.  I

14  don't anticipate he is going to say they're a terrorist.

15          THE COURT:  And Ms. Thompson's concern is that it is

16  all going to end up being Holy Land Foundation.

17          MS. HAMILTON:  Well, I mean, Holy Land Foundation is

18  a big part of this meeting.

19          MS. THOMPSON:  Why isn't it in the indictment?

20          MS. HAMILTON:  Holy Land Foundation was asked about

21  by Mr. Spielfogel on cross-examination.

22          I mean, I didn't elicit these things on direct

23  examination.  They were brought up on cross to make it seem

24  like this is just a meeting about people talking about

25  charity; this is just a meeting about people who were

1   concerned about Gaza and people on the inside.

2          And that's fine.  But I should have a right to get

3   into what his understanding is about this meeting.  He was

4   asked "Yes" or "No" questions.  He was cut off before he could

5   answer.  And I think I should be allowed to get into those

6   things they didn't get into on cross.

7          MR. MOFFITT:  Well, my concern is, again, you're

8   going to have him identify all these people as Hamas members.

9   The question is whether or not that has any relevance just

10  simply because it is a bifarious organization.  They can be

11  Hamas members and support the non-violent side of it.

12         THE COURT:  And that is --

13         MR. MOFFITT:  But this jury doesn't know that, Judge.

14         THE COURT:  But you are going to argue that in

15  closings, I am sure.  And I am going to instruct them on the

16  law, Mr. Moffitt.

17         MS. THOMPSON:  He wasn't identified as an expert,

18  Judge, and --

19         MR. DEUTSCH:  Yeah.  Judge, that's my problem, yeah.

20         THE COURT:  Yes, that is a different issue.

21         MS. THOMPSON:  He was not identified.

22         MS. HAMILTON:  I didn't do that on my direct.  This

23  didn't happen on my direct.

24         MS. THOMPSON:  You can't open a door --

25         MS. HAMILTON:  Excuse me, Ms. Thompson --

1              THE COURT:  Wait, counsel.

2              (Proceedings had in open court:)

3              THE COURT:  Ladies and gentlemen, we are going to

4    take about a ten-minute break.

5              (Jury out.)

6              THE WITNESS:  May I step down?

7              THE COURT:  You may.

8              (Proceedings had at sidebar:)

9              MS. HAMILTON:  I was speaking.

10             THE COURT:  Yes.

11             Now, wait, I am speaking.

12             MS. HAMILTON:  Sorry, Judge.

13             THE COURT:  Ms. Thompson has raised the issue of he

14   was not identified as an expert.  And she is taking the

15   position that some of his arguments and some of his answers

16   are of the expert type.

17             MS. HAMILTON:  Your Honor, I did not -- he was not

18   tendered as an expert.  The questions regarding opinions that

19   would even begin to go into expert opinions were elicited on

20   cross-examination first by Mr. Spielfogel with respect to the

21   Oslo Accords.  They were very detailed, lengthy questions

22   about the Oslo Accords.

23             Ms. Thompson then went into it regarding not only the

24   Oslo Accords, but also all kinds of things about the Israeli

25   military; and, then, went into his understanding about

1   specific things that happened in this meeting and, also, his

2   understanding about what was generally happening at the time

3   and general concerns.

4          Those were opinions elicited on cross.

5          Because his answers were at times, "That is, in part,

6   correct," or he would try to explain and he was cut off, or he

7   would explicitly disagree with the question that was asked, I

8   think that it is totally fair on redirect for me to go back to

9   those issues and have him illuminate the areas that were

10  specifically cut off on cross by their own questioning.

11  That's all I'm trying to do.

12         MR. DEUTSCH:  Wait a minute.

13         THE COURT:  Mr. Ferguson --

14         Wait, I want --

15         MR. DEUTSCH:  Okay.

16         THE COURT:  Mr. Ferguson, you were going to say

17  something?

18         MR. FERGUSON:  No, Judge.

19         THE COURT:  Okay.

20         MR. DEUTSCH:  First of all, she's got an obligation.

21  If somebody asks a question on cross that she thinks is

22  objectionable, she's supposed to stand up and say, "Objection.

23  It calls for opinion, that the witness is not being offered

24  for that."  She didn't do it.  She lets it in and now she

25  wants to go back and have this witness testify as an expert

1    and identify everybody who is in the conference.

2           And the reality is, the witness is basically somebody

3    who wasn't in the FBI in '93, wasn't involved in this

4    conference.  He simply read this transcript -- this

5    translation -- two or three times and that's what he's offered

6    for.

7           If the cross-examination went too far, object and,

8    then, the Court would rule on it.  Now she can't just --

9           MS. THOMPSON:  And, in addition to that, had he been

10   identified as an expert, people might have phrased their

11   questions in different ways.  But he said that he was not in

12   the FBI, he read them a couple of times.  So, we asked

13   questions.  And it's like a setup to then turn around and

14   suddenly he's the big expert on all this material and bring it

15   up on redirect.

16          THE COURT:  Briefly respond.  Go ahead.

17          MS. HAMILTON:  I'm just not sure how -- if the

18   defense is asking for his understanding of things, how -- it

19   is remotely objectionable for me to get back up and,

20   basically, be asking the exact same question on redirect.  If

21   the questions were not artfully worded on cross, that is not

22   my fault.

23          MR. DEUTSCH:  You object.  That's what you do.

24          MR. SCHAR:  No.

25          THE COURT:  But you do not have to.

1           MS. THOMPSON:  The basis of all the questions --

2           MR. DEUTSCH:  Judge --

3           MS. THOMPSON:  -- is the documents themselves, which

4   are in front of him.

5           MS. HAMILTON:  That was not clear.

6           THE COURT:  To the extent doors were opened on cross,

7   it is fair game to redirect them.

8           In answering your -- in asking your questions,

9   Ms. Hamilton, it would be helpful to refer to what was said on

10  cross --

11          MR. DEUTSCH:  Yes.

12          MS. HAMILTON:  Yes, your Honor.

13          THE COURT:  -- to make it clear that that is what you

14  are doing:  Redirecting on issues that came up during cross,

15  not opening up a whole --

16          MR. DEUTSCH:  Yes.

17          THE COURT:  -- new box of opinions.

18          So, in focusing your questions -- we will take a

19  break -- coming back and asking your questions, focus on them

20  that way.

21          MR. MOFFITT:  May I have a continuing line on the

22  membership issue, your Honor?

23          THE COURT:  Absolutely.  And my continuing ruling

24  will stand.

25          MR. MOFFITT:  I understand.

1          MR. DEUTSCH:  And, Judge, just so we can follow up,

2     there was no question asked on cross as, "Who was this

3     person -- "

4          THE COURT:  That is correct.  So --

5          MR. DEUTSCH:  " -- who is this person, who is this

6     person?"  So --

7          MS. THOMPSON:  No.

8          MR. DEUTSCH:  -- for her to go into that is improper.

9          MS. HAMILTON:  There were questions, as I said

10    before, about the fact that this -- the movement was not

11    Hamas; that they were not talking about Hamas; they were

12    talking about a more general movement of --

13         MR. DEUTSCH:  That's what he said.

14         MS. THOMPSON:  That's what he said.

15         THE COURT:  Wait, wait, wait.

16         MS. HAMILTON:  -- of Islamic people generally.  No,

17    that was the question posed on cross.  I think it's fair for

18    me to get back up and say there was a question about whether

19    or not the movement was Hamas or something more generally:

20    "What is your understanding of why 'movement' equals 'Hamas'?"

21         MR. MOFFITT:  There was no question about whether

22    "the movement" referred to Hamas.

23         MR. DEUTSCH:  His answer --

24         MS. HAMILTON:  Right.  The question was that the

25    movement was as to Islamic Palestinian people.

1          THE COURT:  That was the question.

2          MR. FERGUSON:  Right.

3          THE COURT:  Okay.

4          You have my direction.  On redirect, focus it based

5   on answers given on cross.

6          MR. DEUTSCH:  Thank you, Judge.

7          (Brief recess.)

8          THE COURT:  Bring in the jury, please.

9          (Jury in.)

10         THE COURT:  You may be seated.

11         Ms. Hamilton, you may continue.

12         MS. HAMILTON:  Thank you, your Honor.

13  BY MS. HAMILTON:

14  Q.  Agent Miranda, on cross-examination, you were asked

15  questions about the term "movement"?

16  A.  Yes, ma'am.

17  Q.  And you were asked a question that does "the movement"

18  really mean Palestinian people generally; is that correct?

19  Something like that?

20  A.  Yes, ma'am.

21  Q.  And I believe your answer was "No"?

22  A.  That's correct, ma'am.

23  Q.  Do you have an understanding as to what the word

24  "movement" means as used in the Philadelphia conference?

25  A.  Yes, I do, ma'am.

1  Q.  What is it?

2          MR. DEUTSCH:  Can we get a foundation about when his

3  understanding was created?

4          THE COURT:  Sustained on foundation.

5  BY MS. HAMILTON:

6  Q.  When did you come to an understanding as to what the term

7  "movement" means?

8  A.  As soon as I read this transcript.

9  Q.  And is your understanding based on what was specifically

10  said at the Philadelphia conference?

11  A.  Yes, it is, ma'am.

12  Q.  And is your understanding based upon who the participants

13  of the Philadelphia conference were?

14  A.  It's partially it, yes.

15  Q.  And what is your understanding of what "movement" means as

16  stated in the Philadelphia conference?

17  A.  Hamas.

18  Q.  Among the individuals present at the Philadelphia

19  conference is an individual you were asked about yesterday on

20  cross, Nihad Awad; is that right?

21  A.  Yes, ma'am.

22  Q.  And you were asked specific questions about particular

23  organizations that Nihad Awad is associated with; is that

24  correct?

25  A.  Yes, ma'am.

Miranda - redirect

1    Q.  What else do you know about Nihad Awad other than what you

2    were asked on cross-examination?

3    A.  He is associated with an organization called CAIR.

4    Q.  And, generally, what is your understanding of that

5    organization?

6    A.  CAIR was established under the Palestine Committee during

7    the tenure of Omar Ahmad as the leader of the Palestine

8    Committee.

9    Q.  You were asked about the documents -- the first document

10   -- behind Tab 5, which is a summary of an FBI meeting,

11   correct?

12   A.  Yes, ma'am.

13   Q.  And just so it's clear, is this summary an FBI summary?

14   A.  No, not at all.

15   Q.  Do you know who wrote this summary?

16   A.  I have no idea.

17   Q.  Do you know if the summary is accurate?

18   A.  I have no idea.

19   Q.  You were asked about the fact the meeting was between the

20   FBI and the ADC, correct?

21   A.  That's how the question was posed.

22   Q.  You were not asked about the fact that the IAP was also at

23   that meeting --

24   A.  You are --

25   Q.  -- is that right?

Miranda - redirect

275

 1   A.   You are correct, ma'am.

 2   Q.   You were asked what you know about the ADC?

 3   A.   That's correct, ma'am.

 4   Q.   What do you know about the AIP?

 5   A.   About the IAP, ma'am?

 6   Q.   Sorry.

 7   A.   The IAP was established with the assistance and the funds

 8   of Mousa Abu Marzook, the number two man in Hamas.

 9   Q.   And was the IAP represented by anyone at the Philadelphia

10   conference?

11   A.   Yes, it was.

12   Q.   Who represented the IAP at the Philadelphia conference?

13   A.   Ghassan Saleh was one of the representatives.  I believe

14   Omar Ahmad was also one of the representatives.  And I'd have

15   to refresh my memory with the -- some of the other documents.

16   Q.   You were asked questions about the purpose of the ADC?

17   A.   Yes, ma'am.

18   Q.   What is your understanding of the purpose of the IAP?

19   A.   The purpose of the IAP is to be the mouthpiece of Hamas.

20   Q.   You were asked questions about someone at the conference

21   speaking about Muhammad Salah, correct?

22   A.   Yes, ma'am.

23   Q.   According to the translations, who was the someone at the

24   conference talking about Muhammad Salah 's arrest?

25   A.   It was Ashqar.

1    Q.  And you were asked about your understanding of what was

2    said at the meeting and what is in the document behind Tab 24

3    with respect to Muhammad Salah's arrest; is that right?

4    A.  Yes, ma'am.

5    Q.  What is your understanding of the message of that document

6    and that section of the Philadelphia conference?

7    A.  That's the one urging caution and security, I believe, was

8    the term.  But it's my understanding that they are saying just

9    because you're a U.S. passport holder, doesn't prevent you

10   from getting arrested while conducting activities on behalf of

11   Hamas.

12   Q.  You were asked questions about the fact that people came

13   to this conference and they gave their real names, and they

14   checked in under their names, and they flew their under their

15   real names, correct?

16   A.  Yes, ma'am.

17   Q.  Did the planners of this meeting decide that there was

18   someone who was not allowed to come to the meeting and sign in

19   under their real name?

20   A.  I don't recall that.

21   Q.  I direct your attention to the phone call that was gone

22   through in some detail behind Tab 6.  Do you have that up

23   there?

24           THE COURT:  Would you like the jury to turn to Tab 6?

25           MS. HAMILTON:  Yes.

 1              THE COURT:  Okay.

 2              Ladies and gentlemen, please turn in the

 3    Philadelphia --

 4              MS. THOMPSON:  Judge, I just object.  Is she trying

 5    to refresh his recollection or just have him read it?  He said

 6    he doesn't remember and these aren't documents he had anything

 7    to do with.

 8              MS. HAMILTON:  He's already testified about this call

 9    in detail on cross-examination.

10              MR. DEUTSCH:  That's not the question.

11              THE COURT:  Are you --

12              MS. HAMILTON:  I'm --

13              THE COURT:  What are you seeking to do with it?

14              MS. HAMILTON:  Refresh his recollection with the

15    phone call he already testified he looked at it in detail.

16              THE COURT:  Ask your question.

17    BY THE WITNESS:

18    A.  Ma'am, I --

19              THE COURT:  Tab 6, ladies and gentlemen.

20    BY THE WITNESS:

21    A.  I'm sorry, I don't think I have that.

22              THE COURT:  Philadelphia Conference Transcripts?

23              THE WITNESS:  Philadelphia Conference, I'm sorry.

24    BY THE WITNESS:

25    A.  Yes, I have it.

 1  BY MS. HAMILTON:

 2  Q.  And I direct your attention to Page 6, Line 8.

 3          THE COURT:  Page 6 of Tab 6 --

 4          MS. HAMILTON:  Of the phone calls.

 5          THE COURT:  Of the phone calls.

 6          There is a little confusion.  One moment.

 7          The Philadelphia Conference Transcripts --

 8          MS. HAMILTON:  No.  Your Honor, I'm sorry, it's --

 9          THE COURT:  It is my fault.

10          MS. HAMILTON:  -- Ashqar Phone Calls Tab 6.

11          THE COURT:  Sorry.  I caused the confusion.

12  BY THE WITNESS:

13  A.  Ma'am, I don't have that document.

14          MR. FERGUSON:  Permission to approach, Judge?

15          THE COURT:  You may approach the witness.

16          (Document tendered.)

17          THE WITNESS:  Thank you.

18  BY MS. HAMILTON:

19  Q.  Tab 6, Page 6, Line 8, there's a reference to Mohammad

20  Hilmi?

21  A.  Right.

22  Q.  And what is your understanding of who Mohammad Hilmi is?

23          MR. SPIELFOGEL:  Your Honor, I'd ask for a --

24  BY THE WITNESS:

25  A.  I --

1          MR. SPIELFOGEL:  -- sidebar on this.  Very brief.

2          THE COURT:  Okay.

3          (Proceedings had at sidebar:)

4          MR. SPIELFOGEL:  My understanding of this portion of

5     that phone call -- and I don't have it right in front of me

6     now --

7          MR. DEUTSCH:  Here it is.

8          MR. SPIELFOGEL:  The question that was asked by the

9     prosecutor was whether he had to use a different name and,

10    then, he could come to the meeting under a different name.

11    That's not at all what happens in that phone conversation.

12         MS. HAMILTON:  That wasn't my question.

13         THE COURT:  That is not what she just asked.  She

14    asked who he was.

15         MR. SPIELFOGEL:  No, but before that she said -- the

16    lead-in, she said -- there was discussion as to whether people

17    had to attend under a different name.

18         MS. HAMILTON:  I said "people who were not allowed to

19    attend."

20         MR. SPIELFOGEL:  No, that -- and she said "under a

21    different name."  There's nothing --

22         MS. HAMILTON:  They were not allowed to --

23         THE COURT:  Wait, wait, wait.

24         MS. HAMILTON:  -- attend and sign in under a

25    different name.

1              MR. SPIELFOGEL:  And the point is that there's

2    nothing in this phone conversation that talks about that he

3    can't sign in under that name.

4              MS. HAMILTON:  I can rephrase it, if it's unclear.  I

5    don't want to be confusing.

6              THE COURT:  Okay.

7              MS. HAMILTON:  Because that wasn't what I meant to

8    ask at all.

9              THE COURT:  That is not how I took it, but I am not

10   sure what the link to the phone call is.

11             MS. HAMILTON:  I'll rephrase it --

12             THE COURT:  Okay.

13             MS. HAMILTON:  -- if it's confusing.

14             (Proceedings had in open court:)

15   BY MS. HAMILTON:

16   Q.  Let me back up.

17             On cross-examination, you were asked questions about

18   this phone call and the fact that it was decided that this

19   would be an open meeting where anyone off the street could

20   come in, correct?

21   A.  Yes, ma'am.

22   Q.  And you were also asked questions about people coming and

23   signing in under their true names, correct?

24   A.  Yes, ma'am.

25   Q.  Based upon your review of this phone call, is there anyone

1  who the participants on this call decided was not allowed to

2  come to the meeting?

3  A.  Yes, ma'am.

4  Q.  Who?

5  A.  Mohammad Hilmi.

6  Q.  And based upon what is said in this phone call, what is

7  your understanding as to why he was not allowed to come?

8  A.  He might have --

9        MR. MOFFITT:  Objection.

10       MR. SPIELFOGEL:  Objection.

11       MR. MOFFITT:  That's an opinion.

12       THE COURT:  Sustained.

13       And you are going beyond -- you are now referring

14 to -- sustained.

15 BY MS. HAMILTON:

16 Q.  Agent, I direct your attention to Page 37 --

17       THE COURT:  Same call?

18       MS. HAMILTON:  Same call.

19 BY MS. HAMILTON:

20 Q.  -- Lines 2 through 10.  And I'd ask you to publish that,

21 please, read it.

22 A.  Yes, ma'am.

23       Baker says:  "I am still cautious, my brother.  I

24 mean, let some distance between us and especially in a

25 situation like this where all the brothers are here.  I am not

Miranda - redirect

282

1    against you working with him between you and him.  However, I

2    suspect his presence.  From our point of view, we'll be -- but

3    I still have feelings that those people remain under

4    surveillance for a period of time and I don't know how his

5    presence will serve the purpose exactly.  I mean, I remain

6    wary.  But, of course, it's up to you.  I didn't want to hang

7    up the phone and say to myself 'Why?'"

8    Q.  And you were asked questions on cross-examination by

9    Mr. Spielfogel about the fact that there's nothing unusual

10   about having a phone call setting up a conference, right?

11   A.  That's correct.

12   Q.  And there were a number of questions you were asked,

13   "There's nothing unusual about other aspects of this phone

14   call, deciding topics and things of that nature"; is that

15   right?

16   A.  Yes, ma'am.

17   Q.  Is there anything unusual about planning a conference

18   that's supposed to be open but not allowing someone to come

19   because you believe they may remain under surveillance?

20            MR. SPIELFOGEL:  Objection, your Honor.

21            THE COURT:  To form, sustained.

22   BY MS. HAMILTON:

23   Q.  Is there anything unusual about not allowing someone under

24   surveillance to attend an open conference?

25            MR. SPIELFOGEL:  Objection.  There's nothing in there

1    that he's under surveillance.

2           MS. HAMILTON:  I'm reading directly from Line 6 and

3    7, "under surveillance."

4           THE COURT:  Overruled.

5           You may answer that.

6    BY THE WITNESS:

7    A.  I think that is -- for most people, I think that would be

8    unusual.  If you're talking about terrorist individuals being

9    concerned about who --

10          MR. MOFFITT:  Objection.

11          THE COURT:  Objection sustained.

12          And the jury should disregard the last part.

13          If you are asking him about what is unusual, that is

14   the answer he has been responding.  He was about to answer

15   about what -- beyond that.

16   BY MS. HAMILTON:

17   Q.  Based upon what's said in this transcript, as was

18   highlighted on cross-examination, there's a section about it

19   being an open meeting, correct?

20   A.  Yes, ma'am.

21   Q.  And we just went back to a section where they're talking

22   about not letting someone come because he is under

23   surveillance, correct?

24   A.  Yes, ma'am.

25   Q.  Is there anything unusual about that?

Miranda - redirect

284

1   A.   I think that's unusual.

2   Q.   You were asked questions on cross-examination about why,

3   as a federal agent investigating these matters, you don't go

4   into the West Bank and Gaza to check out the conditions,

5   right?

6   A.   Yes, ma'am.

7   Q.   Why don't you?

8   A.   I want to stay alive.

9   Q.   You were asked about the participants of the Philadelphia

10  conference being concerned about the effect of the Oslo

11  Accords, correct?

12  A.   Yes, ma'am.

13  Q.   And there is one section -- a couple sections -- of the

14  transcript where Muin Shabib, defendant Ashqar and others talk

15  about their concern about the Islamic University being shut

16  down --

17  A.   That's correct.

18  Q.   -- correct?

19        What is your understanding about why the individuals

20  at this conference were concerned about the Islamic University

21  being shut down?

22        MR. MOFFITT:   Objection.

23        THE COURT:   Overruled.

24  BY THE WITNESS:

25  A.   The Islamic University of Gaza is recognized as a Hamas

1  stronghold.

2  BY MS. HAMILTON:

3  Q.  You were asked questions about the fact that participants

4  at the meeting specifically said there was to be no direct

5  confrontation in America, correct?

6  A.  Yes, ma'am.

7  Q.  Based upon what was said at the meeting, what is your

8  understanding as to why?

9          MR. MOFFITT:  Objection.  There's not one word in the

10  meeting about why.  This is an opinion that's being offered --

11  his opinion is being offered -- here, again.

12          MS. HAMILTON:  He was asked about his opinion, but I

13  can direct him to a specific portion of the transcript.

14          THE COURT:  Okay.  Why do you not do that.

15          MS. HAMILTON:  I just need a moment, your Honor.

16          (Brief pause.)

17          THE COURT:  Do you have a particular tab you would

18  like the jurors to turn to?

19          MS. HAMILTON:  Yes.  In the Philadelphia conference,

20  Tab 23, Page 6.

21          MR. DEUTSCH:  I'm sorry, what was it?

22          THE COURT:  Tab 23, Page 6 in the Philadelphia

23  Conference binder.

24  BY MS. HAMILTON:

25  Q.  Agent -- and we went through this on direct examination,

 1   correct?

 2   A.  Yes, ma'am.

 3   Q.  I direct your attention to Lines 4 through 7.

 4   A.  Yes, ma'am.

 5   Q.  And just flipping back, who is speaking?

 6   A.  Shukri Abu Baker.

 7   Q.  And at Line 4, he says, "When we say 'avoiding any kind of

 8   direct confrontation on the U.S. front,' this is our

 9   understanding of the ramifications of the situation.  When we

10   had a discussion, we understood that if we escalate the

11   situation on the U.S. front, there will be big problems which

12   are not in our favor."

13          What is your understanding of what Shukri Abu Baker

14   was saying about why there was to be no escalation on the U.S.

15   front?

16          MR. MOFFITT:  I object to his understanding about

17   what --

18          THE COURT:  Sustained.

19          (Brief pause.)

20          MS. HAMILTON:  One moment, your Honor.

21          THE COURT:  Okay.

22          (Brief pause.)

23   BY MS. HAMILTON:

24   Q.  You were asked questions on cross-examination about your

25   understanding that there was nothing in the Philadelphia

1   conference about planning military activity in the United

2   States?

3   A.  Yes, ma'am.

4   Q.  And your answer was that there was not any discussion

5   about planning military activity in the United States?

6   A.  Yes, ma'am.

7   Q.  Do you have an understanding based upon this section and

8   others as to why?

9   A.  Any escalation of activities --

10         MR. MOFFITT:  Objection.

11         MS. THOMPSON:  Objection, Judge.

12         MR. MOFFITT:  It's the same question rephrased as the

13   one that was sustained just a minute ago.

14         MS. HAMILTON:  It is not.  I tied it directly back to

15   a question asked on cross-examination.

16         MR. MOFFITT:  Excuse me.  The question, I believe,

17   that was asked on cross-examination is, "Did you examine the

18   transcript and did you find anything in there that talked

19   about violence or anything?"

20         Now she's asking the question why.  And that's his

21   opinion.

22         THE COURT:  Ms. Hamilton?

23         MS. HAMILTON:  The question was not that specific.

24         MS. THOMPSON:  Judge, I asked the question and it was

25   very specific.  I picked up the binder.  I showed him the

1  binder.  I said, "Is there any evidence in here of any mention

2  of it?"  I used the word "mention."  I used the binder.  I

3  showed it to him.  It was no broader than that and

4  Ms. Hamilton knows it.

5          MS. HAMILTON:  I don't believe that's correct.  I

6  think that it was his understanding of whether there was any

7  discussion about it.

8          THE COURT:  Objection sustained.

9          (Brief pause.)

10          MS. HAMILTON:  Your Honor, just a moment.  I'm sorry.

11          (Brief pause.)

12          THE COURT:  Anything further?

13          MS. HAMILTON:  Just one question.

14  BY MS. HAMILTON:

15  Q.  Based upon your review of this section and others like it,

16  was there discussion at the Philadelphia conference about

17  military action in the United States?

18          MS. THOMPSON:  Objection as to form, Judge.  "And

19  others like it"?  There was specific questions.  This is the

20  same question.  She's trying to reword it by simply putting in

21  some vague notion about others like it and it's the same

22  question, again.

23          THE COURT:  Overruled.  The question is focused on

24  the transcripts.

25  BY THE WITNESS:

Miranda - redirect

1    A.  Can you repeat the question, again, ma'am?

2              MS. HAMILTON:  Your Honor, could you read it, please?

3              THE COURT:  Sure.

4              (Whereupon, the record was read by the Court.)

5    BY THE WITNESS:

6    A.  I do not recall that.

7    BY MS. HAMILTON:

8    Q.  This particular section was --

9              MR. MOFFITT:  Objection.

10             MR. DEUTSCH:  Judge --

11             MS. THOMPSON:  Objection.

12             MR. DEUTSCH:  -- now because he can't recall --

13             MS. HAMILTON:  He said he can't recall.

14             MR. DEUTSCH:  -- and she doesn't like that answer.

15             THE COURT:  He said he cannot recall.  If you need to

16   point him to a specific provision in there or a specific line,

17   you may do so.

18   BY MS. HAMILTON:

19   Q.  Focusing on the line that was published -- I'm sorry,

20   Agent -- Tab 23, Page 6, Lines 4 through 7.

21   A.  It does not specifically say military.  It does mention

22   escalating the situation and ramifications of that and there

23   being big problems as a result.

24   Q.  And what do you take that to mean?

25             MR. MOFFITT:  Objection.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 110 of 121
Miranda - recross by Spielfogel
290

1          THE COURT:  Sustained.

2          MS. HAMILTON:  No further questions.

3          THE COURT:  Mr. Spielfogel.

4                     RECROSS EXAMINATION

5  BY MR. SPIELFOGEL:

6  Q.  Agent, did you just tell us that the Islamic University is

7  a university that's a strong front for Hamas?  Is that

8  correct?

9  A.  I called it a stronghold of Hamas.

10 Q.  Stronghold of Hamas; is that correct?

11 A.  Yes, sir.

12 Q.  There to benefit the people of Hamas; is that correct?  Is

13 that your understanding?

14 A.  Can you rephrase the "benefit" asked?

15 Q.  Well, let me ask you this:  The Islamic University, do you

16 know what kind of courses they teach over at that university?

17 A.  Haven't been there, sir.

18 Q.  Okay.

19         Do you know if they teach courses in business and in

20 education?

21 A.  Don't know.

22 Q.  Do you know if they teach courses in sciences, pharmacy

23 and agriculture?

24 A.  Don't know.

25 Q.  Do you know if they teach nursing, engineering, medicine

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 111 of 121
Miranda - recross by Spielfogel
291

1   and computer sciences?

2   A.   Don't know.

3   Q.   Do you think that those things would only be for the

4   benefit of people who are associated with Hamas?

5   A.   That's not what I said.

6   Q.   You told us -- I'm trying to understand this.

7          Are you saying that you can't have a meeting in this

8   country where you don't speak about violence and you speak

9   about ideas if you are labeled part of a movement?  That's --

10  you're not supposed to do that in this country?

11  A.   I think your question is pretty general.  And I think I'd

12  have to look at the circumstances of meetings that you're

13  talking about.

14  Q.   I'm talking about a movement, part of the movement that

15  we're talking about that we're on trial here today.

16         Are you trying to tell us that you cannot have a

17  meeting of those people -- when you don't discuss violence and

18  you discuss the things that are in those transcripts -- that

19  you can't do that in this country?

20  A.   I can tell you that if you want to go ahead and discuss

21  supporting a -- terrorist groups, you might have to eat those

22  words later on.

23  Q.   You can't -- can't I have a meeting in this country -- the

24  Ku Klux Klan can have a meeting, can't they?

25  A.   And I hope to God we're listening to them.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 112 of 121
Miranda - recross by Spielfogel
292

1  Q.  And they can go and they can have demonstrations; is that

2  right?

3  A.  And I hope they're surveilling them.

4  Q.  And so can the -- and you can surveil them all you want;

5  isn't that true?

6  A.  If I'm legally entitled to, yes.

7  Q.  But the fact of the matter is that in this country, they

8  can have their meeting and they can present their ideas; isn't

9  that true?

10  A.  And their ideas may be evidence later on, sir.

11  Q.  And they should be convicted for their ideas?

12  A.  I don't think anybody's been convicted on an idea.

13  Q.  Aren't there countries where you can't even have the idea

14  and express it in the public?

15  A.  Are we still talking about the U.S. or other countries

16  now, sir?

17  Q.  I said other countries.  Countries --

18  A.  Sure, there's other countries.

19  Q.  But in this country, you can?

20  A.  You can, but the ramifications are that it may be

21  evidence.

22  Q.  But you're not going to be convicted of a crime just for

23  expressing ideas.  That's what this country is all about;

24  isn't it, Agent?

25  A.  You would never be convicted on your word alone.  But

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 113 of 121
Miranda - recross by Spielfogel
293

1  those words may represent what the people think --

2  Q.  And --

3  A.  -- and shine light onto their actions and on who they

4  really are.

5  Q.  And as you've told us here today, there was no discussion

6  about violence in that Philly meeting.  There was a discussion

7  on ideas; isn't that correct?

8  A.  Ideas on supporting Hamas, a terrorist organization.

9  Q.  And if you support -- by the way, it wasn't a terrorist

10  organization -- it wasn't designated that -- at the time of

11  that meeting.  We've established that, haven't we?

12  A.  It was a terrorist organization.  Designation was not a

13  function of the U.S. government until 1995.  But -- --

14  Q.  Let me ask you --

15  A.  -- it was a terrorist organization, sir.

16  Q.  Let me ask you this:  This meeting happened in '93; is

17  that correct?

18  A.  Yes, sir.

19  Q.  Okay.

20        And in '93, the FBI -- obviously, they had this whole

21  thing bugged; is that right?

22  A.  They had it surveilled and -- yes, sir.

23  Q.  And this is a meeting of an organization that you're

24  telling us is a terrorist organization; is that right?

25  A.  Yes, sir.

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 114 of 121
Miranda - recross by Spielfogel
294

1  Q.  And we already at this time had -- Dr. Ashqar's phones had

2  been wired; isn't that correct?

3  A.  Yes, sir.

4  Q.  In 1994, did they indict Dr. Ashqar?

5  A.  No, they sure didn't.

6  Q.  In '95 and in '96, did they indict Dr. Ashqar?

7  A.  No.

8  Q.  It's 13 years later that we've brought him into this

9  courtroom; isn't that correct?

10           MS. HAMILTON:  Objection.

11           THE COURT:  Overruled.

12           He can answer.

13  BY THE WITNESS:

14  A.  Yes, sir.

15  BY MR. SPIELFOGEL:

16  Q.  And he didn't say one word at that meeting about the use

17  of violence; isn't that correct?  Isn't that correct, Agent?

18  A.  I'm trying to figure out whether he was involved in

19  talking about the military against the Israelis.  That's all

20  --

21  Q.  Well --

22  A.  -- I'm trying to decide.

23  Q.  -- think about that.

24           Did Dr. Ashqar ever, during the course of that

25  conversation, advocate the use of violence?

Case 1:03-cr-00978  Document 1075  Filed 01/05/09  Page 115 of 121
Miranda - recross by Thompson
295

1   A.  I don't think -- certainly not directly.

2           MR. SPIELFOGEL:  I have nothing else, Judge.

3           THE COURT:  Ms. Thompson?

4           MS. THOMPSON:  Thank you, Judge.  Just a few

5   questions.

6                       RECROSS EXAMINATION

7   BY MS. THOMPSON:

8   Q.  Agent Miranda, CAIR is an acronysm (sic), isn't it?

9   A.  I'm sorry?

10  Q.  CAIR is an acronysm (sic)?

11  A.  Acronym?

12  Q.  Yes.  Sorry.  Acronym.

13  A.  Yes, ma'am.

14  Q.  And it stands for the Council on American Islamic

15  Relations; isn't that right?

16  A.  I think it's Council on Arab Islamic Relations.

17  Q.  And, in fact, they have a national office, right?

18  A.  Yes, they do.

19  Q.  A national office.

20          They have an office in Chicago; isn't that right?

21  A.  Yes, they do.

22  Q.  And they have 30 offices across the United States; isn't

23  that true?

24  A.  Yes, they do.

25  Q.  And on that document that Ms. Hamilton pointed to you, you

1    don't have any basis to dispute the accuracy of what's

2    contained in that document because, as you told this jury on

3    cross-examination, you never sought out the FBI version of

4    that meeting, did you?

5    A.   That's not correct.  You just misspoke.  I didn't -- I

6    said I personally didn't.  You --

7    Q.   My question was:  Did you --

8    A.   Ma'am, can I --

9    Q.   -- seek it out?

10   A.   -- finish my answer?

11           Can I finish?

12   Q.   You can answer my question, sir.

13           Did you seek out the FBI version of that document?

14   You, sir.

15   A.   And my answer was other agents did.

16   Q.   You did not, though?

17   A.   Other agents did.

18   Q.   My question is:  Did you, sir?

19   A.   And I answered earlier I didn't, ma'am.  I said --

20   Q.   Thank you.

21   A.   -- other agents did.

22   Q.   Now, you were not part of the FBI in 1993; is that right?

23   A.   Correct, ma'am.

24   Q.   And do you know who Robert Wright is -- Special Agent

25   Robert Wright -- with the FBI?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 117 of 121
Miranda - recross by Thompson
297

1    A.  Yeah, I sure do.

2    Q.  Okay.

3         And, in fact, he at that time in those early years

4    was the Hamas expert, wasn't he?

5         MS. HAMILTON:  Objection.  Relevance, beyond the

6    scope.  The question --

7         THE COURT:  Overruled.

8         You can answer that.

9    BY THE WITNESS:

10   A.  No, I would disagree with you on that.

11   BY MS. THOMPSON:

12   Q.  He was, in fact, investigating Hamas for the FBI in the

13   early years; was he not?

14   A.  He was one of many agents investigating Hamas.

15   Q.  And, in fact, he was headquartered here in Chicago, wasn't

16   he?

17   A.  That's my understanding, yes.

18   Q.  And, in fact, he was fired twice because the FBI said that

19   he was a nut; isn't that right?

20   A.  I don't understand the -- why he was --

21   Q.  I don't --

22   A.  -- dismissed.

23   Q.  You don't understand why he was dismissed?

24        Did you ever hear that Robert Wright was a nut in the

25   investigation and the intelligence on Hamas that he created?

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 118 of 121
Miranda - recross by Thompson
298

1          MS. HAMILTON:  Objection.

2          THE COURT:  Sustained.

3    BY MS. THOMPSON:

4    Q.  Well, you know he was fired twice, right?

5    A.  No, actually, I don't know that he was fired twice.  I --

6    Q.  Well, you know he was only hired back by the President of

7    the United States today, George Bush, Jr., right?

8    A.  No, I didn't know that, either.

9    Q.  Well, it's your opinion, in fact, that the Philadelphia

10   conference was just all about terrorism, isn't it?

11   A.  Sure is.

12   Q.  But, in fact, none of the participants of the Philadelphia

13   conference, which are listed at the front of that binder, were

14   indicted in 1993, were they?

15   A.  In '93, no.  Not in 1993.

16   Q.  Were any of them indicted in 1994?

17   A.  Not in 1994.

18   Q.  '95?

19         THE COURT:  Ms. Thompson, let him finish his answer,

20   please.

21   BY THE WITNESS:

22   A.  Not in 1995.

23   BY MS. THOMPSON:

24   Q.  '96?

25   A.  Nope.

Case 1:03-cr-00978  Document 1075   Filed 01/05/09  Page 119 of 121
                      Miranda - recross by Thompson
                                                                299

1   Q.  13 years later, none of these people have been indicted

2   and yet you look at it and you say it's all about terrorism;

3   is that right?

4   A.  Actually, it wasn't 13 years.  Ghassan Elashi, Haitham

5   Maghawri, Shukri Abu Baker were indicted in 2002.  In --

6   Q.  And, in fact, that's been --

7   A.  I'm not done with my answer, ma'am.

8   Q.  Let me stop you.

9        MS. HAMILTON:  Your Honor --

10  BY THE WITNESS:

11  A.  I'm not entitled to finish my answer?

12  BY MS. THOMPSON:

13  Q.  You may finish your answer.

14  A.  So, let's see.  Ghassan Elashi was indicted in 2002 in a

15  case that I was --

16  Q.  I don't need to know the case.  I asked you what year.

17  A.  Oh, okay.  2002.

18        Shukri Baker, Haitham Maghawri, Ghassan Elashi -- let

19  me look at the list -- were indicted in 19 -- or, I'm sorry,

20  2004.

21  Q.  Is it --

22  A.  And -- wait, I'm not done yet.

23        Let's see.  Abdel Jabbar Hamdan was ordered deported,

24  I think it was, this year.

25  Q.  And isn't it a fact that there was no action taken by any

Case 1:03-cr-00978   Document 1075   Filed 01/05/09   Page 120 of 121
Miranda - recross by Thompson
300

1    prior administration until right before the last contested

2    Presidential election?

3    A.  No, that's not entirely correct, either.

4    Q.  Now, let me ask you, is it your opinion that Israel is a

5    terrorist state?

6    A.  No, they're not on the state sponsors of terrorism.

7    Q.  And, in fact, CAIR isn't on the state-sponsored terrorism

8    list, either?

9    A.  A state sponsor only applies to a state, ma'am.  CAIR is

10   an organization.

11   Q.  CAIR --

12   A.  It's not a state.

13   Q.  But CAIR isn't listed as a terrorist organization, is it?

14   A.  Are you asking -- are you asking -- me now is it a state

15   sponsor or a specially-designated --

16   Q.  I'm asking you --

17   A.  -- terrorist group?

18   Q.  -- whether it's a specially-designated terrorist

19   organization.

20   A.  Thank you.

21          No, it's not.

22   Q.  And, in fact, just a moment ago you told Ms. Hamilton that

23   the reason you don't go to Gaza to study the situation there

24   is you want to stay alive, right?

25   A.  That's right.

1  Q.   Is that because you're scared of being run over by an

2  Israeli bulldozer like Rachel Corey was?

3  A.   The -- there were --

4  Q.   Answer the question.  It's a "Yes" or "No" question,

5  Agent.

6  A.   I'm answering your question, ma'am.

7  Q.   Is it because you're scared of being run over by an

8  Israeli bulldozer like Rachel Corey; "Yes" or "No"?

9  A.   I'm afraid of being blown up like the American diplomats

10  were.

11          MS. THOMPSON:  No further questions of this witness.

12          THE COURT:  Thank you, Agent.  You may step down.

13          THE WITNESS:  Thank you.

14          (Witness excused.)

15                      *    *    *    *    *

16

17  I certify that the foregoing is a correct excerpt from the
    record of proceedings in the above-entitled matter.

18

19

    _____    _____, 2006
20  Official Court Reporter

21

22

23

24

25